**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § | (Emergency Hearing Requested) |

**DECLARATION OF TYLER S. FARQUHARSON,**
**CHIEF FINANCIAL OFFICER AND TREASURER OF EXCO RESOURCES, INC.,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Tyler S. Farquharson, hereby declare under penalty of perjury:

1.     I am the Chief Financial Officer and Treasurer of EXCO Resources, Inc. ("EXCO"), a corporation organized under the laws of Texas and one of the above-captioned debtors and debtors in possession (the "Debtors").  I have been employed by EXCO as the Chief Financial Officer and Treasurer since February 2017 and I was the acting Chief Financial Officer and Treasurer since October 2016.  Previously, I was the Vice President of Strategic Planning of EXCO and served in various other roles at EXCO since 2005.

2.     On the date hereof (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holding (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is: 12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtors, and best serves the Debtors' estates and creditors' interests.

3.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' employees and operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and their advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.      This declaration has been organized into four sections.  The ***first*** provides background information on the Debtors' businesses and operations.[2]  The ***second*** offers detailed information on the Debtors' capital structure.  The ***third*** describes the events leading to the filing of these chapter 11 cases and the Debtors' prepetition restructuring efforts.  The ***fourth*** section

---

[2]     Many of the financial figures presented in this declaration are unaudited and potentially subject to change but reflect the Debtors' most recent review of their businesses.  The Debtors reserve all rights to revise and supplement the figures presented herein.

and **Exhibit A** attached hereto summarize the relief requested in, and the legal and factual bases supporting, the First Day Motions.

## Preliminary Statement

5.      EXCO is an independent oil and natural gas company engaged in exploration and production ("E&P") activities in onshore U.S. oil and natural gas properties with a focus on shale resource plays.  EXCO's principal operations are conducted in certain key U.S. oil and natural gas areas including Texas, Louisiana, and the Appalachia region.  Headquartered in Dallas, Texas, the Debtors employ approximately 170 individuals and have, as of the Petition Date, approximately $1.395 billion in total funded debt obligations, including letters of credit, but excluding potential "make-whole" claims.

6.      While EXCO owns and operates valuable oil and natural gas assets, the recent sustained downturn in commodity prices has significantly reduced the Debtors' cash flow from operations.  In response to the lower price environment, the Debtors took a number of steps over the past two years to rationalize capital expenditures and increase production.  Specifically, the Debtors increased well performance through design modifications and the use of extended laterals and increased use of proppant.  Further, the Debtors decreased lease operating expenses by approximately 36 percent in 2016 through reductions in labor costs, modifications to chemical programs, renegotiation of certain contracts, enhanced use of well site automation, optimization of work schedule, and reductions in workover activity.  Finally, the Debtors decreased headcount by approximately 70 percent since year end 2014, further reducing general and administrative expenses as compared to prior years.

7.      In addition to these operational initiatives, the Debtors attempted and executed several non-core asset divestitures throughout 2016 and 2017, which contributed to an approximately 85 percent reduction in field employee headcount in the Appalachia area.

Additionally, the Debtors attempted to sell certain of their South Texas assets, which would have significantly improved the Debtors' liquidity profile. Unfortunately, the Debtors were unable to close this transaction following the termination by a contract counterparty of a certain contract that was integral to the operation of the South Texas assets.

8.　　Finally, the Debtors executed multiple refinancing transactions designed to reduce overall leverage and debt service obligations, as described in greater detail herein. Specifically, the Debtors executed a series of refinancing transactions intended to reduce cash interest payments and overall leverage. Despite these efforts, the Debtors' balance sheet remained unsustainable.

9.　　Beginning in the summer of 2017, the Debtors initiated restructuring discussions with their key creditor constituencies, including JPMorgan Chase Bank, N.A. ("JPMorgan"), the administrative agent under the Debtors' reserve-based revolving credit facility, certain creditors that hold substantial positions in the Debtors' 1.5 lien and 1.75 lien debt, including affiliates of Fairfax Financial Holdings Ltd. ("Fairfax"), Bluescape Resources Company LLC ("Bluescape"), and Gen IV Investment Opportunities, LLC and its affiliate VEGA Asset Partners, LLC (together, "Gen IV"), and an ad hoc group of unsecured noteholders currently holding approximately 18.3 percent of the Debtors' 2018 senior unsecured notes and approximately 30.9 percent of the Debtors' 2022 senior unsecured notes. More recently, the Debtors engaged with another large unsecured noteholder that holds over 25 percent of each of the Debtors' 2018 senior unsecured notes and the Debtors' 2022 senior unsecured notes. Each of these constituents has retained restructuring advisors:

- JPMorgan, in its capacity as agent under the Debtors' revolving credit facility, is represented by Norton Rose Fulbright US LLP, as counsel, and Opportune LLP, as financial advisor.

- Fairfax is represented by Kasowitz Benson Torres LLP, as counsel, and Rothschild Inc. and Petrie Partners Securities, LLC, as financial advisor.

- Bluescape is represented by Bracewell LLP, as counsel.

- Gen IV is represented by White & Case LLP, as counsel.

- The ad hoc unsecured noteholders committee is represented by Brown Rudnick LLP, as counsel, and Miller Buckfire & Co, as financial advisor.

- The single unsecured noteholder with substantial holdings is represented by Quinn Emanuel Urquhart & Sullivan, LLP.

10.      Despite their significant liability management efforts, the Debtors continued to face increasing liquidity concerns as negotiations with creditors remained ongoing.  To ensure access to sufficient liquidity to continue exploring all strategic alternatives, on September 7, 2017, the Debtors borrowed the approximately $88 million of remaining availability under their reserve-based revolving credit facility.

11.      After the revolver draw in September 2017, EXCO utilized the next several months to establish and maintain consistent communication with each of the above-listed stakeholders and their advisors leading up to these chapter 11 cases.  The Debtors have used this ongoing dialogue to keep their creditor constituencies apprised of the Debtors' business and various restructuring alternatives, and to attempt to build consensus for a consensual restructuring transaction.

12.      After executing non-disclosure agreements in October 2017, the Debtors provided counsel to the ad hoc unsecured noteholders committee with substantial diligence regarding the Debtors' operations, have held multiple in-person and telephonic conferences to discuss the Debtors' business plan and potential estate causes of action, and worked cooperatively with the ad hoc unsecured noteholders committee regarding a mortgage analysis for all of the Debtors' oil and gas assets.  More recently, the Debtors also engaged with the single unsecured noteholder

with substantial holdings, and its advisor, which is not a member of the ad hoc unsecured noteholders committee.  Although the Debtors and their unsecured noteholders were not able to reach an agreement regarding the terms of a comprehensive restructuring prior to commencing these chapter 11 cases, the Debtors intend to continue working with their unsecured noteholders, the single large unsecured noteholder, and any official unsecured creditors committee appointed in these chapter 11 cases on the terms of a consensual restructuring transaction that maximizes the value of the Debtors' estates for the benefit of all stakeholders.

13.     With respect to their secured creditors, the Debtors also executed non-disclosure agreements, provided substantial diligence, and engaged in various phone calls and in person meetings regarding the Debtors' business.  While the Debtors have not yet achieved consensus among their secured creditors, they have had productive discussions with a super-majority of their secured creditors and expect those discussions to continue post-filing.  Indeed, while discussions with their secured creditors have not yet led to a global restructuring deal, those discussions resulted in favorable debtor-in-possession financing—on terms significantly more attractive than available third-party financing—that will provide necessary liquidity, avoid a priming fight, and allow for the consensual use of cash collateral.

14.     As discussed, the Debtors were unable to come to an agreement with all parties regarding the terms of a consensual restructuring transaction.  Rather than execute a restructuring support agreement with a subset of their creditor constituencies to the potential disadvantage of others, the Debtors are endeavoring to work with all parties to build consensus for a consensual restructuring transaction.

15.     As of the Petition Date, the Debtors are still evaluating and working to determine whether a value-maximizing transaction will be best achieved through a reorganization

transaction, one or more sale transactions, or a combination thereof.  To that end, the Debtors intend to fully explore all potential sale alternatives and, in consultation with their major stakeholders, may return to the Court at a later date to seek approval of sale procedures for one or more sale transactions.

16.     While exploring a sale process over the coming weeks, the Debtors plan to (a) continue to engage and consult with all of their major stakeholders on the terms of a sale, a restructuring transaction, or a combination thereof that maximizes the value of the Debtors' estates for the benefit of all stakeholders, (b) stabilize the business through the approval of various first day motions, (c) reject certain burdensome midstream contracts, and (d) ensure that the Debtors have adequate liquidity through approval of a new $250 million debtor-in-possession financing facility and the consensual use of cash collateral.

## Discussion

17.     As described above, the Debtors are an independent oil and natural gas company engaged in exploration and production activities in onshore U.S. oil and natural gas properties with a focus on shale resource plays.  The Debtors' principal operations are conducted in certain key U.S. oil and natural gas areas including Texas, Louisiana, and the Appalachia region. Headquartered in Dallas, Texas, the Debtors employ approximately 170 individuals.  In 2017, the Debtors achieved oil and natural gas production of approximately 87 billion cubic feet equivalent ("Bcfe"), of which approximately 92 percent is natural gas.

I.      **The Debtors' History.**

A.      **Founding and IPO.**

18.     EXCO is a Texas corporation founded and incorporated in September 1955.  Prior to July 2003, EXCO had registered equity securities that were publicly traded on the NASDAQ National Market.  On July 29, 2003, EXCO consummated a going private transaction pursuant to

which it became a wholly-owned subsidiary of EXCO Holdings.  In February 2006, the Debtors executed an initial public offering of equity (the "IPO") with an approximately $650 million market capitalization.  The Debtors' common stock subsequently traded on the New York Stock Exchange ("NYSE") until December 2017 when the NYSE suspended trading of the Debtors' common stock and commenced proceedings to delist the Debtors' common stock.  The Debtors' common stock currently trades on the OTC Pink Marketplace.

**B.      The Debtors' Assets and Operations.**

19.      Following the IPO, the Debtors' business focused on key North American oil and natural gas production areas, primarily from their Louisiana, Texas, and Appalachia shale plays. The Debtors are highly-efficient operators, making use of enhanced drilling and completion technologies.

20.      The Debtors have a gas-levered asset portfolio with significant, high quality drilling inventory.  The Debtors hold a large position in the East Texas/North Louisiana region, one of the most active E&P regions, as well as a substantial position in the Appalachia region. The Debtors also hold a significant position in the South Texas region.   East Texas/North Louisiana is the Debtors' largest producing region with operations focused in the Haynesville and Bossier shales.  The Debtors' East Texas/North Louisiana acreage position consists of approximately 96,300 net acres primarily located in DeSoto and Caddo Parishes in Louisiana and in Harrison, Panola, Shelby, San Augustine, and Nacogdoches Counties in Texas.  Additionally, the Debtors have interests in approximately 145 unconventional wells in Pennsylvania, the majority of which are operated by a non-Debtor affiliate.  Their Pennsylvania and West Virginia shale position is primarily held by production through third-party shallow well operators.  The Debtors acquired the West Virginia and Pennsylvania interests in order to apply their core competencies in the development of unconventional resource plays, which have been honed over

years of operating in the Haynesville shale.  If successful, the Debtors expect the development of the Marcellus and Utica shales in the Appalachia region could provide the Debtors with significant upside potential.

21.     As of December 31, 2016, the Debtors held interests in approximately 1,155 gross producing wells, a substantial majority of which are Debtor-operated, had approximately 733,800 gross total acres under lease, and had estimated proved reserves of approximately 476.7 Bcfe of natural gas based on Securities & Exchange Commission parameters.  In 2016, the Debtors' E&P activities yielded total production of approximately 286 Mmcfe/d and adjusted EBITDA of approximately $96 million.



