

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
02/22/2018

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., et al.,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | Re: Docket Nos. 28 & 97 |

## FINAL ORDER PURSUANT TO
## 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507
## (I) AUTHORIZING THE DEBTORS TO OBTAIN
## POSTPETITION SECURED FINANCING, (II) GRANTING
## LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
## EXPENSE CLAIMS, (III) AUTHORIZING THE USE OF CASH
## COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING
## THE AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of an interim order (the "Interim Order") and a final order (this "Final Order") under sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, and 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 2002-1(a) and 4001-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Bankruptcy Rules"):

---

[1]     The Debtors in these chapter 11 cases (the "Bankruptcy Cases"), along with the last four digits of each Debtor's federal tax identification number, include: EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holding (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295). The location of the Debtors' service address is: 12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the DIP Documents (as defined herein), as applicable.

i.    authorizing the Debtors to obtain secured postpetition financing up to an aggregate principal amount of $250 million (the "DIP Facilities"), consisting of (a) a senior secured debtor-in-possession revolving credit facility in an aggregate principal amount of $125,000,000.00 (the "Revolver A Facility"), the proceeds of which shall be used to fund the Bankruptcy Cases and to refinance the loans and obligations outstanding under the RBL Facility (as defined below) that are not fully satisfied by the proceeds of the Revolver B Facility (as defined below) and (b) a senior secured debtor-in-possession revolving credit facility in an aggregate principal amount of $125,000,000.00 (the "Revolver B Facility"), the proceeds of which shall be used by the Borrower to refinance the loans and other obligations outstanding under the RBL Facility (as defined herein), subject to and pursuant to the terms and conditions set forth in this Final Order and the *Debtor-in-Possession Credit Agreement*, dated as of January 22, 2018 (substantially in the form attached to the Interim Order as Exhibit 1, and as hereafter amended, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"; together with all agreements, documents, and instruments executed and delivered in connection therewith, as hereafter amended, supplemented, or otherwise modified from time to time in accordance with its terms or this Final Order, the "DIP Documents"), by and among EXCO Resources, Inc. (the "Borrower" or "EXCO") and certain subsidiaries of the Borrowers named as guarantors (collectively, the "Guarantors"), Hamblin Watsa Investment Counsel Ltd., as administrative agent (in such capacity, the "DIP Agent"), and the lenders from time to time a party thereto (the "DIP Lenders," and together with the DIP Agent and

the Issuing Banks and the other Secured Parties (each as defined in the DIP Credit Agreement), the "DIP Secured Parties");

ii.  authorizing and directing the Debtors to execute, deliver, and perform their respective obligations under the DIP Credit Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith in accordance with the terms thereof;

iii. authorizing the Debtors to use Cash Collateral (as defined herein) and proceeds of the DIP Facilities consistent with the Budget (as defined herein) including with respect to any permitted variances provided therein;

iv.  granting adequate protection, solely to the extent provided herein, to the Junior Secured Parties (as defined herein) including:

    a. the 1.5 Lien Secured Parties (as defined below) under that certain Indenture, dated as of March 15, 2017 (as amended, supplemented or otherwise modified from time to time, the "1.5 Lien Indenture" and, together with all notes, mortgages, security, pledges and guaranties, and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified from time to time, the "1.5 Lien Indenture Documents", and all debts, liabilities and obligations of every kind and nature under the 1.5 Lien Indenture Documents, the "1.5 Lien Indenture Obligations"), by and among EXCO, as issuer, the guarantors party thereto, and Wilmington Trust, N.A., as trustee and collateral trustee (the "1.5 Lien Indenture Trustee") for the holders (the "1.5 Lien Noteholders" and, together with the 1.5 Lien

Indenture Trustee, the "1.5 Lien Secured Parties") of the notes issued thereunder;

b.  the 1.75 Lien Secured Parties (as defined below) under that certain 1.75 Lien Term Loan Credit Agreement, dated as of March 15, 2017 (as amended, restated or otherwise modified from time to time, the "1.75 Lien Credit Agreement" and, together with all mortgages, security, pledges and guaranties, and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified from time to time, the "1.75 Lien Loan Documents", and all debts, liabilities and obligations of every kind and nature under the 1.75 Lien Loan Documents, the "1.75 Lien Obligations"), by and among EXCO, as borrower, the guarantors party thereto, Wilmington Trust, N.A., as administrative agent and collateral trustee (in such capacity, the "1.75 Lien Administrative Agent"), and the lenders party thereto (the "1.75 Lien Lenders" and, together with the 1.75 Lien Administrative Agent, the "1.75 Lien Secured Parties"); and

c.  the Second Lien Secured Parties (as defined below) under that certain Term Loan Credit Agreement, dated as of October 19, 2015 (as amended, restated, or otherwise modified from time to time, the "Second Lien Credit Agreement" and, together with all mortgages, security, pledges and guaranties, and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified from time to time, the "Second Lien Loan Documents" (and, together with the 1.5 Lien Indenture Documents and the 1.75 Lien Loan Documents, the "Prepetition Finance Documents"),

and all debts, liabilities and obligations of every kind and nature under the Second Lien Indenture Documents, the "Second Lien Obligations" (and, together with the 1.5 Lien Indenture Obligations and the 1.75 Lien Obligations, the "Prepetition Secured Obligations"), by and among EXCO, as borrower, the guarantors party thereto, Wilmington Trust, N.A., as administrative agent and collateral trustee (in such capacity, the "Second Lien Administrative Agent"), and the lenders party thereto (the "Second Lien Lenders" and, together with the Second Lien Administrative Agent, the "Second Lien Secured Parties" (and the Second Lien Secured Parties, together with the 1.75 Lien Secured Parties and the 1.5 Lien Secured Parties, the "Junior Secured Parties")), and the liens and security interests granted by the Debtors to, and for the benefit of, the Junior Secured Parties to secure the respective Prepetition Secured Obligations under the Prepetition Finance Documents (such collateral, including the Cash Collateral (as defined below), is collectively referred to herein as the "Prepetition Collateral");

in each case, solely to the extent of any diminution in the value of the Junior Secured Parties' respective interests in the Prepetition Collateral as of the Petition Date (each as defined herein) as provided below;

v.  authorizing the Debtors to immediately use proceeds of the DIP Facilities and Cash Collateral (as defined below) to, simultaneously with the initial draw under the DIP Facilities, refinance all of the RBL Debt (as defined below) in full, including interest and fees through the date of repayment (at the non-default contract rate), which

refinancing shall be indefeasible upon the occurrence of the RBL Discharge[3] outstanding under the RBL Credit Agreement (as defined below) and (y) authorization for the Borrower and Guarantors (each as defined in the RBL Credit Agreement and collectively, the "RBL Credit Parties") to perform under, the Payoff Letter, by and between the RBL Credit Parties and the RBL Agent (as defined below) in the form attached to the Interim Order as Exhibit 5 (the "RBL Payoff Letter"); *provided* that the Exchanging RBL Loans (as defined below) shall not be repaid but shall be deemed satisfied in exchange for the DIP Loans in accordance with the terms of the DIP Credit Agreement and all Existing Letters of Credit (as defined below) shall be deemed outstanding under the DIP Facilities.

vi.  until the occurrence of the RBL Discharge, granting adequate protection in the form of reasonable and documented professional fees and contingent liens to the RBL Agent and the RBL Lenders (as defined below) under or in connection with that certain Amended and Restated Credit Agreement, dated as of July 31, 2013 (as amended, supplemented, or otherwise modified as of the Petition Date, the "RBL Credit Agreement" and the liens and security interests granted to the RBL Agent (as defined below) for the benefit of the RBL Secured Parties (as defined below) in connection therewith, the "RBL Liens"), by and among EXCO, as borrower, the guarantors party thereto, JPMorgan Chase Bank, N.A. as administrative agent (in such capacity, together with its permitted successors and assigns, the "RBL Agent"), and the other lenders and secured parties party thereto (collectively, the "RBL

---

[3]  "RBL Discharge" means the indefeasible refinancing of the RBL Debt in full (other than with respect to the Exchanging RBL Loans), including interest (at the non-default contract rate) and fees through the date of repayment which shall be deemed to have occurred upon entry of this Final Order.

