**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
05/03/2019

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | **Re:  Docket No. 1803** |

**ORDER (I) APPROVING THE ADEQUACY
OF THE DISCLOSURE STATEMENT, (II) APPROVING
THE SOLICITATION PROCEDURES WITH RESPECT TO
CONFIRMATION OF THE PROPOSED THIRD AMENDED SETTLEMENT JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF EXCO RESOURCES, INC. AND ITS
DEBTOR AFFILIATES, (III) APPROVING THE FORMS OF BALLOTS AND
NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN DATES
WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"), pursuant to sections 105, 363,

1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3016, 3017, 3018, 3020,

and 9006, and Bankruptcy Local Rules 2002-1 and 3016-1, approving, (a) the adequacy of the

*Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization*

*of EXCO Resources, Inc. and Its Debtor Affiliates*, substantially in the form attached to the Order

(the "Disclosure Statement") related to the *Third Amended Settlement Joint Chapter 11 Plan of*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc.
(1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC
(0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC
(1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO
Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider
Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas,
Texas 75251.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

*Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "Plan"), which amends and supersedes the *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "First Plan"), (b) the Solicitation Procedures, (c) the Ballots, (d) the Solicitation Packages, (e) the Cover Letter, (f) the Confirmation Hearing Notice, (g) the Non-Voting Status Notices, (h) the Plan Supplement Notice, (i) the Assumption Notice and Rejection Notice, and (j) certain dates and deadlines related to the foregoing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and in accordance with the requirements of Bankruptcy Rule 3017(a) and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as provided herein.

## I.      Approval of the Disclosure Statement.

2.      The Disclosure Statement, attached hereto as **Exhibit 1**, is approved as providing Holders of Claims entitled to vote on the Plan with adequate information to make an informed

decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

3.    The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims, Holders of Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article VIII of the Plan, in satisfaction of the requirements of Bankruptcy Rules 2002(c)(3) and 3016(b) and (c).

**II.    Approval of the Procedures, Materials, and Timeline for Soliciting Votes on and Confirming the Plan.**

    **A.    Approval of the Solicitation Procedures.**

4.    The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation Procedures attached hereto as **<u>Exhibit 2</u>**, which are hereby approved in their entirety.

    **B.    Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.**

5.    The following dates are hereby established (subject to modification as necessary) with respect to the solicitation of votes to accept the Plan, voting on the Plan, and confirming the Plan (all times prevailing Central Time):

| Event | Date |
|---|---|
| Voting Record Date | **Friday, April 26, 2019** |
| Confirmation Hearing Notice Service Deadline | **Saturday, May 4, 2019** |
| Publication Deadline | **Tuesday, May 7, 2019** |
| Solicitation Mailing Deadline | **Wednesday, May 8, 2019, or as soon as reasonably practicable thereafter** |
| Plan Supplement Deadline | **Wednesday, May 22, 2019** |
| Confirmation Objection Deadline | **Tuesday, June 4, 2019 at 5:00 p.m., prevailing Central Time[3]** |
| Voting Deadline | **Wednesday, June 5, 2019 at 5:00 p.m., prevailing Central Time** |
| Deadline to File Voting Report | **Friday, June 7, 2019** |
| Confirmation Objection Response Deadline | **Friday, June 7, 2019 at 12:00 p.m., prevailing Central Time** |
| Confirmation Brief Deadline | **Friday, June 7, 2019 at 12:00 p.m., prevailing Central Time** |

**C.      Approval of the Form and Distribution of Solicitation Packages to Parties Entitled to Vote on the Plan.**

6.      The Solicitation Packages to be transmitted on or before the Solicitation Mailing Deadline, or as soon as reasonably practicable thereafter, to those Holders of Claims entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby approved:

      a.    this Order (excluding the exhibits hereto, except as set forth below);

      b.    the approved Disclosure Statement attached hereto as **Exhibit 1**;

      c.    the Solicitation Procedures attached hereto as **Exhibit 2**;

      d.    the applicable form of Ballot, in substantially the form of the Ballots attached hereto as **Exhibit 3**;

---

[3]    Any objection by a contract or lease counterparty to a proposed rejection or assumption of an executory contract or unexpired lease or the related cure cost (each, an "Assume/Reject Objection") as set forth in the Plan Supplement filed in connection with the First Plan was due by December 5, 2018.  Solely to the extent of any modification to the Assumed Executory Contract and Unexpired Lease List or Rejected Executory Contract and Unexpired Lease List from the Plan Supplement filed in connection with the First Plan, the deadline for any Assume/Rejection Objection with regard to any such modification shall be the Confirmation Objection Deadline.

e. a cover letter, in substantially the form attached hereto as **Exhibit 4A** describing the contents of the Solicitation Package and urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan;

f. the Committee's cover letter, in substantially the form attached hereto as **Exhibit 4B** recommending the Holders of Claims in each of the Voting Classes to vote to accept the Plan;

g. the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed By the Debtors and Related Voting and Objection Procedures*, in substantially the form attached hereto as **Exhibit 8** (the "Confirmation Hearing Notice");

h. a pre-addressed, postage pre-paid reply envelope.

7.      The Solicitation Packages provide Holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Bankruptcy Local Rules.

8.      The Debtors shall distribute Solicitation Packages to all Holders of Claims entitled to vote on the Plan on or before the Solicitation Mailing Deadline, or as soon as reasonably practicable thereafter.[4]  Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

9.      The Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement, and this Order to Holders of Claims entitled to vote on the Plan in electronic format (*i.e.*, on a CD-ROM or flash drive); *provided*, that the Ballots as well as the Cover Letter and the Confirmation Hearing Notice shall be provided in paper form.  Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact

---

[4]      For the avoidance of doubt, Holders of Claims as of the Voting Record Date in Classes 3, 4, 5, and 6 are entitled to vote based upon the records of the applicable agent (and, with respect to Class 6, the records of The Depository Trust Company), in accordance with the Solicitation Procedures; and any Holders of filed Claims relating to ownership of the debt instruments in Classes 3, 4, 5, and 6 shall receive only the Confirmation Hearing Notice from the Debtors.

the Claims and Noticing Agent and request paper copies of the materials previously received in electronic format (to be provided at the Debtors' expense).

10.     On or before the Solicitation Mailing Deadline, or as soon as reasonably practicable thereafter, the Debtors shall provide complete Solicitation Packages (excluding the Ballots and the Cover Letter) to the U.S. Trustee and all parties on the 2002 List as of the Voting Record Date.

11.     The Claims and Noticing Agent is authorized to assist the Debtors in (a) distributing the Solicitation Packages, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims against the Debtors, (c) responding to inquiries from Holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors regarding the Plan.

12.     The Claims and Noticing Agent is also authorized to accept Ballots via electronic online transmission solely through a customized online balloting portal on the Debtors' case website.  The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

13.     For the avoidance of doubt, no votes cast on a prior ballot in connection with the solicitation of the First Plan shall be counted in connection with solicitation of the Plan.

### D. Approval of the Form of Notices to Non-Voting Classes.

14. Except to the extent the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to Holders of Claims or Interests in Non-Voting Classes, as such Holders are not entitled to vote on the Plan. Instead, on or before the Solicitation Mailing Deadline, or as soon as reasonably practicable thereafter, the Claims and Noticing Agent shall mail (first-class postage prepaid) a Non-Voting Status Notice in lieu of Solicitation Packages, the form of each of which is approved, to those parties, outlined below, who are not entitled to vote on the Plan:

| Class(es) | Status | Treatment |
|---|---|---|
| 1, 2, 10 | Unimpaired—Conclusively Presumed to Accept | Will receive a notice, substantially in the form attached to the Order as **Exhibit 5** and **5A**, in lieu of a Solicitation Package. |
| 9, 11 | Impaired—Deemed to Reject | Will receive a notice, substantially in the form attached to the Order as **Exhibit 6**, **6A**, **6B**, and **6C** (as applicable), in lieu of a Solicitation Package. |
| N/A | Disputed Claims | Holders of Claims that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their Claim. As such, Holders of such Claims will receive a notice, substantially in the form attached to the Order as **Exhibit 7** and **7A** (which notice shall be served together with such objection). |

15. The Debtors are not required to mail Solicitation Packages, other solicitation materials, or a Non-Voting Status Notice to: (a) Holders of Claims that have already been paid in full during the chapter 11 cases; (b) any party to whom the Disclosure Statement Hearing Notice was sent but was subsequently returned as undeliverable without a forwarding address; or (c) Holders of Classes 8 Intercompany Claims or Class 10 Intercompany Interests.

E.      **Approval of the Confirmation Hearing Notice.**

16.     The Confirmation Hearing Notice, in the form attached hereto as **Exhibit 8**, which shall be filed by the Debtors and served upon parties in interest in the chapter 11 cases on or before **Saturday, May 4, 2019**, and published in a format modified for publication one time no later than **Tuesday, May 7, 2019**, in the national edition of the *Wall Street Journal*, constitutes adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan could be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

F.      **Approval of the Procedures for Filing Objections to the Plan.**

17.     Objections to the Plan will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order.  Specifically, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, ***must***:  (a) be in writing; (b) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court by Tuesday, June 4, 2019 at 5:00 p.m., prevailing Central Time.

G.      **Approval of Notice of Filing of the Plan Supplement.**

18.     The Debtors are authorized to send notice of the filing of the Plan Supplement to parties in interest, substantially in the form attached hereto as **Exhibit 9**, within the time periods specified in the this Order or the Plan.  Notwithstanding the foregoing, the Debtors may amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with the Plan.

**H.      Approval of Notices to Contract and Lease Counterparties.**

19.      The Debtors are authorized to mail a notice of assumption (and any corresponding Cure Claims) or rejection of any Executory Contracts or Unexpired Leases, in the forms attached hereto as **Exhibit 10** and **Exhibit 11**, respectively, to the applicable counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan, within the time periods specified in this Order or the Plan.

**III.    Miscellaneous.**

20.      The Debtors' rights are reserved to modify the Plan without further order of the Court in accordance with Article X of the Plan, including the right to withdraw the Plan as to an individual Debtor at any time before the Confirmation Date.

21.      Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

22.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

23.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 2002 and the Bankruptcy Local Rules are satisfied by such notice.

24.      The terms and conditions of this Order are immediately effective and enforceable upon its entry.

25.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

26.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: May 03, 2019

Marvin Isgur
United States Bankruptcy Judge

## Exhibit 1

**Disclosure Statement**

## **Exhibit 2**

**Solicitation Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**SOLICITATION PROCEDURES**

     **PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order (the "Disclosure Statement Order"): (a) authorizing EXCO Resources, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit votes on the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

     **The Voting Record Date.**

     The Court has established **Friday, April 26, 2019**, as the record date for purposes of determining which Holders of Claims in Class 3 (1.5 Lien Notes Claims), Class 4 (1.75 Lien Term Loan Facility Claims), Class 5 (Second Lien Term Loan Facility Claims), Class 6 (Unsecured Notes Claims), and Class 7 (GUC Claims), are entitled to vote on the Plan (the "Voting Record Date").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]    Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan.

**The Voting Deadline.**

The Court has established **Wednesday, June 5, 2019 at 5:00 p.m.**, prevailing Central Time as the voting deadline (the "Voting Deadline") for the Plan.  The Debtors may extend the Voting Deadline, in their discretion, without further notice or order of the Court.  To be counted as votes to accept or reject the Plan, all ballots ("Ballots") must be properly executed, completed, and returned in accordance with the instructions provided on or with the Ballot.

**Form, Content, and Manner of Notices.**

1.     **The Solicitation Package.**

The following materials shall constitute the solicitation package (the "Solicitation Package"):

  a.   the Disclosure Statement Order (excluding the exhibits thereto, except as set forth below);

  b.   the approved Disclosure Statement (annexed as **Exhibit 1** to the Disclosure Statement Order) and the exhibits thereto, including the Plan;

  c.   these Solicitation Procedures (annexed as **Exhibit 2** to the Disclosure Statement Order);

  d.   the applicable form of Ballot, in substantially the form of the Ballots annexed as **Exhibit 3** to the Disclosure Statement Order;

  e.   a cover letter, in substantially the form annexed as **Exhibit 4A** to the Disclosure Statement Order describing the contents of the Solicitation Package and urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan;

  f.   the Committee's cover letter, in substantially the form attached hereto as **Exhibit 4B** recommending the Holders of Claims in each of the Voting Classes to vote to accept the Plan;

  g.   the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed By the Debtors and Related Voting and Objection Procedures*, in substantially the form annexed as **Exhibit 8** to the Disclosure Statement Order (the "Confirmation Hearing Notice");

  h.   a pre-addressed, postage pre-paid reply envelope; and

  i.   any additional documents that the Court has ordered to be made available.

2.     **Distribution of the Solicitation Package.**

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (with this **Exhibit 2**) in electronic format (*i.e.*, CD-ROM or flash drive

2

format), and all other contents of the Solicitation Package, including Ballots, shall be provided in paper format.  Any party that receives the materials in electronic format but would prefer paper format may contact Epiq Corporate Restructuring, LLC (the "Claims and Noticing Agent") and request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense) by:  (a) writing to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (b) calling (866) 897-6433 (toll free) or (646) 282-2500 (international) and requesting to speak with a member of the Solicitation Group; or (c) emailing tabulation@epiqglobal.com and referencing "EXCO" in the subject line.

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (excluding the Ballots and the Cover Letter) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 as of the Voting Record Date.  In addition, the Debtors shall mail, or cause to be mailed, the Solicitation Package to all Holders of Claims in the Voting Classes who are entitled to vote, as described in section D below on or before the date that is five (5) days following entry of the Disclosure Statement Order (expected to be **Wednesday, May 8, 2019**) or as soon as reasonably practicable thereafter.[3]

To avoid duplication and reduce expenses, the Debtors will make every reasonable effort to ensure that any Holder of a Claim who has filed duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claims and with respect to that Class as against that Debtor.

3. **Non-Voting Status Notices for Unimpaired Classes and Classes Deemed to Reject the Plan.**

   a. Holders of Claims and Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code will receive only the *Non-Voting Status Notice for Unimpaired Claims Conclusively Presumed to Accept the Plan*, substantially in the form annexed as **Exhibit 5** to the Disclosure Statement Order.  Such notice will instruct these Holders as to how they may obtain copies of the documents contained in the Solicitation Package (*excluding* Ballots), as well as how they may opt out of the Third Party Release provided by the Plan.[4]

   b. Holders of Claims and Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive the *Non-Voting Status Notice to Holders of Impaired Claims and Interests Deemed to Reject the Plan*, substantially in the form annexed as **Exhibit 6** to the Disclosure Statement Order.  Such notice will instruct these

---

[3]   Master Ballots will be distributed to Nominees approximately seven (7) days after the initial solicitation mailing in accordance with customary solicitation procedures.

[4]   Holders of Claims and Interests will receive an *Opt-Out Form for Holders of Unimpaired Claims and Interests Deemed to Accept the Plan,* substantially in the form annexed as **Exhibit 5A** to the Disclosure Statement Order.

Holders as to how they may obtain copies of the documents contained in the Solicitation Package (***excluding*** Ballots), as well as how they may opt out of the Third Party Release provided by the Plan.[5]

    c.   Holders of Claims and Interests that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their claims and will receive the *Non-Voting Status Notice With Respect to Disputed Claims*, substantially in the form annexed as **Exhibit 7** to the Disclosure Statement Order.  Such notice will instruct these Holders as to how they may obtain copies of the documents contained in the Solicitation Package (***excluding*** Ballots), as well as how they may opt out of the Third Party Release provided by the Plan.[6]

**Voting and Tabulation Procedures.**

1.    **Holders of Claims Entitled to Vote.**

Only the following Holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

    a.   Holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection, other than a "reduce and allow" objection, filed by the Debtors with the Court at least seven days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided* that a Holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection absent a further order of the Court;

    b.   Holders of Claims that are listed in the Schedules; *provided* that Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely Filed Proof of Claim) shall be disallowed for voting purposes (unless the applicable Claims Bar Date has not yet expired,

---

[5]   Holders of Claims and Interests who hold such Claims and Interests directly (collectively, the "Direct Holders") will receive an *Opt-Out Form for Holders of Impaired Claims and Interests Deemed To Reject The Plan*, substantially in the form annexed as **Exhibit 6A** to the Disclosure Statement Order.  Holders of Class 11 Interests in EXCO who hold such Interests through a broker, bank, or other nominee (collectively, the "Beneficial Equity Holders") will receive from such broker, bank, or other nominee, or such firm's agent (each of the foregoing, an "Equity Nominee") an *Opt-Out Form for Holders of Impaired Interests Deemed To Reject The Plan*, substantially in the form annexed as **Exhibit 6B** to the Disclosure Statement Order.  The Equity Nominees for Class 11 Interests in EXCO will receive the *Master Form for Optional Release Opt-Out for Class 11 Interests in EXCO*, substantially in the form annexed as **Exhibit 6C** to the Disclosure Statement Order.

[6]   Holders of Claims and Interests that are subject to a pending objection by the Debtors will receive an *Opt-Out Form for Holders of of Disputed Claims,* substantially in the form annexed as **Exhibit 7A** to the Disclosure Statement Order.

in which case such scheduled claims would be allowed to vote in the amount of $1.00);

c. Holders whose Claims arise (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, (ii) in an order entered by the Court, or (iii) in a document executed by the Debtors pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed;

d. Holders of any Disputed Claim that has been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018; and

e. the assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

2. **Establishing Claim Amounts for Voting Purposes.**

**Class 3 Claims**.  The Claims amount of Class 3 Claims for voting purposes only will be established based on the principal amount of the applicable positions held by such Class 3 Claim Holder, as of the Voting Record Date, as evidenced by the applicable records provided by the 1.5 Lien Notes Trustee in electronic Microsoft Excel format to the Debtors or the Claims and Noticing Agent no later than one (1) business day following the Voting Record Date.

**Class 4 Claims**.  The Claims amount of Class 4 Claims for voting purposes only will be established based on the principal amount of the applicable positions held by such Class 4 Claim Holder, as of the Voting Record Date, as evidenced by the applicable records provided by the 1.75 Lien Agent in electronic Microsoft Excel format to the Debtors or the Claims and Noticing Agent no later than one (1) business day following the Voting Record Date.

**Class 5 Claims**.  The Claims amount of Class 5 Claims for voting purposes only will be established based on the principal amount of the applicable positions held by such Class 5 Claim Holder, as of the Voting Record Date, as evidenced by the applicable records provided by the Second Lien Agent in electronic Microsoft Excel format to the Debtors or the Claims and Noticing Agent no later than one (1) business day following the Voting Record Date.

**Class 6 Claims**.  The Claims amount of Class 6 Claims of directly registered and holders of beneficial interests ("Beneficial Holders") for voting purposes only will be established through the applicable Indenture Trustees or applicable Nominees (as defined below), as the case may be, in the amount of the applicable positions held as of the Voting Record Date, by such registered Holder as evidenced by records of the applicable Indenture Trustees or by the applicable Nominees (as defined below) in Class 6 as evidenced by the securities position report(s) from The Depository Trust Company ("DTC").

**Class 7 Claims**.  Each Holder of a Class 7 Claim as of the Voting Record Date shall be entitled to vote the amount of its Claim established in accordance with the procedures set forth below for Filed and Scheduled Claims.

**Filed and Scheduled Claims**.  The Claim amount established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim.  Moreover, any amounts filled in on Ballots by the Debtors through the Claims and Noticing Agent, as applicable, are not binding for purposes of allowance and distribution.  In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each claimant's vote:

a.  the Claim amount (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, (ii) set forth in an order of the Court, or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Court;

b.  the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under section C.3(d) of these Solicitation Procedures;

c.  the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided* that any Ballot cast by a Holder of a Claim who timely files a Proof of Claim in respect of (i) a contingent Claim or a Claim in a wholly-unliquidated or unknown amount (based on a reasonable review by the Debtors and/or the Claims and Noticing Agent) that is not the subject of an objection will count toward satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for a Claim in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and (ii) a partially liquidated and partially unliquidated Claim will be Allowed for voting purposes only in the liquidated amount; *provided, further*, that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes; *provided, further*, that any Claim filed in an amount denominated by a currency other than USD will vote at $1.00;

d.  the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim); *provided* that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid; *provided* that if the applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall vote at $1.00;

e.  Proofs of Claim filed for $0.00 are not entitled to vote;

f.      notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same voting Class shall be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims;

g.      if a Proof of Claim has been amended by a later Proof of Claim that is filed on or prior to the Voting Record Date, the later-filed amending Claim shall be entitled to vote in a manner consistent with these Solicitation Procedures, and the earlier-filed Claim shall be disallowed for voting purposes, regardless of whether the Debtors have objected to such amended Claim. Except as otherwise ordered by the Court, any amendments to Proofs of Claim after the Voting Record Date shall not be considered for purposes of these Solicitation Procedures; and

h.      in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

**3.      Resolution of Disputed Claims for Voting Purposes; Resolution Event.**

a.      Absent a further order of the Court, the Holder of a Claim in a Voting Class that is the subject of a pending objection by the Debtors on a "reduce and allow" basis that is filed with the Court on or prior to seven days before the Voting Deadline shall be entitled to vote such Claim in the reduced amount contained in such objection.

b.      If a Claim in a Voting Class is subject to an objection by the Debtors other than a "reduce and allow" objection that is filed with the Court on or prior to seven days before the Voting Deadline:  (i) the Debtors shall cause the applicable Holder to be served with a Disputed Claim Notice substantially in the form annexed as **Exhibit 7** to the Disclosure Statement Order (which notice shall be served together with such objection); and (ii) the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event (as defined herein) occurs as provided herein.

c.      If a Claim in a Voting Class is subject to an objection by the Debtors other than a "reduce and allow" objection that is filed with the Court less than seven days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the Holder of such Claim and without further order of the Court, unless the Court orders otherwise.

d.      A "Resolution Event" means the occurrence of one or more of the following events no later than two business days prior to the Voting Deadline:

i.      an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

7

ii.        an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

iii.       a stipulation or other agreement is executed between the Holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

iv.       the Debtors' pending objection is voluntarily withdrawn by the objecting party.

e.       No later than one business day following the occurrence of a Resolution Event, the Debtors shall cause the Claims and Noticing Agent to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant Holder to the extent such Holder has not already received a Solicitation Package containing a Ballot.

## 4. <u>Tabulation of Ballots.</u>

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules:

a.       except as otherwise provided in the Solicitation Procedures, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with Confirmation of the Plan;

b.       the Debtors will file with the Court, by no later than **Friday, June 7, 2019**, a voting report (the "<u>Voting Report</u>"). The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or damaged (collectively, in each case, the "<u>Irregular Ballots</u>"). The Voting Report shall indicate the Debtors' intentions with regard to each Irregular Ballot;

c.       the method of delivery of Ballots to be sent to the Claims and Noticing Agent is at the election and risk of each Holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Claims and Noticing Agent actually receives the executed Ballot;

d.       an executed Ballot is required to be submitted by the Entity submitting such Ballot or Master Ballot. Delivery of a Ballot to the Claims and Noticing

Agent by facsimile, or any electronic means other than as expressly approved by the Disclosure Statement Order or these Solicitation Procedures will not be valid;[7]

e.  no Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims and Noticing Agent), the Debtors' financial or legal advisors, and if so sent will not be counted;

f.  if multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;[8]

g.  Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

h.  a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims should indicate such capacity when signing;

i.  the Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

j.  neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

k.  unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

---

[7]   For the avoidance of doubt, a Ballot may be submitted via the on-line electronic ballot portal and, solely for Nominees, via electronic mail to the Claims and Noticing Agent at tabulation@epiqglobal.com with a reference to "EXCO Master Ballot" in the subject line.

[8]   No votes cast on a prior ballot in connection with the solicitation of the First Plan shall be counted in connection with solicitation of the Plan.

l.      any Class that contains Claims entitled to vote but for which no votes are returned shall be deemed to have accepted the Plan;

m.    in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

n.     subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

o.     if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

p.     if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

q.     the following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, a Ballot submitted via the Claims and Noticing Agent online balloting portal shall be deemed an original signature); (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (vi) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

r.     after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors;[9]

---

[9]   For the avoidance of doubt, subject to any order of the Court, following the Voting Deadline but prior to entry of the Confirmation Order, the Debtors may engage with any Holder of a Claim(s) that had previously cast a Ballot to vote their Claim(s) to reject the Plan, to modify such Holder's vote to a vote to accept the Plan, and any such modifications shall be documented in the Voting Report.

s.    the Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes; and

t.    where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that (i) a Ballot, (ii) a group of Ballots within a Voting Class received from a single voting creditor, or (iii) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion.

5.    **Tabulation of Master Ballots.**

In addition to the foregoing generally applicable voting and ballot tabulation procedures, the following procedures shall apply to Holders of Unsecured Notes Claims who hold their position through a broker, bank, or other nominee or an agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"):

a.    the Claims and Noticing Agent shall distribute or cause to be distributed the appropriate number of copies of Ballots to each Beneficial Holder (a "Beneficial Holder Ballot") of a Class 6 Unsecured Notes Claim as of the Voting Record Date;

b.    Nominees identified by the Claims and Noticing Agent as Entities through which Beneficial Holders hold their Claims will be provided with (i) Solicitation Packages for each Beneficial Holder represented by the Nominee as of the Voting Record Date, which will contain, among other things, a Beneficial Holder Ballot for each Beneficial Holder, and (ii) a master ballot (the "Master Ballot");

c.    any Nominee that is a holder of record with respect to a Class 6 Unsecured Notes Claim shall vote on behalf of Beneficial Holders of such Claims by: (i) immediately, and in any event within five Business Days after its receipt of the Solicitation Packages, distributing the Solicitation Packages, including Beneficial Holder Ballots, it receives from the Claims and Noticing Agent to all such Beneficial Holders;[10] (ii) providing such Beneficial Holders with a return address to send the completed Beneficial

---

[10]   Solicitation Packages may be sent in paper format or via electronic transmission in accordance with the customary requirements of each Nominee.  Each Nominee will then distribute the Solicitation Packages, as appropriate, in accordance with their customary practices and obtain votes to accept or to reject the Plan also in accordance with their customary practices.  If it is the Nominee's customary and accepted practice to submit a "voting instruction form" to the Beneficial Holders for the purpose of recording the Beneficial Holder's vote, the Nominee will be authorized to send the voting instruction form in lieu of, or in addition to, a Beneficial Holder Ballot.

Holder Ballots; (iii) compiling and validating the votes and other relevant information of all such Beneficial Holders on the Master Ballot; and (iv) transmitting the Master Ballot to the Claims and Noticing Agent on or before the Voting Deadline;

d. any Beneficial Holder holding a Class 6 Unsecured Notes Claim as a record holder in its own name shall vote on the Plan by completing and signing a Ballot or Master Ballot and returning it directly to the Claims and Noticing Agent on or before the Voting Deadline;

e. any Beneficial Holder Ballot returned to a Nominee by a Beneficial Holder shall not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Claims and Noticing Agent a Master Ballot that reflects the vote of such Beneficial Holders on or before the Voting Deadline or otherwise validates the Beneficial Holder Ballot in a manner acceptable to the Claims and Noticing Agent. Nominees shall retain all Beneficial Holder Ballots returned by Beneficial Holders for a period of one year after the Effective Date of the Plan;

f. if a Beneficial Holder holds a Class 6 Unsecured Notes Claim through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Holder Ballot and each such Beneficial Holder should execute a separate Beneficial Holder Ballot for each block of Class 6 Unsecured Notes Claims that it holds through any Nominee and must return each such Beneficial Holder Ballot to the appropriate Nominee;

g. if a Beneficial Holder holds a portion of its Class 6 Unsecured Notes Claim through a Nominee or Nominees and another portion in its own name as the record holder, such Beneficial Holder should follow the procedures described in Section B herein to vote the portion held in its own name and the procedures described in section D.4 herein to vote the portion held by the Nominee(s);

h. votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees in Class 6 Unsecured Notes Claims as of the Voting Record Date, as evidenced by the applicable securities position report(s) obtained from the DTC. Votes submitted by a Nominee pursuant to a Master Ballot will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date;

i. if conflicting votes or "over-votes" are submitted by a Nominee pursuant to a Master Ballot, the Debtors will use reasonable efforts to reconcile discrepancies with the Nominees. If over-votes on a Master Ballot are not reconciled prior to the preparation of the Voting Report, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that

contained the over-vote, but only to the extent of the Nominee's position in Class 6 Unsecured Notes Claims;

j.      for purposes of tabulating votes, each Nominee or Beneficial Holder will be deemed to have voted the principal amount of its Claims in Class 6 Unsecured Notes Claim although any principal amounts may be adjusted by the Claims and Noticing Agent to reflect the amount of the Claim actually voted, including prepetition interest;

k.      a single Nominee may complete and deliver to the Claims and Noticing Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the latest received valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior received Master Ballot.  Likewise, if a Beneficial Holder submits more than one Beneficial Holder Ballot to its Nominee, (i) the latest received Beneficial Holder Ballot received before the submission deadline imposed by the Nominee shall be deemed to supersede any prior Beneficial Holder Ballot submitted by the Beneficial Holder, and (ii) the Nominee shall complete the Master Ballot accordingly; and

l.      the Debtors will, upon written request, reimburse Nominees for customary mailing and handling expenses incurred by them in forwarding the Beneficial Holder Ballot and other enclosed materials to the Beneficial Holders for which they are the Nominee.  No fees or commissions or other remuneration will be payable to any broker, dealer, or other person for soliciting Beneficial Holder Ballot with respect to the Plan.

**Amendments to the Plan and Solicitation Procedures.**

The Debtors reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, Plan, Ballots, Confirmation Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

## Exhibit 3A

**Form of Class 3 Ballot**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

### BALLOT FOR VOTING TO ACCEPT OR
### REJECT THE THIRD AMENDED JOINT
### CHAPTER 11 PLAN OF REORGANIZATION OF
### EXCO RESOURCES, INC. AND ITS DEBTOR AFFILIATES

### CLASS 3 BALLOT FOR HOLDERS OF 1.5 LIEN NOTES CLAIMS

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE CLAIMS AND NOTICING AGENT BY WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement").[2] The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2019 (the "Disclosure Statement Order").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]    You may have received a Ballot in connection with the Debtors' *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "First Plan"), which has been amended and superseded by the Plan.  No votes cast on a prior ballot in connection with the solicitation of the First Plan shall be counted in connection with solicitation of the Plan.  Accordingly, **you must submit this Ballot to vote on the Plan.**

Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 3 ballot (this "Class 3 Ballot") because you are a Holder of a 1.5 Lien Notes Claim in Class 3 as of **Friday, April 26, 2019** (the "Voting Record Date").  Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 3 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC, the Claims and Noticing Agent, at no charge by: (i) accessing the Debtors' restructuring website at http://dm.epiq11.com/ERI; (ii) writing to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling 866-897-6433 (toll free) or (646) 282-2500 (international) and requesting to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "EXCO" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 3 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 3 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Claims and Noticing Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 3, 1.5 Lien Notes Claims, under the Plan.  If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1**.  **Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Class 3 Claim in the following aggregate unpaid amount:[3]

| $_____ |
| --- |

**Item 2**.   **Vote on Plan.**

The Holder of the Class 3 1.5 Lien Notes Claims against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

| ☐  **ACCEPT** (vote FOR) the Plan | ☐  **REJECT** (vote AGAINST) the Plan |
| --- | --- |

        **Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

---

[3]     For voting purposes only, subject to tabulation rules.

**Item 3.** **Important information regarding the Third Party Release.**[4]

**AS A "<u>RELEASING PARTY</u>" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

**As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement**

---

[4]   Under the Plan, "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case only in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

\*      \*      \*

IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

<u>OPTIONAL RELEASE ELECTION</u>. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:

> ☐ **The Undersigned Holder of the Claim elects to**
> **<u>OPT OUT of the Third Party Release</u>**

[*Remainder of page intentionally left blank; continued next page.*]

**Item 4.** **Certifications.**

By signing this Class 3 Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) **that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the 1.5 Lien Notes Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the 1.5 Lien Notes Claims being voted;**

(b) **that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;**

(c) **that the Entity has cast the same vote with respect to all 1.5 Lien Notes Claims in a single Class; and**

(d) **that no other Class 3 Ballots with respect to the amount of the 1.5 Lien Notes Claims identified in Item 1 have been cast or, if any other Class 3 Ballots have been cast with respect to such 1.5 Lien Notes Claims, then any such earlier Class 3 Ballots are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE)
*PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

---

If by First Class mail:

    EXCO Resources, Inc.
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    P.O. Box 4422
    Beaverton, OR 97076-4422

---

If by overnight courier or hand delivery:

    EXCO Resources, Inc
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    10300 SW Allen Boulevard
    Beaverton, OR 97005

---

By electronic, online submission:

        Please visit http://dm.epiq11.com/ERI. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot.  If you choose to submit your Ballot via Epiq's E-Ballot system, you should not also return a hard copy of your Ballot.

        **IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized E-Ballot:**

**Unique E-Ballot ID#:** _____

        "E-Balloting" is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile or email will not be counted.

---

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot.
Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Claims and Noticing Agent's online portal
should NOT also submit a paper Ballot.

6

**THE VOTING DEADLINE IS <u>WEDNESDAY, JUNE 5, 2019</u> AT 5:00 P.M., PREVAILING CENTRAL TIME**

**THE CLAIMS AND NOTICING AGENT MUST ACTUALLY RECEIVE YOUR CLASS 3 BALLOT ON OR BEFORE THE VOTING DEADLINE.**

| **Class 3 — 1.5 Lien Notes Claims** |
|---|

### INSTRUCTIONS FOR COMPLETING THIS CLASS 3 BALLOT

1.  The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.   Capitalized terms used in the Class 3 Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 3 Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  To ensure that your Class 3 Ballot is counted, you *must either*:  (a) complete and submit this hard copy Class 3 Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://dm.epiq11.com/ERI.  **Ballots will not be accepted by facsimile or other electronic means (other than the online portal).**

4.  **Use of Hard Copy Ballot**.  To ensure that your hard copy Class 3 Ballot is counted, you must:  (a) complete your Class 3 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 3 Ballot; and (c) clearly sign and return your original Class 3 Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery one of the following addresses or in accordance with paragraph 5 below.

| If by First Class Mail: | If by overnight courier or hand delivery: |
|---|---|
| EXCO Resources, Inc. <br> Ballot Processing <br> c/o Epiq Corporate Restructuring, LLC <br> P.O. Box 4422 <br> Beaverton, OR 97076-4422 | EXCO Resources, Inc. <br> Ballot Processing <br> c/o Epiq Corporate Restructuring, LLC <br> 10300 SW Allen Boulevard <br> Beaverton, OR 97005 |

5.  **Use of Online Ballot Portal**.  To ensure that your electronic Class 3 Ballot is counted, please follow the instructions of the Debtors' case administration website at http://dm.epiq11.com/ERI.  You will need to enter your unique E-Ballot identification number indicated above.  The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

6.  Your Class 3 Ballot *must* be returned to the Claims and Noticing Agent so as to be *actually received* by the Claims and Noticing Agent on or before the Voting Deadline.  **The Voting Deadline is Wednesday, June 5, 2019 at 5:00 p.m., prevailing Central Time.**

7.  If a Class 3 Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors.  Additionally, **the following Class 3 Ballots will *not* be counted**:

    (a)  any Class 3 Ballot that partially rejects and partially accepts the Plan;
    (b)  **Class 3 Ballots sent to the Debtors, the Debtors' agents (other than the Claims and Noticing Agent), an administrative agent, any indenture trustee, or the Debtors' financial or legal advisors;**
    (c)  **Class 3 Ballots sent by facsimile or any electronic means other than via the online portal;**

> (d) **any Class 3 Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;**
> (e) **any Class 3 Ballot cast by an Entity that does not hold a Claim in Class 3;**
> (f) **any Class 3 Ballot submitted by a Holder not entitled to vote pursuant to the Plan;**
> (g) **any unsigned Class 3 Ballot;**
> (h) **any Class 3 Ballot not bearing an original signature, except as provided above; and/or**
> (i) **any Class 3 Ballot not marked to accept or reject the Plan or any Class 3 Ballot marked both to accept and reject the Plan.**

8. The method of delivery of Class 3 Ballots to the Claims and Noticing Agent is at the election and risk of each Holder of a 1.5 Lien Notes Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Noticing Agent *actually receives* the originally executed Class 3 Ballot.  In all cases, Holders should allow sufficient time to assure timely delivery.

9. If multiple Class 3 Ballots are received from the same Holder of a 1.5 Lien Notes Claim with respect to the same 1.5 Lien Notes Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 3 Ballot will supersede and revoke any earlier received Class 3 Ballots.

10. You must vote all of your 1.5 Lien Notes Claims within Class 3 either to accept or reject the Plan and may **not** split your vote.  Further, if a Holder has multiple 1.5 Lien Notes Claims within Class 3, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple 1.5 Lien Notes Claims within Class 3 for the purpose of counting votes.

11. This Class 3 Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12. **Please be sure to sign and date your Class 3 Ballot**.  If you are signing a Class 3 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you should indicate such capacity when signing and, if required or requested by the Claims and Noticing Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 3 Ballot.

13. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you received.

<div align="center">

**PLEASE MAIL YOUR CLASS 3 BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 3 BALLOT,**
**THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,**
**PLEASE CALL THE CLAIMS AND NOTICING AGENT AT:**
**(866) 897-6433 (TOLL FREE) OR (646) 282-2500 (INTERNATIONAL)**
**(ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP)**
**OR EMAIL TABULATION@EPIQGLOBAL.COM**
**AND REFERENCE "EXCO" IN THE SUBJECT LINE.**

</div>

---

<div align="center">

**THE VOTING DEADLINE IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M.,**
**PREVAILING CENTRAL TIME**

**THE CLAIMS AND NOTICING AGENT MUST ACTUALLY RECEIVE YOUR CLASS 3 BALLOT**
**ON OR BEFORE THE VOTING DEADLINE.**

</div>

---

<div align="center">9</div>

**<u>Exhibit 3B</u>**

**Form of Class 4 Ballot**

[CUSIP indicated on Exhibit A hereto]

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

BALLOT FOR VOTING TO ACCEPT OR
REJECT THE THIRD AMENDED JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF
EXCO RESOURCES, INC. AND ITS DEBTOR AFFILIATES

### CLASS 4 BALLOT FOR HOLDERS OF 1.75 LIEN TERM LOAN FACILITY CLAIMS

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT
MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE
*ACTUALLY RECEIVED*
BY THE CLAIMS AND NOTICING AGENT BY WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M.,
PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement").[2]  The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2019 (the "Disclosure Statement Order").

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]   You may have received a Ballot in connection with the Debtors' *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "First Plan"), which has been amended and superseded by the Plan.  No votes cast on a prior ballot in connection with the solicitation of the First Plan shall be counted in connection with solicitation of the Plan.  Accordingly, **you must submit this Ballot to vote on the Plan.**

Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 4 ballot (this "Class 4 Ballot") because you are a Holder of a 1.75 Lien Term Loan Facility Claim in Class 4 as of **Friday, April 26, 2019** (the "Voting Record Date").  Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 4 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC, the Claims and Noticing Agent, at no charge by: (i) accessing the Debtors' restructuring website at http://dm.epiq11.com/ERI; (ii) writing to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling 866-897-6433 (toll free) or (646) 282-2500 (international) and requesting to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "EXCO" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 4 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 4 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Claims and Noticing Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claims have been placed in Class 4, 1.75 Lien Term Loan Facility Claims, under the Plan.  If you hold Claims in another Class than your Claims in Class 4, you will receive a ballot for each Class besides Class 4 in which you are entitled to vote.

**Item 1**.  **Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Class 4 Claim in the following aggregate unpaid amount:[3]

Amount of 1.75 Lien Term Loan Facility Claim(s) in Class 4: $_____

**Item 2**.   **Vote on Plan.**

The Holder of the Class 4 1.75 Lien Term Loan Facility Claims against the Debtors set forth in Item 1 votes to (please check one):

| | |
|---|---|
| ☐ **ACCEPT** (vote FOR) the Plan | ☐ **REJECT** (vote AGAINST) the Plan |

---

[3]    For voting purposes only, subject to tabulation rules.

**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

**Item 3.** **Important information regarding the Third Party Release.[4]**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

**As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents,**

---

[4]   Under the Plan, "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case only in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

\*      \*      \*

IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

<u>OPTIONAL RELEASE ELECTION</u>. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:

> ☐ **The Undersigned Holder of the Claim elects to <u>OPT OUT of the Third Party Release</u>**

*[Remainder of page intentionally left blank; continued next page.]*

4

**Item 4.  Certifications.**

By signing this Class 4 Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) **that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the 1.75 Lien Term Loan Facility Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the 1.75 Lien Term Loan Facility Claims being voted;**

(b) **that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;**

(c) **that the Entity has cast the same vote with respect to all 1.75 Lien Term Loan Facility Claims in a single Class; and**

(d) **that no other Class 4 Ballots with respect to the amount of the 1.75 Lien Term Loan Facility Claims identified in Item 1 have been cast or, if any other Class 4 Ballots have been cast with respect to such 1.75 Lien Term Loan Facility Claims, then any such earlier Class 4 Ballots are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

5

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE)
*PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

If by First Class mail:

EXCO Resources, Inc.
Ballot Processing
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4422
Beaverton, OR 97076-4422

If by overnight courier or hand delivery:

EXCO Resources, Inc
Ballot Processing
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Boulevard
Beaverton, OR 97005

By electronic, online submission:

Please visit http://dm.epiq11.com/ERI. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot.  If you choose to submit your Ballot via Epiq's E-Ballot system, you should <u>not</u> also return a hard copy of your Ballot.

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized E-Ballot:**

**Unique E-Ballot ID#:** _____

"E-Balloting" is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile or email will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Claims and Noticing Agent's online portal should NOT also submit a paper Ballot.

6

**THE VOTING DEADLINE IS <u>WEDNESDAY, JUNE 5, 2019</u> AT 5:00 P.M.,
PREVAILING CENTRAL TIME**

**THE CLAIMS AND NOTICING AGENT MUST ACTUALLY RECEIVE YOUR CLASS 4 BALLOT ON
OR BEFORE THE VOTING DEADLINE.**

| Class 4 — 1.75 Lien Term Loan Facility Claims |
|---|

**INSTRUCTIONS FOR COMPLETING THIS CLASS 4 BALLOT**

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Class 4 Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 4 Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3. To ensure that your Class 4 Ballot is counted, you *must either*:  (a) complete and submit this hard copy Class 4 Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://dm.epiq11.com/ERI.  **Ballots will not be accepted by facsimile or other electronic means (other than the online portal).**

4. **Use of Hard Copy Ballot**.  To ensure that your hard copy Class 4 Ballot is counted, you must: (a) complete your Class 4 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 4 Ballot; and (c) clearly sign and return your original Class 4 Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery one of the following addresses or in accordance with paragraph 5 below.

| If by First Class Mail: | If by overnight courier or hand delivery: |
|---|---|
| EXCO Resources, Inc.<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | EXCO Resources, Inc.<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>10300 SW Allen Boulevard<br>Beaverton, OR 97005 |

5. **Use of Online Ballot Portal**.  To ensure that your electronic Class 4 Ballot is counted, please follow the instructions of the Debtors' case administration website at http://dm.epiq11.com/ERI.  You will need to enter your unique E-Ballot identification number indicated above.  The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

6. Your Class 4 Ballot *must* be returned to the Claims and Noticing Agent so as to be *actually received* by the Claims and Noticing Agent on or before the Voting Deadline.  **The Voting Deadline is Wednesday, June 5, 2019 at 5:00 p.m.**, prevailing Central Time.

7. If a Class 4 Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors.  Additionally, **the following Class 4 Ballots will** *not* **be counted**:

   (a) **any Class 4 Ballot that partially rejects and partially accepts the Plan;**
   (b) **Class 4 Ballots sent to the Debtors, the Debtors' agents (other than the Claims and Noticing Agent), an administrative agent, any indenture trustee, or the Debtors' financial or legal advisors;**
   (c) **Class 4 Ballots sent by facsimile or any electronic means other than via the online portal;**

> (d) any Class 4 Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;
> (e) any Class 4 Ballot cast by an Entity that does not hold a Claim in Class 4;
> (f) any Class 4 Ballot submitted by a Holder not entitled to vote pursuant to the Plan;
> (g) any unsigned Class 4 Ballot;
> (h) any Class 4 Ballot not bearing an original signature, except as provided above; and/or
> (i) any Class 4 Ballot not marked to accept or reject the Plan or any Class 4 Ballot marked both to accept and reject the Plan.

8. The method of delivery of Class 4 Ballots to the Claims and Noticing Agent is at the election and risk of each Holder of a 1.75 Lien Term Loan Facility Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Noticing Agent *actually receives* the originally executed Class 4 Ballot. In all cases, Holders should allow sufficient time to assure timely delivery.

9. If multiple Class 4 Ballots are received from the same Holder of a 1.75 Lien Term Loan Facility Claim with respect to the same 1.75 Lien Term Loan Facility Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 4 Ballot will supersede and revoke any earlier received Class 4 Ballots.

10. You must vote all of your 1.75 Lien Term Loan Facility Claims within Class 4 either to accept or reject the Plan and may **not** split your vote. Further, if a Holder has multiple 1.75 Lien Term Loan Facility Claims within Class 4, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple 1.75 Lien Term Loan Facility Claims within Class 4 for the purpose of counting votes.

11. This Class 4 Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12. **Please be sure to sign and date your Class 4 Ballot**. If you are signing a Class 4 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you should indicate such capacity when signing and, if required or requested by the Claims and Noticing Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 4 Ballot.

13. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class. Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you received.

<div align="center">

**PLEASE MAIL YOUR CLASS 4 BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 4 BALLOT, THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING, PLEASE CALL THE CLAIMS AND NOTICING AGENT AT: (866) 897-6433 (TOLL FREE) OR (646) 282-2500 (INTERNATIONAL) (ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP) OR EMAIL TABULATION@EPIQGLOBAL.COM AND REFERENCE "EXCO" IN THE SUBJECT LINE.**

</div>

---

<div align="center">

**THE VOTING DEADLINE IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME**

**THE CLAIMS AND NOTICING AGENT MUST ACTUALLY RECEIVE YOUR CLASS 4 BALLOT ON OR BEFORE THE VOTING DEADLINE**

</div>

---

## Exhibit 3C

**Form of Class 5 Ballot**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

BALLOT FOR VOTING TO ACCEPT OR
REJECT THE THIRD AMENDED JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF
EXCO RESOURCES, INC. AND ITS DEBTOR AFFILIATES

**CLASS 5 BALLOT FOR HOLDERS OF SECOND LIEN TERM LOAN FACILITY CLAIMS**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE CLAIMS AND NOTICING AGENT BY WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement").[2]  The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2019 (the "Disclosure Statement Order").

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]   You may have received a Ballot in connection with the Debtors' *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "First Plan"), which has been amended and superseded by the Plan.  No votes cast on a prior ballot in connection with the solicitation of the First Plan shall be counted in connection with solicitation of the Plan.  Accordingly, **you must submit this Ballot to vote on the Plan.**

Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 5 ballot (this "Class 5 Ballot") because you are a Holder of a Second Lien Term Loan Facility Claim in Class 5 as of **Friday, April 26, 2019,** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 5 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC, the Claims and Noticing Agent, at no charge by: (i) accessing the Debtors' restructuring website at http://dm.epiq11.com/ERI; (ii) writing to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling 866-897-6433 (toll free) or (646) 282-2500 (international) and requesting to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "EXCO" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 5 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 5 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Claims and Noticing Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 5, Second Lien Term Loan Facility Claims, under the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1. Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Class 5 Claim in the following aggregate unpaid amount:[3]



**Item 2.    Vote on Plan.**

The Holder of the Class 5 Second Lien Term Loan Facility Claims against the Debtors set forth in Item 1 votes to (please check one):

☐ **ACCEPT** (vote FOR) the Plan          ☐ **REJECT** (vote AGAINST) the Plan

**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

---

[3]    For voting purposes only, subject to tabulation rules.

**Item 3.** Important information regarding the Third Party Release.[4]

AS A "<u>RELEASING PARTY</u>" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:

As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement

---

[4]     Under the Plan, "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case only in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

\*　　\*　　\*

IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:

☐ **The Undersigned Holder of the Claim elects to OPT OUT of the Third Party Release**

*[Remainder of page intentionally left blank; continued next page.]*

4

**Item 4.  Certifications.**

By signing this Class 5 Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) **that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the Second Lien Term Loan Facility Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Second Lien Term Loan Facility Claims being voted;**

(b) **that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;**

(c) **that the Entity has cast the same vote with respect to all Second Lien Term Loan Facility Claims in a single Class; and**

(d) **that no other Class 5 Ballots with respect to the amount of the Second Lien Term Loan Facility Claims identified in Item 1 have been cast or, if any other Class 5 Ballots have been cast with respect to such Second Lien Term Loan Facility Claims, then any such earlier Class 5 Ballots are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE)
*PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

If by First Class mail:

    EXCO Resources, Inc.
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    P.O. Box 4422
    Beaverton, OR 97076-4422

If by overnight courier or hand delivery:

    EXCO Resources, Inc
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    10300 SW Allen Boulevard
    Beaverton, OR 97005

By electronic, online submission:

    Please visit http://dm.epiq11.com/ERI. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot.  If you choose to submit your Ballot via Epiq's E-Ballot system, you should not also return a hard copy of your Ballot.

    **IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized E-Ballot:**

    **Unique E-Ballot ID#: _____**

    "E-Balloting" is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile or email will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Claims and Noticing Agent's online portal should NOT also submit a paper Ballot.

**THE VOTING DEADLINE IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME**

**THE CLAIMS AND NOTICING AGENT MUST ACTUALLY RECEIVE YOUR CLASS 5 BALLOT ON OR BEFORE THE VOTING DEADLINE.**

| Class 5 — Second Lien Term Loan Facility Claims |
|:---:|

### INSTRUCTIONS FOR COMPLETING THIS CLASS 5 BALLOT

1.  The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Class 5 Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 5 Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  To ensure that your Class 5 Ballot is counted, you ***must either***:  (a) complete and submit this hard copy Class 5 Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://dm.epiq11.com/ERI.  **Ballots will not be accepted by facsimile or other electronic means (other than the online portal).**

4.  **Use of Hard Copy Ballot**.  To ensure that your hard copy Class 5 Ballot is counted, you must:  (a) complete your Class 5 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 5 Ballot; and (c) clearly sign and return your original Class 5 Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery one of the following addresses or in accordance with paragraph 5 below.

| If by First Class Mail: | If by overnight courier or hand delivery: |
|---|---|
| EXCO Resources, Inc.<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | EXCO Resources, Inc.<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>10300 SW Allen Boulevard<br>Beaverton, OR 97005 |

5.  **Use of Online Ballot Portal**.  To ensure that your electronic Class 5 Ballot is counted, please follow the instructions of the Debtors' case administration website at http://dm.epiq11.com/ERI.  You will need to enter your unique E-Ballot identification number indicated above.  The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

6.  Your Class 5 Ballot ***must*** be returned to the Claims and Noticing Agent so as to be ***actually received*** by the Claims and Noticing Agent on or before the Voting Deadline.  **The Voting Deadline is Wednesday, June 5, 2019 at 5:00 p.m.**, prevailing Central Time.

7.  If a Class 5 Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors.  Additionally, **the following Class 5 Ballots will *not* be counted**:

    (a) any Class 5 Ballot that partially rejects and partially accepts the Plan;
    (b) **Class 5 Ballots sent to the Debtors, the Debtors' agents (other than the Claims and Noticing Agent), an administrative agent, any indenture trustee, or the Debtors' financial or legal advisors;**
    (c) **Class 5 Ballots sent by facsimile or any electronic means other than via the online portal;**

> (d) any Class 5 Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;
> (e) any Class 5 Ballot cast by an Entity that does not hold a Claim in Class 5;
> (f) any Class 5 Ballot submitted by a Holder not entitled to vote pursuant to the Plan;
> (g) any unsigned Class 5 Ballot;
> (h) any Class 5 Ballot not bearing an original signature, except as provided above; and/or
> (i) any Class 5 Ballot not marked to accept or reject the Plan or any Class 5 Ballot marked both to accept and reject the Plan.

8. The method of delivery of Class 5 Ballots to the Claims and Noticing Agent is at the election and risk of each Holder of a Second Lien Term Loan Facility Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Noticing Agent **actually receives** the originally executed Class 5 Ballot. In all cases, Holders should allow sufficient time to assure timely delivery.

9. If multiple Class 5 Ballots are received from the same Holder of a Second Lien Term Loan Facility Claim with respect to the same Second Lien Term Loan Facility Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 5 Ballot will supersede and revoke any earlier received Class 5 Ballots.

10. You must vote all of your Second Lien Term Loan Facility Claims within Class 5 either to accept or reject the Plan and may **not** split your vote.  Further, if a Holder has multiple Second Lien Term Loan Facility Claims within Class 5, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple Second Lien Term Loan Facility Claims within Class 5 for the purpose of counting votes.

11. This Class 5 Ballot does **not** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12. **Please be sure to sign and date your Class 5 Ballot**.  If you are signing a Class 5 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you should indicate such capacity when signing and, if required or requested by the Claims and Noticing Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 5 Ballot.

13. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes **only** your Claims indicated on that ballot, so please complete and return each ballot that you received.

<div align="center">

**PLEASE MAIL YOUR CLASS 5 BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 5 BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE CLAIMS AND NOTICING AGENT AT:
(866) 897-6433 (TOLL FREE) OR
(646) 282-2500 (INTERNATIONAL)
(ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP)
OR EMAIL TABULATION@EPIQGLOBAL.COM
AND REFERENCE "EXCO" IN THE SUBJECT LINE.**

</div>

> **THE VOTING DEADLINE IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME**
>
> **THE CLAIMS AND NOTICING AGENT MUST ACTUALLY RECEIVE YOUR CLASS 5 BALLOT ON OR BEFORE THE VOTING DEADLINE.**

## **Exhibit 3D**

**Form of Class 6 Master Ballot**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

MASTER BALLOT FOR VOTING TO
ACCEPT OR REJECT THE THIRD AMENDED JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF EXCO RESOURCES, INC. AND ITS DEBTOR AFFILIATES

**CLASS 6 HOLDERS OF UNSECURED NOTES CLAIMS**

**7.5% Senior Notes Due 2018      and      8.5% Senior Notes Due 2022
(CUSIP No. 269279AD7)               (CUSIP No.  269279AE5)**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**THIS MASTER BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE
*ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT BY WEDNESDAY, JUNE 5, 2019 AT
5:00 P.M., PREVAILING CENTRAL TIME
(THE "VOTING DEADLINE").**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement").[2]  The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2019 (the "Disclosure Statement Order").

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]   You may have received a Ballot in connection with the Debtors' *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "First Plan"), which has been amended and superseded by the Plan.  No votes cast on a prior ballot in connection with the solicitation of the First Plan shall be counted in connection with solicitation of the Plan.  Accordingly, **you must submit this Ballot to vote on the Plan.**

Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this master ballot (the "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[3] of Class 6 Unsecured Notes Claims as of **Friday, April 26, 2019** (the "Voting Record Date").

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy Holder of a Nominee for certain Beneficial Holders' Class 6 Unsecured Notes Claims (the "Class 6 Claims"), to transmit to the Claims and Noticing Agent (as defined below) the votes of such Beneficial Holders in respect of their Class 6 Claims to accept or reject the Plan.  The CUSIP number (the "CUSIP") for the Class 6 Claims entitled to vote and of which you are the Nominee are 269279AD7 and 269279AE5, respectively. This ballot may not be used for any purpose other than for submitting votes with respect to the Plan.**

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC, the Claims and Noticing Agent, at no charge by: (i) accessing the Debtors' restructuring website at http://dm.epiq11.com/ERI; (ii) writing to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 777 Third Avenue, 12th Floor, New York, NY 10017; (iii) calling (866) 897-6433 (toll free) or (646) 282-2500 (international) and requesting to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "EXCO" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Master Ballot in error, please contact the Claims and Noticing Agent *immediately* at the address, telephone number, or email address set forth above.

**YOUR VOTE ON THIS MASTER BALLOT FOR BENEFICIAL HOLDERS OF UNSECURED NOTES CLAIMS IN CLASS 6 SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLASS 6 CLAIM.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

The Court may confirm the Plan and thereby bind all Holders of Claims and Interests.  To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Claims and Noticing Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME.**

**Item 1.  Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

---

[3]  A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through DTC.

☐   Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Class 6 Claims listed in Item 2 below, and is the record Holder of such bonds, or

☐   Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered Holder of the aggregate principal amount of Class 6 Claims listed in Item 2 below, or

☐   Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner, that is the registered Holder of the aggregate principal amount of Class 6 Claims listed in Item 2 below,

and accordingly, has full power and authority to vote to accept or reject the Plan, on behalf of the Beneficial Holders of the Class 6 Claims described in Item 2.

**Item 2.  Class 6 Claims Vote on Plan AND <u>Item 3.</u> Releases.**

The undersigned transmits the following votes, and releases of Beneficial Holders of Class 6 Claims and certifies that the following Beneficial Holders of Class 6 Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "<u>Ballots</u>") casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table.  Please note that each Holder must vote all such Beneficial Holder's Class 6 Claims to accept or reject the Plan and may not split such vote.  Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

**<u>A SEPARATE MASTER BALLOT MUST BE USED FOR EACH CUSIP.</u>**

| CUSIP VOTED ON THIS MASTER BALLOT:  ☐ CUSIP No. 269279AD7   OR   ☐ CUSIP No.  269279AE5 | | | |
|---|---|---|---|
| **Your Customer Account Number for Each Beneficial Holder of Class 6 Claims** | **Principal Amount Held as of Voting Record Date** | **<u>Item 2</u>**<br><br>**Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below.** | | **<u>Item 3</u>**<br><br>**Check the box below if the Beneficial Holder checked the box in Item 3 of their Ballot** |
| | | **Accept the Plan** | **Reject the Plan** | |
| 1 | $ | ☐ | ☐ | ☐ |
| 2 | $ | ☐ | ☐ | ☐ |
| 3 | $ | ☐ | ☐ | ☐ |
| 4 | $ | ☐ | ☐ | ☐ |
| 5 | $ | ☐ | ☐ | ☐ |
| 6 | $ | ☐ | ☐ | ☐ |

| TOTALS | $ | | | |
|--------|---|--|--|--|

**Important information regarding the Third Party Release.[4]**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents,

---

[4]   Under the Plan, "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case only in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

\*      \*      \*

**Item 4.**  **Other Class 6 Ballots Submitted by Beneficial Holders.**  The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 4 of the Beneficial Holder Ballot:

| YOUR customer account number and/or Customer Name for each Beneficial Holder who completed Item 4 of the Beneficial Holder Ballot. | Transcribe from Item 4 of the Beneficial Holder Ballot | | | |
|---|---|---|---|---|
| | **Account Number** | **Name of Record Holder or Nominee** | **Principal Amount of other Class 6 Unsecured Notes Claims** | **CUSIP of other Class 6 Unsecured Notes Claims Votes** |
| 1. | | | $ | |
| 2. | | | $ | |
| 3. | | | $ | |
| 4. | | | $ | |
| 5. | | | $ | |

**Item 5**.  **Certifications.**

Upon execution of this Master Ballot, the undersigned certifies that:

(a)  **it has received a copy of the Disclosure Statement, the Plan, the Master Ballots, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Class 6 Claims listed in Item 2 above;**

(b)  **it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;**

(c)  **it is the registered Holder of all Class 6 Claims listed in Item 2 above being voted, or**

(d)  **it has been authorized by each Beneficial Holder of Class 6 Claims listed in Item 2 above to vote on the Plan;**

(e)  **no other Master Ballots with respect to the same Class 6 Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier Master Ballots are hereby revoked;**

(f)  **it has properly disclosed:  (a) the number of Beneficial Holder of Class 6 Claims who completed the Beneficial Holder Ballots; (b) the respective amounts of the Class 6 Claims owned, as the case may be, by each Beneficial Holder of Class 6 Claims who completed a Beneficial Holder Ballot; (c) each such Beneficial Holder of Class 6 Claims' respective vote concerning the Plan; (e) each such Beneficial Holder of Class 6 Claims' certification as to other Class 6 Claims voted; and (f) the customer account or other identification number for each such Beneficial Holder of Class 6 Claims; and**

(g)  **it will maintain ballots and evidence of separate transactions returned by Beneficial Holder of Class 6 Claims (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Participant Number | |
| Name of Proxy Holder or Agent for Nominee (if applicable) | |
| Signature: | |
| Name of Signatory: | |
| Title: | |
| Address: | |
| | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND
RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

1.  **In the envelope provided via first class mail, by overnight courier, or by hand delivery to:**

EXCO Resources, Inc.
c/o Epiq Corporate Restructuring, LLC
777 Third Avenue, 12th Floor
New York, NY 10017

2.  **Via electronic mail service to:**

tabulation@epiqglobal.com
with a reference to "EXCO Master Ballot" in the subject line.

---

**THE VOTING DEADLINE IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME**

**THE CLAIMS AND NOTICING AGENT MUST ACTUALLY RECEIVE THE
CLASS 6 MASTER BALLOT
ON OR BEFORE THE VOTING DEADLINE.**

---

| Class 6 — Unsecured Notes Claims |
|---|

### INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT

1.  The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Master Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2.  The Plan can be confirmed by the Court and thereby made binding upon the Holders if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Class 6 Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds.  You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices.  You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a beneficial ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.  Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Class 6 Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Claims and Noticing Agent, a Master Ballot that reflects the vote of such Beneficial Holders by **Wednesday, June 5, 2019 at 5:00 p.m.**, prevailing Central Time.

4.  If you are transmitting the votes of any Beneficial Holder of Class 6 Claims other than yourself, you may either:

    (a)  **"Pre-validate" the individual Class 6 Unsecured Notes Claim Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Class 6 Claim for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Claims and Noticing Agent in the return envelope to be provided in the Solicitation Package. A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of Class 6 Claim held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder.  The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Claims and Noticing Agent.  A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date.**

    (b)  **Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Class 6 Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee.  In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Claims and Noticing Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Claims and Noticing Agent.  The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Claims and Noticing Agent so that the Master Ballot is actually received by the Claims and Noticing Agent on or before the Voting Deadline.**

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Claims and Noticing Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Effective Date of the Plan.  You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

The Master Ballot *must* be returned to the Claims and Noticing Agent so as to be ***actually received*** by the Claims and Noticing Agent on or before the Voting Deadline.  **The Voting Deadline is Wednesday, June 5, 2019 at 5:00 p.m.**, prevailing Central Time.

6. If a Master Ballot is received ***after*** the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors.  Additionally, **the following Master Ballots will *not* be counted**:

    (a) **any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;**
    (b) **any Master Ballot cast by a Party that does not hold a Claim in a Class that is entitled to vote on the Plan;**
    (c) **any Master Ballot sent by facsimile or any electronic means other than electronic mail;**
    (d) **any unsigned Master Ballot;**
    (e) **any Master Ballot that does not contain an original signature provided however, that any Master Ballot submitted via electronic mail shall be deemed to contain an original signature;**
    (f) **any Master Ballot not marked to accept or reject the Plan; and**
    (g) **any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.**

7. The method of delivery of Master Ballots to the Claims and Noticing Agent is at the election and risk of each Nominee of Class 6 Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Noticing Agent ***actually receives*** the originally executed Master Ballot.  In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

8. If a Beneficial Holder or Nominee holds a Claim in a Voting Class against multiple Debtors, a vote on their Ballot will apply to all Debtors against whom such Beneficial Holder or Nominee has a Claim , as applicable, in that Voting Class.

9. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim prior to the Voting Deadline, the latest, timely received, and properly completed Master Ballot will supersede and revoke any earlier received Master Ballots.

10. The Master Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11. **Please be sure to sign and date the Master Ballot**.  You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Claims and Noticing Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

12. If you are both the Nominee and the Beneficial Holder of any of the Class 6 Claims and you wish to vote such Class 6 Claims, you may return a Beneficial Holder Ballot or Master Ballot for such Class 6 Claims and you must vote your entire Class 6 Claims to either to accept or reject the Plan and may not split your vote.  Accordingly, a

Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders, that partially rejects and partially accepts the Plan will not be counted.

13. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim in such Class, and all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided* that if separate affiliated entities hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity may be counted separately as a vote to accept or reject the Plan.

14. The following additional rules shall apply to Master Ballots:

   (a) Votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Class 6 Claims as of the Record Voting Date, as evidenced by the record and depository listings.

   (b) Votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Holder Ballots, will not be counted in excess of the record amount of the Class 6 Claims held by such Nominee;

   (c) To the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Holder Beneficial Holder Ballots, the Claims and Noticing Agent will attempt to reconcile discrepancies with the Nominee;

   (d) To the extent that over-votes on a Master Ballot or pre-validated Holder Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Claims and Noticing Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Class 6 Claims; and

   (e) For purposes of tabulating votes, each Holder holding through a particular account will be deemed to have voted the principal amount relating its holding in that particular account, although the Claims and Noticing Agent may be asked to adjust such principal amount to reflect the claim amount.

**PLEASE RETURN YOUR MASTER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT,**
**THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING,**
**PLEASE CALL THE CLAIMS AND NOTICING AGENT AT:**
**(866) 897-6433 (TOLL FREE) OR (646) 282-2500 (INTERNATIONAL)**
**(ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP)**
**OR (IV) EMAIL TABULATION@EPIQGLOBAL.COM**
**AND REFERENCE "EXCO" IN THE SUBJECT LINE**

---

**THE VOTING DEADLINE IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME**

**THE CLAIMS AND NOTICING AGENT MUST ACTUALLY RECEIVE**
**THE CLASS 6 MASTER BALLOT**
**ON OR BEFORE THE VOTING DEADLINE.**

---

**<u>Exhibit 3E</u>**

**Form of Class 6 Beneficial Holder Ballot**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

BENEFICIAL BALLOT FOR VOTING TO ACCEPT
OR REJECT THE THIRD AMENDED SETTLEMENT JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF EXCO RESOURCES, INC. AND ITS DEBTOR AFFILIATES

### CLASS 6 BALLOT FOR BENEFICIAL HOLDERS
### OF UNSECURED NOTES CLAIMS

7.5% Senior Notes Due 2018    and    8.5% Senior Notes Due 2022
(CUSIP No. 269279AD7)                 (CUSIP No.  269279AE5)

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**THE DEADLINE FOR THE RECEIPT OF BALLOTS AND MASTER BALLOTS IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

***IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO THE CLAIMS AND NOTICING AGENT (EPIQ CORPORATE RESTRUCTURING, LLC)*, PLEASE COMPLETE THE BALLOT AND RETURN IT PROMPTLY IN THE ENVELOPE PROVIDED SO THAT IT IS ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT BY THE VOTING DEADLINE.**

***IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE*, PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT PROMPTLY IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.  PLEASE ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE INCLUDED ON A MASTER BALLOT COMPLETED BY YOUR NOMINEE. THE MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT ON OR BEFORE THE VOTING DEADLINE.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement").[2] The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2019 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 6 ballot for Beneficial Holders[3] (the "Class 6 Beneficial Holder Ballot") because you are a Beneficial Holder of an Unsecured Notes Claim in Class 6 as of **Friday, April 26, 2019** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan. You can cast your vote through this Class 6 Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of Class 6 Claims.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 6 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC, the Claims and Noticing Agent, at no charge by: (i) accessing the Debtors' restructuring website at http://dm.epiq11.com/ERI; (ii) writing to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling (866) 897-6433 (toll free) or (646) 282-2500 (international) and requesting to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "EXCO" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 6 Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 6 Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact the Claims and Noticing Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 6, Unsecured Notes Claims, under the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

In order for your vote to count, your Nominee must receive this Class 6 Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Claims and Noticing Agent on or before the Voting Deadline, which is **Wednesday, June 5, 2019 at 5:00 p.m.**, prevailing Central Time. Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee. If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

---

[2]    You may have received a Ballot in connection with the Debtors' *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "First Plan"), which has been amended and superseded by the Plan. No votes cast on a prior ballot in connection with the solicitation of the First Plan shall be counted in connection with solicitation of the Plan. Accordingly, **you must submit this Ballot to vote on the Plan.**

[3]    A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through DTC.

2

**Item 1.**    **Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Beneficial Holder of Class 6 Unsecured Notes Claims in the following principal amount (insert amount in box below, unless otherwise completed by your Nominee):

$$\boxed{\text{\$_____}}$$

**Item 2.**    **Vote on Plan.**

The Beneficial Holder of the Class 6 Unsecured Notes Claims against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

| ☐  **ACCEPT** (vote FOR) the Plan | ☐  **REJECT** (vote AGAINST) the Plan |
|---|---|

<u>**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**</u>

*[Remainder of page intentionally left blank; continued next page.]*

3

**Item 3.  Important information regarding the Third Party Release.[4]**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement

---

[4]   Under the Plan, "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case only in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

\*          \*          \*

IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:

> ☐  **The Undersigned Holder of the Claim elects to OPT OUT of the Third Party Release**

**Item 4.  Other Class 6 Beneficial Holder Ballots Submitted.**  By returning this Beneficial Holder Ballot, the Holder of the Class 6 Unsecured Notes Claims identified in Item 1 certifies that (a) this Beneficial Holder Ballot is the only Beneficial Holder Ballot submitted for Notes Claims owned by such Holder, except as identified in the following table, and (b) *all* Beneficial Holder Ballots submitted by the Holder indicate the same vote to accept or reject the Plan that the Holder has indicated in Item 2 of this Beneficial Holder Ballot (please use additional sheets of paper if necessary):

<div align="center">

**ONLY COMPLETE THIS TABLE IF YOU HAVE VOTED <u>OTHER</u>
CLASS 6 UNSECURED NOTES CLAIMS ON OTHER BENEFICIAL HOLDER BALLOTS**

</div>

| Account Number of other Class 6 Unsecured Notes Claims Voted | Name of Record Holder or Nominee | Principal Amount of other Class 6 Unsecured Notes Claims | CUSIP of Other Class 6 Unsecured Notes Claims |
|---|---|---|---|
|  |  | $ |  |
|  |  | $ |  |
|  |  | $ |  |
|  |  | $ |  |

<div align="center">5</div>

**Item 5**. **Certifications.**

By signing this Class 6 Beneficial Holder Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

    (a) **that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the Class 6 Unsecured Notes Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Note Claims being voted;**

    (b) **that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;**

    (c) **that the Entity has cast the same vote with respect to all Unsecured Notes Claims in a single Class; and**

    (d) **that no other Class 6 Beneficial Holder Ballots with respect to the amount of the Unsecured Notes Claims identified in Item 1 have been cast or, if any other Class 6 Beneficial Holder Ballots have been cast with respect to such Unsecured Notes Claims, then any such earlier Class 6 Beneficial Holder Ballots are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR
OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

THE VOTING DEADLINE IS **WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M.**, PREVAILING CENTRAL TIME

THE CLAIMS AND NOTICING AGENT MUST ***ACTUALLY RECEIVE***
THE CLASS 6 BENEFICIAL HOLDER BALLOT REFLECTING YOUR VOTE (OR PREVALIDATED
BALLOT, IF APPLICABLE) ON OR BEFORE THE VOTING DEADLINE.

| Class 6 — Unsecured Notes Claims |
|---|

**INSTRUCTIONS FOR COMPLETING THIS CLASS 6 BENEFICIAL HOLDER BALLOT**

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 6 Beneficial Holder Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 6 Beneficial Holder Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. Unless otherwise instructed by your Nominee, to ensure that your vote is counted, you must submit your Class 6 Beneficial Holder Ballot to your Nominee so that your Nominee can submit a Master Ballot that reflects your vote so that the Master Ballot is actually received by the Claims and Noticing Agent by the Voting Deadline. You may instruct your Nominee to vote on your behalf in the Master Ballot as follows: (a) complete the Class 6 Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 6 Beneficial Holder Ballot; and (c) sign and return the Class 6 Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee. The Voting Deadline for the receipt of Master Ballots by the Claims and Noticing Agent is **Wednesday, June 5, 2019 at 5:00 p.m.**, prevailing Central Time. Your completed Class 6 Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Claims and Noticing Agent on or before the Voting Deadline.

4. **The following Class 6 Ballots submitted to your Nominee will *not* be counted**:

    (a) any Class 6 Beneficial Holder Ballot that partially rejects and partially accepts the Plan;
    (b) **Class 6 Beneficial Holder sent to the Debtors, the Debtors' agents, any indenture trustee, or the Debtors' financial or legal advisors;**
    (c) **Class 6 Beneficial Holder Ballots sent by facsimile or any electronic means other than in accordance with the instructions of your Nominee (however, if you are directed by your Nominee to submit the Beneficial Holder Ballot to the Nominee via electronic means, such instructions to your Nominee shall have the same effect as if you had completed and returned a physical Beneficial Holder Ballot, including all certifications);**
    (d) **any Class 6 Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;**
    (e) **any Class 6 Beneficial Holder Ballot cast by an Entity that does not hold a Claim in Class 6;**
    (f) **any unsigned Class 6 Beneficial Holder Ballot;**
    (g) **any Class 6 Beneficial Holder Ballot submitted by a holder not entitled to vote pursuant to the Plan.**
    (h) **any Class 6 Beneficial Holder Ballot not bearing an original signature, except as provided above; and/or**
    (i) **any Class 6 Beneficial Holder Ballot not marked to accept or reject the Plan or any Class 6 Ballot marked both to accept and reject the Plan.**

5. If your Class 6 Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise. In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Class 6 Beneficial Holder Ballot to your Nominee. No Class 6 Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors, and if so sent will not be counted.

6.  If you deliver multiple Class 6 Beneficial Holder Ballots to the Nominee with respect to the same Claim prior to the Voting Deadline, the last received valid Class 6 Beneficial Holder Ballot timely received will supersede and revoke any earlier received Class 6 Beneficial Holder Ballots.

7.  You must vote all of your Claims within Class 6 either to accept or reject the Plan and may **not** split your vote. Further, if a Holder has multiple Claims within Class 6, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple Claims within Class 6 for the purpose of counting votes.

8.  This Class 6 Beneficial Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

9.  **Please be sure to sign and date your Class 6 Beneficial Holder Ballot**.  If you are signing a Class 6 Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Claims and Noticing Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.

10. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you receive.

11. The Class 6 Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.  Accordingly, at this time, Holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor the Claims and Noticing Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

**PLEASE RETURN YOUR CLASS 6 BENEFICIAL HOLDER BALLOT PROMPTLY IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS
CLASS 6 BENEFICIAL HOLDER BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE CLAIMS AND NOTICING AGENT AT:
(866) 897-6433 (TOLL FREE) OR (646) 282-2500 (INTERNATIONAL)
(ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP)
OR EMAIL TABULATION@EPIQGLOBAL.COM
AND REFERENCE "EXCO" IN THE SUBJECT LINE.**

THE VOTING DEADLINE IS **WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M.**, PREVAILING CENTRAL TIME.

THE CLAIMS AND NOTICING AGENT MUST *ACTUALLY RECEIVE*
THE CLASS 6 BENEFICIAL HOLDER BALLOT REFLECTING YOUR VOTE (OR PRE-VALIDATED BALLOT, IF APPLICABLE) ON OR BEFORE THE VOTING DEADLINE.

## Exhibit A

***Your Nominee may have checked a box below to indicate the CUSIP to which this
Beneficial Holder Ballot pertains, or otherwise provided that information to you on a label or
schedule attached to the Beneficial Holder Ballot:***

| Class 6 (Unsecured Notes Claims) | | |
|---|---|---|
| ☐ | 7.5% Senior Notes Due 2018 | CUSIP No. 269279AD7 |
| ☐ | 8.5% Senior Notes Due 2022 | CUSIP No. 269279AE5 |

**<u>Exhibit 3F</u>**

**Form of Class 7 Ballot**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

### BALLOT FOR VOTING TO ACCEPT OR
REJECT THE THIRD AMENDED JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF
EXCO RESOURCES, INC. AND ITS DEBTOR AFFILIATES

### CLASS 7 BALLOT FOR HOLDERS OF GUC CLAIMS

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT
MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE
*ACTUALLY RECEIVED*
BY THE CLAIMS AND NOTICING AGENT BY WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M.,
PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement").[2] The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, by entry of an order on [●], 2019 (the "Disclosure Statement Order").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]     You may have received a Ballot in connection with the Debtors' *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "First Plan"), which has been amended and superseded by the Plan.  No votes cast on a prior ballot in connection with the solicitation of the First Plan shall be counted in connection with solicitation of the Plan.  Accordingly, **you must submit this Ballot to vote on the Plan.**

Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 7 ballot (this "Class 7 Ballot") because you are a Holder of a GUC Claim in Class 7 as of **Friday, April 26, 2019** (the "Voting Record Date").  Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 7 Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Epiq Corporate Restructuring, LLC, the Claims and Noticing Agent, at no charge by: (i) accessing the Debtors' restructuring website at http://dm.epiq11.com/ERI; (ii) writing to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (iii) calling 866-897-6433 (toll free) or (646) 282-2500 (international) and requesting to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "EXCO" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 7 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 7 Ballot in error, or if you believe that you have received the wrong ballot, please contact the Claims and Noticing Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 7, GUC Claims, under the Plan.  If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1.  Amount of Claim.**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned was the Holder of a Class 7 Claim in the following aggregate unpaid amount:[3]

$_____

Debtor:_____

**Item 2.    Vote on Plan.**

The Holder of the Class 7 GUC Claim against the Debtor set forth in Item 1 votes to (please check one):

☐  **ACCEPT** (vote FOR) the Plan          ☐  **REJECT** (vote AGAINST) the Plan

---

[3]    For voting purposes only, subject to tabulation rules.

**You will receive a separate ballot for each Debtor for GUC Claims.**

**Item 3.  OPTIONAL TREATMENT ELECTION. Election to be treated as a Convenience Claim.**  The Holder of a GUC Claim in Class 7 has the option to elect to have such Claim irrevocably reduced to $500,000 and treated as a Convenience Claim for the purposes of the Plan if such Claim is Allowed in an amount greater than $500,000.

> ☐    Elect to irrevocably reduce the Class 7 Claim to $500,000 and be treated as a Convenience Claim.

*In the absence of a timely election to be treated as a Holder of an Allowed Convenience Claim, any Allowed Class 7 Claim that is Allowed in an amount greater than $500,000, the Holder of such Claim will receive the Unsecured Claims Recovery on account of the Allowed amount of such Claim.*

**Item 4.  Important information regarding the Third Party Release.**[4]

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

---

[4]    Under the Plan, "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case only in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members,

**As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.**

<p style="text-align:center">*          *          *</p>

**IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**<u>OPTIONAL RELEASE ELECTION</u>. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW.**

<div style="border:1px solid black; text-align:center; padding:10px">

☐  **The Undersigned Holder of the Claim elects to <br> <u>OPT OUT of the Third Party Release</u>**

</div>

---

employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

**Item 5.  Certifications.**

By signing this Class 7 Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

(a) **that, as of the Voting Record Date, either:  (i) the Entity is the Holder of the GUC Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the GUC Claims being voted;**

(b) **that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;**

(c) **that the Entity has cast the same vote with respect to all GUC Claims in a single Class; and**

(d) **that no other Class 7 Ballots with respect to the amount of the GUC Claims identified in Item 1 have been cast or, if any other Class 7 Ballots have been cast with respect to such GUC Claims, then any such earlier Class 7 Ballots are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| | |
| Signature: | |
| Name of Signatory: | |
| | (If other than Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

5

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE)
*PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

---

If by First Class mail:

EXCO Resources, Inc.
Ballot Processing
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4422
Beaverton, OR 97076-4422

---

If by overnight courier or hand delivery:

EXCO Resources, Inc
Ballot Processing
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Boulevard
Beaverton, OR 97005

---

By electronic, online submission:

Please visit http://dm.epiq11.com/ERI. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot.  If you choose to submit your Ballot via Epiq's E-Ballot system, you should <u>not</u> also return a hard copy of your Ballot.

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized E-Ballot:**

**Unique E-Ballot ID#: _____**

"E-Balloting" is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile or email will not be counted.

---

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the Claims and Noticing Agent's online portal should NOT also submit a paper Ballot.

THE VOTING DEADLINE IS **WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M.**, PREVAILING CENTRAL TIME**WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME**.

THE CLAIMS AND NOTICING AGENT MUST ***ACTUALLY RECEIVE*** YOUR CLASS 7 BALLOT ON OR BEFORE THE VOTING DEADLINE.

| Class 7 — GUC Claims |
|---|

### INSTRUCTIONS FOR COMPLETING THIS CLASS 7 BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 7 Ballot or in these instructions (the "Ballot Instructions") but not otherwise defined therein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 7 Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your Class 7 Ballot is counted, you ***must either***: (a) complete and submit this hard copy Class 7 Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://dm.epiq11.com/ERI. **Ballots will not be accepted by facsimile or other electronic means (other than the online portal).**

4. **Use of Hard Copy Ballot**. To ensure that your hard copy Class 7 Ballot is counted, you must: (a) complete your Class 7 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 7 Ballot; and (c) clearly sign and return your original Class 7 Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery one of the following addresses or in accordance with paragraph 5 below.

| If by First Class Mail: | If by overnight courier or hand delivery: |
|---|---|
| EXCO Resources, Inc.<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | EXCO Resources, Inc.<br>Ballot Processing<br>c/o Epiq Corporate Restructuring, LLC<br>10300 SW Allen Boulevard<br>Beaverton, OR 97005 |

5. **Use of Online Ballot Portal**. To ensure that your electronic Class 7 Ballot is counted, please follow the instructions of the Debtors' case administration website at http://dm.epiq11.com/ERI. You will need to enter your unique E-Ballot identification number indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile or electronic means (other than the online portal).**

6. Your Class 7 Ballot ***must*** be returned to the Claims and Noticing Agent so as to be ***actually received*** by the Claims and Noticing Agent on or before the Voting Deadline. **The Voting Deadline is Wednesday, June 5, 2019 at 5:00 p.m.**, prevailing Central Time.

7. If a Class 7 Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors.  Additionally, **the following Class 7 Ballots will *not* be counted**:

    (a) **any Class 7 Ballot that partially rejects and partially accepts the Plan;**

    (b) **Class 7 Ballots sent to the Debtors, the Debtors' agents (other than the Claims and Noticing Agent), an administrative agent, any indenture trustee, or the Debtors' financial or legal advisors;**

    (c) **Class 7 Ballots sent by facsimile or any electronic means other than via the online portal;**

    (d) **any Class 7 Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;**

    (e) **any Class 7 Ballot cast by an Entity that does not hold a Claim in Class 7;**

    (f) **any Class 7 Ballot submitted by a Holder not entitled to vote pursuant to the Plan;**

    (g) **any unsigned Class 7 Ballot;**

    (h) **any Class 7 Ballot not bearing an original signature, except as provided above; and/or**

    (i) **any Class 7 Ballot not marked to accept or reject the Plan or any Class 7 Ballot marked both to accept and reject the Plan.**

8. The method of delivery of Class 7 Ballots to the Claims and Noticing Agent is at the election and risk of each Holder of a GUC Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Claims and Noticing Agent *actually receives* the originally executed Class 7 Ballot.  In all cases, Holders should allow sufficient time to assure timely delivery.

9. If multiple Class 7 Ballots are received from the same Holder of a GUC Claim with respect to the same GUC Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 7 Ballot will supersede and revoke any earlier received Class 7 Ballots.

10. You must vote all of your GUC Claims within Class 7 either to accept or reject the Plan and may **_not_** split your vote.  Further, if a Holder has multiple GUC Claims within Class 7, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple GUC Claims within Class 7 for the purpose of counting votes.

11. This Class 7 Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12. **Please be sure to sign and date your Class 7 Ballot**.  If you are signing a Class 7 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you should indicate such capacity when signing and, if required or requested by the Claims and Noticing Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 7 Ballot.

13. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you received.

**PLEASE MAIL YOUR CLASS 7 BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 7 BALLOT,
THESE VOTING INSTRUCTIONS OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE CLAIMS OR NOTICING AGENT AT:
(866) 897-6433 (TOLL FREE) OR (646) 282-2500 (INTERNATIONAL)
(ASK TO SPEAK WITH A MEMBER OF THE SOLICITATION GROUP)
OR EMAIL TABULATION@EPIQGLOBAL.COM
AND REFERENCE "EXCO" IN THE SUBJECT LINE.**

---

**THE VOTING DEADLINE IS <u>WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME</u>.**

**THE CLAIMS AND NOTICING AGENT MUST ACTUALLY RECEIVE YOUR CLASS 7 BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

## **Exhibit 4A**

**Form of Cover Letter**



**_____, 2019**

<u>RE</u>:     **In re EXCO Resources, Inc. _et al._,**
          **Chapter 11 Case No. 18-30155 (MI) (Jointly Administered)**

TO ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN:

EXCO Resources, Inc. and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") on January 15, 2018.

You have received this letter and the enclosed materials because you are entitled to vote on the _Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates_ (as modified, amended, or supplemented from time to time, the "<u>Plan</u>").[2]   On [●], 2019, the Court entered an order (the "<u>Disclosure Statement Order</u>"): (a) authorizing the Debtors to solicit acceptances for the Plan; (b) approving the _Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates_ (the "<u>Disclosure Statement</u>") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials to be in the packages distributed to solicit votes to accept the Plan (the "<u>Solicitation Packages</u>"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan, and for filing objections to the Plan.  The Debtors previously distributed a

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]   Capitalized terms used but not otherwise defined herein have the meanings as set forth in the Plan.

Solicitation Package in connection with the Debtors' *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "First Plan"), which has been amended and superseded by the Plan.

> YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.  THEREFORE, YOU SHOULD READ THIS LETTER CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY.  IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to Holders of Claims in connection with the solicitation of votes to accept the Plan.  The Solicitation Package consists of the following:

    a.  a Ballot, together with detailed voting instructions and a pre-addressed, postage prepaid return envelope;

    b.  the Disclosure Statement (and exhibits thereto, including the Plan);

    c.  the Disclosure Statement Order (including **Exhibit 2**, the Solicitation Procedures, and excluding all other exhibits);

    d.  the Confirmation Hearing Notice; and

    e.  such other materials as the Court may direct.

EXCO Resources, Inc. (on behalf of itself and each of the other Debtors) has approved the filing of the Plan and the solicitation of votes to accept the Plan.  The Debtors believe that the acceptance of the Plan is in the best interests of their estates, Holders of Claims, and all other parties in interest.  Moreover, the Debtors believe that any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) on account of Claims asserted in the chapter 11 cases.

> **THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN.  BALLOTS SHOULD BE SUBMITTED IN ACCORDANCE WITH THE INSTRUCTIONS INDICATED ON YOUR BALLOT.**
>
> **THE VOTING DEADLINE IS 4:00 P.M. PREVAILING CENTRAL TIME ON WEDNESDAY, JUNE 5, 2019.**

The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions, however, please feel free to contact Epiq Corporate Restructuring, LLC, the claims and noticing agent retained by the Debtors in the chapter 11 cases (the "Claims and Noticing Agent"), by: (a) accessing the Debtors' restructuring website at http://dm.epiq11.com/ERI; (b) writing to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) calling (866) 897-6433 (toll free) or (646) 282-2500

(international) and requesting to speak with a member of the Solicitation Group; or (d) emailing tabulation@epiqglobal.com and referencing "EXCO" in the subject line.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

Please be advised that the Claims and Noticing Agent is authorized to answer questions about, and provide additional copies of, the solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan or provide any legal advice.

Sincerely,

_____

EXCO Resources, Inc. on its own behalf and for each of the Debtors

**<u>Exhibit 4B</u>**

**Form of the Committee's Cover Letter**

OFFICIAL CREDITORS COMMITTEE'S LETTER
RECOMMENDING THAT YOU VOTE TO **ACCEPT**
THE ENCLOSED THIRD AMENDED JOINT SETTLEMENT CHAPTER 11 PLAN


[●], 2019

TO ALL HOLDERS OF UNSECURED CLAIMS
AGAINST EXCO RESCOURCES INC., *et al.*

As you likely know, EXCO Resources, Inc., and its affiliates ("EXCO" or the "Company") filed for chapter 11 bankruptcy protection in the Southern District of Texas on January 15, 2018.  On January 24, 2018, the United States Department of Justice, Office of the United States Trustee, formed an official committee to be the fiduciary body to represent the holders of unsecured claims against the Company, in that bankruptcy case.  The Committee (technically, the "Official Committee of Unsecured Creditors") was selected from those holders who volunteered to serve in that capacity.  **THIS IS THE COMMITTEE'S RECOMMENDATION AS TO YOUR VERY IMPORTANT VOTE TO DECIDE HOW THIS BANKRUPTCY CASE WILL CONCLUDE**.

**Your Committee strongly recommends that all Holders of Unsecured Claims against the Debtors:**

- **complete the enclosed Ballot and return it as quickly as possible in accordance with the enclosed instructions;**

- **vote to ACCEPT the Plan.**

HOW WE GOT HERE, AND **WHY YOUR VOTES ARE IMPORTANT**:

The large set of legal papers enclosed here includes the Company's chapter 11 "Plan," a Disclosure Statement in regards to such Plan, and a Ballot for you to vote on the Plan.  The Committee recommends that you vote to **ACCEPT** the Plan.

As discussed throughout the Disclosure Statement to which this letter is attached, the Plan is a culmination of extended negotiations by the Committee with the Debtors and other key stakeholders, including substantial holders of the 1.5 Lien Notes Claims and 1.75 Lien Term Loan Facility Claims.  Those negotiations followed months of diligence regarding, among other things, the circumstances giving rise to these Chapter 11 Cases and whether the Debtors' Estates hold viable Causes of Action against Holders of Secured Claims.  The Committee ultimately concluded that the Estates do, in fact, possess viable Causes of Action against Holders of Secured Claims; but, rather, than proceeding immediately to potentially protracted and expensive litigation, the Committee instead engaged with the Debtors and other key stakeholders in settlement discussions and mediation, overseen by Chief U.S. Bankruptcy Judge for the Southern District of Texas David R. Jones.

The mediation process commenced last summer, and, as more fully described in the Disclosure Statement, initially resulted in the First Plan filed last Fall.  After capital market issues and oil and gas commodity volatility prevented the Debtors from obtaining the full exit funding needed to exit Chapter 11 in December, 2018 through confirmation of the First Plan, the parties re-engaged in mediation which resulted in the settlements embodied in the current Plan on which you are now being asked to vote.  The Committee believes that the Plan represents a fair resolution of the Estate claims which it identified and fairly allocates and maximizes the Debtors' value for the benefit of all constituencies.

As a result, the Committee strongly **RECOMMENDS THAT YOU VOTE <u>IN FAVOR OF</u> THE PLAN.**

**So, to recap, your Committee strongly recommends that you:**

- **complete your Ballot and return it as quickly as possible in accordance with the enclosed instructions;**

- **vote to <u>ACCEPT</u> the Plan**

It has been our honor to serve Holders of Unsecured Claims here to the best of our abilities despite the challenges we have had to overcome.

_____

David Dunn, as Chair of the Committee

If you have any questions as to any of this, please reach out to the Committee's attorneys so that we can provide whatever further guidance or technical help that might be needed.

**BROWN RUDNICK LLP**
Robert J. Stark
Sigmund S. Wissner-Gross
Kenneth J. Aulet
Seven Times Square
New York, NY 10036
Tel:     (212) 209-4800
Fax:     (212) 209-4801
Email:rstark@brownrudnick.com
Email:  SWissner-
gross@brownrudnick.com
Email:
kaulet@brownrudnick.com

**BROWN RUDNICK LLP**
Steven B. Levine
One Financial Center
Boston, MA 02111
Tel:     (617) 856-8200
Fax:     (617) 856-8201
Email:
slevine@brownrudnick.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Patricia B. Tomasco
711 Louisiana, Suite 500
Houston, Texas 77002
(713) 221-7000
(713) 221-7100
Email:pattytomasco@quinnemanuel.com

## Exhibit 5

**Form of Unimpaired Non-Voting Status Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**NOTICE OF NON-VOTING STATUS TO
HOLDERS OF UNIMPAIRED CLAIMS AND
INTERESTS CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN**

     **PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No.[●]] (the "Disclosure Statement Order"): (a) authorizing EXCO Resources, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

     **PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim under the Plan, *you are not entitled to vote on the Plan*. Specifically, under the terms of the Plan, as a Holder of a Claim (as currently asserted against the Debtors) or Interests that is not Impaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, you are *not* entitled to vote on the Plan.

     **PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **Monday,**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295). The location of the Debtors' service address is: 12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**June 10, 2019, at 9:00 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

PLEASE TAKE FURTHER NOTICE THAT the deadline for filing objections to the Plan is **Tuesday, June 4, 2019 at 5:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the Plan **_must_**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) on or before the Confirmation Objection Deadline.

PLEASE TAKE FURTHER NOTICE THAT if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtors' restructuring website at http://dm.epiq11.com/ERI; (b) write to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) email tabulation@epiqglobal.com and reference "EXCO" in the subject line; or (c) call 1-(800) 683-4332 (toll free). You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII.D OF THE PLAN USING THE ENCLOSED OPT OUT FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

Respectfully Submitted,
*/s/ Christopher T. Greco, P.C.*

Dated:  May 2, 2019

Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:            christopher.greco@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:            patrick.nash@kirkland.com
                  alexandra.schwarzman@kirkland.com

- and -

Marcus A. Helt (TX: 24052187)
Michael K. Riordan (TX: 24070502)
**FOLEY GARDERE**
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone:       (713) 276-5178
Facsimile:       (713) 276-6178
Email:            mhelt@foley.com
Email:            mriordan@foley.com

*Counsel for the Debtors and Debtors in Possession*

## <u>Exhibit 5A</u>

**Opt-Out Form for Holders of Unimpaired Claims and Interests
Conclusively Presumed To Accept the Plan**

**OPTIONAL:  RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a Holder of a Claim or Interest that is not entitled to vote on the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").  You may choose to opt out of the releases set forth in Article VIII.D of the Plan.

**Important information regarding the Third Party Release.[1]**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

> **As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known**

---

[1]   Under the Plan, "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case only in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

\*     \*     \*

**IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**OPTIONAL RELEASE ELECTION.** YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:

> ☐ **The Undersigned Holder of the Claim or Interest elects to <u>OPT OUT of the Third Party Release</u>**

**Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a)    as of the Voting Record Date, either: (i) the Entity is the Holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of the Claim or Interest;

(b)    the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the *Notice of Non-Voting Status to Holders of Unimpaired Claims and Interests Conclusively Presumed to Accept the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)    the Entity has submitted the same respective election concerning the releases with respect to all Claims and Interests; and

(d)    no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claim and Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than the Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

***IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION*, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE METHODS BELOW.**

If by First Class mail:

    EXCO Resources, Inc.
     Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    P.O. Box 4422
    Beaverton, OR 97076-4422

If by overnight courier or hand delivery:

    EXCO Resources, Inc
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    10300 SW Allen Boulevard
    Beaverton, OR 97005

By electronic, online submission:

Please visit http://dm.epiq11.com/ERI. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot.  If you choose to submit your Ballot via Epiq's E-Ballot system, you should not also return a hard copy of your Ballot.

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized E-Ballot:**

**Unique E-Ballot ID#:** _____

"E-Balloting" is the sole manner in which this Opt-Out Form will be accepted via electronic or online transmission.  Opt-Out Forms submitted by facsimile or email will not be counted.

---

**THE VOTING DEADLINE IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M.**, PREVAILING CENTRAL TIME.

THE NOTICE AND CLAIMS AGENT MUST ***ACTUALLY RECEIVE*** YOUR OPT-OUT ELECTION ON OR BEFORE THE VOTING DEADLINE IF YOU WISH TO OPT OUT.

## **Exhibit 6**

**Form of Impaired Non-Voting Status Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

**NOTICE OF NON-VOTING STATUS TO HOLDERS OF
IMPAIRED CLAIMS AND INTERESTS DEEMED TO REJECT THE PLAN**

**PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing EXCO Resources, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim or Interest under the Plan, *you are not entitled to vote on the Plan*.  Specifically, under the terms of the Plan, as a Holder of a Claim or Interest (as currently asserted against the Debtors) that is receiving no distribution under the Plan, you are deemed to reject the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **Monday, June 10, 2019, at 9:00 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]     Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

PLEASE TAKE FURTHER NOTICE THAT the deadline for filing objections to the Plan is **Tuesday, June 4, 2019 at 5:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the Plan ***must***: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) on or before Confirmation Objection Deadline.

PLEASE TAKE FURTHER NOTICE THAT if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtors' restructuring website at http://dm.epiq11.com/ERI; (b) write to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) email tabulation@epiqglobal.com and reference "EXCO" in the subject line; or (c) call 1-(800) 683-4332 (toll free). You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov. .

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII.D OF THE PLAN USING THE ENCLOSED OPT OUT FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

Respectfully Submitted,
*/s/ Christopher T. Greco, P.C.*

Dated:  May 2, 2019

Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           christopher.greco@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                    alexandra.schwarzman@kirkland.com

- and -

Marcus A. Helt (TX: 24052187)
Michael K. Riordan (TX: 24070502)
**FOLEY GARDERE**
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone:      (713) 276-5178
Facsimile:      (713) 276-6178
Email:           mhelt@foley.com
Email:           mriordan@foley.com

*Counsel for the Debtors and Debtors in Possession*

## Exhibit 6A

**Opt-Out Form for Holders of Impaired Claims and Interests Deemed To Reject the Plan (Direct Holders)**

**OPTIONAL:  RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a Holder of a Claim or Interest that is not entitled to vote on the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").  You may choose to opt out of the releases set forth in Article VIII.D of the Plan.

**Important information regarding the Third Party Release.[1]**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

      **As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known**

---

[1]    Under the Plan, "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case only in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

\*       \*       \*

IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

**<u>OPTIONAL RELEASE ELECTION</u>. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:**

<div style="border:1px solid black">

☐ **The Undersigned Holder of the Claim or Interest elects to <u>OPT OUT of the Third Party Release</u>**

</div>

**Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a)      as of the Voting Record Date, either: (i) the Entity is the Holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of the Claim or Interest;

(b)      the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the *Notice of Non-Voting Status to Holders of Impaired Claims and Interests Deemed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)      the Entity has submitted the same respective election concerning the releases with respect to all Claims and Interests; and

(d)      no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claim and Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than the Holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

***IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION*, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE METHODS BELOW.**

<u>If by First Class mail:</u>

    EXCO Resources, Inc.
     Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    P.O. Box 4422
    Beaverton, OR 97076-4422

<u>If by overnight courier or hand delivery:</u>

    EXCO Resources, Inc
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    10300 SW Allen Boulevard
    Beaverton, OR 97005

<u>By electronic, online submission:</u>

Please visit http://dm.epiq11.com/ERI. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot.  If you choose to submit your Ballot via Epiq's E-Ballot system, you should <u>not</u> also return a hard copy of your Ballot.

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized E-Ballot:**

**Unique E-Ballot ID#: _____**

<u>"E-Balloting" is the sole manner in which this Opt-Out Form will be accepted via electronic or online transmission.  Opt-Out Forms submitted by facsimile or email will not be counted.</u>

---

<u>**THE VOTING DEADLINE IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M.**</u>, PREVAILING CENTRAL TIME.

<u>THE NOTICE AND CLAIMS AGENT MUST *ACTUALLY RECEIVE*
YOUR OPT-OUT ELECTION
ON OR BEFORE THE VOTING DEADLINE IF YOU WISH TO OPT OUT.</u>

**Exhibit 6B**

**Opt-Out Form for Holders of Impaired Interests Deemed To Reject the Plan
(Beneficial Equity Holders)**

**OPTIONAL:  RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a Holder of a Class 11 Interest in EXCO that is not entitled to vote on the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").  You may choose to opt out of the releases set forth in Article VIII.D of the Plan.

**Important information regarding the Third Party Release.[1]**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

> **As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known**

---

[1]   Under the Plan, "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case only in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

*        *        *

**IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**<u>OPTIONAL RELEASE ELECTION</u>.   YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:**

> ☐ **The Undersigned Holder of the Interest in EXCO elects to <u>OPT OUT of the Third Party Release</u>**

**Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a)     as of the Voting Record Date, either:  (i) the Entity is the Holder of an Interest in EXCO; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of the Interest;

(b)     the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the *Notice of Non-Voting Status to Holders of Impaired Claims and Interests Deemed to Reject the Plan* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)     the Entity has submitted the same respective election concerning the releases with respect to all Interests; and

(d)     no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claim and Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: _____ | |
| (Print or Type) | |
| | |
| Signature: _____ | |
| Name of Signatory: _____ | |
| (If other than the Holder) | |
| Title: _____ | |
| Address: _____ | |
| _____ | |
| _____ | |
| Telephone Number: _____ | |
| Email: _____ | |
| Date Completed: _____ | |

***IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION*, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE. PLEASE ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO PROCESS YOUR OPT-OUT FORM AND SUBMIT YOUR ELECTION SO THAT IT IS RECEIVED BY NOTICE AND CLAIMS AGENT BY THE VOTING DEADLINE.**

<div style="border:1px solid">

**THE VOTING DEADLINE IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M.**, PREVAILING CENTRAL TIME.

THE NOTICE AND CLAIMS AGENT MUST ***ACTUALLY RECEIVE*** THE OPT-OUT ELECTION, SUBMITTED BY YOUR NOMINEE, ON OR BEFORE THE VOTING DEADLINE IF YOU WISH TO OPT OUT.

</div>

**Exhibit 6C**

**Opt-Out Form for Holders of Impaired Interests Deemed To Reject The Plan
(Equity Nominees)**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

### MASTER FORM FOR OPTIONAL RELEASE OPT-OUT
### FOR CLASS 11 INTERESTS IN EXCO

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS FORM**

**THIS MASTER FORM MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT BY <u>WEDNESDAY, JUNE 5, 2019</u> AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

---

Beneficial Holders of Interests in EXCO deemed to reject the Plan received a Notice of Non-Voting Status and an Optional Release Opt-Out Form.

You are receiving this master form (the "<u>Master Opt-Out Form</u>") because you are the Nominee (as defined below) of a Beneficial Holder[2] of Class 11 Interests in EXCO as of <u>**Friday, April 26, 2019**</u> (the "<u>Voting Record Date</u>").

**This Master Opt-Out Form is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "<u>Nominee</u>"); or as the proxy Holder of a Nominee for certain Beneficial Holders' Class 11 Interests in EXCO (the "<u>Class 11 Interests</u>"), to transmit to the Claims and Noticing Agent (as defined below) the optional elections of such Beneficial Holders in respect of their Class 11 Interests to opt-out of the Releases. The CUSIP number (the "<u>CUSIP</u>") for the Class 11 Interests entitled to make the optional opt-out elections and of which you are the Nominee is 269279501. This Master Opt-Out Form may not be used for any purpose other than for submitting optional opt-out elections with respect to the Plan.**

If you desire copies, of the Disclosure Statement and Plan, you may obtain them from (a) Epiq Corporate Restructuring, LLC, the Claims and Noticing Agent, at no charge by: (i) accessing the Debtors' restructuring website

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]   A "<u>Beneficial Holder</u>" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through DTC.

at http://dm.epiq11.com/ERI; (ii) writing to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 777 Third Avenue, 12th Floor, New York, NY 10017; (iii) calling (866) 897-6433 (toll free) or (646) 282-2500 (international) and ask to speak with a member of the Solicitation Group; or (iv) emailing tabulation@epiqglobal.com and referencing "EXCO" in the subject line; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Master Opt-Out Form may not be used for any purpose other than transmitting elections to opt out of the releases. If you believe you have received this form in error, please contact the Claims and Noticing Agent *immediately* at the address, telephone number, or email address set forth above.

You are authorized to collect elections to opt-out of the releases from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Release Opt-Out Form, and collecting elections from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

To have valid opt-out elections of your Beneficial Holders, you must complete and return this Master Opt-Out Form so that the Claims and Noticing Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON <u>WEDNESDAY, JUNE 5, 2019</u> AT 5:00 P.M., PREVAILING CENTRAL TIME.**

<u>Item 1</u>.  **Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

> ☐ Is a broker, bank, or other nominee for the Beneficial Holders of the Class 11 Interests listed in Item 2 below, and is the record Holder of such bonds, or

> ☐ Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered Holder of the of Class 11 Interests listed in Item 2 below, or

> ☐ Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner, that is the registered Holder of the of Class 11 Interests listed in Item 2 below,

and accordingly, has full power and authority to transmit the optional opt-out release elections on behalf of the Beneficial Holders of the Class 11 Interests.

<u>Item 2</u>.  **Class 11 Interests Opting Out of the Releases.**

The undersigned transmits the following releases of Beneficial Holders of Class 11 Interests and certifies that the following Beneficial Holders of Class 11 Interests, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Interests as of the Voting Record Date and have delivered to the undersigned, as Nominee, Optional Release Opt-Out Form with such election.

Indicate in the appropriate column below the aggregate number of shares held for each account or attach such information to this Master Opt-Out Form in the form of the following table.  Please note that each Holder must elect all such Beneficial Holder's Class 11 Interests to opt-out of the releases and may not split such election.  Any Beneficial Holder Optional Release Opt-Out Form executed by the Beneficial Holder that does not indicate an election to opt-out of the releases will not be counted.

**Item 3.** **Important information regarding the Third Party Release.**

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

**As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.**

\*        \*        \*

**HOLDERS THAT ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF THEY ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

*[Remainder of page intentionally left blank; continued next page.]*

| Your Customer Account Number for Each Beneficial Holder of Class 11 Interests | Number of Shares Held as of Voting Record Date | Holder Elected to Opt Out of the Third Party Release |
|---|---|---|
| 1 | | ☐ |

3

| 2 | | ☐ |
|---|---|---|
| 3 | | ☐ |
| 4 | | ☐ |
| 5 | | ☐ |
| 6 | | ☐ |
| **TOTALS** | | |

**Item 4.**  **Certifications.**

Upon execution of this Master Opt-Out Form, the undersigned certifies that:

(a) **it has received a copy of the Notice of Non-Voting Status to Holders of Impaired Claims and Interests Deemed to Reject the Plan and has delivered the same to the Beneficial Holders of the Class 11 Interests listed in Item 2 above;**

(b) **it has received a completed and signed Release Opt-Out Form from each Beneficial Holder listed in Item 2 of this Master Opt-Out Form;**

(c) **it is the record Holder of all Class 11 Interests listed in Item 2 above, or**

(d) **it has been authorized by each Beneficial Holder of Class 11 Interests listed in Item 2 above to transmit an Optional Release Election on such Beneficial Holders behalf;**

(e) **no other Master Opt-Out Forms with respect to the same Class 11 Interests identified in Item 2 have been cast or, if any other Master Opt-Out Forms have been submitted with respect to such Interests, then any such earlier Master Opt-Out Forms are hereby revoked;**

(f) **it has properly disclosed:  (a) the Beneficial Holder of Class 11 Interests who completed the Release Opt-Out Form; (b) the respective number of the Class 11 Interests owned, as the case may be, by each Beneficial Holder of Class 11 Interests who completed a Release Opt-Out Form; and (c) the customer account or other identification number for each such Beneficial Holder of Class 11 Interests; and**

(g) **it will maintain the Release Opt-Out Forms and evidence of separate transactions returned by Beneficial Holder of Class 11 Interests (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.**

4

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Participant Number | |
| Name of Proxy Holder or Agent for Nominee (if applicable) | |
| Signature: | |
| Name of Signatory: | |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER OPT-OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE FOLLOWING METHODS:**

**In the envelope provided via first class mail, by overnight courier, or by hand delivery to:**

EXCO Resources, Inc.
Master Opt-Out Election Form Processing
c/o Epiq Corporate Restructuring, LLC
777 Third Avenue, 12th Floor
New York, NY 10017

**Via electronic mail service to:**

tabulation@epiqglobal.com
with a reference to "EXCO Opt-Out Release Elections" in the subject line.

**THE VOTING DEADLINE IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M., PREVAILING CENTRAL TIME.**

**THE CLAIMS AND NOTICING AGENT MUST ACTUALLY RECEIVE YOUR CLASS 11 MASTER OPT-OUT FORM ON OR BEFORE THE VOTING DEADLINE.**

**Exhibit 7**

**Form of Notice to Disputed Claim Holders**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**NOTICE OF NON-VOTING STATUS WITH RESPECT TO DISPUTED CLAIMS**

**PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing EXCO Resources, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the Holder of a Claim that is subject to a pending objection by the Debtors. ***You are not entitled to vote any disputed portion of your Claim unless one or more of the following events has taken place before Monday, June 3, 2019 (the date that is two business days before the Voting Deadline)*** (each, a "Resolution Event"):

    1.     an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

2.      an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

3.      a stipulation or other agreement is executed between the Holder of such Claim and the Debtors temporarily allowing the Holder of such Claim to vote its Claim in an agreed upon amount; or

4.      the pending objection to such Claim is voluntarily withdrawn by the objecting party.

Accordingly, this notice is being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtors' restructuring website at http://dm.epiq11.com/ERI; (b) write to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) email tabulation@epiqglobal.com and reference "EXCO" in the subject line; or (c) call 1-(800) 683-4332 (toll free).  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE THAT** if a timely Resolution Event occurs, then no later than one business day thereafter, the Claims and Noticing Agent shall distribute a ballot, and a pre-addressed, postage pre-paid envelope to you, which must be returned to the Claims and Noticing Agent no later than the Voting Deadline, which is on **Wednesday, June 5, 2019 at 5:00 p.m.**, prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims, you should contact the Claims and Noticing Agent in accordance with the instructions provided above.

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII.D OF THE PLAN USING THE ENCLOSED OPT OUT FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. BY OR ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

Respectfully Submitted,

*/s/ Christopher T. Greco, P.C.*

Dated:  May 2, 2019

Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:             christopher.greco@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:             patrick.nash@kirkland.com
                       alexandra.schwarzman@kirkland.com

- and -

Marcus A. Helt (TX: 24052187)
Michael K. Riordan (TX: 24070502)
**FOLEY GARDERE**
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone:     (713) 276-5178
Facsimile:     (713) 276-6178
Email:             mhelt@foley.com
Email:             mriordan@foley.com

*Counsel for the Debtors and Debtors in Possession*

## Exhibit 7A

**Opt-Out Form for Holders of Disputed Claims**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

FORM FOR OPTIONAL RELEASE OPT-OUT
FOR HOLDERS OF DISPUTED CLAIMS

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS FORM**

**THIS FORM MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT BY <u>WEDNESDAY, JUNE 5, 2019</u> AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

---

## OPTIONAL:  RELEASE OPT OUT FORM

You are receiving this opt out form (the "<u>Opt Out Form</u>") because you are a Holder of a Claim that is not entitled to vote on the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>").

## Important information regarding the Third Party Release.[2]

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]   Under the Plan, "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and

6

**AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN SET FORTH BELOW:**

**As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement**

former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

\*       \*       \*

**IF YOU ELECT TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**OPTIONAL RELEASE ELECTION.** **YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:**

> ☐ **The Undersigned Holder of the Claim elects to** **OPT OUT of the Third Party Release**

**Certifications.**

By signing this Opt Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors that:

(a)     as of the Voting Record Date, either:  (i) the Entity is the Holder of a Claim; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of the Claim;

(b)     the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the *Notice of Non-Voting Status With Respect to Disputed Claims* and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)     the Entity has submitted the same respective election concerning the releases with respect to all Claims in a single Class; and

(d)     no other Opt Out Form has been submitted or, if any other Opt Out Forms have been submitted with respect to such Claims, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than the Holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

***IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION*, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE METHODS BELOW.**

If by First Class mail:

    EXCO Resources, Inc.
     Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    P.O. Box 4422
    Beaverton, OR 97076-4422

If by overnight courier or hand delivery:

    EXCO Resources, Inc
    Ballot Processing
    c/o Epiq Corporate Restructuring, LLC
    10300 SW Allen Boulevard
    Beaverton, OR 97005

By electronic, online submission:

    Please visit http://dm.epiq11.com/ERI. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot.  If you choose to submit your Ballot via Epiq's E-Ballot system, you should not also return a hard copy of your Ballot.

    **IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized E-Ballot:**

    **Unique E-Ballot ID#: _____**

    "E-Balloting" is the sole manner in which this Opt-Out Form will be accepted via electronic or online transmission.  Opt-Out Forms submitted by facsimile or email will not be counted.

**THE VOTING DEADLINE IS WEDNESDAY, JUNE 5, 2019 AT 5:00 P.M.,**
PREVAILING CENTRAL TIME.

THE NOTICE AND CLAIMS AGENT MUST ***ACTUALLY RECEIVE***
YOUR OPT-OUT ELECTION ON OR BEFORE THE VOTING DEADLINE.

**<u>Exhibit 8</u>**

**Form of Confirmation Hearing Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

## NOTICE OF HEARING TO CONSIDER
## CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY THE
## DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES

**PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing EXCO Resources, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials to be included in the packages distributed to solicit votes to accept the Plan (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **Monday, June 10, 2019, at 9:00 a.m.**, prevailing Central Time, before the Honorable Judge Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

> **PLEASE BE ADVISED**:  THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**.  The voting record date is **Friday, April 26, 2019**, which is the date for determining which Holders of Claims in Classes 3, 4, 5, 6, and 7 are entitled to vote on the Plan.

**Voting Deadline**.  The deadline for voting on the Plan is on **Wednesday, June 5, 2019 at 5:00 p.m.**, prevailing Central Time (the "Voting Deadline").  If you received a Solicitation Package, including a Ballot, and intend to vote on the Plan you *must*:  (a) follow the instructions carefully; (b) complete *all* of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is *actually received* by the Debtors' notice and claims agent, Epiq Corporate Restructuring, LLC (the "Claims and Noticing Agent") on or before the Voting Deadline.  *A failure to follow such instructions may disqualify your vote*.

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

> ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

Please be advised that Article VIII of the Plan contains the following release, exculpation, and injunction provisions:[3]

### RELEASES BY THE DEBTORS.

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates, from any and all claims and Causes of Action whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof, if applicable), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled

---

[3]     Under the Plan, "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

Under the Plan, "*Releasing Parties*" means, collectively, and in each case only in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the DIP Order (and any payments or transfers in connection therewith), the New Organizational Documents, any preference or avoidance claims pursuant to sections 544, 547, 548, or 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the releases described herein are: (1) in exchange for the good and valuable consideration provided by or on behalf of the Released Parties; (2) a good faith settlement and compromise of the Settled Actions released herein; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6)  a bar to any of the Debtors, the Reorganized Debtors, the Debtors' Estates, the Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, the Unsecured Claims Distribution Trust, or asserting any claim or Cause of Action released pursuant to the releases described herein or asserting (directly or indirectly) or trading any claim or Cause of Action released pursuant to the releases described herein against any Released Party at any time.

<u>**RELEASES BY HOLDERS OF CLAIMS AND INTERESTS**</u>.

As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including

the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

## EXCULPATION.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Mediation, the formulation, preparation, dissemination, negotiation, Filing, or termination of any prepetition transactions, the Disclosure Statement, the Plan, the Secured Lender Settlement, the D&O Settlement, the D&O Liability Insurance Policies, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection

5

with the Disclosure Statement, the Plan, the Exit RBL Facility, the Filing of the Chapter 11 Cases, the negotiation, terms, or execution of the settlement agreements effectuated pursuant to Federal Rule of Bankruptcy Procedure 9019, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to or in connection with the Plan and the Restructuring Transactions. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### INJUNCTION.

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have Held, Hold, or may Hold Claims or Interests that have been released pursuant to Article VIII.C or Article VIII.D of the Plan, shall be discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, the Unsecured Claims Distribution Trust, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

### RELEASE OF INSURERS AND POLICIES.

6

Upon the Debtors' receipt of the D&O Proceeds in cleared funds, the parties to the D&O Settlement, on behalf of themselves, their predecessors, successors, affiliates and assigns, and all persons acting by, through or under them, and each of them, fully release and forever discharge the D&O Carriers, together with their predecessors, successors, affiliates, and assigns, and all persons acting by, through or under them, from all known and unknown claims, liabilities, obligations, promises, agreements, (including the D&O Liability Insurance Policies issued by the D&O Carriers), controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees and expenses (including attorneys' fees and costs), of any nature whatsoever, whether or not apparent or yet to be discovered, related to the Debtors; *provided* that nothing in this section releases (a) any party to the D&O Settlement from its obligations under the D&O Settlement; (b) any party to the D&O Settlement from its liability for breach of any term, warranty, or representation in the D&O Settlement; or (c) the D&O Carriers from payment of Defense Costs (as defined in and in accordance with the terms of the D&O Liability Insurance Policies issued by the D&O Carriers) incurred in connection with the D&O Settlement. The D&O Carriers' payment of the D&O Proceeds and any Defense Costs (as defined in the D&O Liability Insurance Policies issued by the D&O Carriers) is deemed to have exhausted the limits of the D&O Liability Insurance Policies issued by the D&O Carriers. Moreover, upon the Debtors' receipt of the D&O Proceeds in cleared funds, the D&O Liability Insurance Policies issued by the D&O Carriers are immediately discharged and cancelled, and the D&O Carriers are immediately released from any and all obligations under the D&O Liability Insurance Policies issued by the D&O Carriers. Notwithstanding any language in the D&O Settlement or Plan, as of the Effective Date, no party may pursue or file any action that implicates the D&O Liability Insurance Policies issued by the D&O Carriers. For the avoidance of doubt, nothing in this paragraph shall affect the obligations of Beazley Insurance Company, Inc., Allied World National Assurance Company, and XL Specialty Insurance Company arising under Policy No. V15RVK170901, Policy No. 0310-0059, and Policy No. ELU148628-17 or the obligations of the Insurers not party to the D&O Settlement arising under the D&O Liability Insurance Policies issued by such Insurers. Coverage for all the Insureds by Beazley Insurance Company, Inc., Allied World National Assurance Company, and XL Specialty Insurance Company arising under Policy No. V15RVK170901, Policy No. 0310-0059, and Policy No. ELU148628-17 is expressly preserved.

## BAR ORDER AND CHANNELING INJUNCTION.

Except as otherwise specifically provided in the Plan, the Enjoined Parties shall be permanently barred, restrained, and enjoined, with regard to the Claims set forth below and in Article VIII.H (1)-(6) of the Plan, (collectively, the "Enjoined Claims") from ever:

1.      commencing, asserting, continuing, filing, conducting, or bringing, directly, indirectly, or derivatively, any Claim, demand, suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum), against (a) any of the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors and their predecessors, affiliates, successors, principals, directors, officers, and related entities, and (b) the D&O Carriers with regard to any and all

claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' or any of the Released Parties' conduct, individually or collectively, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

2.        asserting, continuing, filing, conducting, or bringing, directly, indirectly, or derivatively, any Claim, demand, suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum), against any of the Released Parties, or their respective property, including the proceeds of such property that would result in the avoidance of allegedly fraudulent (actual or constructive) or preferential transfers from the Debtors to any of the Released Parties, regardless of whether such Released Party is the initial or subsequent transferee, and/or recovery of such allegedly fraudulent (actual or constructive) or preferential transfers from such Released Party;

3.        enforcing, levying, employing legal process (including proceedings supplementary), whether prejudgment or post-judgment, attaching, garnishing, sequestering, collecting, or otherwise recovering by any means or in any manner, any Claims against (a) the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors, and their predecessors, affiliates, successors, principals, directors, officers, and related entities; and (b) the D&O Carriers with regard to any and all Claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' conduct, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

4.        pursuing, aiding, or abetting any action brought by any person or entity seeking recovery, contribution and/or indemnity from (a) any of the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors and their predecessors, affiliates, successors, principals, directors, officers, and related entities, and (b) the D&O Carriers with regard to any and all Claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined

Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' or the Released Parties' conduct, individually or collectively, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

5.      enforcing any terms set forth in any settlement agreement by and among any of the Released Parties and any of the Enjoined Parties that would resolve, compromise, or settle Claims that would otherwise be enjoined by the bar order or the channeling injunction set forth in this section; and

6.      pursuing any of the Enjoined Claims recited herein as they relate to any Claims against retained professionals including accountants and legal counsel as well as their agents and assigns of any of the Released Parties.

The injunction described in this section and incorporated into the Confirmation Order shall be referred to as the "Bar Order and Channeling Injunction."

The automatic stay shall be lifted, to the extent it may be applicable, to permit the D&O Carriers to contribute the D&O Proceeds.

The Bankruptcy Court shall expressly retain jurisdiction in enforcing, implementing and interpreting the scope of the Bar Order and Channeling Injunction.

**Confirmation Objection Deadline**.  The deadline for filing objections to the Plan, including with regard to the treatment of Executory Contracts and Unexpired Leases thereunder, is **Tuesday, June 4, 2019 at 5:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline").  All objections to the relief sought at the Confirmation Hearing *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; *and* (d) be filed with the Court (contemporaneously with a proof of service) on or before the Confirmation Objection Deadline.

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**.  The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions or if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtors' restructuring website at http://dm.epiq11.com/ERI; (b) write to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) email tabulation@epiqglobal.com and reference "EXCO" in the subject line; or (c) call 1-(800) 683-4332 (toll free).  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.  Please be advised that the Claims and Noticing Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may *not* advise you as to whether you should vore to accept or reject the Plan or provide legal advice.

**The Plan Supplement**.  The Debtors will file the Plan Supplement (as defined in the Plan) on or before **Wednesday, May 22, 2019**, and will serve notice on parties in interest, which will:

(a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

<div style="border:1px solid black;">

**BINDING NATURE OF THE PLAN**:

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

</div>

Respectfully Submitted,

*/s/ Christopher T. Greco, P.C.*

Dated:  May 2, 2019    Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        christopher.greco@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              alexandra.schwarzman@kirkland.com

- and -

Marcus A. Helt (TX: 24052187)
Michael K. Riordan (TX: 24070502)
**FOLEY GARDERE**
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone:    (713) 276-5178
Facsimile:    (713) 276-6178
Email:        mhelt@foley.com
Email:        mriordan@foley.com

*Counsel for the Debtors and Debtors in Possession*

## **Exhibit 9**

**Form of Plan Supplement Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## NOTICE OF FILING OF PLAN SUPPLEMENT

    **PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing EXCO Resources, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan");[2] (b) approving the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (e) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

    **PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order approving the Disclosure Statement, the Debtors filed the Plan Supplement with the Court on **[●], 2019** [Docket No. [●]].  The Plan Supplement is comprised of the following: (a) the New Organizational Documents; (b) the Assumed Executory Contract and Unexpired Lease List; (c) the Rejected Executory Contract and Unexpired Lease List; (d) the Schedule of Retained Causes of Action; (e) Claims Objection Schedule; (f)  the identity of the members of the Reorganized EXCO Board and management for the Reorganized Debtors; (g) the Exit RBL Facility Documents; (h) the Unsecured Claims Distribution Trust Documents; (i) the Stockholders' Agreement; and (j) the identity and compensation of the Unsecured Claims Plan Administrator and the members of the Unsecured Claims Distribution Trust Advisory Board.  Any

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (j). Notwithstanding the foregoing, the Debtors may amend, with the consent of the Required Parties, the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **Monday, June 10, 2019, at 9:00 a.m.,** prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **Tuesday, June 4, 2019 at 5:00 p.m.,** prevailing Central Time (the "Confirmation Objection Deadline"). Any objection to the Plan *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) on or before the Confirmation Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may: (a) access the Debtors' restructuring website at http://dm.epiq11.com/ERI; (b) write to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) email tabulation@epiqglobal.com and reference "EXCO" in the subject line; or (c) call 1-(800) 683-4332 (toll free). You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE**. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

Respectfully Submitted,

*/s/ Christopher T., P.C.*

Dated:  May 2, 2019      Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          christopher.greco@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                alexandra.schwarzman@kirkland.com

- and -

Marcus A. Helt (TX: 24052187)
Michael K. Riordan (TX: 24070502)
**FOLEY GARDERE**
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone:      (713) 276-5178
Facsimile:      (713) 276-6178
Email:          mhelt@foley.com
Email:          mriordan@foley.com

*Counsel for the Debtors and Debtors in Possession*

## **Exhibit 10**

**Form of Notice of Assumption of Executory Contracts and Unexpired Leases**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

**NOTICE OF (A) EXECUTORY CONTRACTS AND
UNEXPIRED LEASES TO BE ASSUMED BY THE DEBTORS
PURSUANT TO THE PLAN, (B) CURE AMOUNTS, IF ANY,
AND (C) RELATED PROCEDURES IN CONNECTION THEREWITH**

      **PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):[2] (a) authorizing EXCO Resources, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan"); (b) approving the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]    Capitalized terms not otherwise defined herein have the same meanings as set forth in the Disclosure Statement Order or the Plan (as defined herein).

**PLEASE TAKE FURTHER NOTICE THAT** on November 26, 2018, the Debtors filed the *Assumed Executory Contract and Unexpired Lease List* (the "Assumption Schedule") with the Court as part of the Plan Supplement in connection with the First Plan [Docket No. 1315].

**PLEASE TAKE FURTHER NOTICE THAT** any objection by a contract or lease counterparty to a proposed rejection or assumption of an Executory Contract or Unexpired Lease (each, an "Assume/Reject Objection") as set forth on the Assumption Schedule filed in connection with the First Plan was due by December 5, 2018.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed an amended Assumption Schedule on **[●], 2019** [Docket No. [●]], substantially in the form attached hereto as **Exhibit A**, which modified the previously-filed Assumption Schedule as indicated on the redline attached hereto as **Exhibit B**.  The determination to reject the agreements identified on the Assumption Schedule is subject to further revision in accordance with the Plan.[3]

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Disclosure Statement Order, solely to the extent of any modification to the Assumed Executory Contract and Unexpired Lease List (as set forth on **Exhibit B** hereto), the deadline for any Assume/Rejection Objection with regard to any such modification shall be **Tuesday, June 4, 2019 at 5:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline").[4]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption.  Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Exhibit A** attached hereto.  Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT** absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and

---

[3] Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's schedule of assets and liabilities, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption, that any Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement.  Further, the Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until and including 30 days after the Effective Date and (b) contest any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease.

[4] Any objection by a contract or lease counterparty to a proposed rejection or assumption of an executory contract or unexpired lease (each, an "Assume/Reject Objection") as set forth in the Plan Supplement filed in connection with the First Plan was due by December 5, 2018.  Solely to the extent of any modification to the Assumed Executory Contract and Unexpired Lease List or Rejected Executory Contract and Unexpired Lease List from the Plan Supplement filed in connection with the First Plan, the deadline for any Assume/Rejection Objection with regard to any such modification shall be the Confirmation Objection Deadline.

Unexpired Lease(s) identified on **Exhibit A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtors in Cash on the Effective Date or as soon as reasonably practicable thereafter.  In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption.  If an objection to the proposed assumption or related cure amount is sustained by the Court, however, the Debtors may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **Monday, June 10, 2019, at 9:00 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan (including any assumption of an Executory Contract or Unexpired Lease as contemplated in the Plan Supplement) is the Confirmation Objection Deadline.  Any objection to the Plan ***must***: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) on or before the Confirmation Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE THAT any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption and cure amount.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE DEBTORS OR REORGANIZED DEBTORS ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE.  ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may:  (a) access the Debtors' restructuring website at http://dm.epiq11.com/ERI; (b) write to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) email tabulation@epiqglobal.com and reference "EXCO" in the subject line; or (c) call 1-(800) 683-4332 (toll free).  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

Respectfully Submitted,

*/s/ Christopher T. Greco, P.C.*

Dated:  May 2, 2019         Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:            christopher.greco@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:            patrick.nash@kirkland.com
                      alexandra.schwarzman@kirkland.com

- and -

Marcus A. Helt (TX: 24052187)
Michael K. Riordan (TX: 24070502)
**FOLEY GARDERE**
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone:     (713) 276-5178
Facsimile:     (713) 276-6178
Email:            mhelt@foley.com
Email:            mriordan@foley.com

*Counsel for the Debtors and Debtors in Possession*

**Exhibit A**

**Schedule of Assumed Contracts and Leases and Proposed Cure Cost**

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure Cost |
|--------|-------------|-------------------------------------------|-----------|
|        |             |                                           |           |

**Exhibit B**

**Redline for Modification of the Assumed Executory Contract and Unexpired Lease List or the Rejected Executory Contract and Unexpired Lease List from the Plan Supplement Filed in Connection with the Debtors' *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. And Its Debtor Affiliates***

## Exhibit 11

**Form of Notice of Rejection of Executory Contracts and Unexpired Leases**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**NOTICE REGARDING EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO BE REJECTED PURSUANT TO THE PLAN**

**PLEASE TAKE NOTICE THAT** on [●], 2019, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"):[2] (a) authorizing EXCO Resources, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan"); (b) approving the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Disclosure Statement Order or the Plan (as defined herein).

PLEASE TAKE FURTHER NOTICE THAT on November 26, 2018, the Debtors filed the *Rejected Executory Contract and Unexpired Lease List* (the "Rejection Schedule") with the Court as part of the Plan Supplement in connection with the First Plan [Docket No. 1315].

PLEASE TAKE FURTHER NOTICE THAT any objection by a contract or lease counterparty to a proposed rejection or assumption of an Executory Contract or Unexpired Lease or the related cure cost (each, an "Assume/Reject Objection") as set forth on the Rejection Schedule filed in connection with the First Plan was due by December 5, 2018.

PLEASE TAKE FURTHER NOTICE THAT the Debtors filed an amended Rejection Schedule on **[●], 2019** [Docket No. **[●]**], substantially in the form attached hereto as **Exhibit A**, which modified the previously-filed Rejection Schedule as indicated on the redline attached hereto as **Exhibit B**. The determination to assume the agreements identified on the Rejection Schedule is subject to further revision in accordance with the Plan.[3]

PLEASE TAKE FURTHER NOTICE THAT pursuant to the Disclosure Statement Order, solely to the extent of any modification to the Rejected Executory Contract and Unexpired Lease List (as set forth on **Exhibit B** hereto), the deadline for any Assume/Rejection Objection with regard to any such modification shall be **Tuesday, June 4, 2019 at 5:00 p.m.**, prevailing Central Time (the "Confirmation Objection Deadline").[4]

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence on **Monday, June 10, 2019, at 9:00 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

---

PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE REJECTED PURSUANT TO THE PLAN. THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.

---

[3] Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's schedule of assets and liabilities, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption, that any Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until and including 30 days after the Effective Date and (b) contest any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease.

[4] Any objection by a contract or lease counterparty to a proposed rejection or assumption of an executory contract or unexpired lease or the related cure cost (each, an "Assume/Reject Objection") as set forth in the Plan Supplement filed in connection with the First Plan was due by December 5, 2018. Solely to the extent of any modification to the Assumed Executory Contract and Unexpired Lease List or Rejected Executory Contract and

**PLEASE TAKE FURTHER NOTICE THAT** all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed within 30 days after the later of:  (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; and (2) the effective date of such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, their Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court.**

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan (including any rejection of an Executory Contract or Unexpired Lease as contemplated in the Plan Supplement) is the Confirmation Objection Deadline.  Any objection to the Plan *must*:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) on or before the Confirmation Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to Plan in connection with the rejection of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related rejection damages proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the first omnibus hearing following the Confirmation Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you may:  (a) access the Debtors' restructuring website at http://dm.epiq11.com/ERI; (b) write to EXCO Resources, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Boulevard, Beaverton, OR 97005; (c) email tabulation@epiqglobal.com and reference "EXCO" in the subject line; or (c) call 1-(800) 683-4332 (toll free).  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.D CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

Unexpired Lease List from the Plan Supplement filed in connection with the First Plan, the deadline for any Assume/Rejection Objection with regard to any such modification shall be the Confirmation Objection Deadline.

Respectfully Submitted,

*/s/ Christopher T. Greco, P.C.*

Dated:  May 2, 2019      Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           christopher.greco@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                 alexandra.schwarzman@kirkland.com

- and -

Marcus A. Helt (TX: 24052187)
Michael K. Riordan (TX: 24070502)
**FOLEY GARDERE**
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone:      (713) 276-5178
Facsimile:      (713) 276-6178
Email:           mhelt@foley.com
Email:           mriordan@foley.com

*Counsel for the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Schedule of Rejected Contracts and Leases**

**Exhibit B**

**Redline for Modification of the Assumed Executory Contract and Unexpired Lease List or the Rejected Executory Contract and Unexpired Lease List from the Plan Supplement Filed in Connection with the Debtors'** *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. And Its Debtor Affiliates*

## Exhibit A

**Additionally Revised Second Amended Disclosure Statement**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**DISCLOSURE STATEMENT FOR THE
THIRD AMENDED SETTLEMENT JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF EXCO RESOURCES, INC. AND ITS DEBTOR AFFILIATES**

Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Marcus A. Helt (TX 24052187)
Michael K. Riordan (TX 24070502)
**FOLEY GARDERE**
1000 Louisiana St., Suite 2000
Houston, Texas 77002
Telephone:  (713) 276-5178

*Co-Counsel to the Debtors and Debtors in Possession*

–and–

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: May 3, 2019

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

**The Debtors are providing the information in this document (the "_Amended Disclosure_ _Statement_") to Holders of Claims and Interests for purposes of soliciting votes to accept or reject the _Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates_ (the "_Amended Plan_").** [1]  **Nothing in this Amended Disclosure Statement may be relied upon or used by any Entity for any other purpose.  Before deciding whether to vote for or against the Amended Plan, each Holder entitled to vote should carefully consider all of the information in this Amended Disclosure Statement, including the Risk Factors described in Article VIII herein.**

**The Amended Plan is supported by the Debtors, the Committee, Fairfax, and Bluescape.**

**The Debtors previously distributed _Disclosure Statement for the Settlement Joint Chapter 11_ _Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates_ (the "_First Disclosure_ _Statement_") in connection with the _Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates_ (the "_First Plan_").  The Amended Plan modifies the First Plan with regard to, among other things, the settlement of certain Estate claims and Causes of Action, the preservation of certain Estate claims and Causes of Action, treatment of Claims, and the means for implementation of the Amended Plan.**

_**The Debtors urge Holders of Claims whose votes are being solicited to accept the Amended Plan.  No votes cast for or against the First Plan will count as votes for or against the Amended Plan; accordingly, the Debtors urge Holders of Claims who voted in favor of or against the First Plan to submit a vote in favor of the Amended Plan.**_

**The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Amended Disclosure Statement, the Amended Plan, and the transactions contemplated thereby.  Further, the Bankruptcy Court's approval of the adequacy of the information contained in this Amended Disclosure Statement does not constitute the Bankruptcy Court's approval of the Amended Plan.**

**This Amended Disclosure Statement contains, among other things, summaries of the Amended Plan, certain statutory provisions, and certain anticipated events in the Debtors' Chapter 11 Cases.  Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events.  In the event of any inconsistency or discrepancy between a description in this Amended Disclosure Statement and the terms and provisions of the Amended Plan or any other documents incorporated herein by reference, the Amended Plan or such other documents will govern for all purposes.  Factual information contained in this Amended Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted.  The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.**

**In preparing this Amended Disclosure Statement, the Debtors relied on financial data derived from their books and records and on various assumptions regarding the Debtors' business.  While the Debtors believe that such financial information fairly reflects the financial condition of the**

---

[1]     Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in Article I.A of the Amended Plan.

Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' business or their future results or operations.  The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

The Debtors are making the statements and providing the financial information contained in this Amended Disclosure Statement as of the date hereof, unless otherwise specifically noted, and there is no assurance that the statements contained herein will be correct at any time after such date. Although the Debtors may subsequently update the information in this Amended Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims and Interests reviewing this Amended Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Amended Disclosure Statement was Filed.  Information contained herein is subject to completion, modification, or amendment.  The Debtors reserve the right, with prior notice and reasonable consent of the Required Parties, to File an amended or modified Amended Plan and related Amended Disclosure Statement from time to time, subject to the terms of the Amended Plan.

The Debtors have not authorized any Entity to give any information about or concerning the Amended Plan other than that which is contained in this Amended Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Amended Disclosure Statement.

This Amended Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver.  The Debtors or any other authorized party may seek to investigate, File, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Amended Plan irrespective of whether this Amended Disclosure Statement identifies any such Claims or objections to Claims.

If the Amended Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims and Interests who do not submit ballots to accept or reject the Amended Plan, who vote to reject the Amended Plan, or who are not entitled to vote on the Amended Plan) will be bound by the terms of the Amended Plan and the Restructuring Transactions contemplated thereby.

The Confirmation and effectiveness of the Amended Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Amended Plan.  There is no assurance that the Amended Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Amended Plan to go effective will be satisfied (or waived).

You are encouraged to read the Amended Plan and this Amended Disclosure Statement in its entirety, including Article VIII, entitled "RISK FACTORS," which begins on page 73, before submitting your ballot to vote on the Amended Plan.

The Bankruptcy Court's approval of this Amended Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Amended Plan.

The information contained in this Amended Disclosure Statement is included for purposes of soliciting votes for, and Confirmation of, the Amended Plan and may not be relied on for any other

purpose.  In the event of any inconsistency between this Amended Disclosure Statement and the Amended Plan, the relevant provisions of the Amended Plan will govern.

This Amended Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.  This Amended Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Amended Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Amended Disclosure Statement; however, the financial information contained in this Amended Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Amended Plan, certain of the securities described in this Amended Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code.  Other Securities may be issued pursuant to other applicable exemptions under the federal securities laws.  To the extent exemptions from registration under section 1145 of the Bankruptcy Code or applicable federal securities law do not apply, the Securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Amended Disclosure Statement that are considered forward-looking statements under federal securities laws.  The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements.  Forward-looking statements may include statements about the Debtors':

- business strategy;

- acquisition or disposition of assets, including strategy, amount, timing, and ability to effectuate any such transaction;

- financial strategy;

- risks associated with the Chapter 11 process, including the Debtors' ability to develop, confirm, and consummate a plan under Chapter 11 or an alternative restructuring transaction;

- inability to maintain relationships with suppliers, customers, employees, and other third parties as a result of the Chapter 11 filing or other failure of such parties to comply with their contractual obligations;

- failure to satisfy the Debtors' short- or long-term liquidity needs, including its inability to generate sufficient Cash flow from operations or to obtain adequate financing to fund its capital expenditures and meet working capital needs and its ability to continue as a going concern;

- legal proceedings and the effects thereof;

4

- **drilling locations;**

- **oil and natural gas reserves;**

- **realized oil and natural gas prices;**

- **production volumes;**

- **capital expenditures;**

- **economic and competitive advantages;**

- **credit and capital market conditions;**

- **regulatory changes;**

- **lease operating expenses, general and administrative expenses and development costs;**

- **future operating results, including results of acquired properties;**

- **plans, objectives, expectations and intentions; and**

- **integration and the resulting benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' Cash position and levels of indebtedness.**

**Statements concerning these and other matters are not guarantees of the Debtors and the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Debtors and the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties, and factors may include: the Debtors' ability to confirm and consummate the Amended Plan; the potential that the Amended Plan may be converted to a process to sell substantially all of the Debtors' assets under section 363 of the Bankruptcy Code; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating the Debtors' business during the Chapter 11 Cases; customer responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; the Debtors' ability to access financing necessary to consummate the Amended Plan; general economic, business, and market conditions; commodity price fluctuations; currency fluctuations; interest rate fluctuations; price increases; changes in estimates of oil and natural gas reserves; marketing of oil and natural gas; exposure to litigation; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing business; financial conditions of the Debtors' customers; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; natural disasters; geopolitical instability; and the effects of governmental regulation on the Debtors' business.**

**TABLE OF CONTENTS**

Page

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | PRELIMINARY STATEMENT | 2 |
| III. | OVERVIEW OF THE AMENDED PLAN | 5 |
| | A. Settlement of the Settled Actions | 5 |
| | B. Releases | 6 |
| IV. | QUESTIONS AND ANSWERS REGARDING THIS AMENDED DISCLOSURE STATEMENT AND AMENDED PLAN | 6 |
| | A. What is chapter 11? | 6 |
| | B. Why are the Debtors sending me this Amended Disclosure Statement? | 7 |
| | C. Am I entitled to vote on the Amended Plan? | 7 |
| | D. What will I receive from the Debtors if the Amended Plan is consummated? | 8 |
| | E. What will I receive under the Amended Plan if I hold an Allowed Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Facility Claim? | 13 |
| | 1. Administrative Claims | 13 |
| | 2. Priority Tax Claims | 14 |
| | 3. DIP Facility Claims | 14 |
| | F. What happens to my recovery if the Amended Plan is not confirmed or does not go effective? | 14 |
| | G. What are the sources of Cash and other consideration required to fund the Amended Plan? | 15 |
| | H. Are there any regulatory approvals required to consummate the Amended Plan? | 15 |
| | I. Are there risks to owning the New Common Stock upon emergence from chapter 11? | 15 |
| | J. Is there potential litigation related to the Amended Plan? | 15 |
| | K. Will any party have significant influence over the corporate governance and operations of the Debtors following consummation of the Amended Plan? | 15 |
| | L. What is the Management Incentive Plan and how will it affect the distribution I receive under the Amended Plan? | 16 |
| | M. Will Mineral Interests be affected by the Amended Plan? | 16 |
| | N. What will happen to Executory Contracts and Unexpired Leases under the Amended Plan? | 17 |
| | O. What will happen to Insurance Policies under the Amended Plan? | 18 |
| | P. Are the Debtors assuming any indemnification obligations for their current officers and directors under the Amended Plan? | 18 |
| | Q. Are the Debtors assuming any indemnification obligations for any additional parties under the Amended Plan? | 18 |
| | R. What is the Role of the Unsecured Claims Distribution Trust and the Unsecured Claims Plan Administrator? | 19 |
| | 1. Will there be funding for the prosecution of the Challenge Actions? | 19 |
| | S. How will the preservation of the Causes of Action impact my recovery under the Amended Plan? | 20 |
| | 1. How do the Secured Claim Challenges which are not being settled under the Amended Plan impact my distribution? | 21 |
| | 2. What Causes of Action are not being preserved? | 22 |
| | T. Will the Debtors or Reorganized Debtors pay the fees or expenses of any parties to these Chapter 11 Cases? | 23 |
| | U. What might affect the recovery to Holders of Allowed GUC Claims? | 23 |

1.     How will the final amount of Allowed GUC Claims affect the recovery of Holders of Allowed GUC Claims under the Amended Plan? ........................ 23

2.     How will the Debtor against which an Allowed GUC Claim is Allowed affect the recovery of Holders of Allowed GUC Claims under the Amended Plan? ........................................................................................ 24

3.     How will Claims asserted with respect to rejection damages affect the recovery of Holders of Allowed GUC Claims under the Amended Plan? .......... 24

4.     How will the resolution of certain contingent, unliquidated, and disputed litigation Claims affect the recovery of Holders of Allowed GUC Claims under the Amended Plan? ........................................................................ 24

5.     How will Governmental Claims affect the recovery of Holders of Allowed GUC Claims under the Amended Plan? .............................................. 25

V.     If the Amended Plan provides that I get a distribution, do I get it upon Confirmation, when the Amended Plan goes effective, or on the Distribution Dates?  What is meant by "Confirmation," "Effective Date," and "Consummation?" ...................................................................................................... 25

W.    What happens to contingent, unliquidated, and disputed Claims under the Amended Plan? ...................................................................................................... 26

X.     Will there be releases and exculpation granted to parties in interest as part of the Amended Plan? .................................................................................................... 27

     1.     Releases by the Debtors. .................................................................. 28

     2.     Third Party Release .......................................................................... 29

     3.     Exculpation ...................................................................................... 29

     4.     Release of Liens. .............................................................................. 30

     5.     Releases by the Debtors. .................................................................. 30

     6.     Releases by Holders of Claims and Interests. .................................. 31

     7.     Exculpation. ..................................................................................... 32

     8.     Injunction. ........................................................................................ 32

     9.     Release of D&O Carriers and D&O Liability Insurance Policies. ...................... 33

     10.    Bar Order and Channeling Injunction ............................................... 34

Y.     What impact does the Claims Bar Date have on my Claim? ............................. 35

Z.     What is the effect of the Amended Plan on the Debtors' ongoing business? ................. 36

AA.   Who do I contact if I have additional questions with respect to this Amended Disclosure Statement or the Amended Plan? ...................................................... 36

BB.   What is the deadline to vote on the Amended Plan? ......................................... 36

CC.   How do I vote for or against the Amended Plan? .............................................. 37

DD.   Why is the Bankruptcy Court holding a Confirmation Hearing? ...................... 37

EE.   When is the Confirmation Hearing set to occur? .............................................. 37

FF.   What is the purpose of the Confirmation Hearing? ........................................... 37

GG.   Do the Debtors recommend voting in favor of the Amended Plan? .................. 37

HH.   Who supports the Amended Plan? ..................................................................... 38

V.     **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** .......................................................................................................... 38

A.     The Debtors ........................................................................................................ 38

B.     Assets and Operations ........................................................................................ 38

     1.     East Texas/North Louisiana Region ................................................. 39

     2.     South Texas Region ......................................................................... 39

     3.     Appalachia Region ........................................................................... 40

     4.     Transportation Agreements and Creation of Raider ......................... 40

C.     Prepetition Capital Structure .............................................................................. 42

     1.     RBL Facility ..................................................................................... 42

     2.     1.5 Lien Notes .................................................................................. 43

|  | 3. | 1.75 Lien Term Loan Facility ............................................................... | 43 |
|  | 4. | Second Lien Term Loan Facility ........................................................... | 44 |
|  | 5. | Unsecured Notes .................................................................................... | 44 |
|  | 6. | Common Shares and Units ..................................................................... | 44 |
| VI. | | **EVENTS LEADING TO THE CHAPTER 11 FILINGS** ............................ | **45** |
|  | A. | Adverse Market Conditions and Liquidity Constraints ................................ | 45 |
|  | B. | Proactive Approach to Addressing Liquidity Constraints ............................ | 45 |
|  | | 1. Operational Responses ........................................................................ | 45 |
|  | | 2. Financial Responses ............................................................................ | 46 |
|  | | 3. 2016 Tender Offer .............................................................................. | 46 |
|  | | 4. 2017 Refinancing Transactions ........................................................... | 47 |
|  | | 5. Strategic Responses ............................................................................ | 47 |
| VII. | | **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** ............................................................................... | **49** |
|  | A. | First Day Relief ........................................................................................ | 49 |
|  | | 1. DIP Motion ......................................................................................... | 49 |
|  | | 2. Cash Management Motion .................................................................... | 51 |
|  | | 3. Other Operational Motions ................................................................. | 51 |
|  | B. | Other Procedural and Administrative Motions ............................................ | 53 |
|  | C. | Retention of Professionals ........................................................................ | 56 |
|  | D. | Appointment of Official Creditors' Committee .......................................... | 56 |
|  | E. | Employee Compensation Plans .................................................................. | 56 |
|  | F. | Rejection and Assumption of Executory Contracts and Unexpired Leases ...... | 57 |
|  | | 1. Midstream Rejection Motion ............................................................... | 58 |
|  | | 2. Azure Rejection Motion ...................................................................... | 58 |
|  | | 3. Assumption and Rejection Motions ..................................................... | 59 |
|  | G. | Other Litigation Matters ........................................................................... | 60 |
|  | | 1. Prepetition Litigation .......................................................................... | 60 |
|  | | 2. Automatic Stay Motions ...................................................................... | 64 |
|  | H. | Postpetition Restructuring and Sale Process .............................................. | 67 |
|  | | 1. Marketing Process ............................................................................... | 67 |
|  | | 2. Negotiations with Creditors ................................................................ | 68 |
|  | I. | Expected Timetable of the Chapter 11 Cases ............................................. | 73 |
| VIII. | | **RISK FACTORS** ........................................................................................... | **73** |
|  | A. | Bankruptcy Law Considerations ................................................................ | 73 |
|  | | 1. Parties in Interest May Object to the Amended Plan's Classification of Claims and Interests ........................................................................... | 73 |
|  | | 2. The Conditions Precedent to the Effective Date of the Amended Plan May Not Occur ................................................................................... | 73 |
|  | | 3. The Debtors May Fail to Satisfy Vote Requirements .......................... | 73 |
|  | | 4. The Debtors May Not Be Able to Secure Confirmation of the Amended Plan ...................................................................................... | 74 |
|  | | 5. Nonconsensual Confirmation ............................................................... | 74 |
|  | | 6. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code ........................................................................... | 75 |
|  | | 7. The Debtors May Object to the Amount or Classification of a Claim ...... | 75 |
|  | | 8. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Amended Plan .................................................................... | 75 |
|  | | 9. Releases, Injunctions, and Exculpations Provisions May Not Be Approved ............................................................................................. | 75 |
|  | | 10. Risk of Non-Occurrence of the Effective Date .................................... | 76 |
|  | | 11. Risk of Loss of Exclusive Right to Propose a Plan ............................. | 76 |

|  | 12. | Continued Risk upon Confirmation | 76 |
| B. | | Risks Related to the Debtors' Operations During and After These Chapter 11 Cases | 76 |
|  | 1. | The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases | 76 |
|  | 2. | Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business | 77 |
|  | 3. | Financial Results May Be Volatile and May Not Reflect Historical Trends | 78 |
|  | 4. | The Debtors' Activities May Be Restricted By Financial Covenants Contained in the DIP Credit Agreement | 78 |
|  | 5. | The Debtors' Substantial Liquidity Needs May Impact Production Levels and Revenue | 78 |
|  | 6. | Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Business, Results of Operations, and Financial Condition | 79 |
|  | 7. | Drilling for and Producing Natural Gas and Oil Are High Risk Activities with Many Uncertainties that Could Adversely Affect the Debtors' Business, Financial Condition, and Results of Operations | 80 |
|  | 8. | The Debtors May Not Be Able To Secure Required Consents From Third Parties | 82 |
|  | 9. | The Debtors May Encounter Obstacles to Marketing Their Oil and Natural Gas, Which Could Adversely Impact Revenues | 82 |
|  | 10. | The Debtors are Subject to Complex Federal, State, and Other Laws and Regulations That May Result In Substantial Expenditures | 83 |
|  | 11. | The Loss of Key Customers Could Adversely Affect the Debtors' Revenues | 83 |
|  | 12. | The Loss of Key Personnel Could Adversely Affect the Debtors' Operations | 83 |
| C. | | Risks Related to Recoveries Provided Under the Amended Plan | 84 |
|  | 1. | Timing and Amount of Distributions | 84 |
|  | 2. | The Debtors May Not Be Able to Achieve their Projected Financial Results | 84 |
|  | 3. | The New Common Stock May Not Be Publicly Traded | 84 |
|  | 4. | Certain Holders of New Common Stock May Be Restricted in their Ability to Transfer or Sell their Securities | 84 |
|  | 5. | Certain Tax Implications of the Amended Plan | 85 |
|  | 6. | The Debtors May Not Be Able to Accurately Report Their Financial Results | 85 |
|  | 7. | The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness | 85 |
|  | 8. | The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases or by the Resolution of Pending Litigation Unrelated to the Chapter 11 Proceedings | 86 |
|  | 9. | Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Reorganized Debtors' Financial Condition and Results of Operations | 86 |
| IX. | | **SOLICITATION AND VOTING PROCEDURES** | **86** |
| A. | | Holders of Claims Entitled to Vote on the Amended Plan | 86 |
| B. | | Voting Record Date | 87 |
| C. | | Voting on the Amended Plan | 87 |

| | | | |
|---|---|---|---|
| | D. | Ballots Not Counted | 87 |
| **X.** | **CONFIRMATION OF THE AMENDED PLAN** | | **88** |
| | A. | Requirements for Confirmation of the Amended Plan | 88 |
| | B. | Best Interests of Creditors/Liquidation Analysis | 88 |
| | C. | Feasibility | 89 |
| | D. | Acceptance by Impaired Classes | 89 |
| | E. | Confirmation without Acceptance by All Impaired Classes | 90 |
| | | 1. | No Unfair Discrimination | 90 |
| | | 2. | Fair and Equitable Test | 90 |
| | F. | Valuation of the Debtors | 91 |
| | G. | The Plan Supplement | 91 |
| **XI.** | **CERTAIN SECURITIES LAW MATTERS** | | **91** |
| | A. | New Common Stock | 91 |
| | B. | Issuance and Resale of New Common Stock under the Plan | 91 |
| | | 1. | Private Placement Exemptions | 91 |
| | | 2. | Resale of New Common Stock; Definition of Underwriter | 92 |
| | | 3. | New Common Stock / Management Incentive Plan | 93 |
| **XII.** | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE AMENDED PLAN** | | **93** |
| | A. | Introduction | 93 |
| | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors | 94 |
| | | 1. | Cancellation of Debt and Reduction of Tax Attributes | 94 |
| | | 2. | Limitation of NOL Carryforwards and Other Tax Attributes | 95 |
| | | 3. | Unsecured Claims Distribution Loan | 97 |
| | C. | Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims | 97 |
| | | 1. | Recapitalization Treatment - Determination of "Security" Status | 97 |
| | | 2. | U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 3, Class 4, Class 5, Class 6, and Class 7 Claims | 97 |
| | | 3. | Accrued Interest | 99 |
| | | 4. | Market Discount | 99 |
| | | 5. | Limitation on Use of Capital Losses | 100 |
| | | 6. | U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Shares of New Common Stock | 100 |
| | | 7. | Medicare Tax | 101 |
| | | 8. | Transfer of Assets to an Unsecured Claims Distribution Trust | 101 |
| | | 9. | Litigation Matters Pursued By Unsecured Claims Plan Administrator | 102 |
| | D. | Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims | 102 |
| | | 1. | Gain Recognition | 103 |
| | | 2. | Accrued and/or Imputed Interest | 103 |
| | | 3. | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning Shares of New Common Stock | 104 |
| | | 4. | Sale, Redemption, or Repurchase of New Common Stock | 105 |
| | | 5. | FATCA | 106 |
| | E. | Information Reporting and Back-Up Withholding | 106 |
| **XIII.** | **RECOMMENDATION** | | **107** |

## **EXHIBITS**[1]

**EXHIBIT A**   Amended Plan of Reorganization

**EXHIBIT B**   Corporate Organization Chart

**EXHIBIT C**   Amended Disclosure Statement Order

**EXHIBIT D**   Liquidation Analysis

**EXHIBIT E**   Financial Projections

**EXHIBIT F**   Valuation Analysis

**EXHIBIT G**   Debtor Value Allocation

**EXHIBIT H**   Governance Term Sheet

---

[1]   Each Exhibit is incorporated herein by reference.

## I.       INTRODUCTION

EXCO Resources, Inc. ("EXCO"), and its debtor affiliates as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Amended Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes to accept or reject the *Third Amended Settlement Joint Chapter 11 Plan of EXCO Resources, Inc. and Its Debtor Affiliates* (the "Amended Plan"), dated April 17, 2019.[1] A copy of the Amended Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Amended Plan constitutes a separate chapter 11 plan for EXCO and each of the other Debtors.

**THE DEBTORS, THE COMMITTEE, AND THE SETTLING LENDERS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER AMENDED PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE AMENDED PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES AND STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE AMENDED PLAN.**

## II.      PRELIMINARY STATEMENT

EXCO is an independent oil and natural gas company engaged in exploration and production ("E&P") activities in onshore U.S. oil and natural gas properties with a focus on shale resource plays. EXCO's principal operations are conducted in certain key U.S. oil and natural gas areas including Texas, Louisiana, and the Appalachia region.  Headquartered in Dallas, Texas, as of the Petition Date the Debtors employed approximately 170 individuals and had approximately $1.40 billion in total funded debt obligations, including letters of credit, but excluding potential "make-whole" claims.

The Debtors are highly-efficient operators, making use of enhanced drilling and completion technologies.  The Debtors have a gas-levered asset portfolio with significant, high quality drilling inventory.  The Debtors hold significant positions in several of the most active E&P regions, including the South Texas region, East Texas/North Louisiana region, and Appalachia region.

Although the Debtors' operations remain strong, the depressed commodity pricing environment that has prevailed since late 2014 crippled the Debtors' ability to sustain their leveraged capital structure and obtain and commit the capital necessary for their core production activities.  Despite the Debtors' efforts to mitigate the effects of the historic market downturn by substantially decreasing total capital expenditures, implementing initiatives to reduce general and administrative and lease operating costs, successfully divesting non-core assets during 2016, attempting to sell other core assets in 2017, and executing multiple refinancing transactions designed to reduce their overall leverage and debt service obligations, the capital intensive nature of the Debtors' business together with the Debtors' overleveraged capital structure made it difficult to withstand the current economic climate.  These macroeconomic factors, coupled with the Debtors' substantial debt obligations and fixed commitments related to above-market and underutilized natural gas gathering, transportation, and certain other fixed-cost agreements, strained their ability to sustain the weight of their capital structure and devote the capital necessary to maintain and grow their business.

---

[1]    Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in Article I.A of the Amended Plan.  **The summary of the Amended Plan provided herein is qualified in its entirety by reference to the Amended Plan.  In the case of any inconsistency between this Amended Disclosure Statement and the Amended Plan, the Amended Plan will govern**.

As a result, beginning in the summer of 2017, the Debtors engaged financial advisors and legal counsel to advise management and the board of directors regarding potential strategic alternatives to enhance the Debtors' liquidity and address their capital structure. The Debtors, with the assistance of their advisors, commenced comprehensive restructuring negotiations with their major creditor constituencies, including the administrative agent under their reserve-based revolving credit facility, and creditors holding substantial positions in their prepetition secured and unsecured debt. Following several months of substantive negotiations with these key constituents, each of the Debtors Filed a bankruptcy petition with the Bankruptcy Court on January 15, 2018.

Following the commencement of these Chapter 11 Cases, the Debtors undertook a dual-track restructuring process, pursuant to which the Debtors solicited bids for a sale of some or all of their assets while simultaneously working with their creditor groups to develop a comprehensive plan of reorganization.

The Debtors, with the assistance of their advisors, marketed their assets both as a whole and in three distinct asset packages: (a) East Texas/North Louisiana assets, (b) the Appalachia assets, and (c) the South Texas assets, all of which are described in more detail herein. Beginning in January 2018, the Debtors and their advisors contacted over 275 potential purchasers, executed approximately 100 non-disclosure agreements, and received 25 indications of interest during the first round of the marketing process. The Debtors and their advisors analyzed the bids received and selected approximately 12 bidders to participate in the second round of the bidding process. The Debtors engaged throughout summer 2018 in extensive negotiations with a potential purchaser of their East Texas/North Louisiana assets, but ultimately did not consummate a deal with any party.

In parallel, the Debtors engaged in restructuring negotiations with all key creditor constituencies, including the prepetition secured creditors and the Committee. The Debtors facilitated multiple formal and informal discussions and in-person meetings with key stakeholders and their advisors regarding the terms of a consensual and comprehensive restructuring transaction. At the same time, the Debtors continued their investigation of potential estate claims and causes of action against third parties, including the prepetition secured lenders, and provided documents and information to the Committee in furtherance of the Committee's investigation of the same.

Following significant engagement with these key constituents, including the exchange of several restructuring proposals between certain of the prepetition secured creditors and the Committee, the Debtors requested that the Honorable Chief Judge David R. Jones be appointed as a mediator in the Chapter 11 Cases, as described in more detail herein. Mediation commenced on July 19, 2018, including in person meetings on August 6, August 7, August 27, and September 21, 2018, and resolved many potential claims and causes of action that may have been brought by the Debtors or the Committee.

The Debtors filed the First Plan[2] and First Disclosure Statement[3] on October 1, 2018, seeking to consummate the resolutions achieved in the Mediation and other ongoing negotiations. On November 5, 2018, the Bankruptcy Court entered the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures With Respect to Confirmation of the Proposed Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect*

---

[2]   The Debtors subsequently made modifications to the First Plan and Filed the amended versions on October 29, 2018, November 2, 2018, November 4, 2018, November 5, 2018 and December 3, 2018 [Docket Nos. 1178, 1209, 1216, 1232 and 1391].

[3]   The Debtors subsequently made modifications to the First Disclosure Statement and Filed the amended versions on October 29, 2018, November 2, 2018, November 4, 2018, and November 5, 2018 [Docket Nos. 1179, 1210, 1217, and 1233].

*Thereto, and (V) Granting Related Relief* [Docket No. 1227] (the "First Disclosure Statement Order") approving the First Disclosure Statement and procedures to solicit votes in favor of the First Plan.  The Debtors launched solicitation of votes for the First Plan on November 10, 2018, and completed solicitation of the First Plan on December 6, 2018, in accordance with the Disclosure Statement Order.  The First Plan received overwhelming support at every level of the capital structure.

Simultaneously with solicitation, the Debtors, with the assistance of their investment banker, PJT Partners LP ("PJT"), launched a marketing process for the exit financing contemplated by the First Plan. The Debtors contacted 33 financing parties, including 18 traditional lenders and 15 non-traditional lenders. Following a three-week diligence period, the Debtors received proposals from five potential lenders.  The Debtors evaluated these initial proposals, engaged in further negotiations with the potential lenders over the following two weeks, and received final proposals from the potential lenders on October 26, 2018.  In mid-November, the Debtors engaged Royal Bank of Canada ("RBC") to syndicate the exit RBL facility in the amount of $325 million and the exit second lien financing in the amount of $375 million.  On November 19, 2018, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to (A) Enter into the Exit Financing Agreements, (B) Incur and Pay Related Fees, Indemnities, and Expenses, and (II) Granting Related Relief* [Docket No. 1281], approving the Debtors' entry into exit financing agreements with RBC that provided for a fully-committed exit RBL facility by RBC and Bank of Montreal ("BMO") in equal proportions and a $375 million exit second lien financing to be marketed on a best efforts basis, subject to certain conditions.

The Debtors were fully prepared to proceed to confirmation of the First Plan in December 2018 with a goal of emerging prior to the end of the year.  Unfortunately, the oil and gas markets experienced significant volatility during the exit financing marketing process with the largest monthly percentage decline in oil prices since the 2008 recession occurring in November 2018 and an overall decline in natural gas prices following a temporary spike.  Against this backdrop, the Debtors, along with RBC, met with 12 prospective second lien lending institutions in late-November and early-December 2018.  Simultaneously with these meetings, RBC worked to syndicate the exit RBL facility, contacting 22 lenders regarding various commitment levels.  RBC and BMO received commitments from three lenders for the exit RBL facility totaling approximately $135 million, which, in addition to the RBC and BMO commitments of $65 million each, accounted for only approximately 80 percent of the required exit RBL facility amount. The Debtors ultimately concluded they were unable to raise the necessary exit financing to move forward with confirmation of the First Plan, and adjourned the Confirmation Hearing to a date to be determined in 2019.

The Debtors have continued to promote consensus, including through additional Mediation with certain key stakeholders on January 9, 2019, March 14, 2019, and March 15, 2019, additional in person meetings with certain creditor constituencies on February 13, 2019 and March 12, 2019, and continuous communication with all creditor constituencies and the mediator regarding the terms of multiple restructuring alternatives.  Following these negotiations, the Debtors have reached an agreement with the Settling Lenders and the Committee regarding the terms of the Amended Plan, which contemplates, among other things, a settlement of all Estate claims and Causes of Action against the Settling Lenders pursuant to which, among other things, the Settling Lenders have agreed to contribute $60 million of value to which they are entitled to fund recoveries under the Amended Plan and equitize their funded debt Claims. Additionally, the Amended Plan incorporates the Debtors' and the Committee's settlement with the D&O Carriers regarding all claims and Causes of Action the Debtors, the Committee, or any other party in interest may have asserted against the Insureds in exchange for $13.35 million in Cash contributed by the D&O Carriers to the Debtors' Estates.  The Amended Plan preserves, among other things, claims and Causes of Action against the Holders of 1.5 Lien Notes Claims and 1.75 Lien Term Loan Facility Claims other than the Settling Lenders to be litigated by the Unsecured Claims Distribution Trust or Unsecured Claims Plan Administrator.  The Debtors believe the Amended Plan is a value-maximizing transaction and will allow the Debtors to emerge as a going concern with a significantly de-levered capital structure.

### III.   OVERVIEW OF THE AMENDED PLAN

The Amended Plan provides for a reorganization of the Debtors as a going concern with a significant reduction in long-term debt and a stronger, de-levered balance sheet.

Pursuant to the Amended Plan:

- Holders of Allowed 1.5 Lien Notes Claims will receive their Pro Rata share of 61.2 percent of New Common Stock (prior to giving effect to the Secured Lender Settlement);

- Holders of Allowed 1.75 Lien Term Loan Facility Claims will receive their Pro Rata share of 38.8 percent of the New Common Stock;

- Holders of Allowed Second Lien Term Loan Facility Claims, Holders of Allowed Unsecured Notes Claims, and Holders of Allowed GUC Claims will receive their Pro Rata share of the Unsecured Claims Consideration attributable to each Debtor against which such Holder holds an Allowed Claim. The Unsecured Claims Consideration includes (a) New Common Stock in the amount of (i) the Settlement Contribution minus (ii) the Settlement Contribution Hold-Back; (b) the Unsecured Claims Distribution Trust Beneficial Interests, if applicable; (c) the Challenge Action Recovery (if any); and (d) the Settlement Contribution Hold-Back remaining after repayment of the Unsecured Claims Distribution Trust Loan (if any); and

- Holders of Allowed Convenience Claims shall receive their Pro Rata share of $1.1 million in Cash; *provided that*, no Holder of an Allowed Convenience Claim shall receive a distribution in excess of 20 percent of such Allowed Convenience Claim.

On the Effective Date, the Unsecured Claims Distribution Trust shall be created (if applicable) and shall be vested with the Unsecured Claims Distribution Trust Assets.  On or following the Effective Date, the Reorganized Debtors shall continue to exist, and all property in each Estate will vest in each applicable Reorganized Debtor or, in the case of the Unsecured Claims Distribution Trust Assets, will be contributed to the Unsecured Claims Distribution Trust.  On the Effective Date, the Debtors shall enter into the Exit RBL Facility, with an initial borrowing base of $375 million with approximately $250 million drawn on the Effective Date.  Pursuant to the Amended Plan, all potential claims and Causes of Action against the Insureds and the Settling Lenders will be settled, and the Unsecured Claims Distribution Trust will prosecute the Secured Claim Challenges against non-settling Holders of 1.5 Lien Notes Claims, 1.75 Lien Facilities Claims, and parties related thereto.

The Debtors, the Settling Lenders, and the Committee are the proponents of the Amended Plan within the meaning of section 1129 of the Bankruptcy Code.

### A.   Settlement of the Settled Actions

The Amended Plan embodies the D&O Settlement and the Secured Lender Settlement.  The Debtors determined that prosecution of the Settled Actions could mire the Debtors and other parties in interest in time consuming and expensive litigation, and that effectuating a consensual resolution of the Settled Actions would provide significant value to their Estates, in light of the probability of the success with regard to such Settled Actions and the complexity, expense, and likely duration of litigation related thereto.

The Amended Plan is being proposed as a motion to approve the good-faith compromise and settlement of the Settled Actions pursuant to Bankruptcy Rule 9019 and entry of the Confirmation Order

shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates, and in consideration for the classification, distributions, and other benefits provided under the Amended Plan, upon the Effective Date, the provisions of the Amended Plan shall constitute such good-faith compromise and settlement of all such Settled Actions.

Pursuant to Rule 408 of the Federal Rules of Evidence, the Amended Plan and this Amended Disclosure Statement (and any exhibits or supplements relating to the foregoing), and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until the Amended Plan is consummated, and then only in accordance with the Amended Plan. In the event the Amended Plan is not consummated, provisions of the Amended Plan and this Amended Disclosure Statement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be binding or probative.

After the Effective Date and without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors, the Unsecured Claims Litigation Trustee, or Unsecured Claims Plan Administrator, as applicable, may compromise and settle, pursuant to Bankruptcy Rule 9019 and in accordance with the provisions of the Amended Plan, Claims against, and Interests in, the Debtors and their Estates, and Causes of Action against other Entities.

### B.     Releases

The Amended Plan contains certain customary debtor and third party releases (as described more fully in Article IV.X of this Amended Disclosure Statement).  Each of the Settling Lenders, the DIP Agent, the DIP Lenders, the Committee, the individual members of the Committee (both in their capacity as such and as individual creditors), the Supporting Creditors, each of the Debtors' current and former directors or officers, all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies, any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies, the D&O Carriers, the Unsecured Notes Trustee and certain related parties shall be Released Parties.

Holders of Claims against or Interests in the Debtors who (a) vote in favor of the Amended Plan or (b) do not vote in favor of the Amended Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form will be deemed to have consented to the release and discharge of all claims and Causes of Action against the Released Parties.  By opting out of the Third Party Release, such Holder will forgo the benefit of obtaining the releases set forth in Article VIII of the Amended Plan if such party would otherwise be a Released Party.

## IV.     QUESTIONS AND ANSWERS REGARDING THIS AMENDED DISCLOSURE STATEMENT AND AMENDED PLAN

### A.     What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated interest Holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Amended Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Amended Plan.  Before soliciting votes on the Amended Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Amended Plan and to share such disclosure statement with all Holders of Claims and Interests whose votes on the Amended Plan are being solicited.  This Amended Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Amended Plan?**

Your ability to vote on and your distribution under the Amended Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Amended Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

The Amended Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, each of which shall include the classifications set forth below.[4]  Subject to Article I.D of the Amended Plan, to the extent that a Class contains Claims or Interests only with respect to one or more particular Debtors, such Class applies solely to such Debtor.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | 1.5 Lien Notes Claims | Impaired | Entitled to Vote |
| Class 4 | 1.75 Lien Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 6 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 7 | GUC Claims | Impaired | Entitled to Vote |
| Class 8 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept/Reject) |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

---

[4]      **Exhibit G** attached hereto sets forth the allocation of value as between the Debtors and will govern the recovery available to the Holders of Allowed Claims asserted with respect to a particular Debtor.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 11 | Interests in EXCO | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.   What will I receive from the Debtors if the Amended Plan is consummated?

The table below summarizes the treatment and anticipated recoveries on account of all classified Claims against and Interests in, the Debtors under of the Amended Plan.  Pursuant to the Amended Plan, the Secured Claim Challenges (excluding, for the avoidance of doubt, any Secured Claim Challenge against the Settling Lenders) shall be preserved to be investigated, prosecuted, settled, released, or otherwise liquidated by the Unsecured Claims Litigation Trustee (if applicable) and the Unsecured Claims Plan Administrator, which may materially impact the recoveries projected below.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE AMENDED PLAN.[5]**

---

[5]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided in the Amended Plan: (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Amended Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither Disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount;  (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Amended Plan; (ii) in any stipulation that is approved by the Bankruptcy Court, including a Challenge Resolution Stipulation; (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had Disallowed prior to such Final Order); *provided that* with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors', Reorganized Debtors', or Unsecured Claims Plan Administrator's reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Amended Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; *provided further that* no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow," "Allowing," and "Allowance" shall have correlative meanings.  Notwithstanding anything to the contrary herein, the Claims held by the Settling Lenders and the Supporting Creditors shall be fully and finally Allowed pursuant to the Amended Plan and not subject to objection (including any Secured Claim Challenge).

| Class | Classified Claims | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Amended Plan | Estimated % Recovery Under Chapter 7[6] |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either: (i) payment in full in Cash; (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Claim; or (iv) other treatment rendering such Claim Unimpaired. | $7.1 million | 100.0% | 100.0% |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either: (i) payment in full in Cash; or (ii) other treatment rendering such Claim Unimpaired or otherwise permitted by the Bankruptcy Code. | $0.1 million | 100.0% | 100.0% |
| 3 | 1.5 Lien | Except to the extent that a Holder of an Allowed 1.5 Lien Notes Claim | $317.0 million[7] | 100.0% | 93.0% |

<hr>

[6]   Recoveries are based on the Liquidation Analysis attached hereto as **Exhibit D**.

[7]   The estimated aggregate Allowed Claim amount for the 1.5 Lien Notes Claims excludes postpetition interest, which has been and is projected to be paid through the Effective Date in full in Cash pursuant to the terms of the DIP Order.  Further, the estimate excludes 1.5 Lien Makewhole Claims and other Claims for pre- and post-Effective Date fees and expenses of individual 1.5 Lien Noteholders.  The Debtors have filed an objection to such Claims at Docket No. 1901 and do not believe these Claims will ultimately be Allowed.  However, if such

| Class | Classified Claims | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Amended Plan | Estimated % Recovery Under Chapter 7[6] |
|---|---|---|---|---|---|
| | Notes Claims | agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 1.5 Lien Notes Claim (subject to, for the avoidance of doubt, the Secured Lender Settlement) each such Holder shall receive its Pro Rata share of the 1.5 Lien Claims Recovery; *provided* that to the extent that an Allowed 1.5 Lien Notes Claim is an Unsecured Claim following successful prosecution of a Secured Claim Challenge, the Holder of such Allowed Unsecured 1.5 Lien Notes Claim shall receive its Pro Rata share, together with all Holders of Allowed Unsecured Claims, of the Unsecured Claims Recovery; *provided, further*, that to the extent an Allowed 1.5 Lien Notes Claim is subordinated to Unsecured Claims as a result of successful prosecution of a Secured Claim Challenge, each Holder of an Allowed 1.5 Lien Notes Claim that is so subordinated shall receive no distribution on account of such subordinated Allowed 1.5 Lien Notes Claim until all Unsecured Claims senior to such subordinated Allowed 1.5 Lien Notes Claim have received 100 percent recovery. | | | |

Claims are Allowable, the Debtors will need to ensure that the Plan provides for satisfaction thereof.  Further, if such Claims are Allowable, there are multiple potential outcomes with respect to the treatment of Claims under the Plan that could affect the projected recoveries set forth in this table, and such changes may be material.

| Class | Classified Claims | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Amended Plan | Estimated % Recovery Under Chapter 7[6] |
|---|---|---|---|---|---|
| 4 | 1.75 Lien Term Loan Facility Claims | Except to the extent that a Holder of an Allowed 1.75 Lien Term Loan Facility Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 1.75 Lien Term Loan Facility Claim, each such Holder shall receive its Pro Rata share of the 1.75 Lien Claims Recovery; *provided* that to the extent that an Allowed 1.75 Lien Term Loan Facility Claim is an Unsecured Claim following successful prosecution of a Secured Claim Challenge, the Holder of such Allowed Unsecured 1.75 Lien Term Loan Facility Claim shall instead receive its Pro Rata share, together with all Holders of Allowed Unsecured Claims, of the Unsecured Claims Recovery; *provided, further,* that to the extent an Allowed 1.75 Lien Term Loan Facility Claim is subordinated to Unsecured Claims as a result of successful prosecution of a Secured Claim Challenge, each Holder of an Allowed 1.75 Lien Term Loan Facility Claim that is so subordinated shall receive no distribution on account of such subordinated Allowed 1.75 Lien Term Loan Facility Claim until all Unsecured Claims senior to such subordinated Allowed 1.75 Lien Term Loan Facility Claim have received 100 percent recovery. | $742.2 million | 27.0% | 6.0% |

| Class | Classified Claims | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Amended Plan | Estimated % Recovery Under Chapter 7[6] |
|---|---|---|---|---|---|
| 5 | Second Lien Term Loan Facility Claims | Except to the extent that a Holder of an Allowed Second Lien Term Loan Facility Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Second Lien Term Loan Facility Claim, each such Holder shall receive, together with all Holders of Unsecured Claims, its Pro Rata share of the Unsecured Claims Recovery. | $18.4 million | 23.0% | 23.0% |
| 6 | Unsecured Notes Claims | Except to the extent that a Holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Notes Claim, each such Holder shall receive, together with all Holders of Allowed Unsecured Claims, its Pro Rata share of the Unsecured Claims Recovery. | $206.5 million | 23.0 % | 23.0% |
| 7 | GUC Claims | Except to the extent that a Holder of an Allowed GUC Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed GUC Claim, each such Holder shall receive, together with all Holders of Allowed Unsecured Claims, its Pro Rata share of the Unsecured Claims Recovery; *provided* that to the extent such GUC Claim is a Convenience Claim, such Holder shall receive its Pro Rata share of the Convenience Claims Distribution. | $117.3 million | 0.0%-15.0% | 0.0%-15.0% |

12

| Class | Classified Claims | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Amended Plan | Estimated % Recovery Under Chapter 7[6] |
|---|---|---|---|---|---|
| 8 | Inter-company Claims | Each Allowed Intercompany Claim shall be, at the option of the Debtors or the Reorganized Debtors, as applicable, either: (i) Reinstated; or (ii) canceled and shall receive no distribution on account of such Claims and may be compromised, extinguished, or settled in each case, on or after the Effective Date. | $9,264.0 million | 100.0% / 0.0% | 5.0%[8] |
| 9 | Section 501(b) Claims | Each Section 510(b) Claim shall be deemed canceled, discharged, released, and extinguished, and there shall be no distribution to Holders of Section 510(b) Claims on account of such Claims. | $0.0 | 0.0% | 0.0% |
| 10 | Inter-company Interests | Intercompany Interests shall be Reinstated as of the Effective Date.[9] | N/A | N/A | N/A |
| 11 | Interests in EXCO | On the Effective Date, existing Interests in EXCO shall be deemed canceled, discharged, released, and extinguished, and there shall be no distribution to Holders of Interests in EXCO on account of such Interests. | N/A | 0.0% | 0.0% |

### E.   What will I receive under the Amended Plan if I hold an Allowed Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Facility Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Amended Plan.

---

[8]   This recovery percentage refers to recovery on Intercompany Claims between the Debtors and non-Debtors; the Liquidation Analysis attached hereto as **Exhibit D** provides additional detail.

[9]    Reinstatement of Intercompany Interests is for administrative purposes only as a means to preserve the corporate structure for holding company purposes and avoid the unnecessary cost of having to reconstitute that structure. There is no economic recovery under the Amended Plan on account of Intercompany Interests.

The Debtors estimate that Allowed Administrative Claims will total approximately $170 million and there will be no Allowed Other Priority Claims. The Debtors' estimates are the result of the Debtors' and their advisors' careful analysis of available information, including the Debtors' books and records and an analysis of the validity of the Claims asserted against the Debtors. The actual amount of Allowed Administrative Claims and Other Priority Claims is subject to numerous contingencies, including the outcome of pending litigation. Nonetheless, the Debtors have determined that there will be sufficient value to satisfy Allowed Other Secured Claims in full or otherwise render such claims unimpaired under the Amended Plan.

### 1. Administrative Claims

#### (a) General Administrative Claims

General Administrative Claims will be satisfied as set forth in Article II.A of the Amended Plan, as summarized herein. Each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either: (a) on the Effective Date; (b) if the General Administrative Claim is not Allowed as of the Effective Date, sixty (60) days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed General Administrative Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Administrative Claim, without any further action by the Holders of such Allowed General Administrative Claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.

#### (b) Professional Compensation

Professional Fee Claims will be satisfied as set forth in Article II.A of the Amended Plan, as summarized herein. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be paid by the Debtors or the Reorganized Debtors.

### 2. Priority Tax Claims

The Debtors estimate that Allowed Priority Tax Claims will total approximately $1.1 million. Priority Tax Claims will be satisfied as set forth in Article II.B of the Amended Plan and summarized herein. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated in accordance with the terms set forth in section 1129(a)(9)(D) of the Bankruptcy Code and, if such Claim is not otherwise paid in full, as an Other Secured Claim.

14

### 3. DIP Facility Claims

DIP Facility Claims will be satisfied as set forth in Article II.C of the Amended Plan and summarized herein.  Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, each Holder of an Allowed DIP Facility Claim shall be paid in full in Cash from the proceeds of the Exit RBL Facility.  Upon the payment or satisfaction of the Allowed DIP Facility Claims, all Liens and security interests granted to secure the Allowed DIP Facility Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### F. What happens to my recovery if the Amended Plan is not confirmed or does not go effective?

In the event that the Amended Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their business.  It is possible that any alternative may provide Holders of Claims and Interests with less than they would have received pursuant to the Amended Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Amended Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit D**.

### G. What are the sources of Cash and other consideration required to fund the Amended Plan?

The Debtors shall fund distributions under the Amended Plan with, as applicable:  (1) Cash on hand; (2) the Exit RBL Facility; (3) the New Common Stock; (4) the Unsecured Claims Distribution Trust Beneficial Interests (if applicable); (5) the Challenge Action Recovery (if any); and (6) the Convenience Claims Distribution.

### H. Are there any regulatory approvals required to consummate the Amended Plan?

No.  There are no known regulatory approvals that are required to consummate the Amended Plan.

### I. Are there risks to owning the New Common Stock upon emergence from chapter 11?

Yes.  *See* Article VIII of this Amended Disclosure Statement, entitled "RISK FACTORS," which begins on page 73.

### J. Is there potential litigation related to the Amended Plan?

Parties in interest may object to the approval of this Amended Disclosure Statement and may object to Confirmation of the Amended Plan as well, which objections potentially could give rise to litigation.  *See* Article VIII.C.8 of this Amended Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 86.

In the event that it becomes necessary to confirm the Amended Plan over the objection of certain Classes, the Debtors may seek confirmation of the Amended Plan notwithstanding the dissent of such objecting Classes.  The Bankruptcy Court may confirm the Amended Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Amended Plan satisfies section 1129(b) of the

Bankruptcy Code.  *See* Article VIII.A.4 of this Amended Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Amended Plan," which begins on page 74.

Furthermore, as described more fully in Article IV.U of the Amended Plan and above in Article IV.R of this Amended Disclosure Statement, the Amended Plan provides for the creation of the Unsecured Claims Distribution Trust on the Effective Date.  The Unsecured Claims Litigation Trustee and Unsecured Claims Plan Administrator, as applicable, shall have sole power and authority to investigate, prosecute, settle, release or otherwise liquidate, compromise, or resolve the Challenge Actions and the Contributed Unsecured Notes Action (if applicable).

### K.      Will any party have significant influence over the corporate governance and operations of the Debtors following consummation of the Amended Plan?

As of the Effective Date, the initial Reorganized EXCO Board shall consist of five directors, three of whom shall be chosen by Fairfax and Bluescape, one of whom shall be chosen by the Committee, and one of whom shall qualify as independent under the New York Stock Exchange definition of such term and shall be chosen jointly by the Committee, Fairfax, and Bluescape.  The identities of the directors will be disclosed in the Plan Supplement.  As of the Effective Date, the terms of the current members of the boards of directors or managers, as applicable, of each of the Debtors shall expire, and the initial Reorganized EXCO Board and the boards of directors or managers of each of the other Reorganized Debtors will include those directors and officers set forth in the lists of directors and officers of the Reorganized Debtors included in the Plan Supplement.

After the Effective Date, the officers of each of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of each person proposed to be an officer or to serve on the initial board of directors of any of the Reorganized Debtors.  To the extent any such officer or director of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such officer.  Each such officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and the Governance Term Sheet attached hereto as **Exhibit H.**

### L.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Amended Plan?

After the Effective Date, the Reorganized EXCO Board may adopt and implement a Management Incentive Plan pursuant to which management and key employees will receive a percentage of equity in Reorganized EXCO, comprised of New Common Stock.  The participants in the Management Incentive Plan, the timing and allocations of the awards to participants, and the other terms and conditions of such awards (including, but limited to, vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights, and transferability) shall be determined by the Reorganized EXCO Board.

### M.      Will Mineral Interests be affected by the Amended Plan?

Notwithstanding any other provisions in the Amended Plan, on and after the Effective Date, all Mineral Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Mineral Interests, and no Mineral Interests shall be compromised or discharged by the Amended Plan, *provided however*, that any prepetition or pre-Effective Date right to payment arising from a Mineral Interest, if any, is treated by the Amended Plan as a Claim.  For the avoidance of doubt, although the rights held by Mineral Interest owners in oil and gas in the ground on account of royalties, overriding royalty interests, net profit interests, non-participating royalty interests, production payments, and other similar interests shall not be affected by the Amended

Plan, any prepetition or pre-Effective Date right to payment asserted by a Holder of a Mineral Interest pursuant to such Mineral Interest shall be treated as a Claim under the Amended Plan and shall be treated in accordance therewith (including, for the avoidance of doubt, by discharge or cure, if applicable).  Further, the Debtors or the Reorganized Debtors, as applicable, retain the right, pursuant to the Amended Plan, to object to any such Claim, including based on the validity, priority, or security asserted by such Claim Holder.

Certain Mineral Interest owners believe that prepetition or pre-Effective Date rights to payment arising from Mineral Interests may, among other things, not be considered property of the Debtors' Estate or are not properly classified as Claims, whether as a result of potential litigation, applicable state law, or otherwise.  The Debtors disagree.

In addition, certain Mineral Interest owners believe that Other Secured Claims include such owners' right to be paid royalties pre- or post-petition, and the Debtors will be required to properly reserve any such amounts due as a condition to Amended Plan effectiveness.  The Debtors disagree.  Pursuant to the Amended Plan, Class 1 Other Secured Claims are any Secured Claim against any of the Debtors other than the (a) Secured 1.5 Lien Notes Claims (if any), (b) Secured 1.75 Lien Term Loan Facility Claims (if any), and (c) Secured Second Lien Term Loan Facility Claims (if any).  The Debtors estimate that Allowed Other Secured Claims will total approximately $7.1 million.  The estimate of Allowed Other Secured Claims is the result of the Debtors' and their advisors' careful analysis of available information, including the Debtors' books and records and an analysis of the validity of the Other Secured Claims asserted against the Debtors.  As part of their analysis, the Debtors and their advisors determined that certain of the Other Secured Claims that have been asserted should not be Allowed Other Secured Claims for various reasons, including that such Other Secured Claims have been satisfied during these Chapter 11 Cases, are duplicative, or are not properly asserted against the applicable Debtor, among others.  Nonetheless, Other Secured Claims will be unimpaired under the Amended Plan.

**N.    What will happen to Executory Contracts and Unexpired Leases under the Amended Plan?**

On the Effective Date, except as otherwise provided in the Amended Plan, any Executory Contract or Unexpired Lease of the Debtors is deemed to be an Assumed Executory Contract or Unexpired Lease, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed, assumed and assigned, or rejected by the Debtors; (2) are identified on the Rejected Executory Contract and Unexpired Lease List; (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Certain creditors assert there is a material risk that the Debtors may not be able to reject certain Executory Contracts or Unexpired Leases because, among other reasons, such Executory Contracts or Unexpired Leases may be found to contain one or more covenants running with the land that are not subject to rejection in bankruptcy.  The Debtors disagree.

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter

17

pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

Pursuant to the First Plan, the Debtors Filed the *Notice of Plan Supplement* [Docket No. 1315] (the "First Plan Supplement") containing the Assumed Executory Contract and Unexpired Lease List and Rejected Executory Contract and Unexpired Lease List on November 26, 2018.  For the avoidance of doubt, any objection by a contract or lease counterparty to a proposed rejection or assumption of an executory contract or unexpired lease or the related cure cost (each, an "Assume/Reject Objection") as set forth in the First Plan Supplement was due by December 5, 2018.  ***Solely to the extent of any modification to the Assumed Executory Contract and Unexpired Lease List or Rejected Executory Contract and Unexpired Lease List***, the deadline for any Assume/Rejection Objection with regard to any such modification shall be the Confirmation Objection Deadline.  For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.

For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, may add any Executory Contract or Unexpired Lease proposed to be assumed to the Rejected Executory Contracts and Unexpired Lease List in accordance with the time limits provided by the Amended Plan for any reason, including if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable cure notice or the Amended Plan, in which case such Executory Contract or Unexpired Lease is deemed rejected as the Effective Date.

All Allowed Claims arising from the modification of the Rejected Executory Contract and Unexpired Lease List shall be classified as GUC Claims and shall be treated in accordance with the Amended Plan, unless a different security or priority is otherwise asserted in such Proof of Claim and Allowed in accordance with the Amended Plan.

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtor, and such entity shall be liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

**O.     What will happen to Insurance Policies under the Amended Plan?**

As set forth in Article V.F of the Amended Plan, on the Effective Date each of the Debtors' Insurance Policies shall be deemed assumed by the applicable Reorganized Debtor pursuant to sections 105 and 365 of the Bankruptcy Code as though listed on the Assumed Executory Contract and Unexpired Lease List and such Insurance Policies shall not be impaired in any way by the Amended Plan or Confirmation Order.

**P.     Are the Debtors assuming any indemnification obligations for their current officers and directors under the Amended Plan?**

As set forth in Article V.E of the Amended Plan, the Debtors and the Reorganized Debtors shall assume the Indemnification Obligations for the current and former directors, officers, managers, employees, and other professionals and advisors of the Debtors, to the extent consistent with applicable law, and such Indemnification Obligations shall not be modified, reduced, discharged, impaired, or otherwise affected in

any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose. Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify Indemnification Obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; *provided* that none of the Reorganized Debtors shall amend or restate any of the New Organizational Documents before the Effective Date to terminate or adversely affect any of the Reorganized Debtors' Indemnification Obligations.  For the avoidance of doubt, nothing in this paragraph shall affect the assumption of any Indemnification Obligations arising under the D&O Tail Policies.

**Q.     Are the Debtors assuming any indemnification obligations for any additional parties under the Amended Plan?**

As set forth in Article IV.V of the Amended Plan, the Debtors and the Reorganized Debtors, pursuant to the Secured Lender Settlement, shall (1) indemnify and hold harmless the Settling Lenders from and against any expense, damage or liability arising from any Cause of Action brought by any person or Entity against the Settling Lenders relating to the Debtors, the Amended Plan (including the implementation of the Amended Plan), or the Restructuring Transactions, that, in each case, has arisen or may arise through and including the Effective Date (including any Cause of Action that arises in connection with events occurring prior to the Effective Date), and (2) promptly advance to the Settling Lenders their respective defense costs and expenses related to any such Cause of Action or any Claim, in each case (a) brought against them in any case, hearing, procedure or proceeding of any kind, (b) threatened against them by any person or Entity, or (iii) brought against a third party and that requires the discovery of the Settling Lenders or reasonably requires any other intervention or involvement by the Settling Lenders therein.  This indemnification shall be enforceable regardless of whether any person (including the person from whom indemnification is sought) alleges or proves: (c) the sole, concurrent, contributory, or comparative negligence (whether such negligence is simple or gross) or fault of the person seeking indemnification or (b) the sole or concurrent strict liability imposed upon the person seeking indemnification.  The Debtors have considered the Secured Lender Settlement as a whole and have found the indemnification of Settling Lenders to be proper and reasonable under the circumstances.

**R.     What is the Role of the Unsecured Claims Distribution Trust and the Unsecured Claims Plan Administrator?**

On the Effective Date, if there are any Unsecured Claims Distribution Trust Assets, the Unsecured Claims Distribution Trust shall be created by the Debtors and shall be vested with the Unsecured Claims Distribution Trust Assets (which shall be those Challenge Actions set forth on the Schedule of Retained Causes of Action as Contributed Challenge Actions, if any, and the Contributed Unsecured Notes Action, if applicable, along with proceeds of the foregoing).  The Unsecured Claims Distribution Trust shall be governed and administered in accordance with the Unsecured Claims Distribution Trust Documents.  The Unsecured Claims Distribution Trust shall be governed by a three-person advisory board, whose members shall be chosen by the Committee and whose identity and compensation shall be included in the Plan Supplement.  The three-person advisory board shall select the Unsecured Claims Litigation Trustee, whose identity and compensation shall be included in the Plan Supplement.  The Unsecured Claims Litigation Trustee shall, among other things, prosecute, settle, or otherwise resolve the Contributed Challenge Actions and the Contributed Unsecured Notes Action (if applicable), in accordance with the Unsecured Distribution Trust Documents.  If there are no Unsecured Claims Distribution Trust Assets, the Unsecured Claims Distribution Trust shall not be created.  If the Unsecured Claims Distribution Trust is created, the Holders of Allowed Unsecured Claims shall become the beneficiaries of the Unsecured Claims Distribution Trust.

Further, upon the Effective Date, the Unsecured Claims Plan Administrator shall be vested with the sole right and obligation to pursue the Retained Challenge Actions (which shall be any Challenge

Actions that are set forth on the Schedule of Retained Causes of Action as Challenge Actions to be retained by the Debtors or the Reorganized Debtors), and Causes of Action pursuant to the Intercreditor Assignment (pursuant to which, substantially contemporaneously with the Effective Date, each of the Settling Lenders shall automatically be deemed to grant to the Unsecured Claims Plan Administrator the authority to litigate and enforce their rights against the 1.75 Lien Agent and the Holders of 1.75 Lien Term Loan Facility Claims and the Second Lien Term Loan Facility Agent and Holders of Second Lien Term Loan Facility Claims pursuant to the Intercreditor Agreement and section 510(a) of the Bankruptcy Code to the extent permissible under the Intercreditor Agreement or applicable law, including, without limitation, the right to compel turnover of any distributions under the Plan; *provided* that the Unsecured Claims Plan Administrator shall not assert such rights, directly or indirectly, against any Settling Lender or Supporting Creditor).

### 1.     Will there be funding for the prosecution of the Challenge Actions?

The Unsecured Claims Distribution Trust (if applicable) or Unsecured Claims Plan Administrator shall prosecute the Challenge Actions.  On the Effective Date, the Debtors shall make the Unsecured Claims Distribution Loan jointly to the Unsecured Claims Plan Administrator and the Unsecured Claims Distribution Trust to be used to pay fees and expenses thereof, and both the Unsecured Claims Plan Administrator and the Unsecured Claims Litigation Trustee may draw on such loan with notice to the other.  The Unsecured Claims Distribution Loan shall not bear interest, and if not previously repaid as provided below, shall become due and payable upon the by the later of the termination of the Unsecured Claims Distribution Trust or the resolution of all Challenge Actions.  The Unsecured Claims Distribution Loan shall be repaid as a first priority claim promptly following the receipt of any Cash proceeds recovered by the Unsecured Claims Distribution Trust or the Unsecured Claims Plan Administrator on account of the Secured Claim Challenges, or from any other Cash otherwise remaining in the Unsecured Claims Distribution Trust, at its termination.  In addition, as security for the Unsecured Claims Distribution Loan, the Settlement Contribution Hold-Back shall be pledged to, and retained by, the Reorganized Debtors and remain unissued until the full principal balance of the loan has been repaid.  To the extent that the Unsecured Claims Distribution Trust and the Unsecured Claims Plan Administrator do not repay the Unsecured Claims Distribution Loan in full in Cash by the later of the termination of the Unsecured Claims Distribution Trust or the resolution of all Challenge Actions, the Unsecured Claims Distribution Loan shall be deemed repaid by the Reorganized Debtors' retention of the portion of the Settlement Contribution Hold-Back equal to the principal balance due on the Unsecured Claims Distribution Loan as of that date, and the remainder of the Settlement Contribution Hold-Back (if any) shall be distributed Pro Rata to the Holders of Allowed Unsecured Claims.  The Unsecured Claims Distribution Trust and the Unsecured Claims Plan Administrator shall not incur any indebtedness or obligations that are Secured or that are otherwise senior in right of payment to the Unsecured Claims Distribution Loan unless the Unsecured Claims Distribution Loan has been repaid in full, in Cash.

### S.     How will the preservation of the Causes of Action impact my recovery under the Amended Plan?

The Amended Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.  The Schedule of Retained Causes of Action shall be set forth in the Plan Supplement, in accordance with the Amended Plan.

The Schedule of Retained Causes of Action shall specify which Causes of Action shall be retained by the Reorganized Debtors and which Causes of Action shall be assigned to the Unsecured Claims Distribution Trust.  As set forth in Article IV.U of the Amended Plan and Article IV.R of this Amended Disclosure Statement, the Unsecured Claims Distribution Trust or the Unsecured Claims Plan Administrator, as applicable, shall, among other things, prosecute, settle or otherwise resolve the Challenge Actions (other than those against the Settling Lenders).  The Challenge Actions include any and all actual or potential Causes of Action, or claims objection, belonging to any of the Debtors, and existing at any time

on or prior to the Effective Date, related to the 1.5 Lien Notes Claims and the 1.75 Lien Term Loan Facility Claims and the Holders thereof, whether against the Holders of such Claims or third parties, as set forth on the Schedule of Retained Causes of Action, including, but not limited to, (a) any Cause of Action included in the proposed complaint filed as an exhibit to the Standing Motion, (b) Causes of Action arising under chapter 5 of the Bankruptcy Code, including, but not limited to, sections 506, 544, 545, 547, 548, 549, 550, 551, 552, and 553(b) of the Bankruptcy Code, and similar applicable non-bankruptcy law; (c) Causes of Action under general principles of equitable subordination, recharacterization, contract, section 510(c) of the Bankruptcy Code or similar Claims; and (d) Causes of Action alleging that certain Holders of the 1.5 Lien Notes Claims and the 1.75 Lien Term Loan Facility Claims were engaged in a constructive joint venture and/or general partnership with the Debtors and are liable in such capacity to holders of Claims against the Debtors' Estates.

As set forth in Article IV.U of the Amended Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, the Unsecured Claims Distribution Trust, or the Unsecured Claims Plan Administrator, as applicable, shall retain and may enforce all rights to commence and pursue any and all Causes of Action belonging to the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors', the Unsecured Claims Distribution Trust's, or the Unsecured Claims Plan Administrator's, as applicable, rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Amended Plan, including in Article VIII of the Amended Plan, which shall be deemed released and waived by the Debtors, the Reorganized Debtors, the Unsecured Claims Distribution Trust, or the Unsecured Claims Plan Administrator, as applicable, as of the Effective Date.

The Reorganized Debtors, the Unsecured Claims Distribution Trust, or the Unsecured Claims Plan Administrator, as applicable, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors, the Unsecured Claims Distribution Trust, or the Unsecured Claims Plan Administrator, as applicable, or in accordance with the Unsecured Claims Distribution Trust Documents, as applicable. **No Entity may rely on the absence of a specific reference in the Amended Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Unsecured Claims Distribution Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Amended Plan.** Unless any Cause of Action of the Debtors against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Amended Plan or pursuant to a Final Order, the Debtors, the Reorganized Debtors, the Unsecured Claims Distribution Trust, or or the Unsecured Claims Plan Administrator, as applicable, expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Reorganized Debtors, the Unsecured Claims Distribution Trust, and the Unsecured Claims Plan Administrator as applicable, reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Amended Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor, the Unsecured Claims Distribution Trust, or the Unsecured Claims Plan Administrator, as applicable, except as otherwise provided in the Amended Plan, including Article VIII of the Amended Plan. The Reorganized Debtors, the Unsecured Claims Distribution Trust, or the Unsecured

Claims Plan Administrator, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors, the Unsecured Claims Distribution Trust, and the Unsecured Claims Plan Administrator, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court, subject to, in the case of the Unsecured Claims Distribution Trust, the Amended Plan and the Unsecured Claims Distribution Trust Documents.

> **1.** **How do the Secured Claim Challenges which are not being settled under the Amended Plan impact my distribution?**

Given the nature of the Secured Claim Challenges that are not being settled under the Amended Plan, there are multiple potential outcomes that could affect the distributions to Holders of Allowed Claims in Classes 3, 4, 5, 6, and 7 (other than the Settling Lenders and the Supporting Creditors).

The Secured Claim Challenges generally can be grouped into one of several categories:

- Causes of Action that, if successful, will result in the full or partial avoidance of the Liens securing the Disputed 1.5 Lien Notes Claims or the Disputed 1.75 Lien Term Loan Facility Claims such that the collateral value attributable to such avoided Claims becomes available for distribution Pro Rata to all Holders of Allowed Unsecured Claims (including, for the avoidance of doubt, the Holders of such avoided Claims, if Allowed).

- Causes of Action that, if successful, will result in the recovery of Cash proceeds that will be Unencumbered Cash available for distribution Pro Rata to all Holders of Allowed Unsecured Claims.

- Causes of Action that, if successful, will result in the recharacterization or subordination of some or all of the Disputed 1.5 Lien Notes Claims or the Disputed 1.75 Lien Term Loan Facility Claims such that the  additional collateral value will be available for distribution to Holders of Allowed Secured Claims junior in priority to the subordinated or recharacterized Claims according to the following ranking: *first*, Allowed 1.5 Lien Notes Claims; *second*, Allowed 1.75 Lien Term Loan Facility Claims, and *third*, Allowed Second Lien Term Loan Facility Claims; *provided* that no Holder of a Claim shall recover more than 100 percent of the Allowed amount of such Claim. To the extent there is additional collateral value available following priority recovery in full for all Allowed Secured Claims, such excess value will be available for distribution Pro Rata to all Holders of Allowed Unsecured Claims.

As soon as reasonably practicable following the resolution, whether by settlement or Final Order, of a Secured Claim Challenge with respect to any Disputed 1.5 Lien Claim or Disputed 1.75 Lien Claim, the Unsecured Claims Plan Administrator, in consultation with the Debtors or the Reorganized Debtors, as applicable, shall File a Challenge Resolution Stipulation, which shall set forth: (a) the Allowed amount, if any, of the Disputed 1.5 Lien Notes Claim or the Disputed 1.75 Lien Term Loan Facility Claim; and (b) whether and in what amount the Disputed 1.5 Lien Notes Claim or the Disputed 1.75 Lien Term Loan Facility Claim is Secured, Unsecured, or subordinated.

The Unsecured Claims Plan Administrator shall provide notice of such Challenge Resolution Stipulation in accordance with Bankruptcy Rule 2002(a) as soon as reasonably practicable following the resolution of the Secured Claim Challenge. If no objection to the Challenge Resolution Stipulation is timely made, the Challenge Resolution Stipulation shall be deemed incorporated into and a part of the Amended Plan as if set forth in full in the Amended Plan and approved pursuant to the Confirmation Order. If an

objection is timely Filed, the Bankruptcy Court shall conduct a hearing prior to entering a Final Order approving the Challenge Resolution Stipulation.

### 2. What Causes of Action are not being preserved?

The Settled Actions, including the Settled Insured Claims and any and all claims and Causes of Action that the Debtors could assert against the Settling Lenders, the Supporting Creditors, or any other Cause of Action against any Released Party are being released pursuant to the Amended Plan and shall not be preserved for prosecution by the Unsecured Claims Distribution Trust.

Pursuant to the D&O Settlement, all potential claims and Causes of Action against the Insureds covered by the D&O Policies that Debtors, the Committee, and any other party in interest have identified, asserted, could assert, or could seek standing to assert against the Insureds in any manner, have been fully and finally settled and resolved in exchange for $13.35 million in Cash to be contributed by the D&O Carriers to the Debtors on or before the Effective Date.

### T. Will the Debtors or Reorganized Debtors pay the fees or expenses of any parties to these Chapter 11 Cases?

Yes, pursuant to Article IV.S of the Amended Plan, the Debtors or Reorganized Debtors shall pay fees or expenses to certain parties in connection with their support of the Amended Plan. The Debtors believe that the payment of such fees and expenses is proper and reasonable under the circumstances.

### U. What might affect the recovery to Holders of Allowed GUC Claims?

Holders of Allowed GUC Claims will receive their Pro Rata share of the Unsecured Claims Consideration attributable to the Debtor against which such Holder Holds an Allowed Claim. The Unsecured Claims Consideration includes (1) New Common Stock in the amount of (a) 11.6 percent of New Common Stock minus (b) New Common Stock with a value equal to the amount of the Unsecured Claims Distribution Trust Loan as of the Effective Date, which will be (x) if the aggregate value of Disputed 1.5 Lien Claims and Disputed 1.75 Lien Claims as of the Effective Date is greater than $40 million, $3 million in Cash or (y) if the aggregate value of Disputed 1.5 Lien Claims and Disputed 1.75 Lien Claims as of the Effective Date is less than or equal to $40 million, $2 million in Cash; (2) the Unsecured Claims Distribution Trust Beneficial Interests, if applicable; (3) the Challenge Action Recovery (if any); and (4) the Settlement Contribution Hold-Back remaining after repayment of the Unsecured Claims Distribution Trust Loan (if any).

However, if an Allowed GUC Claim is Allowed in amount that is greater than $0 but less than or equal to $500,000, or the Holder of a GUC Claim irrevocably elects on its Ballot to have such Claim irrevocably reduced to $500,000 and treated as a Convenience Claim for the purposes of the Amended Plan, then such Holder shall receive its Pro Rata share, together with all Holders of Allowed Convenience Claims, of Cash in an amount equal to $1.1 million; *provided that*, no Holder of an Allowed Convenience Claim shall receive a distribution in excess of 20 percent of such Allowed Convenience Claim.

### 1. How will the final amount of Allowed GUC Claims affect the recovery of Holders of Allowed GUC Claims under the Amended Plan?

The Debtors estimate the amount of Allowed GUC Claims against all Debtors is approximately $117.3 million. The Debtors' estimate for the Allowed GUC Claims is materially lower than the value of all GUC Claims asserted against the Debtors. The estimate of Allowed GUC Claims is the result of the Debtors' and their advisors' careful analysis of available information, including the Debtors' books and records and an analysis of the validity of the GUC Claims asserted against the Debtors. As part of their

analysis, the Debtors and their advisors determined that certain of the GUC Claims that have been asserted should not be Allowed GUC Claims for various reasons, including that such GUC Claims have been satisfied during these Chapter 11 Cases, are duplicative, or are not properly asserted against the applicable Debtor, among others.

The Debtors' estimate of Allowed GUC Claims, and the corresponding ranges of potential recoveries resulting therefrom, depends on a number of contingencies, including, among others: (a) the determination to be made by the Debtors regarding the assumption and rejection of Executory Contracts and Unexpired Leases, including gas gathering or other midstream transportation agreements that may have minimum volume commitments; (b) the amount of Claims from the rejection of such Executory Contracts and Unexpired Leases; (c) the amount of Claims Filed by Governmental Units; (d) Claims arising from litigation against the Debtors; and (e) the Claims reconciliation process.

Although the estimate of Allowed GUC Claims is the result of the Debtors' and their advisors' careful evaluation of available information, the ultimate amount of Allowed GUC Claims may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

> **2.     How will the Debtor against which an Allowed GUC Claim is Allowed affect the recovery of Holders of Allowed GUC Claims under the Amended Plan?**

Holders of Allowed GUC Claims will receive their Pro Rata share of the Unsecured Claims Recovery attributable to the Debtor against which such Holder has an Allowed Claim.  As a result, the distributions to such Holders will depend on the allocation of value between the Debtors.  **Exhibit G**, attached hereto, provides the allocation of value as between the Debtors.  Holders of GUC Claims are encouraged to review **Exhibit G** in detail as recoveries may be materially different among Holders of Allowed GUC Claims depending on which Debtor is liable for an Allowed GUC Claim.

In particular, certain creditors have asserted Claims against both Debtor Raider Marketing LP ("Raider") and against other Debtors.  The Debtors believe that certain of these Claims are properly asserted only at Debtor Raider.  The Debtors' analysis of which Claims properly are asserted only at Raider is based on, among other things, the liabilities that were transferred to Raider by operation of law pursuant to the plan of merger filed with the secretary of state of Texas that effectuated the Divisional Merger, described more fully herein.

> **3.     How will Claims asserted with respect to rejection damages affect the recovery of Holders of Allowed GUC Claims under the Amended Plan?**

The Debtors currently estimate that Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases total approximately $83.5 million in the aggregate.  This estimate takes into account large claims that are subject to potential settlement.  If the settlements are not approved by the Bankruptcy Court, the actual amount of Claims arising from rejection of Executory Contracts and Unexpired Leases could be materially greater than the Debtors' estimates.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as GUC Claims against the applicable Debtor and shall be treated in accordance with the Amended Plan, unless a different security or priority is otherwise asserted in such Proof of Claim and Allowed in accordance with Article VII of the Amended Plan.  Accordingly, to the extent that the actual amount of GUC Claims on account of rejection damages Claims changes, the value of recoveries to Holders of Claims in Class 7 could change as well, and such changes could be material.

4. **How will the resolution of certain contingent, unliquidated, and disputed litigation Claims affect the recovery of Holders of Allowed GUC Claims under the Amended Plan?**

The Debtors' estimates of Allowed GUC Claims are based on reasonable estimates of certain contingent, unliquidated, and disputed litigation Claims known to the Debtors as of the date hereof, which generally are considered Unsecured Claims. The actual amount of Allowed GUC Claims could range based on certain contingent, unliquidated, and disputed litigation Claims, some of which were known to the Debtors as of the date hereof, which generally are considered Unsecured Claims.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. Certain of these litigation matters are set forth more fully in section VII of this Amended Disclosure Statement. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of Claims in Class 7 could change as well, and such changes could be material

5. **How will Governmental Claims affect the recovery of Holders of Allowed GUC Claims under the Amended Plan?**

The Debtors currently estimate that Unsecured Claims held by Governmental Units total approximately $578,000. Although the estimated value of Unsecured Claims Filed by Governmental Units is the result of the Debtors' and their advisors' careful analysis of available information, such Claims actually asserted against the Debtors may be higher than the Debtors' estimate provided herein, which difference could be material. Depending on the actual amount of Unsecured Claims from Governmental Units, the value of recoveries to Holders of Claims in Class 7 could change as well, and such changes could be material.

V. **If the Amended Plan provides that I get a distribution, do I get it upon Confirmation, when the Amended Plan goes effective, or on the Distribution Dates? What is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Amended Plan refers to approval of the Amended Plan by the Bankruptcy Court. Confirmation of the Amended Plan does not guarantee that you will receive the distribution indicated under the Amended Plan. After Confirmation of the Amended Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Amended Plan can go effective. *See* Article X of this Amended Disclosure Statement, entitled "Confirmation of the Amended Plan" for a discussion of the conditions precedent to consummation of the Amended Plan.

The "Effective Date" means, with respect to the Plan and any such applicable Debtor(s), the date that is the first Business Day upon which: (a) all conditions precedent specified in Article IX.A and Article IX.B of the Plan have been satisfied or waived (in accordance with Article IX.C); and (b) the Plan is declared effective with respect to such applicable Debtor(s). At the hearing considering adequacy of the Disclosure Statement, the Bankruptcy Court announced that at the Confirmation Hearing, it intended to make a condition in the Confirmation Order that the Effective Date be no later than one year from the date of Confirmation of the Plan.

Unless otherwise provided in the Amended Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Initial Distribution Date, on the date that such Claim or Interest becomes an Allowed Claim, including, for the avoidance of doubt, the date on which a Claims Resolution Stipulation

is Filed and becomes a Final Order, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Amended Plan provides for such Allowed Claim in accordance with its priority and Allowed amount. No interest shall accrue on any Claims from and after the Effective Date.  No Holder of a Claim shall recover more than 100 percent of the Allowed amount of such Claim.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Amended Plan.

To the extent any distributions made in accordance with the Amended Plan are subject to disgorgement to the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, shall effectuate the distribution of such disgorged distribution to the Holders of Allowed Claims entitled to such distributions in accordance with the Amended Plan as soon as reasonably practice.  For the avoidance of doubt, to the extent disgorgement of a distribution made to a Holder of a Claim pursuant to the Amended Plan is required, such Holder shall be required to disgorge any distribution but shall not be required to remit interest on such distribution.

**W.      What happens to contingent, unliquidated, and disputed Claims under the Amended Plan?**

As set forth in more detail in Article VII of the Amended Plan, subject to the rights and duties of the applicable Reorganized Debtor(s) or the Unsecured Claims Distribution Trust, as applicable, after the Effective Date, (a)(i) the Unsecured Claims Distribution Trust shall have the sole authority to File, withdraw, or litigate to judgment, objections to Claims in Classes 3, 4, 5, and 6; (ii) the Unsecured Claims Distribution Trust or applicable Reorganized Debtor, as designated in the Claims Objection Schedule, shall have the sole authority to File, withdraw, or litigate to judgment, objections to Claims in Class 7; and (iii) the applicable Reorganized Debtor(s) shall have the sole authority to File, withdraw, or litigate to judgment, objections to all other Claims; (b) the applicable Reorganized Debtor(s) or the Unsecured Claims Distribution Trust, as applicable, shall have the authority to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c)  the applicable Reorganized Debtor(s) or the Unsecured Claims Distribution Trust, as applicable, shall have the authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, the Unsecured Claims Litigation Trustee and the Unsecured Claims Plan Administrator shall have the sole authority to prosecute, settle, or otherwise resolve the Secured Claim Challenges (other than, for the avoidance of doubt, against any Settling Lender).

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. § 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision to the contrary in the Amended Plan, a Claim that has been Disallowed or expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the

Amended Plan (including for purposes of distributions), and the relevant Reorganized Debtors, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

On or after the Effective Date, the Debtors, the Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, shall establish one or more reserves for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the applicable Debtors, Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim. To the extent that a Disputed Claim may be entitled to receive New Common Stock pursuant to the Plan, such New Common Stock will remain authorized but unissued pending resolution of such Disputed Claim.

### X.  Will there be releases and exculpation granted to parties in interest as part of the Amended Plan?

Yes, to effectuate the settlements reached with these parties, the Amended Plan includes releases by the Debtors (the "Debtors' Releases") and the Third Party Release, an exculpation provision, and an injunction provision. The Amended Plan provides for releases for (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided that* (x) any Holder of a Claim or Interest that votes against or objects to the Amended Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

**Importantly, each Holder of a Claim or Interest who either (a) votes in favor of the Amended Plan or (b) is not entitled to vote, abstains from voting, or votes against the Amended Plan and does not opt out of the Third Party Release on a timely submitted Ballot, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and Causes of Action against the Released Parties.**

In addition, the Amended Plan provides for the exculpation of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Settling Lenders; (d) the Committee; (e) the individual members of the Committee; and (f) with respect to each of the foregoing (a) through (e), such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former members, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors,

managers, predecessors, successors, assigns, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, restructuring advisors, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

The Debtors' Releases, third party releases, and exculpation provisions included in the Amended Plan comply with the Bankruptcy Code and prevailing law because, among other reasons, they are the product of extensive good faith, arm's-length negotiations and were material inducements for the contributions provided by the Released Parties.  These provisions were an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors, each of the Settling Lenders, and the D&O Carriers in reaching the Secured Lender Settlement and the D&O Settlement.  The Settling Lenders and D&O Carriers would not have agreed to support the Amended Plan or contribute the D&O Proceeds or the Settlement Contribution, respectively, without the release and exculpation provisions provided therein.  In addition, the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring that will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

> 1.      **Releases by the Debtors**

The Debtors' Releases are fair and equitable, in the best interest of the Debtors' Estates, and well within the Debtors' business judgment.

*First*, as set forth in Article VII.H of this Amended Disclosure Statement, the Debtors and the Committee undertook a thorough investigation of potential Estate claims and Causes of Action. The Debtors believe the settlements embodied in the Amended Plan and the corresponding releases are fair based on the value to the Debtors' Estates and their creditors in light of the complex and time consuming litigation that would accompany prosecution thereof.  Specifically, pursuant to the D&O Settlement, the D&O Carriers will contribute $13.35 million in Cash to the Debtors' Estates.  Additionally, pursuant to the Secured Lender Settlement, the Settling Lenders shall (i) contribute the Settlement Contribution to fund recoveries to Holders of Allowed Unsecured Claims in Classes 5, 6, and 7 pursuant to the Amended Plan and to fund the Settlement Contribution Hold-Back; (ii) effectuate the Intercreditor Assignment; (iii) waive any right to recover on account of any Claim under section 507(b) of the Bankruptcy Code; and (iv) waive any Makewhole Claim on account of the 1.5 Lien Notes Claims or 1.75 Lien Term Loan Facility Claim Held by such Settling Lender.  The Settling Lenders have also agreed to equitize their funded debt Claims and have agreed to support confirmation of the Amended Plan, thus paving the way to the Debtors' exit from these Chapter 11.  The Debtors believe the D&O Settlement and the Secured Lender Settlement provide significant value to the Debtors' Estates and justify the corresponding release of claims and Causes of Actions that could have been pursued absent settlement thereof.  Moreover, the Debtors' Releases appropriately offer protection to parties that meaningfully participated in the Debtors' restructuring process, including the Supporting Creditors, the Unsecured Notes Trustee, and the Committee and the members thereof.  Specifically, these parties have agreed to support the Amended Plan and provide mutual releases to the Released Parties, paving the way to the Debtors' exit from these Chapter 11 Cases.

*Second*, to the extent the Released Parties, such as the "Insureds" under the Debtors' D&O Liability Insurance Policies, have indemnification rights against the Debtors under applicable agreements for, among other things, all losses, damages, claims, liabilities, or expenses, including defense costs, for claims subject to the release provisions of the Amended Plan, these claims could directly affect the Debtors' Estates.  Moreover, there is no question that directors, managers, and officers provided (and continue to provide) valuable consideration to the Debtors, as they commit substantial time and effort (in addition to their prepetition responsibilities) to the Debtors' Estates and restructuring efforts throughout this chapter 11 process.

*Third*, the Debtors' Releases were vigorously negotiated at arms-length by sophisticated entities that were represented by able counsel and financial advisors and were a necessary and integral element of consideration that these parties required before agreeing to provide the consideration contemplated by the settlements.

*Fourth*, because the Debtors' Releases are consensual, a carve-out for claims and Causes of Action related to actual fraud, gross negligence, or willful misconduct is unnecessary. The Released Parties that benefit from the Debtors' Releases are providing consideration as set forth above, and the Debtors are consenting to the releases, which were a necessary component of the overall bargain that has put the Debtors on the path to a value maximizing restructuring. Such releases are permissible under applicable law and, as a compromise under the Bankruptcy Code, do not require carveouts for actual fraud, gross negligence, or willful misconduct.

Accordingly, the Debtors submit that the Debtors' Releases are consistent with applicable law, represents a valid settlement and release of claims the Debtors may have against the Released Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, are a valid exercise of the Debtors' business judgment, and are in the best interests of their Estates.

## 2. Third Party Release

Similarly, the Third Party Release is integral to the Amended Plan and is a condition of the settlements embodied therein. The provisions of the Amended Plan were heavily negotiated by sophisticated parties, represented by competent counsel. The Third Party Release (together with the Debtors' Releases) are key components of the Debtors' restructuring and a key inducement to bring stakeholder groups to the bargaining table. Put simply, the Released Parties were unwilling to provide value to the Debtors' Estates without assurances that they would not be subject to post-emergence litigation or other disputes related to the restructuring. The Third Party Release therefore not only benefits the non-Debtor Released Parties, but also the Debtors' post-emergence enterprise as a whole.

Importantly, the Third Party Release is consensual because it provides Holders of Claims and Interests (other than those Holders who vote to accept the Amended Plan) with the option to opt out of the Third Party Release by checking a box on the Ballot or opt out form provided by the Debtors. Each of the Amended Disclosure Statement, Ballots, notices of non-voting status, and notice of Confirmation Hearing state in bold-faced, conspicuous text that Holders of Claims and Interests that do not opt out of the Third Party Release will be bound thereby. Accordingly, upon checking the opt-out box, such Holders of Claims or Interests do not grant the Third Party Release and no longer have a basis to argue their rights are affected thereby.

The Third Party Release complies with applicable law: *First*, the Third Party Release is sufficiently specific to put the Releasing Parties on notice of the released claims. *Second*, the Third Party Release is integral to the Amended Plan and is a condition of the D&O Settlement and the Secured Lender Settlement. The provisions of the Amended Plan were heavily negotiated by sophisticated parties, represented by competent counsel, for which the Third Party Release was a material inducement to enter into the D&O Settlement and the Secured Lender Settlement. *Third*, as described more fully above, each of the Released Parties under the Third Party Release provided consideration (and are also Releasing Parties themselves, thereby making the release mutual).

Ultimately, the restructuring contemplated by the Amended Plan operates to maximize the Debtors' fresh start by minimizing the possibility of distracting post-emergence litigation or costs associated with the continuation of disputes related to the Debtors' restructuring, and would not be possible absent the support of the Released Parties.

### 3. Exculpation

In addition to the Debtor release and Third Party Release, the exculpation clause in the Amended Plan provides that only the Debtors and Reorganized Debtors, the Settling Lenders, the Committee, and the individual members of the Committee, and related parties of the foregoing are exculpated from any Causes of Action arising out of acts or omissions related to these Chapter 11 Cases and certain related transactions as set forth therein—except for acts or omissions that are found to have been the product of actual fraud, willful misconduct, or gross negligence.  As such, the exculpation clause is reasonable, appropriate, and vital to these Chapter 11 Cases because it provides protection to parties who served as fiduciaries to the Estates during the restructuring.

*First*, the Debtors and Reorganized Debtors are entitled to the benefits of the exculpation clause. Upon a "good faith" finding within the meaning of section 1125(e) of the Bankruptcy Code, such parties are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation clause.  Further, granting such relief falls squarely within the "fresh start" principles underlying the Bankruptcy Code.

*Second*, certain other Exculpated Parties owe fiduciary duties in favor of the Debtors' Estates, permitting them to receive the benefits of the exculpation clause. The Committee owes fiduciary duties to the general unsecured creditors, and the directors, officers, and advisors that have acted on the Debtors' behalf in these Chapter 11 Cases owe the Debtors similar duties.  The directors, officers, and professionals that have acted on behalf of the Debtors' in connection with the Chapter 11 Cases owe the Debtors fiduciary duties similar to those the debtor in possession owes to the Estates.  Further, the Debtors and their fiduciaries could not possibly have developed the Amended Plan without the support and contributions of the Exculpated Parties.  Though the Settling Lenders do not directly owe fiduciary duties to the Debtors, they were integral participants in the Amended Plan, are *de facto* proponents of the Amended Plan, and are therefore properly entitled to exculpation.

Accordingly, the failure to approve the exculpation clause would undermine the purpose of the Amended Plan and the Secured Lender Settlement set forth in the Amended Plan and this Amended Disclosure Statement by allowing parties to pursue claims post-bankruptcy that are otherwise fully and finally resolved by the Amended Plan when the Exculpated Parties participated in these chapter 11 cases in reliance upon the protections afforded to those constituents by the exculpation clause.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Amended Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors are prepared to present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Amended Plan are copied in pertinent part below.

### 4. Release of Liens.

**Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, except with regard to Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.2(b) of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns (including Reorganized EXCO, if applicable), in each case, without any further approval or order of the Bankruptcy Court**

and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable.

5.      Releases by the Debtors.

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates, from any and all claims and Causes of Action whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof, if applicable), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the DIP Order (and any payments or transfers in connection therewith), the New Organizational Documents, any preference or avoidance claims pursuant to sections 544, 547, 548, or 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the releases described herein are: (1) in exchange for the good and valuable consideration provided by or on behalf of the Released Parties; (2) a good faith settlement and compromise of the Settled Actions released herein; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, the Debtors' Estates, the Unsecured Claims Distribution Trust, the Unsecured Claims Plan Administrator, or the Unsecured Claims Litigation Trustee asserting any claim or Cause of Action released pursuant to the releases described herein or asserting (directly or indirectly) or trading any claim or Cause of Action against any Released Party at any time.

6.          **Releases by Holders of Claims and Interests.**

As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

7.          **Exculpation.**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Mediation, the formulation, preparation, dissemination, negotiation, Filing, or termination of any prepetition transactions, the Disclosure Statement, the Plan, the Secured Lender Settlement, the D&O Settlement, the D&O Liability Insurance Policies, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility,  the Filing of the Chapter 11 Cases, the

32

negotiation, terms, or execution of the settlement agreements effectuated pursuant to Federal Rule of Bankruptcy Procedure 9019, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to or in connection with the Plan and the Restructuring Transactions.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.      Injunction.

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have Held, Hold, or may Hold Claims or Interests that have been released pursuant to Article VIII.C or Article VIII.D of the Plan, shall be discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Unsecured Claims Distribution Trust, the Unsecured Claims Plan Administrator, the Unsecured Claims Litigation Trustee, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

9.      Release of D&O Carriers and D&O Liability Insurance Policies.

Upon the Debtors' receipt of the D&O Proceeds in cleared funds, the parties to the D&O Settlement, on behalf of themselves, their predecessors, successors, affiliates and assigns, and all persons acting by, through or under them, and each of them, fully release and forever discharge the D&O Carriers, together with their predecessors, successors, affiliates, and assigns, and all persons acting by, through or under them, from all known and unknown claims, liabilities, obligations, promises, agreements, (including the D&O Liability Insurance Policies issued by the D&O Carriers), controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees and expenses (including attorneys' fees and costs), of any nature whatsoever, whether or not apparent or yet to be discovered, related to the Debtors, provided that nothing in this section releases (a) any party to the D&O Settlement from its obligations under the D&O Settlement; (b) any party to the D&O Settlement from its liability for breach of any term, warranty, or representation in the

D&O Settlement; or (c) the D&O Carriers from payment of Defense Costs (as defined in and in accordance with the terms of the D&O Liability Insurance Policies issued by the D&O Carriers) incurred in connection with the D&O Settlement.  The D&O Carriers' payment of the D&O Proceeds and any Defense Costs (as defined in the D&O Liability Insurance Policies issued by the D&O Carriers) is deemed to have exhausted the limits of the D&O Liability Insurance Policies issued by the D&O Carriers.  Moreover, upon the Debtors' receipt of the D&O Proceeds in cleared funds, the D&O Liability Insurance Policies issued by the D&O Carriers are immediately discharged and cancelled, and the D&O Carriers are immediately released from any and all obligations under the D&O Liability Insurance Policies issued by the D&O Carriers.  Notwithstanding any language in the D&O Settlement or Plan, as of the Effective Date, no party may pursue or file any action that implicates the D&O Liability Insurance Policies issued by the D&O Carriers.  For the avoidance of doubt, nothing in this paragraph shall affect the obligations of Beazley Insurance Company, Inc., Allied World National Assurance Company, and XL Specialty Insurance Company arising under Policy No. V15RVK170901, Policy No. 0310-0059, and Policy No. ELU148628-17 or the obligations of the Insurers not party to the D&O Settlement arising under the D&O Liability Insurance Policies issued by such Insurers.  Coverage for all the Insureds by Beazley Insurance Company, Inc., Allied World National Assurance Company, and XL Specialty Insurance Company arising under Policy No. V15RVK170901, Policy No. 0310-0059, and Policy No. ELU148628-17 is expressly preserved.

          10.       **Bar Order and Channeling Injunction.**

Except as otherwise specifically provided in the Plan, the Enjoined Parties shall be permanently barred, restrained, and enjoined, with regard to the Claims set forth in this Article VIII.H (1)-(6) (collectively, the "Enjoined Claims") from ever:

1. commencing, asserting, continuing, filing, conducting, or bringing, directly, indirectly, or derivatively, any Claim, demand, suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum), against (a) any of the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors and their predecessors, affiliates, successors, principals, directors, officers, and related entities, and (b) the D&O Carriers with regard to any and all claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' or any of the Released Parties' conduct, individually or collectively, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

2. asserting, continuing, filing, conducting, or bringing, directly, indirectly, or derivatively, any Claim, demand, suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum), against any of the Released Parties, or their respective property, including the proceeds of such property that would result in the avoidance of allegedly fraudulent (actual or constructive) or preferential transfers from the Debtors to any of the Released Parties, regardless of whether such Released Party is the initial or subsequent transferee, and/or recovery of such allegedly fraudulent (actual or constructive) or preferential transfers from such Released Party;

34

3. enforcing, levying, employing legal process (including proceedings supplementary), whether prejudgment or post-judgment, attaching, garnishing, sequestering, collecting, or otherwise recovering by any means or in any manner, any Claims against (a) the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors, and their predecessors, affiliates, successors, principals, directors, officers, and related entities; and (b) the D&O Carriers with regard to any and all Claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' conduct, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

4. pursuing, aiding, or abetting any action brought by any person or entity seeking recovery, contribution and/or indemnity from (a) any of the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors and their predecessors, affiliates, successors, principals, directors, officers, and related entities, and (b) the D&O Carriers with regard to any and all Claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' or the Released Parties' conduct, individually or collectively, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

5. enforcing any terms set forth in any settlement agreement by and among any of the Released Parties and any of the Enjoined Parties that would resolve, compromise, or settle Claims that would otherwise be enjoined by the bar order or the channeling injunction set forth in this section; and

6. pursuing any of the Enjoined Claims recited herein as they relate to any Claims against retained professionals including accountants and legal counsel as well as their agents and assigns of any of the Released Parties.

The injunction described in this section and incorporated into the Confirmation Order shall be referred to as the "Bar Order and Channeling Injunction."

The automatic stay shall be lifted, to the extent it may be applicable, to permit the D&O Carriers to contribute the D&O Proceeds.

The Bankruptcy Court shall expressly retain jurisdiction in enforcing, implementing and interpreting the scope of the Bar Order and Channeling Injunction.

**Y.      What impact does the Claims Bar Date have on my Claim?**

On February 28, 2018, the Debtors Filed their schedules of assets and liabilities and statement of financial affairs with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code (collectively, as amended from time to time, the "Schedules"). The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be Filed in a chapter 11 case.

The Bankruptcy Court established April 16, 2018, at 5:00 p.m. (prevailing Central Time), as the claims bar date for all entities other than Governmental Units (the "Claims Bar Date") in the Chapter 11 Cases, and September 4, 2018 as the claims bar date for Governmental Units (the "Governmental Bar Date").

In accordance with Bankruptcy Rule 3003(c)(2), if any person or Entity that is required, but fails, to File a Proof of Claim on or before the Claims Bar Date, except in the case of certain exceptions explicitly set forth in the order setting the Claims Bar Date and the Governmental Bar Date [Docket No. 448] (the "Bar Date Order") or by further order of the Bankruptcy Court, such person or Entity will be: (1) barred from asserting such Claims against the Debtors in these Chapter 11 Cases; (2) precluded from voting on any plans of reorganization Filed in these Chapter 11 Cases; and (3) precluded from receiving distributions from the Debtors on account of such Claims in these Chapter 11 Cases. Notwithstanding the foregoing, a Holder of a Claim shall be able to assert, vote upon, and receive distributions under the Amended Plan, or any other plan of reorganization or liquidation in the Chapter 11 Cases, to the extent, and in such amount, as any undisputed, non-contingent, and liquidated Claims identified in the Schedules on behalf of such Claim Holder.

As described in this Amended Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which Proofs of Claim were Filed on or before the Claims Bar Date.

**Z.      What is the effect of the Amended Plan on the Debtors' ongoing business?**

The Debtors will reorganize under chapter 11 of the Bankruptcy Code. Following Confirmation, the Amended Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to Consummation have been satisfied or waived. *See* Article IX of the Amended Plan. On or after the Effective Date and unless otherwise provided in the Amended Plan, the Reorganized Debtors may operate their business and, except as otherwise provided by the Amended Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Amended Plan will be deemed authorized and approved.

**AA.     Who do I contact if I have additional questions with respect to this Amended Disclosure Statement or the Amended Plan?**

If you have any questions regarding this Amended Disclosure Statement or the Amended Plan, please contact:

> *By regular mail, hand delivery, or overnight mail:*
>
> EXCO Resources, Inc.
> c/o Epiq Corporate Restructuring, LLC
> 10300 SW Allen Blvd.
> Beaverton, Oregon 97005

*By electronic mail:*
tabulation@epiqglobal.com with a reference to
"EXCO" in the subject line

*By telephone:*
1-(800)-683-4332 (toll free)

Copies of the Amended Plan, this Amended Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Notice and Claims Agent at the address above or by downloading the documents from the website of the Debtors' Notice and Claims Agent at http://dm.epiq11.com/ERI (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov (for a fee).

**BB.    What is the deadline to vote on the Amended Plan?**

The deadline by which Holders of Claims may vote to accept or reject the Amended Plan (the "Voting Deadline") is June 5, 2019, at 5:00 p.m. (prevailing Central Time).

**CC.    How do I vote for or against the Amended Plan?**

Detailed instructions regarding how to vote on the Amended Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Amended Plan.  For a vote to be counted, ballots must be completed, signed, returned as directed, and actually ***received*** by June 5, 2019, at 5:00 p.m. (prevailing Central Time), the Voting Deadline.  Holders of Class 6 Unsecured Notes Claims should return their ballot to their nominee, allowing enough time for the nominee to include the vote on a master ballot, and submit the master ballot by the Voting Deadline.  *See* Article IX of this Amended Disclosure Statement, entitled "SOLICITATION AND VOTING PROCEDURES," which begins on page 86.

**DD.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Amended Plan and recognizes that any party in interest may object to Confirmation of the Amended Plan.

**EE.    When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for June 10, 2019, at 9:00 a.m. (prevailing Central Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Amended Plan must be Filed and served on the Debtors, and certain other parties, by no later than June 4, 2019, at 5:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Amended Disclosure Statement and the Amended Disclosure Statement Order attached hereto as **Exhibit C** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Amended Plan and the date and time of the Confirmation Hearing, the national edition of the *Wall Street Journal* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

### FF.     What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### GG.     Do the Debtors recommend voting in favor of the Amended Plan?

Yes.  The Debtors believe the Amended Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Amended Plan allows for a significant deleveraging of the Debtors' balance sheet to enable them to emerge from chapter 11.  The Debtors believe the Amended Plan will result in meaningful recoveries for creditors and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Amended Plan.

### HH.     Who supports the Amended Plan?

The Debtors, the Settling Lenders, and the Committee support the Amended Plan.

## V.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.     The Debtors

The Debtors are an independent oil and natural gas company engaged in exploration, exploitation, acquisition, development, and production activities in onshore U.S. oil and natural gas properties with a focus on shale resource plays.  The Debtors' principal operations are conducted in certain key U.S. oil and natural gas areas including Texas, Louisiana, and the Appalachia region.  Headquartered in Dallas, Texas, the Debtors employed approximately 170 individuals as of the Petition Date.  A corporate organization chart is attached as **Exhibit B**.  Below is a summary of the Debtors' business and operations.

### B.     Assets and Operations

EXCO is a Texas corporation founded and incorporated in September 1955.  Prior to July 2003, EXCO had registered equity securities that were publicly traded on the NASDAQ National Market.  On July 29, 2003, EXCO consummated a going private transaction pursuant to which it became a wholly-owned subsidiary of EXCO Holdings.  In February 2006, the Debtors executed an initial public offering of equity (the "IPO") with an approximately $650 million market capitalization.  Beginning in 2008, the Debtors' business focused on key North American oil and natural gas production areas, primarily from their Louisiana, Texas, and Appalachia shale plays.  The Debtors are highly-efficient operators, making use of enhanced drilling and completion technologies.

As of the Petition Date, the Debtors had a gas-levered asset portfolio with significant, high quality drilling inventory, with significant positions in several of the most active E&P regions, including the East Texas/North Louisiana region, Appalachia region, and South Texas region.

As of December 31, 2017, the Debtors held interests in approximately 1,181 gross producing wells, 869 of which are Debtor-operated, had approximately 715,200 gross total acres under lease, and had estimated proved reserves of approximately 556.9 Bcfe of natural gas based on Securities & Exchange

Commission parameters.  In 2017, the Debtors' E&P activities yielded total production of approximately 255 Mmcfe/d and adjusted EBITDA of approximately $54.4 million.  The Debtors' adjusted EBITDA prior to 2018 was negatively impacted by certain contracts requiring fixed costs for utilized and unutilized capacity and above-market rates associated with certain midstream agreements, as well as legal and professional fees related to the restructuring process.



**MAP OF PRIMARY ASSETS**

1.      **East Texas/North Louisiana Region**

East Texas/North Louisiana is the Debtors' largest producing region with operations focused in the Haynesville and Bossier shales.  As of the Petition Date, the Debtors' East Texas/North Louisiana acreage position consisted of approximately 98,100 net acres in the core of the Haynesville and Bossier shale plays in East Texas and North Louisiana, and 795 wells, 529 of which were operated by the Debtors, primarily located in DeSoto and Caddo Parishes in Louisiana and in Harrison, Panola, Shelby, San Augustine, and Nacogdoches Counties in Texas.  The Debtors completed an additional 11 gross operated wells in this region in 2018 and expect to begin the completion of seven additional gross operated wells in North Louisiana during late 2018.

2.      **South Texas Region**

The Debtors maintained approximately 49,700 net acres as of the Petition Date in the Eagle Ford shale in South Texas, covering portions of Zavala, Frio, and Dimmit counties.  The Debtors' current business plan projects drilling and completing an additional 16 gross operated wells in this region through the end of 2018.  The Debtors significantly reduced operating costs in this region since the acquisition of these properties in 2013 by reducing service costs with key vendors, including saltwater disposal costs and chemical treatment programs.  In addition, the Debtors renegotiated sales contracts that improved the net realized price for oil production in the region.

The Debtors also executed a definitive agreement in April 2017 to divest its South Texas assets with a subsidiary of Venado Oil and Gas, LLC ("Venado") for a purchase price of $300 million. The transaction originally was expected to close on June 1, 2017, and would have substantially increased the Debtors' liquidity position. The Debtors intended to use the proceeds of the Venado transaction to fund the drilling and development of its core Haynesville and Bossier shale assets in the East Texas/North Louisiana region and pay down certain of its outstanding indebtedness. As conditions to the Venado agreement, the Debtors were required to (a) operate in the ordinary course of business in all material respects during the period from and after signing until the closing of the agreement, and (b) represent and warrant that all material contracts are in full force in effect at the closing of the transaction. As a result of the termination of a material natural gas sales contract, the Debtors were unable to satisfy the material contract representation in the Venado agreement and the agreement was mutually terminated on August 15, 2017. Further, due to such termination, in January 2018 the Debtors commenced flaring natural gas gathered in the South Texas region pursuant to temporary flare permits.

On May 23-24, 2018, the Debtors went before the applicable regulatory agency at a hearing regarding a requested extension of the permits to continue such flaring (the "Flaring Application") for up to two-years, the maximum time allowable. The Debtors expect that a final ruling by the agency regarding the Flaring Application will be issued by February 2019 or March 2019. Further, the Debtors continue to evaluate alternatives, including construction of a Debtor-owned gathering system and negotiation of a new gathering agreement. Moreover, on October 4, 2018, the Debtors also petitioned for leave to intervene in a contested rate case (the "Rate Case") originally brought by OOGC America LLC ("OOGC"), a significant working interest owner in the Debtors' South Texas assets, complaining about alleged discriminatory rates demanded by a third-party for the gathering of natural gas produced from the Debtors' assets and those of their working interest owners in the South Texas region. The Debtors and OOGC seek to have the applicable regulatory agency declare in the Rate Case that the demanded rates are discriminatory and set a market rate for the gathering of natural gas from the assets of the Debtors and their working interest owners in the South Texas region. A hearing before the regulatory agency in the Rate Case is currently scheduled to occur on June 15-18, 2019.

OOGC believes that the Flaring Application and the Rate Case should constitute retained causes of action. As set forth in the Amended Plan, the Debtors will provide the Schedule of Retained Causes of Action in the Plan Supplement. Furthermore, OOGC believes that it is the Holder of an Other Secured Claim that should be treated in accordance with Article III(B)(1)(B)(iii). The Debtors continue to review and evaluate OOGC's Claim and have not yet taken a position regarding the validity or priority thereof.

### 3. Appalachia Region

The Debtors maintained approximately 180,700 net acres as of the Petition Date in the Appalachia region, with interests primarily in Pennsylvania and West Virginia. On February 27, 2018, the Debtors closed a settlement agreement with a subsidiary of Royal Dutch Shell, plc ("Shell") to resolve arbitration regarding the Debtors' right to participate in an area of mutual interest in the Appalachia region. The settlement increased the Debtors' acreage in the Appalachia region by approximately 177,700 net acres, and the production from the additional interests in producing wells acquired was 26 net Mmcfe/d during December 2017. The Debtors' operations in the Appalachia region have primarily included testing and selectively developing the Marcellus shale with horizontal drilling. The Debtors are currently assessing the potential of the Utica shale formation. The Debtors expect the development of the Marcellus and Utica shales in the Appalachia region could provide the Debtors with significant upside potential. The Debtors' 2018 plan included the pipeline connection of one Marcellus well. The Debtors' Pennsylvania and West Virginia shale position is primarily held by production through third-party shallow well operators. The Debtors acquired the West Virginia and Pennsylvania interests in order to apply their core competencies in the development of unconventional resource plays, which have been honed over years of operating in the Haynesville shale.

### 4.        Transportation Agreements and Creation of Raider

To ensure pipeline capacity to transport their natural gas production from the wellhead to points of sale, the Debtors entered into certain long-term firm transportation agreements and gas sales contracts beginning in 2009.  Initially, the firm transportation agreements were entered into by EXCO and EOC and, as discussed below, were subsequently moved by operation of law to Raider through an internal corporate merger.  Over time, these agreements put pressure on the Debtors' ability to effectively manage their business due to above-market rates and the Debtors' reduced need for the fixed capacity.  The Debtors engaged in extensive negotiations with their contract counter-parties over the course of several months seeking to renegotiate such contracts; despite such efforts, the Debtors ultimately were unable to amend the contracts to reduce the significant Cash expenditures incurred thereunder.

In summer 2016, the Debtors executed on a strategy around creating a separate legal entity that would manage the Debtors' marketing activities, a corporate structure that is common in the E&P industry and a structure that previously had been discussed by the Debtors' management team.  After analyzing the issue, the Debtors determined that housing their marketing contracts in a distinct entity would allow them to more effectively pursue marketing opportunities as well as allow the Debtors to more effectively manage their transportation agreements and gas sales contracts.

Accordingly, on August 18, 2016, the Debtors' Board approved a divisional merger (the "Divisional Merger") of Debtor EOC under the Texas Business Organizations Code (the "TBOC"). The TBOC permits domestic entities to conduct two general categories of mergers: (i) the combination of one or more entities and (ii) the "division of a domestic organization into two or more new domestic entities … or into a surviving domestic entity and one or more new domestic or foreign entities[.]" TBOC § 1.002(55)(A)(emphasis added).  A unique aspect of the Texas merger statute is that a single entity may be divided into multiple entities through a merger.  When a merger takes effect, "all liabilities and obligations of each organization that is a party to the merger are allocated to one or more of the surviving or new organizations in the manner provided by the plan of merger" and "each surviving or new domestic organization to which a liability or obligation is allocated under the plan of merger is the primary obligor for the liability or obligation." TBOC § 10.008(a)(3)-(4).  A divisional merger is a division of an entity's assets and liabilities among that entity and a newly-formed entity.  Both entities survive the merger.   In connection with the Divisional Merger, Raider and EXCO sent notices of merger to the parties to the GMT Agreements informing such parties of the Divisional Merger.

Pursuant to the Divisional Merger and consistent with the TBOC, EOC underwent a divisional merger with Raider, whereby EOC was the surviving entity and Raider was the newly-formed marketing entity.  Once Raider was formed, it was required under Section 6.14 of the RBL Credit Agreement and under Section 5.14 of each of the Second Lien Term Loan Agreements promptly to become a guarantor of the indebtedness under those agreements, and in any event within 10 business days of the Divisional Merger.  Under Section 4.14 of each of the Notes Indentures, Raider was required, at the same time that it guaranteed the obligations under the RBL Credit Agreement and the Second Lien Term Loan Credit Agreements, to guaranty the Unsecured Notes as well.  The Divisional Merger also transferred to Raider, by operation of law, certain of EOC's agreements for natural gas sales, marketing, gathering, and transportation (the "GMT Agreements") and associated liabilities to Raider.  The GMT Agreements included, but were not limited to, EOC's agreements for gas sales with BG, Chesapeake, Enterprise, and Shell, among others, agreements for gas gathering and transportation with Acadian and Azure, and agreements for gas and crude oil purchases and pooling, among others.

In addition to being a party to the Debtors' midstream agreements, Raider also provides certain marketing services to the Debtors and its working interest partners and royalty owners, including the purchase and resale of natural gas from third-party producers and Debtor-operated wells in Texas and Louisiana.  One of Raider's business purposes is to separately manage the Debtors' marketing activities, a

corporate structure that is common practice in the E&P industry.  Further, as a distinct entity, Raider can independently pursue marketing opportunities separate from the services provided to the Debtors, for which it charges a fee.  A portion of this fee is passed on to working interest owners in the related wells, to the extent allowable under the applicable agreements.  Raider has been, and is expected to continue to be, profitable as a result of, among other things, this fee structure.  The Debtors were advised on the transaction by legal counsel, believe it is appropriate and in accordance with applicable law, and believe the GMT Agreements were properly transferred from EOC to Raider.  Certain Raider Marketing Creditors strongly disagree with the Debtors' characterization, as set forth above, and believe that significant litigation risks exist related to the creation of Raider.

### C.    Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $1.43 billion in total funded debt obligations (excluding Make-Whole Claims).  The following table depicts the Debtors' prepetition capital structure:

| Debt | Approx. Principal and Accrued Interest Outstanding ($mm) |
|---|---|
| RBL Facility | $150.0[10] |
| 1.5 Lien Notes Claims | 317.0 |
| 1.5 Lien Makewhole Claims | 28.4 |
| 1.75 Lien Term Loan Facility Claims | 742.2 |
| 1.75 Lien Makewhole Claims | 165.0 |
| Second Lien Term Loan Facility Claims | 18.5 |
| **Total Secured Debt (without Make-Whole Claims)** | **$1.228 billion** |
| **Total Secured Debt (with Make-Whole Claims)** | **$1.421 billion** |
| 2018 Unsecured Notes Claims | $134.9 |
| 2022 Unsecured Notes Claims | 71.7 |
| **Total Unsecured Notes Claims** | **$206.5 million** |
| **Total Debt (without Makewhole Claims)** | **$1.434 billion** |
| **Total Debt (with Makewhole Claims)** | **$1.627 billion** |

### 1.    RBL Facility

Prior to the Petition Date, the Debtors maintained a reserve-based revolving first lien credit facility (the "RBL Facility") under that certain Amended and Restated Credit Agreement, dated as of July 31, 2013 (as amended, restated or otherwise modified from time to time, the "RBL Credit Agreement"), by and among EXCO, as borrower, the guarantors party thereto, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, together with its permitted successors and assigns, the "RBL Agent"), and the other lender and agent parties thereto.  Borrowings under the RBL Credit Agreement were subject to a borrowing base that was adjusted semi-annually based on the value of the Debtors' oil and gas reserves, subject to

---

[10]    Including outstanding letters of credit.

certain procedures set forth in the RBL Credit Agreement.[11]   The RBL Facility borrowing base was $150 million as of the Petition Date.

The RBL Credit Agreement was amended nine times.  The Debtors amended the RBL Credit Agreement in March 2017 to reduce the borrowing base from $285 million to $150 million and modify certain financial covenants as part of the 2017 Refinancing Transactions (as defined below).  Subsequently, the RBL Credit Agreement was amended in September 2017 to waive certain covenants.  The RBL Credit Agreement was amended in November 2017 to include a waiver of certain events of default potentially caused by the Debtors' nonpayment under a firm transportation agreement.

On September 7, 2017, the Debtors borrowed the remaining approximately $88 million available under the RBL Facility.  As of the Petition Date, there was approximately $126 million in aggregate principal amount of revolving loans and approximately $24 million on account of letters of credit outstanding under the RBL Facility.

Following the Petition Date, the RBL Facility was paid off in full with proceeds of the DIP Facility. Pursuant to the DIP Order, the RBL Facility was indefeasibly refinanced in full, including interest (at the non-default contract rate) and fees through the date of repayment, which was deemed to have occurred upon entry of the DIP Order.

### 2.      1.5 Lien Notes

As of the Petition Date, the Debtors had approximately $317.0 million in principal and accrued interest outstanding of 1.5 Lien Notes, issued under the 1.5 Lien Notes Indenture, by and among EXCO, as issuer, the guarantors party thereto, and Wilmington Trust, N.A., as indenture trustee.

The 1.5 Lien Notes bear interest at a rate of either 8 percent per annum for Cash payments (the "Cash Rate") or a rate of 11 percent per annum for "in kind" payments (the "PIK Rate"), which payments may be issued either in the form of additional debt ("PIK Notes") or shares of common stock in EXCO ("PIK Shares").  Since March 2017, the Debtors have made certain interest payments on the 1.5 Lien Notes in payments of PIK Notes to preserve liquidity.  The 1.5 Lien Notes are secured by liens that are junior in priority to the liens securing the RBL Facility and senior in priority to the liens securing the 1.75 Lien Term Loan Facility and the Second Lien Term Loan Facility on substantially all of the Debtors' assets.

Additionally, the 1.5 Lien Notes Indenture includes an optional redemption provision permitting EXCO to repay the 1.5 Lien Notes before their scheduled date of maturity.  The 1.5 Lien Notes Indenture provides that EXCO may redeem the 1.5 Lien Notes at any time prior to the maturity date at a redemption price equal to 100 percent of the principal amount plus an applicable premium.  "Applicable Premium" is defined as an amount that approximates the present discounted value of all future interest payments.

### 3.      1.75 Lien Term Loan Facility

As of the Petition Date, the Debtors had approximately $742.2 million in principal and accrued interest outstanding under the 1.75 lien term loan facility (the "1.75 Lien Term Loan Facility"), incurred under the 1.75 Lien Credit Agreement, by and among EXCO, as borrower, the Debtor guarantors party thereto, Wilmington Trust, N.A., as administrative agent and collateral trustee, and the lender parties thereto.

---

[11]    The RBL Facility originally provided for an initial maximum borrowing base of $1.6 billion with an initial available borrowing base of $1.3 billion.

The 1.75 Lien Term Loan Facility bears interests at a Cash Rate of 12.5 percent per annum, and a PIK Rate of 15 percent per annum.  Since March 2017, the Debtors have paid interest on the 1.75 Lien Term Loan Facility at the PIK Rate through both PIK Shares and PIK Notes.  The 1.75 Lien Term Loan Facility is secured by liens that are junior in priority to the liens securing the RBL Facility and the 1.5 Lien Notes and senior in priority to the liens securing the Second Lien Term Loan Facility on substantially all of the Debtors' assets.

Additionally, the 1.75 Lien Credit Agreement includes an optional redemption provision, permitting EXCO to repay the 1.75 Lien Term Loan Facility before the scheduled date of maturity.  The 1.75 Lien Credit Agreement provides that EXCO may repay all or any portion of the 1.75 Lien Term Loan Facility at any time prior to the maturity date at a price equal to 100 percent of the principal amount plus the "Make-Whole Amount."  "Make-Whole Amount" is defined as the prepayment price of the applicable term loans plus all interest that would have accrued on the applicable term loans from the date of repayment through the maturity date.  The 1.75 Lien Credit Agreement provides for the payment of certain fees and the "Make-Whole Amount" in the event any mandatory or voluntary repayment or prepayment, including as a result of the termination of the 1.75 Lien Credit Agreement after the occurrence and during the continuation of an event of default, including an event of default resulting from the filing of a voluntary petition for bankruptcy protection, resulting in the 1.75 Lien Makewhole Claims.

### 4.    Second Lien Term Loan Facility

The Debtors closed (a) a 12.5 percent senior secured second lien term loan with certain affiliates of Fairfax Financial Holdings Ltd. in an aggregate principal amount of $300.0 million (the "Fairfax Term Loan") on October 26, 2015 and (b) a 12.5 percent senior secured second lien term loan with certain of the Debtors' then-unsecured noteholders in an aggregate principal amount of $291.3 million on October 26, 2015 and $108.7 million on November 4, 2015 (the "Exchange Second Lien Term Loan," and together with the Fairfax Term Loan, the "Second Lien Term Loan Facility") pursuant to that certain Term Loan Agreement, dated as of October 19, 2015 (as amended, restated, or otherwise modified from time to time, the "Second Lien Credit Agreement"), by and among EXCO, as borrower, the guarantors party thereto, GLAS Trust Company (previously Wilmington Trust, N.A.), as administrative agent and collateral trustee, and the other lenders party thereto.

In 2017, the Debtors exchanged approximately $682.8 million of loans under the 1.75 Lien Term Loan Facility to satisfy the outstanding Fairfax Term Loan in full and the majority of the then-outstanding loans under the Second Lien Term Loan Facility.  As part of the exchange, each exchanging holder of the Second Lien Term Loan Facility was deemed to consent to certain amendments to the Second Lien Credit Agreement that eliminated substantially all of the restrictive covenants and events of default.

As of the Petition Date, the Debtors had approximately $18.5 million in principal and accrued interest outstanding on account of the Second Lien Term Loan Facility.  The Second Lien Term Loan Facility bears interest at a rate of 12.5 percent per annum and matures in October 2020.  The Second Lien Term Loan Facility is secured by liens that are junior in priority to the liens securing the RBL Facility, the 1.5 Lien Notes, and the 1.75 Lien Term Loan Facility on substantially all of the Debtors' assets.

### 5.    Unsecured Notes

As of the Petition Date, the Debtors had approximately $134.9 million in principal and accrued interest outstanding of 2018 Unsecured Notes and approximately $71.7 million in principal and accrued interest outstanding of 2022 Unsecured Notes, by and among EXCO, as issuer, the other guarantors party thereto, and Wilmington Savings Fund Society, FSB, as indenture trustee.  The 2018 Unsecured Notes and the 2022 Unsecured Notes mature in 2018 and 2022, respectively, and require semi-annual coupon payments at 7.5 percent and 8.5 percent per annum, respectively.

6.        **Common Shares and Units**

Until December 2017, the Debtors' common stock traded on the NYSE, under ticker symbol "XCO." The Debtors' common stock currently trades on the OTC Pink Marketplace, under the symbol "XCOOQ." As of the Petition Date, there were approximately 22 million shares of common stock authorized and outstanding and the common stock traded at $0.36 per share, implying a market capitalization of approximately $8 million.

In 2017, the Debtors issued three series of warrants in connection with the 2017 Refinancing Transactions (as defined below), certain of which have since been cancelled.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.        Adverse Market Conditions and Liquidity Constraints

The difficulties faced by the Debtors are consistent with those faced industry-wide. Oil and gas companies and others have been challenged by low natural gas prices for years. Natural gas prices fell from a peak of $12.50 per MMBtu in June 2008 to $1.73 per MMBtu by March 2016, and remained at approximately $3.00 per MMBtu as of the Petition Date. The price of crude oil has similarly plummeted from a high of $157.73 per barrel in June 2008 to a low of $29.64 per barrel in January 2016. Crude oil prices remained at approximately $65.00 per barrel as of the Petition Date.

These market conditions have affected oil and gas companies at every level of the industry around the world. All companies in the oil and gas industry (not just E&P companies) have felt these effects. However, independent oil and gas companies have been especially hard-hit, as their revenues are generated from the sale of unrefined oil and gas. Over 100 oil and gas companies have filed for chapter 11 since the beginning of 2015, including most recently Bonanza Creek Energy, Inc., Memorial Production Partners LP, Vanguard Natural Resources, LLC, Seadrill Limited, and Cobalt International Energy Inc. Numerous other oil and gas companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings. The current volatility in the commodity markets has made it especially difficult for some companies to execute on any viable out-of-court restructuring alternatives.

In addition, the capital intensive nature of the Debtors' business resulted in an overleveraged capital structure that made it difficult to withstand the adverse economic climate. The Debtors also were burdened with fixed commitments related to above-market and underutilized natural gas gathering, transportation, and certain other fixed-cost agreements that further strained their ability to sustain the weight of their capital structure and devote the capital necessary to maintain and grow their business.

### B.        Proactive Approach to Addressing Liquidity Constraints

Beginning in 2015, the Debtors began evaluating and subsequently implementing a liability management strategy that focused on, among other things, managing liquidity constraints, asset portfolio repositioning, operational performance, capital deployment, and risk management. Since that time, the Debtors have implemented a number of initiatives designed to further this strategy.

1.        **Operational Responses**

(a)        **Operational Efficiencies**

The Debtors increased their focus on becoming a low-cost producer and developing projects that have a higher rate of return. To this end, the Debtors executed additional drilling and exploration projects

to identify and develop further reserves in core areas at low costs.  Further, the Debtors added reserves through leasing and undeveloped acreage acquisition opportunities to maximize returns in their core areas. Finally, the Debtors dedicated themselves to the continuous improvement and innovation of existing wells through modifying design in order to maximize their return on capital.  Specifically, the Debtors improved individual well performance through the use of extended laterals, increased use of proppant, and optimal well spacing.

### (b)  Reduced Operating Expenses

The Debtors spent the years leading up to the Chapter 11 Cases exercising fiscal discipline to transform the company.  The Debtors decreased their lease operating expenses by approximately 46 percent since 2014 through reductions in labor costs, modifications to chemical programs, renegotiation of certain contracts, enhanced use of well site automation, optimization of work schedule, and reductions in workover activity.  Despite extensive negotiations aimed at renegotiating rates and volume commitments under certain sales, gathering, and firm transportation agreements, the Debtors were unable to secure meaningful cost savings under such agreements.  The Debtors also decreased headcount by approximately 70 percent since year end 2014, further reducing general and administrative expenses as compared to prior years.  This has contributed to a 54 percent reduction in the Debtors' general and administrative expenses since 2014.

### (c)  Asset Sales

The Debtors divested certain non-core assets in Appalachia throughout 2016, resulting in a reduction of the Debtors' significant plugging and abandonment liabilities, and contributing to an approximately 85 percent reduction in field employee headcount in the Appalachian region.  Additionally, the Debtors entered into an agreement with a subsidiary of Venado in April 2017 for the sale of the Debtors oil and natural gas properties and surface acreage in South Texas for a purchase price of $300 million.  The agreement was terminated on August 15, 2017, as discussed more fully herein, as a result of the Debtors' inability to satisfy a material contract representation.

### 2.  Financial Responses

In conjunction with implementation of their liability management strategy, the Debtors executed a series of refinancing transactions intended to reduce Cash interest payments and overall leverage.

### (a)  2015 Refinancing Transaction

In the fourth quarter of 2015, the Debtors executed a series of transactions (the "2015 Refinancing Transactions") that resulted in the issuance of the Second Lien Term Loan Facility and utilized the proceeds thereof to reduce indebtedness under the RBL Facility, the 2018 Unsecured Notes, and the 2022 Unsecured Notes.  Seaport Global Securities, LLC ("Seaport") provided a fairness opinion to the board of directors of EXCO Resources, Inc. (the "Board") that concluded that the issuance of the Second Lien Term Loan Facility was fair or was not less favorable than could reasonably be obtained in an arm's-length transaction. Additionally in the fourth quarter of 2015, the Debtors repurchased $40.8 million in principal of the 2018 Unsecured Notes through open market purchases with $12.0 million in Cash.  Together, these transactions reduced the Debtors' then-outstanding leverage by approximately $454 million.

### 3.  2016 Tender Offer

In 2016, the Debtors completed a Cash tender offer for their outstanding unsecured notes that resulted in the repurchase of an aggregate of approximately $101.3 million in principal amount of the 2022 Unsecured Notes for an aggregate purchase price of approximately $40.0 million.  In addition, the Debtors repurchased an aggregate of approximately $26.4 million and $51.4 million in principal amount of

the 2018 Unsecured Notes and 2022 Unsecured Notes, respectively, with an aggregate of approximately $13.3 million in Cash through open market repurchases in 2016.

#### 4.    2017 Refinancing Transactions

In 2017, the Debtors entered into a series of transactions (the "2017 Refinancing Transactions") in response to liquidity constraints and to reduce the Cash burden of future interest payments.  In March 2017, the Debtors issued approximately $300 million in 1.5 Lien Notes that included the option to pay interest in PIK Shares or PIK Notes.  The proceeds from this issuance were primarily used to repay outstanding indebtedness under the RBL Credit Agreement.  The Debtors also exchanged $683 million of Second Lien Term Loans for a like amount of loans under the 1.75 Lien Term Loan Facility that also included the option to pay interest in PIK Shares or PIK Notes.  These transactions increased pro forma liquidity by approximately $116 million as of the transaction dates, and had the potential to reduce Cash interest payments up to approximately $109 million per year, or approximately $433 million through maturity, with the option to pay interest PIK Shares or PIK Notes on the 1.5 Lien Notes and 1.75 Lien Term Loan Facility.

The Debtors utilized the ability to make interest payments on the 1.75 Lien Term Loan Facility in PIK Shares and issued 2.7 million PIK Shares in June 2017.  Following the substantial decline in the stock price of EXCO throughout 2017, however, the Debtors were unable to continue to make interest payments on the 1.5 Lien Notes and the 1.75 Lien Term Loan Facility in PIK Shares due to limitations in the relevant credit documents, including certain change of control provisions.  As a result, rather than paying interest in PIK Shares, the Debtors issued an additional $17 million aggregate principal amount of 1.5 Lien Notes and $26.2 million aggregate principal amount of the 1.75 Lien Term Loan Facility, respectively, in September 2017.  In December 2017, the Debtors, in consultation with their advisors, determined not to make the December 20, 2017 interest payment due under the 1.75 Lien Credit Agreement as they were unable to pay in Cash pursuant to the terms of their debt agreements or in PIK Shares or PIK Notes without either effectuating a change of control or breaching their existing debt agreements.

In connection with the 2017 Refinancing Transactions, the Board initially approved entry into a financing agreement with a third party for which definitive documentation was prepared.  This agreement required the consent of certain lenders under the Second Lien Term Loan Facility that could not be obtained.  The Board was presented with an alternative financing proposal that was ultimately approved by an independent committee of the Board.  Additionally, Credit Suisse Securities (USA) LLC led a full marketing process and served as sole placement agent and book runner to the Debtors on the 1.5 Lien Notes and debt advisor to the Debtors on the 2017 Refinancing Transactions.  Further, Seaport provided a fairness opinion to the Board that concluded that the issuance of the 1.5 Lien Notes and the exchange transaction was fair or was not less favorable than could reasonably be obtained in an arm's-length transaction.

As a part of the same transactions, the Debtors amended the RBL Credit Agreement to establish a borrowing base of $150 million, permit the issuance of the 1.5 Lien Notes and loans under the 1.75 Lien Term Loan Facility, and modify certain financial covenants.

#### 5.    Strategic Responses

#### (a)    Retention of Restructuring Advisors

In July 2017, the Debtors retained Kirkland & Ellis LLP ("K&E") as legal advisor to assist the Board and management with a review of all strategic alternatives.  In August 2017, the Debtors retained PJT Partners, LP ("PJT") as investment bankers and Alvarez & Marsal North America, LLC ("A&M") as restructuring advisors, and continued the process of exploring all strategic alternatives, including a comprehensive restructuring through negotiations with various stakeholders.

47

(b)      **Revolver Draw**

On September 7, 2017, following discussions and the recommendation of their advisors, the Debtors borrowed the remaining approximately $88 million availability outstanding under the RBL Facility.  Access to this additional liquidity, which in the Debtors' view was the least expensive source of liquidity available, proved critical to the Debtors' ability to fund operations during negotiations with all major creditor constituencies regarding the terms of a consensual balance sheet restructuring.

(c)      **Governance Matters**

Prior to the Petition Date, the Board had multiple subcommittees, including an audit committee (the "Audit Committee"), a compensation committee, a nominating and corporate governance committee, and a technical committee.  Since June 2004, the Audit Committee was charged with recommending the appointment of independent registered public accountants, reviewing internal accounting procedures and financial statements, and consulting with and reviewing the services provided by the Debtors' independent registered public accountants, including the results and scope of their audit.  In July 2017, prior to engaging in formal restructuring negotiations, the Board adopted a resolution expanding the authority of the Audit Committee to explore strategic alternatives to strengthen the Debtors' balance sheet and maximize the value of the Debtors' assets, and to consider all restructuring-related matters.  Specifically, the Audit Committee's authority was expanded to include:

- exploring such strategic and/or financial alternatives as the Audit Committee may determine to be advisable for EXCO and its stakeholders in light of EXCO's Cash flow, liquidity, and general financial condition, including refinancing or new capital raising transactions, amendments to or restructuring of the existing indebtedness and other obligations of EXCO, or a potential sale of the Company or any of its assets, and the commencement of judicial processes or out-of-court implementation of restructuring and recapitalization transaction for EXCO, including the filing of a voluntary petition under chapter 11 of the Bankruptcy Code (each of the foregoing and any combination of the foregoing, a "Restructuring Transaction");

- monitoring and participating in the negotiations for a Restructuring Transaction;

- considering and accepting any such Restructuring Transaction that is in the best interests of EXCO and its estate on behalf of the Board;

- negotiating and approving the filing of (i) any motion, order, and related documentation regarding the use of cash collateral and incurrence of debtor-in-possession financing, (ii) a chapter 11 plan for EXCO implementing the terms of a Restructuring Transaction, (iii) a disclosure statement to solicit votes for such chapter 11 plan among constituencies permitted to vote for such chapter 11 plan under the Bankruptcy Code, and (iv) all other papers or documents related thereto or to a chapter 11 case (collectively, the "Chapter 11 Filings");

- approving any and all modifications to any Chapter 11 Filing; and

- regularly updating and advising the Board as to any matters considered or undertaken by the Audit Committee or as the Board may otherwise request.

As of June 2017, the Board was comprised of B. James Ford, Anthony R. Horton, Randall E. King, Samuel A. Mitchell, Robert L. Stillwell, Stephen J. Toy, and C. John Wilder.  Subsequently, all of the non-independent directors and one of the NYSE independent directors resigned from the Board.  As of the Petition Date, the Board was comprised of three members, each of whom is an NYSE independent director and also a member of the Audit Committee.

48

(d)      **Discussions with Creditors**

Beginning in the summer of 2017, the Debtors, with the assistance of their advisors, commenced comprehensive restructuring negotiations with all major creditor constituencies, including the RBL Agent, a super-majority of its secured creditors, and certain unsecured noteholders, including an ad hoc committee of such creditors.  Substantive discussions began in mid-October 2017, and continued up to the Petition Date.  These discussions did not result in an agreement among the parties regarding a restructuring transaction.

Simultaneously with these discussions, the Debtors engaged with the ad hoc unsecured noteholders committee and facilitated significant due diligence efforts.  On October 19, 2017, the Debtors held an in-person meeting with advisors to the ad hoc unsecured noteholders committee at which the Debtors' management presented their go-forward business plan.  Following this meeting, the Debtors and the advisors to the ad hoc unsecured noteholders committee had multiple conferences regarding details of the Debtors' business plan and potential outstanding claims against the Debtors.  Importantly, the Debtors worked closely with counsel to the ad hoc unsecured noteholders committee on a mortgage analysis for all of the Debtors' oil and gas assets as well as providing the ad hoc unsecured noteholders committee with information regarding various collateral security documents, financial models, and pending litigation.  The Debtors also engaged with the single large unsecured noteholder, and its advisor, that is not part of the ad hoc unsecured noteholders committee.

In December 2017, the Debtors, in consultation with their advisors, determined that they would not make the December 20, 2017 interest payment due under the 1.75 Lien Credit Agreement or the December 29, 2017 interest payment due under the Second Lien Credit Agreement.  In mid-December 2017, simultaneously with the debtor-in-possession financing marketing process described below, certain of the Debtors' secured creditors approached the Debtors regarding entry into forbearance agreements through mid-January 2018 with respect to certain specified defaults, including the Debtors' non-payment of interest under the 1.75 Lien Term Loan Facility, to provide all parties with additional time to engage in negotiations regarding the terms of a consensual restructuring transaction.  The Debtors subsequently entered into forbearance agreements with a majority of their lenders under each of the RBL Facility, the 1.5 Lien Notes, and the 1.75 Lien Term Loan Facility.

## VII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.      First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  On January 16, and January 18, 2018, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis.  Hearings to approve certain of the First Day Motions on a final basis were held on February 13, 2018 and February 22, 2018.  The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://dm.epiq11.com/ERI.

### 1.      DIP Motion

On January 16, 2018 the Debtors Filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral,*

*(IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 28] (the "DIP Motion"), requesting that the Bankruptcy Court approve the DIP Facility in the amount of $180.4 million on an interim basis and $250 million on a final basis, provided by Fairfax, Bluescape, and JPMorgan (each as defined in the DIP Motion) (collectively, the "DIP Lenders").

The Debtors received objections to the DIP Motion from each of:  (a) Cross Sound Management LLC ("Cross Sound") [Docket No. 38]; (b) OOGC [Docket No. 58]; and (c) Archrock Partners Operating LLC ("Archrock") and Cogent Energy Services ("Cogent") [Docket No. 78].  Cross Sound argued that (a) the DIP Credit Agreement (as defined in the DIP Motion) unfairly provided control over the chapter 11 cases to the DIP Lenders; and (b) the Interim Order (as defined in the DIP Motion) unfairly provided releases and protection against collateral diminution to the DIP Lenders and impermissibly truncated the period in which the Committee could bring a lien challenge.  OOGC's objection was limited to ensuring the preservation of pre-existing liens, due to a perceived ambiguity in the DIP Credit Agreement regarding liens securing obligations older than thirty (30) days.  Archrock and Cogent's joint objection was also limited to seeking clarifying and protective language regarding the preservation of prepetition liens.

On January 18, 2018, the Debtors Filed a response to Cross Sound's objection [Docket No. 72], along with a revised proposed Interim Order to address the concerns raised by Cross Sound, OOGC, Archrock, Cogent, and other informal objectors [Docket No. 90].  Following a hearing, the Bankruptcy Court entered the Interim Order, as revised to reflect certain additional concerns raised at the hearing, approving of the DIP Motion on an interim basis [Docket No. 97].

Following entry of the Interim Order, the Debtors received further responses or objections to the DIP Motion from each of: (a) BHP Billiton Petroleum (KCS Resources), LLC, et. al. (the "BHP Objectors") [Docket No. 213]; (b) The Williams Companies, Inc. ("Williams") [Docket No. 298]; (c) BG US Production Company, LLC ("BG") [Docket No. 299]; (d) Gen IV Investment Opportunities, LLC and VEGA Asset Partners, LLC (together, the "GEN IV Secured Parties") [Docket No. 313].  The BHP Objectors sought to protect their rights in the Debtors' collateral through segregation of certain funds and inclusion of protective language in the Final Order (as defined in the DIP Motion).  Williams similarly sought the addition of protective language to the Final Order to protect its contract rights under certain gathering agreements, and BG sought to preserve any potential liens it may have.  The GEN IV Secured Parties Filed a reservation of rights to ensure equality of treatment between prepetition secured lenders with regard to payment of professionals' fees.

On February 21, 2018, the Debtors Filed a revised proposed Final Order [Docket No. 340], and on February 22, 2018, the Bankruptcy Court entered the DIP Order, approving the DIP Motion on a final basis [Docket No. 348].

On January 18, 2019, the Debtors Filed a stipulation and agreed order [Docket No. 1576] seeking to amended the DIP Credit Agreement to extend the Maturity Date through and including May 22, 2019.  The Bankruptcy Court entered the order approving the extension of the Maturity Date [Docket No. 1577] on the same day.

### (a)        Committee Challenge Period Extension

Pursuant to the DIP Order, if no challenge is timely Filed by the Debtors, the Committee, or any other party in interest within the period of ninety (90) days following the formation of the Committee (the "Challenge Period"), the Prepetition Secured Obligations (as defined in the DIP Order) shall constitute Allowed Claims with valid and binding liens not subject to challenge.  On April 4, 2018, the Debtors, in consultation with the prepetition secured lenders and the Committee, Filed a stipulation and agreed order [Docket No. 592] to extend the Challenge Period through and including June 1, 2018, solely with respect

to the Debtors, the Committee, and the Committee members, to allow the Debtors and the Committee to continue to investigate potential challenges.  On April 24, 2018, the Bankruptcy Court entered an order [Docket No. 669] so extending the Challenge Period.  On May 31, 2018, the Bankruptcy Court entered an order [Docket No. 780] further extending the Challenge Period through and including August 1, 2018, solely with respect to the Debtors, the Committee, and the Committee members.  On July 30, 2018, the Bankruptcy Court entered an order [Docket No. 926] further extending the Challenge Period through and including October 15, 2018, solely with respect to the Debtors, the Committee, and the Committee members.  On October 1, 2018, the Bankruptcy Court entered an order further extending the Challenge Period through and including December 31, 2018, solely with respect to the Debtors, Committee, and the Committee members [Docket No. 1099]. On December 18, 2018, the Debtors, Filed a stipulation and agreed order [Docket No. 1481] to extend the Challenge Period through and including January 31, 2019, solely with respect to the Debtors, the Committee.  On December 21, 2018, the Bankruptcy Court entered an order [Docket No. 1492] so extending the Challenge Period.  On January 22, 2019, the Debtors, Filed a stipulation and agreed order [Docket No. 1592] to extend the Challenge Period through and including February 15, 2019, solely with respect to the Debtors, the Committee.  On January 24, 2019, the Bankruptcy Court entered an order [Docket No. 1595] so extending the Challenge Period.  On February 15, 2019, the Committee Filed the Standing Motion, as described below.

### 2.    Cash Management Motion

On January 16, 2018, the Debtors Filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 8] (the "Cash Management Motion") seeking authorization to (a) continue to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto; and (b) continue to perform intercompany transactions consistent with historical practice.  On January 18, 2018, the Debtors Filed a revised proposed order [Docket No. 85] clarifying that the Debtors would comply with the requirements of section 345 of the Bankruptcy Code following entry of an order approving the Cash Management Motion.  On January 18, 2018, the Bankruptcy Court entered an order (the "Final Cash Management Order") approving the Cash Management Motion on a final basis [Docket No. 101].

On February 1, 2018, the BHP Objectors Filed a motion (the "Reconsideration Motion") [Docket No. 212] requesting that the Bankruptcy Court reconsider the Final Cash Management Order.  On February 16, 2018, the Debtors Filed a revised proposed amended order [Docket No. 309] addressing the BHP Objectors' concerns.  On February 22 2018, the Bankruptcy Court granted the Reconsideration Motion and entered the Cash Management Order approving the Cash Management Motion on a final basis, as revised [Docket No. 348].

### 3.    Other Operational Motions

The Debtors also Filed several other motions on the Petition Date seeking relief to facilitate their operation in the ordinary course, including:

- Royalty Payments Motion.  The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Obligations Owed to Holders of Mineral and Other Interests and Non-Op Working Interests and (B) Joint Interest Billings, and (II) Granting Related Relief* [Docket No. 10] (the "Royalty Payments Motion"), seeking authorization for payment or application of funds attributable to (i) Mineral and Other Interests and Non-Op Working Interests (each as defined in the Royalty Payments Motion) and (ii) JIBs (as defined in the Royalty Payments Motion).  On January 18, 2018, the Debtors Filed a revised proposed order clarifying that the Debtors would not pay any obligations unless due or deemed necessary

to be paid in their business judgment prior to entry of a final order.  On January 18, 2018, the Bankruptcy Court entered an order approving the Royalty Payments Motion on an interim basis [Docket No. 103].  Following receipt of an objection from the BHP Objectors [Docket No. 266] to the Royalty Payments Motion, the Debtors Filed a revised proposed order [Docket No. 281] (the "Revised Final Royalty Payments Order").  On February 13, 2018, the Bankruptcy Court entered the Revised Final Royalty Payments Order, as further revised to reflect certain additional concerns raised by certain parties, including the Committee, approving the Royalty Payments Motion on a final basis [Docket No. 285].

- Lienholders Motion.  The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Operating Expenses, (B) Marketing Expenses, (C) Shipping and Warehousing Claims, and (D) 503(B)(9) Claims, and (II) Granting Related Relief* [Docket No. 11] (the "Lienholders Motion"), seeking authorization to pay in the ordinary course of business all undisputed, liquidated, prepetition amounts owing on account of (i) operating expenses, (ii) marketing expenses, (iii) shipping and warehousing claims, and (iv) 503(b)(9) claims.  On January 18, 2018, the Bankruptcy Court entered an order approving the Lienholders Motion on an interim basis [Docket No. 104].  On February 13, 2018, the Bankruptcy Court entered an order approving the Lienholders Motion on a final basis [Docket No. 286].

- Taxes Motion.  The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief* [Docket No. 12] (the "Taxes Motion"), seeking authorization to pay certain prepetition taxes and fees as they come due on a postposition basis.  On January 18, 2018, the Debtors Filed a revised proposed order clarifying that the Debtors would not pay any obligations unless due or deemed necessary to be paid in their business judgment prior to entry of a final order.  On January 18, 2018, Court entered an order approving the Taxes Motion on a final basis [Docket No. 105].

- Utilities Motion.  The *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* [Docket No. 13] (the "Utilities Motion"), seeking approval of the Debtors' proposed adequate assurance of payment for future utility services, and prohibiting utility companies from altering, refusing, or discontinuing service.  On January 18, 2018, the Bankruptcy Court entered an order approving the Utilities Motion on a final basis [Docket No. 106].

- Equity Trading Procedures Motion.  The *Debtors' Emergency Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Granting Related Relief* [Docket No. 14] (the "Equity Trading Procedures Motion"), seeking approval of certain notification and hearing procedures (the "Equity Trading Procedures") related to certain transfers of, or declarations of worthlessness with respect to, Debtor EXCO Resources, Inc.'s existing common stock and directing that any purchase, sale, other transfer of, or declaration of worthlessness in violation of the Equity Trading Procedures be null and void *ab initio*.  On January 18, 2018, the Bankruptcy Court entered an order approving the Equity Trading Procedures Motion on an interim basis [Docket No. 110].  On February 12, 2018, the Debtors Filed a revised proposed order [Docket No. 278] (the "Revised Final Equity Procedures Order") entitling the DIP Agent to least five days' notice of any proposed waiver of the Equity Trading Procedures.  On February 13, 2018, the Bankruptcy Court entered the Revised Final

Equity Procedures Order, approving the Equity Trading Procedures Motion on a final basis [Docket No. 287].

- Sell Down Procedures Motion. The *Debtors' Emergency Motion for Entry of an Order Establishing a Record Date for Notice and Sell-Down Procedures For Trading in Certain Claims Against the Debtors Estates* [Docket No. 15] (the "Sell Down Procedures Motion"), seeking to establish an effective date (the "Sell Down Record Date") for notification and sell-down procedures for trading in claims against the Debtors' Estates. On January 18, 2018, the Bankruptcy Court entered an order setting January 18, 2018 as the Sell Down Record Date and approving certain notices related thereto [Docket No. 107].

- Insurance Motion. The *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, Or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder, (IV) Enter Into New Premium Financing Agreements in the Ordinary Course of Business and (V) Granting Related Relief* [Docket No. 16] (the "Insurance Motion"), seeking authorization to pay for and continue the Debtors' insurance coverage in the ordinary course of business. On January 18, 2018, the Bankruptcy Court entered an order approving the Insurance Motion on a final basis [Docket No. 108].

- Surety Bond Motion. The *Debtors' Emergency Motion for Entry of an Order (I) Approving Continuation of the Surety Bond Program and (II) Granting Related Relief* [Docket No. 17] (the "Surety Bond Motion"), seeking authorization to maintain, renew, and modify their surety bond program in the ordinary course. On January 18, 2018, the Debtors Filed a revised proposed order [Docket No. 79] (the "Revised Surety Bond Order") clarifying that the Debtors would not provide additional forms of collateral to secure the surety bonds without further court order. On January 18, 2018, Court entered the Revised Surety Bond Order, approving the Surety Bond Motion on a final basis [Docket No. 109]. Certain of the Debtors are party to indemnity agreements with each of U.S. Specialty Insurance Company and Travelers Casualty and Surety Company of America (the "Sureties") in connection with surety bonds to secure the payment or performance of certain obligations (the "Surety Bond Program"). The Debtors continue to perform and make payments related to the Surety Bond Program under the Revised Surety Bond Order, intend to continue the Surety Bond Program, and will work with the Sureties to facilitate transfer of the Surety Bond Program from the Debtors to the Reorganized Debtors.

### B.      Other Procedural and Administrative Motions

The Debtors also Filed several other motions to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Joint Administration Motion. The *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 2] (the "Joint Administration Motion"), Filed on January 15, 2018, seeking the procedural consolidation and joint administration of the Debtors' chapter 11 cases under the case of EXCO Resources, Inc. On January 16, 2018, the Bankruptcy Court entered an order approving the Joint Administration Motion on a final basis [Docket No. 18].

- Creditor Matrix Motion. The *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Consolidated Creditors Lists, (II) Authorizing Redaction of Certain Personal*

53

*Identification Information, (III) Waiving the Requirement to File Equity Lists and Modifying Equity Holder Notice Requirements, and (IV) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information* [Docket No. 5] (the "Creditor Matrix Motion"), Filed on January 16, 2018, seeking approval of certain procedures for providing information to creditors.  On January 18, 2018, the Bankruptcy Court entered an order approving the Creditor Matrix Motion on a final basis [Docket No. 98].

- SOFA Extension Motion.  The *Debtors' Emergency Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* [Docket No. 6] (the "SOFA Extension Motion"), Filed on January 16, 2018, seeking an extension of the deadlines by which the Debtors must File certain schedules of assets and liabilities to February 28, 2018.  On January 18, 2018, the Bankruptcy Court entered an order approving the SOFA Extension Motion on a final basis [Docket No. 99] (the "SOFA Extension Order").

- Claims Agent Application.  The *Debtors' Emergency Application for Order Appointing Epiq Bankruptcy Solutions, LLC as Claims, Noticing, Solicitation, and Administrative Agent* [Docket No. 7] (the "Claims Agent Application"), Filed on January 16, 2018, seeking authorization to employ Epiq Bankruptcy Solutions, LLC ("Epiq") to act as the Claims, Noticing, Solicitation, and Administrative Agent for the Debtors.  On January 18, 2018, the Debtors Filed a revised proposed order, clarifying that Epiq would not be entitled to indemnification by the Debtors without further Court order or for acts constituting bad faith, gross negligence, fraud, breach of fiduciary duty, self-dealing, or willful misconduct.  On January 18, 2018, the Bankruptcy Court entered an order approving the Claims Agent Application on a final basis [Docket No. 100].

- Ordinary Course Professionals Motion.  The *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 188] (the "OCP Motion"), Filed on January 26, 2018, seeking to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their business.  On February 19, the Debtors Filed a revised proposed order [Docket No. 322] setting a revised cap for the fees of certain professionals during the Chapter 11 Cases.  On February 22, 2018, the Bankruptcy Court entered an order approving the OCP Motion on a final basis [Docket No. 350].

- Interim Compensation Procedures Motion.  The *Debtors' Motion for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 192] (the "Interim Compensation Motion"), Filed on January 26, 2018, seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases.  On February 22, 2018, the Bankruptcy Court entered an order approving the Interim Compensation Motion on a final basis [Docket No. 351].  On March 5, 2018, the Debtors Filed a proposed corrected order [Docket No. 432] reflecting the appointment of the Committee.  On April 30, 2018, the Bankruptcy Court entered a further revised order [Docket No. 683] approving the Interim Compensation Motion, as revised.

- Claims Bar Date Motion.  The *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates* [Docket No. 284] (the "Bar Date

Motion"), Filed on February 13, 2018, seeking approval of:  (a) April 16, 2018, at 5:00 p.m. (prevailing Central Time), as the deadline for all non-Governmental Units to File Claims in the Chapter 11 Cases; (b) September 4, 2018, at 5:00 p.m. (prevailing Central Time) as the deadline for all Governmental Units to File Claims in the Chapter 11 Cases; (c) procedures for Filing Proofs of Claims; and (d) the form and manner of notice of the bar dates.  On March 7, 2018, the Bankruptcy Court entered the Bar Date Order.

- Removal Extension Motion.  The *Debtors' Motion for Entry of an Order Extending the Time Within Which the Debtors May Remove Actions* [Docket No. 424] (the "Removal Extension Motion"), Filed on March 1, 2018, seeking entry of an order enlarging the period within which the Debtors may remove actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027 by 120 days, up to and including December 7, 2016.  On March 28, 2018, the Bankruptcy Court entered an order approving the Removal Extension Motion [Docket No. 558].

- Exclusivity Motion.  The *Debtors' Motion to Extend Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 622] (the "First Exclusivity Motion"), Filed on April 13, 2018, seeking to extend the Debtors' exclusive period for filing and soliciting votes on a plan of reorganization ("Filing Exclusivity Period") through and including August 13, 2018, and the deadline under which the Debtors have the exclusive right to solicit a plan Filed in such period ("Solicitation Exclusivity Period") through and including October 12, 2018.  On May 8, 2018, the Bankruptcy Court entered an order approving the First Exclusivity Motion [Docket No. 710].  On July 13, 2018, the Debtors Filed the *Debtors' Second Motion to Extend Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 885] (the "Second Exclusivity Motion"), seeking to extend the Filing Exclusivity Period through and including December 11, 2018, and the Solicitation Exclusivity through and including February 11, 2018.  On July 27, 2019, the Debtors Filed a revised proposed order [Docket No. 921] (the "Revised Second Exclusivity Order") shortening the requested Filing Exclusivity Period to October 15, 2018, and the Solicitation Exclusivity Period to December 14, 2018.  On August 8, 2018, the Bankruptcy Court entered the Revised Second Exclusivity Order [Docket No. 964].  On September 28, 2018, the Debtors Filed a stipulation and agreed order [Docket No. 1088] seeking to further extend the Filing Exclusivity Period through and including December 31, 2018, and the Solicitation Exclusivity Period through and including March 1, 2019.  On October 1, 2018, the Bankruptcy Court entered an order approving such stipulation and agreed order [Docket No. 1099]. On January 22, 2019,  the Debtors filed the *Stipulation and Agreed Order Extending Exclusivity Periods and Challenge Period* [Docket No. 1592], which was recharacterized as a motion to extend exclusivity pursuant to the Bankruptcy Court's *Order Regarding Stipulation* [Docket No. 1595] (the "Stipulation Order").  The Stipulation Order also set January 31, 2019 as the deadline (the "Extension Objection Deadline") for any party in interest to object to an extension of the exclusivity periods.  As no objections were timely filed by the Extension Objection Deadline, the Debtors filed a proposed form of order granting the extension of exclusivity, which the Bankruptcy Court entered on February 1, 2019 [Docket No. 1610].  On February 15, 2019, the Debtors and the Committee Filed the *Joint Emergency Motion to Extend Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1619] (the "Joint Exclusivity Motion") seeking to further extend the Filing Exclusivity Period through and including April 1, 2019, and the Solicitation Exclusivity Period through and including May 31, 2019.  The Bankruptcy Court entered an order approving the Joint Exclusivity Motion [Docket No. 1620] on the same day. On March 4, 2019, the Bankruptcy Court held a status conference on the Joint Exclusivity Motion at which the Committee sought an evidentiary hearing to be held on the matter.  On March 26, 2019, the Debtors, the Committee, Bluescape, and Fairfax Filed a joint stipulation and agreed order [Docket No. 1763] consensually ending the Debtors' Exclusivity Periods as

of April 8, 2019, which was approved by the Bankruptcy Court on the same day [Docket No. 1764].

### C.      Retention of Professionals

The Debtors Filed applications for, and the Bankruptcy Court entered orders approving, the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:

- A&M, as restructuring advisor [Docket Nos. 201, 353];

- Epiq, as administrative advisor and notice and claims agent [Docket Nos. 7, 100];

- Ernst & Young LLP, as Valuation, Business Modeling, and Accounting Services Provider [Docket Nos. 224, 447];

- Foley Gardere as Texas, Litigation, and Conflicts Counsel For the Debtors [Docket Nos. 205, 358];

- K&E, as restructuring co-counsel [Docket Nos. 193, 352];

- KPMG, LLP, as Audit and Tax Consultants [Docket Nos. 195, 354];

- Latham & Watkins LLP., as Special Counsel [Docket Nos. 196, 355];

- Morgan, Lewis, & Bockius as Special Litigation Counsel [Docket Nos. 198, 357];

- PJT as Investment Banker [Docket Nos. 197, 356]; and

- Arcadi Jackson, LLP, as Special Litigation Counsel [Docket Nos. 1017, 1046].

### D.      Appointment of Official Creditors' Committee

On January 24, 2018, the U.S. Trustee Filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 175], notifying parties in interest that the U.S. Trustee had appointed the Committee in the Chapter 11 Cases.  On January 25, 2018, the U.S. Trustee Filed the *Notice of Reconstituted Committee of Unsecured Creditors* [Docket No. 181].  The Committee is currently composed of the following members:  (a) Wilmington Savings Fund Society, FSB; (b) REME, LLC, d/b/a LEAM Drilling Services; (c) DRW Securities, LLC; and (d) Cross Sound Management LLC. The Committee has retained Brown Rudnick LLP and Jackson Walker LLP as its legal counsel, Intrepid Partners, LLC as its investment banker, and FTI Consulting, Inc. as its financial advisor.  On June 29, 2018, the Committee Filed an application [Docket No. 838] seeking to retain Jefferies LLC its co-investment banker.  On August 3, 2018, the Bankruptcy Court authorized the Committee's retention of Jefferies LLC [Docket No. 941].  On March 26, 2019, the Committee Filed an application [Docket No. 1762] seeking to retain the law firm of Quinn Emanuel Urquhart & Sullivan, LLP to ensure that Patricia B. Tomasco, who represented the Committee in her capacity as counsel at Jackson Walker LLP, can continue to represent the Committee as co-counsel with Brown Rudnick LLP and Jackson Walker LLP.  On January 9, 2019, the application was approved [Docket No. 1518].

### E.      Employee Compensation Plans

As of the Petition Date, the Debtors employed approximately 170 employees.  As is typical for any organization of similar size, scope, and complexity, the Debtors developed programs to encourage and reward exceptional employee performance.

On the Petition Date, the Debtors Filed the *Debtors' Emergency Motion For Entry of Interim and Final Orders (I) Authorizing The Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* [Docket No. 9] (the "Wages Motion").  On January 18, 2018, the Debtors Filed a revised proposed order [Docket No. 74] clarifying that the Debtors would not pay any prepetition amounts due exceeding the priority amounts set forth in section 507(a)(4) or 507(a)(5) of the Bankruptcy Code.  On January 18, 2018, the Bankruptcy Court entered an order, approving the Wages Motion on a final basis [Docket No. 102] (the "Wages Order").  On February 16, 2018, the Debtors Filed a proposed amended order (the "Amended Wages Order") [Docket No. 310], providing that the Debtors would provide notice to the Committee with regard to certain severance payments.  On February 22, 2018, the Bankruptcy Court entered the Amended Wages Order [Docket No. 345].

The Debtors historically have provided compensation programs that encourage and reward exceptional performance.  The Debtors also have provided classic retention-based incentives for non-insider employees.  On January 26, 2018, the Debtors Filed the *Debtors Motion for Entry of an Order (I) Authorizing and Approving the Debtors Key Employee Retention Plan for Non-Insider Employees and (II) Granting Related Relief* [Docket No. 187] (the "Retention Motion"), seeking authority to pay, in the ordinary course of business, quarterly Cash bonus awards to approximately 134 non-insider employees.  On February 22, 2018, the Bankruptcy Court entered an order granting the Retention Motion with respect to the non-insider payments [Docket No. 346].

On April 25, 2018, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Key Employee Incentive Plan and (II) Granting Related Relief* [Docket No. 673] (the "KEIP Motion"), seeking authority to pay, in the ordinary course of business, certain members of the Debtors' management team pursuant to a key employee incentive plan (the "KEIP").  The KEIP covers the five members of the Debtors' senior leadership team and provides for the payment of incentive-based Cash awards based on the Debtors' achievement of (a) certain Emergence Milestones and (b) certain operational Performance Metrics (each as defined in the KEIP Motion).  On May 16, 2018, the Debtors Filed a supplemental statement in connection with the KEIP Motion [Docket No. 740], detailing certain revisions to the KEIP, including: (a) the removal of the Sale Emergence Milestones and the adjustment of Performance Metrics weighting.

On May 17, 2018, the U.S. Trustee Filed an objection to the KEIP Motion [Docket No. 744].  On May 21, 2018, the Debtors Filed a response to the U.S. Trustee's Objection [Docket No. 750].  Following a hearing before the Bankruptcy Court on May 21, 2018, which was continued to May 22, 2018, the Debtors Filed a revised proposed order [Docket No. 756] approving the KEIP Motion.  On May 23, 2018, the Bankruptcy Court entered an order approving the KEIP, as revised [Docket No. 766].

On July 11, 2018, the Debtors Filed the *Debtors Supplemental Motion for Entry of an Order (I) Authorizing and Approving the Debtors Key Employee Retention Plan for Non-Insider Employees and (II) Granting Related Relief* [Docket No. 873] (the "Supplemental KERP Motion"), seeking authority to pay, in the ordinary course of business, quarterly Cash bonus awards to approximately 134 non-insider employees for the third quarter of 2018 and on a quarter by quarter basis thereafter during the pendency of these Chapter 11 Cases, with prior written consent of the DIP Lenders and the Committee.  On August 8, 2018, the Bankruptcy Court entered an order approving the Supplemental KERP Motion [Docket No. 962].

### F.      Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into certain Executory Contracts and Unexpired Leases.  The Debtors, with the assistance of their advisors, reviewed the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject

pursuant to sections 365 or 1123 of the Bankruptcy Code.  Pursuant to the First Plan, the Debtors Filed the First Plan Supplement containing the Assumed Executory Contract and Unexpired Lease List and Assumed Executory Contract and Unexpired Lease List on November 26, 2018.  Any Assume/Reject Objection as relating to the First Plan Supplement was due by December 5, 2018.

Any Executory Contracts or Unexpired Leases not addressed during the Chapter 11 Cases will be treated in accordance with Article V of the Amended Plan, as summarized in Article IV.N of this Amended Disclosure Statement.

### 1.    Midstream Rejection Motion

On January 18, 2018, the Debtors Filed the *Debtors' Motion for Entry of an Order Authorizing Rejection of Certain Executory Contracts and Unexpired Lease Effective Nunc Pro Tunc to the Petition Date* [Docket No. 111] (the "Midstream Rejection Motion"), seeking authority to reject certain Executory Contracts.

- The Debtors received objections from each of: (a) Shell Energy North America (US), LP [Docket No. 252]; (b) Chesapeake Energy Marketing, Inc. [Docket No. 253]; and (c) Enterprise Products Operating LLC ("Enterprise") and Acadian Gas Pipeline System ("Acadian") [Docket No. 256] to the Midstream Rejection Motion.

- On March 6, 2018, the Debtors Filed a revised proposed order in connection with the Midstream Rejection Motion [Docket No. 442] (the "Revised Midstream Rejection Order"), removing the Acadian Agreements (as defined in the Midstream Rejection Motion), all but one of the Chesapeake Contracts (as defined in the Revised Midstream Rejection Order), and clarifying that the BG Contracts (as defined in the Revised Midstream Rejection Order) would be rejected only to the extent not terminated prepetition.

- On March 7, 2018, the Bankruptcy Court entered the Revised Midstream Rejection Order [Docket No. 446].  A final determination with respect to agreements not rejected pursuant to the First Rejection Order was continued to a later date.

- On March 27, 2018, the Debtors, Enterprise, and Acadian Filed a stipulation and agreed order resolving the objection to the Midstream Rejection Motion [Docket No. 545], noting that the Enterprise Agreements (as defined therein) terminated or were repudiated prepetition and thus were not executory contracts within the meaning of section 365 of the Bankruptcy Code.

### 2.    Azure Rejection Motion

On March 1, 2018, the Debtors Filed the *Motion for the Entry of an Order Authorizing Rejection of the Azure Letter Agreement Effective Nunc Pro Tunc to the Petition Date* [Docket No. 423] (the "Azure Rejection Motion").  On May 1, 2018, the Committee Filed a statement in support of the Azure Rejection Motion [Docket No. 687], and Azure Filed the *Objection to Debtors Motion for Entry of an Order Authorizing Rejection of the Azure Letter Agreement Effective Nunc Pro Tunc to the Petition Date and Emergency Motion for an Order Compelling the Debtors to Assume or Reject the New EXCO Gathering Agreements Pursuant to Section 365 of the Bankruptcy Code* [Docket No. 688], in which Azure opposed the Debtors' attempt to reject the Azure Letter Agreement (as defined in the Azure Rejection Motion) and sought to compel the Debtors to assume the Azure Letter Agreement as well as the Gathering Agreements (as defined in the Azure Rejection Motion) (the "Azure Motion to Compel").

On May 8, 2018, the Bankruptcy Court held a hearing on the Azure Rejection Motion, at which the Bankruptcy Court abated the Azure Rejection Motion and the Azure Motion to Compel.  Following the

hearing, the Debtors commenced an adversary proceeding (Adversary Case 18-03096) and Filed the *Adversary Complaint for Declaratory Relief* [Adv. Dock. No. 1] (the "Azure Adversary Complaint") seeking a declaratory judgment that the Azure Letter Agreement was separate or severable from the Gathering Agreements.  On June 15, 2018, Azure Filed a motion to dismiss the Azure Adversary Complaint [Adv. Dock. No. 19] (the "Azure Motion to Dismiss") and an answer to the Azure Adversary Complaint [Adv. Dock. No. 20].  On June 19, 2018, the Debtors Filed a motion for judgment on the pleadings [Adv. Dock. No. 27] (the "Azure 12(c) Motion").  On June 21, 2018, the Debtors Filed a response to the Azure Motion to Dismiss [Adv. Dock. No. 31].  On June 26, 2018, Azure Filed their reply in support of the Azure Motion to Dismiss, and an opposition to the Debtors' Azure 12(c) Motion.  On July 2, the Debtors Filed a reply in further support of their Azure 12(c) Motion [Adv. Dock. No. 36] and a motion to strike an exhibit to the Azure Motion to Dismiss [Adv. Dock. No. 35] (the "Debtor's Motion to Strike").  On July 13, 2018, each of the Debtors and Azure Filed motions for summary judgment [Adv. Dock. No. 41 and 42, respectively] (the "Debtors' Summary Judgment Motion" and "Azure's Summary Judgment Motion," respectively).  On July 16, 2018, the Committee Filed an emergency motion seeking permission to intervene [Adv. Dock. No. 43] in the proceeding (the "Intervention Motion").  On July 20, 2018, Azure Filed an objection to the Debtors' Summary Judgment Motion [Adv. Dock. No. 44] and Debtors' Motion to Strike [Adv. Dock. No. 45], and the Debtors Filed a response in support of the Debtors' Summary Judgment Motion [Adv. Dock. No. 46].  On July 24, the Committee Filed a joinder to the Debtors' Summary Judgment Motion [Adv. Dock. No. 48], which joinder Azure moved to strike on July 25, 2018 [Adv. Dock. No. 49].  On July 24, 2018, Azure also opposed the Committee's Intervention Motion [Adv. Dock. No. 47].  On July 25, 2018, Azure and the Debtors each Filed replies in support of their respective motions for summary judgment [Adv. Dock. Nos. 50 and 51, respectively].  On July 30, 2018, the Committee Filed a response in support of its Intervention Motion.  A hearing on dispositive motions in the adversary proceeding was held on August 9, 2018; and a trial currently was abated pending the Bankruptcy Court's decision on the dispositive motions ("Bankruptcy Litigation").

During that time, Azure filed proofs of claim [Claim Nos. 593 and 594] (the "Azure Proofs of Claim") claiming approximately $30 million on account of certain gathering agreements prior to the Petition Date and approximately $275,000 owed thereunder subsequent to the Petition Date.  On October 19, 2018, the Debtors Filed an objection to Azure Proofs of Claim [Docket No. 1145].  On November 7, 2018, the Debtors Filed a motion to estimate the Azure Proofs of Claim (the "Azure Estimation Motion") [Docket No. 1241].  On November 15, 2018, the Debtors Filed a motion [Docket No. 1265] seeking authorization pursuant to Bankruptcy Rule 9019 to enter into a settlement (the "Azure Settlement").  Under the Azure Settlement, in consideration for the settlement of, among other things, the Bankruptcy Litigation, the Azure Estimation Motion, and the objection to the Azure Proofs of Claim and in satisfaction of any amounts owned under the gathering agreements and Azure Letter Agreement, the Debtors agreed to pay Azure $15 million plus approximately $6.3 million on or before February 28, 2019 and assume the gathering agreements.  Furthermore, the Debtors, with the support of Azure, sought an abeyance of the Bankruptcy Litigation.  The Bankruptcy Court entered an order approving the Azure Settlement [Docket No. 1280] on November 19, 2018.

### 3.   Assumption and Rejection Motions

On April 10, 2018, the Debtors Filed *Debtors' Motion for Entry of an Order Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 608] (the "Assumption Deadline Extension Motion").  Given the large number of unexpired leases to which the Debtors are a party, the Debtors Filed the Assumption Deadline Extension Motion seeking entry of an order extending by 90 days, through and including August 13, 2018, the time period within which the Debtors must assume or reject unexpired leases of nonresidential real property so that the Debtors may fully and adequately address and appraise the complexities inherent in the leases.  On May 8, 2018, the Bankruptcy Court entered an order granting the Rejection Deadline Extension Motion [Docket No. 709].

On July 11, 2018, the Debtors Filed the *Omnibus Motion for Entry of an Order (I) Authorizing Assumption of Unexpired Leases of Non-Residential Real Property and (II) Granting Related Relief* [Docket No. 875] (the "Omnibus Lease Assumption Motion"). The Debtors received a response to the Omnibus Lease Assumption Motion from Hagan Lands LLC [Docket No. 929], which subsequently was resolved. On August 8, 2018, the Bankruptcy Court entered an order granting the Omnibus Lease Assumption Motion [Docket No. 963].

On August 7, 2018, the Debtors Filed the *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Reject the Headquarters Lease and (B) Enter into New Headquarters Lease and (II) Granting Related Relief* [Docket No. 955] (the "Headquarters Lease Motion"). On August 9, 2018, the Bankruptcy Court entered an order granting the Headquarters Lease Motion [Docket No. 975].

### G.    Other Litigation Matters

#### 1.    Prepetition Litigation

In the ordinary course of business, the Debtors are parties to a number of lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations, including:

- Chesapeake Litigation. In May 2017, CEML terminated a transaction confirmation agreement for the purchase and sale of natural gas between CEML and Raider. As a result of the termination, the Debtors were unable to satisfy a material contract representation in connection with the Debtors' potential sale of certain oil and natural gas properties and surface acreage in South Texas to Venado and the sale agreement was terminated. The Debtors filed a lawsuit against CEML (the "Chesapeake Litigation"), asserting breach of contract, tortious interference with existing contract, tortious interference with prospective business relations, and declaratory relief (the "Chesapeake Litigation Claims"). On February 8, 2018, the Debtors Filed a motion [Docket No. 111] seeking to reject certain of Chesapeake's contracts, and on March 7, 2018, the Bankruptcy Court entered an order [Docket No. 446] authorizing the rejection of the transaction between EXCO Operating Company, LP, and CEML. On November 26, 2018, the Debtors Filed the Plan Supplement [Docket No. 1315] which included several Chesapeake executory contracts be assumed by the Debtors and others to be rejected by the Debtors. On December 4, 2019, the Debtors and Chesapeake attended Mediation to resolve the outstanding disputes between the parties. On February 25, 2018, the Debtors Filed a motion pursuant to Bankruptcy Rule 9019 seeking to approve a settlement with Chesapeake [Docket No. 1651]. Following a hearing on March 27, 2019, the Bankruptcy Court took this matter under advisement, pending additional review of the record. On April 23, 2019, the Bankruptcy Court entered an order approving the settlement with Chesapeake [Docket No. 1854].

- Shell/BG Litigation. The Debtors and certain of their affiliates, along with BG, were party to certain development and operation agreements (including the "Appalachia JDA") covering certain assets in the Appalachia region. After BG was acquired by Shell, the Debtors became aware of a potential violation of the Appalachia JDA, and following unsuccessful negotiations, commenced arbitration to enforce their alleged rights (the "Shell/BG Litigation"). During the course of the arbitration, the Debtors and Shell participated in mediation, which ultimately resulted in an agreement. On January 26, 2018, the Debtors Filed the *Debtors Motion for Entry of an Order (I) Authorizing and Approving the Settlement By and Among Debtors EXCO Holding (PA), Inc., EXCO Production Company (PA), LLC, and EXCO Production Company (WV), LLC, and Non-Debtor Affiliates EXCO Resources (PA), LLC and EXCO Appalachia Midstream, LLC, and BG Production Company (PA), LLC, BG Production Company (WV), LLC, and SWEPI LP, and (II) Granting Related Relief* [Docket No. 191], seeking authorization pursuant to Bankruptcy Rule 9019 to enter into a settlement (the "Shell Appalachia

<u>Settlement</u>") that would eliminate the joint venture structure and increase the Debtors' and their affiliates' acreage position and production in the Appalachia region.  On February 22, 2018, the Bankruptcy Court entered an order approving the Shell Appalachia Settlement [Docket No. 349].

- <u>Company Men Litigation</u>.  In January 2017, Rodney Fisher ("<u>Fisher</u>") commenced an action against the Debtors in the United States District Court for the Northern District of Texas, alleging a violation of the Fair Labor Standards Act ("<u>FLSA</u>") based on the Debtors' alleged misclassification of Fisher as an independent contractor instead of an employee (the "<u>Company Men Litigation</u>").  On October 11, 2017, Fisher moved to certify a class of claimants composed of himself and other "company men" classified and compensated as contractors working on any of the Debtors' oil or gas exploration or production rig sites.  On April 23, 2018, Fisher Filed a motion [Docket No. 665] (the "<u>Certification Motion</u>") seeking leave to File a class Proof of Claim.  On May 14, 2018, the Debtors Filed an objection [Docket No. 736] (the "<u>Certification Objection</u>") to the Certification Motion on the basis that Mr. Fisher's request was untimely and unsupported by law.  On May 15, 2018, the Committee Filed a joinder in support of the Certification Objection [Docket No. 737].  On November 27, 2019, Fisher Filed a reply in support of the Certification Motion [Docket No. 1321], identifying further support from a recently entered case in the Fifth Circuit.  The Bankruptcy Court held a hearing on this matter on November 30, 2018, and denied the Certification Motion for lack of evidence.

- <u>Long Petroleum Litigation</u>.  In September 2014, Long Petroleum, L.L.C. ("<u>Long Petroleum</u>") commenced an action in DeSoto Parish, Louisiana seeking to determine the ownership status of certain property allegedly sold by EXCO to Long Petroleum.  Long Petroleum believes that certain of the Debtors' mineral leases in Louisiana are subject to mineral leases owned by Long Petroleum and therefore not part of the Debtors' Estates.  On October 24, 2018, Long Petroleum Filed a motion seeking to lift the automatic stay and for adequate protection [Docket No. 1155] (the "<u>Long Lift Stay Motion</u>") to continue prepetition state court litigation related to the alleged sale and force the Debtors to segregate the purchase price paid by Long Petroleum pursuant to the alleged sale.  Long Petroleum, along with certain joining parties, believed that resolution of litigation regarding Long Petroleum's interest was integral to the potential distributions available to creditors under to the First Plan. The Debtors and Long Petroleum engaged in negotiations to resolve certain issues with language to be included in the Confirmation Order.  On December 4, 2018, Long Petroleum Filed a reservation of rights [Docket No. 1400].

Certain proceedings to which the Debtors are party are the subject of adversary proceedings pending in these Chapter 11 Cases.  In particular:

- <u>Enterprise Litigation</u>.  In September 2016, the Debtors terminated their gas sales contract with Enterprise and firm transportation contract with Acadian following Enterprise's failure to make payments to the Debtors on account of July 2016 gas sales within the applicable grace period.  Enterprise and Acadian subsequently Filed a petition in Texas state court against the Debtors (the "<u>Enterprise Litigation</u>"), and subsequently joined Bluescape and two officers of the Debtors, alleging that the Debtors did not have the right to terminate the contracts.  Enterprise and Acadian asserted various causes of action against the Debtors, Bluescape, and the Debtors' officers that could total up to approximately $175 million.  As of the Petition Date, the Enterprise Litigation was ongoing with an expected trial date of mid-2018.

On March 9, 2018, Enterprise and Acadian filed a motion in the state court proceeding to sever their claims against Bluescape from their claims against the Debtors and their officers.  On March 19, 2018, the Debtors commenced an adversary proceeding (Adversary Case No. 18-03051) related to the Enterprise Litigation, and Filed an emergency motion seeking an

extension of the automatic stay or imposition of a permanent injunction halting litigation against Bluescape and the Debtors' officers. On April 19, 2018, the Debtors, the Committee, Enterprise, and Acadian Filed a joint stipulation [Docket No. 651], pursuant to which (a) the Enterprise Lift Stay Motion (as defined herein) was withdrawn; (b) all parties agreed to let the state court action proceed with regard to Bluescape; (c) the Adversary Case No. 18-03051 was dismissed, and the Debtors, the Committee, and Bluescape agreed to File any objection to any Proof of Claim Filed by Enterprise or Acadian by July 20, 2018. On April 19, 2018, the Bankruptcy Court entered an order enforcing the stipulation [Docket No. 654].

Subsequently, on July 20, 2018, the Debtors Filed an objection to all Proofs of Claim Filed by Enterprise and Acadian [Docket No. 901] (the "Enterprise Claims Objection"), and on October 22, 2018, Filed a motion seeking summary judgment in favor of the Debtors on account thereof [Docket No. 1149] (the "Enterprise Summary Judgment Motion"). On October 5, 2018, Enterprise Filed a response to the Enterprise Claims Objection [Docket No. 1117] and a motion seeking the Bankruptcy Court's abstention therefrom [Docket No. 1119] (the "Enterprise Abstention Motion"). On October 29, 2018, the Debtors and Bluescape each Filed an objection to the Enterprise Abstention Motion [Docket No. 1176 and Docket No. 1190, respectively]. On October 30, 2018, the Committee filed a joinder thereto [Docket No. 1192]. On March 13, 2019, the Debtors Filed a motion to approve a settlement between the Debtors, Enterprise, Bluescape, and the Committee [Docket No. 1693]. On April 23, 2019, the Bankruptcy Court entered an order approving the settlement [Docket No. 1853].

- Shell Litigation. In December 2017, certain agreements governing the sale and purchase of natural gas were terminated following nonpayment by Shell North America (US), L.P. ("Shell Energy") for gas deliveries made by the Debtors. On December 26, 2017, the Debtors commenced proceedings in Harris County District Court against Shell Energy (among others) (the "Shell Litigation"), seeking declaratory relief and damages for breach of contract. On January 26, 2018, the Debtors commenced an adversary proceeding (Adversary Case No. 03015) seeking declaratory relief and damages for breach of contract. On March 23, 2018, the Debtors Filed the *Plaintiffs' Emergency Motion to Dismiss Without Prejudice* [Adv. Dock. No. 14], which was amended on March 29, 2018 [Adv. Dock. No. 22]. On March 29, 2018, the Bankruptcy Court entered an order dismissing the adversary case without prejudice [Adv. Dock. No. 24]. On April 13, 2018, Shell Energy filed a proof of claim ("Shell Proof of Claim") [Claim No. 892], asserting a claim in the amount of approximately $46 million against EXCO Operating Company, LP. On October 19, 2019, the Debtors objected to the Shell Proof of Claim and Filed the *Debtors' Objection to Proof of Claim of Shell Energy North America (US), LP (Proof of Claim No. 892)* [Dock. No. 1147] (the "Shell Claim Objection"). Subsequently, on November 7, 2018, the Debtors Filed their *Motion to Estimate Proof of Claim of Shell Energy North America (US), LP* [Dock. No. 1243] (the "Shell Estimation Motion") to estimate the Shell Proof of Claim at $0.00. On December 4, 2018, the Debtors Filed a notice of adjournment of the hearing on the Shell Estimation Motion and the Shell Claim Objection to a date to be determined.

- Rancho Litigation. In March 2010, Bruce A. Leonard ("Leonard") and Jeffrey A. Brymer (succeeded in interest by Rancho Los Encinos Viejos, L.C.C) ("Rancho") executed an oil, gas, and mineral lease (the "Dimmit Lease"), which lease contained a right of first refusal in favor of Leonard and Rancho. The Debtors subsequently came to be the counterparty to the Dimmit Lease. On April 28, 2017, the Debtors sent a letter to Leonard and Rancho in connection with a potential sale of an asset covered by the Dimmit Lease acknowledging Leonard and Rancho's right of first refusal. Leonard and Rancho purported to exercise their right of first refusal, which the Debtors contested. On November 21, 2017, Leonard and Rancho Filed a lawsuit against the Debtors for breach of contract and specific performance (the "Dimmit Action").

On April 16, 2018, Leonard and Rancho Filed a notice of removal [Docket No. 633] noting that the Dimmit Action had been removed to the Bankruptcy Court for the Western District of Texas, San Antonio division.  On May 7, 2018, the Debtors and Rancho Filed a joint motion seeking to transfer the proceeding to the Bankruptcy Court.  On May 8, 2018, the Bankruptcy Court for the Western District of Texas, San Antonio division transferred the Dimmit Action to the Bankruptcy Court (Adversary Case No. 18-03105).  On July 12, 2018, the Debtors and Rancho Filed a joint stipulation and agreed order abating the Dimmit Action until January 15, 2019 and excluding from any sale the asset governed by the Dimmit Lease [Docket No. 876].  On July 16, 2018, the Bankruptcy Court entered an order approving the stipulation [Docket No. 887].  A status conference is set in this matter for May 20, 2019.

- Samson Litigation.  Samson Resources Company and Samson Contour Energy E & P, LLC ("Samson") own overriding royalty interests in certain of the Debtors' oil, gas and mineral property.  On September 16, 2015, Samson filed for bankruptcy protection, and on March 1, 2017, Samson emerged from bankruptcy as a reorganized debtor. On September 14, 2017, reorganized Samson commenced an adversary proceeding (Adversary Case No. 17-51519) (the "Samson Adversary") and Filed a complaint [Adv. Dock. No. 1] seeking turnover of property allegedly owed to Samson on account of an underpaid revenues.  On June 5, 2018, the Samson Adversary was transferred to the Bankruptcy Court (Adversary Case No. 18-03142).  On June 27, 2018, the Bankruptcy Court abated the Samson Adversary.  A status conference currently is set for May 23, 2019.

- BHP Litigation.  BHP Billiton Petroleum (KCS Resources) ("BHP KCS"), LLC, and  BHP Billiton Petroleum Properties (N.A.) ("BHP Properties" together with BHP KCS, "BHP") own certain royalty and working interests in certain properties for which the Debtors serve as operator.  Due to a title dispute between BHP and a third party relating to certain of BHP's interests, the Debtors placed a certain amount of production proceeds that were due to be distributed to BHP in "suspense" status (the "BHP Suspended Proceeds").  On November 7, 2017, BHP filed a lawsuit against the Debtors seeking payment of the BHP Suspended Proceeds.  BHP was also the operator of certain wells in which EXCO was a non-operating working interest owner.  On August 16, 2016, the Debtors filed a lawsuit against BHP, primarily related to certain fees and penalties retroactively charged by BHP, seeking approximately $9.7 million in damages related thereto.

Following the Petition Date, the Debtors continued to hold the BHP Suspended Proceeds, and on October 10, 2018, BHP initiated an adversary proceeding (Adversary Case No. 18-03290) (the "BHP Adversary") seeking (a) a declaratory judgment that the BHP Suspended Proceeds are not property of the Estate, (b) turnover of such proceeds, and (c) a preliminary injunction to segregate the BHP Suspended Proceeds pending an adjudication of BHP's rights thereto.  Contemporaneously with the commencement of the BHP Adversary, BHP Filed a motion for adequate protection [Docket No. 1128] (the "BHP AP Motion"), seeking segregation of the BHP Suspended Proceeds pending adjudication of the BHP Adversary on the basis that the BHP Suspended Proceeds are "cash collateral" under Bankruptcy Code section 363(a).

On October 24, 2018, the Debtors Filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Settlement By and Among the Debtors and BHP Properties, BHP Petroleum, Petrohawk, and Winwell, and (II) Granting Related Relief* [Docket No. 1154] (the "BHP Settlement Motion"), seeking authorization pursuant to Bankruptcy Rule 9019 to enter into a settlement (the "BHP Settlement") that would Allow certain Proofs of Claim filed by BHP and an affiliate on account of, among other things, the BHP Suspended Proceeds, as GUC Claims in the aggregate amount of approximately $4.5 million, resolve all other prepetition claims and Causes of Action between the Debtors and BHP and its affiliates

including a litigation commenced by the Debtors against BHP prior to the Petition Date primarily on account of certain retroactive charges assessed by BHP, and secure BHP's agreement not to object to the Plan on account of such settled Claims. The Bankruptcy Court entered the order approving the BHP Settlement [Docket No. 1230] on November 5, 2018. On November 20, 2018, BHP withdrew the BHP AP Motion.

- Dowling Litigation. In 2006, James S. Dowling ("Dowling") entered into an oil, gas, and mineral lease with the Debtors. However, a dispute arose concerning the extent of Dowling's ownership in the property subject to the lease. On November 20, 2012, Dowling commenced a state proceeding against the Debtors seeking unpaid royalties, as well as penalties and attorney's fees (the "Dowling Litigation"). The Debtors subsequently paid Dowling all royalties but did not pay penalties and attorney's fees sought. Accordingly, Dowling filed a motion for summary judgement in the Dowling Litigation, and the state court entered a judgement against the Debtor for penalties on February 2, 2017. The Debtors appealed the judgement and deposited approximately $1.4 million in escrow (the "Escrow Funds"), but on December 21, 2017, the State of Louisiana, Court of Appeals, denied the appeal on the grounds the court lacked subject matter jurisdiction.

  On February 8, 2018, Dowling Filed a proof of claim [Claim No. 45] (the "Dowling Proof of Claim"), asserting a right to payment of no less than $1,437,047.43. On December 3, 2018, Dowling objected to the Debtors' First Plan and Filed the *Protective Objection of James S. Dowling to Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* [Docket No. 1373](the "Protective Objection"). In the Protective Objection, Dowling sought to preserve his right to terminate his lease with the Debtors pending the adjudication of the Dowling Litigation. The Debtors reached a settlement with Dowling under which the Dowling Proof of Claim would be allowed in the amount of $725,000 to be satisfied from certain escrowed funds. The Bankruptcy Court entered the *Order (I) Authorizing and Approving the Settlement by and among the Debtors and James Dowling, and (II) Granting Related Relief* [Docket No. 1548] memorializing the settlement on January 15, 2019.

The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims, to the extent they remain unresolved.

## 2.   Automatic Stay Motions

With certain exceptions, the Filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

Following commencement of the Chapter 11 Cases, certain litigation counterparties have Filed, or may File in the future, requests to modify or lift the automatic stay to continue pursuing prepetition litigation against the Debtors, including:

- Louisiana Lift Stay Motion. On January 21, 2018, the State of Louisiana, Office of Mineral Resources Filed a motion [Docket No. 149] seeking relief from the automatic stay (the "Louisiana Lift Stay Motion"). On February 1, 2018, the Debtors and the State of Louisiana Filed a joint stipulation and agreed order [Docket No. 215] modifying the automatic stay for the limited purpose of allowing the State of Louisiana to continue its audit of the

Debtors.   On February 22, 2018, the Bankruptcy Court entered an order approving the stipulation [Docket No. 347].

On March 26, 2018, the Debtors and the State of Louisiana Filed a joint stipulation and agreed order [Docket No. 537] lifting the automatic stay to allow the Debtors to release certain funds to the State of Louisiana.  On March 30, 2018, the Bankruptcy Court entered an order approving the stipulation [Docket No. 577].

- Ware Lift Stay Motion. On February 5, 2018, Sandra Coker and Jimmy Ware Filed a motion [Docket No. 231] seeking relief from the automatic stay (the "Ware Lift Stay Motion").  On February 28, 2018, the Debtors Filed an objection [Docket No. 380], to which the Committee Filed a joinder [Docket No. 388], opposing the Ware Lift Stay Motion.  On March 14, 2016, the Ware Lift Stay Motion was withdrawn [Docket No. 493].

- Enterprise Lift Stay Motion. On February 12, 2018, Enterprise and Acadian Filed a motion [Docket No. 276] seeking relief from the automatic stay (the "Enterprise Lift Stay Motion"). On March 5, 2018, each of the Debtors [Docket No. 438] and the Committee [Docket No. 437] objected to the Enterprise Lift Stay Motion.  On April 19, 2018, the Enterprise Lift Stay Motion was withdrawn in connection with the resolution of the Enterprise Litigation as set forth above.

- BG Litigation Lift Stay Motion. On March 2, 2018, BG Filed a motion [Docket No. 430] seeking relief from the automatic stay (the "BG Litigation Lift Stay Motion").  On March 23, 2018, the Debtors Filed an objection [Docket No. 530], to which the Committee Filed a joinder [Docket No. 531], opposing the BG Litigation Lift Stay Motion.  On March 29, 2018 the BG Litigation Lift Stay Motion was withdrawn in connection with the resolution of the Shell Litigation as set forth above.

- Cudd Lift Stay Joint Motion. On April 3, 2018, the Debtors and certain current and prior employees of the Debtors Filed a joint motion [Docket No. 590] seeking limited relief from the automatic stay (the "Cudd Lift Stay Joint Motion").  On May 8, 2018, the Bankruptcy Court entered an order granting the Cudd Lift Stay Joint Motion [Docket No. 708].

- Chesapeake Lift Stay Motion.  On May 24, 2018, CEML Filed a motion [Docket No. 770] seeking relief from the automatic stay (the "Chesapeake Lift Stay Motion") to pursue their counterclaims in the Chesapeake Litigation.  On June 21, 2018, the Debtors Filed a limited objection to the Chesapeake Lift Stay Motion [Docket No. 824], and CEML Filed an opposition in response [Docket No. 825].  On July 20, 2018, the Debtors and CEML Filed a joint stipulation and agreed order [Docket No. 898] lifting the automatic stay to for the limited purpose of allowing CEML to pursue its counterclaims in the Chesapeake Litigation.  On July 23, 2018, the Bankruptcy Court entered an order approving the stipulation and agreed order [Docket No. 906].

- M&N Resources Lift Stay Motion.  On June 1, 2018, M&N Resources Management, LLC ("M&N") Filed a motion seeking relief from the automatic stay [Docket No. 782] (the "M&N Resources Lift Stay Motion") to liquidate its claims before the United States District Court for the Western District of Louisiana.  On July 5, 2018, the Debtors and M&N Filed a joint stipulation and agreed order [Docket No. 858] lifting the automatic stay for the limited purpose of liquidating M&N's claims before magistrate court.  On July 9, 2018, the Bankruptcy Court approved the stipulation [Docket No. 863].

- Chubb Lift Stay Motion.  On June 29, 2018, Federal Insurance Company and its affiliates ("Chubb") Filed a motion seeking relief from the automatic stay [Docket No. 834] (the "Chubb

Lift Stay Motion") to authorize the continuation of a state court action to continue to final judgment in favor of the Debtors related to a third party's duty to indemnify the Debtors. On July 23, 2018, the Bankruptcy Court granted the Chubb Lift Stay Motion [Docket No. 907].

- BG Wells Lift Stay Motion.  On July 3, 2018, BG Filed a motion seeking relief from the automatic stay [Docket No. 847] (the "BG Wells Lift Stay Motion") to complete certain wells of which the Debtors are the operator and BG is a non-operating interest owner pursuant to a joint development agreement (the "BG JDA") governing the Debtors' assets in the East Texas/North Louisiana region (the "Development Area").  On August 10, 2018, the Debtors Filed an opposition [Docket No. 980], to which the Committee Filed a joinder [Docket No. 981], opposing the BG Wells Lift Stay Motion.  On August 21, 2018, the Debtors and BG conducted a settlement conference, which ultimately resulted in an agreement.

  On September 17, 2018, the Debtors Filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Settlement By and Among the Debtors and BG US Production Company, LLC, and (II) Granting Related Relief* [Docket No. 1055] (the "BG Settlement Motion"), seeking authorization pursuant to Bankruptcy Rule 9019 to enter into a settlement (the "BG JDA Settlement") that would deem the BG JDA assumed, authorize the Debtors to pay $22.5 million in three installments on account of certain withheld revenues, and obligate the Debtors to commence completion of certain wells in the Development Area by November 15, 2018.  The BG JDA Settlement resolved the BG Wells Lift Stay Motion, as well as BG's *Motion to Direct Payment of Administrative Expense Claim Under 11 U.S.C. Section 503(b)(1)(A)* [Docket No. 938] (the "BG Admin Motion"), which was Filed on August 2, 2018.  On September 17, 2018, the BG Wells Lift Stay Motion and the BG Admin Motion were abated pending the Bankruptcy Court's decision on the BG Settlement Motion.  On October 1, 2018, the Bankruptcy Court entered an order approving the BG JDA Settlement [Docket No. 1098], and BG withdrew the BG Wells Lift Stay Motion and the BG Admin Motion.

- Defense Costs Lift Stay Motion.  On July 27, 2018, the Debtors Filed a motion, with the consent of the Committee, seeking relief from the automatic stay [Docket No. 922] (the "Defense Costs Lift Stay Motion"), to the extent necessary, so that insurance proceeds of the Debtors' directors and officers liability policy could be used to advance defenses costs to counsel representing certain of the Debtors' current and former directors and officers.  A hearing on the Defense Costs Lift Stay Motion was held on July 30, 2018, and on July 31, 2018, the Debtors Filed a revised form of order that the Bankruptcy Court approved on August 8, 2018 [Docket No. 959].

- Long Lift Stay Motion.  On October 24, 2018, Long Petroleum and Bienville Investments, LLC ("Bienville") Filed a motion [Docket No. 1155] seeking relief from the automatic stay to continue prepetition state court litigation discussed above.  The Long Lift Stay Motion has been abated.

- Select Energy Services Lift Stay Motion.  On November 2, 2018, Select Energy Services, LLC ("Select"), SES Holdings, LLC ("SES"), Zurich American Insurance Company, American Guarantee and Liability Insurance Company, and Alterra America Insurance Company Filed a motion [Docket No. 1207] (the "Select Energy Services Lift Stay Motion") seeking relief from the automatic stay to permit state court litigation to continue to resolve an issue of whether the Debtors owed Select and SES an indemnity under an agreement.  On November 28, 2018, Select and SES Filed revised proposed order to the Select Energy Services Lift Stay Motion with the Debtors agreement [Docket No. 1337]. A hearing was conducted on November 30, 2018, and the Bankruptcy Court entered an order approving the Select Energy Services Lift Stay Motion [Docket No. 1358].

- <u>CCE Entities Lift Stay Motion</u>.  On January 24, 2019, Camelot Investment Corporation, Black Creek Ventures, LLC, Jane Rhodes Caruthers, Margaret Lagerson, Country Club Estates Number One, Country Club Estates Number Two, Country Club Estates Number Three, Country Club Estates Number Four, and Country Club Estates Number Five Filed a motion [Docket No. 1596] seeking relief from the automatic stay (the "<u>CCE Entities Lift Stay Motion</u>").  On February 14, 2019, the CCE Entities Lift Stay Motion was withdrawn [Docket No. 1617].

- <u>Anderson Lift Stay Motion</u>. On February 1, 2019, Michael Ray Anderson Filed its *Motion to Enter in a Civil Lawsuit* [Docket. 1611] (the "<u>Anderson Lift Stay Motion</u>") to add EXCO Resources Management Corporation to a lawsuit pending in state court.  Although EXCO Resources Management Corporation is not a Debtor entity, the Debtors Filed an objection to the Anderson Lift Stay Motion on February 22, 2019 [Docket No. 1646].  The Bankruptcy Court denied the Anderson Lift Stay Motion on March 20, 2019.

The Debtors will evaluate all such requests for relief from the automatic stay on a case-by-case basis and object or resolve on a consensual basis, as appropriate.

In addition, certain parties may attempt to take actions in violation of the automatic stay.  The Debtors will evaluate all such actions on a case-by-case basis and object or resolve on a consensual basis, as appropriate.  To date, the Debtors have objected to one such action:

- <u>Williams Stay Violation Proceeding</u>:  On May 22, 2018, the Debtors commenced an adversary proceeding (Adversary Case 18-03103) and Filed a complaint [Adv. Dock. No. 1] against Williams MLP Operating, LLC and Mockingbird Midstream Gas Services, LLC (collectively, "<u>Mockingbird</u>") for a declaratory judgment that Mockingbird's action in connection with the Debtors' Venado Flaring Application proceeding violated the automatic stay.  On June 25, 2018, Mockingbird answered the complaint [Adv. Dock. No. 11], which was subsequently amended [Adv. Dock. No. 14].  On July 27, 2018, the Committee moved to intervene in the Williams Stay Violation Proceeding [Adv. Dock. No. 19], which motion was withdrawn on August 13, 2018 [Adv. Dock. No. 21].  On August 16, 2018, the Bankruptcy Court set a comprehensive scheduling order in the Williams Stay Violation Proceeding [Adv. Dock. No. 24].  On March 4, 2019, the Debtors and Mockingbird Filed a joint stipulation [Adv. Dock. No. 27] dismissing the adversary proceeding with prejudice.

### H. Postpetition Restructuring and Sale Process

Following the Petition Date, the Debtors continued to engage with their stakeholders, including the Committee, the DIP Lenders, and their prepetition secured and unsecured creditors, to develop a go-forward path based on a reorganization of their business under a chapter 11 plan, the sale of substantially all their assets, or a combination of transactions.

### 1. Marketing Process

The Debtors engaged in a dual-track restructuring, pursuant to which they conducted a robust marketing process for some or all of their assets while engaging in negotiations with creditors to reorganize their business under a chapter 11 plan.  Beginning in January 2018, the Debtors contacted over 275 potential purchasers to participate in the Debtors' marketing process.  Of those parties, the Debtors executed non-disclosure agreements ("<u>NDAs</u>") with approximately 100 potential purchasers.  Parties executing NDAs were given access to a virtual data room beginning on March 27, 2018.  The data room provided potential purchasers with information regarding the contents of each asset package and details regarding the assets themselves.  Non-binding indications of interest were due on March 14, 2018, and were required

to include the total amount that the bidder was willing to pay, in Cash, for the applicable asset package. Additionally, bidders were required to disclose any necessary conditions or approvals needed prior to submitting a binding bid, including, but not limited to, internal approvals or governmental or regulatory approvals.

The Debtors received approximately 25 non-binding indications of interest during the first round of the sale process. After analyzing the bids and the financial condition of the bidders, the Debtors believed that they had an adequate number of qualified bidders across all asset packages to move forward to the second round of the sale process. The Debtors selected approximately 12 bidders to proceed to the second round of the sale process. These bidders were evaluated primarily based on the value they ascribed to the applicable asset packages, a demonstrated financial capability to pursue an acquisition of this size, and whether they had a strategic interest in the Debtors' assets based on their existing portfolio of assets or otherwise.

The second round bid deadline occurred on April 30, 2018. The Debtors received approximately 5 second round binding bids across the three assets packages. Following the second round bid deadline, the Debtors negotiated extensively with a potential bidder for the East Texas/North Louisiana asset package. The Debtors did not reach a final agreement with any party for the sale of any of their assets.

(a)     **Asset Sales**

On July 11, 2018, the Debtors Filed the *Motion for Entry of an Order (I) Authorizing and Approving the Assignment of Certain Real Property Located in Harrison County, Texas and (II) Granting Related Relief* [Docket No. 874] (the "Rockcliff Assignment Motion"), seeking to assign certain property in Harrison County, Texas to Rockcliff Energy LLC in exchange for certain consideration. On August 9, 2018, the Bankruptcy Court entered an order granting the Rockcliff Assignment Motion [Docket No. 974].

## 2.     Negotiations with Creditors

In parallel with their marketing process, the Debtors continued to engage with all key stakeholders regarding the terms of a consensual plan of reorganization in the event the Debtors were unable or elect not to sell substantially all of their assets. To that end, the Debtors facilitated extensive formal and informal discussions with certain of the 1.5 Lien Noteholders and 1.75 Lien Term Loan Lenders, and the Committee. Additionally, the Debtors facilitated multiple in person meetings between principals, advisors, and a combination thereof.

On April 26, 2018, the Debtors held an in-person meeting with advisors to the Committee and certain of the 1.5 Lien Noteholders and 1.75 Lien Term Loan Lenders at which these parties discussed a resolution of potential claims and causes of action (collectively, the "Challenge Claims") that could be asserted against third parties, including the Debtors' prepetition secured lenders. On June 14, 2018, certain members of the Committee and certain of the 1.5 Lien Noteholders and 1.75 Lien Term Loan Lenders held an in-person meeting to discuss a global resolution and path forward for a consensual restructuring. At this meeting, representatives of the 1.5 Lien Noteholders and 1.75 Lien Term Loan Lenders put forward a proposal for a settlement of the Challenge Claims. On June 25, 2018, the Debtors held an in-person meeting with advisors to certain of the 1.5 Lien Noteholders and 1.75 Lien Term Loan Lenders and the Committee to further discuss a potential consensual restructuring plan. At this meeting, advisors to the Committee presented a counterproposal regarding a settlement of the Challenge Claims. On June 29, 2018, certain of the 1.5 Lien Noteholders and 1.75 Lien Term Loan Lenders responded to the Committee's counterproposal with a revised proposal for settlement of the Challenge Claims. On July 20, 2018, the advisors to the Committee conveyed to advisors for certain of the 1.5 Lien Noteholders and 1.75 Lien Term Loan Lenders a further revised proposal for settlement of the Challenge Claims. Throughout this period, the Debtors and

their advisors engaged with the parties to facilitate ongoing discussions and further the exchange of settlement proposals.

### (a)    The Draft Committee Complaint

On June 7, 2018, as a condition to the meeting held on June 14, 2018, the Committee sent to the Debtors and certain of the 1.5 Lien Noteholders and 1.75 Lien Term Loan Lenders a draft complaint (the "Draft Committee Complaint") alleging various claims and causes of action against certain of the Debtors' prepetition secured lenders (the "Alleged Creditor Defendants"), certain of the Debtors' current and former Board members (the "Alleged Director Defendants"), and Wilmington Trust, N.A. ("Wilmington"), in its capacity as 1.5 Lien Notes Trustee and 1.75 Lien Agent.  The Committee alleged twenty-four claims and causes of action in the Draft Committee Complaint that could be asserted against some or all of the Alleged Creditor Defendants, the Alleged Director Defendants, and Wilmington in connection with, among other things, the Debtors' decision to enter into the 2015 Refinancing Transactions and the 2017 Refinancing Transactions and certain alleged acts by certain members of the Debtors' Board in connection with those two transactions and otherwise during the 2015-2017 time period.

### (b)    The Debtors' and the Committee's Investigations

Prior to and following the Petition Date, the Debtors conducted an investigation into potential claims or causes of action the Debtors may hold against third parties (including those ultimately alleged in the Draft Committee Complaint).  In the course of their investigation, the Debtors collected, reviewed, and produced over 80,000 documents in response to numerous discovery and other requests related to the Committee's ongoing investigation into estate claims and causes of action.  The Debtors also reviewed tens of thousands of documents produced by other parties and conducted multiple interviews of potential witnesses.  Additionally, the Debtors attended the four depositions taken by the Committee, as the Committee chose to depose a subset of the individuals that the Debtors interviewed during the course of their investigations and asked some of the questions that the Debtors posed during their interviews.  In connection with their investigation, the Debtors analyzed various potential claims and causes of action including, among others:

- **Preference actions**: The Debtors completed a comprehensive analysis of the mortgages and liens securing the prepetition secured creditors' claims to determine whether the prepetition secured creditors' liens may be avoided pursuant to applicable bankruptcy or non-bankruptcy law.  In particular, the Debtors analyzed whether certain mortgages provided as security to the 1.5 Lien Noteholders and 1.75 Lien Term Loan Lenders in the 2017 Refinancing Transactions are avoidable as preferential transfers due to granting and perfection of the mortgages occurring after the close of the applicable refinancing transaction.  In addition, the Debtors analyzed whether the equity interests and acreage the Debtors acquired in connection with the Shell Appalachia Settlement were encumbered as proceeds of certain collateral under both the 1.5 Lien Notes Indenture and the 1.75 Lien Credit Agreement, or unencumbered pursuant to section 552 of the Bankruptcy Code, which prohibits the attachment of liens to property acquired by debtors following the commencement of a bankruptcy case.  The Debtors also identified certain other potentially unencumbered property of the Debtors' estates, including un-mortgaged reserves and real estate and proceeds of certain litigation claims, that may not constitute collateral under the 1.5 Lien Notes Indenture or the 1.75 Lien Credit Agreement, and certain untimely-recorded security interests subject to avoidance.

- **Intentional and constructive fraudulent transfer actions**: The Debtors assessed certain transactions, including the 2015 Refinancing Transactions and the 2017 Refinancing Transactions to determine whether such transactions could be avoided, unwound, or otherwise

challenged on the basis of actual or constructive fraudulent transfer pursuant to applicable bankruptcy and non-bankruptcy law.

- **Recharacterization or equitable subordination claims**: The Debtors analyzed whether some or all of the 1.5 Lien Notes Claims or 1.75 Lien Term Loan Facility Claims may be subject to recharacterization or equitable subordination.

- **Breach of fiduciary duty (and aiding and abetting breach of fiduciary duty)**: The Debtors analyzed whether certain directors or officers of the Debtors may be subject to claims for breach of their fiduciary duties of care and loyalty, in particular with regard to the 2017 Refinancing Transactions. The Debtors also analyzed the viability of aiding and abetting claims related to any alleged breaches of fiduciary duty.

- **Disallowance of original issue discount and makewhole claims**: The Debtors reviewed the viability of challenges to the validity and extent of the prepetition secured lenders' claims, based on the potential for disallowance of unmatured interest in the form of original issue discount or the Makewhole Claims.

- **Other claims related to ESAS Agreement**. The Debtors reviewed potential challenges related to agreements executed in 2015 between the Debtors and Energy Strategic Advisory Services LLC ("ESAS") and its affiliates, including, but not limited to, challenges to payments that had been made pursuant to such agreements.

During their investigation, the Debtors also searched for any other potential claims relating to the 2015 and 2017 Refinancing Transactions or other pre-petition activities.

The Debtors understand that in connection with the Committee's separate investigation, the Committee reviewed the claims in the Draft Committee Complaint, reviewed certain of the documents produced by the Debtors, certain of the 1.5 Lien Noteholders and the 1.75 Lien Term Loan Lenders, and certain third parties, and conducted four depositions, all of which the Debtors attended.

### (c) Mediation with Creditor Constituencies

On July 18, 2018, the Debtors Filed an *Emergency Motion for Telephonic Hearing to Appoint Mediator* [Docket No. 891] (the "Emergency Mediation Motion"), requesting the appointment of the Honorable Chief Judge David R. Jones to serve as mediator in the Chapter 11 Cases to facilitate a consensual resolution of outstanding issues. The Debtors, with the consent of the Committee, Fairfax, and Bluescape, requested that Judge Jones be appointed to facilitate a mediation, to commence on August 6, 2018 and continue from time to time thereafter. The Debtors received a limited objection [Docket No. 893] (the "LSP Objection") to the Emergency Mediation Motion from LSP Investment Advisors, LLC, investment advisor to Gen IV Investment Opportunities, LLC and VEGA Asset Partners, LLC. Following a hearing on July 19, 2018, the Bankruptcy Court entered an order appointing Judge Jones as mediator [Docket No. 894], with the scope, parties, time and procedures for the mediation to be determined by Judge Jones following consultation with the parties as he deemed appropriate in light of the agreements announced on the record at the hearing (which agreements resolved the LSP Objection).

On August 1, 2018, Wilmington Filed an emergency motion [Docket No. 960] (the "Wilmington Motion to Compel"), seeking entry of an order compelling the parties to provide an unredacted copy of the Draft Committee Complaint to Wilmington. Fairfax, Bluescape, and Gen IV objected to the Wilmington Motion to Compel [Docket Nos. 935 and 936]. A hearing on the Wilmington Motion to Compel was held on August 2, 2018. Following the hearing, Wilmington, Fairfax, and Bluescape submitted an agreed order resolving the Wilmington Motion to Compel [Docket No. 943] (the "Agreed Wilmington Mediation

Order"). On August 6, 2018, the Bankruptcy Court entered the Agreed Wilmington Mediation Order [Docket No. 951].

Mediation commenced on August 6, 2018, and continued on August 7, 2018. A second round of mediation was held on August 27, 2018, and continued on September 21, 2018. The parties to mediation included: (a) the Debtors; (b) each of the 1.5 Lien Noteholders; (c) the Holders of a super-majority of the 1.75 Lien Term Facility Claims; (d) the Holders of a super-majority of Second Lien Term Loan Facility Claims; (e) the Committee; (f) counsel representing certain Insureds under the D&O Policies; and (g) certain of the D&O Carriers. Mediation resulted in an agreement in principle among the Debtors, the Committee, Fairfax, Bluescape, and the D&O Carriers on certain terms of a comprehensive restructuring transaction reflected in the First Plan, as well as a resolution of potential claims and causes of action that were the subject of the Debtors' and the Committee's investigation (as detailed above) and set forth in the Draft Committee Complaint.

Although the restructuring proposed by the First Plan was supported by the overwhelming majority of the capital structure, LSP Investment Advisors, LLC, Gen IV Investment Opportunities, LLC, VEGA Asset Partners, LLC (collectively, "LSP") disagreed with the reorganization proposed by the First Plan. On October 12, 2018, LSP commenced an adversary proceeding (Adversary Case No. 18-03295) and Filed a complaint [Docket No. 1132] (the "LSP Complaint") seeking to equitably subordinate the Claims of certain 1.5 Lien Noteholders and 1.75 Lien Term Loan Lenders to all Claims of LSP as a 1.5 Lien Noteholder and 1.75 Lien Term Loan Facility Lender.

### (d)      Negotiations Following Solicitation on the First Plan

After completing solicitation on the First Plan, the Debtors were fully prepared to proceed to confirmation of the First Plan in December 2018 with a goal of emerging prior to the end of the year. Unfortunately, the oil and gas markets experienced significant volatility during the exit financing marketing process with the largest monthly percentage decline in oil prices since the 2008 recession occurring in November 2018 and an overall decline in natural gas prices following a temporary spike. Against this backdrop, the Debtors, along with RBC, met with 12 prospective second lien lending institutions in late-November and early-December 2018. Simultaneously with these meetings, RBC worked to syndicate the exit RBL facility, contacting 22 lenders regarding various commitment levels. RBC and BMO received commitments from three lenders for the exit RBL facility totaling approximately $135 million, which, in addition to the RBC and BMO commitments of $65 million each, accounted for only approximately 80 percent of the required exit RBL facility amount. The Debtors ultimately concluded they were unable to raise the necessary exit financing to move forward with confirmation of the First Plan, and adjourned the Confirmation Hearing to a date to be determined in 2019.

Throughout January and February 2019, the Debtors continued to work with all key constituencies to develop consensus regarding an alternative restructuring transaction, including through additional Mediation with certain key stakeholders on January 9, 2019, additional in person meetings with certain creditor constituencies on February 13, 2019, and continuous formal and informal communication with all parties. To provide sufficient time for a consensual plan of reorganization to be negotiated, the Debtors' largest secured creditors and the Committee agreed to support a further extension of the Debtors' exclusive periods to file and solicit votes on a plan through and including February 15, 2019 and April 16, 2019, respectively (from January 31, 2019 and April 1, 2019, respectively). Additionally, the Debtors secured an extension of the maturity of the DIP Facility through May 22, 2019 to provide sufficient funding for the remainder of the Chapter 11 Cases.

On February 15, 2019, the Debtors Filed the Third Exclusivity Motion. The Committee joined the Debtors in the Third Exclusivity Motion in an effort to keep all stakeholders focused on negotiating a consensual plan or, in the alternative, negotiate an agreed-to litigation schedule with the Committee. The

Bankruptcy Court entered an order granting the Third Exclusivity Motion and provided the Debtors another 45 days of exclusivity to File a plan of reorganization [Docket No. 1620].

<div style="text-align:center">

**(e)**        **Committee's Standing Motion**

</div>

On February 15, 2019, the Committee Filed the Standing Motion. On March 9, 2019, the Debtors Filed an objection [Docket No. 1684] to the Standing Motion, as did Fairfax and Bluescape [Docket No. 1681]. On April 4, 2019, Oaktree and B. James Ford ("Ford") Filed a joint objection [Docket No. 1792] to the Standing Motion. On April 5, 2019, LSP (together with Oaktree and Ford, the "Standing Objectors") Filed an objection [Docket No. 1795] to the Standing Motion. Subsequently, the Committee, the Debtors, Bluescape, and Fairfax Filed a joint motion [Docket No. 1796] seeking to abate the hearing on the Standing Motion, which the Bankruptcy Court approved by entering an order (the "Abatement Order") [Docket No. 1797]. On April 8, 2019, the Standing Objectors Filed a joint motion [Docket No. 1798] (the "Motion to Amend the Abatement Order") seeking to amend the Abatement Order to reschedule the Standing Motion as to the Standing Objectors for April 23, 2019 (or other such date as may be convenient for the Bankruptcy Court). On April 9, 2019, the Bankruptcy Court denied the Motion to Amend the Abatement Order [Docket No. 1799].

Oaktree believes that Oaktree has no liability for any of the Causes of Action asserted against it, and that none of the Causes of Action against Oaktree should be preserved. Further, Oaktree has requested that the Bankruptcy Court reconsider its prior order, and require that the Standing Motion or the Causes of Action against Oaktree be litigated and resolved in advance of confirmation. At the hearing considering adequacy of the Disclosure Statement, the Bankruptcy Court announced that at the Confirmation Hearing, it intended to establish a schedule for adjudicating the Causes of Action (including Challenge Actions) against Oaktree.

<div style="text-align:center">

**(f)**        **Filing of the Toggle Plan**

</div>

On March 8, 2019, the Debtors Filed the *Second Amended Joint Chapter 11 Plan of EXCO Resources, Inc., and Its Debtor Affiliates* [Docket No. 1683] (the "Toggle Plan") and the corresponding *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of EXCO Resources, Inc., and Its Debtor Affiliates* [Docket No. 1682]. The Toggle Plan contemplated the preservation of all Secured Lender Challenges, to be litigated following confirmation of the Toggle Plan, and either a reorganization of the Debtors with the New Common Stock of the Reorganized Debtors distributed to Holders of Allowed Claims in accordance with the resolution of the Secured Lender Challenges, or a sale of the Debtors' assets and corresponding distribution of proceeds. The Toggle Plan did not have the support of any key constituents.

<div style="text-align:center">

**(g)**        **Filing of the Amended Plan**

</div>

Since Filing the Toggle Plan, the Debtors have continued to promote a global consensus, including through additional Mediation with certain key stakeholders on March 14, 2019 and March 15, 2019, and continuous communication with all creditor constituencies and the mediator regarding the terms of multiple restructuring alternatives. As a result of these negotiations, the Debtors have reached an agreement with the Settling Lenders and the Committee regarding the terms of the Amended Plan, which contemplates, among other things, a settlement of all Estate claims and Causes of Action against the Settling Lenders pursuant to which, among other things, the Settling Lenders have agreed to contribute $60 million of value to which they are entitled to fund recoveries under the Amended Plan and equitize their funded debt Claims. Additionally, the Amended Plan incorporates the Debtors' settlement with the D&O Carriers regarding all claims and Causes of Action the Debtors, the Committee, or any other party in interest may have asserted against the Insureds in exchange for $13.35 million in Cash contributed by the D&O Carriers to the Estates. The Amended Plan preserves, among other things, claims and Causes of Action against the Holders of

<div style="text-align:center">

72

</div>

1.5 Lien Notes Claims and 1.75 Lien Term Loan Facility Claims other than the Settling Lenders to be litigated by the Unsecured Claims Distribution Trust.

The Debtors believe the Amended Plan is a value-maximizing transaction that will allow the Debtors to emerge as a going concern with a significantly de-levered capital structure. In particular, the Secured Lender Settlement and the D&O Settlement are good-faith compromises that are beneficial to the Debtors' Estates, pursuant to which the Debtors and their Estates will receive substantial value. The support of these settling parties, and the value provided pursuant to these settlements, are critical to allowing the Debtors to emerge from bankruptcy as a going concern with a right-sized capital structure and a fresh start.

### I.        Expected Timetable of the Chapter 11 Cases

The Debtors expect they will emerge from chapter 11 by June 30, 2019. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Amended Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Amended Plan and its implementation.

### A.        Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Amended Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Amended Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.        Parties in Interest May Object to the Amended Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Amended Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.        The Conditions Precedent to the Effective Date of the Amended Plan May Not Occur

As more fully set forth in Article IX of the Amended Plan, the Confirmation Date and the Effective Date of the Amended Plan are subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

#### 3.        The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Amended Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Amended Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an

alternative chapter 11 plan or proceed with a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Amended Plan.

### 4.        The Debtors May Not Be Able to Secure Confirmation of the Amended Plan

There can be no assurance that the requisite acceptances to confirm the Amended Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Amended Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Amended Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Amended Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court could still decline to confirm the Amended Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Confirmation of the Amended Plan is also subject to certain conditions as described in Article IX of the Amended Plan. If the Amended Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Amended Plan, reserve the right, upon reasonable prior notice to and consent of the Required Parties, to modify the terms and conditions of the Amended Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Amended Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Amended Plan or no distribution whatsoever under the Amended Plan.

### 5.        Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Amended Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual

Confirmation or Consummation of the Amended Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.      The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and Executory Contracts.

### 7.      The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Amended Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Amended Plan.  The estimates set forth in this Amended Disclosure Statement cannot be relied upon by any Holder of a Claim, as the Debtors may seek to investigate, File, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Amended Plan irrespective of whether this Amended Disclosure Statement identifies any such Claims or objections to Claims such Claim is subject to an objection.  Any Holder of a Claim thus may not receive its expected share of the estimated distributions described in this Amended Disclosure Statement.

### 8.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Amended Plan

The distributions available to Holders of Allowed Claims under the Amended Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Amended Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Amended Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Amended Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Amended Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that ultimately will be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Amended Plan.

### 9.      Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Amended Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third party releases that may otherwise be asserted against the Debtors, the Reorganized Debtors, or the Released Parties.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

10.     **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.  If the Effective Date does not occur, the Amended Plan shall be null and void in all respects and nothing contained in the Amended Plan or this Amended Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holder of a Claim or Interest, or any other Entity; (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; or (d) be used by the Debtors or any Entity as evidence (or otherwise) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

11.     **Risk of Loss of Exclusive Right to Propose a Plan**

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Amended Plan in order to achieve the Debtors' stated goals.

12.     **Continued Risk upon Confirmation**

Even if the Amended Plan is consummated, the Reorganized Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in consumer demand for, and acceptance of, their oil and gas, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Amended Plan will achieve the Debtors' stated goals.

Further, even if the Debtors' debts are reduced and/or discharged through the Amended Plan, the Reorganized Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

B.     **Risks Related to the Debtors' Operations During and After These Chapter 11 Cases**

The Debtors face substantial risks for the duration of the Chapter 11 Cases, which may impact their business while in Chapter 11 and afterwards.  The Debtors, with the assistance of their advisors, have considered these risks in formulating the Amended Plan.

1.     **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

During the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions (which are the corporate transactions necessary or desirable to implement the Amended Plan); (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers,

customers, employees, royalty interest Holders, working interest Holders, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations and potential for a loss of, or a disruption in the materials or services received from suppliers, contractors or service providers with whom the Debtors have commercial relationships; (e) ability of third parties to seek and obtain Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Court approval to terminate or shorten the exclusive period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' business plan.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' business plan.

### 2. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to limit their relationship with the Debtors.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. Further, the Debtors may experience significant costs and delays due to litigation during the Chapter 11 Cases. The DIP Facilities may not be sufficient to support day-to-day operations in the event of a prolonged restructuring process and the Debtors may be required to seek additional debtor in possession financing to fund operations. Additionally, the DIP Facilities are set expire on May 22, 2019, and the Debtors may be unable to secure an extension or additional funding. If the Debtors are unable to obtain such financing on favorable terms or at all, chances of successfully reorganizing the Debtors' business may be seriously jeopardized, the likelihood that the Debtors instead will be required to liquidate their assets may be enhanced, and, as a result, any claims and securities in the Debtors could become further devalued or become worthless.

Further, the Debtors cannot predict the ultimate settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 3. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In particular, the process of estimating oil and natural gas reserves is complex, requiring significant decisions and assumptions in the evaluation of available geological, engineering and economic data for each reservoir. As a result, the estimates are inherently imprecise evaluations of reserve quantities and future net revenue and such estimates prepared by different engineers or by the same engineers at different times, may vary substantially.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 4. The Debtors' Activities May Be Restricted By Financial Covenants Contained in the DIP Credit Agreement

The Debtors' principal sources of liquidity historically have been internally generated Cash flows from operations, borrowings under certain credit agreements, issuances of debt securities, dispositions of non-strategic assets, joint ventures, and capital markets when conditions are favorable. During the pendency of the Chapter 11 Cases, the Debtors' liquidity depends mainly on Cash generated from operating activities and available funds under the DIP Facility. The DIP Credit Agreement includes certain affirmative and negative covenants, including, among other covenants customary in similar reserve-based credit facilities and debtor-in-possession financings, requirements to maintain a minimum level of liquidity and limit aggregate disbursements to certain thresholds compared to the 13-week Cash flow forecasts provided to the DIP Lenders.

The Debtors' future ability to comply with these restrictions and covenants is uncertain and will be affected by the levels of Cash flow from operations, development activities, and other events or circumstances beyond the Debtors' control. If market or other economic conditions deteriorate, the Debtors' ability to comply with these covenants may be impaired. If the Debtors violate any provisions of such financing agreements that are not cured or waived within the appropriate time periods provided therein, a significant portion of the Debtors' indebtedness may become immediately due and payable and the Debtors' lenders may not make further loans. The Debtors might not have, or be able to obtain, sufficient funds to make these accelerated payments.

### 5. The Debtors' Substantial Liquidity Needs May Impact Production Levels and Revenue

If the Debtors' Cash flow from operations remains depressed or decreases as a result of lower commodity prices or otherwise, the Debtors' ability to expend the capital necessary to replace proved reserves, maintain leasehold acreage, or maintain current production may be limited, resulting in decreased production and proved reserves over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing beyond the DIP Facility, which matures on

May 22, 2019.  In addition to the Cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that Cash on hand and Cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) ability to comply with the terms and conditions of the DIP Order; (b) ability to maintain adequate Cash on hand; (c) ability to generate Cash flow from operations; (d) ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction, including the sale of some or substantially all of the Debtors' assets; and (e) the cost, duration, and outcome of the Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that Cash on hand and Cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.

> **6.** **Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Business, Results of Operations, and Financial Condition**

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on prevailing oil and natural gas prices.  Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand.  Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions.  During 2017, the NYMEX Henry Hub natural gas price fluctuated from a high of $3.65 per Mmbtu to a low of $2.44 per Mmbtu, while the NYMEX WTI crude oil price ranged from a high of $60.42 per Bbl to a low of $42.53 per Bbl. For the five years ended December 31, 2017, the NYMEX Henry Hub natural gas price ranged from a high of $7.94 per Mmbtu to a low of $1.49 per Mmbtu, while the NYMEX WTI crude oil price ranged from a high of $110.53 per Bbl to a low of $26.21 per Bbl.  The Debtors expect such volatility to continue in the future.  The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- the current uncertainty in the global economy;

- changes in global supply and demand for oil and natural gas;

- the condition of the United States and global economies;

- domestic government regulation, legislation, and policies;

- the actions of certain foreign countries;

- the price and quantity of imports of foreign oil and natural gas;

- political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries, and acts of terrorism or sabotage;

- the level of global oil and natural gas exploration and production activity;

- the level of global oil and natural gas inventories;

- production or pricing decisions made by the Organization of Petroleum Exporting Countries;

- weather conditions;

- technological advances affecting energy consumption; and

- the price and availability of alternative fuels and other energy sources.

The reference or regional index prices that the Debtors use to price their oil and natural gas sales sometimes reflect a premium or discount to the relevant benchmark prices, such as NYMEX. The difference between the benchmark price and the price the Debtors reference in their sales contracts is called a differential. The Debtors cannot accurately predict oil and natural gas differentials. Changes in differentials between the benchmark price for oil and natural gas and the reference or regional index price the Debtors reference in their sales contracts could have a material adverse effect on their results of operations and financial condition. These differentials vary depending on factors such as supply, demand, pipeline capacity, infrastructure, and weather. The Debtors have experienced significant volatility in their price differentials to date.

Oil and natural gas prices affect the amount of Cash flow available to the Debtors to meet their financial commitments and fund capital expenditures. Moreover, the Debtors are not party to any commodity derivative contracts, meaning all of the Debtors' estimated production is exposed to commodity price volatility. During the Chapter 11 Cases, the Debtors' ability to enter into commodity derivative contracts covering estimated future production is limited under the DIP Credit Agreement. The Debtors are only permitted to enter into commodity derivative contracts with lenders under the DIP Credit Agreement. As a result, the Debtors may not be able to enter into commodity derivative contracts covering production in future periods on favorable terms or at all. If the Debtors cannot or choose not to enter into commodity derivative contracts in the future, the Debtors could be more affected by changes in commodity prices. The Debtors' inability to hedge the risk of low commodity prices in the future, on favorable terms or at all, could have a material adverse impact on the Debtors' business, financial condition, and results of operations.

Oil and natural gas prices also impact the Debtors' ability to borrow money and raise additional capital. Lower oil and natural gas prices may not only decrease the Debtors' revenues on a per-unit basis, but also may reduce the amount of oil and natural gas that the Debtors can produce economically in the future. Higher operating costs associated with any of the Debtors' oil or natural gas fields will make their profitability more sensitive to oil or natural gas price declines. A sustained decline in oil or natural gas prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity, or ability to finance planned capital expenditures. In addition, a sustained decline in oil or natural gas prices might result in substantial downward estimates of the Debtors' proved reserves. As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' business, results of operations, and financial condition.

**7. Drilling for and Producing Natural Gas and Oil Are High Risk Activities with Many Uncertainties that Could Adversely Affect the Debtors' Business, Financial Condition, and Results of Operations**

The Debtors' future success will depend on, among other things, the success of their development and production activities. The Debtors must incur significant expenditures to identify and acquire

properties and to drill and complete wells. The costs of drilling and completing wells are often uncertain, and drilling operations may be curtailed, delayed, or canceled as a result of a variety of factors, including unexpected drilling conditions, pressure or irregularities in formations, equipment failures or accidents, weather conditions, and shortages or delays in the delivery of equipment. Additionally, seismic and other technology does not allow the Debtors to know conclusively prior to drilling a well that oil and natural gas is present or economically producible. The results of drilling in new or emerging formations, including the Debtors' properties in shale formations, are more uncertain initially than drilling results in areas that are developed, have established production, or where the Debtors have a longer history of operation. Overruns in budgeted expenditures are common risks that can make a particular project uneconomical.

Further, the Debtors' future business, financial condition, results of operations, liquidity, or ability to finance planned capital expenditures could be materially and adversely affected by any factor that may curtail, delay, or cancel drilling, including the following:

- delays imposed by or resulting from compliance with regulatory requirements;

- unusual or unexpected geological formations;

- pressure or irregularities in geological formations;

- shortages of or delays in obtaining equipment, materials, and qualified personnel;

- equipment malfunctions, failures, or accidents;

- unexpected operational events and drilling conditions;

- pipe or cement failures;

- casing collapses;

- lost or damaged oilfield drilling and service tools;

- loss of drilling fluid circulation;

- uncontrollable flows of oil, natural gas, and fluids;

- fires and natural disasters;

- environmental hazards, such as natural gas leaks, oil spills, pipeline ruptures, and discharges of toxic gases;

- adverse weather conditions;

- reductions in oil and natural gas prices;

- natural gas and oil property title problems; and

- market limitations for natural gas and oil.

If any of these factors were to occur with respect to a particular field, the Debtors could lose all or a part of their investment in the field, or they could fail to realize the expected benefits from the field, either of which could materially and adversely affect their revenue and profitability.

In addition, the Debtors' operations are subject to the risks inherent in the oil and natural gas industry, including the risks of fires, explosions, and blowouts; pipe failures; abnormally pressured formations; and environmental accidents such as oil spills, natural gas leaks, ruptures or discharges of toxic gases, brine or well fluids into the environment (including groundwater contamination).  As is customary in the oil and natural gas industry, the Debtors maintain insurance against some, but not all, of these risks. The Debtors' insurance may not be adequate to cover these potential losses or liabilities.  Further, insurance coverage may not continue to be available at commercially acceptable premium levels or at all. Due to cost considerations, from time to time the Debtors have declined to obtain coverage for certain drilling activities, and the Debtors do not carry business interruption insurance.  Losses and liabilities arising from uninsured or under-insured events could require the Debtors to make large unbudgeted Cash expenditures that could adversely impact results of operations and Cash flow.

Further, the Debtors' success depends upon their ability to find, develop or acquire additional oil and natural gas reserves that are profitable to produce.  Factors that may hinder the Debtors' ability to acquire or develop additional oil and natural gas reserves include competition, access to capital, prevailing oil and natural gas prices and the number and attractiveness of properties for sale.  The Debtors' decisions to purchase, explore, develop or otherwise exploit properties or prospects will depend in part on the evaluation of data obtained from production reports and engineering studies, geophysical and geological analyses and seismic and other information, the results of which are often inconclusive and subject to various interpretations.  These decisions could significantly reduce the Debtors' ability to generate Cash needed to service the Debtors' debt and other working capital requirements.

### 8.     The Debtors May Not Be Able To Secure Required Consents From Third Parties

Leases on oil and natural gas properties typically have a term after which they expire unless, prior to expiration, a well is drilled and production of hydrocarbons in paying quantities is established.  If the Debtors' leases expire and they are unable to renew the leases, the Debtors will lose the right to develop the related properties.

Further, the Debtors conduct a substantial portion of their operations through joint interest and joint venture arrangements with third parties.  In many instances, the Debtors depend on these third parties for elements of these arrangements, such as payments of substantial development and other costs.  The performance of these third party obligations or the ability of third parties to meet their obligations under these arrangements is outside the Debtors' control.  If these parties do not meet or satisfy their obligations under these arrangements, the performance and success of these arrangements, and their value to the Debtors, may be adversely affected.  If the Debtors' current or future joint interest or joint venture partners are unable to meet their obligations, the Debtors may be forced to undertake the obligations and/or incur additional expenses in order to have some other party perform such obligations.  In such cases, the Debtors may also be required to enforce their rights, which may cause disputes among the Debtors and their joint interest and joint venture partners.  If any of these events occur, they may adversely impact the Debtors' financial performance and results of operations.

### 9.     The Debtors May Encounter Obstacles to Marketing Their Oil and Natural Gas, Which Could Adversely Impact Revenues

Market conditions or the unavailability of satisfactory oil and natural gas transportation arrangements or infrastructure may hinder the Debtors' access to oil and natural gas markets or delay the Debtors' production.  The availability of a ready market for the Debtors' oil and natural gas production depends on a number of factors, including the demand for and supply of oil and natural gas and the proximity of reserves to pipelines and terminal facilities.  Additionally, market conditions may be impacted by economic, environmental, or political factors that are beyond the Debtors' control.

82

The Debtors' ability to market their production depends, in substantial part, on the availability and capacity of gathering systems, pipelines, processing facilities and oil and condensate trucking operations owned and operated by third-parties. The Debtors' failure to obtain these services on acceptable terms could have a material adverse effect on their business. Transportation space on the gathering systems and pipelines the Debtors utilize is occasionally limited or unavailable due to repairs, outages caused by accidents or other events, or improvements to facilities or due to space being utilized by other companies that have priority transportation agreements. The Debtors may be required to shut in wells for a variety of reasons, including due to lack of a market or inadequacy or unavailability of crude oil or natural gas pipelines, gathering systems or trucking capacity. A portion of the Debtors' production may also be interrupted, or shut-in, from time to time for numerous other reasons, including as a result of accidents, excessive pressures, maintenance, weather, field labor issues or other disruptions of service. Curtailments and disruptions may last from a few days to several months, and we have no control over when or if third-party facilities are restored. In addition, if the Debtors are unable to transport or sell natural gas due to limitations in infrastructure, the Debtors may experience significant curtailments of production if they are not able to find an operational or commercial solution, and may be required to shut-in certain wells, among other things.

### 10.   The Debtors are Subject to Complex Federal, State, and Other Laws and Regulations That May Result In Substantial Expenditures

The Debtors' oil and natural gas development and production operations are subject to complex and stringent laws and regulations that may require the incurrence of substantial compliance costs. Laws, rules and regulations protecting the environment have changed frequently and the changes often include increasingly stringent requirements. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, the incurrence of investigatory or remedial obligations as well as associated natural resource damages, or the issuance of injunctive relief. Any changes in applicable state or federal law or other regulations that result in more stringent or costly waste handling, storage, transport, disposal or cleanup requirements, or requirements for drilling, completing, operating, and abandoning wells and related facilities, could require the Debtors to make significant expenditures to maintain compliance, and may otherwise have a material adverse effect on the Debtors' earnings, results of operations, competitive position or financial condition.

### 11.   The Loss of Key Customers Could Adversely Affect the Debtors' Revenues

The Debtors' ability to collect payments from the sale of oil and natural gas to their customers depends on the payment ability of their customer base, which includes several significant customers. If any one or more of the Debtors' significant customers fails to pay the Debtors for any reason, the Debtors could experience a material loss. In addition, if any of the Debtors' significant customers cease to purchase oil or natural gas or reduce the volume of the oil or natural gas that they purchase from the Debtors, the loss or reduction could have a detrimental effect on the Debtors' production volumes and may cause a temporary interruption in sales of, or a lower price for, our oil and natural gas.

### 12.   The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors may experience increased levels of employee attrition. Because competition for experienced personnel in the oil and gas industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their business. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect

on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' business and the results of operations.

### C.     Risks Related to Recoveries Provided Under the Amended Plan

Certain risks may affect the recoveries provided under the Amended Plan.

#### 1.     Timing and Amount of Distributions

Various factors will impact the amount of recoveries that Holders of Allowed Claims receive, including, without limitation to what degree the Secured Claim Challenges are successful.  Further, due to the nature of litigation, it may take years to fully adjudicate, decide, or resolve the Secured Claim Challenges.  As a result, Holders of Allowed Claims may not receive distributions in accordance to the Amended Plan for a prolonged period of time following the Effective Date.

#### 2.     The Debtors May Not Be Able to Achieve their Projected Financial Results

The Debtors may not be able to achieve their projected financial results.  The Financial Projections set forth in this Amended Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular.  While the Debtors believe that the financial projections contained in this Amended Disclosure Statement are reasonable, there can be no assurance that they will be realized.  In addition, the process of estimating oil and natural gas reserves is complex, requiring significant assumptions in the evaluation of available geological, engineering and economic data for each reservoir.  As a result, the estimates are inherently imprecise and such estimates may vary substantially.

If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected.  The Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

#### 3.     The New Common Stock May Not Be Publicly Traded

The New Common Stock to be issued under the Amended Plan will not be listed on or traded on any nationally recognized market or exchange.  Accordingly, there can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the prices at which such stock might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New Common Stock may be substantially limited.  Moreover, the Shareholders Agreement may contain significant restrictions on transferability, as well as insufficient minority shareholder protections.  Finally, there can be no assurance that even if an active trading market does develop, that such shares will trade at prices that are anywhere near (and in fact, may be materially different) to the recovery percentages as set forth in the Amended Disclosure Statement.

#### 4.     Certain Holders of New Common Stock May Be Restricted in their Ability to Transfer or Sell their Securities

To the extent that the New Common Stock issued under the Amended Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such New Common Stock may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of

the Bankruptcy Code with respect to such securities. Resales by Persons who receive New Common Stock pursuant to the Amended Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Persons would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Stock will not be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell the New Common Stock. *See* Article XI to this Amended Disclosure Statement, entitled "CERTAIN SECURITIES LAW MATTERS," which begins on page 91.

### 5.      Certain Tax Implications of the Amended Plan

Consummation of the Amended Plan may result in significant tax implications for the Debtors and Holders of Claims. Holders of Allowed Claims should carefully review Article XII of this Amended Disclosure Statement, entitled "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE AMENDED PLAN," which begins on page 93, to determine how the tax implications of the Amended Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of Claims.

### 6.      The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' business, results of operations, and financial condition.

### 7.      The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of Cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, anticipated borrowings under the Exit RBL Facility, upon emergence, which risk may be significant in light of the post-emergence capital structure contemplated by the Amended Plan.

8. **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases or by the Resolution of Pending Litigation Unrelated to the Chapter 11 Proceedings**

The Reorganized Debtors may become parties to litigation or litigation in which the Debtors are already a party may not be resolved in the Reorganized Debtors' favor. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Amended Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of any litigation. The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

9. **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Reorganized Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' Filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. However, the Debtors may assume certain prepetition agreements that include certain indemnification obligations. As such, the Reorganized Debtors may retain liabilities under such agreements that may be material. Further, any Claims not ultimately discharged through a plan of reorganization could be asserted against the Reorganized Debtors and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## IX. SOLICITATION AND VOTING PROCEDURES

This Amended Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Amended Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Amended Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Amended Disclosure Statement Order, which is attached hereto as **Exhibit C**.

*The Amended Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Amended Disclosure Statement and in formulating a decision to vote to accept or reject the Amended Plan.*

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS AMENDED DISCLOSURE STATEMENT IS ONLY A SUMMARY**. PLEASE REFER TO THE AMENDED DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A. Holders of Claims Entitled to Vote on the Amended Plan

Under the provisions of the Bankruptcy Code, not all Holders of Claims against a debtor are entitled to vote on a chapter 11 plan. The table in Article IV.C of this Amended Disclosure Statement, entitled "

Am I entitled to vote on the Amended Plan?," which begins on page 7, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Amended Plan only from Holders of Claims in Classes 3, 4, 5, 6, and 7 (collectively, the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Amended Plan and may, in certain circumstances, receive a distribution under the Amended Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Amended Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in Classes 1, 2, 8, 9, 10, and 11.  Additionally, the Amended Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed, are not entitled to vote to accept or reject the Amended Plan.

### B.      Voting Record Date

*The Voting Record Date is April 26, 2019*.  The Voting Record Date is the date on which it was determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Amended Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Amended Plan as the Holder of a Claim.

### C.      Voting on the Amended Plan

*The Voting Deadline is June 5, 2019, at 5:00 p.m. (prevailing Central Time)*.  In order to be counted as votes to accept or reject the Amended Plan, ballots must be returned as directed and *received* by the Voting Deadline.  Holders of Class 6 Unsecured Notes Claims should return their ballot to their nominee, allowing enough time for the nominee to include the vote on a master ballot, and submit the master ballot by the Voting Deadline.

**No votes cast on a prior ballot in connection with the solicitation of the First Plan shall be counted in connection with solicitation of the Amended Plan.**

### D.      Ballots Not Counted

*No Ballot will be counted toward Confirmation if, among other things*:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means other than as specifically set forth in the ballots; (3) it was cast by an Entity that is not entitled to vote on the Amended Plan; (4) it was cast for a Claim listed in the Debtors' Schedules as contingent, unliquidated, or disputed for which the applicable Claims bar date has passed and no Proof of Claim was timely Filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Amended Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent), an administrative agent, an indenture trustee, or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Amended Plan or it is marked both to accept and reject the Amended Plan.  **Please refer to the Amended Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Amended Plan.**

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE EMAIL TABULATION@EPIQGLOBAL.COM AND REFERENCE "EXCO" IN THE SUBJECT LINE OR CALL THE PHONE NUMBER LISTED ON YOUR BALLOT.**
>
> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE AMENDED DISCLOSURE STATEMENT ORDER WILL *NOT* BE COUNTED.**

## X.     CONFIRMATION OF THE AMENDED PLAN

### A.     Requirements for Confirmation of the Amended Plan

Among the requirements for Confirmation of the Amended Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Amended Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Amended Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Amended Plan is feasible; and (3) the Amended Plan is in the "best interests" of Holders of Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Amended Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Amended Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Amended Plan has been proposed in good faith.

If any Parties intend to seek discovery in connection with Confirmation of the Amended Plan, such Parties are encouraged to seek such discovery as soon as possible, because there is no guarantee that there will be sufficient funds to finance the Chapter 11 Cases if the Confirmation Hearing is delayed due to protracted Amended Plan discovery.

### B.     Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the Debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of A&M, the Debtors' restructuring advisor.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Amended Plan.  Consequently, the Debtors and their management believe that Confirmation of the Amended Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Amended Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' business may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to Holders of Claims under

a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their business, which is reflected in the New Common Stock to be distributed under the Amended Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Amended Plan.

Oaktree believes that in connection with a potential liquidation of the Debtors, to the extent the proceeds of such liquidation are not sufficient to satisfy Allowed Secured Claims in full, Holders of such Allowed Secured Claims would have a Claim pursuant to section 507(b) of the Bankruptcy Code that would entitle them to payment in full before other Holders of Claims receive any distribution.

### C.  Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Amended Plan meets this feasibility requirement, the Debtors, with the assistance of PJT, the Debtors' investment banker, have analyzed their ability to meet their respective obligations under the Amended Plan.  As part of this analysis, the Debtors prepared forecasted, post reorganized, consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections") for the annual periods ending December 31, 2019 (fiscal year 2019) through December 31, 2023 (fiscal year 2023) (the "Projection Period").  The Financial Projections were prepared based on a number of assumptions made by the Debtors' management team as to the future performance of the Reorganized Debtors, and reflect management's judgement and expectations regarding its future operations and financial position.  The Financial Projections are based on an assumption that the Amended Plan is consummated on or around May 31, 2019; to the extent that the Effective Date occurs before or after such date, recoveries on account of Allowed Claims could be impacted.  Creditors and other interested parties should review Article VIII of this Amended Disclosure Statement, entitled "RISK FACTORS," which begins on page 73, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Amended Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.  Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accepts the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of votes with respect to such a class is not required.[12]

---

[12]  A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have ***actually*** voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.   Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Amended Plan, the Debtors reserve the right to seek to confirm the Amended Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Amended Plan or is deemed to have rejected the Amended Plan, the Debtors will request Confirmation of the Amended Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right, with the consent of the Required Parties, to alter, amend, modify, revoke, or withdraw the Amended Plan or any Plan Supplement document, including the right to amend or modify the Amended Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.   No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.   Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Amended Plan pursuant to section 1129(b) of the Bankruptcy Code, the Amended Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Amended Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Amended Plan will receive more than 100 percent of the amount of Allowed Claims in that Class. The Debtors believe that the Amended Plan and the treatment of all Classes of Claims and Interests under the Amended Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Amended Plan.

F.     **Valuation of the Debtors**

In conjunction with formulating the Amended Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  The Valuation Analysis is set forth in **Exhibit F** attached hereto and incorporated herein by reference.  The Debtors' enterprise valuation, as set forth in the Valuation Analysis, is substantially less than the value ascribed to the Debtors' assets in their Petitions and subsequently Filed Schedules.  The value of the Debtors' assets as listed on the Debtors' Petitions was based on an accounting book value calculated in accordance with Generally Accepted Accounting Principles ("GAAP") as of December 31, 2017.  Book values of assets prepared in accordance with GAAP generally do not reflect the current performance of the assets or the impact of the commodity price environment and may differ materially from the actual value and/or performance of the underlying assets.  Given the dramatic swing in the commodity prices over the past year, this difference is material.  As such, the value listed in the Petitions and the subsequently Filed Schedules cannot be, and was not, used to determine the Debtors' enterprise valuation.

G.     **The Plan Supplement**

The Debtors will File certain documents that provide additional details regarding implementation of the Plan in the Plan Supplement, which will be Filed with the Bankruptcy Court in accordance with the Disclosure Statement Order (or such later date as may be approved by the Bankruptcy Court).  The Plan Supplement will include documents in accordance with the Amended Disclosure Statement Order.

Notwithstanding the foregoing, the Debtors may amend, with the consent of the Required Parties, the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

Copies of the Plan Supplement documents will be available on the website of the Debtors' Notice and Claims Agent at https://dm.epiq11.com/ERI (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov (for a fee).

XI.     **CERTAIN SECURITIES LAW MATTERS**

A.     **New Common Stock**

As discussed herein, the Amended Plan provides for Reorganized EXCO to distribute the New Common Stock or Unsecured Claims Trust Beneficial Interests to Holders of Allowed 1.5 Lien Notes Claims, 1.75 Lien Term Loan Facility Claims, Allowed Second Lien Term Loan Facility Claims, Allowed Unsecured Notes Claims, and Allowed GUC Claims.  The New Common Stock and/or Unsecured Claims Trust Beneficial Interests are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

B.     **Issuance and Resale of New Common Stock under the Plan**

1.     **Private Placement Exemptions**

All shares of New Common Stock and the Claims Trust Beneficial Interests that will be issued under the Amended Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.  The new equity underlying the Management Incentive Plan, if applicable, will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.

**RECIPIENTS OF NEW COMMON STOCK ARE ADVISED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW.**

### 2.    Resale of New Common Stock; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an Entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Securities Act, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. While there is no precise definition of a "controlling" stockholder, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of New Common Stock by Entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Given the complex nature of the question of whether a particular person may be an underwriter and other issues arising under applicable securities laws, accordingly, the Debtors express no view as to whether any Person would be deemed to be an "underwriter" with respect to the New Common Stock and, in turn, whether any Person may freely resell New Common Stock. **The Debtors recommend that potential recipients of New Common Stock consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law.**

3.      **New Common Stock / Management Incentive Plan**

The participants in the Management Incentive Plan, the timing and allocations of the awards to participants, and the other terms and conditions of such awards (including, but not limited to, vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights, and transferability) shall be determined by the Reorganized EXCO Board.  The Management Incentive Plan shall dilute all of the New Common Stock (if applicable).

## XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE AMENDED PLAN

### A.   Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Amended Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy).  Further, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For

purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes).

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE AMENDED PLAN.**

B.      **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

The Debtors intend to structure the Restructuring Transactions as a reorganization of the Debtors as a going concern without any taxable sales of any assets pursuant to the Amended Plan (such a structure, an "Equity Transaction").  If the Debtors structure the Restructuring Transactions as an Equity Transaction, the transaction would not give rise to any gain or loss, but will give rise to CODI, as described below.  In an Equity Transaction, the Debtors' tax attributes will, subject to the rules discussed below regarding CODI and Section 382 of the Tax Code, survive the restructuring process and potentially be usable by the Reorganized Debtors going forward.

1.      **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize CODI, for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income pursuant to the rule discussed in the preceding sentence.  In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.[13]  Alternatively, a debtor with CODI may elect first to reduce the basis of its

---

[13]      Under the 2017 tax reform legislation commonly referred to as the tax cuts and jobs act (the "Tax Cut and Jobs Act"), interest deductions in excess of statutorily-defined limits are deferred under section 163(j) of the Tax Code unless and until a debt issuer has sufficient adjusted taxable income to be entitled to claim such deductions.  It is

depreciable assets pursuant to section 108(b)(5) of the Tax Code.[14]  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess CODI over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations.  Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding CODI is first subject to reduction.  To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member.  If a debtor member's excluded CODI exceeds its tax attributes, the excess CODI is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

As a result of the Restructuring Transactions, the Debtors expect to realize CODI.  The exact amount of any CODI that will be realized by the Debtors will not be determinable until, at the earliest, the consummation of the Plan.  Because the Amended Plan provides that certain Claim Holders will receive non-Cash consideration, the amount of CODI, and accordingly the amount of tax attributes required to be reduced, will depend, in part, on the fair market value of the non-Cash consideration received, which cannot be known with certainty at this time.  Further, the timing of the issuance and distribution to Holders of certain amounts of New Common Stock may depend upon the resolution of, among other things, the Secured Claim Challenges.

## 2.      Limitation of NOL Carryforwards and Other Tax Attributes

As of December 31, 2018, the Debtors had approximately $2.2 billion of NOLs.  Additional losses may be generated in 2019.  Following the Effective Date, the Debtors anticipate that any NOL carryovers, capital loss carryovers, tax credit carryovers, and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors that are not reduced according to the CODI rules described above and that are allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions consummated pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation.  The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the distribution of the New Common Stock pursuant to the Amended Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual

---

unclear whether interest deductions that are deferred under section 163(j) are subject to reduction under section 108.

[14]   This extent to which this election can apply to the Debtors' assets that are subject to depletion, as opposed to depreciation, is subject to uncertainty.

limitation.  Although not free from doubt, the Debtors currently believe that they have a net unrealized built-in loss.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

<p align="center">(a)   <strong>General Section 382 Annual Limitation</strong></p>

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently 2.20 percent for April 2019).  The section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65, but only to the extent the Debtors have a net unrealized built-in gain at the time of the ownership change.  Although not free from doubt, the Debtors do not currently believe that they have a net unrealized built-in gain.  Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if post-ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

<p align="center">(b)   <strong>Special Bankruptcy Exceptions</strong></p>

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and

<p align="center">96</p>

the debtor may undergo an ownership change within two years without triggering the elimination of its Pre-Change Losses.

The Debtors currently believe that the transactions contemplated by the Amended Plan would not qualify for the 382(l)(5) Exception.

The Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.  Pursuant to the Plan, additional New Common Stock may be issued by the Reorganized Debtors after the Effective Date to certain Holders of Claims.  It is unclear whether these additional issuances will result in additional "ownership shifts" under Section 382 and potentially lead to an additional "ownership change" following the Effective Date.

### 3.      Unsecured Claims Distribution Loan

Pursuant to the Amended Plan, on the Effective Date, the Reorganized Debtors shall make a Cash loan, a part of which may be treated as made to the Unsecured Claims Distribution Trust, which loan will not bear interest.  Under general U.S. federal income tax principles, it is possible that interest income will be imputed to the Reorganized Debtors notwithstanding that the loan does not provide for interest payments. In that event, the Reorganized Debtors would take such interest income into account at regular U.S. federal income tax rates.  Additionally, it is possible that this loan could cause the Unsecured Claims Distribution Trust to be subject to different tax rules, in whole or in part, than what is described below, with any such treatment being uncertain.

### C.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

### 1.      Recapitalization Treatment - Determination of "Security" Status

The U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the Claims surrendered constitute "securities" of EXCO for United States federal income tax purposes.  Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  Holders should consult their own tax advisors regarding the status of their claims as securities.

### 2.      U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 3, Class 4, Class 5, Class 6, and Class 7 Claims

There is substantial uncertainty regarding the consideration that a Holder will receive in respect of its Claim.  Pursuant to the Plan, such consideration will depend upon, among other things, the resolution of Secured Claim Challenges, which resolution cannot be predicted.  Additionally, subject to, among other

things, the resolution of Secured Claim Challenges, distributions pursuant to the Amended Plan are subject to potential reallocation to other Holders of Claims.  The U.S. federal income tax consequences of any such reallocation are highly uncertain and not addressed herein.  Holders should consult with their own tax advisors regarding the potential tax consequences of any such reallocation.  As a result of the foregoing, the following discussion is general in nature.

Pursuant to the Plan, except to the extent that a U.S. Holder of an Allowed Class 3, Class 4, Class 5, Class 6, or Class 7 Claim (such Holders, "U.S. Plan Recipients") agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of such Claim, the U.S. Plan Recipient shall receive its Pro Rata share of New Common Stock, cash, and/or Unsecured Claims Distribution Trust Beneficial Interests.  Further, a U.S. Plan Recipient may receive distributions made after the Effective Date from the Reorganized Debtors or Unsecured Claims Distribution Trust, which distributions may include Cash and/or additional New Common Stock.  The treatment of such distributions made after the Effective Date is described below.

If a U.S. Plan Recipient's Allowed Claim qualifies as a "security" of EXCO and a U.S. Plan Recipient receives at least some New Common Stock, then the Holder of such Claim should be treated as receiving its distribution under the Amended Plan in a recapitalization.  Subject to the rules regarding accrued but untaxed interest, a Holder of such Claim should recognize gain, if any, but not loss, to the extent of any Cash and "other property" (within the meaning of Section 356(a)(1)(B) of the Tax Code) received, with the amount of gain equal to the lesser of (x) the amount of Cash and the fair market value of any "other property" received and (y) the difference between (1) the amount of Cash and the fair market value of the non-cash consideration received and (2) such Holder's adjusted basis, if any, in such Claim.  Such Holder's tax basis in the non-cash consideration received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Claim surrendered therefor increased by gain, if any, recognized by such Holder in the transaction, decreased by the amount of Cash and the fair market value of any "other property" (if any) received, with such basis allocated between the non-cash consideration treated as a "security" based upon respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Plan Recipient's holding period for its interest in the consideration treated as a "security" should include the holding period for the exchanged Claim.  With respect to consideration treated as "other property" (if any), the Holder's tax basis in such property should be equal to its fair market value and the Holder's holding period should begin on the day following the receipt of such property.

To the extent that a U.S. Plan Recipient's Allowed Claim does not qualify as a "security" of EXCO, or if such Holder receives in respect of its claim only Cash and/or "other property," such Holder of such Claim will be treated as exchanging such Claim for such Holder's Pro Rata share of the consideration received pursuant to the Amended Plan in a taxable exchange under section 1001 of the Tax Code.  Accordingly, subject to the rules regarding accrued but untaxed interest, each Holder of such Claim should recognize gain or loss equal to the difference between (1) the amount of Cash and the fair market value of the non-consideration received and (2) such Holder's adjusted basis, if any, in such Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the Holder, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.  Subject to the rules regarding accrued but untaxed interest, a Holder's tax basis in the non-cash consideration received should equal the fair market value of such property as of the date such property is distributed to the Holder.  A Holder's holding period for the non-cash consideration received should begin on the day following the date it receives such property.

The above discussion assumes that the distribution of the Unsecured Claims Recovery attributable to the Settlement Contribution (other than any such amount retained by the Reorganized Debtors as security for the Unsecured Claims Distribution Trust Loan) is treated, for U.S. federal income tax purposes, as a direct distribution from the Debtors to the relevant Holders of Claims, rather than a multi-step process by which (a) the Settling Lenders receive New Common Stock and (b) such Settling Lenders directly or indirectly transfer the Settlement Contribution to relevant Holders of Claims (whether directly, or through the Debtors).  Similarly, the above discussion assumes that any consideration received with respect to causes of action that are retained by Reorganized Debtors, with distributions being made after the Effective Date, are received directly from the Reorganized Debtors on account of Claims against the Debtors, rather than any such recoveries being treated as having been transferred to a separate trust or other entity with the proceeds of such causes of action being distributed by the trust or other entity to Holders of Claims.  It is possible that the IRS could apply a different characterization, in which case the treatment described above could vary.

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

### 3.      Accrued Interest

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder).  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

### 4.      Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument,

excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.

### 5.      Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Amended Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 6.      U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Shares of New Common Stock

#### (a)      Dividends on New Common Stock

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a return of capital reducing the U.S. Holder's basis in its New Common Stock. Any such distributions in excess of the Holder's basis in its New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain. Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction, subject to applicable restrictions, so long as there are sufficient earnings and profits.

#### (b)      Sale, Redemption, or Repurchase of New Common Stock

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock. Such capital gain

100

will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.

### 7. Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of consideration received pursuant to the Plan.

### 8. Transfer of Assets to an Unsecured Claims Distribution Trust

The Amended Plan provides that, among other things, on the Effective Date the Unsecured Claims Distribution Trust may be formed, to which the Debtors' right, title, and interest in certain litigation as well as certain statutory avoidance actions may be assigned, with the proceeds therefrom distributed to certain Holders of Claims.

Additionally, the Debtors may, as provided for in the Plan, including upon resolution of the Challenge Actions, after the Effective Date issue additional New Common Stock to the Unsecured Claims Distribution Trust, which in turn would immediately thereafter distribute such New Common Stock to Holders of one or more Classes of Claims in accordance with the Plan. Generally, such New Common Stock should be treated as received in satisfaction of such Claim as described above. If such New Common Stock were not treated as received in satisfaction of such Holder's Claim, the U.S. federal income tax consequences to such Holder, including whether such transaction qualified as a recapitalization for U.S. federal income tax purposes, could be materially different.

Alternatively, the Debtors may issue and then contribute New Common Stock to the Unsecured Claims Distribution Trust on the Effective Date, or may, as a result of the Unsecured Claims Distribution Trust Loan (as described above) be deemed to have issued and then contributed New Common Stock to the Unsecured Claims Distribution Trust in an amount equal to the security for the Unsecured Claims Distribution Trust Loan. In either case, pursuant to the "disputed ownership fund" treatment described below, the Unsecured Claims Distribution Trust would have a tax liability on account of the appreciation (if any) in such New Common Stock during the period in which the Unsecured Claims Distribution Trust held such New Common Stock. When subsequently distributed by the Unsecured Claims Distribution Trust, any such New Common Stock would not be treated as received in a recapitalization for U.S. federal income tax purposes.

Further, the Amended Plan provides that on the Effective Date certain Holders of Claims may contribute the Contributed Unsecured Notes Action to the Unsecured Claims Distribution Trust. The Unsecured Claims Distribution Trust will have a tax liability on account of the appreciation (if any) in any assets so contributed. Such appreciation (if any) will depend, in part, upon the initial valuation of such assets, which valuation is highly uncertain. The tax treatment to any such transferor will depend upon, among other things, whether such transferor is treated as a "transferor-claimant" or a transferor who is not a "transferor-claimant." Generally, a transferor is a transferor-claimant if such transferor claims ownership in the assets after they are transferred to the Unsecured Claims Distribution Trust. Generally, a transferor other than a "transferor-claimant" must treat a transfer of property to the Unsecured Claims Distribution Trust as a sale or exchange of such property, with the amount realized deemed equal to the fair market value of the property on the date the transfer is made. A "transferor-claimant," however, would not treat the transfer of property to the Unsecured Claims Distribution Trust as a sale or exchange of such property.

Because entitlements to any assets that are treated as contributed to the Unsecured Claims Distribution Trust would be subject to potential disputed claims of ownership or uncertain distributions, the Debtors anticipate that any such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the property is so transferred (other than as described above with respect to property contributed by certain Holders of Claims). Instead, generally, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders. Notwithstanding the immediately preceding sentence, the gross income of a "transferor-claimant" generally would not include a distribution of money or property from the Unsecured Claims Distribution Trust if such distribution constituted money or property which such "transferor-claimant" previously transferred to the trust.

It is possible, however, that a portion of the property received would instead be re-characterized as imputed interest for U.S. federal income tax purposes. The U.S. Holder would be required to take into account any amounts treated as imputed interest under the U.S. Holder's regular method of accounting.

**The application of the foregoing rules regarding the Unsecured Claims Distribution Trust is highly uncertain, and Holders of Claims are urged to consult their own tax advisors regarding the tax consequences of the Restructuring Transactions.**

### 9.    Litigation Matters Pursued By Unsecured Claims Plan Administrator

The Amended Plan provides that a series of litigation claims will be pursued by the Unsecured Claims Plan Administrator, but that legal and economic entitlements with respect to such claims will remain with other parties. Specifically, certain Holders of Claims will effectuate the Intercreditor Assignment by granting to the Unsecured Claims Plan Administrator the authority to litigate certain Causes of Action, but that the Holders of Claims will retain the economic rights associated therewith. Additionally, certain Causes of Action will be retained by the Debtors and Reorganized Debtors but pursued by the Unsecured Claims Plan Administrator.

The Debtors intend to take the position that these claims and Causes of Action are not transferred to any other entity, including the Unsecured Claims Distribution Trust, If, however, the Intercreditor Assignment or the Retained Causes of Action were treated as resulting in a transfer of any Causes of Action to the Unsecured Claims Distribution Trust, then the treatment discussed above would apply to such Claims.

### D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holders should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Amended Plan to such non-U.S. Holders and the ownership and disposition of the consideration.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

### 1.      Gain Recognition

Any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.      Accrued and/or Imputed Interest

Payments to a non-U.S. Holder that are attributable to accrued but untaxed interest (or to imputed interest with respect to delayed distributions) generally will not be subject to U.S. federal income or withholding tax, *provided* that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of EXCO;

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Reorganized Debtors (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning Shares of New Common Stock

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles.

To the extent that a non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its New Common Stock.  Any such distributions in excess of a non-U.S. Holder's basis in its New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange, as discussed below.

Except as described below, dividends paid with respect to New Common Stock held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable).  A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-BEN-E (or a successor form) upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.

Dividends paid with respect to New Common Stock held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

To the extent the FIRPTA rules (discussed below) are applicable to any Non-U.S. Holder (and subject to the rules discussed below regarding less-than-5% Holders if the New Common Stock is regularly traded on an established securities market), distributions that are taxable as dividends will be subject to withholding, as described above.  However, distributions that are not taxable as dividends but, instead, are treated as a return of capital or gain will be subject to withholding on an amount of 15 percent of the gross amount of any such distribution.

#### 4. Sale, Redemption, or Repurchase of New Common Stock

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of its Pro Rata share of consideration received under the Amended Plan unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States);

- in the case of the sale of New Common Stock, Reorganized Debtors are or have been, during a specified testing period, a "United States real property holding corporation" (a "USRPHC") for U.S. federal income tax purposes; or

- such Non-U.S. Holder receives a "flow-through" interest (including pursuant to assets held in a "liquidating trust") in assets that constitutes a "U.S. real property interest" (a "USRPI").

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under FIRPTA and be required to file U.S. federal income tax returns. Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Common Stock will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.

In general, while the FIRPTA provisions will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period and (b) such interest is regularly traded on an established securities market, the Debtors currently anticipate that, as of the Effective Date, such interests will *not* be regularly traded on an established securities market.

If the fourth exception applies, FIRPTA will generally be applicable to any such USRPI.

The Debtors expect that the Reorganized Debtors will constitute a USRPHC as of the Effective Date, and thus that the New Common Stock will constitute a United States real property interest for the period required under the Tax Code. Non-U.S. Holders who may receive or acquire New Common Stock in connection with the Restructuring Transactions are urged to consult a U.S. tax advisor with respect to

the U.S. tax consequences applicable to their acquisition, holding, and disposition of such New Common Stock.

### 5.     FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends (for U.S. federal income tax purposes), if any, on shares of New Common Stock).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.  Although FATCA withholding rules could apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends, proposed regulations indefinitely suspend such withholding requirements.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder.

### E.     **Information Reporting and Back-Up Withholding**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Amended Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Amended Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE AMENDED PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Amended Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors and the Committee recommend that Holders of Claims entitled to vote on the Amended Plan vote to accept the Amended Plan and support Confirmation of the Amended Plan.

Dated: May 3, 2019

EXCO RESOURCES, INC.
on behalf of itself and all other Debtors

*/s/ Draft*
_____
Tyler S. Farquharson
Title: Chief Financial Officer and Treasurer of
EXCO Resources, Inc.

<u>**Exhibit A**</u>

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  | § |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

**THIRD AMENDED SETTLEMENT JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
EXCO RESOURCES, INC. AND ITS DEBTOR AFFILIATES**

Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

–and–

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: [●], 2019

Marcus A. Helt (TX 24052187)
Michael K. Riordan (TX 24070502)
**FOLEY GARDERE**
1000 Louisiana St., Suite 2000
Houston, Texas 77002
Telephone:  (713) 276-5178

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1]	The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

# TABLE OF CONTENTS

**Page**

**Article I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**..................................................................**5**
  A.    Defined Terms. ........................................................................................... 5
  B.    Rules of Interpretation. ............................................................................. 23
  C.    Computation of Time. ............................................................................... 24
  D.    Governing Law. ........................................................................................ 24
  E.    Reference to Monetary Figures. ............................................................... 24
  F.    Conflicts. ................................................................................................... 25

**Article II. ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND DIP FACILITY CLAIMS**............................................................................**25**
  A.    Administrative Claims. ............................................................................ 25
  B.    Priority Tax Claims. ................................................................................. 27
  C.    DIP Facility Claims. ................................................................................. 27
  D.    Statutory Fees. .......................................................................................... 27

**Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**.................**27**
  A.    Classification of Claims and Interests....................................................... 27
  B.    Treatment of Claims and Interests. .......................................................... 28
  C.    Special Provision Governing Unimpaired Claims. ................................... 32
  D.    Elimination of Vacant Classes. ................................................................ 32
  E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code............................................................................................................ 33
  F.    Voting Classes; Presumed Acceptance by Non-Voting Classes................. 33
  G.    Presumed Acceptance and Rejection of the Plan. ..................................... 33
  H.    Intercompany Interests.............................................................................. 33
  I.    Controversy Concerning Impairment. ...................................................... 33
  J.    Subordinated Claims and Interests. .......................................................... 33

**Article IV. MEANS FOR IMPLEMENTATION OF THE PLAN**..........................................**34**
  A.    Restructuring Transactions. ...................................................................... 34
  B.    Settlement of Settled Actions.................................................................... 34
  C.    Settlement of Claims After the Effective Date. ......................................... 35
  D.    Sources of Consideration for Plan Distributions........................................ 35
  E.    Cancellation of Existing Securities and Agreements. ................................ 35
  F.    Release of Liens........................................................................................ 36
  G.    Corporate Action....................................................................................... 36
  H.    Effectuating Documents; Further Transactions. ....................................... 37
  I.    Section 1146 Exemption. .......................................................................... 37
  J.    Corporate Existence. ................................................................................ 37
  K.    Vesting of Assets. ..................................................................................... 38
  L.    New Organizational Documents. .............................................................. 38
  M.    Director, Officer, Manager, and Employee Liability Insurance. ............... 38
  N.    Directors and Officers of the Reorganized Debtors................................... 39
  O.    Management Incentive Plan. ..................................................................... 39
  P.    Employee Obligations............................................................................... 39
  Q.    Preservation of Causes of Action.............................................................. 39

R.      Preservation of Mineral Interests. ................................................................. 40
S.      Payment of Certain Fees. ........................................................................... 41
T.      Document Retention ................................................................................... 41
U.     Unsecured Claims Distribution Trust; Unsecured Claims Plan Administrator. .............. 41
V.      Indemnification of the Settling Lenders. ...................................................... 43

**Article V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES............ 44**
A.     Assumption and Rejection of Executory Contracts and Unexpired Leases.................... 44
B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases. ..................... 44
C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ................... 44
D.     Preexisting Obligations to the Debtors under Executory Contracts and Unexpired
       Leases.......................................................................................................... 45
E.     Indemnification Obligations. ........................................................................ 45
F.      Insurance Policies. ..................................................................................... 46
G.     Modifications, Amendments, Supplements, Restatements, or Other Agreements. .......... 46
H.     Reservation of Rights.................................................................................. 47
I.       Nonoccurrence of Effective Date.................................................................. 47
J.       Contracts and Leases Entered Into After the Petition Date. .............................. 47

**Article VI. PROVISIONS GOVERNING DISTRIBUTIONS ..................................... 47**
A.     Timing and Calculation of Amounts to Be Distributed. ................................... 47
B.     Challenge Resolution Stipulation. ................................................................ 48
C.     Delivery of Distributions and Undeliverable or Unclaimed Distributions. .................... 48
D.     Special Rules for Distributions to Holders of Disputed Claims and Interests. ............... 50
E.     Manner of Payment. ................................................................................... 51
F.      SEC Exemption............................................................................................ 51
G.     Compliance with Tax Requirements. ............................................................ 51
H.     Tax Matters Regarding the Unsecured Claims Distribution Trust......................... 52
I.       No Postpetition or Default Interest on Claims. .............................................. 52
J.       Setoffs and Recoupment. ............................................................................ 52
K.     No Double Payment of Claims. .................................................................... 52
L.      Claims Paid or Payable by Third Parties. .................................................... 53
M.    Allocation of Distributions Between Principal and Interest. ............................. 53

**Article VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ............................................................................................. 54**
A.     Allowance of Claims. ................................................................................. 54
B.     Claims Administration Responsibilities. ........................................................ 54
C.     Adjustment to Claims Without Objection. ...................................................... 54
D.     Time to File Objections to Claims or Interests. .............................................. 54
E.     Estimation of Claims. ................................................................................. 54
F.      Disputed and Contingent Claims Reserve. .................................................... 55
G.     Disallowance of Claims. ............................................................................. 55
H.     Amendments to Proofs of Claim. .................................................................. 56
I.       Reimbursement or Contribution. .................................................................. 56
J.       No Distributions Pending Allowance. ............................................................ 56
K.     Distributions After Allowance....................................................................... 56

**Article VIII. RELEASE, INJUNCTION, EXCULPATION, AND RELATED PROVISIONS ........ 56**
A.     Discharge of Claims and Termination of Interests. ........................................... 56
B.     **Release of Liens.**...................................................................................... 57

C. **Releases by the Debtors.** ................................................................................ 57
D. **Releases by Holders of Claims and Interests.** .................................................. 58
E. **Exculpation.** ....................................................................................................... 59
F. **Injunction.** .......................................................................................................... 60
G. **Release of D&O Carriers and D&O Liability Insurance Policies.** ................... 60
H. **Bar Order and Channeling Injunction.** ............................................................. 61
I. Protections Against Discriminatory Treatment .................................................. 62
J. Recoupment. ........................................................................................................ 62
K. Binding Effect. .................................................................................................... 63
L. SEC Rights Reserved .......................................................................................... 63

**Article IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION**
**OF THE PLAN** ..................................................................................................... 63
A. Conditions Precedent to Confirmation .............................................................. 63
B. Conditions Precedent to the Effective Date. ...................................................... 64
C. Waiver of Conditions. ......................................................................................... 65
D. Substantial Consummation. ................................................................................ 65
E. Effect of Failure of Conditions. ......................................................................... 65

**Article X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** .................... 66
A. Modification and Amendments. .......................................................................... 66
B. Effect of Confirmation on Modifications. .......................................................... 66
C. Revocation or Withdrawal of Plan. ..................................................................... 66

**Article XI. RETENTION OF JURISDICTION** ...................................................................... 66

**Article XII. MISCELLANEOUS PROVISIONS** ..................................................................... 68
A. Immediate Binding Effect. .................................................................................. 68
B. Additional Documents. ........................................................................................ 69
C. Dissolution of the Committee. ............................................................................ 69
D. Payment of Statutory Fees. ................................................................................. 69
E. Reservation of Rights. ......................................................................................... 69
F. Successors and Assigns. ...................................................................................... 70
G. Notices. ................................................................................................................ 70
H. Term of Injunctions or Stays. ............................................................................. 71
I. Entire Agreement. ............................................................................................... 72
J. Exhibits. ............................................................................................................... 72
K. Nonseverability of Plan Provisions. ................................................................... 72
L. Votes Solicited in Good Faith. ............................................................................ 72
M. Waiver or Estoppel. ............................................................................................ 72
N. Closing of Chapter 11 Cases. ............................................................................. 73
O. Creditor Default. ................................................................................................. 73

## INTRODUCTION

EXCO Resources, Inc. and its debtor affiliates as debtors and debtors in possession propose this settlement joint chapter 11 plan of reorganization (the "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article I.A of the Plan. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, results of operations, historical financial information, events during the Chapter 11 Cases, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors, the Settling Lenders, and the Committee are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan constitutes a separate plan for each of the Debtors, and the Debtors reserve the right to seek confirmation of the Plan for each separate Debtor at one or more Confirmation Hearings as may be applicable.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.      Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth in the Introduction above or in the definitions below.

1.      "*1.5 Lien Makewhole Claims*" means the Claims resulting from certain provisions in the 1.5 Lien Notes Indenture that allege that an event of default (including the filing of a voluntary bankruptcy) results in the automatic acceleration of the 1.5 Lien Notes Claims and payment of the applicable premium.

2.      "*1.5 Lien Noteholders*" means the Holders of the 1.5 Lien Notes.

3.      "*1.5 Lien Notes*" means the 8.0% / 11.0% 1.5 lien senior secured notes due 2022, issued by EXCO pursuant to the 1.5 Lien Notes Indenture.

4.      "*1.5 Lien Notes Claims*" means any Claim derived from or arising under the 1.5 Lien Notes and the 1.5 Lien Notes Indenture, whether Secured or Unsecured, in any priority determined by a Final Order.

5.      "*1.5 Lien Notes Indenture*" means that certain Indenture, dated as of March 15, 2017, by and among EXCO, as issuer, the guarantors party thereto, and the 1.5 Lien Notes Trustee, as may be amended, restated, or otherwise supplemented from time to time.

6.      "*1.5 Lien Notes Trustee*" means Wilmington Trust, N.A., as indenture trustee and collateral trustee under the 1.5 Lien Notes Indenture.

7.       "*1.75 Lien Agent*" means Wilmington Trust, N.A., as administrative agent and collateral trustee under the 1.75 Lien Credit Agreement.

8.      "*1.5 Lien Claims Recovery*" means 61.2 percent of the New Common Stock (subject to dilution by the Management Incentive Plan) (for the avoidance of doubt, prior to giving effect to the Settlement Contribution).

9.      "*1.75 Lien Credit Agreement*" means that certain 1.75 Lien Term Loan Credit Agreement, dated as of March 15, 2017, by and among EXCO, as borrower, the guarantors party thereto, the 1.75 Lien Agent, and the other lender and agent parties thereto, as may be amended, restated, or otherwise supplemented from time to time.

10.      "*1.75 Lien Claims Recovery*" means 38.8 percent of the New Common Stock (subject to dilution by the Management Incentive Plan).

11.      "*1.75 Lien Makewhole Claims*" means the Claims resulting from certain provisions in the 1.75 Lien Credit Agreement that allege that an event of default (including the filing of a voluntary bankruptcy) results in the automatic acceleration of the 1.75 Term Loan Facility Claims and payment of the applicable "Make-Whole Amount" (as defined in the 1.75 Lien Credit Agreement).

12.      "*1.75 Lien Term Loan Facility Claims*" means any Claims against the Debtors derived from or arising under the 1.75 Lien Credit Agreement, whether Secured or Unsecured, in any priority determined by a Final Order.

13.      "*1.75 Lien Term Loan Lenders*" means the lenders from time to time party to the 1.75 Lien Credit Agreement.

14.      "*2018 Unsecured Notes*" means the 7.5% senior unsecured notes due 2018, issued by EXCO pursuant to the 2018 Unsecured Notes Indenture.

15.      "*2018 Unsecured Notes Claims*" means any Claim derived from or arising under the 2018 Unsecured Notes and the 2018 Unsecured Notes Indenture.

16.      "*2018 Unsecured Notes Indenture*" means that certain Indenture, dated as of September 5, 2010, by and among EXCO, as issuer, the guarantors party thereto, and the 2018 Unsecured Notes Trustee, as may be amended, restated, or otherwise supplemented from time to time.

17.      "*2022 Unsecured Notes*" means those certain 8.5% senior unsecured notes due 2022, issued by EXCO pursuant to the 2022 Unsecured Notes Indenture.

18.      "*2022 Unsecured Notes Claims*" means any Claim derived from or arising under the 2022 Unsecured Notes and the 2022 Unsecured Notes Indenture.

19.      "*2022 Unsecured Notes Indenture*" means that certain Indenture, dated as of April 6, 2014, by and among EXCO, as issuer, the guarantors party thereto, and the 2022 Unsecured Notes Trustee, as may be amended, restated, or otherwise supplemented from time to time.

20.      "*503(b)(9) Claim*" means a Claim or any portion thereof entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

21.      "*Administrative Agents*" means, collectively, the 1.75 Lien Agent and the Second Lien Agent.

6

22.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates or the Chapter 11 Cases under sections 503(b) (including 503(b)(9) Claims), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the Estates and operating the business of the Debtors; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911–1930; and (d) all Intercompany Claims authorized pursuant to the Cash Management Order.

23.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to General Administrative Claims other than those that were accrued in the ordinary course of business, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

24.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

25.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither Disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount;  (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court, including a Challenge Resolution Stipulation; (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had Disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors', Reorganized Debtors', Unsecured Claims Litigation Trustee's, or Unsecured Claims Plan Administrator's reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; *provided*, *further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow," "Allowing," and "Allowance" shall have correlative meanings.  Notwithstanding anything to the contrary herein, the Claims held by the Settling Lenders and the Supporting Creditors shall be fully and finally Allowed pursuant to the Plan and not subject to objection (including any Secured Claim Challenge).

26.     "*Assumed Executory Contract and Unexpired Lease List*" means the list, compiled by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases (with proposed cure amounts) that will be assumed by the Reorganized Debtors, which list shall be included in the Plan Supplement.

27.     "*Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be assumed by the applicable Reorganized Debtors, including as set forth on the Assumed Executory Contract and Unexpired Lease List.

28.     "*Ballot*" means the ballot applicable to the relevant Holder of a Claim, substantially in the form attached to the Disclosure Statement Order.

29.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

30.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of Texas.

31.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

32.     "*Bar Date*" means the applicable date established by which respective Proofs of Claims and Interests must be Filed pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 448] which is April 16, 2018 except for in the case of governmental units and certain other exceptions set forth therein.

33.     "*Bar Order and Channeling Injunction*" shall have the same meaning as ascribed in Article VIII of the Plan and incorporated in the Confirmation Order.

34.     "*Bluescape*" means, collectively, Bluescape Resources Company LLC, Energy Strategy Advisory Services, and any of their respective Affiliates holding Claims against the Debtors, in their capacity as DIP Lender, 1.5 Lien Noteholder, 1.75 Lien Term Loan Lender, Required Party, Settling Lender, or any other capacity.

35.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

36.     "*Cash*" means the legal tender of the U.S. and equivalents thereof, including bank deposits, checks, and other similar items.

37.     "*Cash Management Order*" means the *Amended Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Grating Related Relief* [Docket No. 344], as may be further amended.

38.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed

by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 551, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

39.     "*Challenge Actions*" means any and all actual or potential Causes of Action, or Claims objection, belonging to any of the Debtors, and existing at any time on or prior to the Effective Date, related to the 1.5 Lien Notes Claims and the 1.75 Lien Term Loan Facility Claims and the Holders thereof, whether against the Holders of such Claims or third parties, as set forth on the Schedule of Retained Causes of Action, including, but not limited to, (a) any Cause of Action included in the proposed complaint filed as an exhibit to the Standing Motion, (b) Causes of Action arising under chapter 5 of the Bankruptcy Code, including, but not limited to, sections 506, 544, 545, 547, 548, 549, 550, 551, 552, and 553(b) of the Bankruptcy Code, and similar applicable non-bankruptcy law; (c) Causes of Action under general principles of equitable subordination, recharacterization, contract, section 510(c) of the Bankruptcy Code or similar challenges; and (d) Causes of Action alleging that certain Holders of the 1.5 Lien Notes Claims and the 1.75 Lien Term Loan Facility Claims were engaged in a constructive joint venture and/or general partnership with the Debtors and are liable in such capacity to holders of Claims against the Debtors' Estates; *provided*, *however*, that, for the avoidance of doubt, any and all Challenge Actions that the Debtors or Unsecured Claims Distribution Trust could assert against the Settling Lenders or the Supporting Creditors shall be fully and finally resolved pursuant to the Plan.

40.     "*Challenge Action Recovery*" means any value recovered from prosecution of the Challenge Actions (both Retained Challenge Actions and Contributed Challenge Actions), which shall be available for distribution to Holders of Unsecured Claims, including, for the avoidance of doubt, any Holder of a 1.5 Lien Notes Claim or 1.75 Lien Term Loan Facility Claim that is determined to have an Allowed Unsecured Claim following successful prosecution of a Challenge Action.

41.     "*Challenge Resolution Stipulation*" means the stipulation that shall be Filed by the Unsecured Claims Plan Administrator, in consultation with the Debtors or Reorganized Debtors, as applicable, as set forth in Article VI.C of the Plan.

42.     "*Chapter 11 Cases*" means, collectively:  (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

43.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

44.     "*Claims and Noticing Agent*" means Epiq Corporate Restructuring, LLC, retained as the Debtors' notice and claims agent pursuant to the *Order Appointing Epiq Bankruptcy Solutions, LLC as the Claims, Noticing, Soliciting and Administrative Agent* [Docket No. 100].

45.     "*Claims Objection Deadline*" means the later of:  (a) the date that is (i) the Effective Date with respect to Claims in Classes 5 and 6; (ii) thirty (30) days after the Effective Date with respect to Claims in Classes 3 and 4; and (iii) 180 days after the Effective Date with respect to all other Claims; and (b) such other date as may be fixed by the Bankruptcy Court, after notice and hearing, upon a motion Filed before the expiration of such deadline.

46.     "*Claims Objection Schedule*" means the schedule designating, with respect to Disputed Claims in Class 7, whether the Reorganized Debtors or the Unsecured Claims Distribution Trust shall have

the responsibilities set forth in Article VII.B of the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be included in the Plan Supplement.

47.     "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

48.     "*Class*" means a category of Claims or Interests as set forth in Article III of the Plan.

49.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

50.     "*Committee*" means the statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on January 24, 2018, the membership of which may be reconstituted from time to time.

51.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

52.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

53.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

54.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Required Parties.

55.     "*Consummation*" means the occurrence of the Effective Date.

56.     "*Contributed Unsecured Notes Action*" means the Cause of Action for intentional interference with contractual relations as described in Count XXII of the Standing Motion, to be contributed by the Unsecured Notes Trustee to the Unsecured Claims Distribution Trust pursuant to the Plan, unless the Unsecured Notes Trustee provides notice in writing to the Debtors by the Effective Date that it shall retain such Cause of Action.

57.     "*Convenience Claim*" means any Allowed GUC Claim in an Allowed amount that is greater than $0 but less than or equal to $500,000; *provided* that a Holder of an Allowed GUC Claim in excess of $500,000 may irrevocably elect on its Ballot to have such Claim irrevocably reduced to $500,000 and treated as a Convenience Claim for the purposes of the Plan, in full and final satisfaction of such Claim.

58.     "*Convenience Claims Distribution*" means Cash in an amount equal to $1.1 million; *provided* that no Holder of an Allowed Convenience Claim shall receive a distribution in excess of 20 percent of such Allowed Convenience Claim; *provided*, *further*, that any excess Convenience Claims Distribution shall be returned to the Reorganized Debtors.

59.     "*Contributed Challenge Actions*" means any Challenge Actions that are set forth on the Schedule of Retained Causes of Action as Challenge Actions to be contributed to the Unsecured Claims Distribution Trust.

60.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

61.     "*D&O Carriers*" means collectively, (i) Illinois National Insurance Company and AIG Claims, Inc.; (ii) XL Specialty Insurance Company, solely in its capacity as an insurer under the Debtors' second layer of the D&O Liability Insurance Policies; and (iii) CNA; *provided*, *however*, an entity is a D&O Carrier only to the extent related to a particular D&O Liability Insurance Policy.  For the avoidance of doubt, the D&O Carriers shall not include any Insurer under the D&O Liability Insurance Policies or D&O Tail Policies other than those specifically enumerated in the foregoing sentence.

62.     "*D&O Liability Insurance Policies*" means all insurance policies (excluding any "tail policy") relating to the Debtors that provided, *inter alia*, directors' and officers' liability insurance coverage for the Settled Insured Claims, including any and all amendments, supplements, and endorsements, and subject to all of the policies' declarations, terms, conditions and exclusions, including without limitation: (i) Policy 01-211-20-13 issued by Illinois National Insurance Company; (ii) Policy No. ELU148627-17 issued by XL Specialty Insurance Company; (iii) Policy No. ELU148628-17 issued by XL Specialty Insurance Company; (iv) Policy No. 596430481 issued by CNA; (v) Policy No. QPL0040464 issued by QBE North America; (vi) Policy No. V15RVK1709091 issued by Beazley Insurance Company; and (vii) Policy No. 0310-0059 issued by Allied World National Assurance Company; *provided*, *however*, that Insurance Policies issued by ACE American Insurance Company, Federal Insurance Company, or their affiliates and successors shall not be D&O Liability Insurance Policies.

63.     "*D&O Proceeds*" means Cash in the amount of $13,350,000 contributed to the Debtors' Estates by the D&O Carriers on or before the Effective Date in full and final settlement and resolution of potential claims and Causes of Action against current and former directors and officers, including the Settled Insured Claims.

64.     "*D&O Settlement*" means the full and final settlement and resolution of the Settled Insured Claims.

65.     "*D&O Tail Policies*" means any "tail policy" of any of the Debtors for current or former directors', managers', and officers' liability that is unexpired as of the Effective Date.

66.     "*Debtors*" means, collectively:  (a) EXCO Resources, Inc.; (b) EXCO GP Partners Old, LP; (c) EXCO Holding (PA), Inc.; (d) EXCO Holding MLP, Inc.; (e) EXCO Land Company, LLC; (f) EXCO Midcontinent MLP, LLC; (g) EXCO Operating Company, LP; (h) EXCO Partners GP, LLC; (i) EXCO Partners OLP GP, LLC; (j) EXCO Production Company (PA), LLC; (k) EXCO Production Company (WV), LLC; (l) EXCO Resources (XA), LLC; (m) EXCO Services, Inc.; (n) Raider Marketing GP, LLC; and (o) Raider Marketing, LP.

67.     "*DIP Agent*" means Hamblin Watsa Investment Counsel Ltd., as administrative agent under the DIP Facility.

68.     "*DIP Facility*" has the meaning ascribed to it in the DIP Order.

69.     "*DIP Facility Claims*" means any Claims arising under the DIP Facility (as such term is defined in the DIP Order).

70.     "*DIP Lenders*" means the lenders from time to time party to the DIP Facility.

71.     "*DIP Order*" means the *Final Order under 11 U.S.C. §§ 105, 361, 362, 363, and 507 (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 348], as may be amended.

72.     "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that (a) has been disallowed by a Final Order, including a Final Order regarding the Secured Claim Challenges, (b) is scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or the Plan, (c) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or the Plan, (d) has been waived or withdrawn by agreement of the applicable Debtor or Reorganized Debtor, as applicable, and the Holder thereof, or (e) has been waived or withdrawn by the Holder thereof.

73.     "*Disclosure Statement*" means the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of EXCO Resources, Inc. and Its Debtor Affiliates*, dated as of [●] [Docket No. [●]], as may be amended, including all exhibits and schedules thereto, as approved pursuant to the Disclosure Statement Order.

74.     "*Disclosure Statement Order*" means the *Order (I) Approving the Amended Disclosure Statement, (II) Establishing the Voting Record Date, Voting Deadline, and Other Dates, (III) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Amended Plan and for Filing Objections to the Amended Plan, and (IV) Approving the Manner and Forms of Notice and Other Related Documents* [Docket No. [●]].

75.     "*Disputed*" means with regard to any Claim or Interest, a Claim or Interest that is not yet Disallowed or Allowed.

76.     "*Disputed 1.5 Lien Claim*" means any 1.5 Lien Notes Claim that is Held by a 1.5 Lien Noteholder who is not a Supporting Creditor or Settling Lender.

77.     "*Disputed 1.75 Lien Claim*" means any 1.75 Lien Term Loan Facility Claim that is Held by a 1.75 Lien Term Loan Lender who is not a Supporting Creditor or Settling Lender.

78.     "*Distribution Dates*" means the dates determined by the Reorganized Debtors, in consultation with the Unsecured Claims Plan Administrator, on which distributions will be made to Holders of Allowed Claims, including the Initial Distribution Date and any subsequent dates of distribution.

79.     "*Distribution Record Date*" means, other than with respect to any publicly-held securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims and Allowed Interests, which date shall be the date that is five (5) Business Days after the Confirmation Date or such other date as designated in a Final Order of the Bankruptcy Court.

80.     "*DTC*" means the Depository Trust Company.

81. "*Effective Date*" means, with respect to the Plan and any such applicable Debtor(s), the date that is the first Business Day upon which: (a) all conditions precedent specified in Article IX.A and Article IX.B have been satisfied or waived (in accordance with Article IX.C); and (b) the Plan is declared effective with respect to such applicable Debtor(s).

82. "*Enjoined Parties*" means all Holders of Claims and Interests holding Enjoined Claims as defined in Article VIII.H of the Plan; *provided* that those Holders of Claims and Interests who exercised their right to opt out of the Third Party Release in accordance with the Plan shall not be Enjoined Parties.

83. "*Enterprise Settlement Agreement*" means that certain settlement agreement approved pursuant to the *Order (I) Authorizing and Approving the Settlement by and among the Debtors, the Enterprise Entities, the Bluescape Entities, and the Committee, and (II) Granting Related Relief* [Docket No. 1853].

84. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

85. "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

86. "*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

87. "*EXCO*" means EXCO Resources, Inc., a Texas corporation.

88. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Settling Lenders; (d) the Committee; (e) the individual members of the Committee; and (f) with respect to each of the foregoing (a) through (e), such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former members, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, predecessors, successors, assigns, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, restructuring advisors, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

89. "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

90. "*Exit RBL Facility*" means the revolving credit facility, in the amount of $375 million, approximately $250 million drawn on the Effective Date, which shall be on such terms as set forth in the applicable Exit RBL Facility Documents.

91. "*Exit RBL Facility Documents*" means, in connection with the Exit RBL Facility, the applicable credit agreements, collateral documents, Uniform Commercial Code statements, and other loan documents, to be dated as of the Effective Date, governing the Exit RBL Facility, which documents shall be included in the Plan Supplement.

92. "*Fairfax*" means, collectively, Fairfax Financial Holdings Ltd., Hamblin Watsa Investment Counsel Ltd., and any of their respective Affiliates holding Claims against the Debtors, in their capacity as DIP Lender, 1.5 Lien Noteholder, 1.75 Lien Term Loan Lender, Required Party, Settling Lender, or any other capacity.

93. "*Fairfax Makewhole Claims*" means any 1.75 Lien Makewhole Claims held by Fairfax.

94.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

95.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, including with respect to a Proof of Claim or Proof of Interest, the Claims and Noticing Agent.

96.     "*Final Order*" means (a) an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction, or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 11 Case (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

97.     "*General Administrative Claim*" means any Administrative Claim, other than a Professional Fee Claim.

98.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

99.     "*GUC Claim*" means any Unsecured Claim, other than any (a) Unsecured Notes Claim or (b) 1.5 Lien Notes Claim, 1.75 Lien Term Loan Facility Claim, or Second Lien Term Loan Facility Claim that is not Secured, whether as a result of successful prosecution of a Challenge Action or otherwise, against any Debtor.

100.     "*Holder*" means an Entity holding a Claim or an Interest, as applicable. "Hold" and "Held" shall have the correlative meanings.

101.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

102.     "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals, advisors, and agents of the Debtors, as applicable.

103.     "*Indenture Trustees*" means, collectively, (a) the 1.5 Lien Notes Trustee, (b) the 2018 Unsecured Notes Trustee, and (c) the 2022 Unsecured Notes Trustee.

104.    "*Initial Distribution Date*" means, with respect to any Claim that is Allowed as of the Effective Date, on or as soon as reasonably practicable following the Effective Date.

105.    "*Insurance Policies*" means any and all insurance policies, including the D&O Liability Insurance Policies and the D&O Tail Policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provision of insurance entered into by or issued to or for the benefit of, at any time, any of the Debtors or their predecessors.

106.    "*Insureds*" means all persons and Entities that may be an "Insured" as defined in the D&O Liability Insurance Policies (or otherwise entitled to coverage thereunder).

107.    "*Insurer*" means any company or other entity that issued an Insurance Policy, any third party administrator of or for any Insurance Policy, and any respective predecessors and/or affiliates of any of the foregoing.

108.    "*Intercompany Claim*" means any Claim held by any Debtor or non-Debtor affiliate or subsidiary against any other Debtor.

109.    "*Intercompany Interest*" means any Interest held by a Debtor in another Debtor, exclusive of any Interests in EXCO.

110.    "*Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of March 15, 2017, by and between the Debtors, JPMorgan Chase Bank, N.A., as administrative agent under the former RBL credit agreement, and Wilmington Trust, N.A., as original second lien collateral trustee and the original third lien collateral trustee, as may be amended, modified, or otherwise supplemented from time to time.

111.    "*Intercreditor Assignment*" means the agreement by the Settling Lenders, pursuant to the Secured Lender Settlement, to grant to the Unsecured Claims Plan Administrator the authority to litigate and enforce their rights against the 1.75 Lien Agent and the Holders of 1.75 Lien Term Loan Facility Claims and the Second Lien Term Loan Facility Agent and Holders of Second Lien Term Loan Facility Claims pursuant to the Intercreditor Agreement and section 510(a) of the Bankruptcy Code to the extent permissible under the Intercreditor Agreement or applicable law, including, without limitation, the right to compel turnover of any distributions under the Plan; *provided* that the Unsecured Creditor Plan Administrator shall not assert such rights against any Settling Lender or Supporting Creditor; *provided*, *further*, that notwithstanding the foregoing, the Settling Lenders shall remain the economic owners of the rights under the Intercreditor Agreement.

112.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Entity.

113.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 432].

114.    "*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

115.    "*Investment Company Act*" means the Investment Company Act of 1940, as amended.

15

116.    "*IRS*" means the Internal Revenue Service.

117.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

118.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

119.    "*LSP*" means, collectively, LSP Investment Advisors, LLC, Gen IV Investment Opportunities, LLC, VEGA Asset Partners, LLC, and any of their respective Affiliates holding Claims against the Debtors, in their capacity as 1.5 Lien Noteholder, 1.75 Lien Term Loan Lender, or any other capacity.

120.    "*Makewhole Claims*" means, collectively, the 1.5 Lien Makewhole Claims and the 1.75 Lien Makewhole Claims, including the Fairfax Makewhole Claims.

121.    "*Management Incentive Plan*" means a post-Effective Date management incentive plan that may be adopted by the board of directors of the Reorganized Debtors.

122.    "*Mediation*" means the mediation between, among others, the Debtors, and certain 1.5 Lien Noteholders, 1.75 Lien Term Loan Lenders, Second Lien Lenders, Holders of Unsecured Notes, the Committee, and the D&O Carriers, which was held before the Honorable David R. Jones, pursuant to the *Order Appointing United States Bankruptcy Judge as Mediator* [Docket No. 894].

123.    "*Mineral Interests*" means the oil, gas, or mineral leases or agreements, working interests granting the right to exploit oil and gas, and certain other royalty or mineral interests, including but not limited to, landowner's royalty interests, overriding royalty interests, net profit interests, non-participating royalty interests, and production payments, pursuant to applicable state law.

124.    "*New Common Stock*" means the new common stock or limited liability company units in Reorganized EXCO whether issued or unissued on the Effective Date to be distributed under and in accordance with the Plan.

125.    "*New Organizational Documents*" means such certificates or articles of incorporation, by-laws, limited liability company operating agreements, stockholders' agreements, or other applicable formation and governance documents of each of the Reorganized Debtors, as applicable, the form of which shall be included in the Plan Supplement.

126.    "*Notes*" means, collectively, (a) the 1.5 Lien Notes, (b) the 2018 Unsecured Notes, and (c) the 2022 Unsecured Notes.

127.    "*Ordinary Course Professional Order*" means the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 350].

128.    "*Other Priority Claims*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

129.    "*Other Secured Claims*" means any Secured Claim against any of the Debtors other than the: (a) Secured 1.5 Lien Notes Claims (if any), (b) Secured 1.75 Lien Term Loan Facility Claims (if any), and (c) Secured Second Lien Term Loan Facility Claims (if any).

130.   "*Petition Date*" means January 15, 2018, which is the date on which the Debtors commenced the Chapter 11 Cases.

131.   "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors, in form and substance reasonably acceptable to the Required Parties, in accordance with the Disclosure Statement Order or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement.  The Plan Supplement shall be comprised of, among other documents, the following: (a) the New Organizational Documents; (b) the Assumed Executory Contract and Unexpired Lease List; (c) the Rejected Executory Contract and Unexpired Lease List; (d) the Schedule of Retained Causes of Action; (e) Claims Objection Schedule; (f)  the identity of the members of the Reorganized EXCO Board and management for the Reorganized Debtors; (g) the Exit RBL Facility Documents; (h) the Unsecured Claims Distribution Trust Documents; (i) the Stockholders' Agreement; and (j) the identity and compensation of the Unsecured Claims Plan Administrator and the members of the Unsecured Claims Distribution Trust Advisory Board.  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (j).  Notwithstanding the foregoing, the Debtors may amend, with the consent of the Required Parties, the documents contained in, and exhibits to, the Plan Supplement through the Effective Date or as otherwise provided herein; *provided* that the Schedule of Retained Causes of Action filed at Docket No. 1880 with regards to the Causes of Action against the 1.5 Lien Noteholders, 1.5 Lien Notes Trustee, 1.75 Lien Term Loan Lenders, 1.75 Lien Agent, Second Lien Lenders, and Second Lien Agent shall not be subject to further amendment.

132.    "*Priority Claims*" means, collectively, the (a) Administrative Claims, (b) Priority Tax Claims, and (c) Other Priority Claims.

133.   "*Priority Tax Claim*" means the Claims of Governmental Units of the type specified in section 507(a)(8) of the Bankruptcy Code.

134.   "*Pro Rata*" means the proportion that the amount of an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of the Allowed Claims or Allowed Interests, in that Class, or the proportion of the Allowed Claims or Allowed Interests in a particular Class and other Classes, respectively, entitled to share in the same recovery as such Claim or Interest under the Plan.  For the avoidance of doubt, with respect to Claims in Classes 3, 4, 5, and 6, the Pro Rata proportion shall be determined based on the amount of the applicable positions held by such Claim Holders, as of the Distribution Record Date, as evidenced by the applicable records received by the Debtors from the applicable Indenture Trustee or Administrative Agent.

135.   "*Professional*" means an Entity, excluding those Entities entitled to compensation pursuant to the Ordinary Course Professional Order:  (a) retained pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; *provided* that professionals employed by any Administrative Agent, any Indenture Trustee, or any other creditor shall not be "Professionals" for the purposes of the Plan.

136.   "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the

amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

137.    "*Professional Fee Escrow Account*" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtors on the Effective Date, pursuant to Article II.A.2(b) of the Plan.

138.    "*Professional Fee Reserve Amount*" means the total amount of Professional Fee Claims estimated in accordance with Article II.A.2(c) of the Plan.

139.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

140.    "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

141.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired for purposes of section 1124 of the Bankruptcy Code.

142.    "*Rejected Executory Contract and Unexpired Lease List*" means the list, compiled by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases that will be rejected by the Debtors pursuant to the Plan, which list shall be included in the Plan Supplement.

143.    "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Settling Lenders; (b) the DIP Agent; (c) the DIP Lenders; (d) the Committee; (e) the individual members of the Committee (both in their capacity as such and as individual creditors); (f) the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) the D&O Carriers; (k) the Unsecured Notes Trustee; and (l) with respect to each of the foregoing (a) through (k), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

144.    "*Releasing Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Settling Lenders; (d) the DIP Agent; (e) the DIP Lenders; (f) the Committee; (g) the individual members of the Committee; (h) the Supporting Creditors; (i) each of the Debtors' current and former directors or officers; (j) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (k) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (l) the D&O Carriers; (m) the Unsecured Notes Trustee; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or

vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (o), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

145.     *"Reorganized"* means, as to any Debtor or Debtors, such Debtor(s) as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, taxable disposition, or otherwise, on or after the Effective Date.

146.     *"Reorganized Debtors"* means, collectively, and each in its capacity as such, the Debtors, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, and from and after the Effective Date, shall include (without limitation) Reorganized EXCO.

147.     *"Reorganized EXCO"* means EXCO, as reorganized pursuant to and under the Plan or any successor thereto, as set forth in the Plan and the New Organizational Documents.

148.     *"Reorganized EXCO Board"* means the board of directors of Reorganized EXCO on and after the Effective Date.

149.     *"Required Parties"* means Bluescape, Fairfax, and the Committee.

150.     *"Restructuring Transactions"* means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, sales, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors reasonably determine to be necessary or desirable to implement the Plan with respect to the Debtors, including, without limitation, the Exit RBL Facility, and the transactions contemplated by the New Organizational Documents.

151.     *"Retained Challenge Actions"* means any Challenge Actions that are set forth on the Schedule of Retained Causes of Action as Challenge Actions to be retained by the Debtors or the Reorganized Debtors, as applicable, and prosecuted by the Unsecured Claims Plan Administrator on behalf of the Debtors or the Reorganized Debtors, as applicable.

152.     *"Schedule of Retained Causes of Action"* means the schedule of certain Causes of Action of the Debtors that are not released or waived pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be included in the Plan Supplement, *provided* that such schedule shall not include any Causes of Action against any Released Party, and any such inclusion will be deemed void *ab initio* (and for the avoidance of doubt, the Schedule of Retained Causes of Action shall not include any Causes of Action, including any Secured Claim Challenge, against the Settling Lenders or the Supporting Creditors); *provided*, *further*, that such schedule shall specify which of such Causes of Action shall be retained by the Reorganized Debtors and which Causes of Action shall be assigned to the Unsecured Claims Distribution Trust.

153.     *"Schedules"* means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

154.    "*SEC*" means the Securities and Exchange Commission.

155.    "*Second Lien Agent*" means GLAS Trust Company, as administrative agent and collateral trustee under the Second Lien Credit Agreement.

156.    "*Second Lien Credit Agreement*" means that certain Term Loan Agreement, dated as of October 19, 2015, by and among EXCO, as borrower, the guarantors party thereto, the Second Lien Agent, and the other lender and agent parties thereto, as may be amended, restated, or otherwise supplemented from time to time.

157.    "*Second Lien Lenders*" means the lending institutions party from time to time to the Second Lien Credit Agreement.

158.    "*Second Lien Term Loan Facility Claims*" means any Claims against the Debtors derived from or arising under the Second Lien Credit Agreement, whether Secured or Unsecured.

159.    "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan or separate order of the Bankruptcy Court as a secured claim.

160.    "*Secured Claim Challenge*" means any objection, Challenge Action, or the Contributed Unsecured Notes Action (if applicable) in respect to the 1.5 Lien Notes Claims or the 1.75 Lien Term Loan Facility Claims or the Holders thereof.

161.    "*Secured Claim Challenge Resolution Date*" means the date on which all timely-Filed Secured Claim Challenges have been resolved by settlement, Final Order or other disposition.  For the avoidance of doubt, all Secured Claim Challenges with respect to the Settling Lenders and the Supporting Creditors are resolved pursuant to the Plan.

162.    "*Secured Lender Settlement*" means the full and final settlement and resolution of any and all claims and Causes of Action the Debtors, the Committee, or the Unsecured Claims Distribution Trust could assert against the Settling Lenders in any manner, pursuant to which the Settling Lenders shall (a) contribute the Settlement Contribution to fund recoveries to Holders of Allowed Unsecured Claims in Classes 5, 6, and 7 pursuant to the Plan and to fund the Settlement Contribution Hold-Back; (b) effectuate the Intercreditor Assignment; (c) waive any right to recover on account of any Claim under section 507(b) of the Bankruptcy Code; and (d) waive any Makewhole Claim on account of the 1.5 Lien Notes Claims or 1.75 Lien Term Loan Facility Claim Held by such Settling Lender.

163.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77–77a, as amended, together with the rules and regulations promulgated thereunder.

164.    "*Security*" or "*Securities*" has the meaning set forth in section 2(a)(1) of the Securities Act.

165.    "*Settled Actions*" means, collectively, (a) the Settled Insured Claims and (b) any and all claims and Causes of Action that the Debtors, the Committee, the Unsecured Claims Litigation Trustee, or the Unsecured Claims Plan Administrator could assert against the Settling Lenders and the Supporting

Creditors in any manner, which claims and Causes of Action shall be fully and finally released pursuant to the Plan.

166.    "*Settled Insured Claims*" means, collectively, any and all claims and Causes of Action that the Debtors could assert against the Insureds or the Insurers in any manner, including, without limitation, any other claim or action was would implicate the D&O Liability Insurance Policies; *provided*, *however*, that the Settled Insured Claims do not include claims or actions to the extent covered by any Insurance Policies that have been issued by ACE American Insurance Company, Federal Insurance Company, or their affiliates and successors, which claims and Causes of Action shall be fully and finally released pursuant to the Plan.

167.    "*Settlement Contribution*" means 11.6 percent of New Common Stock which the Settling Lenders are entitled to receive pursuant to the Plan as Holders of 1.5 Lien Notes Claims.

168.    "*Settlement Contribution Hold-Back*" means New Common Stock with a value equal to the amount of the Unsecured Claims Distribution Trust Loan as of the Effective Date (which shall be, for the avoidance of doubt, 0.6 percent and 0.4 percent of the New Common Stock, respectively, with respect to clauses (a) and (b) of the Unsecured Claims Distribution Trust Loan) which shall secure the Unsecured Claims Distribution Trust Loan.

169.    "*Settling Lenders*" means, collectively, Fairfax and Bluescape.

170.    "*Standing Motion*" means the *Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors Estates, and (II) Exclusive Settlement Authority* [Docket No. 1624] (as may be amended) and all exhibits thereto.

171.    "*Stockholders' Agreement*" means the stockholders' agreement, entered into by all holders of New Common Stock, which shall contain customary and appropriate minority protections, the form of which shall be included in the Plan Supplement.

172.    "*Supporting 1.5L Noteholder*" means any Holder of a 1.5 Lien Notes Claim who, with the consent of each of the Required Parties, agrees to support the Plan pursuant to a timely-executed Supporting Joinder Agreement and who does vote any Claims Held in favor of the Plan and does not opt out of the Third Party Release.

173.    "*Supporting 1.75L Lender*" means any Holder of a 1.75 Lien Term Loan Facility Claim who, with the consent of each of the Required Parties, agrees to support the Plan pursuant to a timely-executed Supporting Joinder Agreement and who does vote any Claims Held in favor of the Plan and does not opt out of the Third Party Release.

174.    "*Supporting 2L Lender*" means any Holder of a Second Lien Term Loan Facility Claim who, with the consent of each of the Required Parties, agrees to support the Plan pursuant to a timely-executed Supporting Joinder Agreement and who does vote any Claims Held in favor of the Plan and does not opt out of the Third Party Release.

175.    "*Supporting Creditors*" means, collectively, the Supporting 1.5L Noteholders, Supporting 1.75L Lenders, and Supporting 2L Lenders.

176.    "*Supporting Joinder Agreement*" means the agreement executed prior to Confirmation by a Supporting Creditor, with the consent of the Debtors, and each of the Required Parties, pursuant to which

a Supporting Creditor agrees to vote in favor of the Plan and not opt out of the Third Party Release and the Debtors and the Required Parties acknowledge that the Claim held by such Supporting Creditor shall be an Allowed Claim (and for the avoidance of doubt shall not be a Disputed 1.5 Lien Claim or Disputed 1.75 Lien Claim (as applicable)).  For the avoidance of doubt, each of the Required Parties may withhold their consent for a party to become a Supporting Creditor for any reason, or condition their consent on a satisfactory settlement of any Challenge Actions that may be asserted against such party.

177.    "*Third Party Release*" means the release provided by the Releasing Parties in favor of the Released Parties as set forth in Article VIII.D of the Plan.

178.    "*Trustee Fees and Expenses*" means the Claims for reasonable and documented compensation, fees, expenses, and disbursements arising under the 1.5 Lien Notes Indenture, the 2018 Unsecured Notes Indenture, and the 2022 Unsecured Notes Indenture, including, without limitation, trustee fees, attorneys', financial advisors', and agents' fees, expenses, and disbursements, incurred under any such indenture by the respective Indenture Trustees, prior to or after the Petition Date and prior to the Effective Date.

179.    "*U.S.*" means the United States of America.

180.    "*U.S. Trustee*" means the Office of the U.S. Trustee Region 7 for the Southern District of Texas.

181.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

182.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

183.    "*Unsecured*" means when referring to a Claim, any Claim that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, or Secured Claim.  For the avoidance of doubt, Unsecured Claims include any GUC Claim, together with any 1.5 Lien Notes Claim, 1.75 Lien Term Loan Facility Claim, or Second Lien Term Loan Facility Claim that is not Secured whether as a result of successful prosecution of a Challenge Action or otherwise, and any Unsecured Notes Claim.

184.    "*Unsecured Claims Consideration*" means (a) New Common Stock in the amount of (i) the Settlement Contribution minus (ii) the Settlement Contribution Hold-Back; (b) the Unsecured Claims Distribution Trust Beneficial Interests (if applicable) (c) the Challenge Action Recovery (if any); and (d) the Settlement Contribution Hold-Back remaining after repayment of the Unsecured Claims Distribution Loan in accordance with Article IV.U.3 of the Plan (if any).

185.    "*Unsecured Claims Distribution Trust*" means (if applicable) the trust or other legal entity established on the Effective Date (if applicable) in accordance with the Unsecured Claims Distribution Trust Documents, which trust or other legal entity shall be vested with the Unsecured Claims Distribution Trust Assets and have the powers and responsibilities set forth in Article IV.U of the Plan and in the Unsecured Claims Distribution Trust Documents.

186.    "*Unsecured Claims Distribution Trust Advisory Board*" means (if applicable) that certain three-member board of the Unsecured Claims Distribution Trust appointed by the Committee in accordance with the Unsecured Claims Distribution Trust Documents.

187.    "*Unsecured Claims Distribution Trust Assets*" means (if applicable) (a) all of the Debtors' right, title, and interest in those Challenge Actions set forth on the Schedule of Retained Causes of Action as Contributed Challenge Actions; (b) the Contributed Unsecured Notes Action (if applicable), and (c) all proceeds of the foregoing.  For the avoidance of doubt, the Unsecured Claims Distribution Trust Assets shall not include any objection or Cause of Action against the Settling Lenders or Supporting Creditors.

188.    "*Unsecured Claims Distribution Trust Beneficial Interests*" means the beneficial interests in the Unsecured Claims Distribution Trust to be issued to Holders of Allowed Unsecured Claims pursuant to the Plan (if applicable).

189.    "*Unsecured Claims Distribution Trust Documents*" means that certain trust agreement, the form of which shall be included in the Plan Supplement, and relevant documents related thereto.

190.    "*Unsecured Claims Distribution Loan*" means (a) if the aggregate value of Disputed 1.5 Lien Claims and Disputed 1.75 Lien Claims as of the Effective Date is greater than $40 million, $3 million in Cash loaned by the Debtors jointly to the Unsecured Claims Plan Administrator and the Unsecured Claims Distribution Trust on or prior to the Effective Date; or (b) if the aggregate value of Disputed 1.5 Lien Claims and Disputed 1.75 Lien Claims as of the Effective Date is less than or equal to $40 million, $2 million in Cash loaned by the Debtors jointly to the Unsecured Claims Plan Administrator and the Unsecured Claims Distribution Trust on or prior to the Effective Date.

191.    "*Unsecured Claims Litigation Trustee*" means (if applicable) the Trustee who shall be appointed by the Unsecured Claims Distribution Trust Advisory Board to coordinate administration and other activities of the Unsecured Claims Distribution Trust and the Unsecured Claims Distribution Trust Assets in accordance with the Unsecured Distribution Trust Documents.

192.    "*Unsecured Claims Plan Administrator*" means the individual who shall be appointed by the Committee and whose identity shall be disclosed in the Plan Supplement, and who shall be authorized to prosecute any Retained Challenge Actions and any Causes of Action pursuant to the Intercreditor Assignment.

193.    "*Unsecured Claims Recovery*" means, with respect to each Holder of an Allowed Unsecured Claim, the Unsecured Claims Consideration attributable to each Debtor against which such Holder has an Allowed Claim, as set forth in **Exhibit G** of the Disclosure Statement.

194.    "*Unsecured Notes*" means, collectively, (a) the 2018 Unsecured Notes and (b) the 2022 Unsecured Notes.

195.    "*Unsecured Notes Claims*" means any Claim derived from or arising under the Unsecured Notes.

196.    "*Unsecured Notes Trustee*" means Wilmington Savings Fund Society, FSB, as indenture trustee under the 2018 Unsecured Notes Indenture and 2022 Unsecured Notes Indenture.

B.    *Rules of Interpretation.*

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neutral gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced

document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, or similar formation document or agreement, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any immaterial effectuating provisions may be interpreted by the Debtors or Reorganized Debtors, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (15) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors and the Reorganized Debtors, shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States, unless otherwise expressly provided.

*F.*     *Conflicts.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND DIP FACILITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests.

*A.*     *Administrative Claims.*

1.     General Administrative Claims.

Except as specified in this Article II, unless the Holder of an Allowed General Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either: (a) on the Effective Date; (b) if the General Administrative Claim is not Allowed as of the Effective Date, sixty (60) days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed General Administrative Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Administrative Claim, without any further action by the Holders of such Allowed General Administrative Claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except for Claims of Professionals, requests for payment of General Administrative Claims that were not accrued in the ordinary course of business must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date.  Holders of General Administrative Claims that are required to File and serve a request for payment of such General Administrative Claims by the Administrative Claims Bar Date and do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Claims against the Debtors or Reorganized Debtors, as applicable, or their respective property, and such General Administrative Claims shall be deemed forever discharged and released as of the Effective Date.  Any requests for payment of General Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be Disallowed automatically without the need for further action by the Debtors or the Reorganized Debtors, as applicable, or further order of the Bankruptcy Court.  To the extent this Article II.A.1 conflicts with Article XII.C of the Plan with respect to fees and expenses payable under section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, Article XII.C of the Plan shall govern.  Notwithstanding the foregoing, no request for payment of a General Administrative Claim need be Filed with respect to a General Administrative Claim previously Allowed by Final Order.

The Debtors or the Reorganized Debtors, in their sole and absolute discretion, may settle General Administrative Claims without further Bankruptcy Court approval.  The Reorganized Debtors may also choose to object to any Administrative Claim no later than sixty (60) days from the Administrative Claims

Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or Reorganized Debtors (or other party with standing), as applicable, object to a timely filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested.  In the event that the Debtors or Reorganized Debtors, as applicable, object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

       2.       Professional Compensation.

       (a)       <u>Final Fee Applications</u>.

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date, must be Filed and served on the Reorganized Debtors no later than sixty (60) days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice to other parties on the regular service list and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, including the Interim Compensation Order, and once approved by the Bankruptcy Court, promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.

       (b)       <u>Professional Fee Escrow Account</u>.

On the Effective Date, the Debtors or Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors, as applicable.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be paid by the Debtors or the Reorganized Debtors, as applicable.

       (c)       <u>Professional Fee Reserve Amount</u>.

Professionals shall estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than five business days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total amount estimated pursuant to this section shall comprise the Professional Fee Reserve Amount.

       (d)       <u>Post-Confirmation Date Fees and Expenses</u>.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or

approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

B.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

C.      *DIP Facility Claims.*

Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, each Holder of such Allowed DIP Facility Claim shall be paid in full in Cash from the proceeds of the Exit RBL Facility.  Upon the payment or satisfaction of the Allowed DIP Facility Claims in accordance with this Article II.C, all Liens and security interests granted to secure the Allowed DIP Facility Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

D.      *Statutory Fees.*

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the case of that particular Debtor being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Claims and Interests, except for Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Facility Claims, are classified as required by the Bankruptcy Code in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.  The Debtors reserve the right to assert

27

that the treatment provided to Holders of Claims and Interests pursuant to Article III.B of the Plan renders such Holders Unimpaired.

    1.    <u>Class Identification for the Debtors</u>.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, each of which shall include the classifications set forth below.  Subject to Article I.D of the Plan, to the extent that a Class contains Claims or Interests only with respect to one or more particular Debtors, such Class applies solely to such Debtor.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | 1.5 Lien Notes Claims | Impaired | Entitled to Vote |
| Class 4 | 1.75 Lien Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 6 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 7 | GUC Claims | Impaired | Entitled to Vote |
| Class 8 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept/Reject) |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 11 | Interests in EXCO | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.**    *Treatment of Claims and Interests.*

To the extent that a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the treatment of Allowed Claims and Allowed Interests in such Class is specified below.

    1.    Class 1 – Other Secured Claims.

    (a)    *Classification*:  Class 1 consists of Other Secured Claims.

    (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

    (i)    payment in full in Cash;

      (ii)      delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

      (iii)      Reinstatement of such Claim; or

      (iv)      other treatment rendering such Claim Unimpaired.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims.

(a)      *Classification*:  Class 2 consists of Other Priority Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

      (i)      payment in full in Cash; or

      (ii)      other treatment rendering such Claim Unimpaired or otherwise permitted by the Bankruptcy Code.

(c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3.      Class 3 –1.5 Lien Notes Claims.

(a)      *Classification*:  Class 3 consists of 1.5 Lien Notes Claims.

(b)      *Allowance*:  The 1.5 Lien Notes Claims held by any Settling Lender or any Supporting Creditor are Allowed.

(c)      *Treatment*:  Except to the extent that a Holder of an Allowed 1.5 Lien Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 1.5 Lien Notes Claim (subject to, for the avoidance of doubt, the Secured Lender Settlement) each such Holder shall receive its Pro Rata share of the 1.5 Lien Claims Recovery; *provided* that to the extent that an Allowed 1.5 Lien Notes Claim is an Unsecured Claim following successful prosecution of a Secured Claim Challenge, the Holder of such Allowed Unsecured 1.5 Lien Notes Claim shall receive its Pro Rata share, together with all Holders of Allowed Unsecured Claims, of the Unsecured Claims Recovery; *provided*, *further*, that to the extent an Allowed 1.5 Lien Notes Claim is subordinated to Unsecured Claims as a result of successful prosecution of a Secured Claim Challenge, each Holder of an Allowed 1.5 Lien

Notes Claim that is so subordinated shall receive no distribution on account of such subordinated Allowed 1.5 Lien Notes Claim until all Unsecured Claims senior to such subordinated Allowed 1.5 Lien Notes Claim have received 100 percent recovery.

(d) *Voting:*  Class 3 is Impaired under the Plan.  Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4 – 1.75 Lien Term Loan Facility Claims.

(a) *Classification*:  Class 4 consists of 1.75 Lien Term Loan Facility Claims.

(b) *Allowance*: The 1.75 Lien Term Loan Facility Claims held by any Settling Lender or any Supporting Creditor are Allowed.

(c) *Treatment*:  Except to the extent that a Holder of an Allowed 1.75 Lien Term Loan Facility Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 1.75 Lien Term Loan Facility Claim, each such Holder shall receive its Pro Rata share of the 1.75 Lien Claims Recovery; *provided* that to the extent that an Allowed 1.75 Lien Term Loan Facility Claim is an Unsecured Claim following successful prosecution of a Secured Claim Challenge, the Holder of such Allowed Unsecured 1.75 Lien Term Loan Facility Claim shall instead receive its Pro Rata share, together with all Holders of Allowed Unsecured Claims, of the Unsecured Claims Recovery; *provided*, *further*, that to the extent an Allowed 1.75 Lien Term Loan Facility Claim is subordinated to Unsecured Claims as a result of successful prosecution of a Secured Claim Challenge, each Holder of an Allowed 1.75 Lien Term Loan Facility Claim that is so subordinated shall receive no distribution on account of such subordinated Allowed 1.75 Lien Term Loan Facility Claim until all Unsecured Claims senior to such subordinated Allowed 1.75 Lien Term Loan Facility Claim have received 100 percent recovery.

(d) *Voting:*  Class 4 is Impaired under the Plan.  Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan:

5. Class 5 – Second Lien Term Loan Facility Claims.

(a) *Classification*:  Class 5 consists of Second Lien Term Loan Facility Claims.

(b) *Treatment*:  Except to the extent that a Holder of an Allowed Second Lien Term Loan Facility Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Second Lien Term Loan Facility Claim, each such Holder shall receive, together with all Holders of Unsecured Claims, its Pro Rata share of the Unsecured Claims Recovery.

(c) *Voting:*  Class 5 is Impaired under the Plan.  Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

30

6.      Class 6 – Unsecured Notes Claims.

    (a)      *Classification*:  Class 6 consists of Unsecured Notes Claims.

    (b)      *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Notes Claim, each such Holder shall receive, together with all Holders of Allowed Unsecured Claims, its Pro Rata share of the Unsecured Claims Recovery.

    (c)      *Voting:*  Class 6 is Impaired under the Plan.  Holders of Claims in Class 6 are entitled to vote to accept or reject the Plan.

7.      Class 7 – GUC Claims.

    (a)      *Classification*:  Class 7 consists of GUC Claims.

    (b)      *Treatment*:  Except to the extent that a Holder of an Allowed GUC Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed GUC Claim, each such Holder shall receive, together with all Holders of Allowed Unsecured Claims, its Pro Rata share of the Unsecured Claims Recovery; *provided* that to the extent such GUC Claim is a Convenience Claim, such Holder shall receive its Pro Rata share of the Convenience Claims Distribution.

    (c)      *Voting:*  Class 7 is Impaired under the Plan.  Holders of Claims in Class 7 are entitled to vote to accept or reject the Plan.

8.      Class 8 – Intercompany Claims.

    (a)      *Classification*:  Class 8 consists of Intercompany Claims.

    (b)      *Treatment*:  Each Allowed Intercompany Claim shall be, at the option of the Debtors or the Reorganized Debtors, as applicable, either:  (i) Reinstated; or (ii) canceled and shall receive no distribution on account of such Claims and may be compromised, extinguished, or settled in each case, on or after the Effective Date.

    (c)      *Voting:*  Class 8 is either Unimpaired and/or treated as a General Administrative Claim, and such Holders of Class 8 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Class 8 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 8 are not entitled to vote to accept or reject the Plan.

9.      Class 9 – Section 510(b) Claims.

    (a)      *Classification*:  Class 9 consists of Section 510(b) Claims.

(b)     *Treatment*:  Each Section 510(b) Claim shall be deemed canceled, discharged, released, and extinguished, and there shall be no distribution to Holders of Section 510(b) Claims on account of such Claims.

(c)     *Voting:*   Class 9 is Impaired under the Plan.    Holders of Allowed Section 510(b) Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 9 are not entitled to vote to accept or reject the Plan.

10.     Class 10 – Intercompany Interests.

(a)     *Classification*: Class 10 consists of all Intercompany Interests.

(b)     Treatment:  Intercompany Interests shall be Reinstated as of the Effective Date.[2]

(c)     *Voting:*   Class 10 is Unimpaired, and such Holders of Class 10 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

11.     Class 11 – Interests in EXCO.

(a)     *Classification*: Class 11 consists of any Interests in EXCO.

(b)     *Treatment*:  On the Effective Date, existing Interests in EXCO shall be deemed canceled, discharged, released, and extinguished, and there shall be no distribution to Holders of Interests in EXCO on account of such Interests.

(c)     *Voting:*  Class 11 is Impaired under the Plan.  Holders of Interests in EXCO are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Interests in Class 11 are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement Order shall be considered vacant, deemed eliminated from

---

2   Reinstatement of Intercompany Interests is for administrative purposes only as a means to preserve the corporate structure for holding company purposes and avoid the unnecessary cost of having to reconstitute that structure. There is no economic recovery under the Plan on account of Intercompany Interests.

the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

E.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

F.      *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Holders of Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

G.      *Presumed Acceptance and Rejection of the Plan.*

To the extent that Claims of any Class receive no distribution under the Plan, each Holder of a Claim in such Class is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.  To the extent that Claims or Interests of any Class are Reinstated, each Holder of a Claim or Interest in such Class is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

H.      *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests, but rather for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Common Stock and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor as of the Effective Date shall continue to be owned by the applicable Reorganized Debtor.

I.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

J.      *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable or contractual subordination rights relating thereto, whether arising under general principles of equitable

subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Restructuring Transactions.*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, in consultation with the Required Parties, will effectuate the Restructuring Transactions, and will take any actions as may be necessary or advisable to effect a corporate restructuring of their respective business.  The actions to implement the Restructuring Transactions may include, as applicable, and without limitation:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, if applicable, the formation of any entity or entities that will constitute, in whole or in part, the Reorganized Debtors; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable state law; (4) the execution and delivery of the New Organizational Documents; (5) the execution and delivery of the Exit RBL Facility Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors, as applicable), subject to any post-closing execution and delivery periods provided for in the Exit RBL Facility Documents; (6) the issuance of the New Common Stock as set forth in the Plan; (7) the creation of the Unsecured Claims Distribution Trust in accordance with the Unsecured Claims Distribution Trust Documents; and (8) all other actions that the applicable Entities determine to be necessary or advisable, including making filings or recordings that may be required by law in connection with the Plan.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

B.    *Settlement of Settled Actions.*

The Plan shall be deemed a motion to approve the good-faith compromise and settlement pursuant to which the Debtors settle the Settled Actions pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all the Settled Actions.  The compromises and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.  The Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise, settlement, and release of the Settled Actions, as well as a finding by the Bankruptcy Court that the settlement of the Settled Actions and the releases and indemnities provided to

effectuate such settlement are in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests, and is fair, equitable, and reasonable.

C.      *Settlement of Claims After the Effective Date.*

In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors, the Unsecured Claims Litigation Trustee, or the Unsecured Claims Plan Administrator, as applicable, (in each case, in consultation with each other as provided herein) may compromise and settle Claims against, and Interests in, the Debtors and their Estates, and Causes of Action against other Entities.

D.      *Sources of Consideration for Plan Distributions.*

The Debtors shall fund distributions under the Plan with, as applicable:  (1) Cash on hand; (2) the Exit RBL Facility; (3) the New Common Stock; (4) the Unsecured Claims Distribution Trust Beneficial Interests; (5) the Challenge Action Recovery (if any); and (6) the Convenience Claims Distribution.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, of certain securities in connection with the Plan, including the New Common Stock and Claims Distribution Trust Beneficial Interests, will be exempt from SEC registration to the fullest extent permitted by law, as described more fully in Article VI.G below.

1.      *Exit RBL Facility.*

On the Effective Date, the Reorganized Debtors shall enter into the Exit RBL Facility.  The Exit RBL Facility shall be on terms set forth in the Exit RBL Facility Documents.

Confirmation shall be deemed approval of the Exit RBL Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not previously approved by the Bankruptcy Court, and the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to obtain the Exit RBL Facility, including any and all documents required to enter into the Exit RBL Facility and all collateral documents related thereto, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate entry into the Exit RBL Facility.

E.      *Cancellation of Existing Securities and Agreements.*

Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, indentures, mortgages, security documents, and other documents evidencing Claims or Interests, including Other Secured Claims, 1.5 Lien Notes Claims, 1.75 Lien Term Loan Facility Claims, Second Lien Term Loan Facility Claims, Unsecured Notes Claims, and Interests in EXCO, shall be deemed canceled, surrendered, and discharged without any need for further action or approval of the Bankruptcy Court or any Holder or other person and the obligations of the Debtors or Reorganized Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged, and the Indenture Trustees and the Administrative Agents shall be released from all duties thereunder; *provided* that the Intercreditor Agreement shall not be deemed canceled, surrendered, or discharged; *provided*,

*further*, that notwithstanding Confirmation or Consummation, any such indenture or agreement that governs the rights of the Holder of a Claim other than the Intercreditor Agreement shall continue in effect solely for purposes of: (1) allowing Holders to receive distributions under the Plan; (2) allowing the Indenture Trustees and the Administrative Agents to enforce their rights, claims, and interests vis-à-vis any parties other than the Debtors; (3) allowing the Indenture Trustees and the Administrative Agents to make the distributions in accordance with the Plan (if any), as applicable; (4) preserving any rights of the Indenture Trustees and the Administrative Agents to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant indenture or the relevant credit agreement, including any rights to priority of payment and/or to exercise charging liens; (5) allowing the Indenture Trustees and the Administrative Agents to enforce any obligations owed to each of them under the Plan; (6) allowing the Indenture Trustees and the Administrative Agents to exercise rights and obligations relating to the interests of the Holders under the relevant indentures and credit agreements; (7) allowing the Indenture Trustees and the Administrative Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, but not limited, to enforce the respective obligations owed to such parties under the Plan; and (8) permitting the Indenture Trustees and the Administrative Agents to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, that except as provided below, the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, as applicable, or result in any expense or liability to the Debtors or the Reorganized Debtors, as applicable; *provided*, *still further*, that except as set forth in the Plan, after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall not be obligated to pay any fees or expenses under the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, or the Second Lien Credit Agreement, and all related Claims shall be released and discharged consistent with Article VIII of the Plan, including any claim for diminution in value of collateral as of the Effective Date.

F.    *Release of Liens.*

Except as otherwise expressly provided herein, on the Effective Date, all Liens on any property of any Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors shall be automatically discharged and released.

G.    *Corporate Action.*

On the Effective Date, all actions contemplated under the Plan with respect to the Debtors and the Reorganized Debtors, as applicable, shall be deemed authorized and approved in all respects, including, as applicable: (1) implementation of the Restructuring Transactions; (2) formation by the Debtors or such other party as contemplated in the Plan, Plan Supplement, or Confirmation Order, of Reorganized EXCO, and the any transactions related thereto; (3) selection of, and the election or appointment (as applicable) of, the directors and officers for the Reorganized Debtors; (4) adoption of and entry into any employment agreements; (5) execution and delivery of the Exit RBL Facility Documents and incurrence of the Exit RBL Facility; (6) approval and adoption of (and, as applicable, the execution, delivery, and filing of) the New Organizational Documents; (7) issuance and distribution of New Common Stock as set forth in the Plan; (8) formation of the Unsecured Claims Distribution Trust, issuance of the Unsecured Claims Distribution Trust Beneficial Interests, execution and delivery of the Unsecured Claims Distribution Trust Documents, and the vesting of the Unsecured Claims Distribution Trust Assets in the Unsecured Claims Distribution Trust; and (9) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).

All matters provided for herein involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action, authorization, or approval that would otherwise be required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be

deemed to have occurred or to have been obtained and shall be in effect as of the Effective Date, without any requirement of further action, authorization, or approval by the Bankruptcy Court, security holders, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other person.

On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments, and take such actions, contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors including, as applicable, the Exit RBL Facility Documents, the New Organizational Documents, the New Common Stock, the Unsecured Claims Distribution Trust Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing, and all such documents shall be deemed ratified.  The authorizations and approvals contemplated by this Article IV.F shall be effective notwithstanding any requirements under non-bankruptcy law.

## H.    *Effectuating Documents; Further Transactions.*

On or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, and the officers, directors, and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

## I.    *Section 1146 Exemption.*

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including: (1) the Restructuring Transactions; (2) the Exit RBL Facility; (3) the issuance of the New Common Stock, including with regard to the Management Incentive Plan, (4) the transfer, if any, of the Debtors' assets to the Reorganized Debtors; (5) the assignment or surrender of any lease or sublease; (6) the Unsecured Claims Distribution Trust, the issuance of the Unsecured Claims Distribution Trust Beneficial Interests, and the vesting of the Unsecured Claims Distribution Trust Assets in the Unsecured Claims Distribution Trust; and (7) the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer, mortgage recording tax, or other similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers or property without the payment of any such tax, recordation fee, or governmental assessment.

## J.    *Corporate Existence.*

Except as otherwise provided in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan, the Plan

Supplement, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan or Plan Supplement and require no further action or approval (other than any requisite filings required under applicable state or federal law).

K.     *Vesting of Assets.*

Except as otherwise provided in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each applicable Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, free and clear of all Liens, Claims, charges, Interests, or other encumbrances other than those specifically granted pursuant to the Plan or the Confirmation Order.  Except as otherwise provided in the Plan, on and after the Effective Date, each of the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

L.     *New Organizational Documents.*

On the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation, to the extent required for such New Organizational Documents to become effective.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  Such New Organizational Documents shall contain customary minority protections, reasonably acceptable to each of the Required Parties.  The initial board of directors of the Reorganized Debtors shall consist of five (5) persons, three (3) of whom shall be chosen by Fairfax and Bluescape, one (1) of whom shall be chosen by the Committee, and one (1) of whom shall qualify as independent under the New York Stock Exchange definition of such term and shall be chosen jointly by the Committee, Fairfax, and Bluescape.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective state of incorporation and its respective New Organizational Documents and other constituent documents of the Reorganized Debtors.

M.     *Director, Officer, Manager, and Employee Liability Insurance.*

Notwithstanding anything contained in the Plan to the contrary, the D&O Tail Policies unexpired as of the Effective Date shall be continued.  To the extent that the D&O Tail Policies are deemed to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Tail Policies pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Tail Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity or other obligations of the Insurers under any of the D&O Tail Policies.

After the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring on or prior to the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full six-year term of such policy regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

N.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the initial Reorganized EXCO Board shall consist of five directors, the identities of whom will be disclosed in the Plan Supplement.  As of the Effective Date, the terms of the current members of the boards of directors or managers, as applicable, of each of the Debtors shall expire, and the initial Reorganized EXCO Board and the boards of directors or managers of each of the other Reorganized Debtors will include those directors and officers set forth in the lists of directors and officers of the Reorganized Debtors included in the Plan Supplement.

After the Effective Date, the officers of each of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of each person proposed to be an officer or to serve on the initial board of directors of any of the Reorganized Debtors.  To the extent any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer.  Each such director or officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents.

O.      *Management Incentive Plan.*

After the Effective Date, the Reorganized EXCO Board may adopt and implement a Management Incentive Plan pursuant to which management and key employees will receive a percentage of equity in Reorganized EXCO, comprised of New Common Stock.  The participants in the Management Incentive Plan, the timing and allocations of the awards to participants, and the other terms and conditions of such awards (including, but limited to, vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights, and transferability) shall be determined by the Reorganized EXCO Board.

P.      *Employee Obligations.*

Except as otherwise provided in the Plan or the Plan Supplement, the Reorganized Debtors shall honor the Debtors' written contracts, agreements, policies, programs, plans, and Insurance Policies for, among other things, compensation, reimbursement, indemnity, health care benefits, disability benefits, vacation and sick leave benefits, workers' compensation claims, savings, severance benefits, including in the event of a change of control, retirement benefits, welfare benefits, relocation programs, certain grandfathered benefits, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time (including any compensation programs approved by the Bankruptcy Court); *provided* that the consummation of the transactions contemplated herein shall not constitute a "change in control" with respect to any of the foregoing arrangements.  To the extent that the above-listed written contracts, agreements, policies, programs, plans, and Insurance Policies are Executory Contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, each of them will be deemed assumed as of the Effective Date and assigned to the Reorganized Debtors.

Q.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, shall retain and may enforce (or the Unsecured Claims Plan Administrator may enforce, as applicable) all rights to commence and pursue any and all Causes of Action belonging to the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action, and the

Reorganized Debtors', the Unsecured Claims Plan Administrator's, or Unsecured Claims Distribution Trust's, as applicable, rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations set forth in Article VIII of the Plan, which shall be deemed released and waived by the Debtors, the Reorganized Debtors, the Unsecured Claims Distribution Trust, or the Unsecured Claims Plan Administrator, as applicable, as of the Effective Date. The Schedule of Retained Causes of Action shall specify which Causes of Action shall be deemed transferred to the Unsecured Claims Distribution Trust on the Effective Date.

The Reorganized Debtors, the Unsecured Claims Plan Administrator, or the Unsecured Claims Distribution Trust, as applicable, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, or in accordance with the Unsecured Claims Distribution Trust Documents, as applicable. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, the Unsecured Claims Plan Administrator, or the Unsecured Claims Distribution Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors, the Reorganized Debtors, the Unsecured Claims Plan Administrator, and the Unsecured Claims Distribution Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan. Unless any Cause of Action of the Debtors against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Debtors, the Reorganized Debtors, the Unsecured Claims Plan Administrator, or the Unsecured Claims Distribution Trust, as applicable, expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, except as otherwise provided in the Plan, including Article VIII of the Plan. The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce (or the Unsecured Claims Plan Administrator may enforce, as applicable) any and all such Causes of Action. The Reorganized Debtors, the Unsecured Claims Plan Administrator, and the Unsecured Claims Distribution Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court, subject to, in the case of the Unsecured Claims Distribution Trust, the Plan and the Unsecured Claims Distribution Trust Documents.

R.    *Preservation of Mineral Interests.*

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Mineral Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Mineral Interests, and no Mineral Interests shall be compromised or discharged by the Plan. For the avoidance of doubt and notwithstanding anything to the contrary in the preceding sentence, any prepetition or pre-Effective Date right to payment asserted

by a Holder of a Mineral Interest pursuant to such Mineral Interest shall be treated as a Claim under the Plan and shall be treated in accordance therewith (including, for the avoidance of doubt, by discharge or cure, if applicable).

S.     *Payment of Certain Fees.*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors, or the Reorganized Debtors, as applicable, shall pay on the Effective Date any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, accountants, and other professionals, advisors, and consultants (a) payable under the Exit RBL Facility Documents, (b) payable under the DIP Order (which fees and expenses shall be paid pursuant to the terms of the DIP Order); (c) of the Settling Lenders; (d) of the Supporting 2L Lenders; and (e) of Cross Sound, the Unsecured Notes Trustee, and Reme, LLC, each of whom is a member of the Committee.

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Reorganized Debtors shall pay in Cash, on the Effective Date, all reasonable and documented unpaid fees and expenses incurred on or before the Effective Date of the Indenture Trustees and the Administrative Agents (including the reasonable and documented fees and expenses of their counsel), without a reduction to the recoveries of their respective Holders. The Indenture Trustees and the Administrative Agents requesting payment shall provide reasonably detailed invoices to the Debtors no later than five (5) days prior to the Effective Date (subject to redaction to preserve attorney-client privilege). If any of the Debtors, or the Reorganized Debtors, as applicable, dispute any of the requested Indenture Trustees' or Administrative Agents' fees and expenses, the Debtors or Reorganized Debtors, as applicable, shall (i) pay the undisputed portion of such Indenture Trustee's or Administrative Agent's fees and expenses on the Effective Date, and (ii) notify such Indenture Trustee of such dispute within five (5) days after presentment of the invoices by the Indenture Trustees or the Administrative Agents. Upon such notification, such Indenture Trustee or Administrative Agent may submit such dispute for resolution by the Bankruptcy Court.

T.     *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

U.     *Unsecured Claims Distribution Trust; Unsecured Claims Plan Administrator.*

1.     Formation of the Unsecured Claims Distribution Trust.

On the Effective Date, if there are any Unsecured Claims Distribution Trust Assets, the Unsecured Claims Distribution Trust shall be created by the Debtors and shall be vested with the Unsecured Claims Distribution Trust Assets. The Unsecured Claims Distribution Trust shall be governed and administered in accordance with the Unsecured Claims Distribution Trust Documents. The Unsecured Claims Distribution Trust shall be governed by a three-person advisory board, whose members shall be chosen by the Committee and whose identity and compensation shall be included in the Plan Supplement. The three-person advisory board shall select the Unsecured Claims Litigation Trustee, whose compensation shall be included in the Plan Supplement. The Unsecured Litigation Trustee shall, among other things, prosecute, settle, or otherwise resolve the Contributed Challenge Actions and the Contributed Unsecured Notes Action (if applicable), and exercise the rights pursuant to the Intercreditor Assignment, in the Unsecured Litigation Trustee's sole discretion, in accordance with the Unsecured Distribution Trust Documents.

If there are no Unsecured Claims Distribution Trust Assets, the Unsecured Claims Distribution Trust shall not be created.

2.      Unsecured Claims Distribution Trust Assets.

On the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, the Unsecured Claims Distribution Trust Assets shall be transferred to the Unsecured Claims Distribution Trust by the Debtors for the benefit of holders of Allowed Unsecured Claims free and clear of all Claims, Lien, charges, encumbrances, rights, and interests, other than as provided by the Plan, without the need for any Entity to take any further action to obtain any approval.  From and after the Effective Date, the Unsecured Claims Distribution Trust shall have sole power and authority to investigate, prosecute, settle, release or otherwise liquidate, compromise, or resolve the Challenge Actions.

Substantially contemporaneously with the formation of the Unsecured Claims Distribution Trust, the Unsecured Notes Trustee shall be deemed to have contributed the Contributed Unsecured Notes Action to the Unsecured Claims Distribution Trust, unless the Unsecured Notes Trustee provides written notice to the Debtors prior to the Effective Date declining to contribute such Cause of Action, and such Cause of Action shall be prosecuted by the Unsecured Claims Litigation Trustee, who shall have the sole power and authority to investigate, prosecute, settle, release or otherwise liquidate, compromise, or resolve such Contributed Unsecured Notes Action.

Upon the creation of the Unsecured Claims Distribution Trust and pursuant to the Plan and the Unsecured Claims Distribution Trust Documents, Holders of Allowed Unsecured Claims shall become the beneficiaries of the Unsecured Claims Distribution Trust.

3.      Transfer.

The Unsecured Claims Distribution Trust Documents shall provide that the Unsecured Claims Distribution Trust Beneficial Interests shall be tradeable to the extent permitted by applicable law (without requiring the Unsecured Claims Distribution Trust to register as a reporting company under Section 12 of the Exchange Act of 1934) and otherwise in accordance with procedures and restrictions to be set forth in such Trust Agreement.

4.      Unsecured Claims Plan Administrator.

Upon the Effective Date the Unsecured Claims Plan Administrator shall be vested with the sole right and obligation to pursue the Retained Challenge Actions and Intercreditor Assignment claims. Substantially contemporaneously with the Effective Date, each of the Settling Lenders shall each be automatically be deemed to have effectuated the Intercreditor Assignment to the Unsecured Claims Plan Administrator, and such rights shall be exercised by the Unsecured Claims Plan Administrator in its sole power and authority; *provided* that, for the avoidance of doubt, the Unsecured Creditor Plan Administrator shall not assert such rights, directly or indirectly, against any Settling Lender or Supporting Creditor.

5.      Unsecured Claims Distribution Loan.

On the Effective Date, the Debtors shall make the Unsecured Claims Distribution Loan jointly to the Unsecured Claims Plan Administrator and the Unsecured Claims Distribution Trust to be used to pay fees and expenses thereof, and both the Unsecured Claims Litigation Trustee and the Unsecured Claims Plan Administrator may draw on such loan with notice to the other.  The Unsecured Claims Distribution Loan shall not bear interest, and if not previously repaid as provided below, shall become due and payable upon the by the later of the termination of the Unsecured Claims Distribution Trust or the resolution of all

Challenge Actions.  The Unsecured Claims Distribution Loan shall be repaid as a first priority claim promptly following the receipt of any Cash proceeds recovered by the Unsecured Claims Distribution Trust or the Unsecured Claims Plan Administrator on account of the Secured Claim Challenges, or from any other Cash otherwise remaining in the Unsecured Claims Distribution Trust, at its termination.  In addition, as security for the Unsecured Claims Distribution Loan, the Settlement Contribution Hold-Back shall be pledged to, and retained by, the Reorganized Debtors and remain unissued until the full principal balance of the loan has been repaid.  To the extent that the Unsecured Claims Distribution Trust and the Unsecured Claims Plan Administrator do not repay the Unsecured Claims Distribution Loan in full in Cash by the later of the termination of the Unsecured Claims Distribution Trust or the resolution of all Challenge Actions, the Unsecured Claims Distribution Loan shall be deemed repaid by the Reorganized Debtors' retention of the portion of the Settlement Contribution Hold-Back equal to the principal balance due on the Unsecured Claims Distribution Loan as of that date, and the remainder of the Settlement Contribution Hold-Back (if any) shall be distributed Pro Rata to the Holders of Allowed Unsecured Claims.  The Unsecured Claims Distribution Trust and the Unsecured Claims Plan Administrator shall not incur any indebtedness or obligations that are Secured or that are otherwise senior in right of payment to the Unsecured Claims Distribution Loan unless the Unsecured Claims Distribution Loan has been repaid in full, in Cash.

6.     Attorney Client Privilege.

Any privilege or immunity attaching to any documents or communications (whether written or oral), including but not limited to attorney-client privilege, work product privilege, or joint interest privilege, related to the Unsecured Claims Distribution Trust Assets, Challenge Actions, or held by the Committee shall vest in the Unsecured Claims Litigation Trustee and its representatives or the Unsecured Claims Plan Administrator and its representatives, as appropriate.  The Debtors or Reorganized Debtors and the Unsecured Claims Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses.  Receipt of these privileges by the Unsecured Claims Distribution Trust shall not operate as a waiver of other privileges possessed or retained by the Debtors or Reorganized Debtors, as applicable, and no action taken by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan, shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors or Reorganized Debtors, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).

V.     *Indemnification of the Settling Lenders.*

The Debtors and the Reorganized Debtors, pursuant to the Secured Lender Settlement, shall (a) indemnify and hold harmless the Settling Lenders from and against any expense, damage or liability arising from any Cause of Action brought by any person or Entity against the Settling Lenders relating to the Debtors, the Plan (including the implementation of the Plan), or the Restructuring Transactions, that, in each case, has arisen or may arise through and including the Effective Date (including any Cause of Action that arises in connection with events occurring prior to the Effective Date), and (b) promptly advance to the Settling Lenders their respective defense costs and expenses related to any such Cause of Action or any Claim, in each case (i) brought against them in any case, hearing, procedure or proceeding of any kind, (ii) threatened against them by any person or Entity, or (iii) brought against a third party and that requires the discovery of the Settling Lenders or reasonably requires any other intervention or involvement by the Settling Lenders therein.  This indemnification shall be enforceable regardless of whether any person (including the person from whom indemnification is sought) alleges or proves: (a) the sole, concurrent, contributory, or comparative negligence (whether such negligence is simple or gross) or fault of the person seeking indemnification or (b) the sole or concurrent strict liability imposed upon the person seeking indemnification.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, any Executory Contract or Unexpired Lease of the Debtors is deemed to be an Assumed Executory Contract or Unexpired Lease, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that:  (1) previously were assumed, assumed and assigned, or rejected by the Debtors; (2) are identified on the Rejected Executory Contract and Unexpired Lease List; (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a court order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Rejected Executory Contract and Unexpired Lease List, or the Assumed Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party before the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or rejection under applicable federal law.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List and the Assumed Executory Contract and Unexpired Lease List at any time through and including thirty (30) days after the Effective Date.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed within thirty (30) days after the later of:  (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; and (2) the effective date of such rejection.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, Reorganized Debtors, the Estates, or their property without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as GUC Claims and shall be treated in accordance with the Plan, unless a different security or priority is otherwise asserted in such Proof of Claim and Allowed in accordance with Article VII of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash

on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

Any objection by a contract or lease counterparty to a proposed assumption of an Executory Contract or Unexpired Lease or the related cure cost (including as set forth on the Assumed Executory Contract or Unexpired Lease List) must be Filed, served, and actually received by the Debtors in accordance with the Disclosure Statement Order or other applicable Final Order of the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount.  For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.

For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, may add any Executory Contract or Unexpired Lease proposed to be assumed to the Rejected Executory Contracts and Unexpired Lease List in accordance with the time limits provided by the Plan for any reason, including if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable cure notice or the Plan, in which case such Executory Contract or Unexpired Lease is deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption.  Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed Disallowed, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed by the Executory Contract or Unexpired Lease counterparty or counterparties to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

E.      *Indemnification Obligations.*

The Debtors and the Reorganized Debtors shall assume the Indemnification Obligations for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals, advisors, and agents of the Debtors, to the extent consistent with applicable law, and such Indemnification Obligations shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.  Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify

45

Indemnification Obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; *provided* that none of the Reorganized Debtors shall amend or restate any of the New Organizational Documents before the Effective Date to terminate or adversely affect any of the Reorganized Debtors' Indemnification Obligations.  For the avoidance of doubt, nothing in this paragraph shall affect the assumption of any Indemnification Obligations arising under the D&O Tail Policies.

F.     *Insurance Policies.*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, the *Order Granting Chubb Relief from the Automatic Stay* [Docket No. 907], any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases), (i) on the Effective Date each of the Debtors' Insurance Policies shall be deemed assumed by the applicable Reorganized Debtor pursuant to sections 105 and 365 of the Bankruptcy Code as though listed on the Assumed Executory Contract and Unexpired Lease List and the Reorganized Debtors shall become and remain jointly and severally liable in full for all of the Debtors' obligations under the Insurance Policies, regardless of whether such obligations arise before or after the Effective Date, without the requirement or need for any Insurer to File a Proof of Claim, an Administrative Claim, a Cure Claim or to object to any cure amount; (ii) nothing alters, modifies or otherwise amends the terms and conditions of (or the coverage provided by) any of the Insurance Policies; (iii) such Insurance Policies shall not be impaired in any way by the Plan or Confirmation Order, but will remain valid and enforceable in accordance with their terms and applicable non-bankruptcy law; and (iv) if and to the extent applicable, the automatic stay of Bankruptcy Code section 362(a) and the injunction set forth in Article VIII.F of the Plan, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit:  (a) claimants with valid workers' compensation claims or with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (b) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (1) workers' compensation claims, (2) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Article VIII.F of the Plan to proceed with its claim, and (3) all costs in relation to each of the foregoing; and (c) the Insurers to cancel any Insurance Policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Policies.

G.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Unless otherwise provided herein or in the applicable Executory Contract or Unexpired Lease (as may have been amended, modified, supplemented, or restated), modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory

Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Executory Contract and Unexpired Lease List or the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors or the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

I.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur with respect to a Debtor, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases with respect to such Debtor pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

J.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Assumed Executory Contracts or Unexpired Leases, will be performed by the applicable Debtor or the applicable Reorganized Debtor, liable thereunder in the ordinary course of their business.  Accordingly, any such contracts and leases (including any Assumed Executory Contracts or Unexpired Leases) that have not been rejected as of the date of the Confirmation Date shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Initial Distribution Date, on the date that such Claim or Interest becomes an Allowed Claim, including, for the avoidance of doubt, the date on which the Claims Resolution Stipulation is Filed and becomes a Final Order, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for such Allowed Claim in accordance with its priority and Allowed amount.  No Holder of a Claim shall recover more than 100 percent of the Allowed amount of such Claim.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.

To the extent any distributions made in accordance with the Plan are subject to disgorgement to the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, shall effectuate the distribution of such disgorged distribution to the Holders of Allowed Claims entitled to such distributions in accordance with the Plan as soon as reasonably practicable.  For the avoidance of doubt, to the extent disgorgement of a distribution

made to a Holder of a Claim pursuant to the Plan is required, such Holder shall be required to disgorge any distribution but shall not be required to remit interest on such distribution.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

B.    *Challenge Resolution Stipulation.*

As soon as reasonably practicable following the resolution, whether by settlement or Final Order, of a Secured Claim Challenge with respect to any Disputed 1.5 Lien Claim or Disputed 1.75 Lien Claim, the Unsecured Claims Plan Administrator, in consultation with the Debtors or the Reorganized Debtors, as applicable, shall File a Challenge Resolution Stipulation, which shall set forth: (a) the Allowed amount, if any, of the 1.5 Lien Notes Claim or 1.75 Lien Term Loan Facility Claim; and (b) whether and in what amount such 1.5 Lien Notes Claim or 1.75 Lien Term Loan Facility Claim is Secured, Unsecured, or subordinated.

The Unsecured Claims Plan Administrator shall provide notice of such Challenge Resolution Stipulation in accordance with Bankruptcy Rule 2002(a) as soon as reasonably practicable following the resolution of the Secured Claim Challenge.  If no objection to the Challenge Resolution Stipulation is timely made, the Challenge Resolution Stipulation shall be deemed incorporated into and a part of the Plan as if set forth in full in the Plan and approved pursuant to the Confirmation Order.  If an objection is timely Filed, the Bankruptcy Court shall conduct a hearing prior to entering a Final Order approving the Challenge Resolution Stipulation.

C.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on such Distribution Record Date.

2.    Delivery of Distributions.

Except as otherwise provided herein, the Reorganized Debtors or the Unsecured Claims Litigation Trustee (with respect to the Unsecured Claims Distribution Trust Assets) in consultation with the Reorganized Debtors, shall be authorized to make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the Distribution Record Date shall not apply to publicly-traded Securities.  The manner of such distributions shall be determined at the discretion of the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, and the address for each Holder of an Allowed Claim or Allowed Interest shall be deemed to be the address set forth in any Proof of Claim or Interest Filed by that Holder.

3.    Delivery of Distributions on 1.75 Lien Term Loan Facility Claims and Second Lien Term Loan Facility Claims.

Except as otherwise provided in the Plan, all distributions on account of Allowed 1.75 Lien Loan Facility Claims and Allowed Second Lien Term Loan Facility Claims shall be governed by the

respective credit agreement and shall be deemed completed when made to the respective Administrative Agent, which shall be deemed the Holder of their respective portion of the Allowed 1.75 Lien Term Loan Facility Claims and Allowed Second Lien Term Loan Facility Claims for purposes of distributions to be made hereunder.  The applicable Administrative Agents shall hold or direct such distributions for the benefit of their respective Holders of Allowed 1.75 Lien Term Loan Facility Claims and Allowed Second Lien Term Loan Facility Claims.  As soon as practicable following compliance with the requirements set forth in this Article VI, the Administrative Agents shall arrange to deliver or direct the delivery of such distributions to or on behalf of their respective Holders of 1.75 Lien Term Loan Facility Claims and Second Lien Term Loan Facility Claims.

4.      Delivery of Distributions on 1.5 Lien Notes Claims, 2018 Unsecured Notes Claims, and 2022 Unsecured Notes Claims.

Except as otherwise provided in the Plan, or reasonably requested by the Indenture Trustees, all distributions to Holders of Allowed 1.5 Lien Notes Claims, Allowed 2018 Unsecured Notes Claims, and Allowed 2022 Unsecured Notes Claims shall be deemed completed when made to the respective Indenture Trustee; *provided* that non-Cash consideration shall not be distributed in the name of the Indenture Trustees. The applicable Indenture Trustees shall hold or direct such distributions for the benefit of the respective Holders of Allowed 1.5 Lien Notes Claims, Allowed 2018 Unsecured Notes Claims, and Allowed 2022 Unsecured Notes Claims.  As soon as practicable in accordance with the requirements set forth in this Article VI, the Indenture Trustees shall arrange to deliver such distributions to or on behalf of such Holders in accordance with the 1.5 Lien Notes Indenture, the 2018 Unsecured Notes Indenture, and the 2022 Unsecured Notes Indenture, as applicable, and subject to the rights of the Indenture Trustees to assert their charging liens.  If the Indenture Trustees are unable to make, or consent to the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, making such distributions, the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, with the cooperation of the applicable Indenture Trustee, shall make such distributions to the extent practicable.  The Indenture Trustees shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors, the Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed 1.5 Lien Notes Claims, Allowed 2018 Unsecured Notes Claims, and Allowed 2022 Unsecured Notes Claims that is held in the name of, or by a nominee of, DTC, shall be made to the extent possible through the facilities of DTC on the Effective Date or as soon as practicable thereafter.  The Reorganized Debtors shall reimburse the Indenture Trustees for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan or the cancellation and discharge of the 1.5 Lien Notes Indenture, the 2018 Unsecured Notes Indenture, and the 2022 Unsecured Notes Indenture.  Any such fees or expenses invoiced after the Effective Date shall be paid promptly, but no later than five (5) Business Days after the Reorganized Debtors receive an invoice.  The Indenture Trustees shall retain all rights under the 1.5 Lien Notes Indenture, the 2018 Unsecured Notes Indenture, and the 2022 Unsecured Notes Indenture, as applicable, to exercise their charging lien against distributions to their respective Holders.

5.      Delivery of Distributions to Holders of GUC Claims.

The Debtors, the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, will, in their reasonable discretion, in consultation with the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, determine the method for a timely distribution of all distributions to Holders of Allowed GUC Claims pursuant to the Plan.

6.      No Fractional Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an applicable Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

7.      Minimum Distribution.

No Cash payment of less than $500 or issuance of New Common Stock fewer than ten (10) shares shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.  The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing minimum distribution threshold.

8.      Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date such distribution is returned as undeliverable.  After such date, all unclaimed property or interests in property shall revert to the applicable Reorganized Debtor(s) automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and any claim of any Holder to such property shall be fully discharged, released, and forever barred.

For the avoidance of doubt, the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, and their respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder.

D.      *Special Rules for Distributions to Holders of Disputed Claims and Interests.*

Except as otherwise provided in the Plan, agreed to by the Debtors, Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, or set forth in an order of the Bankruptcy Court:  (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim (including, for the avoidance of doubt, any Disputed 1.5 Lien Claim or Disputed 1.75 Lien Claim) or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order; *provided* that if a portion of a Claim is not Disputed, the Debtors or the Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, may make a partial distribution based on such portion of such Claim that is not Disputed; and (b) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or Disallowed.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that

such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

E.      *Manner of Payment.*

Unless otherwise set forth herein, all distributions of New Common Stock and Cash, as applicable, to the Holders of Allowed Claims under the Plan shall be made by the Debtors or Unsecured Claims Litigation Trustee, as applicable.  At the option of the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.      *SEC Exemption.*

The New Common Stock and the Unsecured Claims Distribution Trust Beneficial Interests are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

All shares of the New Common Stock and the Unsecured Claims Distribution Trust Beneficial Interests issued pursuant to the Plan will be issued in reliance upon section 1145 of the Bankruptcy Code.

Pursuant to section 1145 of the Bankruptcy Code, the issuance of (1) the New Common Stock, (2) the Unsecured Claims Distribution Trust Beneficial Interest (if such interests are securities), and (3) any other securities issued in reliance on section 1145 of the Bankruptcy Code, are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities.  Each of the foregoing securities (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable (except as provided in the Unsecured Claims Distribution Trust Documents) by any initial recipient thereof that (i) at the time of transfer, is not an "affiliate" of the Reorganized EXCO as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (ii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the New Common Stock issuable pursuant to the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock issuable pursuant to the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, as applicable, the Debtors and the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit with respect to distributions pursuant to the Plan.  Notwithstanding any provision herein to the

contrary, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, and establishing any other mechanisms they believe are reasonable and appropriate to comply with such requirements.  The Debtors and the Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.  The Reorganized Debtors shall not have any duty to obtain an executed Internal Revenue Service Form W-9 (or other applicable tax form) from any Claim Holder.

H.    *Tax Matters Regarding the Unsecured Claims Distribution Trust.*

The Plan provides that, among other things, on the Effective Date the Unsecured Claims Distribution Trust shall be formed, to which all of the Debtors' right, title, and interest in certain litigation as well as certain statutory avoidance actions shall be assigned, with the proceeds therefrom distributed to certain Holders of Allowed Claims.

The Debtors, the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, may establish one or more reserves on account of Claims that are Disputed or contingent.  The Unsecured Claims Litigation Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (a) make an election pursuant to Treasury Regulation Section 1.468B-9 to treat and so treat such reserve as a "disputed ownership fund" within the meaning of that section, and (b) distribute assets from such reserve as, when, and to the extent such Claims that are Disputed cease to be Disputed, whether by virtue of becoming Allowed or otherwise resolved.  The beneficiaries of the Unsecured Claims Distribution Trust shall be bound by such election, if made by the trustee, and, as such, shall, for U.S. federal income tax purposes (and, to the extent permitted by law) for state and local income tax purposes, report consistently therewith.

I.    *No Postpetition or Default Interest on Claims.*

Notwithstanding any documents that govern the Debtors' prepetition funded indebtedness or Proofs of Claim to the contrary, (1) postpetition and/or default interest shall not accrue or be paid on any Claims and (2) no Holder of a Claim shall be entitled to:  (a) interest accruing on or after the Petition Date on any such Claim; or (b) interest at the contract default rate.  For the avoidance of doubt, no interest shall accrue or be paid as a result of a delay, if any, between the Confirmation Date and the date a Holder of an Allowed Claim receives a distribution pursuant to the Plan.

J.    *Setoffs and Recoupment.*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors, as applicable may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors, as applicable, of any such right it may have against the Holder of such Claim.

K.    *No Double Payment of Claims.*

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the Holder of an Allowed Claim against more than

one Debtor may recover distributions from all co-obligor Debtors' Estates until the Holder has received payment in full on the Allowed Claims.  No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

L.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors, the Reorganized Debtors, the Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, as applicable, shall reduce a Claim, and such Claim shall be deemed Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, Reorganized Debtor, or the Unsecured Claims Litigation Trustee, as applicable.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, Reorganized Debtor, or the Unsecured Claims Litigation Trustee, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, or the Unsecured Claims Litigation Trustee, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor, or the Unsecured Claims Litigation Trustee, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

Except as otherwise provided for in the Plan, no distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such a Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, any distributions of insurance proceeds to Holders of Allowed Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy.  Except as otherwise provided in the Plan, the Plan shall not otherwise constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies, nor shall anything contained herein (a) constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers, or (b) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any Insurer.

M.      *Allocation of Distributions Between Principal and Interest.*

For distributions in respect of Allowed Claims, to the extent that any such Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such

distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims.*

Except as otherwise set forth in the Plan, after the Effective Date, the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as specifically provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, and subject to the rights and duties of the applicable Reorganized Debtor(s) or the Unsecured Claims Distribution Trust, as applicable, as set forth herein, after the Effective Date, (a) (i) the Unsecured Claims Distribution Trust shall have the sole authority to File, withdraw, or litigate to judgment, objections to Claims in Classes 3, 4, 5, and 6; (ii) the Unsecured Claims Distribution Trust or applicable Reorganized Debtor, as designated in the Claims Objection Schedule, shall have the sole authority to File, withdraw, or litigate to judgment, objections to Claims in Class 7; and (iii) the applicable Reorganized Debtor(s) shall have the sole authority to File, withdraw, or litigate to judgment, objections to all other Claims; (b) the applicable Reorganized Debtor(s) or the Unsecured Claims Distribution Trust, as applicable, shall have the authority to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c)  the applicable Reorganized Debtor(s) or the Unsecured Claims Distribution Trust, as applicable, shall have the authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, the Unsecured Claims Litigation Trustee and the Unsecured Claims Plan Administrator shall have the sole authority to prosecute, settle, or otherwise resolve the Secured Claim Challenges (other than, for the avoidance of doubt, against any Settling Lender).

C.      *Adjustment to Claims Without Objection.*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted on the Claims Register by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Time to File Objections to Claims or Interests.*

Any objections or challenges to Claims or Interests shall be Filed on or before the applicable Claims Objection Deadline.

E.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors, the Reorganized Debtors, or the Unsecured Claims Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the

Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. § 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been Disallowed or expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

F.      *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Debtors, the Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, shall establish one or more reserves for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the applicable Debtors, Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim.  To the extent that a Disputed Claim may be entitled to receive New Common Stock pursuant to the Plan, such New Common Stock will remain authorized but unissued pending resolution of such Disputed Claim.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  As such, such assets will be subject to entity-level taxation, and the Debtors and Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, shall be required to comply with the relevant rules.

G.      *Disallowance of Claims.*

Any Claims held by Entities from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 547, 548, 549, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and the full amount of such obligation to the Debtors has been paid or turned over in full.

All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and Disallowed as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.  All Proofs of Claim Filed on account of an employee benefit shall be deemed satisfied and Disallowed as of the Effective Date to the extent the Reorganized Debtors

elect to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed to by the Reorganized Debtors in their sole discretion, any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

H.      *Amendments to Proofs of Claim.*

On or after the Effective Date, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Proof of Claim or Interest Filed that is not so authorized before it is Filed shall be deemed Disallowed in full without any further action.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

J.      *No Distributions Pending Allowance.*

Except as otherwise set forth herein, if an objection to a Claim or portion thereof is Filed as set forth in Article VII.C of the Plan, no payment or distribution provided under the Plan shall be made on account of such Disputed Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

K.      *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date a Disputed Claim becomes Allowed, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan, as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under such order or judgment of the Bankruptcy Court.

## ARTICLE VIII.
## RELEASE, INJUNCTION, EXCULPATION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or

compromised after the Effective Date by the Reorganized Debtors, if applicable), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. For the avoidance of doubt, from and after the Effective Date, any Claim for adequate protection (as required by the Bankruptcy Code) of any Secured Claim for post-Effective Date diminution in value shall be deemed satisfied, discharged, and released, effective as of the Effective Date, and neither the Reorganized Debtors nor the Unsecured Claims Distribution Trust, as applicable, shall have any obligation to provide such protection.

B.      *Release of Liens.*

**Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, except with regard to Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.2(b) of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns (including Reorganized EXCO, if applicable), in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable.**

C.      *Releases by the Debtors.*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates, from any and all claims and Causes of Action whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof, if applicable), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit**

Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the DIP Order (and any payments or transfers in connection therewith), the New Organizational Documents, any preference or avoidance claims pursuant to sections 544, 547, 548, or 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the releases described herein are: (1) in exchange for the good and valuable consideration provided by or on behalf of the Released Parties; (2) a good faith settlement and compromise of the Settled Actions released herein; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6)  a bar to any of the Debtors, the Reorganized Debtors, the Debtors' Estates, the Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, the Unsecured Claims Distribution Trust, or asserting any claim or Cause of Action released pursuant to the releases described herein or asserting (directly or indirectly) or trading any claim or Cause of Action released pursuant to the releases described herein against any Released Party at any time.

D.      *Releases by Holders of Claims and Interests.*

As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility,

the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

E.      *Exculpation.*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Mediation, the formulation, preparation, dissemination, negotiation, Filing, or termination of any prepetition transactions, the Disclosure Statement, the Plan, the Secured Lender Settlement, the D&O Settlement, the D&O Liability Insurance Policies, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Filing of the Chapter 11 Cases, the negotiation, terms, or execution of the settlement agreements effectuated pursuant to Federal Rule of Bankruptcy Procedure 9019, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to or in connection with the Plan and the Restructuring Transactions.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

59

F.      *Injunction.*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have Held, Hold, or may Hold Claims or Interests that have been released pursuant to Article VIII.C or Article VIII.D of the Plan, shall be discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, the Unsecured Claims Distribution Trust, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

G.      *Release of D&O Carriers and D&O Liability Insurance Policies.*

Upon the Debtors' receipt of the D&O Proceeds in cleared funds, the parties to the D&O Settlement, on behalf of themselves, their predecessors, successors, affiliates and assigns, and all persons acting by, through or under them, and each of them, fully release and forever discharge the D&O Carriers, together with their predecessors, successors, affiliates, and assigns, and all persons acting by, through or under them, from all known and unknown claims, liabilities, obligations, promises, agreements, (including the D&O Liability Insurance Policies issued by the D&O Carriers), controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees and expenses (including attorneys' fees and costs), of any nature whatsoever, whether or not apparent or yet to be discovered, related to the Debtors; *provided* that nothing in this section releases (a) any party to the D&O Settlement from its obligations under the D&O Settlement; (b) any party to the D&O Settlement from its liability for breach of any term, warranty, or representation in the D&O Settlement; or (c) the D&O Carriers from payment of Defense Costs (as defined in and in accordance with the terms of the D&O Liability Insurance Policies issued by the D&O Carriers) incurred in connection with the D&O Settlement. The D&O Carriers' payment of the D&O Proceeds and any Defense Costs (as defined in the D&O Liability Insurance Policies issued by the D&O Carriers) is deemed to have exhausted the limits of the D&O Liability Insurance Policies issued by the D&O Carriers.  Moreover, upon the Debtors' receipt of the D&O Proceeds in cleared funds, the D&O Liability Insurance Policies issued by the D&O Carriers are immediately discharged and cancelled, and the D&O Carriers are immediately released from any and all obligations under the D&O Liability Insurance Policies issued by the D&O Carriers.  Notwithstanding any language in the D&O Settlement or Plan, as of the Effective Date, no party may pursue or file any action that implicates the D&O Liability Insurance Policies issued by the D&O Carriers.  For the avoidance of doubt, nothing in this paragraph shall affect the obligations of Beazley Insurance Company, Inc., Allied World National Assurance Company, and XL Specialty Insurance Company arising under

Policy No. V15RVK170901, Policy No. 0310-0059, and Policy No. ELU148628-17 or the obligations of the Insurers not party to the D&O Settlement arising under the D&O Liability Insurance Policies issued by such Insurers.  Coverage for all the Insureds by Beazley Insurance Company, Inc., Allied World National Assurance Company, and XL Specialty Insurance Company arising under Policy No. V15RVK170901, Policy No. 0310-0059, and Policy No. ELU148628-17 is expressly preserved.

H.      *Bar Order and Channeling Injunction.*

Except as otherwise specifically provided in the Plan, the Enjoined Parties shall be permanently barred, restrained, and enjoined, with regard to the Claims set forth in this Article VIII.H (1)-(6) (collectively, the "Enjoined Claims") from ever:

1.      commencing, asserting, continuing, filing, conducting, or bringing, directly, indirectly, or derivatively, any Claim, demand, suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum), against (a) any of the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors and their predecessors, affiliates, successors, principals, directors, officers, and related entities, and (b) the D&O Carriers with regard to any and all claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' or any of the Released Parties' conduct, individually or collectively, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

2.      asserting, continuing, filing, conducting, or bringing, directly, indirectly, or derivatively, any Claim, demand, suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum), against any of the Released Parties, or their respective property, including the proceeds of such property that would result in the avoidance of allegedly fraudulent (actual or constructive) or preferential transfers from the Debtors to any of the Released Parties, regardless of whether such Released Party is the initial or subsequent transferee, and/or recovery of such allegedly fraudulent (actual or constructive) or preferential transfers from such Released Party;

3.      enforcing, levying, employing legal process (including proceedings supplementary), whether prejudgment or post-judgment, attaching, garnishing, sequestering, collecting, or otherwise recovering by any means or in any manner, any Claims against (a) the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors, and their predecessors, affiliates, successors, principals, directors, officers, and related entities; and (b) the D&O Carriers with regard to any and all Claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties

whether based upon a theory of law or equity; or (iv) the Debtors' conduct, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

4.        pursuing, aiding, or abetting any action brought by any person or entity seeking recovery, contribution and/or indemnity from (a) any of the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors and their predecessors, affiliates, successors, principals, directors, officers, and related entities, and (b) the D&O Carriers with regard to any and all Claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' or the Released Parties' conduct, individually or collectively, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

5.        enforcing any terms set forth in any settlement agreement by and among any of the Released Parties and any of the Enjoined Parties that would resolve, compromise, or settle Claims that would otherwise be enjoined by the bar order or the channeling injunction set forth in this section; and

6.        pursuing any of the Enjoined Claims recited herein as they relate to any Claims against retained professionals including accountants and legal counsel as well as their agents and assigns of any of the Released Parties.

The injunction described in this section and incorporated into the Confirmation Order shall be referred to as the "Bar Order and Channeling Injunction."

The automatic stay shall be lifted, to the extent it may be applicable, to permit the D&O Carriers to contribute the D&O Proceeds.

The Bankruptcy Court shall expressly retain jurisdiction in enforcing, implementing and interpreting the scope of the Bar Order and Channeling Injunction.

I.        *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.        *Recoupment.*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such

Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Binding Effect.*

On the Effective Date, except as otherwise provided herein to the contrary, and effective as of the Effective Date, the Plan will bind, and will be deemed binding upon, all Holders of Claims against and Interests in the Debtors, and such Holder's respective successors and assigns, to the maximum extent permissible by law, notwithstanding whether or not such Holder (1) will receive any property or interest in property under the Plan, or (2) has filed a Proof of Claim or Interest in the Chapter 11 Cases, or (3) failed to vote to accept or reject the Plan or affirmatively voted to reject the Plan.

L.      *SEC Rights Reserved*

Nothing in the Plan or the Confirmation Order (i) releases any non-Debtor Entity from any claim or Cause of Action of the SEC; or (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any claims, Causes of Action, proceedings or investigations against any non-Debtor Entity in any forum.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.      the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order in a manner consistent in all material respects with the Plan; and

2.      the Confirmation Order shall, among other things:

(a)      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(b)      authorize the Debtors and the Reorganized Debtors, as applicable, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(c)      authorize the Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable/necessary to:  (i) implement the Restructuring Transactions; (ii) authorize, issue, incur, and/or distribute the Exit RBL Facility, the New Common Stock, the exemption from registration provided by section 1145 of the Bankruptcy Code and in the case of any other securities pursuant to the exemption from registration provided by section 1145 of the Bankruptcy Code or another exemption from the registration requirements of the Securities Act or pursuant to one or more registration statements; (iii) make all distributions and issuances as required and as applicable under the Plan, including

Cash, the New Common Stock, the Exit RBL Facility, and the Unsecured Claims Distribution Trust Assets; and (iv) enter into any agreements, transactions, and sales of property, as set forth in the Plan Supplement with respect to the Debtors or the Reorganized Debtors, as applicable, including the Exit RBL Facility Documents;

(d)    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order in furtherance of, or in connection with, any transfers of property pursuant to the Plan, including any deeds, mortgages, security interest filings, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan shall not be subject to transfer or recording taxes or fees to the extent permissible under section 1146 of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment;

(e)    authorize and approve the settlement of the Settled Actions pursuant to the Secured Lender Settlement and the D&O Settlement;

(f)    contain the release, injunction, and exculpation provisions contained in Article VIII herein; and

(g)    grant the Unsecured Claims Distribution Trust immediate standing to assert the Contributed Challenge Actions; and

(h)    grant the Unsecured Claims Plan Administrator authority to assert the Retained Challenge Actions.

B.    *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.    the Confirmation Order shall have become a Final Order;

2.    the Plan and the applicable documents included in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed and be in form and substance reasonably satisfactory to each of the Required Parties;

3.    the New Organizational Documents with respect to the Reorganized Debtors, the Exit RBL Facility Documents shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived) and subject to any post-closing execution and delivery requirements provided for in the Exit RBL Facility Documents and be in form and substance reasonably satisfactory to each of the Required Parties;

4.　　　the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the Restructuring Transactions;

5.　　　all Allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court and all fees and expenses payable pursuant to Article IV.R shall have been paid in full;

6.　　　the Unsecured Claims Distribution Loan shall have been issued, and the Unsecured Claims Plan Administrator and Unsecured Claims Distribution Trust Advisory Board shall have been appointed; and if there are any Unsecured Claims Distribution Trust Assets, the Unsecured Claims Distribution Trust shall have been formed and the Unsecured Claims Distribution Trust Assets shall have been transferred to the Unsecured Claims Distribution Trust;

7.　　　the Debtors shall have received the D&O Proceeds;

8.　　　any Cause of Action asserted, or that may be asserted, as a result of the transactions contemplated by the Plan by LSP, including, without limitation, those Causes of Action alleged pursuant to Adversary Proceeding No. 18-30155 (Gen IV Investment Opportunities, LLC et al v. Fairfax Financial Holdings Limited et al.) against the Settling Lenders shall have been dismissed with prejudice or otherwise resolved to the satisfaction of the Required Parties; and

9.　　　the payments required by the Enterprise Settlement Agreement to have been made by the Effective Date shall have been made.

C.　　　*Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this IX may be waived by the prior written consent of the Required Parties without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D.　　　*Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

E.　　　*Effect of Failure of Conditions.*

If the Effective Date does not occur with respect to any of Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Subject to the limitations contained in the Plan, and on prior notice to and with the consent of each of the Required Parties, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors, with the consent of each of the Required Parties, reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the extent provided under applicable law, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount, or Allowance of Claims or Interests, including a Challenge Resolution Stipulation;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the Rejected Executory Contracts and Unexpired Lease List, or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

5.      adjudicate, decide, or resolve any and all matters related to the Causes of Action enumerated in the Schedule of Retained Causes of Action;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary to execute, implement, or consummate the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including injunctions or other actions as may be necessary to restrain interference by an Entity with Consummation or enforcement of the Plan;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions or the Plan;

10.      resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action relating to the distribution or the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.L.1 of the Plan;

13.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by or assess damages against any Entity with Consummation or enforcement of the Plan or the Restructuring Transactions;

14.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     enter an order or decree concluding or closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any of the transactions contemplated therein;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including any request made under section 505 of the Bankruptcy Code for the expedited determination of any unpaid liability of a Debtor for any tax incurred during the administration of the Chapter 11 Cases, including any tax liability arising from or relating to the Restructuring Transactions, for tax periods ending after the Petition Date and through the closing of the Chapter 11 Cases;

20.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee benefit program, regardless of whether such termination occurred before or after the Effective Date;

21.     hear and determine all pre-Effective Date disputes involving the obligations or terms of the Exit RBL Facility;

22.     except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

23.     enforce all orders previously entered by the Bankruptcy Court and resolve any issues not enumerated above related to any matters adjudicated in the Chapter 11 Cases; and

24.     hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the foregoing, the Bankruptcy Court shall retain non-exclusive jurisdiction to adjudicate, decide, or resolve any and all matters related to Secured Claim Challenges.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.     Immediate Binding Effect.*

Subject to Article I.B of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon, as applicable, the Debtors, the Reorganized Debtors, Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, and the Unsecured Claims Distribution Trust, and as applicable, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject

to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Dissolution of the Committee.*

On the Effective Date, the Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases; *provided* that such official committee shall be deemed to remain in existence solely with respect to, and shall not be heard on any issue except, applications filed by the Professionals pursuant to sections 330 and 331 of the Bankruptcy Code.  From and after the Effective Date, none of, as applicable, the Debtors, the Reorganized Debtors, the Unsecured Claims Distribution Trust, the Unsecured Claims Litigation Trustee, or the Unsecured Claims Plan Administrator shall be responsible for paying any fees or expenses incurred after the Effective Date by the members of or advisors to the Committee, and neither the Debtors or the Reorganized Debtors shall be responsible for paying any fees or expenses incurred by the Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, or advisors to the Unsecured Claims Distribution Trust (without limiting the Debtors' obligation to transfer the Unsecured Claims Distribution Trust Funds to the Unsecured Claims Distribution Trust) on the Effective Date.

D.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, will be paid by each of the applicable Reorganized Debtors for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtors is converted, dismissed, or closed, whichever occurs first.  All such fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the applicable Reorganized Debtor shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until the earliest of the date on which the applicable Chapter 11 Case of the Reorganized Debtors is converted, dismissed, or closed.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor,

Settling Lender, or any other Entity with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.      if to the Debtors, to:

EXCO Resources, Inc.
112377 Merit Drive, Suite 1700
Dallas, Texas 75251
Houston, Texas 77002
Attention:  Heather Summerfield
Email address:  hsummerfield@excoresources.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile:  (212) 446-4900
Attention:  Christopher T. Greco
E-mail addresses:  christopher.greco@kirkland.com

–and–

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Facsimile:  (312) 862-2200
Attention:  Patrick J. Nash, Esq. and Alexandra Schwarzman, Esq.
E-mail addresses: patrick.nash@kirkland.com; alexandra.schwarzman@kirkland.com

2.      if to the Required Parties, to:

Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Attention:  Andrew K. Glenn and Shai Schmidt
E-mail addresses:  AGlenn@kasowitz.com; SSchmidt@kasowitz.com

Bracewell LLP
CityPlace I, 34th Floor
185 Asylum Street
Hartford, Connecticut 06103
Facsimile:  (860) 760-6814
Attention:  Kurt A. Mayr and David Lawton
E-mail address:  kurt.mayr@bracewell.com; david.lawton@bracewell.com

Brown Rudnick LLP
Seven Times Square
New York, NY 10036
Facimile: (212) 209-4801
Attention:  Robert Stark and Kenneth Aulet
E-mail addresses: rstark@brownrudnick.com; kaulet@brownrudnick.com

Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Facsimile: (617) 289-0418
Attention:  Steven B. Levine
E-mail address:  slevine@brownrudnick.com

Jackson Walker LLP
1401 McKinney Street,
Suite 1900
Houston, Texas 77010
Facimile: (713) 752-4221
Attention: Elizabeth Freeman
E-mail addresses: efreeman@jw.com

Quinn Emanuel Urquhart & Sullivan, LLP
711 Louisiana Street, Suite 500,
Houston, TX 77002
Facsimile:
Attention:  Patricia Tomasco
E-mail address: pattytomasco@quinnemanuel.com

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to Entities that request to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.     *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All

injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https:/dm.epiq11.com/ERI or the Bankruptcy Court's website at http:/www.txs.uscourts.gov/bankruptcy.

K.      *Nonseverability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as applicable, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Reorganized Debtors' consent; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors shall have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or

any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

N.      *Closing of Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of EXCO, and all contested matters and adversary proceedings relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of EXCO; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Chapter 11 Case of EXCO has been closed.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of EXCO in accordance with the Bankruptcy Code and the Bankruptcy Rules.

O.      *Creditor Default.*

On and after the Effective Date, any act or omission by a holder of a Claim or an Interest in contravention of the provisions of the Plan shall be deemed an event of default under the Plan. Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default.  Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized Debtors in an amount, including interest, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

[*Remainder of page intentionally left blank.*]

Dated: [●], 2019

Respectfully submitted,

By: *DRAFT*
_____
Name: Tyler S. Farquharson
Title: Chief Financial Officer and Treasurer of EXCO Resources, Inc.

Prepared by:
KIRKLAND & ELLIS LLP
Christopher T. Greco (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022

–and–

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654

–and–

FOLEY GARDERE
Marcus A. Helt (TX 24052187)
Michael K. Riordan (TX 24070502)
1000 Louisiana St., Suite 2000
Houston, Texas 77002

*Co-Counsel to the Debtors and Debtors in Possession*

**Exhibit B**

**Corporate Organization Chart**

# EXCO Resources, Inc. Structure Chart



**<u>Exhibit C</u>**

**Amended Disclosure Statement Order**

*[Intentionally Omitted]*

**<u>Exhibit D</u>**

**Liquidation Analysis**

## Exhibit D

Liquidation Analysis

### 1)  Introduction

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To make these findings, the Bankruptcy Court would: (1) estimate the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee (the "Trustee") would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated; (2) determine the distribution (the "Liquidation Distribution") that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated by chapter 7; and (3) compare each such Holder's Liquidation Distribution to the distribution under the Plan (the "Plan Distribution") that such Holder would receive if the Plan were confirmed and consummated. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The analysis (the "Liquidation Analysis") is based upon certain assumptions discussed herein and in the Disclosure Statement.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT THAT THESE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION. ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

### 2)  Basis of Presentation

The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered proceeding. Any recoveries on account of non-Debtor affiliates would be recovered, after payment of non-Debtor claims, by the parent Entity according to the corporate structure.

The Liquidation Analysis has been prepared assuming that the Debtors' Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code on or about June 30, 2019 (the "Conversion Date"). Except as otherwise noted herein, the Liquidation Analysis is based upon the Debtors' unaudited pro forma, consolidated balance sheets as of December 31, 2018, and those values are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. The Liquidation Analysis was prepared on an unconsolidated basis.

---

[1]  All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (the "Plan"), to which this exhibit is attached as **Exhibit D**.

It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint the Trustee, who would sell the Debtors' assets and distribute the cash proceeds, net of liquidation related costs, to Holders of Claims and Interests in accordance with applicable bankruptcy and non-bankruptcy law.

The Liquidation Analysis assumes the continuation of production for the three months following a conversion to chapter 7 to allow a reasonable amount of time for the sale of producing assets, however, post conversion revenue and production related disbursements would be included in the final sale price as post Effective Date working capital adjustments. The Liquidation Analysis further assumes negative operating cash flows during the initial wind-down period prior to sale of assets as production receivables and joint interest billing ("JIB") receivables would be collected from pre-conversion produced oil and gas.

The cessation of business in a liquidation is likely to trigger certain Claims that otherwise would not exist absent a liquidation, including various potential employee claims (for such items as severance and potential WARN Act claims) and Executory Contract and Unexpired Lease rejection damages.  Some of these Claims could be significant and would be entitled to priority in payment over Unsecured Claims.  Those Priority Claims would be paid in full from the Liquidation Proceeds before the balance thereof would be made available to satisfy Unsecured Claims.

As discussed herein, the Claim amounts reflected in the Liquidation Analysis are estimates and are subject to material revision.  The Liquidation Analysis reflects the impact of a mediated settlement among the Debtors, the Settling Lenders, the Committee, and the D&O Carriers, which resolves certain potential claims and causes of action further discussed in Article VII.H.2(d) of the Disclosure Statement and embodied in the Plan, which result in, among other things:  (a) the D&O Carriers contributing $13,350,000 in Cash proceeds to the Debtors' Estates, and (b) the Settling Lenders contributing $60 million of value to fund recoveries to Holders of Claims in Classes 5, 6, and 7.  This Liquidation Analysis also assumes: (a) that no Makewhole Claims are Allowed; and (b) the same classification structure and settlement structure as the Plan.

The Debtors have assumed that a liquidation would occur over an approximately six-month time period during which the Trustee would sell substantially all of the Debtors' assets, monetize and collect receivables and other assets on the pro forma balance sheet, and administer and wind-down the Estates.  In an actual liquidation, the process and length of wind-down could be materially longer and more expensive than assumed herein and thereby significantly reduce the actual recoveries shown herein.

For example, the potential for Priority, contingent, litigation, rejection, and other Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to Holders of Claims and Interests.  Also, in the context of a liquidation, there would likely be a myriad of potential offset claims, particularly with respect to JIB receivables, that would take time to reconcile and resolve.  Additionally, certain of the joint operating agreements to which the Debtors are party appear to be non-assignable (absent consent) which could result in potential asset transfer issues in the context of a chapter 7 liquidation.  Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if Debtors were in fact, to undergo such a liquidation and the actual amounts received could be materially different (including materially less) than the amounts shown herein.

Pursuant to Bankruptcy Code section 1129, no junior creditor may receive any distributions until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full. Further, Trustee fees, Professional Fee Claims, Administrative Claims,[2] and Priority Claims, among other such Claims that may arise in a liquidation scenario, would have to be paid in full from the Liquidation Proceeds prior to proceeds being made available to the Holders of Unsecured Claims. Under the Plan, pursuant to the Secured Lender Settlement, the Settling Lenders are contributing 11.6 % of New Common Stock (with a value of $60 million) to which they are entitled as Holders of 1.5 Lien Notes Claims to Holders of Allowed Claims in Classes 5, 6, and 7; this Liquidation Analysis assumes the same structure.[3]

The Liquidation Analysis does not include estimates for the tax consequences, both Federal and state, that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could be material.

## 3) Liquidation Process

The Debtors' liquidation would be conducted in a chapter 7 environment with the Trustee managing the bankruptcy estate (the "Chapter 7 Estate") to maximize recovery in an expedited process. The Trustee's initial step would likely be to develop a liquidation plan to generate proceeds from the sale of the Debtors' assets for distribution to creditors. The three major components of the liquidation are as follows:

1. generation of Cash proceeds from asset sales, largely sold on a piecemeal basis;

2. payment of costs related to the liquidation process, such as purchase price adjustments, personnel retention costs, Estate wind-down costs, and Trustee, professional, and other administrative fees; and

3. distribution of net proceeds generated from asset sales to Holders of Claims and Interests in accordance with the priority scheme under chapter 7 of the Bankruptcy Code; the liquidation analysis assumes Cash generated from the sale of unencumbered assets and the proceeds of the D&O Settlement received from the D&O Carriers are used to satisfy the DIP Facility and Administrative Claims.

---

[2]  This liquidation analysis does not take into account potential Claims the 1.5 Lien Noteholders may assert for diminution in value to ensure that they receive a full recovery. The effect of this, if needed and successful, would be to further decrease the recovery to Holders of 1.75 Lien Term Loan Facility (if any).

[3]  This Liquidation Analysis does not take into account the potential application of rights under the Intercreditor Agreement.

### 4)  Distribution of Net Proceeds to Claimants

Any available net proceeds after payment of costs related to the Liquidation Process would be allocated to the Holders of Claims and Interests in strict priority in accordance with section 726 of the Bankruptcy Code:

- <u>Superpriority Claims</u>: includes outstanding balances owed under the DIP Facility and professional Carve-Out pursuant to the DIP Order;

- <u>Secured Claims</u>: includes 1.5 Lien Notes Claims, 1.75 Lien Term Loan Facility Claims, and Second Lien Term Loan Facility Claims;

- <u>Administrative Claims & Priority Claims</u>: includes claims for postpetition accounts payable, postpetition accrued expenses, certain accrued / unpaid Professional Fee Claims, and certain Unsecured Claims entitled to priority under section 507 of the Bankruptcy Code;

- <u>Unsecured Claims</u>: includes non-secured, non-priority debt, including trade payables, and various other unsecured liabilities.

### 5)  Conclusion

- The Debtors have determined, as summarized in the following analysis, upon the Effective Date, the Plan will provide all creditors and equity holders with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and as such believe that the Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code.

**SUMMARY OF ESTIMATED RECOVERIES FOR CLAIMS AND INTERESTS**

| Class | Name of Class Under Plan | Status | Estimated Percentage Recovery Under the Plan | Recovery Under Hypothetical Liquidation (Low) | Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | 100% | 100% | 100% |
| 2 | Other Priority Claims | Unimpaired | 100% | 100% | 100% |
| 3 | 1.5 Lien Notes Claims[4] | Impaired | 100% | 86% | 100% |
| 4 | 1.75 Lien Term Loan Facility Claims | Impaired | 27% | 0% | 12% |
| 5 | Second Lien Term Loan Facility Claims | Impaired | 23% | 23% | 23% |
| 6 | Unsecured Notes Claims | Impaired | 23% | 23% | 23% |
| 7 | GUC Claims[5] | Impaired | 0 to 15% | 0% to 15% | 0% to 15% |
| 8 | Intercompany Claims | Unimpaired / Impaired | N/A | 5% | 5% |
| 9 | Section 501(b) Claims | Impaired | N/A | N/A | N/A |
| 10 | Intercompany Interests | Unimpaired | N/A | N/A | N/A |
| 11 | Interests in EXCO | Impaired | N/A | N/A | N/A |

---

[4] This chart reflects that 1.5 Lien Notes Claims held by the Settling Lenders first recover and then gift a portion of such recovery to Holders of Claims in Classes 5, 6, and 7.

[5] These ranges reflect that Holders of GUC Claims at certain Debtors will receive different recoveries. For the avoidance of doubt, no creditor receives a higher recovery in a hypothetical liquidation than they receive under the Plan.

The following Liquidation Analysis should be reviewed with the accompanying notes.

**EXCO Resources et al**
**Liquidation Analysis: Combined View of Unconsolidated Debtors**

| in $000's | | Balance Sheet as of 12/31/18 | Adjustments | Pro Forma as of 6/30/19 | Potential Recovery — Recovery Estimate % Low | Mid | High | Recovery Estimate $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Cash | [A] | $ 27,209 | $ 6,570 | $ 33,780 | 100% | 100% | 100% | $ 33,780 | $ 33,780 | $ 33,780 |
| Restricted Cash | [B] | 16,049 | (13,879) | 2,170 | 100% | 100% | 100% | 2,170 | 2,170 | 2,170 |
| Accounts Receivable | [C] | 92,918 | (14,909) | 78,009 | 91% | 91% | 91% | 70,840 | 70,840 | 70,840 |
| Inventory | [D] | 644 | - | 644 | 75% | 88% | 100% | 483 | 563 | 644 |
| Oil & Gas Assets | [E] | 416,488 | 717,184 | 1,133,672 | 45% | 50% | 56% | 504,533 | 569,980 | 635,427 |
| Unevaluated Properties | [F] | 121,738 | (121,710) | 28 | 47% | 74% | 100% | 13 | 20 | 28 |
| Gas Gathering Assets | [G] | 1,169 | - | 1,169 | 4% | 5% | 7% | 43 | 64 | 85 |
| Other PP&E | [H] | 18,861 | (2,912) | 15,950 | 26% | 39% | 51% | 4,124 | 6,147 | 8,169 |
| Other Assets & Prepaid Expenses | [I] | 169,691 | (163,155) | 6,536 | 0% | 0% | 0% | - | - | - |
| Intercompany Receivables | [J] | 11,873 | - | 11,873 | 100% | 100% | 100% | 11,873 | 11,873 | 11,873 |
| Investments in Affiliates/Subsidiaries | [K] | 8,658 | (641) | 8,017 | 36% | 72% | 100% | 2,868 | 5,800 | 8,017 |
| **Total Assets** | | **885,299** | **406,549** | **1,291,848** | **49%** | **54%** | **60%** | **630,727** | **701,237** | **771,033** |
| **Total Asset Recovery** | | | | | | | | **630,727** | **701,237** | **771,033** |
| **Less: Liquidation Adjustments** | | | | | | | | | | |
| Chapter 7 Trustee | [L] | | | | | | | (17,843) | (19,959) | (22,052) |
| Chapter 7 Professional Fees | [M] | | | | | | | (14,467) | (14,467) | (14,467) |
| Chapter 11 Professional Fees Carve Out | [N] | | | | | | | (23,554) | (23,554) | (23,554) |
| Purchase Price Adjustments | [O] | | | | | | | (62,213) | (62,213) | (62,213) |
| Post Conversion Cash Flow | [P] | | | | | | | (75,245) | (75,245) | (75,245) |
| Wind - Down Costs | [Q] | | | | | | | (5,702) | (5,702) | (5,702) |
| **Total Liquidation Adjustments** | | | | | | | | **(199,024)** | **(201,140)** | **(203,234)** |
| Net Encumbered Proceeds | | | | | | | | 411,451 | 473,239 | 534,334 |
| Net Unencumbered Proceeds | | | | | | | | 20,251 | 26,858 | 33,465 |
| Plus: D&O Carrier Proceeds | [R] | | | | | | | 13,350 | 13,350 | 13,350 |
| **Proceeds Available After Liquidation Adjustments** | | | | | | | | **445,053** | **513,448** | **581,149** |

| | | Claims Low | Mid | High | Potential Recovery of Claims — Recovery Estimate % Low | Mid | High | Recovery Estimate $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Superpriority Claims** | | | | | | | | | | |
| Total DIP Claims | [S] | $ 166,516 | $ 166,516 | $ 166,516 | 100% | 100% | 100% | $ 166,516 | $ 166,516 | $ 166,516 |
| Net Encumbered Proceeds Remaining | | | | | | | | 278,537 | 346,932 | 414,634 |
| Net Unencumbered Proceeds Remaining | | | | | | | | - | - | - |
| D&O Carrier Proceeds Remaining | | | | | | | | - | - | - |
| **Proceeds Available after Superpriority Claims** | | | | | | | | **278,537** | **346,932** | **414,634** |
| **Secured Claims** | | | | | | | | | | |
| Class 1 - Other Secured Claims | [T] | 7,103 | 7,103 | 7,103 | 100% | 100% | 100% | 7,103 | 7,103 | 7,103 |
| Class 3 - 1.5 Lien Notes Claims | [T] | 316,958 | 316,958 | 316,958 | 86% | 100% | 100% | 271,434 | 316,958 | 316,958 |
| Class 4 - 1.75 Lien Term Loan Facility Claims | [T] | 742,206 | 742,206 | 742,206 | 0% | 3% | 12% | 0 | 22,871 | 90,572 |
| Total Secured Claims | | 1,066,267 | 1,066,267 | 1,066,267 | 26% | 33% | 39% | 278,537 | 346,932 | 414,634 |
| Net Encumbered Proceeds Remaining | | | | | | | | - | - | - |
| Plus: Proceeds from Settling Lenders | | | | | | | | 60,000 | 60,000 | 60,000 |
| **Proceeds Available after Secured Claims** | | | | | | | | **60,000** | **60,000** | **60,000** |
| **Unsecured Claims** | | | | | | | | | | |
| Class 5 - Second Lien Term Loan Facility Claims | [U] | 18,447 | 18,447 | 18,447 | 23% | 23% | 23% | 4,241 | 4,241 | 4,241 |
| Class 6 - Unsecured Notes Claims | [U] | 206,526 | 206,526 | 206,526 | 23% | 23% | 23% | 47,477 | 47,477 | 47,477 |
| Class 7 - GUC Claims | [U] | 117,331 | 117,331 | 117,331 | 6% | 6% | 6% | 7,434 | 7,434 | 7,434 |
| Class 8 - Intercompany Claims | [U] | 17,687 | 17,687 | 17,687 | 5% | 5% | 5% | 848 | 848 | 848 |
| Total Unsecured Claims | | 359,990 | 359,990 | 359,990 | 17% | 17% | 17% | 60,000 | 60,000 | 60,000 |
| **Net Proceeds Remaining** | | | | | | | | **-** | **-** | **-** |

6

**Recovery Estimate % - High**

| High | 910 EXCO Res. Inc. | 810 EOC | 950 Raider | 245 Holding PA | 887 Land Co. LLC | 252 Resources PA | 254 Production WV | Other Debtors | Total Debtors |
|---|---|---|---|---|---|---|---|---|---|
| **Superpriority Claims** | | | | | | | | | |
| Total DIP Claims | 7% | 65% | 8% | 1% | 4% | 8% | 9% | 0% | 100% |
| **Secured Claims** | | | | | | | | | |
| Class 1 - Other Secured Claims | 100% | 100% | - | - | - | 100% | - | - | 100% |
| Class 3 - 1.5 Lien Notes Claims | 8% | 61% | 10% | 1% | - | 9% | 11% | 0% | 100% |
| Class 4 - 1.75 Lien Term Loan Facility Claims | 1% | 7% | 1% | 0% | - | 1% | 1% | 0% | 12% |
| **Unsecured Claims** | | | | | | | | | |
| Class 5 - Second Lien Term Loan Facility Claims | 1% | 15% | 2% | 0% | 0% | 2% | 2% | 0% | 23% |
| Class 6 - Unsecured Notes Claims | 1% | 15% | 2% | 0% | 0% | 2% | 2% | 0% | 23% |
| Class 7 - GUC Claims | 1% | 15% | 2% | | | - | - | - | 6% |
| Class 8 - Intercompany Claims | | 15% | - | - | - | 2% | - | - | 5% |

**Recovery Estimate % - Low**

| Low | 910 EXCO Res. Inc. | 810 EOC | 950 Raider | 245 Holding PA | 887 Land Co. LLC | 252 Resources PA | 254 Production WV | Other Debtors | Total Debtors |
|---|---|---|---|---|---|---|---|---|---|
| **Superpriority Claims** | | | | | | | | | |
| Total DIP Claims | 9% | 70% | 11% | 0% | 2% | 3% | 5% | 0% | 100% |
| **Secured Claims** | | | | | | | | | |
| Class 1 - Other Secured Claims | 100% | 100% | - | - | - | 100% | - | - | 100% |
| Class 3 - 1.5 Lien Notes Claims | 9% | 58% | 11% | 0% | - | 2% | 5% | 0% | 86% |
| Class 4 - 1.75 Lien Term Loan Facility Claims | - | - | - | - | - | - | - | - | - |
| **Unsecured Claims** | | | | | | | | | |
| Class 5 - Second Lien Term Loan Facility Claims | 1% | 15% | 2% | 0% | 0% | 2% | 2% | 0% | 23% |
| Class 6 - Unsecured Notes Claims | 1% | 15% | 2% | 0% | 0% | 2% | 2% | 0% | 23% |
| Class 7 - GUC Claims | 1% | 15% | 2% | | | - | - | - | 6% |
| Class 8 - Intercompany Claims | - | 15% | - | - | - | 2% | - | - | 5% |

7

Specific Notes to the Liquidation Analysis

<u>Gross Liquidation Proceeds</u>

A.    <u>Cash</u>

- The Liquidation Analysis assumes estimated Cash on the balance sheet of $33.8 million as of June 30, 2019 based on the 13-week cash forecast as of April 15, 2019.

B.    <u>Restricted Cash</u>

- The Liquidation Analysis assumes estimated restricted Cash on the balance sheet of $2.2 million as of June 30, 2019 as of the 13-Week cash forecast as of April 15, 2019.

  - This primarily includes the Debtors' portion of the escrow and operating trust accounts related to the Debtors' settlement with Shell in the Appalachia region.

C.    <u>Accounts Receivable</u>

- "Accounts Receivable" includes proceeds from operated and non-operated wells, amounts due from JIB partners, tax related refunds from federal and state government agencies, and miscellaneous receivables.

  - <u>A/R - Production</u>: $58.3 million for receivables related to the sale of oil and gas; the Liquidation Analysis assumes a recovery of 100% for Production Accounts Receivable.

  - <u>A/R - Joint Interest Billings</u>: $19.7 million of JIB receivables; the Liquidation Analysis assumes a recovery of 82% for JIB Accounts Receivable.

    - As discussed above, a chapter 7 liquidation likely will result in Claims asserted by JIB counterparties which are likely to reduce the ultimate recoveries from this specific asset class in the context of a chapter 7 liquidation.

  - <u>A/R - Other</u>: $1.8 million of federal and state tax refunds and miscellaneous receivables; the Liquidation Analysis assumes no recovery for Other Accounts Receivable

D.    Inventory

- "Inventory" includes such assets as tanks, tubing, casing, pumps, and valves. Typically, the Debtors sell their excess Inventory directly to third parties. The Liquidation Analysis assumes estimated Inventory of $0.6 million.

- As of December 31, 2018, most of the Debtors' Inventory had been sold (and is no longer in the Debtors' possession). The remaining Inventory consists primarily of tanks. The Liquidation Analysis assumes a recovery range of 75% to 100% for these specific assets and is based on the Debtors' historical recovery rates for Inventory when sold directly to third parties or through an auction site.

E.    Oil & Gas Properties

- "Oil & Gas Properties" includes the Debtors' oil and gas reserves. The liquidation value of reserves is stratified based on probability of recovery and consists of proved developed producing, proved not producing, and proved undeveloped reserves.

- The liquidation assumes a recovery range using the average of gross bids received during the Debtors' postpetition sale process on the low end (rolled forward for changes in reserve value), and high-end range based on risk adjusted discount rates for reserves. The values included are net of PP&E, Unevaluated Properties, and Appalachia non-Cash assets including Gas Gathering Assets, Accounts Receivable, and owned land.

- Due to the accelerated time frame of a proposed sale, the Liquidation Analysis assumes an estimated recovery range of between 45% and 56% of the Pro-Forma PV10 for the Debtors' oil and gas reserves.

- Values of Oil & Gas Assets are derived from the reserve report prepared on 4/4/19 with an effective date of 7/1/19, which includes Asset Retirement Obligations and uses NYMEX pricing as of 3/29/19.

F.    Unevaluated Properties

- "Unevaluated Properties" are valued on a per acre basis for both low and high case recoveries. Acreage was only considered where leases expired no less than 1 year and 6 months from the conversion date. The Liquidation Analysis assumes estimated value of Unevaluated Properties of $28,000, with a recovery range of 47% to 100%.

G.    Gas Gathering Assets

- "Gas Gathering Assets" includes pipelines and other owned gathering related equipment that are integrated into Eagleford and Haynesville producing properties and included in the valuation of Oil & Gas Properties. The Liquidation Analysis assumes estimated Gas Gathering Assets of $1.2 million, with a recovery range of 4% to 7%.

H.   Property, Plant & Equipment (Other PP&E)

- "Other PP&E" includes owned land, furniture, fixtures, software, hardware, leasehold improvements and vehicles.  The Liquidation Analysis assumes estimated Other PP&E of $15.9 million of, with a recovery range of 26% to 51%.

I.   Other Assets and Prepaid Expenses

- "Other Assets & Prepaid Expenses" includes $6.5 million of prepaid insurance premiums, joint interest billing prepayments (cash calls), and other miscellaneous prepayments.  The Liquidation Analysis assumes no recovery these specific assets.

J.   Intercompany Receivables

- "Intercompany Receivables" includes receivables owed by non-Debtor affiliates to various Debtor entities.  The Liquidation Analysis assumes estimated Intercompany Receivables of $11.9 million, with a recovery of 100%.

K.   Investments in Affiliates/Subsidiaries

- "Investments in Affiliates/Subsidiaries" includes value attributable to non-Debtor subsidiaries EXCO Resources (PA), LLC, Appalachia Midstream, LLC, and Moran Land Co.

  - EXCO Operating Company, LP owns a 50% interest in Moran Land Co. whose primary assets are owned property and an intercompany receivable from EXCO Operating Company, LP. The Liquidation Analysis assumes a recovery of 35% and 47% for these specific assets.

  - EXCO Resources (PA), LLC and Appalachia Midstream, LLC are owned by EXCO Holding (PA), Inc. and have various assets including Cash, Accounts Receivable, and Gas Gathering Assets.  The Liquidation Analysis assumes a recovery of 26% to 35% for these specific assets.

  - The assets associated with EXCO Production Company (PA) II, LLC, and EXCO Production Company (WV) II, LLC are included in the O&G recovery values for Appalachia assets.

Liquidation Adjustments

L.   Chapter 7 Trustee Fees

- "Chapter 7 Trustee" expenses would be limited to the fee guidelines set forth in Section 326(a) of the Bankruptcy Code.  The Liquidation Analysis assumes that Chapter 7 Trustee expenses are 3% of gross liquidation proceeds excluding Cash, restricted Cash, and Carve Out Reserves.

M.     Chapter 7 Professional Fees

- "Chapter 7 Professional Fees" includes the estimated cost for financial advisors, attorneys, asset divestiture advisors, and other professionals retained by the Trustee. The Liquidation Analysis estimates Chapter 7 Professional Fees to be $14.5 million. However, this amount is subject to change based on the length and complexity of the wind-down process and could be substantially greater than the amounts assumed herein.

N.     Chapter 11 Professional Fees

- "Chapter 11 Professional Fees Carve Out" includes unpaid professional fees retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code, incurred prior to the delivery of the Carve Out Trigger Notice as defined in the DIP Order.

O.     Purchase Price Adjustments

- "Purchase Price Adjustments" includes assumed liabilities related to Oil & Gas Assets which would serve as a reduction to sale proceeds as a purchaser of the Oil & Gas Assets and related to payable balances for gathering, lease operating expense, and capital expenditures.  The Liquidation Analysis estimates Purchase Price Adjustments to be $62.2 million.

P.     Post Conversion Cash Flow

- "Post Conversion Cash Flow" reflects cash disbursements from operations from July 2019 through December 2019.  The Liquidation Analysis assumes that operations will continue during the sale process and any short-term pre-conversion liabilities, including accrued capital expenditures, 1.5L accrued adequate protection, lease operating expenses, gathering expenses, royalty and working interest, production tax, payroll, and G&A, would be satisfied prior to sale of the Oil & Gas Assets.  Pre-conversion receipts are accounted for in the recovery of Accounts Receivable.

Q.     Wind-Down Costs

- "Wind-Down Costs" are estimated to be $5.7 million, which includes wind down staff retention bonuses and accrued interest on the DIP facility.  For those employees that are retained during the liquidation process, the Liquidation Analysis includes estimated retention and wind down bonuses of $3.2 million and accrued DIP interest of $2.5 million.

- The retention bonuses are based on a percentage of the employee's base pay and their estimated length of service during the wind-down process.

R.      D&O Insurance Proceeds

- The Liquidation Analysis assumes additional cash proceeds of $13.35 million from D&O Carriers.

Claims

S.      DIP Facility Claims

- The Liquidation Analysis assumes the outstanding principal balance on the DIP Facility claim is approximately $166.5 million as of the Conversion Date, which includes accrued interest and estimated accrued and unpaid DIP advisor fees.

T.      Secured Claims:  Class 1 – Other Secured Claims, Class 3 - 1.5 Lien Notes Claims, and Class 4 - 1.75 Lien Term Loan Facility Claims

- The Liquidation Analysis assumes the following balances as of the Conversion Date:

  - Class 1 - $7.1 million
  - Class 3 - $317.0 million
  - Class 4 - $742.2 million

U.      Unsecured Claims: Class 5 – Second Lien Term Loan Facility Claims, Class 6 – Unsecured Notes Claims, Class 7 - General Unsecured Claims, and Class 8 – Intercompany Claims

- The Liquidation Analysis includes $18.4 million of Second Lien Term Loan Facility Claims.

- The Liquidation Analysis includes $206.5 million of Unsecured Notes Claims.  This includes estimated Claim amounts for the 2018 Unsecured Notes and the 2022 Unsecured Notes.  The estimated Claim amounts reflect principal and unpaid interest as of the Petition Date.

- The Liquidation Analysis includes estimated GUC Claims of approximately $117.3 million.  This includes prepetition trade debt, unsecured employee claims, and estimated lease rejection claims.  The projected aggregate amount of GUC Claims set forth herein is subject to change and reflects the Debtors' current view on, among other things, potential Executory Contract and Unexpired Lease rejections pursuant to section 365 of the Bankruptcy Code.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on both the amount of GUC Claims and recoveries of Holders of Allowed GUC Claims.

- The Liquidation Analysis includes estimated Intercompany Claims of approximately $17.7 million owed by Debtors to non-Debtor affiliates and subsidiaries.

**<u>Exhibit E</u>**

**Financial Projections**

## Financial Information and Projections

I.      Financial Projections

For purposes of demonstrating feasibility of the Plan, the Debtors have prepared the forecasted, post reorganized, consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections" or the "Projections") for the annual periods ending December 31, 2019 (fiscal year 2019) through December 31, 2023 (fiscal year 2023) (the "Projection Period"). The Financial Projections were prepared based on a number of assumptions made by the Debtors' management team as to the future performance of the Reorganized Debtors, and reflect management's judgement and expectations regarding its future operations and financial position.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond management's control, including the exploration for and development, production, gathering and sale of oil, natural gas and natural gas liquids. In addition to the risk factors set forth in Article VIII of the Disclosure Statement, Factors that may cause actual results to differ from expected results include, but are not limited to:

(i)      fluctuations in oil and natural gas prices and the Reorganized Debtors' ability to hedge against pricing changes;

(ii)     the uncertainty inherent in estimating reserves, future net revenues and discounted future cash flows;

(iii)    the timing and amount of future production of oil and natural gas;

(iv)     changes in the availability and cost of capital;

(v)      environmental, drilling and other operating risks, including liability claims as a result of oil and natural gas operations;

(vi)     proved and unproved drilling locations and future drilling plans; and

(vii)    the effects of existing and future laws and governmental regulations, including environmental, hydraulic fracturing and climate change regulation.

Should one or more of the risks or uncertainties referenced above occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections.

II.     Accounting Policies and Disclaimer

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE

FINANCIAL INFORMATION. THE FINANCIAL PROJECTIONS DO NOT REFLECT THE FORMAL IMPLEMENTATION OF REORGANIZATION ACCOUNTING PURSUANT TO FINANCIAL ACCOUNTING STANDARDS BOARD ACCOUNTING STANDARDS CODIFICATION TOPIC 852, REORGANIZATIONS ("ASC 852"). OVERALL, THE IMPLEMENTATION OF ASC 852 IS NOT ANTICIPATED TO HAVE A MATERIAL IMPACT ON THE UNDERLYING ECONOMICS OF THE PLAN. THE FINANCIAL PROJECTIONS HAVE BEEN PREPARED USING GENERALLY ACCEPTED ACCOUNTING POLICIES ("GAAP") THAT ARE MATERIALLY CONSISTENT WITH THOSE APPLIED IN THE DEBTORS' HISTORICAL FINANCIAL STATEMENTS. THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT ACCOUNTING FIRM.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, THE DEBTORS AND THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. THE FINANCIAL PROJECTIONS HEREIN ARE NOT, AND MUST NOT BE VIEWED AS, A REPRESENTATION OF FACT, PREDICTION, OR GUARANTY OF THE COMPANY'S FUTURE PERFORMANCE. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, ANY REVIEW OF THE PROJECTIONS SHOULD TAKE INTO ACCOUNT THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS, INCLUDING WITHOUT LIMITATION THOSE SET FORTH HEREIN. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS ARE AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY

SUCH STATEMENTS. THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

III.    General Assumptions

a.    Overview

The Debtors are an independent energy company focused on the acquisition, production, exploration and development of onshore oil and natural gas assets in the United States.

b.    Methodology

Key personnel from all of the Debtors' operating areas and across various functions provided input in the development of the Projections. In preparing the Projections, the Debtors considered the current commodity price environment, historical operating/production performance and operating costs. The Projections were developed taking into consideration the Debtors' current scope of operation and development of its acreage position based on projected commodity prices, capital

investment and return requirements, and other operating and non-operating considerations at a granular level.

    c.  Plan Consummation

The Financial Projections assume that the Plan will be consummated on or around May 31, 2019.

**Assumptions With Respect to the Projected Income Statement**

    a.  Production

Forecasted oil and natural gas volumes for operated production are based on production estimates by the Debtors' management team and contemplate future commodity prices and anticipated operated rig activity. Forecasted volumes for non-operated production are based on anticipated development plans of outside operators obtained through active dialogue with those operators.

    b.  Revenues

Revenues are derived from the sale of the consolidated Reorganized Debtors' share of oil and natural gas production primarily from their owned and operated working interests in the Eagle Ford formation in Texas, the Haynesville formation in North Louisiana and East Texas, and the Marcellus and Utica formations in Pennsylvania, as well as the Debtors' respective ownership interest in non-operated wells.

    c.  Commodity Pricing

Revenues are sensitive to changes in the prices received for oil and natural gas production. Oil and natural gas production is sold at prevailing market prices, which may be volatile and subject to numerous factors that are outside of the Reorganized Debtors' control. The Projections assume New York Mercantile Exchange ("NYMEX") futures strip pricing as of March 29, 2019 for crude oil and natural gas as shown in the chart below:

| Calendar Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Oil ($/bbl) | $58.78 | $58.75 | $56.32 | $54.56 | $53.71 |
| Gas ($/mcf) | 2.77 | 2.74 | 2.65 | 2.66 | 2.75 |

Assumptions regarding realized pricing (i.e., "differentials") from NYMEX are based on input from the Debtors' management, recent historical rates and existing marketing, gathering and transportation contracts with purchasers of the Reorganized Debtors' production and are consistent with recent realized pricing.

    d.   Production Taxes

Production taxes are based on production volumes and projected commodity pricing, as well as management's estimates of future tax obligations.

    e.   Operating Costs

Lease operating expenses ("LOE"), workover expenses, and gathering expenses are based on historical levels and management estimates of future expectations. LOE includes, among other items, lifting costs, fuel, certain field level payroll and benefits, maintenance, repair and outside services.

    f.   General and Administrative

General and Administrative Costs ("G&A") are primarily comprised of labor costs and other expenses associated with the Debtors' corporate overhead. Projected G&A is based on historical G&A costs, adjusted for recent cost reduction efforts.

    g.   Professional Fees

Professional fees consist of estimated fees incurred by professionals in relation to the Debtors Chapter 11 case prior to the Plan Consummation date of May 31, 2019 in the Financial Projections.

    h.   Income Taxes

Taxes are projected to remain at an effective rate near zero throughout the projection period due to the impact of deductions for depletion, depreciation, intangible drilling costs, and NOLs.

    i.   Interest Expense

Interest expense is comprised of interest on a $375 million reserve based revolving credit facility. Interest expense on the reserve based revolving credit facility is based on anticipated funding costs.

## Income Statement

| ($ in millions) | Forecasted | | | | |
|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 |
| Realized Oil Price | $58.13 | $57.39 | $55.38 | $53.90 | $53.09 |
| Realized Gas Price | $2.61 | $2.37 | $2.22 | $2.19 | $2.25 |
| | | | | | |
| Oil (Mbbl) | 1,741 | 2,049 | 2,736 | 2,308 | 1,745 |
| Gas (Mmcfe) | 92,114 | 86,501 | 77,271 | 86,661 | 110,276 |
| Total (Mmcfe) | 102,558 | 98,795 | 93,686 | 100,509 | 120,749 |
| | | | | | |
| Oil | $101 | $118 | $152 | $124 | $93 |
| Gas | 240 | 205 | 171 | 190 | 248 |
| Total Revenue | $341 | $323 | $323 | $314 | $341 |
| LOE | (43) | (44) | (45) | (46) | (47) |
| Severance Taxes | (8) | (9) | (11) | (9) | (8) |
| Ad Valorem Taxes | (8) | (8) | (9) | (8) | (7) |
| Gathering and Transportation | (52) | (48) | (43) | (48) | (61) |
| Depletion, Depreciation and Amortization | (98) | (108) | (121) | (132) | (143) |
| General and Administrative | (21) | (21) | (21) | (21) | (21) |
| Total Operating Costs | ($230) | ($239) | ($250) | ($264) | ($286) |
| Professional Fees | (35) | – | – | – | – |
| Interest Expense | (22) | (10) | (9) | (7) | (5) |
| Income Before Taxes | $55 | $74 | $64 | $43 | $50 |
| Income Taxes | – | – | – | – | – |
| Net Income | $55 | $74 | $64 | $43 | $50 |

### Reconciliation of Net Income to Adjusted EBITDA

| | | | | | |
|---|---|---|---|---|---|
| Net Income | $55 | $74 | $64 | $43 | $50 |
| (+) Professional Fees | 35 | – | – | – | – |
| (+) Income Taxes | – | – | – | – | – |
| (+) Interest Expense | 22 | 10 | 9 | 7 | 5 |
| (+) Depletion, Depreciation and Amortization | 98 | 108 | 121 | 132 | 143 |
| Adj. EBITDA | $209 | $192 | $194 | $182 | $198 |

**Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows**

      a.   Capital Expenditures

Projections for capital expenditures were prepared with consideration of the Debtors' current drilling program and future estimates in the development of the Eagle Ford formation in Texas, the Haynesville formation in North Louisiana and East Texas and the Marcellus and Utica formations in Pennsylvania. These expenditures include capital associated with drilling and completing new producing wells, improving operational efficiency and capitalized maintenance expenditures. Capital expenditures also include expenditures directed at maintaining lease acreage positions and capitalized G&A.

      b.   Working Capital

The Projections contemplate timing of forecasted receivables, payables and pre-funding of capital expenditures associated with the Debtors' Haynesville assets that are consistent with the timing experienced with the Debtors' historical receipts and payments.

      c.   Pro Forma Adjustments Related to Emergence

The Balance Sheet included in the Projections presents a pro forma view assuming the effect of certain adjustments related to the Debtors' emergence from the Chapter 11 Cases. These adjustments primarily relate to the additional borrowings under the Reorganized Debtors Exit Facility and the exchange of the 1.5 Lien Notes Claims, 1.75 Lien Term Loan Facility Claims, Second Lien Term Loan Facility Claims and Unsecured Notes Claims for equity. The Financial Projections include pro forma adjustments to reflect the proposed restructuring, but do not purport to represents all aspects of the Financial Accounting Standards Board ASC 852.

      d.   Capital Structure

The Projections assume that the Debtors are able to secure financing in the form of a $375 million reserve based revolving credit facility, which will allow the Reorganized Debtors to fund operations.

## Opening Balance Sheet

| ($ in millions) | Predecessor May-19 | Reorganization Adjustments | Successor May-19 |
|---|---:|---:|---:|
| **Assets** | | | |
| Current assets: | | | |
| Cash and Cash Equivalents | $10 | $- | $10 |
| Restricted Cash | 32 | – | 32 |
| Total Cash | $42 | $- | $42 |
| Accounts Receivable, Net: | | | |
| Oil and Natural Gas | 35 | – | 35 |
| Joint Interest | 20 | – | 20 |
| Other | 5 | – | 5 |
| Total Receivables | $60 | $- | $60 |
| Inventory and Other | 7 | – | 7 |
| Total Current Assets | $109 | $- | $109 |
| | | | |
| Non-Current Assets: | | | |
| Equity Investments | 5 | – | 5 |
| Oil and Natural Gas Properties: | | | |
| Unproved Oil and Natural Gas Properties | 215 | – | 215 |
| Proved Developed and Undeveloped Oil | 3,333 | – | 3,333 |
| Accumulated Depletion | (2,870) | – | (2,870) |
| Total O&G Properties | $678 | $- | $678 |
| Other Property and Equipment, Net | 38 | – | 38 |
| Deferred Financing Costs, Net | – | 11 | 11 |
| Goodwill | 163 | – | 163 |
| Total Non-Current Assets | $883 | $11 | $894 |
| | | | |
| Total Assets | $993 | $11 | $1,003 |
| | | | |
| **Liabilities** | | | |
| Current Liabilities: | | | |
| Accounts Payable and Accrued Liabilities | 127 | (67) | 60 |
| Revenues and Royalties Payable | 261 | (228) | 33 |
| Accrued Interest Payable | 8 | (8) | – |
| Current Portion of Asset Retirement Obligations | 1 | – | 1 |
| Total Current Liabilities | $397 | ($303) | $94 |
| | | | |
| Non-Current Liabilities: | | | |
| Long-Term Debt | 1,736 | (1,496) | 241 |
| Asset Retirement Obligations and Other | 27 | (3) | 24 |
| Total Non-Current Liabilities | $1,764 | ($1,498) | $265 |
| | | | |
| Total Liabilities | $2,160 | ($1,801) | $359 |
| | | | |
| **Shareholders Equity** | | | |
| Total Shareholders Equity | ($1,168) | $1,812 | $644 |
| | | | |
| Total Liabilities & Shareholders Equity | $993 | $11 | $1,003 |

**Balance Sheet**

| ($ in millions) | Forecasted | | | | |
|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Assets** | | | | | |
| Current assets: | | | | | |
| Cash and Cash Equivalents | $10 | $10 | $10 | $10 | $10 |
| Restricted Cash | 7 | 5 | 12 | 9 | 5 |
| Total Cash | $17 | $15 | $22 | $19 | $15 |
| Accounts Receivable, Net: | | | | | |
| Oil and Natural Gas | $73 | $64 | $62 | $63 | $71 |
| Joint Interest | 26 | 23 | 21 | 22 | 25 |
| Other | 6 | 6 | 5 | 5 | 6 |
| Total Receivables | $105 | $93 | $89 | $90 | $103 |
| Inventory and Other | 8 | 11 | 6 | 3 | 5 |
| Total Current Assets | $131 | $119 | $116 | $112 | $122 |
| | | | | | |
| Non-Current Assets: | | | | | |
| Equity Investments | $5 | $5 | $5 | $5 | $5 |
| Oil and Natural Gas Properties: | | | | | |
| Unproved Oil and Natural Gas Properties | 313 | 445 | 583 | 712 | 868 |
| Proved Developed and Undeveloped Oil | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 |
| Accumulated Depletion | (2,929) | (3,038) | (3,159) | (3,291) | (3,434) |
| Total O&G Properties | $716 | $740 | $757 | $754 | $768 |
| Other Property and Equipment, Net | 38 | 38 | 38 | 38 | 38 |
| Deferred Financing Costs, Net | 11 | 11 | 11 | 11 | 11 |
| Goodwill | 163 | 163 | 163 | 163 | 163 |
| Total Non-Current Assets | $933 | $956 | $973 | $970 | $984 |
| | | | | | |
| Total Assets | $1,063 | $1,075 | $1,089 | $1,083 | $1,105 |
| | | | | | |
| **Liabilities** | | | | | |
| Current Liabilities: | | | | | |
| Accounts Payable and Accrued Liabilities | $55 | $61 | $29 | $40 | $47 |
| Revenues and Royalties Payable | 51 | 52 | 38 | 40 | 47 |
| Accrued Interest Payable | – | – | – | – | – |
| Current Portion of Asset Retirement Obligations | 1 | 1 | 1 | 1 | 1 |
| Total Current Liabilities | $106 | $113 | $67 | $80 | $95 |
| | | | | | |
| Non-Current Liabilities: | | | | | |
| Long-Term Debt | $236 | $167 | $163 | $100 | $58 |
| Asset Retirement Obligations and Other | 24 | 24 | 24 | 24 | 24 |
| Total Non-Current Liabilities | $260 | $191 | $187 | $124 | $83 |
| | | | | | |
| Total Liabilities | $366 | $304 | $254 | $205 | $178 |
| | | | | | |
| **Shareholders Equity** | | | | | |
| Total Shareholders Equity | $697 | $771 | $835 | $878 | $928 |
| | | | | | |
| Total Liabilities & Shareholders Equity | $1,063 | $1,075 | $1,089 | $1,083 | $1,105 |

## Cash Flow Statement

| | Forecasted | | | | |
|---|---|---|---|---|---|
| *($ in millions)* | 2019 | 2020 | 2021 | 2022 | 2023 |
| **Cash Flow From Operating Activities:** | | | | | |
| Net Income | $55 | $74 | $64 | $43 | $50 |
| Adjustments to Reconcile Net Income to Cash: | | | | | |
| Depletion, Depreciation and Amortization | $98 | $108 | $121 | $132 | $143 |
| Changes in Assets and Liabilities: | | | | | |
| Restricted Cash With Related Party | $9 | $3 | ($7) | $3 | $4 |
| Accounts Receivable | (9) | 12 | 5 | (2) | (12) |
| Inventory and Other Current Assets | 3 | (3) | 5 | 3 | (1) |
| Accounts Payable | (10) | 6 | (32) | 11 | 7 |
| Royalties Payable | 5 | 1 | (14) | 2 | 7 |
| Accrued Interest | 0 | – | – | – | – |
| Other Current Liabilities | (13) | – | – | – | – |
| Total Cash Flow from Operating | $138 | $201 | $142 | $192 | $198 |
| | | | | | |
| **Cash Flow from Investing Activities:** | | | | | |
| Drilling & Completion, Operations and Capitalized G&A | ($153) | ($128) | ($134) | ($125) | ($152) |
| Lease Acquisition | (4) | (4) | (4) | (4) | (4) |
| Total Cash Flow from Investing | ($157) | ($132) | ($138) | ($129) | ($156) |
| | | | | | |
| **Cash Flow from Financing Activities:** | | | | | |
| Debt Borrowing / (Repayment) | ($18) | ($69) | ($4) | ($63) | ($41) |
| Total Cash Flow From Financing | ($18) | ($69) | ($4) | ($63) | ($41) |
| | | | | | |
| Net Cash Flow | ($37) | $- | $- | $- | $- |

**<u>Exhibit F</u>**

**Valuation Analysis**

**Valuation Analysis**

Solely for purposes of the Plan and this Disclosure Statement, management requested that PJT, as investment banker to the Debtors, estimate both the total enterprise value (the "Total Enterprise Value") of the Reorganized Debtors and the implied equity value of the Reorganized Debtors (the "Equity Value"), as of an assumed Effective Date of May 31, 2019, on a going concern basis and pro forma for the transactions contemplated by the Plan.

In estimating the Total Enterprise Value of the Debtors, PJT, among other things, consulted with the Debtors' senior management team to discuss the Debtors' operations and future prospects, reviewed the Debtors' historical financial information, reviewed the Debtors' financial projections, and reviewed publicly-available third-party information.

PJT's estimates are based upon market, economic and other conditions, as they exist on, and can be evaluated as of March 29, 2019. In preparing the estimates set forth below, PJT has relied upon the accuracy, completeness, and fairness of financial, operating, and other information furnished by the Debtors. Events and conditions subsequent to this date, including updated projections, as well as other factors, could have a substantial effect upon the Total Enterprise Value and the Equity Value of the Reorganized Debtors. Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the Total Enterprise Value and the Equity Value. For purposes of this valuation, PJT has assumed that no material changes that would affect value will occur between March 29, 2019 through the contemplated Effective Date of May 31, 2019.

The Debtors' Projections for the Reorganized Debtors are set forth in Exhibit E of the Disclosure Statement. The estimated values set forth herein assume that the Reorganized Debtors will achieve their Projections in all material respects. PJT has relied on the Debtors' representation and warranty that the Projections (a) have been prepared in good faith; (b) are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable in all material respects; (c) reflect the Debtors' best currently available estimates and judgments as to the Debtors' future operating and financial performance; and (d) reflect the good faith judgments of the Debtors. PJT does not offer an opinion as to the attainability of the Projections and no such opinion should be assumed by virtue of PJT's analysis or conclusions in respect of the estimated Total Enterprise Value or implied Equity Value of the Reorganized Debtors. As set forth in the Disclosure Statement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and PJT, and consequently are inherently difficult to project.

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE

1

INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS.

PJT DID NOT INDEPENDENTLY AUDIT OR VERIFY THE PROJECTIONS IN CONNECTION WITH PJT'S ESTIMATES OF THE TOTAL ENTERPRISE VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS OR THEIR ASSETS OR LIABILITIES WERE PERFORMED, SOUGHT OR OBTAINED IN CONNECTION HEREWITH. ESTIMATES OF THE TOTAL ENTERPRISE VALUE AND EQUITY VALUE CONTAINED HEREIN DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE. THE ESTIMATES SET FORTH HEREIN DO NOT CONSTITUTE AN OPINION ON THE TERMS AND PROVISIONS OR FAIRNESS FROM A FINANCIAL POINT OF VIEW TO ANY PERSON OF THE CONSIDERATION TO BE RECEIVED BY SUCH PERSON UNDER THE PLAN. IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE TOTAL ENTERPRISE VALUE PREPARED BY PJT REPRESENT THE HYPOTHETICAL TOTAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS AS OF AN ASSUMED EFFECTIVE DATE OF MAY 31, 2019. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR THE PURPOSES OF THE FORMULATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED TOTAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN. THE ESTIMATED RANGES OF TOTAL ENTERPRISE VALUE AND EQUITY VALUE DO NOT CONSTITUTE A RECOMMENDATION TO ANY HOLDER OF ALLOWED CLAIMS OR ALLOWED INTERESTS AS TO HOW SUCH PERSON SHOULD VOTE OR OTHERWISE ACT WITH RESPECT TO THE PLAN.

THE ASSUMED RANGE OF THE TOTAL ENTERPRISE VALUE AND IMPLIED EQUITY VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF MAY 31, 2019, REFLECTS WORK PERFORMED BY PJT ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO PJT AS OF MARCH 29, 2019. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY

AFFECT PJT'S CONCLUSIONS, PJT DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATES CONTAINED HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE TOTAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, PJT, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES. PJT HAS NOT BEEN REQUESTED TO AND DOES NOT EXPRESS ANY VIEW AS TO THE POTENTIAL TRADING VALUE OF THE REORGANIZED DEBTORS' SECURITIES UPON ISSUANCE OR AT ANY OTHER TIME.

THE SUMMARY SET FORTH HEREIN DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY PJT. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION.

THE VALUATION ANALYSIS SET FORTH HEREIN, INCLUDING THE ESTIMATED TOTAL ENTERPRISE VALUE, REPRESENTS ESTIMATES AND DOES NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF THE REORGANIZED DEBTORS ASCRIBED IN THIS ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE ESTIMATED EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS SET FORTH HEREIN.

3

PJT IS ACTING AS INVESTMENT BANKER TO THE DEBTORS, AND WILL NOT BE RESPONSIBLE FOR AND HAS NOT AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL OR OTHER SPECIALIST ADVICE TO THE DEBTORS OR ANY OTHER PARTY IN CONNECTION WITH THE DEBTORS' CHAPTER 11 CASES, THE PLAN OR OTHERWISE.

### Methodology Overview

In preparing its valuation analysis to estimate the Total Enterprise Value for the Reorganized Debtors, PJT considered the following standard valuation techniques:

     i.      Net Asset Value Analysis;
     ii.     Precedent Transactions Analysis;
     iii.    Comparable Company Analysis; and
     iv.    Orderly Sale Value

1. Net Asset Value Analysis

    The value of the Debtors' proved, probable, possible and contingent oil and gas reserves was estimated using a net asset value ("NAV") approach. The Debtors' reserve report calculates the estimated sum of net cash flows directly attributable to the Debtors' oil and gas properties. Future production volumes attributable to the properties are estimated and multiplied by the projected realized price, which incorporates the projected market price less an expected differential between the market price and the price at which the Debtors can sell their production. The net cash flows in the reserve report are discounted at an industry standard rate of ten percent (10%). PJT then risk adjusted the reserve values by category using risk adjustment factors as recommended by the Society of Petroleum Evaluation Engineers in its 37th annual survey dated June 2018. These values are then adjusted for other assets and liabilities of the Debtors not reflected in the reserve report to determine the net asset value of the Debtors. Projected severance taxes (i.e., production taxes), ad valorem taxes, lease operating expenses, transportation expenses, and capital expenditures are then subtracted from revenue to calculate net cash flows.

2. Precedent Transactions Analysis

    The Precedent Transactions Analysis estimates the value of a company by examining public transactions on both an enterprise and asset level basis. Precedent transaction metrics were used to arrive at the value outside of PDP reserves, and were primarily focused on adjusted dollar per net acre (adjusted for production value), along with implied dollar per net operated drilling location. While enterprise transactions were identified within the basins in which the Reorganized Debtors operate, most transactions were for assets that differed from the Reorganized Debtors' assets, given the Debtors' operations in multiple basins. Therefore, PJT

4

analyzed asset-level transactions solely within the Reorganized Debtors' three geographic areas and then combined them to get to a Total Enterprise Value range.

3.   Comparable Company Analysis

The comparable company analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the total enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such comparable company (at market value) and any minority interest. Such enterprise values are commonly expressed as multiples of various measures of financial and operating statistics. The Total Enterprise Value is then calculated by applying these multiples to the Debtors' actual and projected financial and operational metrics. The selection of public comparable companies for this purpose was based upon the geographic location, scale, production metrics, financial performance (operating margins, profitability), capital structure (leverage, interest expense) and other characteristics that were deemed relevant. However, PJT determined that the number of companies with assets, geographic locations and/or production metrics similar to the reorganized Debtors was limited and the comparability of these companies was therefore insufficient to support the inclusion of this approach. As such, PJT did not rely upon this valuation technique.

4.   Orderly Sale Value

PJT began a process to market all of the Company's assets as part of a section 363 sale process in connection with a chapter 11 plan. As part of this marketing process, PJT reached out to more than 417 parties. The company received indications of interest, but did not receive binding commitments. As a result, the Debtors ultimately elected not to sell any of their assets and instead to reorganize around all of their assets. Due to the non-binding nature of the indications of interest received, PJT did not rely upon this valuation technique.

**Total Enterprise and Implied Equity Value**

Based upon the analyses described herein, PJT estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $650 million - $850 million, with a mid-point of $750 million. This compares to $850 million - $1,150 million, with a mid-point of $1,000 million estimate evaluated as of October 10, 2018, with an assumed Plan Consummation Date of December 31, 2018 in the Debtors *Amended Disclosure Statement for the Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* filed October 29, 2018. The decline in estimated Total Enterprise Value was a result of multiple factors, including but not limited to, changes in commodity prices that directly affect the Debtors' business and limited transaction volumes in 2019. Based on assumed net debt of approximately $225 million, the Total Enterprise Value implies an Equity Value range

5

of approximately $425 million - $625 million, with a mid-point of $525 million as of an assumed effective date of May 31, 2019.

| ($ in millions) | Low | Midpoint | High |
|---|---|---|---|
| Total Enterprise Value | $650 | $750 | $850 |
| Less: Net Debt | (225) | (225) | (225) |
| Total Equity Value | $425 | $525 | $625 |

**<u>Exhibit G</u>**

**Debtor Value Allocation**

**Exhibit G**

Debtor Value Allocation

This analysis sets forth the Distributable Asset Value (as determined in Exhibit F) at each Debtor under the Plan of Reorganization. The estimated recovery values are subject to material change pending claims objections. Allocation does not completely reflect the impact of "fresh start" accounting, which could result in material change to book asset values.

| | | 910 | 810 | 950 | 245 | 887 | 252 | 254 | 259 | 915 | | |
| | | EXCO Res. Inc. | EOC | Raider | Holding PA | Land Co. LLC | Production PA | Production WV | Resources XA | Services Inc. | All Other Debtors | Total Debtors |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Distributable Plan Value** | [1] | **44,011** | **535,889** | **58,316** | **14,662** | **11,674** | **56,820** | **67,151** | **525** | **148** | **-** | **789,195** |
| **Value Allocation** | | **5.6%** | **67.9%** | **7.4%** | **1.9%** | **1.5%** | **7.2%** | **8.5%** | **0.1%** | **0.0%** | **0.0%** | **100.0%** |
| **Settlement Allocation** | | $ 3,346 | $ 40,742 | $ 4,434 | $ 1,115 | $ 888 | $ 4,320 | $ 5,105 | $ 40 | $ 11 | $ - | $ 60,000 |
| **Claims** | | | | | | | | | | | | **Total** |
| Class 5 - Second Lien Term Loan Facility Claims | | 18,447 | 18,447 | 18,447 | 18,447 | 18,447 | 18,447 | 18,447 | 18,447 | 18,447 | 18,447 | 18,447 |
| Class 6 - Unsecured Notes Claims | | 206,526 | 206,526 | 206,526 | 206,526 | 206,526 | 206,526 | 206,526 | 206,526 | 206,526 | 206,526 | 206,526 |
| Class 7 - GUC Claims | | 6,725 | 40,913 | 67,331 | - | - | - | - | - | - | - | 114,969 |
| **Total Claims** | | 231,697 | 265,885 | 292,304 | 224,972 | 224,972 | 224,972 | 224,972 | 224,972 | 224,972 | 224,972 | 339,941 |
| **Estimated Recovery %** | [2] | | | | | | | | | | **Range** | **Blended** |
| Class 5 - Second Lien Term Loan Facility Claims | | 1% | 15% | 2% | 0% | 0% | 2% | 2% | 0% | 0% | 0% | 15% - 0% | 23% |
| Class 6 - Unsecured Notes Claims | | 1% | 15% | 2% | 0% | 0% | 2% | 2% | 0% | 0% | 0% | 15% - 0% | 23% |
| Class 7 - GUC Claims | | 1% | 15% | 2% | 0% | 0% | 2% | 2% | 0% | 0% | 0% | 15% - 0% | 6% |

[1] Distributable Plan Value as calculated in Exhibit F based on $750m of TEV, $25.8m of cash, and $13.4m of cash proceeds from certain D&O Carriers
[2] Recoveries calculated prior to impact of Convenience Class

**<u>Exhibit H</u>**

**Governance Term Sheet**

## EXCO RESOURCES, INC.

### Term Sheet Relating to Corporate Governance Matters

The following non-binding term sheet (this "Term Sheet") presents certain proposed, preliminary material terms relating to the corporate governance of reorganized EXCO Resources, Inc. (the "Company") that would be implemented in connection with consummation of the Company's restructuring plan on the economic terms that have been negotiated (the "Plan"). This Term Sheet is not legally binding, is not a complete list of all terms and conditions of the potential transactions described herein, is subject to material change, and is being distributed confidentially for discussion purposes only.

*THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT ANY SUCH OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET IS BEING PROVIDED AS A POSSIBLE COMPROMISE AND IS THUS SUBJECT TO FEDERAL RULE OF EVIDENCE 408. THE TERMS SET FORTH HEREIN ARE SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION AND DELIVERY BY ALL RELEVANT PARTIES OF LEGALLY BINDING DEFINITIVE DOCUMENTATION. THIS TERM SHEET DOES NOT INCLUDE ALL THE TERMS TO BE INCLUDED IN SUCH DEFINITIVE DOCUMENTATION, AND SHALL NOT BE BINDING ON ANY PARTY.*

| Corporate Governance Matters | |
|---|---|
| **General:** | The Company will be organized as a [Delaware ][1] corporation managed by a board of directors (the "New Board"), which will be responsible for overseeing the operation of the Company's business. The executive officers of the Company will consist of its Chief Executive Officer and other senior executive officers. Capitalized terms not defined in this Term Sheet shall have the meanings given them in the Plan). |
| **Capital Stock:** | The Company's issued equity interests will initially consist of one class of common stock, par value $0.001 per share (each such share, a "Common Share" and collectively, the "Common Shares" and each holder thereof, a "Holder"). |
| | Subject to each Holder's preemptive rights, the Company may subsequently issue one or more classes or series of preferred stock having such designations, preferences, limitations and relative rights, including preferences over the Common Shares |

---

[1] Jurisdiction of org and venue tbd

| | |
|---|---|
| | with respect to dividends and distributions, as the New Board may determine. |
| **Stock Exchange Listing:** | Upon emergence, the Common Shares will not be listed for trading on any securities exchange. |
| **SEC Reporting:** | The Company will terminate/suspend its reporting obligations with the Securities and Exchange Commission. |
| **Information Rights:** | The Company shall provide each Holder of the Common Shares with the same information/disclosure as is provided to the exit reserve-based loan (the "RBL") lenders and the holders of the senior secured notes issued by the Company (the "Senior Notes") to refinance or exchange the Company's senior secured 1.5 lien notes due March 20, 2022, including financial statements, at the same time as such information/disclosure is provided to such RBL lenders or holders of the Senior Notes. Such information may also be made available on a confidential basis to prospective purchasers of the Common Shares. The obligation to provide such information shall continue notwithstanding the repayment or refinancing of the RBL and the Senior Notes. For the avoidance of doubt, such information shall include the information required to be provided by non-reporting companies in order to comply with the current public information requirement set forth in Rule 144(c)(2) under the Securities Act, including without limitation: <br><br> • Quarterly and Annual Financial Statements; <br><br> • A management's discussion and analysis of financial condition and results of operations; <br><br> • Information that would be required to be included in a Current Report on Form 8-K (other than Item 2.02, 5.02(c)(3), 5.02(e), 5.05, 7.01, 8.01 or 9.01 thereof) if the Company were a public company; <br><br> • A quarterly conference call whereby management makes itself available to review and discuss recent business developments and the Company's financial condition and results of operations; and <br><br> • Annual budgets and projections. <br><br> Such information may be provided on a password-protected portal. |
| **Board of Directors:** | The New Board will be comprised of 5 directors. <br><br> One director shall be selected by the official committee of unsecured creditors (the "OCC Director"), one director shall qualify as "independent" under the rules of the New York Stock Exchange and shall be selected jointly by the official committee |

| | |
|---|---|
| | of unsecured creditors, Bluescape and Fairfax (the "Independent Director"), two directors shall be selected by Fairfax, and one director shall be selected by BlueScape. The CEO shall be an ex officio member of the New Board entitled to attend all meetings thereof. |
| | The nomination rights set forth above shall be in effect for two years (the "Initial Term") expiring at the Company's 2021 annual meeting of stockholders. The mechanisms to provide for selection and service of such directors for the Initial Term as contemplated herein will be further refined in the Plan Supplement consistent with applicable law. After the Initial Term, nomination rights, shall be subject to nomination, election and removal in accordance with customary procedures by the Board and its stockholders. |
| | Except as otherwise set forth herein or the Company's charter or by-laws, all actions of the New Board shall be by majority vote. |
| | There shall be no cumulative voting for directors. |
| | The New Board shall not be staggered or classified. |
| **Board Vacancies:** | Board vacancies during the Initial Term shall be filled by the Holder(s) (or remaining director(s)) who have the continuing right to nominate such director pursuant to the immediately preceding paragraphs; provided, however, vacancies in respect of the OCC Director shall be filled, if possible, by the person nominated by the OCC Director before such director's departure, or if not so nominated, by the Trustee of the Trust. During the Initial Term the filing of a vacancy in respect of the Independent Director shall be an independent director recommended by the Nominating and Corporate Governance Committee and approved by each of the Fairfax, Bluscape and OCC directors. For so long as the special nomination rights of a person continues to exist, any director may be removed, with or without cause, only by the person(s) who nominated such director, or for the OCC Director, a majority of the then outstanding Common Shares not beneficially owned by Fairfax, BlueScape, or any of their respective affiliates. During the Initial Term, the Independent Director may not be removed, except for cause by the unanimous consent of the Board and the vote of at least two thirds of the then outstanding Common Shares. |
| **Chairman of the Board:** | The Chairman of the Board will be determined by a majority vote of the New Board. |
| **Board Committees:** | Subject to the terms set forth herein, the New Board will have the discretion to establish Committees, including an Audit Committee, a Compensation Committee and a Nominating and |

| | |
|---|---|
| | Corporate Governance Committee. The committees of the New Board will be appointed by a majority of the New Board; provided, however, that the OCC Director must be included in each Committee during the Initial Term, subject to any reasonable and customary membership requirements then applicable to such committees. |
| **Board Compensation:** | Each non-executive Board member shall be entitled to reasonable and customary compensation on the same basis as all other non-executive Board members, reimbursement of expenses and indemnification. |
| **Affiliate Transactions:** | Notwithstanding anything contained herein to the contrary, affiliate transactions (affiliate transactions to include any debt or equity financing in which any affiliate has a significant economic participation) shall require the consent of at least eighty percent of the members of the New Board during the Initial Term including either the OCC Director or the Independent Director. Customary exceptions will be permitted for matters such as (i) executive officer compensation approved by an independent Compensation Committee and (ii) participation in a rights offering that is made available to all shareholders on the same terms to avoid a default on either the RBL or the 2nd lien facility, to avoid a bankruptcy filing or [to keep the Company's debt/capital ratio below 70%] (a "Permitted RO"). Affiliate definition to include all stockholders who own 10% or more of the Common Stock. |
| **Major Decisions:** | The organizational documents of the Company shall provide that the following actions shall require the consent of at least eighty percent of the members of the New Board during the first eighteen (18) months including either the OCC Director or the Independent Director: |
| | i. Incurrence of any indebtedness for borrowed money (including capital leases, or the grant of any guarantee related thereto) resulting in a debt to capital ratio in excess of 70%; |
| | ii. Amendment of charter or bylaw provisions relating to any matters affecting the New Board designation rights and the minority stockholder protections set forth herein; |
| | iii. Fundamental change (change of control, sale of substantially all assets, or sale of significant assets (e.g., one of the 3 major reserve properties or a subsequently acquired reserve property)); |

|  | iv. | [Authorization, issuance or sale of equity securities that are senior to the Common Stock except through a Permitted RO]; |
|---|---|---|
|  | v. | Non-pro rata dividends/distributions or repurchase/redemption of shares other than customary permitted exceptions relating to employee compensation or tender offers available on a non¬discriminatory basis to all Holders; and |
|  | vi. | Liquidation, dissolution or winding up, voluntarily or involuntarily, or appointment of a liquidator, trustee or receiver, initiation of any bankruptcy, insolvency or receivership proceedings involving the Company or any of its material subsidiaries, or any general assignment for the benefit of the Company's creditors or any creditors of any material subsidiary. |
| **Transfer Restrictions on Common Shares:** | | So long as the Company does not become a public reporting company, the Common Shares to be issued in exchange for claims will be issued pursuant to Section 1145 of the Bankruptcy Code, be eligible to be issued and held through DTC, and be freely tradeable to [noncompetitors[2]] to the fullest extent provided therein. Notwithstanding the foregoing, if applicable, appropriate limitations shall be included in the Company's charter/bylaws to avoid future ownership changes under IRC Section 382 in order to preserve the benefit of Section 382(l)(5) including:<br><br>• Requirement that (a) persons that own less than or equal to 4.9% of Company stock give notice to the Company three business days before effecting any transaction that involves their owning more than 4.9% of Company stock; and (b) persons that own greater than or equal to 4.9% of Company stock give notice to the Company three business days before effecting any transaction that would increase or decrease their ownership of Company stock;<br><br>• So long as notice requirements are complied with, unrestricted trading of the Company's stock up until there has been, or would be if the prospective trade were effectuated, a 30-point increase in the percentage of the value of the Company's stock owned by its "5% shareholders" for purposes of the IRC (such point in time, the "Threshold Level"); |

---

[2] TBD, whether noncompetitor restriction will adversely affect DTC eligibility

| | |
|---|---|
| | • Upon reaching the Threshold Level, in each case without Company permission: (1) no person who owns less than or equal to 4.9% of Company stock may acquire such stock if such acquisition would increase such person's percentage ownership above 4.9%, and (2) no person who owns greater than or equal to 4.9% of Company stock may acquire or dispose of Company stock (such restrictions in clauses (1) and (2), the "<u>Threshold Level Restrictions</u>"); and<br><br>• Any transactions in violation of the Threshold Level Restrictions shall be void ab initio and proper remedial actions will be taken and/or required.<br><br>• All of the foregoing restrictions shall remain in place until the Board determines otherwise. |
| **Tag and Drag Rights:** | Tag-Along Rights – If any Holder(s) proposes to dispose, in a single transaction or series of related transactions, of 30% or more of the then outstanding Common Shares to a person or a group of affiliated persons (a "<u>Tag-Along Sale</u>"), each other Holder shall have the right to participate, on a pro rata basis (based on the relative percentage ownership of Common Shares) in the Tag-Along Sale, on the same terms and subject to the same conditions as the initiating Holders (including for the same consideration per Common Share and on the same non-economic terms and conditions), except that the only representations to be made by non-initiating Holders shall be as to such Holder's ownership and authority; provided further, that it is understood that non-initiating Holders may be required to participate in any purchase price holdback, escrow or indemnity on a pro rata basis (in accordance with their holdings) with the initiating Holders in an amount not to exceed proceeds received by such Holder.<br><br>Drag-Along Rights – If any Holder(s) proposes to dispose of 50% or more of the then outstanding Common Shares to a person or group of affiliated persons (such persons being unaffiliated with any Dragging Holder (as defined below) and unaffiliated with the Company) that proposes to purchase for cash all (but not less than all) of the outstanding Common Shares (a "<u>Drag-Along Sale</u>"), then the proposing Holders (the "<u>Dragging Holders</u>") shall have a drag-along right to cause all of the other Holders Shares (including securities convertible or exchangeable into Common Shares, if any) to be purchased such buying person(s), on the same terms and subject to the same conditions as the Dragging Holders (including for the same consideration per equity interest and on the same non-economic terms and conditions), except that the only representations to be made by non-dragging Holders |

| | |
|---|---|
| | shall be as to such Holder's ownership and authority; provided further, that it is understood that non-dragging Holders may be required to participate in any purchase price holdback, escrow or indemnity on a pro rata basis (in accordance with their holdings) with the Dragging Holders in an amount not to exceed proceeds received by such Holder. |
| **Preemptive Rights:** | For as long as a Holder is an "accredited investor" (as such term is defined under Regulation D promulgated under the Securities Act of 1933) and holds at least [1%][3] of the issued and outstanding Common Shares, the Holder shall have the right to purchase its pro rata share of the issuance of any Common Shares or securities convertible into Common Shares that are issued in connection with any financing (except as part of the stock option plan or any other share compensation arrangement of the Company). |
| **Registration Rights Agreement:** | The Holders who may not otherwise be allowed to sell their shares without restriction under the Securities Act of 1933 will be granted customary demand, piggyback and shelf registration rights with respect to the Common Shares held by them; *provided*, that the Company shall not be required to file a registration statement until the date that is 180 days after the Company's initial public offering. |
| **Corporate Opportunities:** | The Company's charter and bylaws will provide, to the fullest extent permitted by applicable law, for the renunciation of the Company's interest in business opportunities that are presented to directors or Holders, in each case, other than opportunities presented to directors, employees, consultants or officers of the Company in their capacity as such (and the renunciation shall apply to any Chairman of the New Board that is not otherwise an employee, consultant or officer of the Company). |
| **Charter/Bylaws:** | Charter and bylaws of the Company shall be in form and substance satisfactory to the official committee of unsecured creditors, Fairfax and Bluescape, and included in the Plan Supplement. In addition to the provisions implementing the governance and other provisions contemplated herein, the documents shall include provisions:<br><br>• designating [Texas][4] state court as the exclusive jurisdiction for intra-corporate disputes;<br><br>• eliminating of stockholder action by written consent; and |

---

[3] TBD

[4] Jurisdiction to be discussed

| | |
|---|---|
| | • limiting of amendments to the charter or by-laws as set forth above. |
| **Holder Approvals:** | Other Holder approvals only as required by [Delaware][5] law (e.g., mergers/sale of substantially all assets); provided, however, any affiliate transaction involving a fundamental change shall require the consent of a majority of the disinterested stockholders. |

---

[5] Jurisdiction to be discussed