22.     Operations in East Texas and North Louisiana are focused on the Haynesville and Bossier shales.  The Debtors hold approximately 96,300 net acres in East Texas and North Louisiana and operated approximately 521 wells as of December 31, 2016.  The Debtors' current business plan projects completing an additional six wells in this region through the end of 2018.





23.     The Debtors' operations in the Appalachia region have primarily included testing and selectively developing the Marcellus shale with horizontal drilling. The Debtors hold approximately 181,100 net acres in the Appalachia region, with approximately 127,000 acres prospective for the Marcellus shale, and approximately 40,000 acres prospective for the dry gas window of the Utica shale in Pennsylvania.



24. The Debtors maintain approximately 49,300 net acres in the Eagle Ford shale in South Texas, covering portions of Zavala, Dimmit, and Frio counties. The Debtors' current business plan projects drilling and completing an additional 12 wells in this region through the end of 2018. The Debtors significantly reduced operating costs in this region during 2016 by reducing service costs with key vendors, including saltwater disposal costs and chemical treatment programs. In addition, the Debtors renegotiated sales contracts that improved the net realized price for oil production in the region. The Debtors executed a definitive agreement in April 2017 to divest its South Texas assets. The agreement was subsequently terminated in August 2017 due to a failure to satisfy certain conditions precedent to the close of the transaction, as described in greater detail herein.

## SOUTH TEXAS OVERVIEW



### C.    Transportation Agreements.

25.    To ensure pipeline capacity to transport their natural gas production from the wellhead to points of sale, the Debtors entered into certain long-term firm transportation agreements and gas sales contracts beginning in 2009.    Initially, the firm transportation agreements were entered into by EXCO and EXCO Operating Company, LP and, as discussed below, were subsequently moved by operation of law to Raider Marketing, LP through an internal corporate merger. A detailed corporate organizational chart is attached hereto as **Exhibit B**.

26.    In August 2016, the Debtors created a marketing affiliate, Debtor Raider Marketing, LP ("Raider"). To effectuate the creation of Raider, Debtor EXCO Operating Company, LP underwent a divisional merger under a Texas state statute. A divisional merger is a division of an entity's assets and liabilities among that entity and a newly-formed entity.  Both entities survive the merger.  In this case, EXCO Operating Company, LP was the surviving entity and Raider was the newly-formed marketing entity under the merger.  The merger allocated

certain of EXCO Operating Company, LP's assets and liabilities to Raider, namely agreements for gas sales, marketing, gathering, and transportation, which were moved as part of the merger in accordance with the terms of each agreement.  The Debtors subsequently notified the counterparties to these agreements about the merger and Raider's rights under the agreements.

27.    In addition to being a party to the Debtors' midstream agreements, Raider also provides certain marketing services to the Debtors, including the purchase and resale of natural gas from third-party producers and Debtor-operated wells in Texas and Louisiana.  One of Raider's business purposes is to separately manage the Debtors' marketing activities, a corporate structure that is common practice in the E&P industry.  Further, as a distinct entity, Raider can independently pursue marketing opportunities separate from the services provided to the Debtors.  Raider charges a three percent fee for these marketing services, a portion of which is passed on to working interest owners in the related wells, to the extent allowable under the applicable agreements.

28.    Notably, the Debtors have multiple long-term transportation agreements and gas sales contracts that are burdensome and provide no benefit to the Debtors' estates.  The Debtors intend to reject certain of these agreements, in connection with the contract rejection motion filed contemporaneously herewith.  Further, the two Acadian Gas System agreements listed in the summary table below were terminated by the Debtors in September 2016 due to the counterparty's failure to pay the Debtors for gas sales.  The termination of the contracts is the subject of litigation currently pending in Harris County, Texas, which is more fully described below.  In addition, in December 2017, the Tiger Pipeline agreement listed in the summary table below was terminated following nonpayment by the contract counterparty for gas deliveries made by the Debtors.  Such nonpayment is the subject of ongoing litigation between the Debtors

and the contract counterparty.  The Debtors believe that the rejection damages claims resulting from such contract rejections likely will represent a substantial portion of the Debtors' unsecured claims pool, in addition to the Debtors' unsecured notes.  The Debtors do not anticipate a material amount of unsecured trade claims.  The following tables include certain of the Debtors' current sales, transportation, and gathering contracts and existing commitments due thereunder:

### Overview of Contracts

| Name of Contract | Counterparty | Type of Contract | End Date | Current Rate |
|---|---|---|---|---|
| Tiger Pipeline | Shell / Energy Transfer | NAESB | Oct-20 | $0.39 |
| Mansfield System | Chesapeake | NAESB | Dec-21 | 0.39 |
| Regency Intrastate Gas | Energy Transfer | Transportation (FT) | Jan-20 | 0.30 |
| System MVC Shortfall | Azure | Gathering | Dec-18 | 0.40 |
| Williams - Mansfield System | Williams | Gathering | Dec-21 | 0.60 |
| Acadian Gas System | Enterprise Products | NAESB | Sep-25 | 0.25 |
| Acadian Gas System | Enterprise Products | Transportation (FT) | Sep-25 | 0.23 |

**Existing Commitments**
($ in millions)

| Savings from Contract Rejection: | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Tiger Pipeline | $6 | $6 | $5 | $- | $- | $- | $- | $- | $16 |
| Mansfield System | 1 | 1 | 1 | 1 | – | – | – | – | 4 |
| Regency Intrastate Gas | 21 | 21 | 2 | – | – | – | – | – | 43 |
| System MVC Shortfall | 2 | – | – | – | – | – | – | – | 2 |
| Williams - Mansfield System | 2 | 2 | 2 | 2 | – | – | – | – | 7 |
| Acadian Gas System (NAESB) | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 4 | 42 |
| Acadian Gas System (FT) | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 16 | 169 |
| Total  Contractual Obligations | $59 | $57 | $37 | $30 | $27 | $27 | $27 | $20 | $284 |

## II.    EXCO's Capital Structure.

29.    As of the Petition Date, the Debtors have approximately $1.395 billion in total funded debt obligations.  The following table depicts the Debtors' prepetition capital structure:

| Debt | Approx. Principal Amount Outstanding ($mm) |
|---|---|
| RBL Facility | $150[3] |
| 1.5 Lien Senior Secured Notes | 317 |

---

[3]    Includes outstanding letters of credit.

| | |
|---|---:|
| Potential 1.5 Lien Senior Secured Notes Make-Whole Claim | 36[4] |
| 1.75 Lien Term Loan Facility | 709 |
| Potential 1.75 Lien Term Loan Make-Whole Claim | 194[5] |
| Second Lien Term Loan Facility | 17 |
| **Total Secured Debt (without Make-Whole Claims)** | **$1.19 billion** |
| **Total Secured Debt (with Make-Whole Claims)** | **$1.42 billion** |

| | |
|---|---:|
| 7.5% Senior Notes due 2018 | $132 |
| 8.5% Senior Notes due 2022 | 70 |
| **Total Unsecured Senior Notes** | **$202 million** |

| | |
|---|---:|
| **Total Debt (without Make-Whole Claims)** | **$1.395 billion** |
| **Total Debt (with Make-Whole Claims)** | **$1.625 billion** |

A.    **RBL Facility.**

30.    The Debtors maintain a reserve-based revolving first lien credit facility (the "RBL Facility") under that certain Amended and Restated Credit Agreement, dated as of July 31, 2013 (as amended, restated or otherwise modified from time to time, the "RBL Credit Agreement"), by and among EXCO, as borrower, the guarantors party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with its permitted successors and assigns, the "RBL Agent"), and the other lender and agent parties thereto.  Borrowings under the RBL Credit Agreement are subject to a borrowing base that is adjusted semi-annually based on the

---

[4]    Potential make-whole claim resulting from provisions in the 1.5 Lien Notes Indenture (as defined below) providing that an event of default (including the filing of a voluntary bankruptcy) results in the automatic acceleration of the 1.5 Lien Senior Secured Notes (as defined below) and payment of the applicable premium.

[5]    Potential make-whole claim resulting from provisions in the 1.75 Lien Credit Agreement (as defined below) providing that an event of default (including the filing of a voluntary bankruptcy) results in the automatic acceleration of the 1.75 Lien Term Loan Facility (as defined below) and payment of the "Make-Whole Amount."

value of the Debtors' oil and gas reserves, subject to certain procedures set forth in the RBL Credit Agreement.[6]  The RBL Facility borrowing base was $150 million as of the Petition Date.

31.    The RBL Credit Agreement has been amended nine times, most recently on November 20, 2017.  The Debtors amended the RBL Credit Agreement in March 2017 to reduce the borrowing base from $285 million to $150 million and modify certain financial covenants as part of the 2017 Refinancing Transactions (as defined below).  Subsequently, the RBL Credit Agreement was amended in September 2017 to waive certain covenants.  The RBL Credit Agreement was amended on November 20, 2017 to include a waiver of certain events of default potentially caused by the Debtors' nonpayment under a firm transportation agreement.

32.    The RBL Facility bears interest at a floating rate and matures in July 2018.  The Debtors' obligations under the RBL Facility are secured by mortgages on oil and gas properties representing approximately 95 percent of the value of the Debtors' oil and gas properties included in the Debtors' most recent reserve report, liens on certain other assets, and pledges of ownership interests in certain of the other Debtors.

33.    On September 7, 2017, the Debtors borrowed the remaining approximately $88 million available under the RBL Facility.  As of the Petition Date, there is approximately $126 million in aggregate principal amount of revolving loans and approximately $24 million on account of letters of credit outstanding under the RBL Facility.

**B.    1.5 Lien Senior Secured Notes.**

34.    The Debtors have approximately $317 million in aggregate principal amount outstanding of 8.0% / 11.0% 1.5 lien senior secured notes due March 2022 (the "1.5 Lien Senior

---

[6]    The RBL Facility originally provided for an initial maximum borrowing base of $1.6 billion with an initial available borrowing base of $1.3 billion.

Secured Notes"), issued under that certain Indenture, dated as of March 15, 2017 (as amended, restated or otherwise modified from time to time, the "1.5 Lien Notes Indenture"), by and among EXCO, as issuer, the guarantors party thereto, and Wilmington Trust, N.A., as indenture trustee.

35.    The 1.5 Lien Senior Secured Notes bear interest at a rate of either 8 percent per annum for cash payments (the "Cash Rate") or a rate of 11 percent per annum for "in kind" payments (the "PIK Rate"), which payments may be issued either in additional 1.5 Lien Senior Secured Notes ("PIK Notes") or shares of common stock in EXCO ("PIK Shares").  Since March 2017, the Debtors have made certain interest payments on the 1.5 Lien Senior Secured Notes in payments of PIK Notes to preserve liquidity.  The 1.5 Lien Senior Secured Notes are secured by liens that are junior in priority to the liens securing the RBL Facility and senior in priority to the liens securing the 1.75 Lien Term Loan Facility and the Second Lien Term Loan Facility on substantially all of the Debtors' assets.

36.    Additionally, the 1.5 Lien Notes Indenture includes an optional redemption provision permitting EXCO to repay the 1.5 Lien Senior Secured Notes before their scheduled date of maturity.  The 1.5 Lien Notes Indenture provides that EXCO may redeem the 1.5 Lien Senior Secured Notes at any time prior to the maturity date at a redemption price equal to 100 percent of the principal amount plus an applicable premium.  "Applicable Premium" is defined as an amount that approximates the present discounted value of all future interest payments.  The 1.5 Lien Notes Indenture also provides for an automatic acceleration of the 1.5 Lien Senior Secured Notes upon the filing of a voluntary petition for bankruptcy protection. The following table depicts the potential "Applicable Premium" as of the Petition Date:

**1.5L Claim**

| ($ in millions) | 1/15/2018 |
|---|---|
| Principal | $317 |
| Redemption Premium | 108% |
| Principal + Make-whole | $342 |
| Remaining Cash Coupons | 5 |
| Undiscounted Future Payments | 346 |
| Discount Factor[A] | 1.00 |
| Make-Whole Payment | $345 |
| Accrued Interest | 8 |
| Total 1.5L Claim | $353 |

(A) Discount rate of 1.8% discounted from 3/19/18 to 1/15/18.