Lenders" and together with the RBL Agent, the "RBL Secured Parties") and the facilities thereunder (the "RBL Facility") and the obligations arising thereunder (the "RBL Debt"), and the liens and security interests granted by the Debtors to, and for the benefit of, the RBL Secured Parties to secure the RBL Debt under the RBL Credit Agreement;

vii.   granting to the DIP Agent, for the benefit of the DIP Secured Parties: (a) allowed super-priority administrative expense claims with priority over all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 or any other provision of the Bankruptcy Code and (b) priming liens, security interests, and pledges on all of the Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3), and 364(d), which liens shall be senior to all liens, security interests and pledges, except that such liens, security interests, and pledges shall be junior solely to the Carve Out and the Permitted Liens and shall not have recourse to the Excluded Collateral as provided below;

viii.   authorizing the DIP Agent to exercise remedies under the DIP Documents upon the occurrence and during the continuance, of an Event of Default (as defined in the DIP Credit Agreement) and subject to the requirement that the DIP Agent provide five (5) business days' prior written notice to the Debtors, counsel to the Debtors, the Office of the U.S. Trustee, and counsel to the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases (the "Creditors' Committee"), during which period the Debtors may seek an emergency hearing as provided in Paragraph 13 below;

ix.   modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of this Final Order;

x.   waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Final Order; and

xi.   granting such other related relief as may be necessary or proper.

The final hearing (the "Final Hearing") for this Court to consider entry of this Final Order granting the relief requested in the Motion having been held by this Court on February 22, 2018; and upon the record made by the Debtors at the Final Hearing, including the First Day Declaration, the O'Hara Declaration, and the Stuart Declaration, and this Court having heard and resolved or overruled all objections to the relief requested in the Motion; and it appearing that the relief requested on a final basis in the Motion is in the best interests of the Debtors, their estates and creditors; and after due deliberation and consideration and sufficient cause appearing therefor,

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.   *The Motion.*  The Motion is granted on a final basis as set forth herein.  Any objection to the Motion to the extent not withdrawn or resolved is hereby overruled.

2.   *Jurisdiction.*   This Court has core jurisdiction over the Bankruptcy Cases commenced on January 15, 2018 (the "Petition Date"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Notice.*  Requisite notice of the Motion and the relief requested thereby and this Final Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Final Order.

4.      *Findings Regarding the DIP Facilities and the Use of Prepetition Collateral.*

(a)      The Debtors require the DIP Facilities and the use of Cash Collateral to refinance and satisfy all of the RBL Debt (other than the Exchanging RBL Loans which shall be deemed satisfied and exchanged for DIP Loans in accordance with the DIP Credit Agreement) and to pay (i) post-petition operating expenses in accordance with the Budget (as defined herein), (ii) certain transaction costs, fees and expenses, and (iii) certain other costs and expenses of administration of the Bankruptcy Cases, including funding the Carve Out (as defined herein) (such permitted uses set forth in this Paragraph 4(a), collectively, the "Approved Purposes").

(b)      The Debtors are unable to obtain financing on more favorable terms and conditions, both with regard to the DIP Facilities themselves as well as with regard to support for the Debtors' overall restructuring efforts, from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors also have been unable to obtain sufficient credit (a) having priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  Sufficient postpetition financing is not otherwise available without granting the DIP Agent, for the benefit of itself and the other DIP Secured Parties: (i) perfected priming security interests in and liens on (each as provided herein) all of the

Debtors' existing and after-acquired assets with the priorities set forth herein; (ii) superpriority claims and liens; and (iii) the other protections set forth in this Final Order and the DIP Documents, pursuant to the terms and conditions thereof.

(c)     The DIP Secured Parties have indicated a willingness to provide financing to the Debtors, including findings that such financing is essential to the Debtors' estates, the DIP Secured Parties are extending credit to the Debtors as set forth in the DIP Documents in good faith, and that the DIP Superpriority Claim (as defined below), security interests, liens, rights and other protections granted to the DIP Secured Parties, including the DIP Agent will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Final Order or any other order.

(d)     All of the Debtors have received and will receive fair and reasonable consideration in exchange for access to the DIP Facilities and all other financial accommodations provided under the DIP Documents and this Final Order. The terms of the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

(e)     The terms of the DIP Documents and the use of the Prepetition Collateral, including the Cash Collateral, including, without limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are more favorable to the Debtors than those available from alternative sources. Based upon the record before this Court, the DIP Documents have been negotiated in good faith and at arm's-length among the Debtors, the DIP Lenders, and the DIP Agent. The DIP Facilities and other financial accommodations, including without limitation all loans made to, letters of credit issued for the account of, or guarantees issued by, the Debtors

pursuant to the DIP Documents and this Final Order (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Agent and the other DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and the DIP Agent and the other DIP Secured Parties shall be entitled to all protections afforded thereby.

(f)     Good cause has been shown for immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  The authorization granted herein to enter into the DIP Documents, to continue using Cash Collateral and to obtain funds under the DIP Facilities, including on a priming basis as set forth herein, is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Entry of this Final Order is in the best interests of the Debtors, their estates, and creditors because it will, among other things, allow for access to the financing necessary for the Debtors to, among other things, maintain business relationships with vendors, suppliers, customers, and other parties, permit the orderly continuation of their business, and pay for certain costs and expenses related to the Bankruptcy Cases.

5.     *Findings Regarding Adequate Protection.*

(a)     The DIP Facilities contemplated hereby provide for a priming of the Junior Secured Parties' respective interests in the Prepetition Collateral pursuant to section 364(d) of the Bankruptcy Code.  The Debtors are hereby authorized to use the Cash Collateral as provided herein.  Based on the foregoing, the Junior Secured Parties are entitled to the adequate protection as set forth herein, including pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code and the terms of that certain Intercreditor Agreement, dated as of October 26, 2015, and amended as of March 15, 2017 (as amended, restated, or otherwise modified from time to time, the "Intercreditor Agreement").  Based on the Motion, the First Day

Declaration, the O'Hara Declaration, the Stuart Declaration, and the record presented to the Court, the terms of the proposed adequate protection arrangements under the DIP Documents and the DIP Facilities contemplated hereby are in compliance with sections 361, 362, 363, and 364 of the Bankruptcy Code and the terms of the Intercreditor Agreement, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the consent of the Junior Secured Parties.