### C. 1.75 Lien Term Loan Facility.

37.     As of the Petition Date, the Debtors have approximately $709 million outstanding under the 1.75 lien term loan facility (the "1.75 Lien Term Loan Facility") incurred under that certain 1.75 Lien Term Loan Credit Agreement, dated as of March 15, 2017 (as amended, restated or otherwise modified from time to time, the "1.75 Lien Credit Agreement"), by and among EXCO, as borrower, the Debtor guarantors party thereto, Wilmington Trust, N.A., as administrative agent and collateral trustee, and the lender parties thereto.

38.     The 1.75 Lien Term Loan Facility bears interests at a Cash Rate of 12.5 percent per annum, and a PIK Rate of 15 percent per annum.  Since March 2017, the Debtors have paid interest on the 1.75 Lien Term Loan Facility at the PIK Rate through both PIK Shares and capitalization of the loans outstanding under the 1.75 Lien Term Loan Facility by an amount equal to such accrued and unpaid interest.  The 1.75 Lien Term Loan Facility is secured by liens that are junior in priority to the liens securing the RBL Facility and the 1.5 Lien Senior Secured Notes and senior in priority to the liens securing the Second Lien Term Loan Facility on substantially all of the Debtors' assets.

39.     Additionally, the 1.75 Lien Credit Agreement includes an optional redemption provision, permitting EXCO to repay the 1.75 Lien Term Loan Facility before the scheduled date

of maturity.  The 1.75 Lien Credit Agreement provides that EXCO may repay all or any portion of the 1.75 Lien Term Loan Facility at any time prior to the maturity date at a price equal to 100 percent of the principal amount plus the "Make-Whole Amount."  "Make Whole Amount" is defined as the prepayment price of the applicable term loans plus all interest that would have accrued on the applicable term loans from the date of repayment through the maturity date.

40.     The 1.75 Lien Credit Agreement provides for the payment of certain fees and the "Make-Whole Amount" in the event any mandatory or voluntary repayment or prepayment, including as a result of the termination of the 1.75 Lien Credit Agreement after the occurrence and during the continuation of an event of default, including an event of default resulting from the filing of a voluntary petition for bankruptcy protection.  The following table depicts the potential "Make-Whole Amount" as of the Petition Date:

| 1.75L Claim | |
| --- | --- |
| ($ in millions) | 1/ 15/ 2018 |
| Principal | $709 |
| Principal + Redemption Premium | 734 |
| PV of Principal + Redemption Premium | $726 |
| Remaining Cash Coupons | 148 |
| PV of Principal + Remaining Coupons | $874 |
| Accrued Interest | 29 |
| Total 1.75L Claim | $903 |

41.     In December 2017, the Debtors, in consultation with their advisors, determined that they would not make the December 20, 2017 interest payment due under the 1.75 Lien Credit Agreement.  As more fully described below, the Debtors instead entered into forbearance agreements with the majority of their secured lenders.

**D.     Second Lien Term Loan Facility.**

42.     The Debtors closed (a) a 12.5% senior secured second lien term loan with certain affiliates of Fairfax Financial Holdings Ltd. in an aggregate principal amount of $300 million (the "<u>Fairfax Term Loan</u>") on October 26, 2015 and (b) a 12.5% senior secured second lien term

loan with certain of the Debtors' then-unsecured noteholders in an aggregate principal amount of $291.3 million on October 26, 2015 and $108.7 million on November 4, 2015 (collectively, the "Second Lien Term Loan Facility") pursuant to that certain Term Loan Agreement, dated as of October 19, 2015 (as amended, restated, or otherwise modified from time to time, the "Second Lien Credit Agreement"), by and among EXCO, as borrower, the guarantors party thereto, Wilmington Trust, N.A., as administrative agent and collateral trustee, and the other lenders party thereto.

43.      As part of the 2017 Refinancing Transactions (as defined below), the Debtors exchanged approximately $682.8 million of loans under the 1.75 Lien Term Loan Facility to satisfy the outstanding Fairfax Term Loan in full and the majority of the then-outstanding loans under the Second Lien Term Loan Facility.  As part of the exchange, each exchanging holder of the Second Lien Term Loan Facility was deemed to consent to certain amendments to the Second Lien Credit Agreement that eliminated substantially all of the restrictive covenants and events of default.

44.      As of the Petition Date, the Debtors have an aggregate principal amount of approximately $17 million outstanding on account of the Second Lien Term Loan Facility.  The Second Lien Term Loan Facility bears interest at a rate of 12.5 percent per annum and matures in October 2020.  The Second Lien Term Loan Facility is secured by liens that are junior in priority to the liens securing the RBL Facility, the 1.5 Lien Senior Secured Notes, and the 1.75 Lien Term Loan Facility on substantially all of the Debtors' assets.

45.      In December 2017, the Debtors, in consultation with their advisors, determined that they would not make the December 29, 2017 interest payment due under the Second Lien

Credit Agreement.  As more fully described below, the Debtors instead entered into forbearance agreements with the majority of their secured lenders.

       **E.**    **Intercreditor Agreement.**

    46.    The Debtors, the RBL Agent, and Wilmington Trust, N.A., as Second Lien Collateral Trustee and Original Third Lien Collateral Trustee (as each term is defined in the Intercreditor Agreement) are parties to that certain Intercreditor Agreement, dated as of March 15, 2017 (as amended, restated, or otherwise modified from time to time, the "Intercreditor Agreement").  The Intercreditor Agreement governs the relationship among the lenders under the RBL Facility, the 1.5 Lien Senior Secured Notes, the 1.75 Lien Term Loan Facility, and the Second Lien Term Loan Facility with respect to collateral and certain other matters, including the exercise of remedies and permitted actions in the event of the Debtors' chapter 11 proceedings.

    47.    Specifically, section 4.02(b) of the Intercreditor Agreement restricts, among other things, the rights of the lender parties to the 1.5 Lien Notes Indenture, the 1.75 Lien Term Loan Facility, and the Second Lien Term Loan Facility (collectively, the "Junior Secured Parties") to object to the Debtors' use of Cash Collateral and entry into a debtor-in-possession financing facility pursuant to sections 363 and 364 of the Bankruptcy Code as well as such parties entitlement to adequate protection in the event the Court grants such relief.  Specifically, under section 4.02(b) of the Intercreditor Agreement, neither the Junior Secured Parties, nor their respective trustees or agents, may "raise any objection, contest, or oppose . . . [and] will waive any claim such [p]erson may now or hereafter have . . . to any such [debtor-in-possession] financing . . . or to any use, sale, or lease of cash collateral or to any grant of administrative expense priority under section 364 of the Bankruptcy Code" unless:

- the RBL Agent or the RBL Lenders oppose the debtor-in-possession financing or the use of cash collateral;

- the debtor-in-possession financing is in excess of the sum of the RBL Facility being refinanced plus an additional $100 million;

- the debtor-in-possession financing disposes of a substantial part of the collateral and the first priority liens are not discharged contemporaneously with such disposition;

- the terms of the proposed debtor-in-possession financing are not commercially reasonable under the circumstances; or

- the Junior Secured Parties are not permitted to seek adequate protection to the extent permitted by section 4.02(f) of the Intercreditor Agreement.

48.    Section 4.02(f) of the Intercreditor Agreement entitles the Junior Secured Parties to replacement liens on the collateral securing their respective debt and additional liens and security interests on all other collateral subject to the existing priority of the secured parties' prepetition liens.

49.    Further, section 4.02(c) of the Intercreditor Agreement restricts the ability of the 1.5 Lien Senior Secured Noteholders or the 1.75 Lien Term Loan Lenders to provide the Debtors with debtor-in-possession financing on a senior basis to the RBL Facility so long as the obligations under the RBL Facility remain outstanding.

50.    None of the grounds permitting the Junior Secured Parties to object to the DIP Facility or the use of Cash Collateral are present:

- the RBL Agent and the RBL Lenders do not oppose the Debtors' entry into the DIP Facility or the use of Cash Collateral;

- the DIP Facility does not exceed the sum of the RBL Facility being refinanced plus $100 million;

- the DIP Facility does not contemplate a disposition of any of the collateral;

- the terms of the DIP Facility are commercially reasonable; and

- the Junior Secured Parties will receive, at minimum, the adequate protection contemplated by section 4.02(f) of the Intercreditor Agreement.

51.     As a result, the Junior Secured Parties are prohibited from objecting to either the DIP Facility or the use of Cash Collateral.  Additionally, and as described herein, because the Debtors intend to use the proceeds of the DIP Facility to repay the outstanding obligations under the RBL Facility at the outset of these cases, provision of the DIP Facility by certain of the Junior Secured Parties is permissible.

### F.     Senior Notes.

52.     The Debtors have approximately $132 million in principal outstanding of senior unsecured notes issued under an indenture, dated as of September 15, 2010 (such notes, the "2018 Senior Notes") and approximately $70 million in principal outstanding of senior unsecured notes issued under an indenture, dated as of April 16, 2014 (such notes, the "2022 Senior Notes," and together with the 2018 Senior Notes, the "Senior Notes"), by and among EXCO, as issuer, the other guarantors party thereto, and Wilmington Savings Fund Society, FSB, as indenture trustee.  The 2018 Senior Notes and the 2022 Senior Notes mature in 2018 and 2022, respectively, and require semi-annual coupon payments at 7.5 percent and 8.5 percent per annum, respectively.

### G.     Common Stock and Warrants.

53.     Until December 2017, the Debtors' common stock traded on the NYSE, under ticker symbol "XCO."  The Debtors' common stock currently trades on the OTC Pink Marketplace, under the symbol "XCOO."  As of the Petition Date, there were approximately 22 million shares of common stock authorized and outstanding and the common stock traded at $0.36 per share, implying a market capitalization of approximately $8 million.

54.     As part of the 2017 Refinancing Transactions (as defined below), the Debtors issued three series of warrants:  1.5 Lien Notes Warrants, Commitment Fee Warrants, and Amendment Fee Warrants, certain of which have since been cancelled.

III.     **Pending Litigation.**

    A.     **Enterprise Litigation.**

55.     In September 2016, the Debtors terminated their gas sales contract with Enterprise Products Operating LLC ("Enterprise") and firm transportation contract with Acadian Gas Pipeline System ("Acadian") following Enterprise's failure to make payments to the Debtors on account of July 2016 gas sales within the applicable grace period.   Enterprise and Acadian subsequently filed a petition against the Debtors and subsequently joined Bluescape and two officers of the Debtors in Texas state court alleging that the Debtors did not have the right to terminate the contracts.   Enterprise and Acadian have asserted various causes of action that the Debtors and the two officers conspired to "shed EXCO of unwanted midstream obligations in order to hinder, delay or defraud EXCO's creditors, including Enterprise" and that the two officers of the Debtors breached their fiduciary duties to the Debtors by bringing about the alleged "scheme" to transfer and terminate the contracts.

56.     Enterprise and Acadian seek relief, including:  (a) damages for the alleged breach of contract; (b) a declaration finding the Debtors' termination of the contracts invalid; and (c) avoidance of Debtor EXCO Operating Company, LP's transfer of contracts to Debtor Raider. Damage claims asserted by Enterprise and Acadian could total up to approximately $175 million. The litigation is ongoing and likely will be set for trial in the first half of 2018.

    B.     **Chesapeake Litigation.**

57.     In June 2017, the Debtors initiated litigation against Chesapeake Energy Marketing, L.L.C. ("CEML") in connection with the Debtors' potential sale of certain oil and natural gas properties and surface acreage in South Texas to Venado Oil and Gas, LLC ("Venado") (described below).   Pursuant to the sale agreement, the Debtors were required to, among other things, represent and warrant that all material contracts are in full force and effect at

the closing of the agreement.  Prior to the closing of the sale, CEML terminated a transaction confirmation agreement for the purchase and sale of natural gas between CEML and Raider.  As a result of the termination of the CEML contract, the Debtors were unable to satisfy the material contract representation and the sale agreement was terminated.