6.      *Authorization of the DIP Facilities and the DIP Documents.*

(a)     The Debtors are hereby authorized to enter into, deliver, and perform under, the DIP Documents and, in the case of the Borrower, to make borrowings, subject to the terms and conditions of (i) this Final Order, (ii) the DIP Documents, and (iii) the Budget (as defined herein), under the DIP Facilities in an aggregate principal amount of up to $250 million as set forth in the DIP Documents, for the Approved Purposes.  Proceeds of the DIP Facilities shall not be used (i) to permit the Borrower, any Guarantor or any of their representatives to challenge or otherwise contest or institute any proceeding to determine (x) the validity, perfection or priority of security interests in favor of any of the Lenders or the Secured Parties (as such terms are defined in the DIP Credit Agreement), each in their capacity as such, or (y) the enforceability of the obligations of the Borrower or any Guarantor under the DIP Credit Agreement, (ii) to investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against any of the Lenders or the Secured Parties (each as defined in the DIP Credit Agreement), each in such capacity, and their respective agents, attorneys, advisors or representatives, including, without limitation, any lender liability claims or subordination claims, or (iii) to fund acquisitions, capital expenditures, capital leases, or any other expenditure other

than as set forth in paragraph 10(e), the DIP Credit Agreement, Budget or the Carve Out (as each term is defined in the DIP Credit Agreement).

(b)     Upon the closing of the DIP Facilities, (i) the loans under the RBL Facility that are held by the DIP Lenders identified on Schedule 2.01B to the DIP Credit Agreement (the "Exchanging RBL Loans") were deemed satisfied and exchanged for the DIP Loans in accordance with the terms of the DIP Credit Agreement, (ii) the existing issued and outstanding letters of credit under the RBL Facility (the "Existing Letters of Credit") were deemed "Letters of Credit" issued under, and as defined in, the DIP Credit Agreement, and (iii) upon the occurrence of the RBL Discharge, the RBL Liens shall be deemed assigned to the DIP Agent for the benefit of the DIP Secured Parties.

(c)     In furtherance of the foregoing and without further approval of this Court, and as set forth in the DIP Credit Agreement, each Debtor is authorized and directed to perform all acts (and to the extent such acts have already occurred, such acts are hereby ratified) and to execute and deliver all instruments and documents that the DIP Secured Parties, including the DIP Agent determine to be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Documents including, without limitation:

(i)     the execution, delivery and performance of the DIP Documents;

(ii)    the non-refundable payment to the DIP Agent, and/or the DIP Secured Parties, as the case may be, of the fees, expenses, and other amounts set forth in the DIP Documents including without limitation:  (A) automatically after the occurrence and continuance of certain Events of Default (including an Event of Default with respect to the payment of principal and interest when due on the DIP Facilities) as set forth in the DIP Credit Agreement and during the continuation of an Event of Default after the DIP

Agent has delivered notice to the Debtors, all outstanding principal, interest, fees and other obligations shall bear interest at two percent (2.00%) plus the rate applicable to ABR Loans (as defined in the DIP Credit Agreement); (B) an arrangement fee of one percent (1.00%) of the Initial Borrowing Base (as defined in the DIP Credit Agreement), which shall be due and payable on a pro rata basis to Fairfax Holdings Limited and Energy Strategic Advisory Services, LLC and certain of their respective affiliates in full on the Effective Date (as defined in the DIP Credit Agreement) or to such other DIP Lenders as determined by Fairfax Holdings Limited in their sole discretion; (C) a participation fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Rate used to determine the interest rate applicable to Eurodollar Loans on the average daily amount of such lender's LC Exposures (each as defined in the DIP Credit Agreement); (D) an Unused Commitment Fee to the DIP Agent for the account of each Lender, which shall accrue at the Applicable Rate times the average daily amount of the Aggregate Unused Commitments (each as defined in the DIP Credit Agreement); and (E) reasonable and documented out-of-pocket costs and expenses, as may be due from time to time as provided in this Final Order and in the DIP Documents including, without limitation, reasonable and documented fees and expenses of counsel and financial advisor, if any; and

    (iii)  the performance of all other acts required under or in connection with the DIP Documents.

    (d)  The DIP Documents constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Final Order and the DIP Documents.  No obligation, payment, transfer, or grant of security by the Debtors under the

DIP Documents (or, as it relates to the DIP Facilities, this Final Order) shall be subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law).

      7.    *Occurrence of the RBL Discharge.*

      (a)    The RBL Discharge has occurred and shall be binding upon all parties in interest, including, without limitation, the Debtors, any statutory or non-statutory committees appointed or formed in the Bankruptcy Cases (including the Creditors' Committee), and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes.

      (b)    The RBL Liens are hereby deemed to have been, as of the Petition Date, legal, valid, binding, enforceable, perfected, security interests and liens, not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual, or otherwise), claims, counterclaims, cross-claims, set-offs, recoupments, defenses or any other challenges of any kind under the Bankruptcy Code or any applicable law or regulation by any person or entity.

      (c)    The RBL Debt and the RBL Liens are not subject to any avoidance, reduction, set-off, offset, recoupment, recharacterization, subordination (whether equitable,

contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges of any kind under the Bankruptcy Code or any applicable law or regulation by the Debtors, the Creditors' Committee, any non-statutory committees appointed or formed in the Bankruptcy Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates and any defenses, claims, causes of action, counterclaims, offsets or other challenges or defenses by the Debtors, the Creditors' Committee, any non-statutory committees appointed or formed in the Bankruptcy Cases, or any other party acting or seeking to act on behalf of the Debtors' estates, whether arising under the Bankruptcy Code or otherwise, against any of the RBL Secured Parties arising out of or relating to the RBL Credit Agreement, the RBL Liens, the RBL prepetition collateral, the RBL Facility and the RBL Debt is deemed forever waived, discharged, released, and barred.

(d)    All payments made to or for the benefit of the RBL Secured Parties pursuant to, or otherwise authorized by, this Final Order or otherwise (whether made prior to, on, or after the Petition Date) are indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance.

(e)    The RBL Secured Parties and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest of and from and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, are released, discharged, and acquitted from any and all claims arising from any actions relating to any aspect of the relationship between the RBL Secured Parties and the Debtors and their affiliates including any equitable subordination claims

or defenses, with respect to or relating to the RBL Credit Agreement, the RBL Liens, the RBL prepetition collateral, the RBL Facility and the RBL Debt, the Debtors' attempts to restructure the RBL Debt, and any all claims and causes of action arising under title 11 of the United States Code relating to the RBL Debt.

8.    *Budget.*    Attached as Exhibits 2–4 to the Interim Order, respectively, and incorporated by reference herein are (a) a reasonably satisfactory balance sheet of the Borrower giving pro forma effect to the Indebtedness to be incurred on the Effective Date as a part of the Transactions (each as defined in the DIP Credit Agreement), (b) financial projections of the Borrower and its Consolidated Subsidiaries for the 2018 fiscal year consisting of monthly projections (each as defined in the DIP Credit Agreement) (the "Budget") and (c) the Initial Forecast (as defined in the DIP Credit Agreement).    Subject to the permitted variances as set forth in the DIP Documents, the use of proceeds of the DIP Facilities and Cash Collateral shall in all cases be consistent with this Final Order, the Budget, and any permitted variances therein. The Borrower shall deliver to the DIP Agent and the Committee Professionals (as defined herein) on each four-week anniversary of the Effective Date (as defined in the DIP Credit Agreement) an updated thirteen (13)-week cash flow forecast, containing line items of sufficient detail to reflect the Borrower's and its subsidiaries' projected receipts and disbursements for such 13-week period (the "13-Week Forecast"), subject to the conditions set forth in the DIP Credit Agreement.    Each 13-Week Forecast shall be consistent in all material respects with the applicable period covered by the Budget, including the Initial Forecast (as defined in the DIP Credit Agreement).