58.     The Debtors filed a lawsuit against CEML, and subsequently added other Chesapeake entities, asserting breach of contract, tortious interference with existing contract, tortious interference with prospective business relations, and declaratory relief that the CEML contract is still in full force and effect.  In the lawsuit, the Debtors allege that CEML unreasonably withheld its consent to the sale of the oil and gas assets in South Texas to Venado, and improperly attempted to terminate the transaction confirmation.  In so doing, the Debtors allege that CEML irreparably harmed the Debtors by, among other things, impairing the transaction with Venado and causing the virtual shut-down of a significant portion of the Debtors' producing assets.  The lawsuit remains pending in federal court after being removed from Texas state court in 2017.

## IV.     Events Leading Up to the Restructuring.

59.     The difficulties faced by the Debtors are consistent with those faced industry-wide.  Oil and gas companies and others have been challenged by low natural gas prices for years.  Natural gas prices fell from a peak of $12.50 per MMBtu in June 2008 to $1.73 per MMBtu by March 2016, and remain at approximately $3.00 per MMBtu as of the Petition Date. The price of crude oil has similarly plummeted from a high of $157.73 per barrel in June 2008 to a low of $29.64 per barrel in January 2016.  Crude oil prices remain at approximately $65.00 per barrel as of the Petition Date.

**WTI Crude Oil Closing Prices**



**Natural Gas Henry Hub Closing Prices**



*Decline of oil and natural gas prices over time*

60.      These market conditions have affected oil and gas companies at every level of the industry around the world.  All companies in the oil and gas industry (not just E&P companies) have felt these effects.  However, independent oil and gas companies have been especially hard-hit, as their revenues are generated from the sale of unrefined oil and gas.  Over 100 oil and gas companies have filed for chapter 11 since the beginning of 2015, including most recently Bonanza Creek Energy, Inc., Memorial Production Partners LP, Vanguard Natural Resources, LLC, Seadrill Limited, and Cobalt International Energy Inc.  Numerous other oil and gas companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.  The current volatility in the commodity markets has made it especially difficult for some companies to execute on any viable out-of-court restructuring alternatives.

61.      As discussed, beginning in 2015, the Debtors began evaluating and subsequently implementing a liability management strategy that focused on, among other things, managing liquidity constraints, asset portfolio repositioning, operational performance, capital deployment, and risk management.  Since that time, the Debtors have implemented a number of initiatives designed to further this strategy.

A.     **Operational Responses.**

1.     **Operational Efficiencies.**

62.     The Debtors increased their focus on becoming a low-cost producer and developing projects that have a higher rate of return.   To this end, the Debtors executed additional drilling and exploration projects to identify and develop further reserves in core areas at a low cost.   Further, the Debtors added reserves through leasing and undeveloped acreage acquisition opportunities to maximize returns in their core areas.   Finally, the Debtors dedicated themselves to the continuous improvement and innovation of existing wells through modifying design in order to maximize their return on capital.   Specifically, the Debtors improved individual well performance through the use of extended laterals and increased use of proppant.

2.     **Reduced Operating Expenses.**

63.     The Debtors spent the years leading up to these chapter 11 cases exercising fiscal discipline to transform the company.   The Debtors decreased their lease operating expenses by approximately 36 percent in 2016 through reductions in labor costs, modifications to chemical programs, renegotiation of certain contracts, enhanced use of well site automation, optimization of work schedule, and reductions in workover activity, and.   Further, the Debtors successfully renegotiated certain saltwater disposal contracts.   Although the Debtors attempted to renegotiate rates and volume commitments under certain sales, gathering, and firm transportation agreements, the Debtors were unable to secure meaningful cost savings under such agreements. In addition, the Debtors decreased headcount by approximately 70 percent since year end 2014, further reducing general and administrative expenses as compared to prior years.

3.     **Asset Sales.**

64.     As discussed, the Debtors divested certain non-core assets in Appalachia throughout 2016, which contributed to an approximately 85 percent reduction in field employee

headcount in the Appalachian region. Additionally, and as discussed above in relation to the CEML litigation, the Debtors entered into an agreement with a subsidiary of Venado in April 2017 for the sale of the Debtors oil and natural gas properties and surface acreage in South Texas for a purchase price of $300 million. The transaction originally was expected to close on June 1, 2017 and would have substantially increased the Debtors' liquidity position. The Debtors intended to use the proceeds of the Venado transaction to fund the drilling and development of its core Haynesville and Bossier shale assets in the East Texas/North Louisiana region and pay down certain of its outstanding indebtedness.

65.    As conditions to the Venado agreement, the Debtors were required to (a) operate in the ordinary course of business in all material respects during the period from and after signing until the closing of the agreement, and (b) represent and warrant that all material contracts are in full force in effect at the closing of the transaction. The Debtors expected the transaction to close in June 2017, and had an option to extend the closing date to August 15, 2017. In May 2017, prior to the closing of the transaction, CEML terminated a transaction confirmation agreement for the purchase and sale of natural gas between CEML and Debtor Raider. As a result of the termination of the CEML contract, the Debtors were unable to satisfy the material contract representation in the Venado agreement and the agreement was mutually terminated on August 15, 2017.

**B.    Financial Responses.**

In conjunction with implementation of their liability management strategy, the Debtors executed a series of refinancing transactions intended to reduce cash interest payments and overall leverage.

### 1.    2015 Refinancing Transactions.

66.    In the fourth quarter of 2015, the Debtors executed a series of transactions (the "2015 Refinancing Transactions") that resulted in the issuance of the Second Lien Term Loan and utilized the proceeds thereof to reduce indebtedness under the RBL Facility, the 2018 Senior Notes, and the 2022 Senior Notes.  Additionally in the fourth quarter of 2015, the Debtors repurchased $40.8 million in principal of the 2018 Senior Notes through open market purchases with $12.0 million in cash.   Together, these transactions reduced the Debtors' then-outstanding leverage by approximately $454 million.

### 2.    2016 Tender Offer.

67.    In 2016, the Debtors completed a cash tender offer for their outstanding unsecured notes that resulted in the repurchase of an aggregate of approximately $101.3 million in principal amount of the 2022 Senior Notes for an aggregate purchase price of approximately $40 million.  In addition, the Debtors repurchased an aggregate of approximately $26.4 million and $51.4 million in principal amount of the 2018 Senior Notes and 2022 Senior Notes, respectively, with an aggregate of approximately $13.3 million in cash through open market repurchases in 2016.

### 3.    2017 Refinancing Transactions.

68.    In 2017, the Debtors entered into a series of transactions (the "2017 Refinancing Transactions") in response to liquidity constraints and to reduce the cash burden of future interest payments.  In March 2017, the Debtors issued approximately $300 million in 1.5 Lien Senior Secured Notes that include the option to pay interest in-kind in common shares or additional debt.  The proceeds from this issuance were primarily utilized to repay outstanding indebtedness under the RBL Credit Agreement.  The Debtors also exchanged $683 million of Second Lien Term Loans for a like amount of loans under the 1.75 Lien Term Loan Facility that also included

the option to pay interest in-kind in common shares or additional debt.  These transactions increased pro forma liquidity by approximately $116 million as of the transaction dates, and had the potential to reduce cash interest payments up to approximately $109 million per year, or approximately $433 million through maturity, with option to pay interest in common shares or additional debt on the 1.5 Lien Senior Secured Notes and 1.75 Lien Term Loan Facility.

69.     The Debtors utilized the ability to make payments of PIK Shares and PIK Notes on the outstanding 1.5 Lien Senior Secured Notes and the 1.75 Lien Term Loan Facility in the form of issuing 2.7 million PIK Shares in June 2017.  Following the substantial decline in the stock price of EXCO throughout 2017, however, the Debtors were unable to utilize the payment-in-kind features to continue to make interest payments on the 1.5 Lien Senior Secured Notes and the 1.75 Lien Term Loan Facility in PIK Shares.  As a result, rather than paying interest in PIK Shares, the Debtors issued an additional $17 million aggregate principal amount of 1.5 Lien Senior Secured Notes and $26.2 million aggregate principal amount of the 1.75 Lien Term Loan Facility, respectively, in September 2017.  In December 2017, the Debtors, in consultation with their advisors, determined not to make the December 20, 2017 interest payment due under the 1.75 Lien Credit Agreement as they were unable to pay in cash pursuant to the terms of their debt agreements or in PIK Shares or in in-kind payments of debt without either effectuating a change of control or breaching their existing debt agreements.

70.     In connection with the 2017 Refinancing Transactions, the board of directors of EXCO Resources, Inc. (the "Board") initially approved entry into a financing agreement with a third party for which definitive documentation was prepared.  This agreement required the consent of certain lenders under the Second Lien Term Loan Facility that could not be obtained. Fairfax subsequently provided the Board with an alternative financing proposal that was

ultimately approved by an independent committee of the Board.  Additionally, Credit Suisse Securities (USA) LLC led a full market process and served as sole placement agent and book runner to the Debtors on the 1.5 Lien Senior Secured Notes and debt advisor to the Debtors on the 2017 Refinancing Transactions.  Further, Seaport Global provided a fairness opinion to the Board that concluded that the exchange transaction was fair or was not less favorable than could reasonably be obtained in an arm's-length transaction.

71.    As a part of the same transactions, the Debtors amended the RBL Credit Agreement to establish a borrowing base of $150 million, permit the issuance of the 1.5 Lien Senior Secured Notes and loans under the 1.75 Lien Term Loan Facility, and modify certain financial covenants.

72.    A summary of the debt and equity positions of the Debtors' most significant stakeholders and capital providers prior to and after the 2015 Refinancing Transactions and 2017 Refinancing Transactions is included below:

**DEBT & EQUITY OWNERSHIP**



4.      **Retention of Restructuring Advisors.**

73.      In July 2017, the Debtors retained Kirkland & Ellis LLP ("K&E") as legal advisor

to assist the Board and management with a review of all strategic alternatives.  In August 2017,

the Debtors retained PJT Partners, LP ("PJT") as investment bankers and Alvarez & Marsal

North America, LLC as restructuring advisors, and continued the process of exploring all

strategic alternatives, including a comprehensive restructuring through negotiations with various

stakeholders.

5.      **Revolver Draw.**

74.      On September 7, 2017, following discussions and the recommendation of their

advisors, the Debtors borrowed the remaining approximately $88 million availability outstanding

under the RBL Facility.  Access to this additional liquidity, which in the Debtors' view was the

least expensive funded source of liquidity available, proved critical to the Debtors' ability to

fund operations during negotiations with all major creditor constituencies regarding the terms of

a consensual balance sheet restructuring.

**C.      Governance Matters.**

75.      In July 2017, prior to engaging in formal restructuring negotiations, the Board

adopted a resolution expanding the authority of the audit committee of the Board (the "Audit

Committee"), which was then comprised of four NYSE independent directors, to explore

strategic alternatives to strengthen the Debtors' balance sheet and maximize the value of the

Debtors' assets, and to consider all restructuring-related matters.   Specifically, the audit

committee's authority was expanded to include:

- exploring such strategic and/or financial alternatives as the Audit Committee may
  determine to be advisable for EXCO and its stakeholders in light of EXCO's cash
  flow, liquidity and general financial condition, including refinancing or new
  capital raising transactions, amendments to or restructuring of the existing
  indebtedness and other obligations of EXCO, or a potential sale of the Company

or any of its assets, and the commencement of judicial processes or out-of-court implementation of restructuring and recapitalization transaction for EXCO, including the filing of a voluntary petition under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (each of the foregoing and any combination of the foregoing, a "Restructuring Transaction");

- monitoring and participating in the negotiations for a Restructuring Transaction;

- considering and accepting any such Restructuring Transaction that is in the best interests of EXCO and its estate on behalf of the Board;

- negotiating and approving the filing of (i) any motion, order, and related documentation regarding the use of cash collateral and incurrence of debtor-in-possession financing, (ii) a chapter 11 plan for EXCO implementing the terms of a Restructuring Transaction, (iii) a disclosure statement to solicit acceptances for such chapter 11 plan among constituencies permitted to vote for such chapter 11 plan under the Bankruptcy Code, and (iv) all other papers or documents related thereto or to a chapter 11 case (collectively, the "Chapter 11 Filings");

- approving any and all modifications to any Chapter 11 Filing; and

- regularly updating and advising the Board as to any matters considered or undertaken by the Audit Committee or as the Board may otherwise request.