9.    *DIP Claims and Liens.*    As security for the DIP Obligations, the DIP Secured Parties are hereby granted the following claims, liens, security interests, rights, and benefits, in

each case, and notwithstanding anything herein to the contrary in each case subject and subordinate only to the Carve Out and other valid, perfected, and non-avoidable liens that are as of the Petition Date senior to the liens securing the RBL Facility, including such liens perfected after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code (the "Permitted Liens") (collectively, the "DIP Claims and Liens"):

      (a)    *DIP Superpriority Claims.*   An allowed superpriority administrative expense claim in the Bankruptcy Cases pursuant to sections 364(c)(1), 503(b), 507(a), and 507(b) of the Bankruptcy Code shall be payable from all assets and property of the Debtors (the "DIP Superpriority Claim"), subject only to the Carve Out and the Permitted Liens; *provided*, however, that such DIP Superpriority Claim shall not have recourse to the Excluded Collateral (as defined below). The DIP Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally) with priority over any and all administrative expenses, adequate protection, and other diminution claims (in each case other than the Carve Out), unsecured claims, and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including without limitation all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, or ordered pursuant to, sections 105, 326, 327, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, payable from and with recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof. Other than the Carve Out, no priority claims are, or will be, senior to, prior to, or *pari passu* with the DIP Superpriority

18

Claims, or any of the DIP Obligations, or with any other claims of the DIP Agent or the other DIP Secured Parties arising hereunder or under the other DIP Documents or otherwise in connection with the DIP Facility.

       (b)    *DIP Liens on DIP Collateral.*  Pursuant to sections 364(c)(2), 363(c)(2), and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, first priority priming liens consisting of (i) a pledge of all capital stock owned by the Debtors in their Subsidiaries (as defined in the DIP Credit Agreement) and (ii) a lien on and security interest in all prepetition and postpetition assets and other property (including the Prepetition Collateral), whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, oil and gas properties, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests in the Subsidiaries, money, investment property and the proceeds of each of the foregoing (collectively, but excluding the Excluded Collateral (as defined below), the "DIP Collateral" and together with the Prepetition Collateral, the "Collateral," and the liens, pledges, and security interests granted pursuant to this Paragraph 9(b), the "DIP Liens"), but not

any causes of action under chapter 5 of the Bankruptcy Code, the proceeds thereof, any Excluded Accounts[4] (as defined in the DIP Documents), or any claims or causes of action against any of the Junior Secured Parties or the proceeds thereof (collectively, the "Excluded Collateral"), *provided* that the DIP Liens shall be subordinate to the Carve Out and the Permitted Liens. The DIP Liens on the Collateral shall be senior in all respects to, and shall prime, the security interests in, and liens on, the Collateral of each of the Junior Secured Parties (including the applicable Adequate Protection Liens granted to such Junior Secured Parties).

(c)     *DIP Liens Senior to Other Liens.*  No claim or lien, security interest, or mortgage having a priority senior to or *pari passu* with those granted by this Final Order to the DIP Agent and the other DIP Secured Parties other than the Carve Out and the Permitted Liens shall be granted or allowed while any portion of the DIP Obligations remain outstanding. Subject to the Carve Out and the Permitted Liens, the DIP Liens shall not be (i) subject or subordinate to (A) any liens, security interests, or mortgages that are avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code (except in respect to the Excluded Collateral) or (B) any liens, security interests or mortgages arising after the Petition Date, or (ii) subordinated to or made *pari passu* with any other lien or security interest or mortgage under sections 363 or 364 of the Bankruptcy Code or otherwise, or (iii) any liens, security interests, mortgages, or deemed trusts that may arise under statute. The DIP Liens and the Adequate Protection Liens shall be valid and enforceable against any trustee appointed in the Bankruptcy Cases upon the conversion of any of the Bankruptcy Cases to a case under

---

[4]     For the avoidance of doubt, to the extent the funds in any Excluded Account are transferred to a non-Excluded Account of the Debtors, such funds shall not be Excluded Collateral; *provided, however* that nothing in this Order shall permit the Debtors to transfer funds out of the BG Operating Account (2529) or the BG Escrow Account (5987) other than in accordance with the joint development agreement by and among Debtors EXCO Operating Company, LP and EXCO Production Company, LP or BG US Production Company, LLC dated as of August 14, 2009 and consistent historical practice.

chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing and/or upon the dismissal of any of the Bankruptcy Cases.

10.     *Carve Out.*  For purposes hereof, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,000,000.00 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation

of an Event of Default and acceleration of the DIP Obligations under the DIP Facilities, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(a)      Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for Loans (as defined in the DIP Credit Agreement) under the DIP Facilities  (on a pro rata basis based on the then outstanding Commitments (as defined in the DIP Credit Agreement), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a request by the Debtors for Loans under the Commitments (on a pro rata basis based on the then outstanding Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Loans).  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such Lenders (as defined in the DIP Credit Agreement),

notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for Loans under the DIP Facilities, any termination of the Commitments following an Event of Default, or the occurrence of the Maturity Date, each Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such Lender's pro rata share with respect to such borrowing in accordance with the DIP Facilities. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Secured Parties, unless the DIP Obligations (excluding contingent obligations for which no claim has been made) have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Junior Secured Creditors in accordance with their rights and priorities as of the Petition Date; *provided*, *however*, that such Junior Secured Creditors, the Debtors, and the Creditors' Committee each reserve the right to argue as to the proper characterization of any such payment to the Junior Secured Creditors as principal, interest, fees or expenses, and to seek disgorgement thereof in the event of a timely and successful challenge to their claims in accordance with Paragraphs 10(e) and (f) hereof. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent

for the benefit of the DIP Secured Parties, unless the DIP Obligations (excluding contingent obligations for which no claim has been made) have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Junior Secured Parties in accordance with their rights and priorities as of the Petition Date *provided*, *however*, that such Junior Secured Creditors, the Debtors, and the Creditors' Committee each reserve their right to argue as to the proper characterization of any such payment to the Junior Secured Creditors as principal, interest, fees or expenses, and to seek disgorgement thereof in the event of a timely and successful challenge to their claims in accordance with Paragraphs 10(e) and (f) hereof.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 10(a), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 10(a), prior to making any payments to the DIP Agent or the Junior Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Junior Secured Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in

full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Final Order, the DIP Facilities, or the Prepetition Secured Obligations, the Carve Out shall be senior to all liens and claims securing the DIP Facilities and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(b)     No Direct Obligation To Pay Allowed Professional Fees. The DIP Agent and the other DIP Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Bankruptcy Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agent or the other DIP Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(c)     Payment of Allowed Professional Fees Prior to the Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     Payment of Carve Out on or After the Termination Declaration Date. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP

Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(e)     Challenge Period and Releases.  Notwithstanding anything herein, there shall be (i) a cap of $250,000.00 for the use of the DIP Facilities, any loans thereunder (the "DIP Loans"), any Cash Collateral and the Carve Out for fees and expenses incurred by the Creditors' Committee in connection with any investigation of or challenge to the validity, perfection, priority, extent or enforceability of the RBL Debt and the Prepetition Secured Obligations (the "Investigation Budget") and (ii) a period of ninety (90) days (the "Challenge Period") from the formation of the Creditors' Committee to file a motion seeking standing to (x) challenge the validity, priority, amount or perfection of the liens and claims underlying the Prepetition Secured Obligations or (y) assert any claims or defenses against the Junior Secured Parties.