76.     Since that time, one member of the Audit Committee has resigned from the Board, as well as all non-Audit Committee directors, including those directors appointed by Oaktree Capital Group, LLC, Fairfax, and Bluescape.[7]

77.     The Board currently is comprised of three members, Anthony R. Horton, Randall E. King, and Robert L. Stillwell, each of whom is a member of the Audit Committee. Mr. Horton has been Chief Financial Officer/Treasurer and Executive Vice President of Energy Future Holdings Corp. since October 3, 2016.  Prior to that, Mr. Horton served as its Treasurer

---

[7]     Additionally, on February 28, 2017, former Board member Wilbur L. Ross resigned from his positions as a member of the Board and each of the Audit Committee, the compensation committee, and the nominating and corporate governance committee as a result of his appointment as Secretary of the U.S. Department of Commerce.  Mr. Stephen Toy succeeded Mr. Ross on the Board.  Investment funds managed by WL Ross & Co. LLC that then beneficially own approximately 18 percent of EXCO's outstanding common stock were not required to divest ownership as a result of Mr. Ross' appointment or in connection with his resignation from the Board.

and Senior Vice President.  In addition, Mr. Horton currently serves as a director and officer of several subsidiaries of Energy Future Holdings Corp.  Mr. Horton has been a member of the Board since March 1, 2017.

78.     Mr. King is a founding member and Managing Partner of Anderson King Energy Consultants, LLC.  Prior to forming Anderson King Energy Consultants, LLC in 2012, Mr. King was a Managing Director for Bank of America Merrill Lynch's oil and gas divestiture business and supervised a team of professionals based in Houston.  Mr. King has been a member of the Board since March 1, 2017.

79.     Mr. Stillwell has been a member of the Board since 2005.  He previously served as a General Counsel of BP Capital LP, and also served as a Managing Director, Chief Compliance Officer, Vice President and Principal at TBP Investments Management, LLC.  Mr. Stillwell was also previously a partner at Baker Botts L.L.P. and served as a Regent on the University of Texas System Board of Regents from 2009 through 2015.

### D.     Investigation.

80.     In October 2017, K&E began a review of potential claims that the Debtors may possess against third parties, including EXCO's former directors who were appointed by certain secured creditors, and any claims arising out of the 2015 Refinancing Transactions and the 2017 Refinancing Transactions, among others.  The investigation was commenced in anticipation of a potential in- or out-of-court transaction.  In the course of the investigation, the Debtors have reviewed multiple potential claims and causes of action, which the Debtors are continuing to evaluate.

### E.     Discussions with Creditors.

81.     As discussed, beginning in the summer of 2017, the Debtors, with the assistance of their advisors, commenced comprehensive restructuring negotiations with all major creditor

constituencies, including the RBL Agent, a super-majority of its secured creditors, and certain unsecured noteholders, including the ad hoc unsecured noteholders committee.  Substantive discussions began in mid-October 2017, and continued up to the Petition Date.  These discussions did not result in an agreement amongst the parties regarding a restructuring transaction.

82.     Simultaneously with these discussions, the Debtors engaged with the ad hoc unsecured noteholders committee and facilitated significant due diligence efforts.  On October 19, 2017, the Debtors held an in-person meeting with advisors to the ad hoc unsecured noteholders committee at which the Debtors' management presented their go-forward business plan.  Following this meeting, the Debtors and the advisors to the ad hoc unsecured noteholders committee had multiple conferences regarding details of the Debtors' business plan and potential outstanding claims against the Debtors.  Importantly, the Debtors have been working closely with counsel to the ad hoc unsecured noteholders committee on a mortgage analysis for all of the Debtors' oil and gas assets as well as providing the ad hoc unsecured noteholders committee with information regarding various collateral security documents, financial models, and pending litigation.  More recently, the Debtors have also engaged with the single large unsecured noteholder, and its advisor, that is not part of the ad hoc unsecured noteholders committee.

83.     In mid-December 2017, simultaneously with the debtor-in-possession financing marketing process described below, certain of the Debtors' secured creditors approached the Debtors regarding entry into forbearance agreements through mid-January 2018 with respect to certain specified defaults, including the Debtors' non-payment of interest under the 1.75 Lien Term Loan Facility, to provide all parties with additional time to engage in negotiations regarding the terms of a consensual restructuring transaction.  The Debtors subsequently entered

into forbearance agreements with the majority of their lenders under each of the RBL Facility, the 1.5 Lien Senior Secured Notes, and the 1.75 Lien Term Loan Facility.  Notably, the lenders under the RBL Facility conditioned entry into a forbearance agreement on receipt of a signed commitment letter for a proposed DIP financing facility that would pay down the RBL Facility at the outset of these chapter 11 cases.  Additionally, the RBL Facility forbearance agreement contained a provision that requires the Debtors to pay the lenders under the RBL Facility a late payment fee of $750,000 if the RBL Facility is not paid down by January 19, 2018.

### F.    Proposed DIP Financing.

84.    Beginning in November 2017, the Debtors, with the assistance of PJT, contacted 28 parties to solicit proposals for debtor-in-possession financing and indications of interest for an exit facility.  Of the 28 parties contacted, 16 parties signed non-disclosure agreements and were granted access to due diligence through the Debtors' data room.  The Debtors' management team hosted in-person meetings for 11 of the interested parties from November 14, 2017 through November 20, 2017.  In total, the Debtors received nine first-round proposals.

85.    In early December 2017, following material adjustments to the Debtors' business plan, the Debtors, with the assistance of PJT, resolicited proposals for a debtor-in-possession financing facility.  The Debtors received three second-round proposals from third-party lenders as well as a proposal from the RBL Agent.  Following additional discussions, the three third-party lenders submitted a joint proposal (the "Joint Proposal") that provided a fully-committed, fully-syndicated postpetition financing facility with more favorable economic terms than the RBL Agent proposal.

86.    Simultaneously with the ongoing financing process, the Debtors continued to engage in restructuring discussions with certain of their key constituencies and advisors.  In early December 2017, certain of the Debtors' secured creditors approached the Debtors regarding

entry into forbearance agreements through mid-January 2018, to provide all parties with additional time to engage in negotiations regarding the terms of a consensual restructuring transaction. While the Debtors were interested in maximizing the potential for a consensual restructuring transaction, they did not want to forgo the favorable financing alternatives provided by the Joint Proposal and the RBL Agent proposal and subject themselves to potential market deterioration during the forbearance period. As a result, the Debtors approached the RBL Agent and the third-party lenders regarding the possibility of executing a financing commitment in December 2017, which commitment would remain open through mid-January 2018. Both the RBL Agent and the third-party lenders agreed to provide an open financing commitment through January 19, 2018 in consideration for an advance of a portion of the upfront fees. With this concession in hand, the Debtors, in consultation with their advisors, determined that entry into forbearance agreements with their secured creditors simultaneously with the execution of a DIP commitment letter was in the best interests of the Debtors and all parties in interest. Further, the Debtors, in consultation with their advisors, determined that the Joint Proposal was the best available financing in light of the fully-syndicated nature of the commitment and the materially reduced fees compared to the RBL Agent proposal.

87. While the Debtors were finalizing the terms of the Joint Proposal commitment with the third-party lenders, the Debtors received a term sheet for a $250 million postpetition financing facility from Fairfax and Bluescape. Subsequent modifications to that term sheet resulted in Fairfax and Bluescape agreeing to provide the Debtors with a fully-committed, fully-syndicated $250 million postpetition financing facility with materially lower interest rate, fees, and expenses than contained in the Joint Proposal, resulting in cheaper financing for the Debtors. Similar to the Joint Proposal, Fairfax and Bluescape were willing to keep the financing

commitment open through January 19, 2018; however, the Fairfax and Bluescape term sheet did not require the Debtors to pay any fees upon execution of the DIP commitment letter, allowing the Debtors to conserve liquidity in the weeks leading up to the commencement of these cases.

88.     In addition, the Fairfax and Bluescape term sheet contained fewer covenants. Most notably, it did not require the Debtors to significantly hedge their existing oil and gas production or accept potential near-term redetermination risk, unlike the Joint Proposal.  The Fairfax and Bluescape term sheet did include a sale milestone, but the Debtors and their advisors did not view this as a material restriction as the Debtors already intended to commence a marketing process for their assets. Finally, Fairfax and Bluescape agreed to provide the Debtors with significant flexibility with respect to the borrowing base, budget, and the Debtors' ability to potentially hedge, as well as more limited reporting and testing than would be required under the Joint Proposal.

89.     The Debtors, in consultation with their advisors, determined that the Fairfax and Bluescape financing proposal afforded the Debtors the greatest flexibility with the fewest restrictions and at the lowest cost, and was in the best interests of the Debtors and their estates. On December 20, 2017, the Debtors executed a commitment letter with Fairfax and Bluescape for a $250 million postpetition financing facility, substantially on the same terms as set forth in the DIP Motion and DIP Credit Agreement (each as defined in **Exhibit A**), filed contemporaneously herewith.  The proposed debtor-in-possession financing facility represents the culmination of an over two-month marketing process and provides the Debtors and their creditor constituencies with postpetition financing on the best available terms.

90.     As discussed in the DIP Motion, the Debtors require immediate access to the proposed debtor-in-possession financing facility and cash collateral to refinance their obligations

under the RBL Facility and continue operating in the ordinary course of business during the early stages of these chapter 11 cases.  Absent immediate access to the proposed debtor-in-possession financing facility and cash collateral, the Debtors would be unable to operate their businesses, pay employees, vendors, and other suppliers, or administer these chapter 11 cases, and their ability to successfully reorganize or market their assets would be jeopardized.

## V.     First Day Motions.

91.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.  I have reviewed each of the First Day Motions.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  January 15, 2018

Tyler S. Farquharson
Chief Financial Officer and Treasurer
EXCO Resources, Inc.

**<u>Certificate of Service</u>**

      I certify that on January 16, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Marcus A. Helt*
Marcus A. Helt

**<u>Exhibit A</u>**

**Evidentiary Support for First Day Motions**

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

### Administrative and Procedural Motions

**I.      Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief ("Joint Administration Motion").**

1.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these chapter 11 cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  I believe that parties in interest will not be harmed by the relief requested, but instead will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.  Accordingly, I believe that the joint administration of these chapter 11 cases is in the best interests of their estates, their creditors, and all other parties in interest.

**II.      Debtors' Emergency Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs ("SOFA Extension Motion").**

2.      Pursuant to the SOFA Extension Motion, the Debtors seek entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 30 days, for a total of 44 days from the Petition Date,

---

[1]      Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motion.

through and including February 28, 2018, without prejudice to the Debtors' ability to request additional extensions for cause shown.

3.      To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to hundreds of claims, assets, and contracts from each Debtor entity.  Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees. Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

4.      In the days leading up to the Petition Date, the Debtors' primary focus has been preparing for these chapter 11 cases.  I believe that focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of these chapter 11 cases will facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.