(f)     If no challenge is timely filed by the Debtors, the Creditors' Committee, or any other party in interest within the Challenge Period, (i) the Prepetition Secured Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination (except as set forth in the Intercreditor Agreement), defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, recovery, for all purposes in the Bankruptcy Cases and any subsequent chapter 7 cases, (ii) the liens on the Collateral securing the Prepetition Secured Obligations shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in the Intercreditor Agreement as applicable, not subject to setoff, subordination (except as set forth in the Intercreditor Agreement), defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery, and (iii) the Prepetition Secured Obligations, the Junior Secured Parties, in their capacities as such, and the liens on the Prepetition Collateral securing the Prepetition Secured Obligations

shall not be subject to any other or further challenge by any party-in-interest, and all parties-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of the Debtors) against the Prepetition Secured Obligations, the Junior Secured Parties, and the liens securing Prepetition Secured Obligations.

11.    *Protection of DIP Secured Parties' Rights.*

(a)    Until the DIP Facilities have expired or terminated and the principal of and interest on the DIP Facilities and all fees payable pursuant to the DIP Credit Agreement have been paid in full and all Letters of Credit have expired or terminated and all LC Disbursements (each as defined in the DIP Credit Agreement) shall have been reimbursed, each Debtor covenants and agrees with the DIP Lenders that the Debtors will not create, incur, assume, or permit to exist any Indebtedness (as defined in the DIP Credit Agreement) except as permitted in this Final Order and the DIP Documents.

(b)    The Borrower will, and will cause each Restricted Subsidiary (as defined in the DIP Credit Agreement) to: (i) keep proper books of record and account in which full, true, and correct entries are made of all dealings and transactions in relation to its business and activities and (ii) permit any representatives designated by the DIP Agent or any DIP Lenders and the Committee Professionals, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances, and condition with its officers and, provided an officer of the Borrower has the reasonable opportunity to participate, its independent accountants, all at such reasonable times and as often as reasonably requested.

(c)     To the extent not inconsistent with the terms of this Final Order, the DIP Secured Parties shall enjoy all other protections set forth in the DIP Credit Agreement.

12.     *Fundamental Changes and Dispositions.*   Except as permitted under the DIP Credit Agreement and subject to the Court's approval (if applicable), the Borrower will not, nor will it permit any of its Restricted Subsidiaries, and none of the Debtors will enter into or consummate any merger into or consolidation with another entity, or dispose of (in one transaction or in a series of transactions) all or any substantial part of its assets, or any of its Borrowing Base Properties or any of the Equity Interests of any Restricted Subsidiary (each as defined in the DIP Credit Agreement) (in each case, whether now owned or hereafter acquired), or liquidate or dissolve.   Notwithstanding the foregoing, the Borrower or any Restricted Subsidiary (as defined in the DIP Credit Agreement) may pursue and consummate any other merger, consolidation, liquidation, dissolution, sale, transfer, lease or other Disposition (as defined in the DIP Credit Agreement) approved by an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Majority Lenders (as defined in the DIP Credit Agreement) so long as either (a) the consent of all DIP Secured Parties would not be required to permit such transaction under the DIP Credit Agreement or (b) the Court order approving such transaction requires that the proceeds of such transaction be used to repay in full in cash the outstanding DIP Obligations on the closing date of such transaction and the proceeds are so used.

13.     *Remedies upon Event of Default.*   Upon an Event of Default, all remedies provided in Article IX of the DIP Credit Agreement shall be available to the DIP Agent and the DIP Secured Parties. The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to permit the DIP Agent and the DIP Secured Parties to exercise, (a) immediately upon the occurrence and during the continuance of an Event of

Default, all rights and remedies under the applicable DIP Documents, other than those rights and remedies against the applicable DIP Collateral as provided in clause (b) below and except as set forth in paragraph 10(a) above with respect to funding the Carve Out Reserve and (b) upon the occurrence and during the continuance of an Event of Default, and the giving of five (5) business days' prior written notice to the Debtors (with a copy to counsel to the Debtors, counsel to the Prepetition Secured Agents (as defined herein), the U.S. Trustee, and counsel to the Creditors' Committee), all rights and remedies against the DIP Collateral provided for in the applicable DIP Documents and this Final Order (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the DIP Agent or any DIP Secured Party, other than with respect to the Carve-Out Reserves in accordance with this Final Order); *provided that*, during the foregoing five (5) business day period, (a) the only issue that may be raised by any party in opposition other than the Court, the U.S. Trustee, or the Creditors' Committee to the exercise of rights and remedies shall be whether an Event of Default has in fact occurred and is continuing and (b) the Debtors may use proceeds of the DIP Loans then outstanding or Cash Collateral to (i) fund operations in accordance with the DIP Credit Agreement and (ii) fund the Carve-Out Reserves.

14.     *Entitlement to Adequate Protection (1.5 Lien Indenture Secured Parties).* The 1.5 Lien Indenture Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral (it being understood that the 1.5 Lien Indenture Secured Parties' interests extend to the Cash Collateral) as of the Petition Date in an amount equal to the aggregate postpetition diminution in value, if any, of such interests from and after the Petition Date, consisting of any such diminution resulting from the use by the Debtors of such Prepetition Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code,

the Debtors' incurrence of the DIP Facilities, the granting of the priming liens and claims with respect thereto, the subordination of the Prepetition Collateral to the Carve Out, and the use of the Cash Collateral pursuant to this Final Order (such diminution in value, the "1.5 Lien Adequate Protection Obligations"); *provided*, *however*, that all parties in interest's rights are reserved with respect to whether any asserted diminution has been caused by the imposition of bankruptcy as contemplated by section 361 of the Bankruptcy Code. All distributions made on account of the 1.5 Lien Adequate Protection Obligations shall be made and applied in accordance with the 1.5 Lien Notes Indenture and the Intercreditor Agreement. The 1.5 Lien Indenture Trustee shall be, and hereby is, granted the following forms of adequate protection on behalf of the 1.5 Lien Secured Parties:

   (a) <u>1.5 Lien Adequate Protection Claim</u>. An allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code as provided for by section 507(b) of the Bankruptcy Code on account of the 1.5 Lien Adequate Protection Obligations (the "1.5 Lien Adequate Protection Claim"); *provided*, however, that such 1.5 Lien Adequate Protection Claim shall not have recourse to the Excluded Collateral. Subject and junior in priority in all respects to the Carve Out and the DIP Superpriority Claim, the 1.5 Lien Adequate Protection Claim shall be an allowed claim against each of the Debtors (jointly and severally) with priority over any and all administrative expenses, adequate protection or diminution claims (in each case other than the Carve Out and the DIP Superpriority Claim), unsecured claims, and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the

Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, payable from and with recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof. Except to the extent set forth in this Final Order, the 1.5 Lien Secured Parties shall not receive or retain any payments, property, or other amounts in respect of any 1.5 Lien Adequate Protection Claim unless and until all DIP Obligations have indefeasibly been paid in full in cash or otherwise satisfied in a manner acceptable to the DIP Lenders and until the Carve Out shall have been satisfied as provided herein.

(b)     1.5 Lien Adequate Protection Liens.  Subject and junior in priority in all respects to the Carve Out, the Permitted Liens, and the DIP Liens, and in accordance with the DIP Credit Agreement, effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by any 1.5 Lien Secured Party, the following security interests and liens are hereby granted to the 1.5 Lien Indenture Trustee on behalf of the 1.5 Lien Secured Parties (all such liens and security interests, the "1.5 Lien Adequate Protection Liens");

(i)     *Liens on Unencumbered Property.*  Subject and junior in priority in all respects to the Carve Out, the Permitted Liens, and the DIP Liens, and in accordance with the DIP Credit Agreement, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement liens on, and security interests in, all DIP Collateral that is not subject to (x) valid, perfected, unavoidable, and enforceable liens in existence on or as of

31

the Petition Date or (y) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code.