**III.    Debtors' Emergency Motion for Entry of an Order (I) Authorizing Consolidated Creditors Lists, (II) Authorizing Redaction of Certain Personal Identification Information, (III) Waiving the Requirement to File Equity Lists and Modifying Equity Holder Notice Requirements, and (IV) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information ("Creditor Matrix Motion").**

5.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to file a consolidated creditor matrix and list of the 50 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, (b) waiving the requirement to file a list of equity security holders and modifying the requirements for provision of notice to such holders, (c) authorizing the Debtors to redact certain personal identification information for individual creditors, and (d) approving the form and manner

of notice of commencement of these chapter 11 cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

6.     The preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome.  I believe that the permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, will maximize the value of the Debtors' estates and is in the interests of all of the Debtors' stakeholders.

## IV.     Debtors' Emergency Application for Order Appointing Epiq Bankruptcy Solutions, LLC as Claims, Noticing, Solicitation, and Administrative Agent ("Claims Agent Application").

7.     Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Epiq Bankruptcy Solutions, LLC as the Claims and Noticing Agent for the Debtors in their chapter 11 cases to (a) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and other parties in interest, (b) provide computerized claims, objection, and solicitation- and balloting- related services, and (c) assist the Debtors in claim and ballot processing and other administrative services with respect to these chapter 11 cases, in each case, pursuant to the terms of the Engagement Agreement.

8.     Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be tens of thousands of persons and entities to be noticed and that many of these parties will file claims.  In view of the number of anticipated claimants and the complexity of the Debtors' business, I believe that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's Office of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of both the Debtors' estates and their creditors.

**Operational Motions**

**V.    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief ("DIP Motion").**

9.      The Debtors request that the Court approve the senior secured superpriority priming debtor-in-possession credit facilities in the amount of $180.4 million on an interim basis and $250 million on a final basis, provided by Hamblin Watsa Investment Counsel Ltd., as administrative agent (in such capacity, the "DIP Agent"), and the lenders from time to time a party thereto (collectively, the "DIP Lenders" and together with the DIP Agent and the Issuing Banks and the other Secured Parties (each as defined in the DIP Credit Agreement), the "DIP Secured Parties"). The DIP Facilities will provide the Debtors with sufficient liquidity to pay down the Debtors' existing RBL obligations—avoiding a priming fight with the Debtors' existing prepetition RBL lenders—and stabilize and fund the Debtors' operations during these chapter 11 cases.

10.     The Debtors require immediate access to the DIP Facilities in addition to continued use of the Prepetition Secured Parties' Cash Collateral. As of the Petition Date, the Debtors' total unrestricted cash balance is approximately $34.4 million, which I believe is insufficient to operate their enterprise and continue paying their debts as they come due. The Debtors' business is cash intensive, with significant daily costs required to satisfy obligations to vendors and employees. As such, and due to their current limited liquidity, the Debtors require immediate access to the DIP Facilities and the use of Cash Collateral to operate their business, preserve value, and avoid irreparable harm pending the Final Hearing.

11.     I believe the DIP Facilities were the product of extensive, arm's-length negotiations with the DIP Lenders.  The DIP Facilities were preceded by a competitive marketing process designed to secure postpetition financing on the best available terms.  As part of this process, PJT solicited proposals for debtor-in-possession financing and indications of interest for an exit facility from 28 parties.  The Debtors executed non-disclosure agreements with 16 of the 28 parties contacted, hosted in-person meetings for 11 of the interested parties, and received nine first round proposals.

12.     In early December, following material adjustments to the Debtors' business plan, the Debtors, with the assistance of PJT, resolicited proposals for debtor in possession financing. The Debtors received three second round proposals from third parties as well as a proposal from the RBL Agent.  Following additional discussions, the three third parties submitted the Joint Proposal that provided a fully-committed, fully-syndicated postpetition financing facility with more favorable economic terms than the RBL Agent's proposal.

13.     Simultaneously with the ongoing financing process, the Debtors continued to engage in restructuring discussions with certain of their secured creditors.  With offers for DIP financing in hand, the Debtors, in consultation with their advisors, determined that entry into forbearance agreements with their secured creditors simultaneously with execution of a DIP commitment letter was in the best interests of the Debtors and all parties.  Further, the Debtors, in consultation with their advisors, determined that the Joint Proposal was the best available financing in light of the fully-syndicated nature of the commitment and the materially reduced fees compared with the RBL Agent proposal.

14.     While the Debtors were finalizing the terms of the Joint Proposal commitment with the third parties, the Debtors received a term sheet for a $250 million postpetition financing facility

from affiliates of Fairfax and Bluescape. Subsequent modifications to that term sheet resulted in a more favorable postpetition financing facility for the Debtors than available under the Joint Proposal. Fairfax and Bluescape agreed to provide the Debtors with a fully-committed, fully-syndicated $250 million postpetition financing facility with materially lower interest rate, fees, and expenses than contained in the Joint Proposal, resulting in a cheaper financing for the Debtors. Similar to the Joint Proposal, Fairfax and Bluescape were willing to keep the financing commitment open through January 19, 2018; however, the Fairfax and Bluescape term sheet did **not** require the Debtors to pay any fees upon execution of the DIP commitment letter, allowing the Debtors to conserve liquidity in the weeks leading up to the commencement of these cases.

15.     In addition, the Fairfax and Bluescape term sheet contained fewer covenants. Most notably, it did not require the Debtors to significantly hedge their existing oil and gas production or accept potential near-term redetermination risk, unlike the Joint Proposal. The Fairfax and Bluescape term sheet did include a sale milestone, but the Debtors and their advisors did not view this as a material restriction as the Debtors already intended to commence a marketing process for their assets. Finally, Fairfax and Bluescape agreed to provide the Debtors with significant flexibility with respect to the borrowing base, DIP Budget, and the Debtors' ability to potentially hedge, as well as more limited reporting and testing than required under the Joint Proposal.

16.     I believe the Fairfax and Bluescape financing proposal afforded the Debtors the greatest flexibility with the least restrictions and at the lowest cost, and is in the best interests of the Debtors and their estates. On December 20, 2017, the Debtors executed the DIP Commitment Letter with Fairfax and Bluescape for a $250 million postpetition financing facility, substantially on the same terms as set forth in the DIP Motion and in the DIP Credit Agreement. The DIP Facilities represent the culmination of an over two-month solicitation process and I believe provide

the Debtors and their creditor constituencies with postpetition financing on the best available terms.

17.     In light of the foregoing, I do not believe that alternative sources of financing with terms as favorable as those of the DIP Facilities are available to the Debtors.  I believe the economic terms of the proposed DIP Facilities are very competitive and reflect the market interest in providing the Debtors with postpetition financing.  I believe the requested relief is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors were denied the liquidity that would be provided by the DIP Facilities pursuant to the interim order and the final order.  Accordingly, I submit that the DIP Motion should be approved.

**VI.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief ("<u>Cash Management Motion</u>").**

18.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order authorizing the Debtors to (a) continue to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto, and (b) continue to perform intercompany transactions consistent with historical practice.

19.     The Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with intercompany

transactions.  Additionally, the Debtors' corporate accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

20.     I understand that Debtor EXCO Resources historically has provided services to two partially owned non-Debtor entities, EXCO Resources (PA), LLC and EXCO Appalachia Midstream, LLC, each pursuant to that certain services agreement entered into on June 1, 2010 by and between Debtor EXCO Holding (PA), Inc. and non-Debtor EXCO Resources (PA), LLC (the "Shared Services Agreement").  Pursuant to the limited liability company agreement entered into in connection with the Appalachia JV, Debtor EXCO Holding (PA), Inc. provides certain services to assist with non-Debtor EXCO Resources (PA), LLC's operations.  I understand that these services include engineering, development, and/or producing professional skills such as those performed by engineers, geologists, and landmen, human resources, tax, and legal services, among others.  To commence any of the services provided under the Shared Services Agreement, Debtor EXCO Holding (PA), Inc. and non-Debtor EXCO Resources (PA), LLC must execute a written confirmation describing the specific services to be performed.  Debtor EXCO Holding (PA), Inc. is not authorized to perform and is not entitled to reimbursement or other compensation for any services not encompassed by a written confirmation.  In connection with the Shared Services Agreement, the Master Funding Account disburses funds on account of payroll obligations to EXCO Resources (PA), LLC.  The claims related to the Shared Services Agreement are reflected as general and administrative journal entries, rather than capital contributions.  EXCO Resources (PA), LLC repays the amounts owed to EXCO Resources, Inc. the following month in the ordinary course.

21.     Additionally, I understand that historically EXCO Operating Company, LP has funded the Haynesville JV in accordance with that certain joint development agreement entered

into on August 14, 2009 by and between Debtor EXCO Operating Company, LP and BG US Production Company, LLC (the "Joint Development Agreement"). Pursuant to the Joint Development Agreement, EXCO Operating Company, LP and BG US Production Company, LLC each have a 50-percent interest in certain assets located in East Texas and North Louisiana ("Haynesville Assets"). EXCO Operating Company, LP and BG US Production Company, LLC are each responsible for their 50 percent proportionate share of all development costs incurred in connection with the development of the Haynesville Assets. Debtor EXCO Operating Company, LP disburses funds from the EXCO Operating LP Operating Account to the Haynesville Escrow Account on account of the Haynesville JV. Approximately three months after the funds are disbursed, joint interest billings are deposited into the EXCO Operating LP Operating Account.

22.     The Debtors track all fund transfers through their accounting system and can ascertain, trace, and account for all Intercompany Transactions. If the Intercompany Transactions were to be discontinued, I believe the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

23.     I believe the Intercompany Transactions between the Debtors and certain non-Debtor entities are crucial to the Debtors' interests in the Appalachia JV and Haynesville JV. Without the services provided by Debtor EXCO Holding (PA), Inc. to non-Debtor EXCO Resources (PA), LLC under the Shared Services Agreement, I do not believe the Appalachia JV would be able to operate effectively. I do not believe that the claims created on account of the Shared Services Agreement prejudice other stakeholders or cause harm to the Debtors' estates because all amounts related to these claims are repaid in full by non-Debtor EXCO Resources (PA), LLC the following month, in the ordinary course.

24.     Additionally, I do not believe the Haynesville JV would be able to operate effectively if the Debtors were to discontinue their 50-percent proportionate share of all development costs from the EXCO Operating LP Operating Account to the Haynesville Escrow Account on account of the Haynesville JV.  Likewise, I believe the joint interest billings deposited into the EXCO Operating LP Operating Account total the same amount disbursed on account of the Haynesville JV development costs, and therefore do not prejudice other stakeholders or cause harm to the Debtors' estates.

25.     Moreover, I believe the Intercompany Transactions are comparable to those of other companies with similarly complex corporate structures and operate in a fashion typical of other oil and natural gas companies.  Importantly, all Intercompany Transactions can be, and will be, tracked on a postpetition basis, and fully subject to monthly reviews by the Debtors.  Any discrepancies can, and will be, addressed through a monthly intercompany true-up, consistent with past practice.

26.     I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' business.  Requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  Importantly, the Cash Management System provides the Debtors with the ability to quickly create status reports on the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds.  I believe that any disruption of the Cash Management System could have a severe and adverse effect on the Debtors' restructuring efforts.  Indeed, requiring the Debtors to adopt a new, segmented cash management system could cause the Debtors' operations to grind to

a halt, needlessly destroying the value of the Debtors' business enterprise. In contrast, I believe that maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.

**VII.    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs and (II) Granting Related Relief ("<u>Wages Motion</u>").**

27.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

28.    The Debtors employ approximately 170 individuals on a full-time basis (the "<u>Employees</u>"). Approximately 40 Employees are paid on an hourly basis and approximately 130 Employees receive a salary. The Debtors employ approximately two individuals on a part-time basis. None of the Employees are represented by a union or collective bargaining unit. In addition to the Employees, the Debtors also retain from time to time specialized individuals as independent contractors (the "<u>Independent Contractors</u>") to complete discrete projects, as well as temporary workers (the "<u>Temporary Staff</u>") from several staffing agencies to fulfill certain duties on a short-term basis. The Debtors currently retain approximately eight Independent Contractors and Temporary Staff in the aggregate, although this number fluctuates based on the Debtors' specific needs at any given time. The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Debtors' Employees.