(ii)     *Liens Junior to Certain Existing Liens.*   Subject and junior in priority in all respects to the Carve Out, the Permitted Liens, and the DIP Liens, and in accordance with the DIP Credit Agreement, a valid, binding, continuing, enforceable, fully-perfected non-avoidable junior priority replacement lien on, and security interest in, all DIP Collateral that is only subject to (x) valid, perfected, non-avoidable and enforceable liens in existence immediately prior to the Petition Date or (y) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code.  For the avoidance of doubt, any and all liens granted as adequate protection to the 1.5 Lien Indenture Trustee on behalf of the 1.5 Lien Secured Parties on the DIP Collateral shall be junior in all respects to the Carve Out, the Permitted Liens, and the DIP Liens, and in accordance with the DIP Credit Agreement and shall not extend to any Excluded Collateral.

(c)     Payments to the 1.5 Lien Secured Parties.   The Debtors will make adequate protection payments following entry of this Final Order in an amount equal to accrued and unpaid prepetition or postpetition interest calculated at the non-default rate pursuant to the terms of the 1.5 Lien Indenture.  The Debtors and the Creditors' Committee reserve their rights to argue that, to the extent that any cash payment of interest, fees, and/or expenses as adequate protection to the 1.5 Lien Indenture Trustee on behalf of the 1.5 Lien Secured Parties is not allowed under section 506(b) of the Bankruptcy Code and not allowed on any other basis, such

payments should be recharacterized and applied to reduce permanently the principal owed under the 1.5 Lien Indenture Documents.

15.    *Entitlement to Adequate Protection (1.75 Lien Secured Parties).*  The 1.75 Lien Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral (it being understood that the 1.75 Lien Secured Parties' interests extend to the Cash Collateral) as of the Petition Date in an amount equal to the aggregate postpetition diminution in value, if any, of such interests from and after the Petition Date, consisting of any such diminution resulting from the use by the Debtors of such Prepetition Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Debtors' incurrence of the DIP Facilities, the granting of the priming liens and claims with respect thereto, the subordination of the Prepetition Collateral to the Carve Out, and the use of the Cash Collateral pursuant to this Final Order (such diminution in value, the "1.75 Lien Adequate Protection Obligations"); *provided, however,* that all parties in interest's rights are reserved with respect to whether any asserted diminution has been caused by the imposition of bankruptcy as contemplated by section 361 of the Bankruptcy Code.  All distributions made on account of the 1.75 Lien Adequate Protection Obligations shall be made and applied in accordance with the 1.75 Lien Credit Agreement and the Intercreditor Agreement.  The 1.75 Lien Secured Parties shall be, and hereby are, granted the following forms of adequate protection:

(a)    1.75 Lien Adequate Protection Liens.  Subject and junior in priority in all respects to the Carve Out, the Permitted Liens, the DIP Liens, and the 1.5 Lien Adequate Protection Liens, and in accordance with the DIP Credit Agreement, perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar

documents, or the possession or control by the 1.75 Lien Secured Parties, the following security interests and liens are hereby granted to the 1.75 Lien Administrative Agent for the benefit of the 1.75 Lien Secured Parties (all such liens and security interests, the "1.75 Lien Adequate Protection Liens"):

(i)    *Liens on Unencumbered Property.*  Subject and junior in priority in all respects to the Carve Out, the Permitted Liens, the DIP Liens, and the 1.5 Lien Adequate Protection Liens, and in accordance with the DIP Credit Agreement, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement liens on, and security interests in, all DIP Collateral that is not subject to (x) valid, perfected, unavoidable, and enforceable liens in existence on or as of the Petition Date or (y) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code.

(ii)    *Liens Junior to Certain Existing Liens.*  Subject and junior in priority in all respects to the Carve Out, the Permitted Liens, the DIP Liens, and the 1.5 Lien Adequate Protection Liens, and in accordance with the DIP Credit Agreement, a valid, binding, continuing, enforceable, fully-perfected non-avoidable junior priority replacement lien on, and security interest in, all DIP Collateral that is only subject to (x) valid, perfected, non-avoidable and enforceable liens in existence immediately prior to the Petition Date or (y) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code.  For the avoidance of doubt, any and all liens

granted as adequate protection to the 1.75 Lien Secured Parties on the DIP Collateral shall be junior in all respects to the Carve Out, the Permitted Liens, the DIP Liens, and the 1.5 Lien Adequate Protection Liens, and in accordance with the DIP Credit Agreement and shall not extend to any Excluded Collateral.

16.     *Entitlement to Adequate Protection (Second Lien Secured Parties).*  The Second Lien Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral (it being understood that the Second Lien Secured Parties' interests extend to the Cash Collateral) as of the Petition Date in an amount equal to the aggregate postpetition diminution in value, if any, of such interests from and after the Petition Date, consisting of any such diminution resulting from the use by the Debtors of such Prepetition Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Debtors' incurrence of the DIP Facilities, the granting of the priming liens and claims with respect thereto, the subordination of the Prepetition Collateral to the Carve Out, and the use of the Cash Collateral pursuant to this Final Order (such diminution in value, the "Second Lien Adequate Protection Obligations" and, together with the 1.5 Lien Adequate Protection Obligations and the 1.75 Lien Adequate Protection Obligations, the "Adequate Protection Obligations"); *provided, however,* that all parties in interest's rights are reserved with respect to whether any asserted diminution has been caused by the imposition of bankruptcy as contemplated by section 361 of the Bankruptcy Code.  All distributions made on account of the Second Lien Adequate Protection Obligations shall be made and applied in accordance with the Second Lien Credit Agreement and the Intercreditor Agreement.  The Second Lien Secured Parties shall be, and hereby are, granted the following forms of adequate protection:

(a)    <u>Second Lien Adequate Protection Liens</u>.  Subject and junior in priority in all respects to the Carve Out, the Permitted Liens, the DIP Liens, the 1.5 Lien Adequate Protection Liens, and the 1.75 Lien Adequate Protection Liens, and in accordance with the DIP Credit Agreement, perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the Second Lien Secured Parties, the following security interests and liens are hereby granted to the Second Lien Administrative Agent on behalf of the Second Lien Secured Parties (all such liens and security interests, the "<u>Second Lien Adequate Protection Liens</u>" and together with the 1.5 Lien Adequate Protection Liens and the 1.75 Lien Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"):

(i)    *Liens on Unencumbered Property*.  Subject and junior in priority in all respects to the Carve Out, the Permitted Liens, the DIP Liens, the 1.5 Lien Adequate Protection Liens, and the 1.75 Lien Adequate Protection Liens, and in accordance with the DIP Credit Agreement, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement liens on, and security interests in, all DIP Collateral that is only subject to (x) valid, perfected, unavoidable, and enforceable liens in existence on or as of the Petition Date or (y) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code.

(ii)    *Liens Junior to Certain Existing Liens*.  Subject and junior in priority in all respects to the Carve Out, the Permitted Liens, the DIP Liens, the 1.5 Lien

36

Adequate Protection Liens, and the 1.75 Lien Adequate Protection Liens, and in accordance with the DIP Credit Agreement, a valid, binding, continuing, enforceable, fully-perfected non-avoidable junior priority replacement lien on, and security interest in, all DIP Collateral that is not subject to (x) valid, perfected, non-avoidable and enforceable liens in existence immediately prior to the Petition Date or (y) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code. For the avoidance of doubt, any and all liens granted as adequate protection to the Second Lien Secured Parties on the DIP Collateral shall be junior in all respects to the Carve Out, the Permitted Liens, the DIP Liens, the 1.5 Lien Adequate Protection Liens, and the 1.75 Lien Adequate Protection Liens, and in accordance with the DIP Credit Facility and shall not extend to any Excluded Collateral.