29.    To minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected, the Debtors seek authority to pay and honor

11

certain prepetition claims relating to, among other things, wages, salaries, expense reimbursements, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, flex spending account contributions, taxes, and 401(k) contributions), health insurance, retirement benefits, workers' compensation benefits, paid time off, other paid leave, unpaid leave, life and accidental death and dismemberment insurance, short- and long-term disability coverage, severance, relocation assistance, certain grandfathered benefits, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business (collectively, the "Employee Compensation and Benefits").  In addition, the Debtors also are seeking to pay all costs incident to the Employee Compensation and Benefits.

30.     The Debtors do not believe there are amounts owed to any individuals on account of the Employee Compensation and Benefits that exceed $12,850, the priority expense compensation and benefit cap set forth by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

31.     I believe the Employees provide the Debtors with services necessary to conduct the Debtors' business, and absent the payment of the Employee Compensation and Benefits owed to the Employees, Independent Contractors, and Temporary Staff, the Debtors may experience workforce turnover and instability at this critical time in these chapter 11 cases.  The oil and gas industry is a highly specialized business that requires unique technical expertise.  I believe that without these payments, the Debtors' workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees, Independent Contractors, and Temporary Staff may face.  Such individuals may then elect to seek alternative employment opportunities.

32.     Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  I therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their workforce as the Debtors seek to operate their business in these chapter 11 cases.

**VIII.  Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief ("Utilities Motion").**

33.     Pursuant to the Utilities Motion, the Debtors seek entry of an order (a) approving the Debtors' proposed adequate assurance of payment for future utility services, (b) prohibiting utility companies from altering, refusing, or discontinuing services, and (c) approving the Debtors' proposed procedures for resolving adequate assurance requests.

34.     In connection with the operation of their business and management of their properties, the Debtors obtain electricity, natural gas, propane, telecommunications, water, waste management (including sewer and trash), internet, cable, and other similar services from a number of utility companies or brokers.  On average, the Debtors pay approximately $580,000 each month for third-party Utility Services, calculated as a historical average payment for the 12-month period ended December 31, 2017.  Accordingly, the Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $580,000. The Debtors provide certain of the Utility Companies with cash deposits, escrow agreements, or

letters of credit.  To the best of the Debtors' knowledge, the Debtors do not have any existing prepayments with respect to any Utility Companies.

35.     I believe uninterrupted Utility Services are essential to the Debtors' ongoing business operations, and hence the overall success of these chapter 11 cases.  Should any Utility Company refuse or discontinue service, even for a brief period, I believe the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.  Accordingly, I believe it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

## IX.   Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Operating Expenses, (B) Marketing Expenses, (C) Shipping and Warehousing Claims, and (D) 503(B)(9) Claims, and (II) Granting Related Relief ("Lienholders Motion").

36.     Pursuant to the Lienholders Motion, the Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business all undisputed, liquidated, prepetition amounts owing on account of (i) operating expenses, (ii) marketing expenses, (iii) shipping and warehousing claims, and (iv) 503(b)(9) claims; and (b) granting related relief.

### A.   Payment of Operating Expenses.

37.     The Debtors are operators under the majority of their oil and gas leases.  As operators, the Debtors are responsible for paying all of the lease operating expenses (the "Operating Expenses") on account of their working interests in the oil and gas leases and on behalf of the non-operating working interest owners.  The Debtors seek reimbursement from non-operating interest owners for their *pro rata* share of the operating expenses.

38.     In the 12 months before the Petition Date, the Debtors paid approximately $262 million in Operating Expenses, approximately $110.4 million of which was reimbursed by

14

non-operating working interest owners.  As of the Petition Date, the Debtors estimate that they have approximately $53 million of Operating Expenses outstanding, approximately $19.2 million of which will come due and owing within the first 21 days of these chapter 11 cases, and for which they will be reimbursed approximately $22.7 million by the owners of non-operating working interests.

39.     Regardless of when an operator is reimbursed by non-operating working interest owners, the operator must continue to pay Operating Expenses in a timely fashion.  Failure to pay Operating Expenses when due could result in, among other remedies, the operator's removal as operator under a joint operating agreement and/or the perfection and enforcement of liens on the Debtors' assets.

**B.     Payment of Marketing Expenses.**

40.     To effectively market or sell production from oil and gas properties operated by the Debtors, the Debtors, as operator, will make contractual arrangements (the "Marketing Arrangements") by which third parties will charge the operator for gathering, transportation, treating, dehydration, compression, processing, fractionation, and other similar services necessary or desirable to get the oil and natural gas production to market in a condition ready for sale (such charges, collectively, the "Marketing Expenses").  In addition, where the Debtors elect to take their production "in-kind" rather than requesting that the third-party operator market the production associated with the Debtors' non-operating working interest on the Debtors' behalf, the Debtors similarly will incur Marketing Expenses.

41.     The Debtors' compliance with the Marketing Arrangements and timely payment of the Marketing Expenses is critical to the Debtors' ability to receive revenue from production that they market both on behalf of themselves and third parties (the "Marketed Production").  Failure to receive such revenue would directly threaten the Debtors' ability to make timely payments to

15

third parties holding an interest in production, such as working interest owners and royalty interest owners.

42.     In the twelve months preceding the Petition Date, the Debtors paid approximately $144 million in Marketing Expenses.  As of the Petition Date, the Debtors estimate that they have approximately $18.9 million of prepetition Marketing Expenses outstanding, approximately $9.5 million of which will come due and owing in the first 21 days of these chapter 11 cases.

43.     I understand that failure to timely pay the Marketing Expenses due and owing by the Debtors could result in counterparties to the Marketing Arrangements refusing to release production or revenues associated with the Marketed Production in their possession or refusing to accept delivery of additional Marketed Production.  In instances where delivery of Marketed Production is refused, the Debtors may be forced to shut-in a well.  Shutting in a well may have economic consequences to the Debtors beyond temporary cessation of production and revenue therefrom.  Further, the act of shutting in a well can trigger obligations to other interest owners in that well, including payment obligations or potential forfeiture of the Debtors' interest under the terms of an oil and gas lease.  Without seamless compliance with their Marketing Arrangements and the ability to make the Debtors' production marketable for sale, the Debtors revenue stream and ability to operate their business potentially would be severely impaired.  Therefore, I believe it is critical that the Debtors pay Marketing Expenses and to continue paying such Marketing Expenses in the ordinary course of business on a postpetition basis.

C.     **Payment of Shipping and Warehousing Claims.**

44.     In the ordinary course of business, the Debtors engage certain vendors (the "Shippers") to transport or deliver goods, materials, or other property, including drilling pipe, casing, wellheads, tanks, separators, and other necessary oil and gas equipment (the "Materials") from a manufacturer to a storage yard, between a storage yard and an oil and gas

16

property, between oil and gas properties, or between storage yards.  The Shippers regularly possess Materials belonging to the Debtors and the owners of non-operating working interests in an oil and gas property.  The Materials are integral to the exploration and production process.  The Debtors commonly require timely, and sometimes immediate, access to the Materials while drilling or operating a well.  Additionally, while the Debtors own multiple storage yards, they rely on approximately two additional vendors (collectively, the "Warehousemen") in the ordinary course of business to store Materials when not being used.  To avoid refusal by Shippers and Warehousemen to deliver or release Materials or other property in their possession or control, the Debtors seek approval to pay prepetition amounts owed to the Shippers and Warehousemen (collectively, the "Shipping and Warehousing Claims").

45.     In the twelve months preceding the Petition Date, the Debtors paid approximately $1.06 million in Shipping and Warehousing Claims.  As of the Petition Date, the Debtors estimate that they have approximately $90,000 of prepetition Shipping and Warehousing Claims outstanding, all of which will come due and owing in the first 21 days of these chapter 11 cases.

46.     I believe that certain Shippers and Warehousemen may refuse to deliver or release Materials or other property in their possession or control, as applicable, before the prepetition amounts owed to them by the Debtors have been satisfied.  To continue using the Shippers' and Warehousemen's transportation and storage services and have access to the Materials held or controlled thereby, I believe it is important that the Debtors obtain approval to pay prepetition Shipping and Warehousing Claims and to continue paying such Shipping and Warehousing Claims in the ordinary course of business on a postpetition basis.

**D.     503(b)(9) Claims.**

47.     The Debtors may have received certain goods or materials from various vendors within the 20 days before the Petition Date.  As of the Petition Date, the Debtors owe

17

approximately $14.1 million on account of goods delivered within the 20 days prior to the Petition Date. The Debtors' ongoing ability to obtain goods as provided herein is key to their survival and necessary to preserve the value of their estates. I believe that absent payment of certain of these amounts at the outset of these chapter 11 cases, the Debtors could be denied access to the equipment and goods necessary to maintain the Debtors' business operations. I also believe that failure to honor certain of these claims in the ordinary course of business may also cause the Debtors' vendor base to withhold support for the Debtors during the chapter 11 process. Such vendors could accelerate or eliminate favorable trade terms. I believe such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

**E.      Outstanding Orders.**

48.      Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders"). Certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition. I believe that receiving delivery of Outstanding Orders is critical to preventing any disruption to the Debtors' business operations.

49.      In light of the foregoing, I believe that authorizing the Debtors to pay all undisputed, liquidated prepetition amounts owing on account of Operating Expenses, Marketing Expenses, Shipping and Warehousing Claims, and 503(b)(9), and honor Outstanding Orders on a postpetition basis in the ordinary course of business is critical to protect the Debtors' business operations and is the best interests of the Debtors' estates, their creditors, and all stakeholders.

X.     **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Obligations Owed to Holders of Mineral and Other Interests and Non-Op Working Interests and (B) Joint Interest Billings, and (II) Granting Related Relief ("Royalty Payments Motion").**

50.     Pursuant to the Royalty Payments Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the payment or application of funds attributable to (i) Mineral and Other Interests and Non-Op Working Interests and (ii) JIBs.

A.     **Mineral and Other Interests and Non-Working Interests.**

51.     The Debtors operate and/or have working interests in approximately 4,700 oil and gas production sites.  In connection with these interests, the Debtors are obligated, pursuant to their oil and gas leases and certain other agreements, to remit to the lessors of the oil and gas leases and holders of certain other interests (collectively, the "Mineral and Other Interests") their share of revenue from the producing wells located on such leases (the "Royalties").

52.     In their capacity as operator, the Debtors are also obligated to market oil and gas production on behalf of certain owners of non-operating working interests (the "Non-Op Working Interests").  Following the sale of the marketed production and the receipt of proceeds attributable thereto, the Debtors are obligated to remit to holders of Non-Op Working Interests, their share of the proceeds, net of all applicable deductions.

53.     The amount of Royalties owed to holders of Mineral and Other Interests in a given month is subject to variation due to many factors, including the specific terms of the Mineral and Other Interests, changes in ownership, and changes in the amount or type of minerals captured. The Debtors generally pay Royalties in an aggregate amount of approximately $14 million per month.  In the 12 months ending December 31, 2017, the Debtors paid Royalties in an aggregate amount of approximately $142 million.  These payments are remitted by the Debtors throughout the course of a given month.  As a result of the time required to market and sell the production,

19

and the significant accounting process required each month to accurately disburse the resulting proceeds, Royalties generally are paid approximately 55 days following the end of the month in which production of the underlying oil and gas occurred.

54.     The Debtors estimate that, as of the Petition Date, there are approximately $39.8[2] million in outstanding Royalties owed to holders of Mineral and Other Interests, approximately $9.3 million of which will become due and owing within the first 21 days of these chapter 11 cases.