17.     *Further Adequate Protection.*  The Junior Secured Parties, statutory lien creditors, mineral interest owners (including holders of working interests, royalty interests, production payments, net profit interests, or mineral rights that constitute real property interests under applicable law), and parties-in-interest that have or claim a dedication interest created by or arising under a gas gathering agreement or contract or other real property interest under applicable law, reserve all rights to file a motion at any time asking the Court to provide them with additional or further adequate protection, including to seek segregation of any production proceeds; *provided*, however, that any party in interest shall be permitted to object on any basis to such motion.

18.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     Without regard to the terms of section 362 of the Bankruptcy Code regarding the automatic stay, the 1.5 Lien Indenture Trustee, the 1.75 Lien Administrative Agent, and the Second Lien Administrative Agent (collectively, the "Prepetition Secured Agents") and the DIP Agent, as applicable, are each hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction or take any other action (including, with respect to the DIP Agent only, take possession or control over DIP Collateral), in order to validate and perfect the DIP Liens and the Adequate Protection Liens hereunder.  Whether or not the DIP Agent or the Prepetition Secured Agents, as applicable, shall, in their respective sole discretion, file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, take possession or control or otherwise confirm perfection of the DIP Liens and the Adequate Protection Liens, as applicable, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute,

subordination, contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law as of the date of entry of the Interim Order. If the DIP Agent or any of the Prepetition Secured Agents, as applicable, determines to file any financing statements, notice of liens or similar instruments, or otherwise confirm perfection of the DIP Liens or the Adequate Protection Liens (including by the DIP Agent taking possession or control over DIP Collateral), the Debtors will cooperate and assist in any such filings as reasonably requested by the DIP Agent or the Prepetition Secured Agents as applicable, and the automatic stay shall be modified to allow such filings.

(b)    DIP Agent or the Prepetition Secured Agents, as applicable, may, in their respective sole discretion, cause a certified copy of this Final Order to be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

19.    Subject to the terms and conditions of the DIP Documents, the Debtors shall execute and deliver to the DIP Agent or the Prepetition Secured Agents, as applicable, all such agreements, financing statements, instruments and other documents as the DIP Agent or the Prepetition Secured Agents, as applicable, may reasonably request in writing to evidence, confirm, validate, or perfect the DIP Liens and the Adequate Protection Liens, as applicable.

20.     *Preservation of Rights Granted Under this Final Order.*

(a)     Unless all DIP Obligations shall have been indefeasibly paid in full in cash, it shall constitute an Event of Default under the DIP Credit Agreement and a termination of the right to use the Cash Collateral (i) if any of the Debtors seeks, or if there is entered, any modification of this Final Order other than as permitted by the DIP Credit Agreement, and no such consent shall be implied by any other action, inaction, or acquiescence by the DIP Secured Parties or (ii) an order is entered converting or dismissing any of the Bankruptcy Cases.

(b)     Notwithstanding any order dismissing any of the Bankruptcy Cases under section 1112 of the Bankruptcy Code or otherwise entered at any time, but subject to the Carve Out in all respects, (x) the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, and the other administrative claims granted pursuant to this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order and in accordance with the DIP Credit Agreement until all DIP Obligations and the Adequate Protection Obligations shall have been indefeasibly paid and satisfied in full in cash, as applicable, and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(c)     If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect: (i) the validity, priority, or enforceability of the DIP Liens or DIP Obligations or any Adequate Protection Obligations incurred prior to the actual receipt of written notice by counsel to the DIP Agent (with respect to the DIP Obligations) and counsel to the Prepetition Secured Agents of the effective date of such reversal, stay, modification or vacatur; or (ii) the validity, priority or enforceability of the DIP Liens and the Adequate Protection Liens, as applicable.

Notwithstanding any such reversal, stay, modification or vacatur, any use of the Prepetition Collateral (including the Cash Collateral), the DIP Liens, or the Adequate Protection Obligations incurred by the Debtors hereunder, as the case may be, prior to the actual receipt of written notice by counsel to the DIP Agent (with respect to the DIP Obligations) and counsel to the Prepetition Secured Agents (with respect to the Adequate Protection Obligations) of the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the original provisions of this Final Order, and the DIP Secured Parties, the DIP Agent, and the Junior Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 363(m) of the Bankruptcy Code, this Final Order and (with respect to the DIP Obligations) the DIP Documents with respect to all uses of the Prepetition Collateral (including the Cash Collateral), all Adequate Protection Obligations, and the DIP Obligations.

(d)    Except as expressly provided in this Final Order, and subject to the Carve Out and the Permitted Liens, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and all other rights and remedies of the DIP Agent, the other DIP Secured Parties and the Junior Secured Parties granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by the entry of an order converting any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Bankruptcy Cases. The terms and provisions of this Final Order and the DIP Documents shall continue in the Bankruptcy Cases and in any successor cases, and the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim, the DIP Obligations, the other administrative claims granted pursuant to this Final Order, and all other rights and remedies of the DIP Agent, the other DIP Secured Parties, and the Junior Secured Parties granted

by the provisions of this Final Order and the DIP Documents shall continue in full force and effect.

21.    *Preservation of Prepetition Priorities and Interests.*

(a)    Nothing in this Final Order is intended to change or otherwise modify (i) the rights of any parties-in-interest with respect to a dedication interest created by or arising under a gas gathering contract or other real property interest under applicable law; or (ii) the prepetition priorities among secured creditors of the Debtors, including (x) any operators' or nonoperators' lien or recoupment rights to the extent their liens or rights are valid, enforceable, nonavoidable and perfected, and (y) any claims of the lienholders or any other mechanic or materialmen or mineral lien claimants to the extent their liens are valid, enforceable, non-avoidable and perfected, including as permitted by section 546(b) of the Bankruptcy Code, and nothing in this Final Order, including the granting of the DIP Liens or adequate protection liens, shall be deemed to have changed or modified such prepetition priorities, all of which are hereby expressly preserved; *provided, however,* that the Debtors, the Creditors' Committee, the DIP Secured Parties, and all other parties in interest reserve all rights to object to any of the foregoing claims or liens.

(b)    Notwithstanding anything to the contrary, (x) liens securing up to $150 million of DIP Obligations shall continue to be senior to Junior 3rd Party Liens (as defined herein) and (y) unless consented to or otherwise authorized by further order of the Court, liens securing DIP Obligations in excess of $150 million shall not prime and shall be immediately subordinate to Junior 3rd Party Liens.  "Junior 3rd Party Liens" shall mean valid, properly perfected and non-avoidable liens in existence as of the Petition Date or perfected thereafter solely to the extent permitted by section 546 of the Bankruptcy Code that are, in each case,

junior to the RBL Liens as of the Petition Date; *provided* that the liens securing the 1.5 Lien Obligations, 1.75 Lien Obligations, Second Lien Obligations, and all adequate protection liens granted to the foregoing shall in no event be deemed Junior 3rd Party Liens and shall be and hereby are primed by the DIP Liens and shall not receive any recoveries or distributions (other than adequate protection payments permitted hereunder) until payment in full of the DIP Obligations and the termination of the commitments under the DIP Credit Agreement.