55.     Similarly, payments on account of Non-Op Working Interests typically are not uniform and are not entirely predictable on a month-to-month basis.  On average, the Debtors remit approximately $10.3 million per month on account of Non-Op Working Interests.  In the 12 months ending December 31, 2017, the Debtors remitted approximately $117.7 million in payments to holders of Non-Op Working Interests.

56.     As of the Petition Date, the Debtors estimate they owe approximately $54.3[3] million to holders of Non-Op Working Interests, approximately $15.7 million of which will become due and owing within the first 21 days of these chapter 11 cases.

57.     I believe that failure to forward all required amounts to holders of Mineral and Other Interests and Non-Op Working Interests as and when due could have a material adverse

---

[2]     This amount includes approximately $14,800,000 in "suspended funds" that are Royalties due and owing to certain holders of Mineral and Other Interests but are otherwise unpayable for a variety of reasons, including incorrect contact information, unmarketable title, and ongoing disputes over ownership of the underlying interest. Subject to applicable laws, when and to the extent the Debtors are provided evidence or sufficient notice that the issue preventing payment of the suspended funds to particular holders of Mineral and Other Interests is resolved, the Debtors will release the suspended funds in question.

[3]     This amount includes approximately $22,000,000 in "suspended funds" that are due and owing to certain holders of Non-Op Working Interests but are otherwise unpayable for a variety of reasons, including incorrect contact information, unmarketable title, and ongoing disputes over ownership of the underlying interest. Subject to applicable laws, when and to the extent the Debtors are provided evidence or sufficient notice that the issue preventing payment of the suspended funds to particular holders of Non-Op Working Interests is resolved, the Debtors will release the suspended funds in question.

effect upon the Debtors and their operations, including, without limitation, potential cancellation, forfeiture, or termination of oil and gas leases, penalties and interest, initiation of litigation, including turnover actions, conversion and constructive trust claims, and assertion of significant secured claims against property of the Debtors' estates, and, in certain circumstances, attempted removal of the Debtors as operator.  I believe payment of Royalties in the ordinary course of business is in the best interests of the Debtors and their creditors.

**B.      Joint-Interest Billings.**

58.      Likewise, the Debtors hold Non-Op Working Interests in wells under various JOAs. In such instances, the Debtors receive payments representing their share of production revenues and then reimburse the operators for their share of production costs through payment of joint-interest billings ("JIBs").  Rights to payment of JIBs are often secured under contractual lien rights or statutory lien rights in favor of the operator against the Debtors' interest in the well or are subject to recoupment and setoff.

59.      The Debtors seek only to remit prepetition JIB payments in the ordinary course of business.  As of the Petition Date, the Debtors estimate that there are approximately $31 million in JIB payments outstanding, of which approximately $5.4 million will become due and owing in the first 21 days of these chapter 11 cases.

60.      I understand that failure to satisfy the prepetition JIBs as they become due will severely impact the Debtors' drilling and production operations, production may completely cease for certain wells, or leases may be lost.  The Debtors' ongoing operations depend, to a significant degree, on their relationship with the operators to whom JIB payments are owed.  I believe that if these relationships are harmed, either through the nonpayment of JIBs as they become due or through the perceived difficulties of dealing with chapter 11 debtors, the Debtors may encounter particularized controversies with each counterparty, unnecessary costs and distractions, and

corresponding harm to their business to the detriment of all parties.  As a result, I believe that payment of prepetition JIBs is in the best interests of the Debtors, their estates, and all parties in interest, and should be approved.

61.     In light of the foregoing, I believe the relief requested in the Royalty Payments Motion is critical to preserving the value of the Debtors' estates and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, I respectfully submit that the relief requested in the Royalty Payments Motion should be approved.

## XI.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief ("Taxes Motion").

62.     Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to remit and pay certain prepetition taxes and fees that will become payable during the pendency of these chapter 11 cases.  The Debtors estimate that approximately $19.5 million in Taxes and Fees relating to the prepetition period will become due and owing to the Authorities after the Petition Date.  Of this amount, approximately $16.8 million will become due and owing during the interim period.

63.     The Debtors collect, withhold, and incur sales, use, income, withholding, franchise, severance, and property taxes, as well as other business, environmental, and regulatory fees.  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities.  Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.

64.     I believe that failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways.  *First*, the Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from the reorganization process.  *Second*, failing to pay Taxes and Fees could

22

subject certain of the Debtors' directors and officers to claims of personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring. **Third**, failing to pay certain of the Taxes and Fees, particularly franchise taxes, would likely cause the Debtors to lose their ability to conduct business in certain jurisdictions. **Fourth**, I believe unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' business. Finally, the U.S. Trustee requires that debtors pay all tax obligations arising after the filing of the petition in full when due.

65.　In light of the foregoing, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Taxes Motion should be approved.

**XII.　Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder, (IV) Enter into New Premium Financing Agreements in the Ordinary Course of Business, and (V) Granting Related Relief ("<u>Insurance Motion</u>").**

66.　Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to (a) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business and (b) renew, supplement, or purchase insurance coverage in the ordinary course of business on a postpetition basis.

67.　In the ordinary course of business, the Debtors maintain approximately 24 Insurance Policies administered by multiple third-party insurance carriers. The Insurance Policies provide the Debtors with coverage for, among other things, property and casualty, general liability, automobile liability, excess umbrella liability, directors

and officers liability, employment practices liability, fiduciary liability, employed lawyers professional liability, well policy insurance, and pollution and environmental legal liability.

68.     Additionally, in the ordinary course of business the Debtors finance the premiums under each of the Insurance Policies because it is not economically advantageous for the Debtors to pay the premiums on the Insurance Policies in full on or around the start date of each policy period.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Insurance Policies, the Premium Financing Agreements, or Brokers Fees.

69.     I believe that continuation of the Insurance Policies and Premium Financing Agreements and entry into new insurance policies and premium financing agreements, as required in the ordinary course of business, is essential to the preservation of the value of the Debtors' properties and assets.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Insurance Motion.

**XIII.   Debtors' Emergency Motion for Entry of an Order (I) Approving Continuation of the Surety Bond Program and (II) Granting Related Relief ("Surety Bond Motion").**

70.     By the Surety Bond Motion, the Debtors seek entry of an order (a) authorizing the Debtors to maintain, renew, and modify their Surety Bond Program—including, but not limited to, the procurement of new sureties—in the ordinary course of business on a postpetition basis and to pay outstanding prepetition amounts, and (b) granting related relief.  In the ordinary course of business, the Debtors themselves and on behalf of their non-Debtor affiliates, are required to provide surety bonds or other forms of credit support to certain third parties, often governmental units or other public agencies, to secure the payment or performance of certain obligations.  These obligations include, among others, conservation and environmental bonds, general performance obligation bonds, lease or land use bonds, and bonds guaranteeing plugging and abandonment obligations.  As such, failing to provide, maintain, or timely replace their surety bonds may prevent

the Debtors and non-Debtor affiliates from undertaking essential functions related to their operations.

71.    Historically, Debtors EXCO Resources, Inc., EXCO Operating Company, LP, and and EXCO Production Company (PA), LLC, have provided surety bonds for certain Debtor and non-Debtor subsidiaries who have surety bond or other credit support needs.[4]  The non-Debtor surety bonds are included in the Surety Bond Program and the relief requested herein as the Debtors and non-Debtor affiliates would suffer serious consequences to their operations, up to and including a complete forced cessation of operations, if they fail to maintain appropriate surety bonds.

72.    Approximately two companies have issued the Debtors and certain non-Debtor affiliates current outstanding surety bonds.   As of the Petition Date, the Debtors have approximately nine surety bonds, which provide approximately $1.265 million in aggregate surety bond coverage for facilities and assets owned or operated by the Debtors and certain non-Debtor affiliates.  As of the Petition Date, the Debtors owe approximately $2,250 on account of prepetition obligations under the Surety Bond Program.   The Surety Bond Program is backed by various indemnities from the Debtors and non-Debtor affiliates.

73.    Continuing the Surety Bond Program is therefore necessary in order to maintain the Debtors' current business operations, as well as existing relationships with the Sureties.  Based on the Debtors' current circumstances, it is not likely that the Debtors will be able to renew, or obtain replacement of, existing bonds on terms more favorable than those offered by the Sureties. Moreover, the process of establishing a new Surety Bond Program would be burdensome to the

---

[4]    One surety bond—bond number B009443—is held by both Debtor EXCO Production Company (PA), LLC as well as non-Debtor affiliate EXCO Resources (PA), LLC.

Debtors, and it is doubtful that the Debtors could replace all of their surety bonds in time to avoid defaults or other consequences of the applicable obligations.

74.     I believe that the relief requested in the Surety Bond Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Surety Bond Motion should be granted.

**XIV.   Debtors' Emergency Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Granting Related Relief ("Equity Trading Procedures Motion").**

75.     Pursuant to the Equity Trading Procedures Motion, the Debtors seek entry of interim and final orders (a) approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to, Debtor EXCO Resources, Inc.'s existing common stock or any Beneficial Ownership[5] therein (any such record or Beneficial Ownership of common stock, the "Common Stock")[6]; (b) directing that any purchase, sale, other

---

[5]     "Beneficial Ownership" will be determined in accordance with the applicable rules of sections 382 and 383 of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1–9834 as amended (the "IRC"), and the Treasury Regulations thereunder (other than Treasury Regulations Section 1.382-2T(h)(2)(i)(A)), and includes direct, indirect, and constructive ownership (e.g., (1) a holding company would be considered to beneficially own all equity securities owned by its subsidiaries, (2) a partner in a partnership would be considered to beneficially own its proportionate share of any equity securities owned by such partnership, (3) an individual and such individual's family members may be treated as one individual, (4) persons and entities acting in concert to make a coordinated acquisition of equity securities may be treated as a single entity, and (5) a holder would be considered to beneficially own equity securities that such holder has an Option to acquire). An "Option" to acquire stock includes all interests described in Treasury Regulations Section 1.382-4(d)(9), including any contingent purchase right, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock, or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

[6]     For the avoidance of doubt, the definition of Common Stock shall not include any securities issued in connection with a chapter 11 plan of reorganization of the Debtors.

26

transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio*.

76.　　As of December 31, 2016, the Debtors estimate that they have NOLs in the amount of approximately $2.3 billion and general business credit carryforwards in the amount of approximately $280,000, translating to potential material future tax savings.

77.　　The Tax Attributes are of significant value to the Debtors and their estates. I believe that an ownership change of Common Stock may negatively impact the Debtors' utilization of the Tax Attributes. I believe it is necessary to closely monitor certain transfers of Common Stock so as to be in a position to act expeditiously to prevent such transfers, if necessary, with the purpose of preserving the Tax Attributes. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Equity Trading Procedures Motion should be approved by the Court.

## XV.　Debtors' Emergency Motion for Entry of an Order Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Certain Claims Against the Debtors' Estates ("Record Date Motion").

78.　　Pursuant to the Record Date Motion, the Debtors seek entry of an order (a) establishing the date the Court enters the Record Date Order as the effective date for notice and sell-down procedures for trading in certain claims against the Debtors' estates in order to preserve the Debtors' ability to formulate a plan of reorganization that maximizes the use of their Tax Attributes; and (b) granting related relief pursuant to the Record Date Motion.

79.　　As of December 31, 2016, the Debtors estimate that they have NOLs in the amount of approximately $2.3 billion and general business credit carryforwards in the amount of approximately $280,000, translating to potential material future tax savings.

80.　　The Record Date Order will ensure that the Debtors preserve their ability to request entry of the Sell-Down Procedures to preserve the Tax Attributes. I believe entry of the Record

Date Order is necessary to preserve the Debtors' flexibility to seek to implement sell-down procedures if they determine that proposing a plan of reorganization that would take advantage of the Section 382(*l*)(5) Exception is in the best interest of their estates.

[*Remainder of page intentionally left blank*]

**<u>Exhibit B</u>**

**Corporate Organizational Structure**

# EXCO Resources, Inc. Structure Chart