(c)     Notwithstanding anything contained in this Final Order to the contrary, and for the avoidance of doubt, statutory lien creditors, mineral interest owners (including, holders of working interests, royalty interests, production payments, net profits interests, or other mineral rights that constitute real property interests under applicable law), and parties-in-interest that have or claim a dedication interest created by or arising under a gas gathering agreement or contract or other real property interest under applicable law, shall not be required to file a lien ranking adversary proceeding prior to the expiration of the Challenge Period to preserve or protect the priority of their respective lien, privilege, security interest, right of setoff, right of recoupment, dedication, or real property interests under applicable non-bankruptcy law. Furthermore, notwithstanding anything contained in this Final Order to the contrary, and for the avoidance of doubt, (i) neither Cash Collateral, Prepetition Collateral, nor the DIP Collateral includes property that is not property of the estate, (ii) nothing in this Final Order is an adjudication of whether any property constitutes property of the estate,[5] (iii) all parties' rights are reserved regarding whether any property (including proceeds of production) is property of the estate, and (iv) parties shall not be required to file an adversary proceeding prior to the expiration of the Challenge Period to preserve or protect their respective ownership rights in such property

---

[5]     The Debtors acknowledge that they do not have title to any propane tanks provided by AmeriGas Propane, LP.

or production proceeds that are not property of the estate under applicable non-bankruptcy law. For the avoidance of doubt, the Debtors, the Creditors' Committee, the DIP Secured Parties, and all parties in interest reserve all of their rights to object to any of the foregoing claims that may be asserted.

22.    *Fees.*  Notwithstanding anything to the contrary in this Final Order, the Debtors shall reimburse the reasonable and documented fees and expenses of the DIP Agent and the DIP Lenders, solely in their capacity as such and in respect of the DIP Facilities (and not in any other capacity, including as a 1.5 Lien Secured Party or 1.75 Lien Secured Party), incurred through the date hereof and incurred during the pendency of these cases until such time as all DIP Obligations have been indefeasibly paid in full in cash. The Debtors shall reimburse the reasonable and documented fees and expenses of the 1.5 Lien Indenture Trustee.

23.    *Information and Other Covenants.*  The Debtors shall comply with the reporting requirements set forth in the DIP Credit Agreement and shall provide copies of all such reports and notices required to be delivered to the DIP Agent or DIP Lenders under the DIP Credit Agreement to the Committee Professionals. The Debtors shall maintain their cash management arrangements in a manner consistent with that described in any cash management motion filed by the Debtors and any successor or final orders with respect thereto.

24.    *Insurance Policies.*  The Debtors will maintain insurance in accordance with the terms of the DIP Credit Agreement.

25.    *Expenses and Indemnification.*  The Borrower shall pay the expenses of and indemnify the DIP Agent, the Issuing Bank and the DIP Secured Parties, all in accordance with the terms of the DIP Credit Agreement.

26.     *Limitation on Use of the DIP Facilities, the DIP Collateral, and the Prepetition Collateral (Including the Cash Collateral).*  The Debtors shall use the proceeds of the DIP Facilities and the Prepetition Collateral, including the Cash Collateral, solely as provided in this Final Order, consistent with the DIP Documents.  Notwithstanding anything herein or in any other order of this Court to the contrary, none of the DIP Facilities, the DIP Collateral, or the Carve Out (other than the Investigation Budget) may be used to (a) object, contest, or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents or the liens or claims granted under this Final Order, (b) assert any claims and defenses or any other causes of action against the DIP Agent or the other DIP Secured Parties, in their capacity as such, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Agent's assertion, enforcement, or realization on the Prepetition Collateral or the DIP Collateral in accordance with the DIP Documents or this Final Order, (d) seek to modify any of the rights granted to the DIP Agent or the other DIP Secured Parties hereunder or under the DIP Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court, including pursuant to any "first day orders" and (ii) permitted under the DIP Documents.

27.     *No Standing Granted.*  Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including the Creditors' Committee or any other statutory committee appointed in the Bankruptcy Cases, standing or authority to pursue any claims or defenses or other causes of action belonging to the Debtors or their estates with respect to the Prepetition Secured Obligations or any obligations arising therefrom.

28.     *Binding Effect; Successors and Assigns.*  The provisions of this Final Order, the DIP Credit Agreement, and the other DIP Documents shall be binding upon all parties-in-interest in the Bankruptcy Cases and any successor cases, including the Junior Secured Parties, any Creditors' Committee, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of the DIP Agent and the other DIP Secured Parties.

29.     *Effectiveness of Section 6.19 of the DIP Credit Agreement.*  Section 6.19 of the DIP Credit Agreement is hereby removed from the DIP Credit Agreement in its entirety and shall be of no further force or effect.

30.     *Modifications of DIP Documents.*  The Debtors and the DIP Parties are hereby authorized to implement, in accordance with the terms of the DIP Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders or the DIP Agent and any extension of any deadline or milestone set forth in the DIP Documents, including but not limited to the deadlines set forth in subsections (o) and (p) of Article IX ("Events of Default") of the DIP Credit Agreement (other than this Final Order)) without further notice, motion or application to, order of or hearing before, this Court; *provided, however,* counsel to the Creditors' Committee shall be given at least five (5) business days prior written notice of any non-material modification.  Any material modification or amendment to the DIP Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon notice to counsel for the Creditors' Committee, if any, the U.S. Trustee, the

Prepetition Secured Agents and any party that has requested notice pursuant to Bankruptcy Rule 2002, including with respect to any fees or expenses payable by the Debtors in connection with such modification; *provided, however*, that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a Default or an Event of Default, in each case under the DIP Documents shall not require an order of this Court.

31.     *Limitation of Liability.*   In determining to make any loan or other extension of credit under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the DIP Agent and the other DIP Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).   Furthermore, nothing in this Final Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent or the other DIP Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

32.     *Rights Reserved.*   Unless inconsistent with the provisions of this Final Order or the DIP Documents, the rights or interests of any party-in-interest with respect to the Intercreditor Agreement or the rights of offset or recoupment of any party shall remain in full force and effect.

33.     *Choice of Law; Jurisdiction.*   The DIP Facilities and DIP Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections

5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code. The Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facilities or the DIP Documents.

34.     *Controlling Effect of Final Order.* To the extent any provision of this Final Order conflicts or is inconsistent with any provision of the Motion or the DIP Documents, the provisions of this Final Order shall control.

35.     *No Waiver.* No failure or delay by the DIP Agent or the other DIP Secured Parties in exercising any right or power hereunder or under any DIP Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the DIP Agent, the Issuing Bank and the other DIP Secured Parties hereunder and under any other DIP Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of the DIP Credit Agreement or consent to any departure by the Debtors therefrom shall in any event be effective unless the same shall be otherwise permitted by the DIP Credit Agreement, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

36.     *No Third Party Rights.* Except as explicitly provided for herein or in any DIP Documents, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary. In determining to make any loan or other extension of credit (whether under the DIP Documents or otherwise) or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents,

the DIP Agent and the other DIP Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

37.     *Jurisdiction.*  This Court shall retain exclusive jurisdiction to enforce the terms of this Final Order and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Final Order, including with respect to any and all disputes or matters under, arising out of, or in connection with either the DIP Loans or the DIP Documents.

38.     *Final Borrowings.*  Notwithstanding anything herein to the contrary, the Debtors' borrowings under the DIP Credit Agreement shall not exceed $250,000,000.00 (consisting of $125,000,000.00 drawn from the Revolver B Facility and $125,000,000.00 drawn from the Revolver A Facility).

39.     *Effectiveness.*  This Final Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of effectiveness of this Final Order.

Dated: 2-22, 2018
Houston, Texas

THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE