**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
06/18/2019

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**ORDER CONFIRMING THIRD**
**AMENDED SETTLEMENT JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF EXCO RESOURCES, INC. AND ITS DEBTOR AFFILIATES**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), having:[2]

a.   commenced, on January 15, 2018 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b.   continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code;

c.   filed, on October 1, 2018, the *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* [Docket No. 1102] and the *Disclosure Statement for the Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as amended, supplemented, or modified from time to time, the "First Disclosure Statement") [Docket No. 1103];

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

[2]   Capitalized terms used but not otherwise defined in these findings of fact, conclusions of law, and order (collectively, the "Confirmation Order") shall have the meaning ascribed to them in the *Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates*, attached hereto as **Exhibit A** (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "Plan").  The rules of interpretation set forth in Article I.B of the Plan apply to this Confirmation Order.

d.    filed, on October 29, 2018, a revised *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* [Docket No. 1178] and a revised First Disclosure Statement [Docket No. 1179];

e.    filed, on November 2, 2018, a further revised *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* [Docket No. 1209] and a further revised First Disclosure Statement [Docket No. 1210];

f.    filed, on November 5, 2018, a further revised *Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* [Docket No. 1232] and a further revised First Disclosure Statement [Docket No. 1233];

g.    obtained, on November 5, 2018, entry of the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Proposed Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 1227] (the "First Disclosure Statement Order") approving the First Disclosure Statement, solicitation procedures, and related notices, forms, and ballots;

h.    filed, on November 26, 2018, a *Plan Supplement* [Docket No. 1315] (the "First Plan Supplement");

i.    filed, on December 3, 2018, the *Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* [Docket No. 1391];

j.    filed, on March 8, 2019, the *Second Amended Joint Chapter 11 Plan of EXCO Resources, Inc. and Its Debtor Affiliates* [Docket No. 1682] and the *Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of EXCO Resources, Inc. and Its Debtor Affiliates* [Docket No. 1683];

k.    filed, on April 10, 2019, the Plan [Docket No. 1801] and the *Disclosure Statement for the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as amended, supplemented, or modified from time to time, the "Disclosure Statement") [Docket No. 1802];

l.    filed, on April 17, 2019, a revised Plan [Docket No. 1830] and a revised Disclosure Statement [Docket No. 1831];

m.    filed, on April 29, 2019, the revised *Proposed Order Regarding Scheduling for the Confirmation Hearing Related to the Debtors' Third Amended Settlement Plan of Reorganization* [Docket No. 1879] (the "Proposed Scheduling Order");

n.    filed, on April 29, 2019, a *Plan Supplement* with regard to the Schedule of Retained Causes of Action [Docket No. 1880] (the "RCA Plan Supplement");

o.      filed, on May 2, 2019, a further revised Plan [Docket No. 1897] and a further revised Disclosure Statement [Docket No. 1898];

p.      obtained, on May 3, 2019, entry of the *Order Regarding Scheduling for the Confirmation Hearing Related to the Debtors' Third Amended Settlement Plan of Reorganization* [Docket No. 1908] (the "Scheduling Order") approving the Proposed Scheduling Order;

q.      obtained, on May 3, 2019, entry of the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Proposed Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 1909] (the "Disclosure Statement Order") approving the Disclosure Statement, solicitation procedures (the "Solicitation Procedures"), and related notices, forms, and ballots (collectively, the "Solicitation Packages");

r.      caused, on May 7, 2019, notice of the Confirmation Hearing (the "Confirmation Hearing Notice") to be published in *The Wall Street Journal* (national edition), as evidenced by the *Affidavit of Publication* [Docket No. 1915] (the "Publication Affidavit");

s.      filed, on May 8, 2019, the *Debtors' Emergency Motion For Entry of an Order (I) Authorizing the Debtors to (A) Enter Into the Exit Financing Agreements, (B) Incur and Pay Related Fees, Indemnities, and Expenses, and (II) Granting Related Relief* [Docket No. 1932] (the "Exit Financing Motion");

t.      caused, beginning on or about May 8, 2019 (the "Solicitation Date"), the Solicitation Packages and notice of the Confirmation Hearing and the deadline for objecting to confirmation of the Plan to be distributed in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 1940] (the "Solicitation Affidavit");

u.      filed, on May 13, 2019, a *Plan Supplement* with regard to material terms of the Plan Supplement documents [Docket No. 1945] (the "Second Plan Supplement");

v.      filed, on May 22, 2019, a *Plan Supplement* [Docket No. 1989] (the "Third Plan Supplement")

w.      filed, on June 3, 2019, a further revised Plan [Docket No. 2023];

x.      filed, on June 7, 2019, the *Debtors' Memorandum of Law in Support of Confirmation of the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* [Docket No. 2076] (the "Confirmation Brief");

y.      filed, on June 7, 2019, the *Declaration of Jane Sullivan of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on the Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates* (as amended supplemented, or modified from time to time, the "Voting Report") [Docket No. 2082]; and

z.      filed, on June 9, 2019, a revised Voting Report [Docket No. 2089];

aa.     filed, on June 12, 2019, a further revised Plan [Docket No. 2103];

bb.     announced, at the continued Confirmation Hearing conducted at 2:30 p.m. (prevailing Central Time) on June 17, 2019, a resolution with LSP (as defined below), as set forth below; and

cc.     filed, on June 18, 2019, a *Plan Supplement* [Docket No. 2126] (the "Fourth Plan Supplement," and together with the RCA Plan Supplement, the First Plan Supplement, the Second Plan Supplement, and the Third Plan Supplement, as may be amended supplemented, or modified from time to time in accordance with the Plan, the "Plan Supplement").

This Court having:

a.      entered the Disclosure Statement Order and Scheduling Order on Friday, May 3, 2019;

b.      set Tuesday, June 4, 2019, at 5:00 p.m. (prevailing Central Time) as the deadline for filing objections in opposition to the Plan;

c.      set Wednesday, June 5, 2019, at 5:00 p.m. (prevailing Central Time) as the deadline for voting on the Plan;

d.      set Monday, June 10, 2019, at 9:00 a.m. (prevailing Central Time) as the date and time for the commencement of the Confirmation Hearing in accordance with Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

e.      reviewed the Plan, the Disclosure Statement, the Confirmation Brief, the Voting Report, and all pleadings, exhibits, declarations, affidavits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

f.      held the Confirmation Hearing;

g.      heard the statements and arguments made by counsel in respect of Confirmation;

h.      considered all oral representations, live testimony, written direct testimony, designated deposition testimony, exhibits, documents, filings, and other evidence presented at the Confirmation Hearing;

i.      made rulings on the record at the Confirmation Hearing (the "<u>Confirmation Ruling</u>");

j.      overruled any and all objections to the Plan and to Confirmation, except as otherwise stated or indicated on the record, and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated; and

k.      taken judicial notice of all papers and pleadings filed in the Chapter 11 Cases.

NOW, THEREFORE, the Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby; and the record of the Chapter 11 Cases and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing, including without limitation, the declarations in support, establish just cause for the relief granted in the Confirmation Order; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following findings of fact, conclusions of law, and order:

## I.   <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.    Jurisdiction and Venue.**

1.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1334. The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed and to enter a final order with respect thereto.  The Debtors confirm their consent, pursuant to rule 7008 of the Bankruptcy Rules, to the entry of a final order by the Court in connection with this motion to the extent that it is later

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue in this Court was proper as of the Petition Date and continues to be proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).

**B.      Eligibility for Relief.**

2.       The Debtors were and continue to be entities eligible for relief under section 109 of the Bankruptcy Code.

**C.      Commencement and Joint Administration of the Chapter 11 Cases.**

3.       On the Petition Date, the Debtors commenced the Chapter 11 Cases.   On January 16, 2018, the Court entered an order [Docket No. 18] authorizing the joint administration of the Chapter 11 Cases in accordance with Bankruptcy Rule 1015(b).  The Debtors have operated their business and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

**D.      Appointment of Committee.**

4.       On January 24, 2018, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") to represent the interests of the unsecured creditors of the Debtors in the Chapter 11 Cases [Docket No. 175].   The Committee was reconstituted on January 25, 2018 [Docket No. 181].

**E.      Plan Supplement.**

5.       On November 26, 2018, the Debtors filed the First Plan Supplement [Docket No. 1315].  On April 29, 2019, the Debtors filed the RCA Plan Supplement [Docket No. 1880] containing certain revisions to the Schedule of Retained Causes of Action.  On May 13, 2019, the Debtors filed the Second Plan Supplement [Docket No. 1945] containing certain material terms of

the Plan Supplement documents.  On May 22, 2019, the Debtors filed the Third Plan Supplement [Docket No. 1989].   On June 18, 2019, the Debtors filed the Fourth Plan Supplement [Docket No. 2126].The Plan Supplement (as may be amended, supplemented, or otherwise modified from time to time according to the Plan) complies with the terms of the Plan, and the Debtors provided good and proper notice of the filing in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement Order, and the facts and circumstances of the Chapter 11 Cases.  No other or further notice is or will be required with respect to the Plan Supplement or any of the documents contained therein or related thereto.  Subject to the terms of the Plan, the Debtors are authorized to modify the Plan Supplement in accordance with the time limits set forth in the Plan.

**F.      Modifications to the Plan.**

6.      Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan since the Debtors began the solicitation of votes as described or set forth in this Confirmation Order constitute technical changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest.  These modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and solicitation materials served pursuant to the Disclosure Statement Order, and notice of these modifications was adequate and appropriate under the facts and circumstances of the Chapter 11 Cases.

7.      In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosures under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims and Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

Accordingly, the Plan, as modified, is properly before this Court and all votes cast with respect to the Plan prior to such modifications shall be binding and shall apply with respect to the Plan.

**G.    Objections Overruled.**

8.    Any resolution or disposition of objections to Confirmation of the Plan explained or otherwise ruled upon by the Court on the record at the Confirmation Hearing is hereby incorporated by reference.  All unresolved objections, statements, and reservations of rights with respect to Confirmation are hereby overruled on the merits.

**H.    Disclosure Statement Order.**

9.    On May 3, 2019, the Court entered the Disclosure Statement Order [Docket No. 1909].  The Disclosure Statement Order, among other things, fixed Tuesday, June 4, 2019 at 5:00 p.m. (prevailing Central Time) as the deadline for objecting to the Plan (the "Plan Objection Deadline") and Wednesday, June 5, 2019, at 5:00 p.m. (prevailing Central Time) as the deadline for voting to accept or reject the Plan (the "Voting Deadline").

10.    On May 3, 2019, the Court entered the *Order Regarding Scheduling for the Confirmation Hearing Related to the Debtors' Third Amended Settlement Plan of Reorganization* [Docket No. 1908] (the "Scheduling Order").  The Scheduling Order, among other things, fixed certain dates and deadlines in connection with approval and solicitation of the Disclosure Statement and confirmation of the Plan, including a discovery and briefing schedule with respect to contested confirmation issues.

**I.    Transmittal and Mailing of Materials; Notice.**

11.    As evidenced by the Solicitation Affidavit and the Publication Affidavit, the Debtors provided due, adequate, and sufficient notice of the Plan, Disclosure Statement, Disclosure Statement Order, Solicitation Packages, the Confirmation Hearing Notice, the Plan Supplement, and all the other materials distributed by the Debtors in connection with the

Confirmation of the Plan in compliance with the Bankruptcy Rules, including Bankruptcy Rules 2002, 3017, 3019, and 3020(b), the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules"), and the procedures set forth in the Disclosure Statement Order.  The Debtors provided due, adequate, and sufficient notice of the Voting Deadline and Plan Objection Deadline, the Confirmation Hearing (as continued from time to time), and any applicable hearings described in the Disclosure Statement Order in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Disclosure Statement Order.  No other or further notice is or shall be required.

**J.      Solicitation.**

12.     The Debtors solicited votes for acceptance and rejection of the Plan in good faith, and such solicitation complied with sections 1125, 1126, and all other applicable sections of the Bankruptcy Code, Bankruptcy Rules 2002, 3017, 3018, and 3019, the Disclosure Statement Order, the Bankruptcy Local Rules, and all other applicable rules, laws, and regulations.  The Solicitation Packages provided the opportunity for voting creditors to opt out of the releases.

**K.      Voting Report.**

13.     Before the Confirmation Hearing, the Debtors filed the Voting Report.  The Voting Report was admitted into evidence during the Confirmation Hearing without objection.  The procedures used to tabulate ballots were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all other applicable rules, laws, and regulations.

14.     As set forth in the Plan and Disclosure Statement, Holders of Claims in Classes 3, 4, 5, 6, and 7 of the Plan (collectively, the "Voting Classes") were eligible to vote to accept or reject the Plan in accordance with the Solicitation Procedures.  Holders of Claims and Interests in Classes 1, 2, 8, as applicable, and 10 of the Plan (collectively, the "Deemed Accepting Classes")

are Unimpaired and conclusively presumed to accept the Plan and, therefore, did not vote to accept

or reject the Plan.  Holders of Claims or Interests in Classes 8, as applicable, 9, and 11 of the Plan

(collectively, the "Deemed Rejecting Classes") are Impaired and are entitled to no recovery under

the Plan, and are therefore deemed to have rejected the Plan.  Holders of Intercompany Claims in

Class 8 of the Plan are Unimpaired and conclusively presumed to have accepted the Plan, or are

Impaired and deemed to reject the Plan, and, in either event, are not entitled to vote to accept or

reject the Plan.

15. As evidenced by the Voting Report, Classes 3, 4, 5, 6, and 7 voted to accept the

Plan at each Debtor, with the sole exception of Class 7 at Debtor EXCO Resources, Inc., which

voted to reject the Plan (together with the Deemed Rejecting Classes, the "Rejecting Classes").

**L.    Bankruptcy Rule 3016.**

16. The Plan is dated and identifies the Entities submitting it, thereby satisfying

Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and Plan with

the Court, thereby satisfying Bankruptcy Rule 3016(b).  The injunction, release, and exculpation

provisions in the Plan, as described in the Disclosure Statement, describe, in bold font and with

specific and conspicuous language, all acts to be enjoined and identify the Entities that will be

subject to the injunction, thereby satisfying Bankruptcy Rule 3016(c).

**M.    Burden of Proof.**

17. The Debtors, as proponents of the Plan, have met their burden of proving the

elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the

evidence, the applicable evidentiary standard for Confirmation.  Further, the Debtors have

surpassed that standard and have proven the elements of sections 1129(a) and 1129(b) by clear and

convincing evidence.  Each witness who testified on behalf of the Debtors in connection with the

Confirmation Hearing was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

**N.    Compliance with the Requirements of Section 1129 of the Bankruptcy Code.**

18.    The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows:

**a.    Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.**

19.    The Plan complies with all applicable provisions of the Bankruptcy Code, including sections 1122 and 1123, as required by section 1129(a)(1) of the Bankruptcy Code.

**i.    Sections 1122 and 1123(a)(1)—Proper Classification.**

20.    The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.  In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into eleven different Classes, based on differences in the legal nature or priority of such Claims and Interests (other than Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facility Claims, which are each addressed in Article II of the Plan and are required not to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code).  Valid business, factual, and legal reasons exist for the classification of the various Classes of Claims and Interests created under the Plan; the classifications were not implemented for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims and Interests.

21.    In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims or Interests contains only Claims or Interests substantially similar to the other Claims or Interests

within that Class.  Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

### ii.     Sections 1123(a)(2)—Specification of Unimpaired Classes.

22.     Article III of the Plan specifies that Claims in the Deemed Accepting Classes are Unimpaired under the Plan.  In addition, Article II of the Plan specifies that Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Facility Claims with respect to the Plan are Unimpaired, although the Plan does not classify these Claims.  Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### iii.    Sections 1123(a)(3)—Specification of Treatment of Impaired Classes.

23.     Article III of the Plan specifies the treatment of each Impaired Class under the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### iv.     Sections 1123(a)(4)—No Discrimination.

24.     Article III of the Plan provides the same treatment to each Claim or Interest in any particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest.  Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

### v.      Section 1123(a)(5)—Adequate Means for Plan Implementation.

25.     The Plan and the various documents included in the Plan Supplement provide adequate and proper means for the Plan's execution and implementation, including: (a) the restructuring of the Debtors' balance sheet and other financial transactions provided for by the Plan; (b) the New Organizational Documents; (c) the Assumed Executory Contract and Unexpired Lease List; (d) the Rejected Executory Contract and Unexpired Lease List; (d) the Schedule of Retained Causes of Action; (e) Claims Objection Schedule; (f) the borrowings under the Exit RBL Facility; (g) the identity of the members of the Reorganized EXCO Board and management for the

Reorganized Debtors; (h) the Stockholders' Agreement; (i) the identity and compensation of the

Unsecured Claims Plan Administrator; (j) the cancellation of certain existing agreements,

obligations, instruments, and Interests, as provided in Article III of the Plan; (k) the vesting of the

assets of the Debtors' Estates in the Reorganized Debtors; and (l) the execution, delivery, filing,

or recording of all contracts, instruments, releases, and other agreements or documents in

furtherance of the Plan.  Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of

the Bankruptcy Code.

<strong>vi.      Section 1123(a)(6)—Non-Voting Equity Securities.</strong>

26.     The New Organizational Documents for the Debtors prohibit the issuance of non-

voting securities.  Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the

Bankruptcy Code.

<strong>vii.      Section 1123(a)(7)—Directors, Officers, and Trustees.</strong>

27.     The selection of the members of the Reorganized EXCO Board is set forth in the

Plan Supplement.  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the

Bankruptcy Code.

**b.      Section 1123(b)—Permissive Contents of the Plan.**

28.     The Plan contains various discretionary provisions that are permitted by

section 1123(b) of the Bankruptcy Code.  Any such provision complies with section 1123(b) of

the Bankruptcy Code and is not inconsistent with the applicable provisions of the Bankruptcy

Code.  Thus, the Plan satisfies section 1123(b) of the Bankruptcy Code.

<strong>i.      Impairment/Unimpairment of Any Class of Claims or Interests.</strong>

29.     Pursuant to the Plan, Article III of the Plan impairs or leaves unimpaired, as the

case may be, each Class of Claims and Interests, as contemplated by section 1123(b)(1) of the

Bankruptcy Code.

### ii. Assumption and Rejection of Executory Contracts and Unexpired Leases.

30.     Article V of the Plan provides for the assumption of the Debtors' Executory Contracts and Unexpired Leases as of the Effective Date of the Plan, unless such Executory Contracts or Unexpired Leases:  (a) previously were assumed, assumed and assigned, or rejected by the Debtors; (b) are identified on the Rejected Executory Contract and Unexpired Lease List; (c) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (d) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

### iii. Compromise and Settlement.

31.     In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The Plan (as expressly modified by this Confirmation Order) incorporates integrated compromises and settlements, including the Secured Lender Settlement, the D&O Settlement, and the LSP Settlement (as defined herein) (collectively, the "Settlements"), of numerous claims and Causes of Action, issues, and disputes designed to achieve a beneficial and efficient resolution of the Chapter 11 Cases for all parties in interest.

32.     Accordingly, in consideration for the distributions and other benefits provided under the Plan, this Confirmation Order shall constitute the Court's approval of the Settlements as

well as a finding by the Court that such Settlements are in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests and are fair, equitable, and reasonable.

33.     Based upon the representations and arguments of counsel to the Debtors and all other testimony either actually given or proffered and other evidence introduced at the Confirmation Hearing and the full record of the Chapter 11 Cases, this Confirmation Order constitutes the Court's approval of the Settlements incorporated in the Plan and this Confirmation Order, because, among other things:  (a) the Settlements reflect a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes and allowing the Debtors to expeditiously exit chapter 11, on the other hand; (b) absent the Settlements, there is a likelihood of complex and protracted litigation involving, among other things, the Settlements, with the attendant expense, inconvenience, and delay that have a possibility to derail the Debtors' reorganization efforts; (c) each of the parties supporting the Settlements, including the Debtors, the Settling Lenders, the Committee, the Supporting Creditors, and the D&O Carriers are represented by counsel that is recognized as being knowledgeable, competent, and experienced; (d) the Settlements are the product of arm's-length bargaining and good faith negotiations between sophisticated parties; and (e) the Settlements are fair, equitable, and reasonable and in the best interests of the Debtors, Reorganized Debtors, their respective Estates and property, creditors, and other parties in interest, will maximize the value of the Estates by preserving and protecting the ability of the Reorganized Debtors to continue operating outside of bankruptcy protection and in the ordinary course of business, and are essential to the successful implementation of the Plan. Based on the foregoing, the Settlements satisfy the requirements of applicable Fifth Circuit law for approval of settlements and compromises pursuant to Bankruptcy Rule 9019.

### iv.   Debtors' Release.

34.    The releases of claims and Causes of Action by the Debtors described in Article VIII.C of the Plan and incorporated and expressly modified by this Confirmation Order in accordance with section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment under Bankruptcy Rule 9019 (the "Debtors' Release").  The Debtors' or the Reorganized Debtors' pursuit of any such claims against the Released Parties is not in the best interest of the Estates' various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such claims.  The Debtors' Release is fair and equitable.

35.    The Debtors' Release is furthermore an integral part of the Plan and the Settlements embodied therein and in this Confirmation Order, and is in the best interests of the Debtors' Estates as a component of the comprehensive settlement implemented under the Plan.  The probability of success in litigation with respect to the released Causes of Action supports the Debtors' Release. In negotiations between the Debtors, the Settling Lenders, the Supporting Creditors, the Committee, and certain of the D&O Carriers, the parties identified various potential claims and Causes of Action held by the Debtors.  With respect to each of these potential claims and Causes of Action, parties could assert colorable defenses, and the probability of success is highly uncertain and appropriately reflected in the recoveries provided under the Plan.

36.    Creditors have overwhelmingly voted in favor of the Plan, including the Debtors' Release.   The Plan, including the Debtors' Release contained therein, was negotiated by sophisticated parties represented by able counsel and financial advisors, including the Settling Lenders, the Supporting Creditors, and the Committee.  The Debtors' Release is therefore the result of an arm's-length negotiation process.

37.     The Debtors' Release appropriately offers protection to parties that provided consideration to the Debtors and that participated in the Debtors' restructuring process. Specifically, the Released Parties under the Plan, including each of: (a) each of the Settling Lenders; (b) the DIP Agent; (c) each of the DIP Lenders; (d) the Committee; (e) each of the individual members of the Committee (both in their capacity as such and as individual creditors); (f) each of the Supporting Creditors; (g) each of the Debtors' current and former directors or officers; (h) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (i) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (j) each of the D&O Carriers; (k) the Unsecured Notes Trustee; (l) the Second Lien Agent; (m) the 1.5 Lien Notes Trustee and (n) the 1.75 Lien Agent made significant concessions and contributions to the Chapter 11 Cases, including, as applicable, entering into the Settlements and actively supporting the Plan and the Chapter 11 Cases.  The Debtors' Release for the Debtors' directors and officers is appropriate because the Debtors' directors and officers share an identity of interest with the Debtors, supported the Plan and the Chapter 11 Cases, actively participated in meetings, negotiations, and implementation during the Chapter 11 Cases, and have provided other valuable consideration to the Debtors to facilitate the Debtors' reorganization.

38.     As such, the releases are:  (a) in exchange for the good and valuable consideration provided by or on behalf of the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released herein; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors,

or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the releases described herein.  In light of the foregoing, the Debtors' Release is approved.

v.      **Release by Holders of Claims and Interests.**

39.      The release by the Releasing Parties set forth in Article VIII.D of the Plan and incorporated and expressly modified by this Confirmation Order (the "Third Party Release") is an essential provision of the Plan.  The Third Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of such claims or Causes of Action; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases described herein.

40.      The Third Party Release is an integral part of the Plan.  Similar to the Debtors' Release, the Third Party Release was integral to the formulation of the Plan, including the Settlements embodied therein and in this Confirmation Order.  The Third Party Release was critical in incentivizing the Released Parties to support the Plan and the Settlements and preventing potentially significant and time-consuming litigation regarding the Settled Actions.  The Third Party Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring process by supporting the Plan through the Settlements.  Furthermore, the Third Party Release is consensual, as the Releasing Parties in interest were provided notice of the chapter 11 proceedings, the Plan, and the deadline to object to confirmation of the Plan.  Additionally, voting creditors and non-voting parties were given the opportunity to opt out of the Third Party Release, and the release provisions of the Plan were conspicuous and emphasized with boldface type in the Plan, the Disclosure Statement, and the applicable ballots or opt-out form.

18

41.     The scope of the Third Party Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases, and parties received due and adequate notice of the Third Party Release.  Among other things, the Plan provides appropriate and specific disclosure with respect to the claims and Causes of Action that are subject to the Third Party Release, and no other disclosure is necessary.  The Debtors, as evidenced by the Solicitation Affidavit, provided sufficient notice of the Third Party Release, and no further or other notice is necessary.  The Third Party Release is consistent with established practice in this jurisdiction and others.  The Third Party Release is specific in language, integral to the Plan, a condition of the settlement, and given for substantial consideration.

### vi.     Exculpation.

42.     The exculpation provision set forth in Article VIII.E of the Plan and incorporated and expressly modified by this Confirmation Order is essential to the Plan.  The record in the Chapter 11 Cases supports the exculpation provision set forth in Article VIII.E of the Plan, which is appropriately tailored to protect the Exculpated Parties from unnecessary litigation.  The exculpation, including the carveout for actual fraud, gross negligence, or willful misconduct, is consistent with established practice in this jurisdiction and others.

### vii.     Injunction.

43.     The injunction provision set forth in Article VIII.F of the Plan is essential to the Plan and is necessary to implement the Plan and to preserve and enforce the discharge, the Debtors' Release, the Third Party Release, and the exculpation provision in Article VIII.E of the Plan.  The injunction provision is appropriately tailored to achieve those purposes.

### viii.     Release of D&O Carriers and D&O Liability Insurance Policies.

44.     The release of the D&O Carriers and the D&O Liability Insurance Policies (the "D&O Release") provision set forth in Article VIII.G of the Plan is an essential provision of

the Plan and is necessary to implement the Plan.  The D&O Carriers provided valuable consideration to effectuate the D&O Settlement.  The D&O Release is instrumental to the D&O Settlement and the Plan and was critical in incentivizing the D&O Carriers to enter into the D&O Settlement and avoiding potentially significant and time-consuming litigation of Settled Insured Claims settled by the D&O Settlement.  The D&O Release was a core negotiation point in connection with the D&O Settlement and instrumental in developing the Plan in a manner that maximized value for all of the Debtors' creditors and kept the Debtors intact as a going concern. As such, the D&O Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring process by supporting the Plan through the Settlements.

45.     The scope of the D&O Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases, and parties received due and adequate notice of the D&O Release.  In light of, among other things, the value provided by the D&O Carriers to the Debtors' Estates and the critical nature of the D&O Release to the Plan, the D&O Release is approved.

### ix.     Bar Order and Channeling Injunction.

46.     The bar order and channeling injunction provision set forth in Article VIII.H of the Plan is an essential provision of the Plan and is necessary to implement the Plan.  The parties benefiting from the bar order and channeling injunction provided consideration to effectuate the Settlements.  The bar order and channeling injunction is instrumental to the Plan and was critical in incentivizing the D&O Carriers to support the Plan and avoiding potentially significant and time-consuming litigation of Settled Insured Claims settled by the D&O Settlement.  The bar order and channeling injunction was a core negotiation point in connection with the Settlements and instrumental in developing the Plan in a manner that maximized value for all of the Debtors' creditors and kept the Debtors intact as a going concern.

47.     The scope of the bar order and channeling injunction is appropriately tailored under the facts and circumstances of the Chapter 11 Cases, and parties received due and adequate notice of the bar order and channeling injunction.  In light of, among other things, the value provided by the D&O Carriers to the Debtors' Estates and the critical nature of the bar order and channeling injunction to the Plan, the bar order and channeling injunction is approved.

### x.     Preservation of Claims and Causes of Action.

48.     Article IV.Q of the Plan, as well as the Plan Supplement, appropriately provide for the preservation by the Debtors or the Reorganized Debtors of certain Causes of Action in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  Causes of Action not released by the Debtors or exculpated under the Plan or this Confirmation Order will be retained by the Reorganized Debtors as provided by the Plan.  The Plan is specific and unequivocal with respect to the Causes of Action to be retained by the Reorganized Debtors, and the Plan and the Plan Supplement provide meaningful disclosure with respect to the potential Causes of Action that the Reorganized Debtors may retain, and all parties in interest received adequate notice with respect to such Causes of Action.  The provisions regarding Causes of Action in the Plan, and as set forth in the Plan Supplement, are appropriate and in the best interests of the Debtors, their respective Estates, and Holders of Claims and Interests.  For the avoidance of any doubt, Causes of Action released or exculpated under the Plan will not be retained by the Reorganized Debtors.[3]

---

[3]     For the further avoidance of doubt, the Retained Causes of Action shall be subject to the Enterprise Settlement Agreement and the *Order (I) Authorizing and Approving the Settlement By and Among the Debtors, the Enterprise Entities, the Bluescape Entities, and the Committee, and (II) Granting Related Relief* [Docket No. 1853], which order controls in the event of a conflict or inconsistency with the terms of the Plan, Plan Supplement, or this Confirmation Order.

### xi.     Lien Releases.

49.     The release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates set forth in Article VIII.B of the Plan and (the "Lien Releases") is necessary to implement the Plan.  The provisions of the Lien Releases are appropriate, fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and holders of Claims and Interests.

### xii.     Additional Plan Provisions.

50.     The other discretionary provisions of the Plan, including the Plan Supplement, are appropriate and consistent with applicable provisions of the Bankruptcy Code, including, without limitation, provisions for the allowance of certain Claims, treatment of indemnification obligations, and the retention of court jurisdiction.

### c.     Section 1123(d)—Cure of Defaults.

51.     Article V.C of the Plan provides for the satisfaction of Cure Claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.  Any monetary defaults under each Assumed Executory Contract or Unexpired Lease (calculated as of the Petition Date) shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitations described in Article V.C of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Except as expressly provided in this Confirmation Order, any disputed Cure Claims will be determined in accordance with the procedures set forth in Article V.C of the Plan or this Confirmation Order and applicable bankruptcy and nonbankruptcy law.  As such, the Plan provides that the Debtors will cure, or provide adequate assurance that the Debtors will promptly cure, defaults with respect to assumed Executory Contracts and Unexpired

Leases in accordance with section 365(b)(1) of the Bankruptcy Code. Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

      **d.**      **Section 1129(a)(2)—Compliance of the Debtors and Others with the Applicable Provisions of the Bankruptcy Code.**

52.     The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1128, and 1129 and Bankruptcy Rules 2002, 3017, 3018, and 3019.

53.     The Debtors and their agents solicited votes to accept or reject the Plan after the Court approved the adequacy of the Disclosure Statement, pursuant to section 1125(a) of the Bankruptcy Code and the Disclosure Statement Order.

54.     The Debtors and their agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e), and in a manner consistent with the applicable provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provision set forth in Article VIII.E of the Plan. The Debtors and their agents and Affiliates have participated in good faith and in compliance with applicable provisions of the Bankruptcy Code in the offer, issuance, sale, or purchase of the New Common Stock, and the Debtors, the Reorganized Debtors,

and their respective agents and Affiliates shall not be held liable on account of such participation for violation of any applicable law, rule, or regulation governing the offer, issuance, sale, or purchase of such securities.

55.     The Debtors and their agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

     **e.**     **Section 1129(a)(3)—Proposal of Plan in Good Faith.**

56.     The Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders, and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan, and the process leading to its formulation.  The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement, the hearing on the Disclosure Statement, and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases.

57.     The Plan is the product of good faith, arm's-length negotiations by and among the Debtors, the Settling Lenders, the Supporting Creditors, the D&O Carriers, and the Committee. The Plan itself and the process leading to its formulation, including the fact that the Plan is a product of mediation with a court-appointed mediator, provides independent evidence of the Debtors' and such other parties' good faith, serves the public interest, and assures fair treatment of Holders of Claims and Interests.  Consistent with the overriding purpose of chapter 11, the

Debtors filed the Chapter 11 Cases with the belief that the Debtors were in need of reorganization, and the Plan was negotiated and proposed with the intention of accomplishing a successful reorganization and maximizing stakeholder value and for no ulterior purpose.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

58.     The Debtors or the Reorganized Debtors, as appropriate, have been, are, and will continue acting in good faith if they proceed to:  (a) consummate the Plan, the Restructuring Transactions, the Exit RBL Facility, and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed or contemplated by this Confirmation Order.  Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

**f.      Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable.**

59.     Any payment made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable.  Accordingly, the Plan satisfies the requirements of section 1129(a)(4).

**g.      Section 1129(a)(5)—Disclosure of Directors and Officers Are Consistent with the Interests of Creditors and Public Policy.**

60.     The identities of the Reorganized Debtors' directors and officers were, to the extent reasonably practicable and known to the Debtors, disclosed in the Plan Supplement.  To the extent that such directors and officers are insiders, the nature of their compensation has been disclosed to the extent known and reasonably practicable.

61.     Accordingly, the Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

### h.      Section 1129(a)(6)—Rate Changes.

62.      The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and therefore will not require governmental regulatory approval.  Therefore, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

### i.      Section 1129(a)(7)—Best Interests of Holders of Claims and Interests.

63.      The evidence in support of the Plan that was proffered or adduced at the Confirmation Hearing, and the facts and circumstances of the Chapter 11 Cases, establishes that each Holder of Allowed Claims or Interests in each Class either (i) has accepted the Plan; or (ii) will recover as much or more value under the Plan on account of such Claim or Interest, as of the Effective Date of the Plan, than the amount such Holder would receive if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.  As a result, the Debtors have demonstrated that the Plan is in the best interest of their creditors and equity holders, and the requirements of section 1129(a)(7) of the Bankruptcy Code are satisfied.

### j.      Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Certain Impaired Classes; Fairness of Plan with Respect to Rejecting Classes.

64.      The Deemed Accepting Classes are Unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  At least one Class of Claims that is Impaired under the Plan has accepted the Plan.  Nevertheless, because the Plan has not been accepted by the Rejecting Classes, the Debtors seek Confirmation, solely with respect to the Rejecting Classes, under section 1129(b) of the Bankruptcy Code, rather than section 1129(a)(8) of the Bankruptcy Code.  Although section 1129(a)(8) has not been satisfied with respect to the Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes, and thus

satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further

below.  As a result, the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

> **k.** **Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

65.     The treatment of Administrative Claims, Professional Fee Claims, Priority Tax

Claims, and DIP Claims under Article II of the Plan satisfies the requirements of, and complies in

all respects with, section 1129(a)(9) of the Bankruptcy Code.

> **l.** **Section 1129(a)(10)—Acceptance by at Least One Impaired Class.**

66.     As set forth in the Voting Reports, each Impaired Class that was entitled to vote on

the Plan has voted to accept the Plan (except for Class 7 at Debtor EXCO Resources, Inc.).

Specifically, Holders of Claims in Classes 3, 4, 5, 6, and 7 voted to accept the Plan (except for

Class 7 at Debtor EXCO Resources, Inc.).  As such, there is at least one Class of Claims that is

Impaired under the Plan and has accepted the Plan, determined without including any acceptance

of the Plan by any insider (as defined by the Bankruptcy Code).  Accordingly, the requirements of

section 1129(a)(10) of the Bankruptcy Code are satisfied with respect to the Plan.

> **m.** **Section 1129(a)(11)—Feasibility of the Plan.**

67.     The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence

supporting the Plan proffered or adduced by the Debtors at or before the Confirmation Hearing:

(a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared,

presented, or proffered; (b) has not been controverted by other persuasive evidence; (c) establishes

that the Plan is feasible and Confirmation of the Plan is not likely to be followed by liquidation or

the need for further financial reorganization; (d) establishes that the Debtors will have sufficient

funds available to meet their obligations under the Plan—including sufficient amounts of Cash to

reasonably ensure payment of, among other Allowed Claims, Allowed General Administrative

Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed DIP Claims, Allowed Other Secured Claims, Allowed Professional Fee Claims, and Allowed GUC Claims that will receive the Convenience Claims Distribution pursuant to the terms of the Plan, and other expenses in accordance with the terms of the Plan and section 507(a) of the Bankruptcy Code; and (e) establishes that the Debtors or the Reorganized Debtors, as applicable, will have the financial wherewithal to pay any Claims that accrue, become payable, or are allowed by Final Order following the Effective Date.

68.    Accordingly, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**n.    Section 1129(a)(12)—Payment of Statutory Fees.**

69.    Article XII.D of the Plan provides that all fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Court at the Confirmation Hearing in accordance with section 1128 of the Bankruptcy Code, will be paid by the applicable Debtor (on the Effective Date) or each of the applicable Reorganized Debtor for each quarter (including any fraction of a quarter) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**o.    Section 1129(a)(13)—Retiree Benefits.**

70.    Pursuant to section 1129(a)(13) of the Bankruptcy Code, and as provided in Article IV.P of the Plan, the Reorganized Debtors will continue to pay all obligations on account of retiree benefits (as such term is used in section 1114 of the Bankruptcy Code) on and after the Effective Date in accordance with applicable law.  As a result, the requirements of section 1129(a)(13) of the Bankruptcy Code are satisfied.

p.     **Section 1129(a)(14), (15), and (16)—Domestic Support Obligations, Individuals, and Nonprofit Corporations.**

71.     The Debtors do not owe any domestic support obligations, are not individuals, and are not nonprofit corporations.  Therefore, sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

q.     **Section 1129(b)—Confirmation of the Plan Over Nonacceptance of Impaired Classes.**

72.     Notwithstanding the fact that the Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because:  (a) at least one Impaired Class voted to accept the Plan; and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Claims and Interests in the Rejecting Classes.  As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  Thus, the Plan may be confirmed even though section 1129(a)(8) of the Bankruptcy Code is not satisfied with respect to the Rejecting Classes.  After entry of this Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon all Holders of Claims and Interests, including the members of the Rejecting Classes.

r.     **Section 1129(c)—Only One Plan.**

73.     Other than the Plan with respect to the Debtors, no other plan has been confirmed in the Chapter 11 Cases.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code are satisfied.

s.     **Section 1129(d)—Principal Purpose of the Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act.**

74.     No Governmental Unit has requested that the Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  As evidenced by its terms, the principal purpose of

the Plan is not the avoidance of the taxes or the application of section 5 of the Securities Act. Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

       **t.**      **Section 1129(e)—Not Small Business Cases.**

75.     The Chapter 11 Cases are not small business cases, and, accordingly, section 1129(e) of the Bankruptcy Code does not apply to the Chapter 11 Cases.

       **u.**      **Satisfaction of Confirmation Requirements.**

76.     Based upon the foregoing and all other pleadings and evidence proffered or adduced at or prior to the Confirmation Hearing, the Plan and the Debtors, as applicable, satisfy all the requirements for plan confirmation set forth in section 1129 of the Bankruptcy Code.

       **v.**      **Conditions to Effective Date.**

77.     The Plan shall not become effective unless and until the conditions set forth in Article IX.B of the Plan have been satisfied or waived pursuant to Article IX.C of the Plan.

       **w.**      **Implementation.**

78.     All documents and agreements necessary to implement transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement, the Exit RBL Facility Documents, the New Organizational Documents for the Reorganized Debtors, and all other relevant and necessary documents have been negotiated in good faith and at arm's-length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.  The Debtors are authorized to take any action reasonably necessary or appropriate to consummate such agreements and the transactions contemplated thereby.

       **x.**      **Vesting of Assets.**

79.     Except as otherwise provided in the Plan (including, without limitation, Article IV.K of the Plan), on the Effective Date, all property in each Estate, all Causes of Action,

and any property acquired by any of the Debtors pursuant to the Plan shall vest in each applicable

Reorganized Debtor free and clear of all Liens, Claims, charges, Interests, or other encumbrances

other than those specifically granted pursuant to the Plan or this Confirmation Order.  Except as

otherwise provided in the Plan, on and after the Effective Date, each of the Reorganized Debtors

may operate their business and may use, acquire, or dispose of property and compromise or settle

any Claims, Interests, or Causes of Action without supervision or approval by the Court and free

of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

   **y.**  **Treatment of Executory Contracts and Unexpired Leases.**

   80.  Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the

occurrence of the Effective Date, the Plan and Plan Supplement provides for the assumption or

rejection of certain Executory Contracts and Unexpired Leases.  The Debtors' determinations

regarding the assumption or rejection of Executory Contracts and Unexpired Leases are based on

and within the sound business judgment of the Debtors, are necessary to the implementation of the

Plan, and are in the best interests of the Debtors, their Estates, Holders of Claims and other parties

in interest in the Chapter 11 Cases.

   **z.**  **Exit RBL Facility.**

   81.  The Exit RBL Facility is an essential element of the Plan, is necessary for

confirmation and consummation of the plan, and is critical to the overall success and feasibility of

the Plan.  Entry into the Exit RBL Facility and the Exit RBL Facility Documents is in the best

interest of the Debtors, their Estates, and all holders of Claims or Interests.  The Debtors have

exercised reasonable business judgment in determining to enter into the Exit RBL Facility

Documents and have provided sufficient and adequate notice of the material terms of each such

exit facility, which material terms were filed as part of the Plan, Plan Supplement, and related

pleadings.  The terms and conditions are fair and reasonable, and were negotiated in good faith

and at arm's-length, and any credit extended, letters of credit issued, and loans made pursuant to the Exit RBL Facility shall be deemed to have been extended, assumed and assigned, issued, or made in good faith.  The Debtors are authorized without further approval of the Court or any other party to execute and deliver all agreements, guarantees, instruments, mortgages, control agreements, certificates, and other documents and to perform their obligations thereunder, including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities.

## II. <u>ORDER</u>

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

82.     This Confirmation Order confirms the Plan in its entirety, as expressly modified herein.

83.     This Confirmation Order approves the Plan Supplement, including the documents contained therein that may be amended in accordance with and as permitted by the Plan and this Confirmation Order.  The terms of the Plan, the Plan Supplement, and the exhibits thereto are incorporated herein by reference and are an integral part of this Confirmation Order; *provided*, *however*, that if there is any direct conflict between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control solely to the extent of such conflict.

84.     All Holders of Claims that voted to accept the Plan are conclusively presumed to have accepted the Plan.

85.     The terms of the Plan, the Plan Supplement, all exhibits thereto, and this Confirmation Order shall be effective and binding as of the Effective Date on all parties in interest,

including, but not limited to:  (a) the Debtors; (b) the Supporting Creditors; (c) the Settling Lenders; (d) the D&O Carriers; and (e) all Holders of Claims and Interests against the Debtors.

86.    The failure to include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, any related document, agreement, or exhibit does not impair the effectiveness of that article, section, or provision; it being the intent of the Court that the Plan, the Plan Supplement, and any related document, agreement, or exhibit are approved in their entirety.

87.    Subject to commercially reasonable efforts of the Debtors (in consultation with the Committee) to effectuate such election, as set forth in the Plan, any Holder of a GUC Claim may elect to reduce the Allowed amount of its GUC Claim to less than or equal to $500,000 and receive the treatment provided for Holders of Allowed Convenience Claims in lieu of its Pro Rata share of the Unsecured Claims Recovery.

**A.    Objections.**

88.    To the extent that any objections (including any reservations of rights contained therein) to Confirmation have not been withdrawn, waived, or settled before entry of this Confirmation Order, are not cured by the relief granted in this Confirmation Order, or have not been otherwise resolved as stated on the record of the Confirmation Hearing, all such objections (including any reservation of rights contained therein) are hereby overruled in their entirety and on their merits.

**1.    LSP Settlement**

89.    As set forth on the record at the Confirmation Hearing conducted on June 17, 2019, in full and final settlement and resolution of any and all claims and Causes of Action (x) the Debtors, the Committee, the Unsecured Claims Plan Administrator, or any Releasing Party could

assert against LSP[4] in any manner, and (y) LSP could assert against any Released Party (the "LSP Settlement"), LSP shall: (a) (i) withdraw its objections to confirmation of the Plan, (ii)  be and be deemed a Supporting 1.5L Noteholder, Supporting 1.75L Lender, Supporting Creditor (and, for the avoidance of doubt, be a Holder of and be deemed to Hold, as of the date of entry of this Confirmation Order, Allowed 1.5 Lien Notes Claims and Allowed 1.75 Lien Term Loan Facility Claims) and, solely with respect to any provisions of the Plan adversely affecting LSP in its individual capacity or its capacity as a Supporting 1.5L Noteholder or Supporting 1.75L Lender, a Required Party; (iii) be and be deemed a Releasing Party and a Released Party, and a beneficiary of the Third Party Release; and (iv) be deemed to effectuate the Intercreditor Assignment pursuant to the Plan, to waive any right to recover on account of any Claim under section 507(b) of the Bankruptcy Code, and to waive any Makewhole Claim on account of the 1.5 Lien Notes Claims or 1.75 Lien Term Loan Facility Claims held by LSP; and (b) seek and be deemed to seek dismissal with prejudice of Adversary Proceeding No. 18-03295 (Gen IV Investment Opportunities, LLC, et al. v. Fairfax Financial Holdings Limited, et al.); in consideration for which LSP shall receive, on the Initial Distribution Date, in addition to the distributions otherwise provided for under the Plan to LSP as a Holder of Allowed 1.5 Lien Notes Claims and Allowed 1.75 Lien Term Loan Facility Claims, one (1) percent of New Common Stock (allocated from the Settlement Contribution and thereby reducing the Unsecured Claims Consideration as described in paragraph 93 hereof) (the "LSP Settlement Amount"), and payment (which payment shall, for the avoidance

---

[4] "LSP" means, collectively, LSP Investment Advisors, LLC, Gen IV Investment Opportunities, LLC, VEGA Asset Partners, LLC, and any of their respective Affiliates that currently hold or have held Claims or Interests, in their capacity as 1.5 Lien Noteholder, 1.75 Lien Term Loan Lender, Holder of Unsecured Notes, Interest Holder, Required Party, Supporting Creditor or any other capacity.

of doubt, be made no later than the Effective Date) by the Debtors to, or as directed by, LSP of $4,125,000 in Cash on account of professional fees and expenses incurred by LSP.

90.     The condition precedent set forth in Article IX.B.8 to the Plan regarding the resolution of Causes of Action asserted, or that may be asserted, as a result of the transactions contemplated by the Plan by LSP, including, without limitation, those Causes of Action alleged pursuant to Adversary Proceeding No. 18-03295 (Gen IV Investment Opportunities, LLC, et al. v. Fairfax Financial Holdings Limited, et al.) against the Settling Lenders shall be and be deemed satisfied in accordance with the Plan.

**2.      Modifications Regarding Unsecured Claims Distribution Trust**

91.     In light of the fact that all Holders of 1.5 Lien Notes Claims and 1.75 Lien Term Loan Facility Claims as of the Distribution Record Date are Supporting Creditors, the Unsecured Claims Distribution Trust shall not be established, and there shall be no Unsecured Claims Distribution Trust Advisory Board, Unsecured Claims Distribution Trust Assets, Unsecured Claims Distribution Trust Beneficial Interests, Unsecured Claims Distribution Trust Documents, or Unsecured Claims Litigation Trustee, and no Challenge Actions, Challenge Action Recoveries, Challenge Resolution Stipulation, Contributed Unsecured Notes Action, Contributed Challenge Actions, Disputed 1.5 Lien Claims, Disputed 1.75 Lien Claims, Retained Challenge Actions, Secured Claim Challenges, or Secured Claim Challenge Resolution Date.  The Unsecured Claims Distribution Loan shall not be made, and there shall be no Settlement Contribution Hold-Back. The provisions of the Plan relating to these matters shall be of no force and effect.  The condition precedent set forth in Article IX.B.6 of the Plan regarding the issuance of the Unsecured Claims Distribution Loan, appointment of the Unsecured Claims Distribution Trust Advisory Board and creation of the Unsecured Claims Distribution Trust and vesting of Unsecured Claims Distribution Trust Assets shall be deemed waived in accordance with the Plan.  In light of the changed nature

35

of the Unsecured Claims Plan Administrator's duties from those originally contemplated, the identity of the Unsecured Claims Plan Administrator and its compensation, and the existence of the Unsecured Claims Plan Administrator Advisory Board may differ from that disclosed in the Plan Supplement, as determined by the Committee prior to the Effective Date.

92.     The Debtors shall provide $500,000 to the Unsecured Claims Plan Administrator (the "Unsecured Claims Plan Administrator Funding") to pay the fees and expenses thereof (including, if applicable, the Unsecured Claims Plan Administrator Advisory Board).  For the avoidance of doubt, neither the Debtors nor the Reorganized Debtors shall be responsible for paying any additional fees or expenses incurred by the Unsecured Claims Plan Administrator or the Unsecured Claims Plan Administrator Advisory Board.

93.     The Unsecured Claims Consideration shall be: (a) New Common Stock in the amount of (i) the Settlement Contribution,[5] minus (ii) the LSP Settlement Amount; (b) $1 million in Cash; and (c) the Unsecured Claims Plan Administrator Funding (if any) remaining after resolution of all Disputed Claims.

**B.      Findings of Fact and Conclusions of Law.**

94.     The findings of fact and the conclusions of law set forth in this Confirmation Order constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Confirmation Hearing in relation to Confirmation, including the Confirmation Ruling, are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such.

---

[5]     For the avoidance of doubt, "Settlement Contribution" means 11.1 percent of New Common Stock which the Settling Lenders are entitled to receive pursuant to the Plan as Holders of 1.5 Lien Notes Claims.

To the extent any finding of fact or conclusion of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Court at the Confirmation Hearing and incorporated herein) constitutes an order of this Court, it is adopted as such.

**C.     General Settlement of Claims and Interests.**

95.     Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of this Confirmation Order shall constitute the Court's approval of the compromise, settlement, and release of the Settled Actions as well as a finding by the Court that the settlement of the Settled Actions and the releases and indemnities provided to effectuate such settlement is in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests, and are fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors, or the Unsecured Claims Plan Administrator, as applicable, (in each case, in consultation with each other as provided in the Plan) may compromise and settle Claims against, and Interests in, the Debtors and their Estates, and Causes of Action against other Entities.

**3.     The Settlements.**

96.     The Settlements, as incorporated into the Plan and this Confirmation Order, and each component of the Settlements are hereby approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  The compromises and settlements embodied in the Settlements constitute a good faith compromise and settlement of all Claims and Interests and

controversies resolved pursuant to the Plan.  The Plan is deemed a motion to approve the good

faith compromise and settlement pursuant to which the Debtors, the Settling Lenders, and the D&O

Carriers settle all Claims, Interests, and Causes of Action pursuant to section 1123 of the

Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification,

distributions, releases, and other benefits provided under the Plan.

97.     This Confirmation Order constitutes the Court's approval of the compromise,

settlement, and release of all such Claims, Interests, and Causes of Action, as well as a finding by

the Court that all such compromises, settlements, and releases are in the best interests of the

Debtors, their Estates, and the Holders of Claims, Interests, and Causes of Action, and are fair,

equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 1123

of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order,

or approval of the Court, after the Effective Date, the Reorganized Debtors (or the Unsecured

Claims Plan Administrator, as applicable, pursuant to the Plan) may compromise and settle all

Claims and Causes of Action against, and Interests in, the Debtors and their Estates.   The

compromises, settlements, and releases described herein shall be deemed nonseverable from each

other and from all other terms of the Plan.  Subject to Article VI of the Plan, all distributions made

to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be

final.

**D.     The Releases, Injunction, Exculpation, and Related Provisions Under the Plan.**

98.     The following releases, injunctions, exculpations, and related provisions set forth

in Article VIII of the Plan are incorporated and expressly modified herein, are hereby approved

and authorized in all respects, are so ordered, and shall be immediately effective on the Effective

Date without further order or action on the part of this Court or any other party:

38

99.     In addition, the 1.5 Lien Notes Trustee and 1.75 Lien Agent shall be Released Parties and Releasing Parties.

**1.      Releases by the Debtors.**

100.    **Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates, from any and all claims and Causes of Action whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof, if applicable), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, the LSP Settlement, any intercompany transactions, the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the DIP Order (and any payments or transfers in connection therewith), the New Organizational Documents, any preference or avoidance claims pursuant to sections 544, 547, 548, or 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release,**

39

or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, with respect to the foregoing, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

101.    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the releases described herein are: (1) in exchange for the good and valuable consideration provided by or on behalf of the Released Parties; (2) a good faith settlement and compromise of the Settled Actions released herein; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and

opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, the Debtors' Estates, the Unsecured Claims Plan Administrator, or asserting any claim or Cause of Action released pursuant to the releases described herein or asserting (directly or indirectly) or trading any claim or Cause of Action released pursuant to the releases described herein against any Released Party at any time.

>    **2.**    **Releases by Holders of Claims and Interests.**

>    102.    **As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, the LSP Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract,**

instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, with respect to the foregoing, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

103.    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

**3.    Exculpation.**

104.    **Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated**

from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Mediation, the formulation, preparation, dissemination, negotiation, Filing, or termination of any prepetition transactions, the Disclosure Statement, the Plan, the Secured Lender Settlement, the D&O Settlement, the LSP Settlement, the D&O Liability Insurance Policies, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Filing of the Chapter 11 Cases, the negotiation, terms, or execution of the settlement agreements effectuated pursuant to Federal Rule of Bankruptcy Procedure 9019, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, with respect to the foregoing, except for claims related to any related act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to or in connection with the Plan and the Restructuring Transactions.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable

at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

4.      **Injunction.**

105.      **Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have Held, Hold, or may Hold Claims or Interests that have been released pursuant to Article VIII.C or Article VIII.D of the Plan, shall be discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Unsecured Claims Plan Administrator, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to**

applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

**5.      Release of D&O Carriers and D&O Liability Insurance Policies.**

106.      **Upon the Debtors' receipt of the D&O Proceeds in cleared funds, the parties to the D&O Settlement, on behalf of themselves, their predecessors, successors, affiliates and assigns, and all persons acting by, through or under them, and each of them, fully release and forever discharge the D&O Carriers, together with their predecessors, successors, affiliates, and assigns, and all persons acting by, through or under them, from all known and unknown claims, liabilities, obligations, promises, agreements, (including the D&O Liability Insurance Policies issued by the D&O Carriers), controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees and expenses (including attorneys' fees and costs), of any nature whatsoever, whether or not apparent or yet to be discovered, related to the Debtors; *provided* that nothing in this section releases (a) any party to the D&O Settlement from its obligations under the D&O Settlement; (b) any party to the D&O Settlement from its liability for breach of any term, warranty, or representation in the D&O Settlement; or (c) the D&O Carriers from payment of Defense Costs (as defined in and in accordance with the terms of the D&O Liability Insurance Policies issued by the D&O Carriers) incurred in connection with the D&O Settlement. The D&O Carriers' payment of the D&O Proceeds and any Defense Costs (as defined in the D&O Liability Insurance Policies issued by the D&O Carriers) is deemed to have exhausted the limits of the D&O Liability Insurance Policies issued by the D&O Carriers.  Moreover, upon the Debtors' receipt of the D&O Proceeds in cleared funds, the D&O Liability Insurance Policies issued by the D&O Carriers are immediately discharged and cancelled, and the D&O Carriers are**

immediately released from any and all obligations under the D&O Liability Insurance Policies issued by the D&O Carriers. Notwithstanding any language in the D&O Settlement or Plan, as of the Effective Date, no party may pursue or file any action that implicates the D&O Liability Insurance Policies issued by the D&O Carriers. For the avoidance of doubt, nothing in this paragraph shall affect the obligations of Beazley Insurance Company, Inc., Allied World National Assurance Company, and XL Specialty Insurance Company arising under Policy No. V15RVK170901, Policy No. 0310-0059, and Policy No. ELU148628-17 or the obligations of the Insurers not party to the D&O Settlement arising under the D&O Liability Insurance Policies issued by such Insurers. Coverage for all the Insureds by Beazley Insurance Company, Inc., Allied World National Assurance Company, and XL Specialty Insurance Company arising under Policy No. V15RVK170901, Policy No. 0310-0059, and Policy No. ELU148628-17 is expressly preserved.

> **6.   Bar Order and Channeling Injunction.**

107.   **Except as otherwise specifically provided in the Plan, the Enjoined Parties shall be permanently barred, restrained, and enjoined, with regard to the Claims set forth in Article VIII.H (1)-(6) of the Plan (collectively, the "Enjoined Claims") from ever:**

> i.   **commencing, asserting, continuing, filing, conducting, or bringing, directly, indirectly, or derivatively, any Claim, demand, suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum), against (a) any of the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors and their predecessors, affiliates, successors, principals, directors, officers, and related entities, and (b) the D&O Carriers with regard to any and all claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result**

of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' or any of the Released Parties' conduct, individually or collectively, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

ii.   asserting, continuing, filing, conducting, or bringing, directly, indirectly, or derivatively, any Claim, demand, suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum), against any of the Released Parties, or their respective property, including the proceeds of such property that would result in the avoidance of allegedly fraudulent (actual or constructive) or preferential transfers from the Debtors to any of the Released Parties, regardless of whether such Released Party is the initial or subsequent transferee, and/or recovery of such allegedly fraudulent (actual or constructive) or preferential transfers from such Released Party;

iii.   enforcing, levying, employing legal process (including proceedings supplementary), whether prejudgment or post-judgment, attaching, garnishing, sequestering, collecting, or otherwise recovering by any means or in any manner, any Claims against (a) the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors, and their predecessors, affiliates, successors, principals, directors, officers, and related entities; and (b) the D&O Carriers with regard to any and all Claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' conduct, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

iv.   pursuing, aiding, or abetting any action brought by any person or entity seeking recovery, contribution and/or indemnity from (a) any of the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors and their predecessors, affiliates, successors, principals, directors, officers, and related entities, and (b) the D&O Carriers with regard to any and all Claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or

breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' or the Released Parties' conduct, individually or collectively, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

v.   enforcing any terms set forth in any settlement agreement by and among any of the Released Parties and any of the Enjoined Parties that would resolve, compromise, or settle Claims that would otherwise be enjoined by the bar order or the channeling injunction set forth in this section; or

vi.   pursuing any of the Enjoined Claims recited herein as they relate to any Claims against retained professionals including accountants and legal counsel as well as their agents and assigns of any of the Released Parties.

108.   **The injunction described in this section and incorporated into this Confirmation Order shall be referred to as the "Bar Order and Channeling Injunction."**

109.   The automatic stay shall be lifted, to the extent it may be applicable, to permit the D&O Carriers to contribute the D&O Proceeds.

110.   The Court shall expressly retain jurisdiction in enforcing, implementing and interpreting the scope of the Bar Order and Channeling Injunction.

111.   Notwithstanding anything to the contrary in the foregoing or the Plan, the Releasing Parties shall only include those parties to whom the Debtors provided (or attempted to provide) notice of the Third Party Release and opportunity to opt out of the Third Party Release.  The Court shall retain exclusive jurisdiction for determining whether any Releasing Party received constitutionally sufficient notice of the Third Party Release and opportunity to opt out of the Third Party Release.

112.   The Court shall retain exclusive jurisdiction for determining whether any claim or Cause of Action relating to an act or omission that is alleged to have constituted gross negligence, willful misconduct, or actual fraud may proceed notwithstanding Article VIII of the Plan. Notwithstanding the carve-out from the exculpation provision for gross negligence, willful

misconduct, or actual fraud, no person may assert any lawsuit or Cause of Action (including a lawsuit or Cause of Action for gross negligence, willful misconduct, or actual fraud) against any party that is released under this Order without obtaining prior authorization from the Court to assert such a claim, which authorization shall be sought by a motion, subject to notice and hearing.  At any such hearing, the movant must prove by a preponderance of the evidence that such claim is a bona fide claim and conforms with the exceptions to the release provisions in this Order.

**E.      Preservation of Causes of Action.**

113.    In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action belonging to the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations set forth in Article VIII of the Plan and this Confirmation Order, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.[6]

114.    The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the applicable Reorganized Debtor(s).  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that

---

[6]    For the avoidance of doubt, the Retained Causes of Action shall be subject to the Enterprise Settlement Agreement and the *Order (I) Authorizing and Approving the Settlement By and Among the Debtors, the Enterprise Entities, the Bluescape Entities, and the Committee, and (II) Granting Related Relief* [Docket No. 1853], which order controls in the event of a conflict or inconsistency with the terms of the Plan, Plan Supplement, or this Confirmation Order.

the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan or this Confirmation Order.  Unless any Cause of Action of the Debtors against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Debtors and the Reorganized Debtors expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

115.    The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor except as otherwise provided in the Plan, including Article VIII of the Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, otherwise liquidate, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Court.

**F.      Post-Confirmation Notices, Professional Compensation, and Bar Dates.**

116.    In accordance with Bankruptcy Rules 2002 and 3020(c), no later than seven (7) Business Days after the Effective Date of the Plan, the Reorganized Debtors must cause notice of Confirmation and occurrence of such Effective Date (the "Notice of Effective Date") to be served by United States mail, first-class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; *provided* that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.

117.    To supplement the notice procedures described in the preceding sentence, no later than ten (10) Business Days after the Effective Date, the Reorganized Debtors must cause the Notice of Effective Date, modified for publication, to be published on one occasion in the *Wall Street Journal* (national edition).  Mailing and publication of the Notice of Effective Date in the time and manner set forth in this paragraph will be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c).  No further notice is necessary.

118.    The Notice of Effective Date will have the effect of an order of the Court, will constitute sufficient notice of the entry of this Confirmation Order to filing and recording officers, and will be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

119.    All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through the

Confirmation Date, must be Filed and served on the Reorganized Debtors no later than sixty (60) days after the Effective Date.  All such final requests will be subject to approval by the Court after notice to other parties on the regular service list and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, including the Interim Compensation Order, and once approved by the Court, promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.

120.    On the Effective Date, the Debtors or Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors, as applicable.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors, without any further action or order of the Court.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be paid by the Debtors or the Reorganized Debtors, as applicable.

121.    Professionals shall estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than five (5) business days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and

expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total amount estimated pursuant to this section shall comprise the Professional Fee Reserve Amount.

122.    Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

123.    Except as otherwise provided in the Plan, requests for payment of General Administrative Claims (other than Claims arising under section 503(b)(9) of the Bankruptcy Code, Professional Fee Claims, and those that accrued in the ordinary course of the Debtors' business against any of the Debtors) must be Filed no later than the first Business Day that is thirty (30) days following the Effective Date.  Holders of General Administrative Claims that are required to, but do not, File and serve a request for payment of such General Administrative Claims against the Debtors by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Claims against the Debtors, the Reorganized Debtors, or their respective property, and such General Administrative Claims will be deemed forever discharged and released as of the Effective Date.  Objections to such requests, if any, must be Filed and served no later than 60 days from the Administrative Claims Bar Date.

**G.      Notice of Subsequent Pleadings.**

124.    Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in the Chapter 11 Cases after the Effective Date will be limited to the following parties:  (a) the U.S. Trustee; (b) the Reorganized Debtors and their counsel; and (c) any party known to be directly affected by the relief sought by such pleadings.

**H.      Retention of Jurisdiction.**

125.    Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, this Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, the matters set forth in Article XI of the Plan, and other applicable provisions of the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the extent provided under applicable law.

**I.      Reports.**

126.    After the Effective Date of the Plan, the Debtors have no obligation to file with the Court or serve on any parties reports that the Debtors were obligated to file under the Bankruptcy Code or a Court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before such Effective Date), ordinary course professional reports, and monthly or quarterly reports for Professionals; *provided, however,* that the Debtors will comply with the U.S. Trustee's quarterly reporting requirements.  From Confirmation through the Effective Date of the Plan, the Debtors will file such reports as are required under the Bankruptcy Local Rules.

**J.      Effectiveness of All Actions.**

127.    Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, before, or after the Effective Date of the Plan, and pursuant to this Confirmation Order, without further application to, or order of the Court, or further action by the

Debtors and/or the Reorganized Debtors and their respective directors, officers, members, or stockholders, and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders.

**K.  Approval of Consents and Authorization to Take Acts Necessary to Implement the Plan.**

128.    This Confirmation Order shall constitute all authority, approvals, and consents required, if any, by the laws, rules, and regulations of any states, federal, and any other governmental authority with respect to the implementation or consummation of the Plan and any certifications, mortgages, documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and any certifications, mortgages, documents, instruments, securities, or agreements, and any amendments or modifications thereto.

**L.  Plan Implementation Authorization.**

129.    The Debtors or the Reorganized Debtors, as the case may be, and their respective directors, officers, members, agents, and attorneys, financial advisors, restructuring advisors, and investment bankers are authorized and empowered from and after the date hereof to negotiate, execute, issue, deliver, implement, file, or record any contract, instrument, mortgage, release, assumption and assignment, or other agreement or document related to the Plan, as the same may be modified, amended, and supplemented, and to take any action necessary or appropriate to implement, effectuate, consummate, or further evidence the Plan in accordance with their terms, or take any or all corporate actions authorized to be taken pursuant to the Plan, whether or not specifically referred to in the Plan or any exhibit thereto, without further order of the Court.  To the extent applicable, any or all such documents shall be accepted upon presentment by each of the respective state filing offices and recorded in accordance with applicable state law and shall

become effective in accordance with their terms and the provisions of state law.  Pursuant to section 10.301 of the Business Organizations Code of the State of Texas and any comparable provision of the business corporation laws of any other state, as applicable, no action of the Debtors' boards of directors or the Reorganized Board will be required to authorize the Debtors or Reorganized Debtors, as applicable, to enter into, execute and deliver, adopt or amend, as the case may be, any such contract, instrument, mortgage, release, assumption and assignment, or other agreement or document related to the Plan, and following the Effective Date, each of the documents for the Plan will be a legal, valid, and binding obligation of the Debtors or Reorganized Debtors, as applicable, enforceable against the Debtors and the Reorganized Debtors in accordance with the respective terms thereof.  Consistent with the Plan, the Debtors may also take additional steps on the Effective Date to consolidate and streamline their organization, including, among other things, the creation of new subsidiaries, or the merger, liquidation, or consolidation of one or more of the Debtors, including, but not limited to, EXCO Resources, Inc., EXCO GP Partners Old, LP, EXCO Holding (PA), Inc., EXCO Holding MLP, Inc., EXCO Land Company, LLC, EXCO Midcontinent MLP, LLC, EXCO Operating Company, LP, EXCO Partners GP, LLC, EXCO Partners OLP GP, LLC, EXCO Production Company (PA), LLC, EXCO Production Company (WV), LLC, EXCO Resources (XA), LLC, EXCO Services, Inc., Raider Marketing GP, LLC, and Raider Marketing, LP.

**M.    Restructuring Transactions.**

130.    On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, in consultation with the Required Parties, will effectuate the Restructuring Transactions, and will take any actions as may be necessary or advisable to effect a corporate restructuring of their respective business.  The actions to implement the Restructuring Transactions may include, as applicable, and without limitation:  (1) the execution and delivery of appropriate agreements or

other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, if applicable, the formation of any entity or entities that will constitute, in whole or in part, the Reorganized Debtors; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable state law; (4) the execution and delivery of the New Organizational Documents; (5) the execution and delivery of the Exit RBL Facility Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors, as applicable), subject to any post-closing execution and delivery periods provided for in the Exit RBL Facility Documents; (6) the issuance of the New Common Stock as set forth in the Plan and this Confirmation Order; and (7) all other actions that the applicable Entities determine to be necessary or advisable, including making filings or recordings that may be required by law in connection with the Plan.

131.    This Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**N.      Approval of Exit RBL Facility.**

132.    On the Effective Date, the Reorganized Debtors shall enter into the Exit RBL Facility, the terms of which will be set forth in the Exit RBL Facility Documents.  The terms of the Exit RBL Facility are fair and reasonable, and the Exit RBL Facility was negotiated in good faith and at arm's-length by the Debtors and the agent under the Exit RBL Facility.  This Confirmation Order constitutes approval of the Exit RBL Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors are hereby authorized to execute and deliver those documents necessary or appropriate to obtain the Exit RBL Facility, including any and all documents required to enter into the Exit RBL Facility and all collateral documents related thereto, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate entry into the Exit RBL Facility.

**O.      Binding Effect.**

133.    On the Effective Date, except as otherwise provided herein to the contrary, and effective as of the Effective Date, the Plan will bind, and will be deemed binding upon, all Holders of Claims against and Interests in the Debtors, and such Holder's respective successors and assigns, to the maximum extent permissible by law, notwithstanding whether or not such Holder (a) will receive any property or interest in property under the Plan, or (b) has filed a Proof of Claim or Interest in the Chapter 11 Cases, or (c) failed to vote to accept or reject the Plan or affirmatively voted to reject the Plan.

**P.      Continued Corporate Existence**

134.      Except as otherwise provided in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan, the Plan Supplement, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan or Plan Supplement and require no further action or approval (other than any requisite filings required under applicable state or federal law).

**Q.      Vesting of Assets in the Reorganized Debtors.**

135.      Except as otherwise provided in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each applicable Reorganized Debtor free and clear of all Liens, Claims, charges, Interests, or other encumbrances other than those specifically granted pursuant to the Plan or the Confirmation Order.  Except as otherwise provided in the Plan, on and after the Effective Date, each of the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**R.    Directors and Officers of Reorganized Debtors.**

136.    Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors have, to the extent reasonably practicable and known, disclosed in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the Reorganized Board.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer has also been disclosed to the extent reasonably practicable.  Each such director and officer shall serve from and after the Effective Date of the Plan pursuant to the terms of the New Organizational Documents for the Reorganized Debtors, as applicable, and other constituent documents of the Reorganized Debtors.

**S.    Employee Obligations.**

137.    Except as otherwise provided in the Plan or the Plan Supplement, the Reorganized Debtors shall honor the Debtors' written contracts, agreements, policies, programs, plans, and Insurance Policies for, among other things, compensation, reimbursement, indemnity, health care benefits, disability benefits, vacation and sick leave benefits, workers' compensation claims, savings, severance benefits, including in the event of a change of control, retirement benefits, welfare benefits, relocation programs, certain grandfathered benefits, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time (including any compensation programs approved by the Court); *provided* that the consummation of the transactions contemplated herein shall not constitute a "change in control" with respect to any of the foregoing arrangements.  To the extent that the above-listed written contracts, agreements, policies, programs, plans, and Insurance Policies are Executory Contracts, pursuant to sections 365

and 1123 of the Bankruptcy Code, each of them will be deemed assumed as of the Effective Date and assigned to the Reorganized Debtors.

**T.    Ownership and Control.**

138.    The consummation of the Plan shall not constitute a change in ownership or change in control, as such terms are used in any statute, regulation, contract, or agreement, including, but not limited to, any assumption, assumption and assignment, insurance agreement, mortgage, letter of credit, or hedging arrangement, in effect on the Effective Date and to which any Debtor is a party or under any applicable law of any unit of government.[7]

**U.    Cooperation.**

139.    Upon the Effective Date, the Reorganized Debtors and the Unsecured Claims Plan Administrator agree to reasonably cooperate with respect to resolution of Disputed Claims as set forth in the Plan and Plan Supplement.  Such cooperation shall include, but is not limited to (i) providing access to documents; (ii) providing access to employees and, as applicable, former employees to be interviewed, and prepared as a deposition or trial witness; (iii) causing witnesses to appear at a deposition or trial; and (iv) retaining all books, records and other documents relating to any applicable Disputed Claims; *provided that* in each case, the Unsecured Claims Plan Administrator shall use best efforts to minimize disruption to the Reorganized Debtors and their employees; *provided further that* in each case, the Unsecured Claims Plan Administrator shall direct all requests to, and shall not contact employees without the consent of, the general counsel of the Reorganized Debtor(s).

---

[7]    For the avoidance of doubt, the provisions of this Confirmation Order relating to the reservation of rights with Seitel, GPI, and GX (each as defined herein) shall control.

**V.     Indemnification of the Settling Lenders and Supporting 1.5 Lien Noteholders.**

140.     The Debtors and the Reorganized Debtors, pursuant to the Secured Lender Settlement and the settlements embodied in the Plan, shall (a) indemnify and hold harmless the Settling Lenders and Supporting 1.5 Lien Noteholders from and against any expense, damage or liability arising from any Cause of Action brought by any person or Entity against the Settling Lenders relating to the Debtors, the Plan (including the implementation of the Plan), or the Restructuring Transactions, that, in each case, has arisen or may arise through and including the Effective Date (including any Cause of Action that arises in connection with events occurring prior to the Effective Date), and (b) promptly advance to the Settling Lenders and Supporting 1.5 Lien Noteholders their respective defense costs and expenses related to any such Cause of Action or any Claim, in each case (i) brought against them in any case, hearing, procedure or proceeding of any kind, (ii) threatened against them by any person or Entity, or (iii) brought against a third party and that requires the discovery of the Settling Lenders or Supporting 1.5 Lien Noteholders or reasonably requires any other intervention or involvement by the Settling Lenders or Supporting 1.5 Lien Noteholders therein.  This indemnification shall be enforceable regardless of whether any person (including the person from whom indemnification is sought) alleges or proves: (a) the sole, concurrent, contributory, or comparative negligence (whether such negligence is simple or gross) or fault of the person seeking indemnification or (b) the sole or concurrent strict liability imposed upon the person seeking indemnification.

**W.     Release of Liens.**

141.     Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date of the Plan,

except with regard to Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.2(b) of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns (including Reorganized EXCO, if applicable), in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable.

**X.       Disputed and Contingent Claims Reserves.**

142.    If an objection to a Claim or portion thereof is filed as set forth in Article VII.F of the Plan, no payment or distribution provided under the Plan shall be made on account of such Disputed Claim or a portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

143.    On or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall establish one or more reserves for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the applicable Debtors or Reorganized Debtors, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim.  To the extent that a Disputed Claim may be entitled to receive New Common Stock pursuant to the Plan, such New Common Stock will remain authorized but unissued pending resolution of such Disputed Claim.

144.    Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  As such, such assets will be subject to entity-level taxation, and the Debtors and Reorganized Debtors shall be required to comply with the relevant rules.

**Y.      Claims Reconciliation Process.**

145.    After the Effective Date, (a)(i) the Unsecured Claims Plan Administrator or the applicable Reorganized Debtor, as designated in the Claims Objection Schedule, shall have the sole authority to File, withdraw, or litigate to judgment, objections to Claims in Class 7; and (ii) the applicable Reorganized Debtor(s) shall have the sole authority to File, withdraw, or litigate to judgment, objections to all other Claims; (b) the applicable Reorganized Debtor(s) or the Unsecured Claims Plan Administrator, as applicable, shall have the authority to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c)  the applicable Reorganized Debtor(s) or the Unsecured Claims Plan Administrator, as applicable, shall have the authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

**Z.      Injunctions and Automatic Stay.**

146.    Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

**AA.    Cancellation of Existing Securities and Agreements.**

147.    Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, indentures, mortgages, security documents, and other documents evidencing Claims or Interests, including Other Secured Claims, 1.5 Lien Notes Claims, 1.75 Lien Term Loan Facility Claims, Second Lien Term Loan Facility Claims, Unsecured

Notes Claims, and Interests in EXCO, shall be deemed canceled, surrendered, and discharged without any need for further action or approval of the Court or any Holder or other person and the obligations of the Debtors or Reorganized Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged, and the Indenture Trustees and the Administrative Agents shall be released from all duties thereunder; *provided,* that notwithstanding Confirmation or Consummation, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of:  (a) allowing Holders to receive distributions under the Plan; (b) naming any Indenture Trustee or Administrative Agent, solely in their capacity as such, in any Cause of Action not being released under the Plan; (c) allowing the Indenture Trustees and the Administrative Agents to enforce their rights, claims, and interests vis-à-vis any parties other than the Debtors; (d) allowing the Indenture Trustees and the Administrative Agents to make the distributions in accordance with the Plan (if any), as applicable; (e) preserving any rights of the Indenture Trustees and the Administrative Agents to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant indenture or the relevant credit agreement, including any rights to priority of payment and/or to exercise charging liens; (f) allowing the Indenture Trustees and the Administrative Agents to enforce any obligations owed to each of them under the Plan; (g) allowing the Indenture Trustees and the Administrative Agents to exercise rights and obligations relating to the interests of the Holders under the relevant indentures and credit agreements; (h) allowing the Indenture Trustees and the Administrative Agents to appear in the Chapter 11 Cases or in any proceeding in the Court or any other court, including, but not limited, to enforce the respective obligations owed to such parties under the Plan; and (i) permitting the Indenture Trustees and the Administrative Agents to perform any functions that are necessary to

effectuate the foregoing; *provided, still further,* that except as provided in the Plan or the Confirmation Order, the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, as applicable, or result in any expense or liability to the Debtors or the Reorganized Debtors, as applicable; *and further*, that except as set forth in the Plan, after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall not be obligated to pay any fees or expenses under the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, or the Second Lien Credit Agreement, and all related Claims shall be released and discharged consistent with Article VIII of the Plan, including any claim for diminution in value of collateral as of the Effective Date; *provided that*, the Reorganized Debtors shall pay in Cash all reasonable and documented fees and expenses incurred after the Effective Date by the Indenture Trustees and the Administrative Agents (including the reasonable and documented fees and expenses of their advisors), or amounts attributable to losses or damages, with respect to the Debtors, the Reorganized Debtors, or the Plan pursuant to the Plan and in accordance with Article IV.S of the Plan.

## BB.   Cooperation by the DTC.

148.    The DTC, and any participants and intermediaries, shall fully cooperate and facilitate distributions, as applicable, pursuant to the Plan, including to Holders of Claims in Classes 3 and 6 of the Plan.

## CC.   Securities Law Exemption.

149.    The New Common Stock are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

150.    All shares of the New Common Stock issued pursuant to the Plan will be issued in reliance upon section 1145 of the Bankruptcy Code.

151.    Pursuant to section 1145 of the Bankruptcy Code, the issuance of (a) the New Common Stock, and (b) any other securities issued in reliance on section 1145 of the Bankruptcy Code, are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities.  Each of the foregoing securities (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any initial recipient thereof that (i) at the time of transfer, is not an "affiliate" of the Reorganized EXCO as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (ii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

152.    Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock under applicable securities laws.

153.    DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the New Common Stock issuable pursuant to the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

154.    Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock issuable pursuant to the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

**DD.    Section 1146 Exemption.**

155.    Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including: (1) the Restructuring Transactions; (2) the Exit RBL Facility; (3) the issuance of the New Common Stock, including with regard to the Management Incentive Plan; (4) the transfer, if any, of the Debtors' assets to the Reorganized Debtors; (5) the assignment or surrender of any lease or sublease; and (6) the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer, mortgage recording tax, or other similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers or property without the payment of any such tax, recordation fee, or governmental assessment.

**EE.    Payment of Certain Fees.**

156.    Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors, or the Reorganized Debtors, as applicable, shall pay on the Effective Date any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, accountants, and other professionals, advisors, and consultants: (a) payable under the Exit RBL Facility Documents; (b) payable under the DIP Order (which fees and expenses shall be paid pursuant to the terms of the DIP Order); (c) of the Settling Lenders; (d) of the Supporting 1.5L Noteholders (in accordance with the respective Supporting Creditor Joinder of such Supporting 1.5L Noteholder or this Confirmation Order); (e) of the Supporting 2L Lenders

(in accordance with the respective Supporting Creditor Joinder of such Supporting 2L Lender); (f) of Cross Sound, the Unsecured Notes Trustee, and Reme, LLC, each of whom is a member of the Committee; and (g) of the Indenture Trustees and the Administrative Agents.

157.    The Indenture Trustees and the Administrative Agents requesting payment of fees and expenses pursuant to the Plan shall provide reasonably detailed invoices to the Debtors or Reorganized Debtors, as applicable.  If any of the Debtors or the Reorganized Debtors, as applicable, dispute any of the requested Indenture Trustees' or Administrative Agents' fees and expenses, the Debtors or Reorganized Debtors, as applicable, shall (i) pay the undisputed portion of such Indenture Trustee's or Administrative Agent's fees and expenses, and (ii) notify such Indenture Trustee of such dispute within five (5) days after presentment of the invoices by the Indenture Trustees or the Administrative Agents.  Upon such notification, such Indenture Trustee or Administrative Agent may submit such dispute for resolution by the Bankruptcy Court.

**FF.    Nonseverability of Plan Provisions upon Confirmation.**

158.    Each term and provision of each of the Plan as it heretofore may have been altered or interpreted by the Court in accordance with the Plan and as modified by this Confirmation Order is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors', the Reorganized Debtors' consent; and (3) nonseverable and mutually dependent.

**GG.    Waiver or Estoppel.**

159.    Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

HH.    **Authorization to Consummate.**

160.    The Debtors and the Reorganized Debtors, as applicable, are authorized to consummate the Plan, including the transactions contemplated by the Exit RBL Facility Documents, the Settlements, and any other contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan at any time after the entry of this Confirmation Order, subject to satisfaction or waiver (by the Required Parties) of the conditions precedent to Consummation set forth in Article IX of the Plan.   The substantial consummation of the Plan, within the meaning of sections 1101(2) and 1127 of the Bankruptcy Code, is deemed to occur on the first date, on or after the Effective Date of the Plan, on which distributions are made in accordance with the terms of the Plan to Holders of any Allowed Claims against the Debtors.

II.    **Assumption and Cure of Executory Contracts.**

161.    The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article V of the Plan (including the procedures regarding the resolution of any and all disputes concerning the assumption or rejection, as applicable, of such Executory Contracts and Unexpired Leases) shall be, and hereby are, approved in their entirety.   For the avoidance of doubt, on the Effective Date, except as otherwise provided in the Plan or this Confirmation Order, any Executory Contract or Unexpired Lease of the Debtors will be deemed to be an Assumed Executory Contract or Unexpired Lease in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that:   (1) previously were assumed, assumed and assigned, or rejected by the Debtors; (2) are identified on the Rejected Executory Contract and Unexpired Lease List; (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation

Date; or (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

162.    This Confirmation Order constitutes approval of such assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Rejected Executory Contract and Unexpired Lease List, or the Assumed Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Court, which has not been assigned to a third party before the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the Plan or any order of the Court authorizing and providing for its assumption or rejection under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List and the Assumed Executory Contract and Unexpired Lease List at any time through and including thirty (30) days after the Effective Date.

163.    Any objection by a contract or lease counterparty to a proposed assumption of an Executory Contract or Unexpired Lease or the related cure cost (including as set forth on the Assumed Executory Contract or Unexpired Lease List) must be Filed, served, and actually received by the Debtors in accordance with the Disclosure Statement Order or other applicable Final Order of the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have

consented to such assumption or proposed cure amount.  For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.

164.    For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, may add any Executory Contract or Unexpired Lease proposed to be assumed to the Rejected Executory Contracts and Unexpired Lease List in accordance with the time limits provided by the Plan for any reason, including if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable cure notice or the Plan, in which case such Executory Contract or Unexpired Lease is deemed rejected as the Effective Date.

165.    Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption.  Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed Disallowed, without further notice to or action, order, or approval of the Bankruptcy Court.

166.    Except as provided in this Confirmation Order, any disputed Cure Costs shall be determined in accordance with the procedures set forth in Article V.C of the Plan, and applicable bankruptcy and nonbankruptcy law.

**JJ.    Preservation of Mineral Interests.**

167.    All Mineral Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Mineral Interests, and no Mineral Interests shall be compromised or discharged by the Plan. For the avoidance of doubt and notwithstanding anything to the contrary in the preceding sentence, any prepetition or pre-Effective Date right to payment asserted by a Holder of a Mineral Interest pursuant to such Mineral Interest shall be treated as a Claim under the Plan and shall be treated in accordance therewith (including, for the avoidance of doubt, by discharge or cure, if applicable). Notwithstanding anything to the contrary in the Plan or this Confirmation Order, this Confirmation Order shall not be, and shall not be construed as, a liquidation, determination, allowance, or classification of any right to payment asserted by a Holder of a Mineral Interest on account of any prepetition or pre-Effective Date entitlement as a result of any such Mineral Interest.

**KK.    Provisions Regarding Certain Governmental Unit Liabilities.**

168.    Notwithstanding anything in this Plan or any Order Confirming the Plan to the contrary, nothing in the Plan or Order Confirming the Plan or related documents discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit first arising on or after the Confirmation Date; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property but only to the extent first arising after the Confirmation Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors or Reorganized Debtors.  Nor shall anything in this Plan or any Order Confirming the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

169.     Further, nothing in this Plan or any Order Confirming the Plan or related documents authorizes the transfer or assignment of any Texas governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law, except as provided in 11 U.S.C. § 525.  Nothing in this Plan or any Order Confirming the Plan shall relieve any entity from any obligation to address or comply with any non-discriminatory information requests or inquiries from any Texas Governmental Unit.  Nothing in this Plan or any Order Confirming the Plan shall affect any setoff or recoupment rights of any Texas Governmental Unit.  Nothing in this Plan or any Order Confirming the Plan divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Plan or any Order Confirming the Plan or to adjudicate any defense asserted under this Plan or any Order Confirming the Plan.

## LL.     Provisions Regarding SEC.

170.     Nothing in the Plan or this Confirmation Order (i) releases any non-Debtor Entity from any claim or Cause of Action of the SEC; or (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any claims, Causes of Action, proceedings or investigations against any non-Debtor Entity in any forum.

## MM.   Provisions Regarding the United States Department of the Interior.

171.     Notwithstanding any provision to the contrary in the Plan, this Order, and any implementing Plan documents (collectively for purposes of paragraphs 171 through 175 of this Confirmation Order, "Plan Documents"), nothing shall:  (i) cause the United States to be a Releasing Party under the Plan or affect the ability of the United States to assert or enforce any claim, interest or cause of action against any non-debtor to the extent allowed by non-bankruptcy law; (ii) affect the rights of the United States of America, inclusive of its agencies and sub-agencies

74

(the "United States") to assert setoff and recoupment and such rights are expressly preserved; (iii) be construed as a compromise or settlement of any claim, interest or cause of action of the United States; (iv) affect the United States' police and regulatory powers; (v) be deemed to alter the actual distribution dates of Disputed Claims that become Allowed Claims or affect the entitlement of the United States to the payment of interest on its Allowed Claims (if applicable); or (vi) be deemed to authorize the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law.

172.    Without limiting the foregoing, for the avoidance of doubt, nothing in the Disclosure Statement, this Order, or Plan Documents (i) shall be interpreted to require the United States to novate, approve, or otherwise consent to the assumption, assignment or transfer of any interests in contracts, mineral leases, covenants, operating rights agreements, rights-of-use and easements, and rights-of-way or other interests or agreements with the federal government; or which are administered by the federal government on behalf of federally-recognized Indian tribes or Indian individuals; or held by such Indian landowners in fee with federal restriction on alienation (collectively, the "Federal Leases"); (ii) shall be interpreted to set cure amounts for the Federal Leases, or require the United States to novate or otherwise consent to the sale, assignment, and/or transfer of any interests in the Federal Leases; (iii) is intended to release Debtors or Reorganized Debtors from any reclamation, plugging and abandonment, or other operational requirements under applicable Federal law; (iv) is intended to impair audit rights; (v) is intended to address or otherwise affect any plugging and abandonment, reclamation, or decommissioning obligations and financial assurance requirements relating to the Federal Leases, as determined by

the United States Department if the Interior ("DOI"), that must be met by the Debtors, the Reorganized Debtors, or their successors and assigns on the Federal Leases going forward; or (vi) is intended to or shall release, nullify, preclude, or enjoin the enforcement of any police or regulatory liability to the United States that any entity would be subject to as the owner or operator of property after the date of entry of this Order.  Moreover, nothing in this Order or the Plan Documents enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.  Nothing in this Order, in any prior orders entered in these bankruptcy proceedings, or the Plan Documents divests any tribunal of any jurisdiction it may have under applicable non-bankruptcy law to interpret this Order or the Plan Documents.

173.    Notwithstanding any other provision in this Order or Plan Documents, no assumption and assignment and/or transfer of any interests in the Federal Leases shall take effect absent the prior consent of the United States.  For the avoidance of doubt, in order to obtain the consent of the United States to the assumption, sale, assignment and/or transfer of any interests in a Federal Lease, all existing defaults under such Federal Lease must be cured, including, without limitation, payment in full of any outstanding rents or pre-petition and post-petition royalties known to date as determined by the Office of Natural Resources Revenue ("ONRR"), plus any accrued and unpaid interest or late payment charges.  Any amounts owed to the United States of America by the Debtors or the Reorganized Debtors under any Federal Leases shall be paid in full when due in the ordinary course.  Nothing in this Order or Plan Documents shall be interpreted to set cure amounts or require the United States to approve of the assumption and/or assignment of any interests in the Federal Leases except pursuant to existing regulatory requirements and applicable law; *provided, however*, that on the Effective Date the Debtors (including the

Reorganized Debtors, if applicable) will pay to ONRR any and all rents and royalties known to date as owing on such Federal Leases plus accrued interest or late payment charges at the rate established at 30 C.F.R. § 1218.54 (collectively, the "ONRR Payments").  For the avoidance of any doubt, the payment of an ONRR Payment, or any other payment that may be made in connection with the assumption and assignment of any of the Debtors' interests in the Federal Leases, shall not release any monetary or non-monetary obligations that are owing by either the Debtors or the Reorganized Debtors or their assignee(s) and/or transferee(s) under applicable laws and regulations other than with respect to the specific monetary obligation being paid.  Acceptance of the ONRR Payments is without prejudice to the rights of the United States to make additional demands for payment after an audit and/or compliance review as set forth in paragraph 175 below.

174.    Notwithstanding any other provision herein, DOI, and/or its respective delegees, will have and retain the right to audit and/or perform any compliance review related to the Federal Leases, and if appropriate, collect from, the Debtors, the Reorganized Debtors and/or their successors and assigns any additional monies owing under the Federal Leases and any additional monies that were owed by the Debtors prior to the assumption and/or assignment of the Federal Leases, including any amounts determined by ONRR to be owed by the Debtors for pre- and post-petition royalties, including interest accrual through the date(s) of receipt by ONRR of payments on account of any such amount(s).  The Debtors and the Reorganized Debtors and their successors and assigns, will retain all defenses and/or rights, other than defenses and/or rights arising from the Chapter 11 Cases, to challenge any such determination by ONRR relating to the Federal Leases; *provided, however*, that any such challenge, including any challenge associated with the Chapter 11 Cases, must be raised in the United States' administrative review process and/or subsequent appeal under applicable law leading to a final agency determination by the DOI.  The

audit and/or compliance review period shall remain open for the full statute of limitations period established by applicable law.

175.    In addition, nothing in this Order, in any prior orders entered in these bankruptcy proceedings, or Plan Documents, addresses or shall otherwise affect any decommissioning obligations and financial assurance requirements under the Federal Leases, as determined by the United States that must be met by the Debtors, the Reorganized Debtors, or their successors and assigns on the Federal Leases going forward.  For the avoidance of doubt, nothing in this Order, in any prior orders entered in the Chapter 11 Cases, or Plan Documents, releases, nullifies, limits, waives or precludes or enjoins the enforcement of, any plugging and abandonment or reclamation obligation or financial assurance requirements under applicable statutes, regulations or the terms of the Federal Leases, as determined by the DOI for which the Debtors or the Reorganized Debtors and any of their successors and/or assigns, shall be jointly and severally liable.  Nor shall anything in this Order, in any prior orders entered in the Chapter 11 Cases, or Plan Documents nullify the United States' right to assert, against Debtors and their Estates, or the Reorganized Debtors, applicable, any decommissioning liability and/or claim arising from the Debtors' interest in any Federal Lease not assumed by the Debtors.  Further, nothing in this Order, in any prior orders entered in the Chapter 11 Cases, or Plan Documents prohibits or limits the United States' right to draw on any surety bond issued to support the Debtors' obligations under the Federal Leases.  All parties, including the Debtors and the Reorganized Debtors and any and all assignees and transferees of the Debtors, reserve all rights and defenses thereto with respect to such bonds, and the United States' rights to offset or recoup any amounts due under, or relating to any Federal Leases (if any), are expressly preserved, as are the Debtors' and the Reorganized Debtors' defenses and rights thereto.  The assignment of any interest in any Federal Lease shall be filed in the proper

DOI Bureau of Land Management ("BLM") or DOI Bureau of Indian Affairs ("BIA") office and will be ineffective unless the United States consents to the assignment.

**NN.    Provisions Regarding Burk, Kimbell, True Oil, and Long Petroleum.**

176.    Notwithstanding anything to the contrary in either the Plan or this Confirmation Order, including the provisions relating to cure claims relating to any Assumed Executory Contract or Unexpired Lease to which any of the Louisiana Counterparties (defined below) are listed as a counterparty, the terms of this paragraph shall apply to Long Petroleum, L.L.C., Bienville Investments LLC, Alpha Collections, LP, David G. Benscoter, Flamingo Enterprises, LLC, Simeon K. Horton, Kevin O. Long, J. Baker Barr, Karen Toppett, and MOBL Mineral & Royalty, L.C.C., (each a "Long Counterparty" and, collectively, the "Long Counterparties"), and to Burk Royalty Co., Ltd., Kimbell Family Resources, and True Oil LLC (each a "TBK Counterparty" and, collectively the "TBK Counterparties," and with the Long Counterparties, the "Louisiana Counterparties"). The Debtors or the Reorganized Debtors, as applicable, and the Louisiana Counterparties shall endeavor in good faith to reach agreement as to all disputes between and among the Debtors and the Louisiana Counterparties at issue in prepetition litigation against the Debtors captioned as: (a) *Long Petroleum, L.L.C. v. EXCO Operating Company, LP, et al.* (Suit No. 75911) 42nd Judicial District Court, Parish of Desoto, State of Louisiana, and (b) *Kevin O. Long, et al. v. EXCO Operating Co., et al.* (Suit No. 76034), 42nd Judicial District Court, Parish of Desoto, State of Louisiana (together, the "Long Louisiana Litigation") following the Effective Date. If the Reorganized Debtors and the Long Counterparties or Debtors and the TBK Counterparties fail to resolve consensually the Long Louisiana Litigation within ninety (90) days following the Effective Date, either the Reorganized Debtors, the Long Counterparties or the TBK Counterparties, as applicable, may, on notice to the Reorganized Debtors or Louisiana Counterparties, as applicable, resume litigation of the Long Louisiana Litigation notwithstanding

anything to the contrary in the Plan or this Confirmation Order; *provided*, that the Bankruptcy Court shall adjudicate the character of any prepetition or pre-Effective Date right to payment asserted by any of the Louisiana Counterparties on account of any Mineral Interest determined to be held by any of the Louisiana Counterparties, including, for the avoidance of doubt, whether such right to payment constitutes an Administrative Claim, a Secured Claim, an Unsecured Claim, or is not a Claim; *provided*, *further*, that this Confirmation Order shall not be, and shall not be construed as, a determination of whether any prepetition or pre-Effective Date ownership or right to payment thereunder asserted by any of the Louisiana Counterparties on account of any Royalty and Working Interest held by any of the Louisiana Counterparties constitutes property of the Debtors' Estates or limit the Louisiana Counterparties' right to recover such amounts.  Nothing herein shall prejudice the Louisiana Counterparties' rights to oppose assumption and/or assignment of any Executory Contracts or Unexpired Lease to which such party is a counterparty, or the Debtors' or Reorganized Debtors' right, as applicable, to add any such Executory Contracts or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases List if the Court determines that the cure amount due thereunder is greater than the amount set forth in any applicable cure notice.  For the avoidance of doubt, upon the Effective Date, *Long Petroleum, L.L.C. and Bienville Investments, LLC's Motion for Clarification of and Relief from Automatic Stay to Allow Continuation of State Court Proceedings, and Motion for Adequate Protection* [Docket No. 1155] and *Joinder of Burk Royalty Co. Ltd., Kimbell Family Resources, Ltd and True Oil, LLC to Long Petroleum, LLC and Bienville Investments, LLC's Motion for Clarification of and Relief from Automatic Stay to Allow Continuation of State Court Proceedings, and Motion for Adequate Protection [Related to Docket No. 1155]* [Docket No. 1283] shall be deemed withdrawn.

**OO.    Provisions Regarding SENA.**

177.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, this Confirmation Order shall not be, and shall not be construed as, a determination or adjudication of the rights, claims, defenses, objections and remedies that Shell Energy North America (US), L.P. ("SENA"), or the Debtors or Reorganized Debtors, as applicable, have, or may have, or have asserted, or may assert, in relation to:

(i)    (a) that certain Base Contract for Sale and Purchase of Natural Gas, dated as of August 14, 2009 by and between EXCO and BG Energy Merchants, LLC (the "NAESB"), including the Special Provisions thereto (the "NAESB Special Provisions") and (b) that certain Transaction Confirmation for Immediate Delivery, effective as of July 9, 2010 (the "Tiger Confirmation," and together with the NAESB, the "SENA Contracts"), including any claims or causes of action of the Debtors or Reorganized Debtors against SENA related to the SENA Contracts, including as alleged in the adversary proceeding styled as EXCO Operating Co., LP v. Shell Energy North America (US) [Adversary Proceeding No. 18-03015] (the "EXCO v. SENA Claims"); or

(ii)    Claim No. 892 against Debtor EOC (the "EOC POC"), and Claim No. 898 filed against Debtor Raider (the "Raider POC," and collectively with the EOC POC, the "SENA POCs") filed in these Chapter 11 Cases, including as asserted in the Debtors' Objection to Proof of Claim of Shell Energy North America (US), LP [Docket No. 1147] (the "SENA Claims Objection") and the Debtors' Motion to Estimate Proof of Claim of Shell Energy North America (US), LP [Docket No. 1243] (the "SENA Estimation Motion," and together with the SENA Claims Objection, the "SENA Claims Litigation").

178.    All such rights, claims, defenses, objections and remedies of SENA and the Debtors or Reorganized Debtors, as applicable, in relation to the SENA Contracts and the SENA POCs, are reserved (including for the avoidance of doubt, any right of setoff of either SENA or the Debtors or Reorganized Debtors, as applicable, pursuant to applicable bankruptcy and non-bankruptcy law  (the "EXCO / SENA Setoff Rights") which rights shall not be extinguished or otherwise affected by the Confirmation Order), and shall be adjudicated and determined reasonably promptly following the Effective Date, pursuant to a schedule to be mutually agreed

upon by SENA and the Debtors or Reorganized Debtors, as applicable, following entry of the

Confirmation Order.  In regards thereto:

(i)     SENA reserves all rights to exercise its contractual rights to arbitrate the liquidation of the EXCO v. SENA Claims, the SENA POCs, and the Setoff Rights and the Debtors reserve all rights to object to such relief;

(ii)    to the extent that SENA is determined not to be entitled to arbitrate; the Bankruptcy Court shall retain jurisdiction to liquidate the SENA POCs and the EXCO v. SENA Claims and to determine the existence and extent of any EXCO / SENA Setoff Right; and

(iii)   to the extent the SENA POCs are liquidated in an amount greater than $0.00, taking into account the EXCO / SENA Setoff Rights, SENA shall be entitled to amend the SENA POCs to reflect such liquidated amount, and SENA shall be entitled to receive distribution pursuant to the Plan on account of either the EOC POC or the Raider EOC, as amended, at SENA's election, but not both.

179.    Upon entry of this Confirmation Order, the SENA Claims Litigation shall be

deemed withdrawn with prejudice; *provided* the Debtors and Reorganized Debtors reserve the

right to assert the objection set forth therein to allow for the liquidation of the SENA POCs in

accordance with this Confirmation Order; *provided further* that the Unsecured Claims Plan

Administrator shall have the right to consent to any agreement that results in a GUC Claim.

**PP.     Provisions Regarding Pennsylvania DCNR.**

180.    The Debtors and certain of their affiliates are parties to four (4) Oil and Gas Leases

(collectively, "PA Oil and Gas Leases") to which the Pennsylvania Department of Conservation

and Natural Resources ("PA DCNR") is a party.  Notwithstanding any provisions of the Plan or

any Order Confirming the Plan, the terms of this paragraph shall apply only to PA DCNR and the

PA Oil and Gas Leases.  This Confirmation Order shall not be, and shall not be construed as, a

determination of the cure amount, if any, required to satisfy the provisions of sections 365(b)(1)(A)

and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the PA Oil and Gas Leases, if

applicable.  The Debtors or Reorganized Debtors, as applicable, and PA DCNR shall endeavor in

good faith to reach agreement as to any amounts owed under the PA Oil and Gas Leases, including as set forth in Claim No. 1048, within one hundred and eighty (180) days following the Effective Date.  If the Debtors or Reorganized Debtors, as applicable, and PA DCNR fail to reach such agreement, either the Debtors or Reorganized Debtors, as applicable, or PA DCNR may, upon notice to the Debtors or Reorganized Debtors or PA DCNR, as applicable, request a hearing before the Court for the determination thereof.  Otherwise, the Debtors or Reorganized Debtors, as applicable, and PA DCNR expressly reserve their respective rights regarding any contracts, leases, covenants, operating rights agreements or other interests or agreements between the Debtors or Reorganized Debtors, as applicable, and the PA DCNR, including but not limited to the PA Oil and Gas Leases, which shall be paid, treated, determined, and administered in the ordinary course of business following the Effective Date in accordance with applicable bankruptcy and non-bankruptcy law.

**QQ.    Provisions Regarding Louisiana DNR.**

181.    Notwithstanding anything to the contrary in either the Plan or this Confirmation Order, including the provisions relating to cure claims relating to any oil and gas leases to which the State of Louisiana Office of Mineral Resources, Department of Natural Resources (the "LA DNR") and the Debtors are listed as counterparties (the "LA DNR Leases"), the terms of this paragraph shall apply only to the LA DNR and the LA DNR Leases.  This Confirmation Order shall not be, and shall not be construed as, a determination of whether the LA DNR Leases are Royalty and Working Interests or Executory Contracts and Unexpired Leases, or the cure amount, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the LA DNR Leases, if applicable.  The Debtors or Reorganized Debtors, as applicable, and the LA DNR shall endeavor in good faith to reach agreement as to any amounts outstanding related to the LA DNR Leases within ninety (90) days

following the Effective Date, and if such agreement is reached, the Debtors or Reorganized Debtors, as applicable, and the LA DNR shall file a stipulation with the Court setting forth such resolution. If the Debtors or Reorganized Debtors, as applicable, and the LA DNR fail to reach such agreement within such ninety (90) day period, either the Debtors or Reorganized Debtors, as applicable, or the LA DNR may, upon notice to the Debtors or Reorganized Debtors, as applicable, or the LA DNR, as applicable, request a hearing before the Court for the determination of the status of the LA DNR Leases and any amounts due thereunder, including, for the avoidance of doubt, whether any LA DNR Leases constitute Executory Contracts and Unexpired Leases. Nothing herein shall prejudice the LA DNR's rights to oppose assumption and/or assignment of the LA DNR Leases, or the Debtors or Reorganized Debtors' right to add any LA DNR Lease to the Rejected Executory Contracts and Unexpired Leases List if the Court determines that a cure amount is owed with respect to the LA DNR Leases.

182.    For the avoidance of doubt, nothing in this Plan discharges, precludes or constitutes a release of any environmental liability, specifically with regard to plugging and abandonment, operational, decommissioning or financial assurance requirements that may arise under the LA DNR Leases or under the laws of the State of Louisiana upon rejection of these leases by the Reorganized Debtors, or if the State of Louisiana successfully opposes assumption and/or assignment of the LA DNR Leases at any hearing before this Court.

**RR.    Provision Regarding BHP Billiton Petroleum (KCS Resources), LLC, et al.**

183.    Notwithstanding anything to the contrary in either the Plan or this Confirmation Order, the terms of this paragraph shall only apply to BHP[8] and the BHP Executory

---

[8]    "BHP" shall mean BHP Billiton Petroleum (KCS Resources), LLC, f/k/a KCS Resources LLC ("BHP KCS"), BHP Billiton Petroleum Properties (N.A.), LP ("BHP Properties"), BHP Billiton Petroleum (TxLa Operating) Company, f/k/a Petrohawk Operating Company ("BHP Petroleum"), and Petrohawk Energy Corporation ("Petrohawk").

Contracts.[9]  This Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, if any required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the BHP Executory Contracts (the "BHP Cure Amount").  The Debtors or Reorganized Debtors, as applicable, and BHP shall endeavor in good faith to reach agreement as to the BHP Cure Amount within ninety (90) days following the Effective Date and if such agreement is reached shall file a stipulation with the Court setting forth the agreed BHP Cure Amount.  If the Reorganized Debtors and BHP fail to reach an agreement as to the BHP Cure Amount within such ninety (90) day period, either the Reorganized Debtors or BHP may, upon notice to the Reorganized Debtors or BHP, as applicable, request a hearing before the Court for the determination of the proposed assumption of the BHP Executory Contracts and/or the BHP Cure Amount.  For purposes of determining the BHP Cure Amount, the effective date of assumption shall be the Effective Date.  Nothing herein shall prejudice BHP's right to oppose assumption and/or assignment of the BHP Executory Contracts, or the Debtors' or the Reorganized Debtors' right to add any BHP Executory Contract to the Rejected Executory Contracts and Unexpired Leases List if the Court determines that the BHP Cure Amount is greater than the amount set forth in any applicable cure notice.  All Allowed Claims arising under the BHP Contracts from and after the Petition Date shall be deemed to be Allowed General Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of their business pursuant to Article II(A)(1) of the Plan, and the Debtors or the Reorganized Debtors, as applicable, shall pay in full all postpetition obligations and other disbursements due and owing to BHP after the Petition Date.  Notwithstanding anything to the contrary in either the

---

[9]    "BHP Executory Contracts" means any executory contract between one or more of the BHP entities and one or more of the Debtors.

Plan or this Confirmation Order, the Reorganized Debtors' and BHP's rights under that certain Settlement Agreement and Release, by and among the Debtors and BHP, dated October 24, 2018 and approved by the Court on November 5, 2018 (the "BHP Settlement Agreement") are preserved; and specifically, the Allowed BHP Claims (as defined therein) shall not be affected by any assumption and/or assignment of the BHP Executory Contracts or this Confirmation Order. To the extent that a BHP Executory Contract is assumed, such assumption shall result in the release and satisfaction of only those Claims that are based on an actual default existing as of the Effective Date with respect to such assumed BHP Executory Contract. Otherwise, BHP expressly retains all of its rights under the BHP Executory Contracts. This Confirmation Order shall not alter any of the BHP counterparties' rights of setoff or recoupment to the extent such rights exist under the BHP Executory Contracts or applicable law.

**SS.    Provision Regarding U.S. Specialty Insurance Company.**

184.    Notwithstanding any other provision of the Plan or the Confirmation Order, from and after the Effective Date (a) all agreements between the Debtors and U.S. Specialty Insurance Company ("U.S. Specialty") (collectively, the "U.S. Specialty Agreements"), along with all claims, rights, liens, and obligations under the U.S. Specialty Agreements, are reinstated and left unimpaired by the Plan, shall continue in full force and effect according to their terms and applicable non-bankruptcy law with respect to the applicable Reorganized Debtors, and are not discharged or released by the Plan or the Confirmation Order (for clarity, the U.S. Specialty Agreements include, without limitation; the Payment and Indemnity Agreement No. 0842, executed March 4, 2010, and all bonds and other agreements related thereto), and (b) the Debtors and the Reorganized Debtors remain bound by and obligated to fully perform the U.S. Specialty Agreements and all obligations thereunder. U.S. Specialty, in its sole discretion, is entitled to receive, and the Reorganized Debtors are required to provide, replacements for the current U.S.

Specialty Agreements, which are to be executed by the applicable Reorganized Debtors on identical terms to the current U.S. Specialty Agreements, at no additional cost to the Reorganized Debtors.  For the avoidance of any doubt and only to the extent applicable, the U.S. Specialty Agreements are assumed by the Debtors and the Reorganized Debtors pursuant to section 365 of the Bankruptcy Code upon the Effective Date.  Nothing herein shall affect U.S. Specialty's rights in any way against any other party to the U.S. Specialty Agreements.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, USSIC shall be a Releasing Party.

**TT.      Provision Regarding the Admiral Entities.**

185.      Notwithstanding anything to the contrary in either the Plan or this Confirmation Order, the terms of this paragraph shall apply to the Admiral Entities,[10] the Admiral Executory Contracts,[11] the Admiral Proofs of Claim,[12] and the Liens and security interests granted to the Admiral Entities under the Admiral Executory Contracts.  This Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, if any, required to satisfy the provisions of sections 365(b)(1) of the Bankruptcy Code for the assumption of the Admiral Executory Contracts (the "Admiral Cure Amount").  The Debtors or Reorganized Debtors, as applicable, and the Admiral Entities shall endeavor in good faith to reach agreement as to the Admiral Cure Amount within sixty (60) days following the entry of the Confirmation Order and if such agreement is reached, the Debtors or Reorganized Debtors, as applicable, and the Admiral Entities shall file a stipulation with the Court setting forth the agreed Admiral Cure

---

[10]   Admiral A Holding L.P., Colt Admiral A Holding L.P., and TE Admiral A Holding L.P., individually and collectively, the "Admiral Entities."

[11]   "Admiral Executory Contracts" means any executory contract between one or more of the Admiral Entities and one or more of the Debtors.

[12]   The "Admiral Proofs of Claim" shall mean Proof of Claim Nos. 20147, 20151 (amending Proof of Claim No. 20140), and 20154 (amending Proof of Claim No. 20145).

Amount.  If the Debtors or Reorganized Debtors, as applicable, and the Admiral Entities fail to reach an agreement as to the Admiral Cure Amount within such sixty (60) day period, either the Debtors or Reorganized Debtors, as applicable, or the Admiral Entities may, upon notice to the Debtors or Reorganized Debtors, as applicable, or the Admiral Entities, as applicable, request a hearing before the Court for the determination of the Debtors' proposed assumption of the Admiral Executory Contracts and/or the Admiral Cure Amount.  For purposes of determining the Admiral Cure Amount, the effective date of assumption shall be the Effective Date.  Nothing herein shall prejudice the Admiral Entities' rights to oppose assumption and/or assignment of the Admiral Executory Contracts, or the Debtors' or Reorganized Debtors' right to add any Admiral Executory Contract to the Rejected Executory Contracts and Unexpired Leases List if the Court determines that the Admiral Cure Amount is greater than the amount set forth in any applicable cure notice.  To the extent that an Admiral Executory Contract is assumed, such assumption shall result in the satisfaction of only those Claims that are based on an actual default existing as of the Effective Date with respect to such assumed Admiral Executory Contract, and for the avoidance of doubt,  the Debtors or Reorganized Debtors, as applicable, and the Admiral Entities otherwise expressly retain all of their rights under the Admiral Executory Contracts and the Admiral Proofs of Claim, and the Plan and this Confirmation Order shall not otherwise disallow, discharge, or otherwise expunge the Admiral Proofs of Claim or impair, discharge, or release the Liens and security interests granted to the Admiral Entities under the Admiral Executory Contracts.

**UU.**     **Provision Regarding Exxon/XTO Executory Contracts.**

186.     Notwithstanding anything to the contrary in the Plan or this Confirmation Order,

the terms of this paragraph shall apply to the Exxon/XTO Entities and their respective Exxon/XTO

Executory Contracts:[13]

(i)     This Confirmation Order shall not authorize the assumption or rejection of the Exxon/XTO Executory Contracts, which assumption or rejection shall be authorized pursuant to a separate stipulation and agreed order between the Debtors or the Reorganized Debtors, as applicable, and the Exxon/XTO Entities, or in the event an agreed stipulation and order is not reached, by further order of the Court.

(ii)     This Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the Exxon/XTO Executory Contracts (the "Exxon/XTO Cure Amount"). The Debtors or the Reorganized Debtors, as applicable, and the Exxon/XTO Entities shall endeavor in good faith to reach agreement as to the Exxon/XTO Cure Amount within sixty (60) days following the entry of the Confirmation Order, and if such an agreement is reached, the Debtors or Reorganized Debtors, as applicable, and Exxon/XTO Entities, shall file a stipulation with the Court setting forth the agreed Exxon/XTO Cure Amount.  If the Reorganized Debtors and the Exxon/XTO Entities fail to reach agreement as to the Exxon/XTO Cure Amount within such sixty (60) day period, either the Reorganized Debtors or Exxon/XTO Entities may, on notice to the Reorganized Debtors or Exxon/XTO, as applicable, request a hearing before the Court for the determination of the Exxon/XTO Cure Amount. Nothing herein shall prejudice the Exxon/XTO Entities' right to assert the arguments raised in their *Objection by the Exxon/XTO Entities To (A) Third Amended Settlement Joint Chapter 11 Plan of Reorganization of EXCO Resources, Inc. and Its Debtor Affiliates [Docket No. 1897] and (B) The Cure Claims Proposed In the Debtors' Notice of Filing of Plan Supplement [Docket No. 1989]* [Docket No. 2018].

(iii)     For purposes of determining the Exxon/XTO Cure Amount, the effective date of assumption shall be the Petition Date.  All Claims arising under the Exxon/XTO Executory Contracts from and after the Petition Date shall be deemed to be Allowed General Administrative Claims based on a liability incurred by the Debtors in the ordinary course of their business for which no request for allowance of an administrative claim shall be necessary, as contemplated in Section II.A.1 of the Plan.  However, in the event the Debtors or the Reorganized Debtors, as applicable,

---

[13]     As used herein, the term "Exxon/XTO Entities" shall collectively mean ExxonMobil Corporation, Exxon Mobil Production Co., Exxon Mobil Exploration Co., XTO Energy Inc., HHE Energy, and XH, LLC, as well as any parent, subsidiary or affiliate of any of said parties; and the term "Exxon/XTO Executory Contracts" shall mean any executory contract between any one or more of the Debtors and any one or more of the Exxon/XTO Entities.

and the Exxon/XTO Entities, are unable to agree on the amount of the Allowed General Administrative Claim held by the Exxon/XTO Entities, either party may apply to the Court for a review and determination thereof.

(iv)     If the Debtors or the Reorganized Debtors, as applicable, add any of the Exxon/XTO Executory Contracts to the Rejected Executory Contract and Unexpired Lease List as provided in Section V.A. of the Plan, the bar date for filing a rejection claim for such Exxon/XTO Executory Contracts shall be no earlier than thirty (30) days after an amended or supplemental Rejected Executory Contract and Unexpired Lease List is filed with the Court and served on the Exxon/XTO Entities and their counsel.

187.    To the extent that an Exxon/XTO Executory Contract is later assumed, such assumption shall result in the full release and satisfaction of only those Claims based on an actual default existing as of the Petition Date with respect to such assumed Exxon/XTO Executory Contract, and for the avoidance of doubt, this Confirmation Order shall not otherwise (a) disallow, discharge, or otherwise expunge the Proofs of Claim filed by any of the Exxon/XTO Entities, or (b) alter any of the Exxon/XTO Entities' rights of setoff or recoupment, to the extent such rights exist under the Exxon/XTO Executory Contracts or pursuant to applicable law.  The Exxon/XTO Entities shall be deemed to have opted out of the Third Party Releases contained in Article VIII.D of the Plan.

**VV.    Provision Regarding Rancho.**

188.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, this Confirmation Shall not be, and shall not be construed as, a determination or adjudication of the rights, claims, defenses, objections and remedies that Bruce E. Leonard Jr. and Rancho Encinos Viejos, LLC (collectively, "Rancho") and the Debtors or the Reorganized Debtors, as applicable, have, or may have, or have asserted, or may assert, in the adversary proceeding (Adversary Case No. 18-03105) pending in the Debtors' bankruptcy case (the "Rancho Adversary").  All such rights, claims, defenses, objections, and remedies of Rancho and the Debtors or the Reorganized Debtors, as applicable,   in the Rancho Litigation are reserved and will be adjudicated and

determined in the Rancho Litigation, including for the avoidance of doubt, the remedy of specific performance.  Further, in the event any of the Reorganized Debtors seek to sell, prior to final resolution of the Rancho Adversary, any oil and gas assets located in Dimmit County, Texas, that may vest in the Reorganized Debtors upon confirmation of the Plan, the conveyance of the Silva Unit Dim 1H well (API # 42-127-34844), the 297.234 acres associated with such well described in that Declaration of Pooled Unit Silva Unit Recorded in Volume 450, Page 775 of the Official Public Records of Dimmit County, Texas, oil and gas leases associated with such well, and any and all equipment associated with such well at issue in the Rancho Adversary shall be either excluded from such sale or contingent on the resolution of the matters pled in the Rancho Adversary and in the proofs of claim filed by Bruce E. Leonard, Jr. and Rancho Los Encinos Viejos, LLC, pursuant to an agreed or Court-issued scheduling order.

**WW.   Provision Regarding CMWW.**

189.    That certain oil and gas lease made and entered into on July 29, 2010, by and between CMWW Partners, Ltd. as lessor and Chesapeake Exploration, LLC as lessee covering 400.75 acres, more or less, situated in Dimmit County, Texas and more fully described in Proof of Claim No. 483 (the "CMWW Lease") shall vest in the Reorganized Debtors.  The Court shall have exclusive jurisdiction regarding the determination of whether the CMWW Lease shall have vested in the Reorganized Debtors free and clear of all liens, claims, and encumbrances, and the Court shall have exclusive jurisdiction to adjudicate the validity, priority, or extent of any Claim related thereto.

**XX.   Provision Regarding Seitel.**

190.    Nothing in this Confirmation Order shall be construed to authorize or permit: (i) the transfer of any seismic, geological or geophysical data or intellectual property owned by Seitel Data, Ltd., Seitel Data Corp., Seitel Offshore Corp., Seitel Canada Ltd. f/k/a Olympic

Seismic Ltd. (collectively, "Seitel") or (ii) the modification, amendment, release or restriction of any term, or the obligation or right of any parties under any executory contract, master license agreement and/or supplemental agreements, schedules, or modifications (the "Seitel Agreements") between Seitel, the Debtors, and/or the Reorganized Debtors.  This Confirmation Order shall not authorize the assumption or rejection of the Seitel Agreements, which assumption or rejection may only be authorized pursuant to a separate stipulation and agreed order by the Debtors or the Reorganized Debtors, as applicable, and Seitel, or in the event an agreed stipulation and order is not reached, by further order of the Court.

191.    Further, this Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, including any re-licensing fees, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the Seitel Agreements (the "Seitel Cure Amount").  The Debtors or the Reorganized Debtors, as applicable, and Seitel shall endeavor in good faith to reach agreement as to assumption and/or the Seitel Cure Amount within sixty (60) days following the entry of the Confirmation Order, and if such an agreement is reached, the Debtors or Reorganized Debtors, as applicable, and Seitel shall file a stipulation with the Court setting forth the agreed Seitel Cure Amount.  If the Reorganized Debtors and Seitel fail to reach agreement as to the Seitel Cure Amount within such sixty (60) day period, either the Reorganized Debtors or Seitel may, on notice to the Reorganized Debtors or Seitel, as applicable, request a hearing before the Court for the determination of the Seitel Cure Amount.

**YY.    Provision Regarding Louisiana Midstream Gas Services, LLC and Magnolia Midstream Gas Services, LLC.**

192.    Notwithstanding anything to the contrary in either the Plan or the Plan Supplement or this Confirmation Order, the terms of this paragraph shall apply to Louisiana Midstream Gas

Services, LLC and Magnolia Midstream Gas Services, LLC (collectively, "Midstream Gas Services") and the Midstream Gas Services Executory Contracts.[14]  This Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, if any required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the Midstream Gas Services Executory Contracts (the "Midstream Gas Services Cure Amount").  The Debtors, Reorganized Debtors, or Unsecured Claims Plan Administrator (collectively, the "Debtors"), as the case may be, and Midstream Gas Services shall endeavor in good faith to reach agreement as to the Midstream Gas Services Cure Amount within ninety (90) days following the Effective Date and if such agreement is reached shall file a stipulation with the Bankruptcy Court setting forth the agreed Midstream Gas Services Cure Amount.  If the Debtors and Midstream Gas Services fail to reach an agreement as to the Midstream Gas Services Cure Amount within such ninety (90) day period, either Debtors or Midstream Gas Services may, upon notice to the Debtors or Midstream Gas Services, as applicable, request a hearing before the Court for the determination of the Debtors' proposed assumption of the Midstream Gas Executory Contracts and/or the Midstream Gas Services Cure Amount.   For purposes of determining the Midstream Gas Services Cure Amount, the effective date of assumption shall be the Effective Date.   Nothing herein shall prejudice Midstream Gas Services' right to oppose assumption and/or assignment of the Midstream Gas Services Executory Contracts, or the Debtors' right to add any Midstream Gas Services Executory Contract to the Rejected Executory Contracts and Unexpired Leases List if the Court determines that the Midstream Gas Services Cure Amount is greater than the amount set forth in any applicable cure

---

[14]   "Midstream Gas Services Executory Contracts" means any executory contract between one or more of the Midstream Gas Services entities and one or more of the Debtors.

notice.    To the extent that a Midstream Gas Services Executory Contract is assumed, such assumption shall result in the release and satisfaction of only those Claims that are based on an actual default existing as of the Effective Date with respect to such assumed Midstream Gas Services Executory Contract.    Otherwise, Midstream Gas Services expressly retains all of its rights under the Midstream Gas Services Executory Contracts.

**ZZ.     Provision Regarding Mockingbird Midstream Gas Services, LLC.**

193.    Nothing in this Confirmation Order, and no provision of the Plan or Plan Supplement, shall operate as an adjudication or determination of (i) the validity, priority, or extent of the Mockingbird Dedication, or (ii) whether the Confirmation Order or any provision of the Plan or Plan Supplement has an effect on the Mockingbird Dedication.[15]  Resolution of these issues are reserved for adjudication and determination in an adversary proceeding in the Chapter 11 Cases; *provided* that (a) this Court shall have exclusive jurisdiction with respect to any such adversary proceeding, (b) none of Mockingbird, the Debtors, the Reorganized Debtors, or the Unsecured Claims Plan Administrator, as the case may be, shall initiate any such adversary proceeding within the forty-five (45) days following entry of the Confirmation Order, and (c) in the event that an adversary proceeding has not been commenced within one hundred eighty (180) days following the entry of the Confirmation Order any reservation with respect to (ii) above is null and void.

---

[15]    Mockingbird Midstream Gas Services, LLC ("Mockingbird") provides natural gas gathering, transportation and related services to Chesapeake Energy Marketing, L.L.C., Chesapeake Operating, L.L.C. and Chesapeake Exploration, LLC (collectively, "Chesapeake") as Producers, pursuant to a *Gas Gathering Contract Cost of Service – Eagle Ford* effective as of July 11, 2012 (the "Mockingbird GGC").  The Mockingbird GGC includes a dedication in favor of Mockingbird of the underlying oil and gas mineral interests, leases, wells, natural gas and associated acreage owned by Chesapeake in Zavala, Frio, McMullen, LaSalle, Dimmit and Atascosa Counties, Texas where the natural gas that Chesapeake produces is located that Mockingbird gathers and transports under the Mockingbird GGC (the "Mockingbird Dedication").

**AAA.  Provision Regarding GX Technology/ION Geophysical.**

194.    Nothing in this Confirmation Order shall be construed to authorize or permit:  (i) the transfer of any seismic, geological or geophysical data or intellectual property owned by GX Technology Corporation or its related entities (collectively, "GX") or (ii) the modification, amendment, release or restriction of any term, or the obligation or right of any parties under that certain Master Geophysical Data-Use License GXT No. 11086 dated as of November 19, 2010 (as amended, modified or supplemented from time to time, the "GX Agreement") between GX and the Debtors.  This Confirmation Order shall not be construed as a determination of whether the GX Agreement is an executory contract and shall not authorize the assumption, assumption and assignment, or rejection of the GX Agreement, which assumption, assumption and assignment, or rejection may only be authorized pursuant to a separate stipulation and agreed order by the Debtors or the Reorganized Debtors, as applicable, and GX, or in the event an agreed stipulation and order is not reached, by further order of the Court, with all parties fully reserving all rights in this regard.  For the avoidance of doubt, this Confirmation Order shall not, and shall not be construed as, a determination of whether the Plan results in a Third Party Acquisition as defined in the GX Agreement.

195.    Further, this Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, including any additional license or change of control fees, if any, including as required under the GX Agreement or to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the GX Agreement (the "GX Cure Amount").  The Debtors or the Reorganized Debtors, as applicable, and GX shall endeavor in good faith to reach agreement as to the GX Cure Amount within sixty (60) days following the entry of the Confirmation Order, and if such an agreement is reached, the Debtors or Reorganized Debtors, as applicable, and GX shall file a stipulation with the Court

setting forth the agreed GX Cure Amount.  If the Reorganized Debtors and GX fail to reach agreement as to the GX Cure Amount within such sixty (60) day period, either the Reorganized Debtors or GX may, on notice to the Reorganized Debtors or GX, as applicable, request a hearing before the Court for the determination of the reserved matters and the GX Cure Amount.

**BBB.   Provision Regarding Geophysical Pursuit Inc.**

196.    Nothing in this Confirmation Order shall be construed to authorize or permit:  (i) the transfer of any seismic, geological or geophysical data or intellectual property owned by Geophysical Pursuit Inc. ("GPI") or (ii) the modification, amendment, release or restriction of any term, or the obligation or right of any parties under any executory contract, master license agreement and/or supplemental agreements, schedules, or modifications (the "GPI Agreements") between GPI, the Debtors, and/or the Reorganized Debtors.  This Confirmation Order shall not authorize the assumption or rejection of the GPI Agreements, which assumption or rejection may only be authorized pursuant to a separate stipulation and agreed order by the Debtors or the Reorganized Debtors, as applicable, and GPI; or in the event an agreed stipulation and order is not reached, by further order of the Court. For the avoidance of doubt, this Confirmation Order shall not, and shall not be construed as, a determination of whether the Plan results in a Third Party Acquisition and/or change of control as defined in the GPI Agreements.

197.    Further, this Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, including any re-licensing fees and/or additional license or change of control fees, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the GPI Agreements (the "GPI Cure Amount").  The Debtors or the Reorganized Debtors, as applicable, and GPI shall endeavor in good faith to reach agreement as to assumption and/or the GPI Cure Amount within sixty (60) days following the entry of the Confirmation Order, and if such an agreement is reached,

the Debtors or Reorganized Debtors, as applicable, and GPI shall file a stipulation with the Court setting forth the agreed GPI Cure Amount.  If the Reorganized Debtors and GPI fail to reach agreement as to the GPI Cure Amount within such sixty (60) day period, either the Reorganized Debtors or GPI may, on notice to the Reorganized Debtors or GPI, as applicable, request a hearing before the Court for the determination of the GPI Cure Amount.

198.    Further, during the sixty (60) days and thereafter following the entry of the Confirmation Order or until a resolution between GPI and the Debtors' or Reorganized Debtors', GPI's seismic, geological or geophysical data or intellectual property shall remain at the current office of the Debtors' and in the possession of those individuals with current control at that office.  In other words, GPI's seismic, geological or geophysical data or intellectual property shall not be transferred pending resolution of GPI's Objection to Debtors' Confirmation of the Proposed Plan and Plan Supplement [Docket No. 2032] without the prior written consent of GPI.

**CCC.  Provision Regarding Certain Taxing Authorities.**

199.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, Dallas County, Dilley Independent School District, Frio Hospital District, Pearsall Independent School District, Polk County, Rusk County, San Augustine County and Zavala CAD (together, the "Taxing Authorities") shall retain their statutory liens securing their pre-petition claims, if applicable, and post-petition claims, until such time as the Allowed amount of such tax claims is paid in full.  Nothing in the Plan or this Confirmation Order shall be construed as an admission as to the validity of any claim asserted by the Taxing Authorities against the Debtors or a waiver of the Debtors' rights to subsequently dispute such claim on any grounds.

200.    Further, nothing in the Plan or this Confirmation Order shall be construed as a determination as to whether the Taxing Authorities are entitled to interest on any prepetition or postpetition claims, or the amount or rates of such interest.  The Debtors and the Taxing Authorities

reserve all rights with respect to any claims for prepetition or postpetition interest on any claims made by the Taxing Authorities.

**DDD.     Provisions Regarding CNOOC.**

201.     Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the terms of this paragraph shall apply to CNOOC Energy U.S.A. LLC ("CNOOC"), and their respective Operator Executory Contracts:[16]

(i)     This Confirmation Order shall not authorize the assumption or rejection of the Operator Executory Contracts, which assumption or rejection shall be authorized pursuant to a separate stipulation and agreed order entered by the Debtors or the Reorganized Debtors, as applicable, and CNOOC, or in the event an agreed stipulation and order is not reached, by further order of the Court.

(ii)     This Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation, if any, required to satisfy the provisions of sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code for the assumption of the Operator Executory Contracts (the "JOA Cure Amount"). The Debtors or the Reorganized Debtors, as applicable, and CNOOC shall endeavor in good faith to reach agreement as to the JOA Cure Amount within sixty (60) days following the entry of the Confirmation Order, and if such an agreement is reached, the Debtors or Reorganized Debtors, as applicable, and CNOOC shall file a stipulation with the Court setting forth the agreed JOA Cure Amount. If the Reorganized Debtors and CNOOC fail to reach agreement as to the JOA Cure Amount within such sixty (60) day period, either the Reorganized Debtors or CNOOC may, on notice to the Reorganized Debtors or CNOOC, as applicable, request a hearing before the Court for the determination of the JOA Cure Amount. Nothing herein shall prejudice CNOOC's right to assert the arguments raised in their *Limited Objection to Plan Confirmation* [Docket No. 2024] at any hearing to determine the JOA Cure Amount.

(iii)     For purposes of determining the JOA Cure Amount, the effective date of assumption shall be the Petition Date. All Claims arising under the Operator Executory Contracts from and after the Petition Date shall be deemed to be Allowed General Administrative Claims based on a liability incurred by the Debtors in the ordinary course of their business for which no request for allowance of an administrative claim shall be necessary, as contemplated in Article II.A.1 of the Plan. However, in the event the Debtors or the Reorganized Debtors, as applicable, and CNOOC are unable to agree on the amount of the Allowed General Administrative Claim held by CNOOC, if any, either party may apply to the Court

---

[16]     The term "Operator Executory Contracts" shall mean any executory contract between any one or more of the Debtors and CNOOC and any one or more of its affiliates.

for a review and determination thereof. The parties reserve all rights regarding whether or not any ongoing audits as of the Petition Date and any amounts related to prepaid AFEs (i.e. authorization of expenditure) and JIBs (i.e. joint interest billing), constitute amounts to be included in the JOA Cure Amount or instead should be categorized as an Allowed General Administrative Claim.

(iv)     If the Debtors or the Reorganized Debtors, as applicable, add any of the Operator Executory Contracts to the Rejected Executory Contract and Unexpired Lease List as provided in Section V.A. of the Plan, the bar date for filing a rejection claim for such Operator Executory Contracts shall be no earlier than thirty (30) days after an amended or supplemental Rejected Executory Contract and Unexpired Lease List is filed with the Court and served on CNOOC and their counsel.

(v)     To the extent that an Operator Executory Contract is assumed, such assumption shall result in the full release and satisfaction of only those Claims based on an actual default existing as of the Petition Date with respect to such assumed Operator Executory Contract, and for the avoidance of doubt, this Confirmation Order shall not otherwise (a) disallow, discharge, or otherwise expunge the Proof of Claim filed by CNOOC (Proof of Claim No. 20190) or (b) alter any of the CNOOC's rights of setoff, recoupment, or indemnification, as applicable, to the extent such rights exist under the Operator Executory Contracts or pursuant to applicable law.

**EEE.     Provision Regarding Chesapeake.**

202.     Notwithstanding anything to the contrary in either the Plan or this Confirmation Order, the Reorganized Debtors' and Chesapeake's[17] rights under that certain Settlement Agreement and Release, by and among the Debtors and Chesapeake, dated February 25, 2019 and approved by the Court on April 23, 2019 [Docket. No. 1854] (the "Chesapeake Settlement Agreement") are preserved. Further, notwithstanding anything to the contrary in either the Plan or this Confirmation Order, neither the Plan nor Confirmation Order alter or amend Chesapeake's or the Debtors' rights under the Chesapeake Settlement Agreement. This Confirmation Order shall not be, and shall not be construed as, a determination of the cure amount or compensation owed under the Assumed Chesapeake Contracts (as defined in the Chesapeake Settlement Agreement),

---

[17] "Chesapeake" shall mean Chesapeake Energy Marketing, L.L.C. f/k/a Chesapeake Energy Marketing, Inc. ("CEML"), Chesapeake Exploration, L.L.C. f/k/a Chesapeake Exploration, LP ("CELLC"), Chesapeake Operating, L.L.C. f/k/a Chesapeake Operating, Inc. ("COLLC"), Chesapeake Louisiana LP ("Chesapeake Louisiana"), and Chesapeake Energy Corporation ("CEC").

and the listing of such executory contracts in the Plan Supplement is not intended to, does not, and shall not be construed to alter the terms of such assumption (including the previously agreed effective date of assumption and/or the previously agreed cure amount related to such assumption). Any post-assumption obligations related to the Assumed Chesapeake Contracts will be paid or performed in the ordinary course of business, and this Confirmation Order shall not alter any of the Chesapeake counterparties' rights of setoff or recoupment to the extent such rights exist under the Assumed Chesapeake Contracts or applicable law.

**FFF.   Dissolution of the Committee.**

203.    On the Effective Date, the Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases; *provided* that such official committee shall be deemed to remain in existence solely with respect to, and shall not be heard on any issue except, applications filed by the Professionals pursuant to sections 330 and 331 of the Bankruptcy Code.  From and after the Effective Date, none of, as applicable, the Debtors, the Reorganized Debtors, or the Unsecured Claims Plan Administrator shall be responsible for paying any fees or expenses incurred after the Effective Date by the members of or advisors to the Committee, and neither the Debtors or the Reorganized Debtors shall be responsible for paying any fees or expenses incurred by the Unsecured Claims Plan Administrator or Unsecured Claims Plan Administrator Advisory Board (if applicable).

**GGG.  Outside Date.**

204.    In no event will the Effective Date of the Plan be later than 60 days from the date of the entry of this Order.

**HHH.  Effect of Non-Occurrence of Conditions to the Effective Date.**

205.    Notwithstanding the entry of this Confirmation Order, if the Effective Date of the Plan does not occur with regard to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

**III.     Waiver of 14-Day Stay.**

206.    Notwithstanding Bankruptcy Rule 3020(e), and to the extent applicable, Bankruptcy Rules 6004(h), 7062, and 9014, this Confirmation Order is effective and enforceable immediately upon its entry and not subject to any stay.

**JJJ.    Post-Confirmation Modification of the Plan.**

207.    Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors are hereby authorized to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**KKK. Final Order.**

208.    This Confirmation Order is a final order and the period in which an appeal must be filed will commence upon entry of this Confirmation Order.

Signed: June 18, 2019

_____
                         Marvin Isgur
                         United States Bankruptcy Judge

**Exhibit A**

**The Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| EXCO RESOURCES, INC., *et al.*,[1] | § | Case No. 18-30155 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

---

**THIRD AMENDED SETTLEMENT JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**EXCO RESOURCES, INC. AND ITS DEBTOR AFFILIATES**

---

Christopher T. Greco, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

–and–

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois  60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

Dated: June 12, 2019

Marcus A. Helt (TX 24052187)
Michael K. Riordan (TX 24070502)
**FOLEY GARDERE**
1000 Louisiana St., Suite 2000
Houston, Texas 77002
Telephone:  (713) 276-5178

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  EXCO Resources, Inc. (2779); EXCO GP Partners Old, LP (1262); EXCO Holdings (PA), Inc. (1745); EXCO Holding MLP, Inc. (1972); EXCO Land Company, LLC (9981); EXCO Midcontinent MLP, LLC (0557); EXCO Operating Company, LP (1261); EXCO Partners GP, LLC (1258); EXCO Partners OLP GP, LLC (1252); EXCO Production Company (PA), LLC (7701); EXCO Production Company (WV), LLC (7851); EXCO Resources (XA), LLC (7775); EXCO Services, Inc. (2747); Raider Marketing GP, LLC (6366); and Raider Marketing, LP (4295).  The location of the Debtors' service address is:  12377 Merit Drive, Suite 1700, Dallas, Texas 75251.

**TABLE OF CONTENTS**

**Page**

**Article I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** .................................................................................. **5**
    A.    Defined Terms. ............................................................................................. 5
    B.    Rules of Interpretation. ............................................................................. 24
    C.    Computation of Time. ............................................................................... 24
    D.    Governing Law. ......................................................................................... 25
    E.    Reference to Monetary Figures. ................................................................ 25
    F.    Conflicts. ................................................................................................... 25

**Article II. ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND DIP FACILITY CLAIMS** ............................................................................................... **25**
    A.    Administrative Claims. ............................................................................. 25
    B.    Priority Tax Claims. .................................................................................. 27
    C.    DIP Facility Claims. ................................................................................. 27
    D.    Statutory Fees. .......................................................................................... 27

**Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ................. **28**
    A.    Classification of Claims and Interests. .................................................... 28
    B.    Treatment of Claims and Interests. ......................................................... 29
    C.    Special Provision Governing Unimpaired Claims. ................................. 33
    D.    Elimination of Vacant Classes. ................................................................ 33
    E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ......................................................................................................... 33
    F.    Voting Classes; Presumed Acceptance by Non-Voting Classes. ............ 33
    G.    Presumed Acceptance and Rejection of the Plan. ................................... 33
    H.    Intercompany Interests. ............................................................................ 33
    I.    Controversy Concerning Impairment. ..................................................... 34
    J.    Subordinated Claims and Interests. ......................................................... 34

**Article IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ............................................... **34**
    A.    Restructuring Transactions. ..................................................................... 34
    B.    Settlement of Settled Actions. .................................................................. 35
    C.    Settlement of Claims After the Effective Date. ....................................... 35
    D.    Sources of Consideration for Plan Distributions. .................................... 35
    E.    Cancellation of Existing Securities and Agreements. ............................. 36
    F.    Release of Liens. ....................................................................................... 36
    G.    Corporate Action. ..................................................................................... 37
    H.    Effectuating Documents; Further Transactions. ...................................... 37
    I.    Section 1146 Exemption. .......................................................................... 37
    J.    Corporate Existence. ................................................................................. 38
    K.    Vesting of Assets. ..................................................................................... 38
    L.    New Organizational Documents. ............................................................. 38
    M.    Director, Officer, Manager, and Employee Liability Insurance. ........... 39
    N.    Directors and Officers of the Reorganized Debtors. ............................... 39
    O.    Management Incentive Plan. ..................................................................... 39
    P.    Employee Obligations. ............................................................................. 40
    Q.    Preservation of Causes of Action. ........................................................... 40

R.     Preservation of Mineral Interests. ................................................................ 41
S.     Payment of Certain Fees. ............................................................................ 41
T.     Document Retention ................................................................................... 42
U.    Unsecured Claims Distribution Trust; Unsecured Claims Plan Administrator. ............... 42
V.    Indemnification of the Settling Lenders. ................................................... 44

**Article V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES........... 45**
A.    Assumption and Rejection of Executory Contracts and Unexpired Leases.................... 45
B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. ..................... 45
C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .................. 46
D.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired
       Leases. ......................................................................................................... 46
E.     Indemnification Obligations. ...................................................................... 47
F.     Insurance Policies. ...................................................................................... 47
G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. .......... 47
H.    Reservation of Rights. ................................................................................. 48
I.     Nonoccurrence of Effective Date. ............................................................... 48
J.     Contracts and Leases Entered Into After the Petition Date. ......................... 48

**Article VI. PROVISIONS GOVERNING DISTRIBUTIONS........................................................ 48**
A.    Timing and Calculation of Amounts to Be Distributed. ............................. 48
B.    Challenge Resolution Stipulation. .............................................................. 49
C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ................... 49
D.    Special Rules for Distributions to Holders of Disputed Claims and Interests. ............... 51
E.     Manner of Payment. ................................................................................... 52
F.     SEC Exemption. .......................................................................................... 52
G.    Compliance with Tax Requirements. .......................................................... 53
H.    Tax Matters Regarding the Unsecured Claims Distribution Trust................................ 53
I.     No Postpetition or Default Interest on Claims. ........................................... 53
J.     Setoffs and Recoupment. ............................................................................ 54
K.    No Double Payment of Claims. ................................................................... 54
L.     Claims Paid or Payable by Third Parties. ................................................... 54
M.    Allocation of Distributions Between Principal and Interest. ........................ 55

**Article VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
DISPUTED CLAIMS .............................................................................................................. 55**
A.    Allowance of Claims. ................................................................................. 55
B.    Claims Administration Responsibilities. ................................................... 55
C.    Adjustment to Claims Without Objection. ................................................. 56
D.    Time to File Objections to Claims or Interests. ......................................... 56
E.     Estimation of Claims. ................................................................................. 56
F.     Disputed and Contingent Claims Reserve. ................................................ 56
G.    Disallowance of Claims. ............................................................................. 57
H.    Amendments to Proofs of Claim. ............................................................... 57
I.     Reimbursement or Contribution. ............................................................... 57
J.     No Distributions Pending Allowance. ........................................................ 57
K.    Distributions After Allowance. ................................................................... 58

**Article VIII. RELEASE, INJUNCTION, EXCULPATION, AND RELATED PROVISIONS ........ 58**
A.    Discharge of Claims and Termination of Interests. .................................... 58
B.    **Release of Liens.**................................................................................... 58

| | | |
|---|---|---|
| C. | **Releases by the Debtors.** | 59 |
| D. | **Releases by Holders of Claims and Interests.** | 60 |
| E. | **Exculpation.** | 60 |
| F. | **Injunction.** | 61 |
| G. | **Release of D&O Carriers and D&O Liability Insurance Policies.** | 61 |
| H. | **Bar Order and Channeling Injunction.** | 62 |
| I. | Protections Against Discriminatory Treatment | 64 |
| J. | Recoupment. | 64 |
| K. | Binding Effect. | 64 |
| L. | SEC Rights Reserved | 64 |

**Article IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ... 64

| | | |
|---|---|---|
| A. | Conditions Precedent to Confirmation. | 64 |
| B. | Conditions Precedent to the Effective Date. | 66 |
| C. | Waiver of Conditions. | 67 |
| D. | Substantial Consummation. | 67 |
| E. | Effect of Failure of Conditions. | 67 |

**Article X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ... 67

| | | |
|---|---|---|
| A. | Modification and Amendments. | 67 |
| B. | Effect of Confirmation on Modifications. | 67 |
| C. | Revocation or Withdrawal of Plan. | 67 |

**Article XI. RETENTION OF JURISDICTION** ... 68

**Article XII. MISCELLANEOUS PROVISIONS** ... 70

| | | |
|---|---|---|
| A. | Immediate Binding Effect. | 70 |
| B. | Additional Documents. | 70 |
| C. | Dissolution of the Committee. | 70 |
| D. | Payment of Statutory Fees. | 71 |
| E. | Reservation of Rights. | 71 |
| F. | Successors and Assigns. | 71 |
| G. | Notices. | 71 |
| H. | Term of Injunctions or Stays. | 73 |
| I. | Entire Agreement. | 73 |
| J. | Exhibits. | 73 |
| K. | Nonseverability of Plan Provisions. | 73 |
| L. | Votes Solicited in Good Faith. | 74 |
| M. | Waiver or Estoppel. | 74 |
| N. | Closing of Chapter 11 Cases. | 74 |
| O. | Creditor Default. | 74 |

## INTRODUCTION

EXCO Resources, Inc. and its debtor affiliates as debtors and debtors in possession propose this settlement joint chapter 11 plan of reorganization (the "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article I.A of the Plan.  Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, results of operations, historical financial information, events during the Chapter 11 Cases, and projections of future operations, as well as a summary and description of the Plan and certain related matters.  The Debtors, the Settling Lenders, and the Committee are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan constitutes a separate plan for each of the Debtors, and the Debtors reserve the right to seek confirmation of the Plan for each separate Debtor at one or more Confirmation Hearings as may be applicable.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.     Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth in the Introduction above or in the definitions below.

1.     "*1.5 Lien Makewhole Claims*" means the Claims resulting from certain provisions in the 1.5 Lien Notes Indenture that allege that an event of default (including the filing of a voluntary bankruptcy) results in the automatic acceleration of the 1.5 Lien Notes Claims and payment of the applicable premium.

2.     "*1.5 Lien Noteholders*" means the Holders of the 1.5 Lien Notes.

3.     "*1.5 Lien Notes*" means the 8.0% / 11.0% 1.5 lien senior secured notes due 2022, issued by EXCO pursuant to the 1.5 Lien Notes Indenture.

4.     "*1.5 Lien Notes Claims*" means any Claim derived from or arising under the 1.5 Lien Notes and the 1.5 Lien Notes Indenture, whether Secured or Unsecured, in any priority determined by a Final Order.

5.     "*1.5 Lien Notes Indenture*" means that certain Indenture, dated as of March 15, 2017, by and among EXCO, as issuer, the guarantors party thereto, and the 1.5 Lien Notes Trustee, as may be amended, restated, or otherwise supplemented from time to time.

6.     "*1.5 Lien Notes Trustee*" means Wilmington Trust, National Association, as indenture trustee and collateral trustee under the 1.5 Lien Notes Indenture.

7.      "*1.75 Lien Agent*" means Wilmington Trust, National Association, as administrative agent and collateral trustee under the 1.75 Lien Credit Agreement.

8. "*1.5 Lien Claims Recovery*" means 61.0 percent of the New Common Stock (subject to dilution by the Management Incentive Plan) (for the avoidance of doubt, prior to giving effect to the Settlement Contribution).

9. "*1.75 Lien Credit Agreement*" means that certain 1.75 Lien Term Loan Credit Agreement, dated as of March 15, 2017, by and among EXCO, as borrower, the guarantors party thereto, the 1.75 Lien Agent, and the other lender and agent parties thereto, as may be amended, restated, or otherwise supplemented from time to time.

10. "*1.75 Lien Claims Recovery*" means 39.0 percent of the New Common Stock (subject to dilution by the Management Incentive Plan).

11. "*1.75 Lien Makewhole Claims*" means the Claims resulting from certain provisions in the 1.75 Lien Credit Agreement that allege that an event of default (including the filing of a voluntary bankruptcy) results in the automatic acceleration of the 1.75 Term Loan Facility Claims and payment of the applicable "Make-Whole Amount" (as defined in the 1.75 Lien Credit Agreement).

12. "*1.75 Lien Term Loan Facility Claims*" means any Claims against the Debtors derived from or arising under the 1.75 Lien Credit Agreement, whether Secured or Unsecured, in any priority determined by a Final Order.

13. "*1.75 Lien Term Loan Lenders*" means the lenders from time to time party to the 1.75 Lien Credit Agreement.

14. "*2018 Unsecured Notes*" means the 7.5% senior unsecured notes due 2018, issued by EXCO pursuant to the 2018 Unsecured Notes Indenture.

15. "*2018 Unsecured Notes Claims*" means any Claim derived from or arising under the 2018 Unsecured Notes and the 2018 Unsecured Notes Indenture.

16. "*2018 Unsecured Notes Indenture*" means that certain Indenture, dated as of September 5, 2010, by and among EXCO, as issuer, the guarantors party thereto, and the 2018 Unsecured Notes Trustee, as may be amended, restated, or otherwise supplemented from time to time.

17. "*2022 Unsecured Notes*" means those certain 8.5% senior unsecured notes due 2022, issued by EXCO pursuant to the 2022 Unsecured Notes Indenture.

18. "*2022 Unsecured Notes Claims*" means any Claim derived from or arising under the 2022 Unsecured Notes and the 2022 Unsecured Notes Indenture.

19. "*2022 Unsecured Notes Indenture*" means that certain Indenture, dated as of April 6, 2014, by and among EXCO, as issuer, the guarantors party thereto, and the 2022 Unsecured Notes Trustee, as may be amended, restated, or otherwise supplemented from time to time.

20. "*503(b)(9) Claim*" means a Claim or any portion thereof entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

21. "*Administrative Agents*" means, collectively, the 1.75 Lien Agent and the Second Lien Agent.

22. "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates or the Chapter 11 Cases under sections 503(b) (including 503(b)(9) Claims), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the Estates and operating the business of the Debtors; (b) Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911–1930; and (d) all Intercompany Claims authorized pursuant to the Cash Management Order.

23. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to General Administrative Claims other than those that were accrued in the ordinary course of business, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

24. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

25. "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither Disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount;  (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court, including a Challenge Resolution Stipulation; (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had Disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) through (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors', Reorganized Debtors', Unsecured Claims Litigation Trustee's, or Unsecured Claims Plan Administrator's reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order; *provided*, *further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow," "Allowing," and "Allowance" shall have correlative meanings.  Notwithstanding anything to the contrary herein, the Claims held by the Settling Lenders and the Supporting Creditors shall be fully and finally Allowed pursuant to the Plan and not subject to objection (including any Secured Claim Challenge).

26. "*Assumed Executory Contract and Unexpired Lease List*" means the list, compiled by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases (with proposed cure amounts) that will be assumed by the Reorganized Debtors, which list shall be included in the Plan Supplement.

27.     "*Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be assumed by the applicable Reorganized Debtors, including as set forth on the Assumed Executory Contract and Unexpired Lease List.

28.     "*Ballot*" means the ballot applicable to the relevant Holder of a Claim, substantially in the form attached to the Disclosure Statement Order.

29.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

30.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of Texas.

31.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

32.     "*Bar Date*" means the applicable date established by which respective Proofs of Claims and Interests must be Filed pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 448] which is April 16, 2018 except for in the case of governmental units and certain other exceptions set forth therein.

33.     "*Bar Order and Channeling Injunction*" shall have the same meaning as ascribed in Article VIII of the Plan and incorporated in the Confirmation Order.

34.     "*Bluescape*" means, collectively, Bluescape Resources Company LLC, Energy Strategy Advisory Services, and any of their respective Affiliates holding Claims or Interests against the Debtors, in their capacity as DIP Lender, 1.5 Lien Noteholder, 1.75 Lien Term Loan Lender, Required Party, Settling Lender, or any other capacity.

35.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

36.     "*Cash*" means the legal tender of the U.S. and equivalents thereof, including bank deposits, checks, and other similar items.

37.     "*Cash Management Order*" means the *Amended Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Grating Related Relief* [Docket No. 344], as may be further amended.

38.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed

8

by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 551, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

39.     "*Challenge Actions*" means any and all actual or potential Causes of Action, or Claims objection, belonging to any of the Debtors, and existing at any time on or prior to the Effective Date, related to the 1.5 Lien Notes Claims and the 1.75 Lien Term Loan Facility Claims and the Holders thereof, whether against the Holders of such Claims or third parties, as set forth on the Schedule of Retained Causes of Action, including, but not limited to, (a) any Cause of Action included in the proposed complaint filed as an exhibit to the Standing Motion, (b) Causes of Action arising under chapter 5 of the Bankruptcy Code, including, but not limited to, sections 506, 544, 545, 547, 548, 549, 550, 551, 552, and 553(b) of the Bankruptcy Code, and similar applicable non-bankruptcy law; (c) Causes of Action under general principles of equitable subordination, recharacterization, contract, section 510(c) of the Bankruptcy Code or similar challenges; and (d) Causes of Action alleging that certain Holders of the 1.5 Lien Notes Claims and the 1.75 Lien Term Loan Facility Claims were engaged in a constructive joint venture and/or general partnership with the Debtors and are liable in such capacity to holders of Claims against the Debtors' Estates; *provided*, *however*, that, for the avoidance of doubt, any and all Challenge Actions that the Debtors or Unsecured Claims Distribution Trust or Unsecured Claims Plan Administrator could assert against the Settling Lenders or the Supporting Creditors shall be fully and finally resolved pursuant to the Plan.

40.     "*Challenge Action Recovery*" means any value recovered from prosecution of the Challenge Actions (both Retained Challenge Actions and Contributed Challenge Actions), which shall be available for distribution to Holders of Unsecured Claims, including, for the avoidance of doubt, any Holder of a 1.5 Lien Notes Claim or 1.75 Lien Term Loan Facility Claim that is determined to have an Allowed Unsecured Claim following successful prosecution of a Challenge Action.

41.     "*Challenge Resolution Stipulation*" means the stipulation that shall be Filed by the Unsecured Claims Plan Administrator, in consultation with the Debtors or Reorganized Debtors, as applicable, as set forth in Article VI.C of the Plan.

42.     "*Chapter 11 Cases*" means, collectively:  (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

43.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

44.     "*Claims and Noticing Agent*" means Epiq Corporate Restructuring, LLC, retained as the Debtors' notice and claims agent pursuant to the *Order Appointing Epiq Bankruptcy Solutions, LLC as the Claims, Noticing, Soliciting and Administrative Agent* [Docket No. 100].

45.     "*Claims Objection Deadline*" means the later of:  (a) the date that is (i) the Effective Date with respect to Claims in Classes 5 and 6; (ii) thirty (30) days after the Effective Date with respect to Claims in Classes 3 and 4; and (iii) 180 days after the Effective Date with respect to all other Claims; and (b) such other date as may be fixed by the Bankruptcy Court, after notice and hearing, upon a motion Filed before the expiration of such deadline.

46.     "*Claims Objection Schedule*" means the schedule designating, with respect to Disputed Claims in Class 7, whether the Reorganized Debtors or the Unsecured Claims Distribution Trust or Unsecured Claims Plan Administrator shall have the responsibilities set forth in Article VII.B of the Plan,

as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be included in the Plan Supplement.

47.     "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

48.     "*Class*" means a category of Claims or Interests as set forth in Article III of the Plan.

49.      "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

50.     "*Committee*" means the statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on January 24, 2018, the membership of which may be reconstituted from time to time.

51.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

52.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

53.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

54.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Required Parties.

55.      "*Consummation*" means the occurrence of the Effective Date.

56.     "*Contributed Unsecured Notes Action*" means the Cause of Action for intentional interference with contractual relations as described in Count XXII of the Standing Motion, to be contributed by the Unsecured Notes Trustee to the Unsecured Claims Distribution Trust pursuant to the Plan, unless the Unsecured Notes Trustee provides notice in writing to the Debtors by the Effective Date that it shall retain such Cause of Action.

57.     "*Convenience Claim*" means any Allowed GUC Claim in an Allowed amount that is greater than $0 but less than or equal to $500,000; *provided* that a Holder of an Allowed GUC Claim in excess of $500,000 may irrevocably elect on its Ballot to have such Claim irrevocably reduced to $500,000 and treated as a Convenience Claim for the purposes of the Plan, in full and final satisfaction of such Claim.

58.      "*Convenience Claims Distribution*" means Cash in an amount equal to $1.1 million; *provided* that no Holder of an Allowed Convenience Claim shall receive a distribution in excess of 20 percent of such Allowed Convenience Claim; *provided*, *further*, that any excess Convenience Claims Distribution shall be returned to the Reorganized Debtors.

59.     "*Contributed Challenge Actions*" means any Challenge Actions that are set forth on the Schedule of Retained Causes of Action as Challenge Actions to be contributed to the Unsecured Claims Distribution Trust.

60.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

61.     "*D&O Carriers*" means collectively, (i) Illinois National Insurance Company and AIG Claims, Inc.; (ii) XL Specialty Insurance Company, solely in its capacity as an insurer under the Debtors' second layer of the D&O Liability Insurance Policies; and (iii) Continental Casualty Company; *provided*, *however*, an entity is a D&O Carrier only to the extent related to a particular D&O Liability Insurance Policy.  For the avoidance of doubt, the D&O Carriers shall not include any Insurer under the D&O Liability Insurance Policies or D&O Tail Policies other than those specifically enumerated in the foregoing sentence.

62.     "*D&O Liability Insurance Policies*" means all insurance policies (excluding any "tail policy") relating to the Debtors that provided, *inter alia*, directors' and officers' liability insurance coverage for the Settled Insured Claims, including any and all amendments, supplements, and endorsements, and subject to all of the policies' declarations, terms, conditions and exclusions, including without limitation: (i) Policy 01-211-20-13 issued by Illinois National Insurance Company; (ii) Policy No. ELU148627-17 issued by XL Specialty Insurance Company; (iii) Policy No. ELU148628-17 issued by XL Specialty Insurance Company; (iv) Policy No. 596430481 issued by Continental Casualty Company; (v) Policy No. QPL0040464 issued by QBE North America; (vi) Policy No. V15RVK1709091 issued by Beazley Insurance Company; and (vii) Policy No. 0310-0059 issued by Allied World National Assurance Company; *provided*, *however*, that Insurance Policies issued by ACE American Insurance Company, Federal Insurance Company, or their affiliates and successors shall not be D&O Liability Insurance Policies.

63.     "*D&O Proceeds*" means Cash in the amount of $13,350,000 contributed to the Debtors' Estates by the D&O Carriers on or before the Effective Date in full and final settlement and resolution of potential claims and Causes of Action against current and former directors and officers, including the Settled Insured Claims.

64.     "*D&O Settlement*" means the full and final settlement and resolution of the Settled Insured Claims.

65.     "*D&O Tail Policies*" means any "tail policy" of any of the Debtors for current or former directors', managers', and officers' liability that is unexpired as of the Effective Date.

66.     "*Debtors*" means, collectively:  (a) EXCO Resources, Inc.; (b) EXCO GP Partners Old, LP; (c) EXCO Holding (PA), Inc.; (d) EXCO Holding MLP, Inc.; (e) EXCO Land Company, LLC; (f) EXCO Midcontinent MLP, LLC; (g) EXCO Operating Company, LP; (h) EXCO Partners GP, LLC; (i) EXCO Partners OLP GP, LLC; (j) EXCO Production Company (PA), LLC; (k) EXCO Production Company (WV), LLC; (l) EXCO Resources (XA), LLC; (m) EXCO Services, Inc.; (n) Raider Marketing GP, LLC; and (o) Raider Marketing, LP.

67.     "*DIP Agent*" means Hamblin Watsa Investment Counsel Ltd., as administrative agent under the DIP Facility.

68.     "*DIP Facility*" has the meaning ascribed to it in the DIP Order.

69.     "*DIP Facility Claims*" means any Claims arising under the DIP Facility (as such term is defined in the DIP Order).

70.      "*DIP Lenders*" means the lenders from time to time party to the DIP Facility.

71.      "*DIP Order*" means the *Final Order under 11 U.S.C. §§ 105, 361, 362, 363, and 507 (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 348], as may be amended.

72.      "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that (a) has been disallowed by a Final Order, including a Final Order regarding the Secured Claim Challenges, (b) is scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or the Plan, (c) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or the Plan, (d) has been waived or withdrawn by agreement of the applicable Debtor or Reorganized Debtor, as applicable, and the Holder thereof, or (e) has been waived or withdrawn by the Holder thereof.

73.      "*Disclosure Statement*" means the *Disclosure Statement for the Second Amended Joint Chapter 11 Plan of EXCO Resources, Inc. and Its Debtor Affiliates*, dated as of May 3, 2019, as may be amended, including all exhibits and schedules thereto, as approved pursuant to the Disclosure Statement Order.

74.      "*Disclosure Statement Order*" means the *Order (I) Approving the Amended Disclosure Statement, (II) Establishing the Voting Record Date, Voting Deadline, and Other Dates, (III) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Amended Plan and for Filing Objections to the Amended Plan, and (IV) Approving the Manner and Forms of Notice and Other Related Documents* [Docket No. 1909].

75.      "*Disputed*" means with regard to any Claim or Interest, a Claim or Interest that is not yet Disallowed or Allowed.

76.      "*Disputed 1.5 Lien Claim*" means any 1.5 Lien Notes Claim that is Held by a 1.5 Lien Noteholder who is not a Supporting Creditor or Settling Lender.

77.      "*Disputed 1.75 Lien Claim*" means any 1.75 Lien Term Loan Facility Claim that is Held by a 1.75 Lien Term Loan Lender who is not a Supporting Creditor or Settling Lender.

78.      "*Distribution Dates*" means the dates determined by the Reorganized Debtors, in consultation with the Unsecured Claims Plan Administrator, on which distributions will be made to Holders of Allowed Claims, including the Initial Distribution Date and any subsequent dates of distribution.

79.      "*Distribution Record Date*" means, other than with respect to any publicly-held securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims and Allowed Interests, which date shall be the date that is five (5) Business Days after the Confirmation Date or such other date as designated in a Final Order of the Bankruptcy Court.

80.      "*DTC*" means the Depository Trust Company.

81.     "*Effective Date*" means, with respect to the Plan and any such applicable Debtor(s), the date that is the first Business Day upon which:  (a) all conditions precedent specified in Article IX.A and Article IX.B have been satisfied or waived (in accordance with Article IX.C); and (b) the Plan is declared effective with respect to such applicable Debtor(s).

82.     "*Enjoined Parties*" means all Holders of Claims and Interests holding Enjoined Claims as defined in Article VIII.H of the Plan; *provided* that those Holders of Claims and Interests who exercised their right to opt out of the Third Party Release in accordance with the Plan shall not be Enjoined Parties.

83.     "*Enterprise Settlement Agreement*" means that certain settlement agreement approved pursuant to the *Order (I) Authorizing and Approving the Settlement by and among the Debtors, the Enterprise Entities, the Bluescape Entities, and the Committee, and (II) Granting Related Relief* [Docket No. 1853].

84.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

85.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

86.     "*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

87.     "*EXCO*" means EXCO Resources, Inc., a Texas corporation.

88.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Settling Lenders; (d) the Committee; (e) the individual members of the Committee; (f) the Unsecured Claims Distribution Trust; (g) the Unsecured Claims Distribution Trust Advisory Board; (g) the Unsecured Claims Litigation Trustee; (h) the Unsecured Claims Plan Administrator; (i) the Unsecured Claims Plan Administrator Advisory Board; and (j) with respect to each of the foregoing (a) through (h), such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former members, equity holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, predecessors, successors, assigns, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, restructuring advisors, investment bankers, consultants, representatives, and other professionals, each in their capacity as fiduciary to the Debtors or proponent of the Plan.

89.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

90.     "*Exit RBL Facility*" means the revolving credit facility, in the amount of $375 million, approximately $250 million drawn on the Effective Date, which shall be on such terms as set forth in the applicable Exit RBL Facility Documents.

91.     "*Exit RBL Facility Documents*" means, in connection with the Exit RBL Facility, the applicable credit agreements, collateral documents, Uniform Commercial Code statements, and other loan documents, to be dated as of the Effective Date, governing the Exit RBL Facility, which documents shall be included in the Plan Supplement.

92.     "*Fairfax*" means, collectively, Fairfax Financial Holdings Ltd., Hamblin Watsa Investment Counsel Ltd., and any of their respective Affiliates holding Claims or Interests against the Debtors, in their capacity as DIP Lender, 1.5 Lien Noteholder, 1.75 Lien Term Loan Lender, Required Party, Settling Lender, or any other capacity.

93.     "*Fairfax Makewhole Claims*" means any 1.75 Lien Makewhole Claims held by Fairfax.

94.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

95.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, including with respect to a Proof of Claim or Proof of Interest, the Claims and Noticing Agent.

96.     "*Final Order*" means (a) an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction, or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 11 Case (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

97.     "*General Administrative Claim*" means any Administrative Claim, other than a Professional Fee Claim.

98.      "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

99.     "*GUC Claim*" means any Unsecured Claim, other than any (a) Unsecured Notes Claim or (b) 1.5 Lien Notes Claim, 1.75 Lien Term Loan Facility Claim, or Second Lien Term Loan Facility Claim that is not Secured, whether as a result of successful prosecution of a Challenge Action or otherwise, against any Debtor.

100.     "*Holder*" means an Entity holding a Claim or an Interest, as applicable.  "Hold" and "Held" shall have the correlative meanings.

101.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

102.     "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals, advisors, and agents of the Debtors, as applicable.

14

103.    "*Indenture Trustees*" means, collectively, (a) the 1.5 Lien Notes Trustee, (b) the 2018 Unsecured Notes Trustee, and (c) the 2022 Unsecured Notes Trustee.

104.    "*Initial Distribution Date*" means, with respect to any Claim that is Allowed as of the Effective Date, on or as soon as reasonably practicable following the Effective Date.

105.    "*Insurance Policies*" means any and all insurance policies, including the D&O Liability Insurance Policies and the D&O Tail Policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provision of insurance entered into by or issued to or for the benefit of, at any time, any of the Debtors or their predecessors.

106.    "*Insureds*" means all persons and Entities that may be an "Insured" as defined in the D&O Liability Insurance Policies (or otherwise entitled to coverage thereunder).

107.    "*Insurer*" means any company or other entity that issued an Insurance Policy, any third party administrator of or for any Insurance Policy, and any respective predecessors and/or affiliates of any of the foregoing.

108.    "*Intercompany Claim*" means any Claim held by any Debtor or non-Debtor affiliate or subsidiary against any other Debtor.

109.    "*Intercompany Interest*" means any Interest held by a Debtor in another Debtor, exclusive of any Interests in EXCO.

110.    "*Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of March 15, 2017, by and between the Debtors, JPMorgan Chase Bank, N.A., as administrative agent under the former RBL credit agreement, and Wilmington Trust, National Association, as original second lien collateral trustee and the original third lien collateral trustee, as may be amended, modified, or otherwise supplemented from time to time.

111.    "*Intercreditor Assignment*" means the agreement by the Settling Lenders, pursuant to the Secured Lender Settlement, and the Supporting 1.5L Noteholders, to grant to the Unsecured Claims Plan Administrator the authority to litigate and enforce their rights against the 1.75 Lien Agent and the Holders of 1.75 Lien Term Loan Facility Claims and the Second Lien Term Loan Facility Agent and Holders of Second Lien Term Loan Facility Claims pursuant to the Intercreditor Agreement and section 510(a) of the Bankruptcy Code to the extent permissible under the Intercreditor Agreement or applicable law, including, without limitation, the right to compel turnover of any distributions under the Plan; *provided* that the Unsecured Claims Plan Administrator shall not assert such rights against any Settling Lender or Supporting Creditor; *provided*, *further*, that notwithstanding the foregoing, the Settling Lenders and Supporting 1.5L Noteholders shall remain the economic owners of the rights under the Intercreditor Agreement.

112.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Entity.

113.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 432].

114.    "*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

115.    "*Investment Company Act*" means the Investment Company Act of 1940, as amended.

116.    "*IRS*" means the Internal Revenue Service.

117.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

118.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

119.    "*LSP*" means, collectively, LSP Investment Advisors, LLC, Gen IV Investment Opportunities, LLC, VEGA Asset Partners, LLC, and any of their respective Affiliates holding Claims against the Debtors, in their capacity as 1.5 Lien Noteholder, 1.75 Lien Term Loan Lender, or any other capacity.

120.    "*Makewhole Claims*" means, collectively, the 1.5 Lien Makewhole Claims and the 1.75 Lien Makewhole Claims, including the Fairfax Makewhole Claims.

121.    "*Management Incentive Plan*" means a post-Effective Date management incentive plan that may be adopted by the board of directors of the Reorganized Debtors.

122.    "*Mediation*" means the mediation between, among others, the Debtors, and certain 1.5 Lien Noteholders, 1.75 Lien Term Loan Lenders, Second Lien Lenders, Holders of Unsecured Notes, the Committee, and the D&O Carriers, which was held before the Honorable David R. Jones, pursuant to the *Order Appointing United States Bankruptcy Judge as Mediator* [Docket No. 894].

123.    "*Mineral Interests*" means the oil, gas, or mineral leases or agreements, working interests granting the right to exploit oil and gas, and certain other royalty or mineral interests, including but not limited to, landowner's royalty interests, overriding royalty interests, net profit interests, non-participating royalty interests, and production payments, pursuant to applicable state law.

124.    "*New Common Stock*" means the new common stock or limited liability company units in Reorganized EXCO whether issued or unissued on the Effective Date to be distributed under and in accordance with the Plan.

125.    "*New Organizational Documents*" means such certificates or articles of incorporation, by-laws, limited liability company operating agreements, stockholders' agreements, or other applicable formation and governance documents of each of the Reorganized Debtors, as applicable, the form of which shall be included in the Plan Supplement.

126.    "*Notes*" means, collectively, (a) the 1.5 Lien Notes, (b) the 2018 Unsecured Notes, and (c) the 2022 Unsecured Notes.

127.    "*Oaktree*" means, collectively, Oaktree Capital Management, L.P. and any of its Affiliates that currently hold or have held Claims or Interests, in their capacity as a 1.5 Lien Noteholder, Interest Holder, Required Party, Supporting Creditor or any other capacity.

128.    "*Ordinary Course Professional Order*" means the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 350].

129.    "*Other Priority Claims*" means any Claim against a Debtor, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

130.    "*Other Secured Claims*" means any Secured Claim against any of the Debtors other than the: (a) Secured 1.5 Lien Notes Claims (if any), (b) Secured 1.75 Lien Term Loan Facility Claims (if any), and (c) Secured Second Lien Term Loan Facility Claims (if any).

131.    "*Petition Date*" means January 15, 2018, which is the date on which the Debtors commenced the Chapter 11 Cases.

132.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors, in form and substance reasonably acceptable to the Required Parties, in accordance with the Disclosure Statement Order or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement.  The Plan Supplement shall be comprised of, among other documents, the following:  (a) the New Organizational Documents; (b) the Assumed Executory Contract and Unexpired Lease List; (c) the Rejected Executory Contract and Unexpired Lease List; (d) the Schedule of Retained Causes of Action; (e) Claims Objection Schedule; (f) the identity of the members of the Reorganized EXCO Board and management for the Reorganized Debtors; (g) the Exit RBL Facility Documents; (h) the Unsecured Claims Distribution Trust Documents; (i) the Stockholders' Agreement; and (j) the identity and compensation of the Unsecured Claims Plan Administrator and the members of the Unsecured Claims Distribution Trust Advisory Board.  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (j). Notwithstanding the foregoing, the Debtors may amend, with the consent of the Required Parties, the documents contained in, and exhibits to, the Plan Supplement through the Effective Date or as otherwise provided herein; *provided* that the Schedule of Retained Causes of Action filed at Docket No. 1880 with regards to the Causes of Action against the 1.5 Lien Noteholders, 1.5 Lien Notes Trustee, 1.75 Lien Term Loan Lenders, 1.75 Lien Agent, Second Lien Lenders, and Second Lien Agent shall not be subject to further amendment.

133.    "*Priority Claims*" means, collectively, the (a) Administrative Claims, (b) Priority Tax Claims, and (c) Other Priority Claims.

134.    "*Priority Tax Claim*" means the Claims of Governmental Units of the type specified in section 507(a)(8) of the Bankruptcy Code.

135.    "*Pro Rata*" means the proportion that the amount of an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of the Allowed Claims or Allowed Interests, in that Class, or the proportion of the Allowed Claims or Allowed Interests in a particular Class and other Classes, respectively, entitled to share in the same recovery as such Claim or Interest under the Plan.  For the avoidance of doubt, with respect to Claims in Classes 3, 4, 5, and 6, the Pro Rata proportion shall be determined based on the amount of the applicable positions held by such Claim Holders, as of the Distribution Record Date, as evidenced by the applicable records received by the Debtors from the applicable Indenture Trustee or Administrative Agent.

136.    "*Professional*" means an Entity, excluding those Entities entitled to compensation pursuant to the Ordinary Course Professional Order:  (a) retained pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; *provided* that professionals employed by any Administrative Agent, any Indenture Trustee, or any other creditor shall not be "Professionals" for the purposes of the Plan.

137.    "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

138.    "*Professional Fee Escrow Account*" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtors on the Effective Date, pursuant to Article II.A.2(b) of the Plan.

139.    "*Professional Fee Reserve Amount*" means the total amount of Professional Fee Claims estimated in accordance with Article II.A.2(c) of the Plan.

140.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

141.    "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

142.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired for purposes of section 1124 of the Bankruptcy Code.

143.    "*Rejected Executory Contract and Unexpired Lease List*" means the list, compiled by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases that will be rejected by the Debtors pursuant to the Plan, which list shall be included in the Plan Supplement.

144.    "*Released Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Debtors and the Reorganized Debtors; (b) each of the Settling Lenders; (c) the DIP Agent; (d) each of the DIP Lenders; (e) the Committee; (f) each of the individual members of the Committee (both in their capacity as such and as individual creditors); (g) each of the Supporting Creditors; (h) each of the Debtors' current and former directors or officers; (i) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (j) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (k) each of the D&O Carriers; (l) the Unsecured Notes Trustee; (m) the Second Lien Agent; and (n) with respect to each of the foregoing (a) through (m), each of such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided* that (x) any Holder of a Claim or Interest that votes against or objects to the Plan or opts out of the Third Party Release or (y) any Holder of a Disputed 1.5 Lien Claim or a Disputed 1.75 Lien Claim, shall not be a Released Party.

145.    "*Releasing Parties*" means, collectively, and in each case only in its capacity as such: (a) each of the Debtors and the Reorganized Debtors; (b) each of the Settling Lenders; (c) the DIP Agent; (d) each of the DIP Lenders; (e) the Committee; (f) each of the individual members of the Committee;

(g) each of the Supporting Creditors; (h) each of the Debtors' current and former directors or officers; (i) all persons and Entities that may be an "Insured," in their capacity as such, as defined in the D&O Liability Insurance Policies; (j) any and all known or unknown individuals or Entities asserting or who may assert any basis for coverage under the D&O Liability Insurance Policies; (k) each of the D&O Carriers; (l) the Unsecured Notes Trustee; (m) the Second Lien Agent; (n) the Unsecured Claims Distribution Trust; (o) the Unsecured Claims Plan Administrator; (p) all Holders of Claims or Interests who (i) vote in favor of the Plan or (ii) abstain from voting, are not entitled to vote, or vote to reject the Plan **and** do not opt out of the Third Party Release on a timely submitted Ballot or opt out form; and (q) with respect to each of the foregoing (a) through (q), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former members, directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former members, equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

146.     *"Reorganized"* means, as to any Debtor or Debtors, such Debtor(s) as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, taxable disposition, or otherwise, on or after the Effective Date.

147.     *"Reorganized Debtors"* means, collectively, and each in its capacity as such, the Debtors, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, and from and after the Effective Date, shall include (without limitation) Reorganized EXCO.

148.     *"Reorganized EXCO"* means EXCO, as reorganized pursuant to and under the Plan or any successor thereto, as set forth in the Plan and the New Organizational Documents.

149.     *"Reorganized EXCO Board"* means the board of directors of Reorganized EXCO on and after the Effective Date.

150.     *"Required Parties"* means Bluescape, Fairfax, and the Committee and, solely with respect to any provisions of the Plan adversely affecting Oaktree in its individual capacity or its capacity as a Supporting 1.5 Lien Noteholder, Oaktree.

151.     *"Restructuring Transactions"* means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, sales, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors reasonably determine to be necessary or desirable to implement the Plan with respect to the Debtors, including, without limitation, the Exit RBL Facility, and the transactions contemplated by the New Organizational Documents.

152.     *"Retained Challenge Actions"* means any Challenge Actions that are set forth on the Schedule of Retained Causes of Action as Challenge Actions to be retained by the Debtors or the Reorganized Debtors, as applicable, and prosecuted by the Unsecured Claims Plan Administrator on behalf of the Debtors or the Reorganized Debtors, as applicable.

153.     *"Schedule of Retained Causes of Action"* means the schedule of certain Causes of Action of the Debtors that are not released or waived pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be included in the Plan Supplement, *provided* that such schedule shall not include any Causes of Action against any Released Party, and any such inclusion will be deemed void *ab initio* (and for the avoidance of doubt, the Schedule of Retained

Causes of Action shall not include any Causes of Action, including any Secured Claim Challenge, against the Settling Lenders or the Supporting Creditors); *provided*, *further*, that such schedule shall specify which of such Causes of Action shall be retained by the Reorganized Debtors and which Causes of Action shall be assigned to the Unsecured Claims Distribution Trust.

154.    "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

155.    "*SEC*" means the Securities and Exchange Commission.

156.    "*Second Lien Agent*" means GLAS Trust Company, as administrative agent and collateral trustee under the Second Lien Credit Agreement and Wilmington Trust, National Association, as predecessor administrative agent and collateral trustee under the Second Lien Credit Agreement.

157.    "*Second Lien Credit Agreement*" means that certain Term Loan Agreement, dated as of October 19, 2015, by and among EXCO, as borrower, the guarantors party thereto, the Second Lien Agent, and the other lender and agent parties thereto, as may be amended, restated, or otherwise supplemented from time to time.

158.    "*Second Lien Lenders*" means the lending institutions party from time to time to the Second Lien Credit Agreement.

159.    "*Second Lien Term Loan Facility Claims*" means any Claims against the Debtors derived from or arising under the Second Lien Credit Agreement, whether Secured or Unsecured.

160.    "*Secured*" means when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan or separate order of the Bankruptcy Court as a secured claim.

161.    "*Secured Claim Challenge*" means any objection, Challenge Action, or the Contributed Unsecured Notes Action (if applicable) in respect to the 1.5 Lien Notes Claims or the 1.75 Lien Term Loan Facility Claims or the Holders thereof.

162.    "*Secured Claim Challenge Resolution Date*" means the date on which all timely-Filed Secured Claim Challenges have been resolved by settlement, Final Order or other disposition.  For the avoidance of doubt, all Secured Claim Challenges with respect to the Settling Lenders and the Supporting Creditors are resolved pursuant to the Plan.

163.    "*Secured Lender Settlement*" means the full and final settlement and resolution of any and all claims and Causes of Action the Debtors, the Committee, or the Unsecured Claims Distribution Trust or Unsecured Claims Plan Administrator could assert against the Settling Lenders in any manner, pursuant to which the Settling Lenders shall (a) contribute the Settlement Contribution to fund recoveries to Holders of Allowed Unsecured Claims in Classes 5, 6, and 7 pursuant to the Plan and to fund the Settlement Contribution Hold-Back; (b) effectuate the Intercreditor Assignment; (c) waive any right to recover on account of any Claim under section 507(b) of the Bankruptcy Code; and (d) waive any Makewhole Claim

on account of the 1.5 Lien Notes Claims or 1.75 Lien Term Loan Facility Claim Held by such Settling Lender.

164.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77–77a, as amended, together with the rules and regulations promulgated thereunder.

165.    "*Security*" or "*Securities*" has the meaning set forth in section 2(a)(1) of the Securities Act.

166.    "*Settled Actions*" means, collectively, (a) the Settled Insured Claims and (b) any and all claims and Causes of Action that the Debtors, the Committee, the Unsecured Claims Litigation Trustee, or the Unsecured Claims Plan Administrator could assert against the Settling Lenders and the Supporting Creditors in any manner, which claims and Causes of Action shall be fully and finally released pursuant to the Plan.

167.    "*Settled Insured Claims*" means, collectively, any and all claims and Causes of Action that the Debtors could assert against the Insureds or the Insurers in any manner, including, without limitation, any other claim or action was would implicate the D&O Liability Insurance Policies; *provided*, *however*, that the Settled Insured Claims do not include claims or actions to the extent covered by any Insurance Policies that have been issued by ACE American Insurance Company, Federal Insurance Company, or their affiliates and successors, which claims and Causes of Action shall be fully and finally released pursuant to the Plan.

168.    "*Settlement Contribution*" means 11.1 percent of New Common Stock which the Settling Lenders are entitled to receive pursuant to the Plan as Holders of 1.5 Lien Notes Claims.

169.    "*Settlement Contribution Hold-Back*" means New Common Stock with a value equal to the amount of the Unsecured Claims Distribution Loan as of the Effective Date (which shall be, for the avoidance of doubt, 0.49 percent of the New Common Stock) which shall secure the Unsecured Claims Distribution Loan.

170.    "*Settling Lenders*" means, collectively, Fairfax and Bluescape.

171.    "*Standing Motion*" means the *Motion of the Official Committee of Unsecured Creditors for (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors Estates, and (II) Exclusive Settlement Authority* [Docket No. 1624] (as may be amended) and all exhibits thereto.

172.    "*Stockholders' Agreement*" means the stockholders' agreement, entered into by all holders of New Common Stock, which shall contain customary and appropriate minority protections, the form of which shall be included in the Plan Supplement.

173.    "*Supporting 1.5L Noteholder*" means any Holder of a 1.5 Lien Notes Claim who, with the consent of each of the Required Parties, agrees to support the Plan pursuant to a timely-executed Supporting Joinder Agreement and who votes (or is deemed to vote pursuant to a timely-executed Supporting Joinder Agreement) its 1.5 Lien Notes  Claims Held in favor of the Plan and does not opt out (or is deemed not to opt out pursuant to a timely-executed Supporting Joinder Agreement) of the Third Party Release, and who shall be deemed, in exchange for being a Released Party and beneficiary of the Third Party Release including, without limitation, with respect to any and all claims and Causes of Action the Debtors, the Committee, the Unsecured Claims Distribution Trust or Unsecured Claims Plan Administrator could assert against such Supporting 1.5L Noteholder and receipt of its Pro Rata Share of the 1.5 Lien Claims Recovery and the other benefits provided to such Supporting 1.5 Lien Noteholder under the Plan (a) effectuate the

Intercreditor Assignment pursuant to the Plan; (b) waive any right to recover on account of any Claim under section 507(b) of the Bankruptcy Code; and (c) waive any Makewhole Claim on account of the 1.5 Lien Notes Claims held by such Supporting 1.5L Noteholder.

174.     "*Supporting 1.75L Lender*" means any Holder of a 1.75 Lien Term Loan Facility Claim who, with the consent of each of the Required Parties, agrees to support the Plan pursuant to a timely-executed Supporting Joinder Agreement and who does vote any Claims Held in favor of the Plan and does not opt out of the Third Party Release.

175.     "*Supporting 2L Lender*" means any Holder of a Second Lien Term Loan Facility Claim who, with the consent of each of the Required Parties, agrees to support the Plan pursuant to a timely-executed Supporting Joinder Agreement and who does vote any Claims Held in favor of the Plan and does not opt out of the Third Party Release.

176.     "*Supporting Creditors*" means, collectively, the Supporting 1.5L Noteholders, Supporting 1.75L Lenders, and Supporting 2L Lenders.

177.     "*Supporting Joinder Agreement*" means the agreement executed prior to Confirmation by a Supporting Creditor, with the consent of the Debtors, and each of the Required Parties, pursuant to which a Supporting Creditor agrees to vote in favor of the Plan and not opt out of the Third Party Release and the Debtors and the Required Parties acknowledge that the Claims held by such Supporting Creditor shall be Allowed Claims (and for the avoidance of doubt shall not be a Disputed 1.5 Lien Claim or Disputed 1.75 Lien Claim (as applicable)). For the avoidance of doubt, each of the Required Parties may withhold their consent for a party to become a Supporting Creditor for any reason, or condition their consent on a satisfactory settlement of any Challenge Actions that may be asserted against such party.

178.     "*Third Party Release*" means the release provided by the Releasing Parties in favor of the Released Parties as set forth in Article VIII.D of the Plan.

179.     "*Trustee Fees and Expenses*" means the Claims for reasonable and documented compensation, fees, expenses, and disbursements arising under the 1.5 Lien Notes Indenture, the 2018 Unsecured Notes Indenture, and the 2022 Unsecured Notes Indenture, including, without limitation, trustee fees, attorneys', financial advisors', and agents' fees, expenses, and disbursements, incurred under any such indenture by the respective Indenture Trustees, prior to or after the Petition Date and prior to the Effective Date.

180.     "*U.S.*" means the United States of America.

181.     "*U.S. Trustee*" means the Office of the U.S. Trustee Region 7 for the Southern District of Texas.

182.     "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

183.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

184.     "*Unsecured*" means when referring to a Claim, any Claim that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, or Secured Claim. For the avoidance of doubt, Unsecured Claims include any GUC Claim, together with any 1.5 Lien Notes Claim, 1.75 Lien Term Loan Facility

Claim, or Second Lien Term Loan Facility Claim that is not Secured whether as a result of successful prosecution of a Challenge Action or otherwise, and any Unsecured Notes Claim.

185.     "*Unsecured Claims Consideration*" means (a) New Common Stock in the amount of (i) the Settlement Contribution minus (ii) the Settlement Contribution Hold-Back; (b) $1 million in Cash; (c) the Unsecured Claims Distribution Trust Beneficial Interests (if applicable); (d) the Challenge Action Recovery (if any);  and  (e) the  Settlement  Contribution  Hold-Back  remaining  after  repayment  of  the  Unsecured Claims Distribution Loan in accordance with Article IV.U.3 of the Plan (if any).

186.     "*Unsecured Claims Distribution Trust*" means (if applicable) the trust or other legal entity established on the Effective Date (if applicable) in accordance with the Unsecured Claims Distribution Trust Documents, which trust or other legal entity shall be vested with the Unsecured Claims Distribution Trust Assets and have the powers and responsibilities set forth in Article IV.U of the Plan and in the Unsecured Claims Distribution Trust Documents.

187.     "*Unsecured Claims Distribution Trust Advisory Board*" means (if applicable) that certain three-member board of the Unsecured Claims Distribution Trust appointed by the Committee in accordance with the Unsecured Claims Distribution Trust Documents.

188.     "*Unsecured Claims Distribution Trust Assets*" means (if applicable) (a) all of the Debtors' right, title, and interest in those Challenge Actions set forth on the Schedule of Retained Causes of Action as Contributed Challenge Actions; (b) the Contributed Unsecured Notes Action (if applicable), and (c) all proceeds of the foregoing.  For the avoidance of doubt, the Unsecured Claims Distribution Trust Assets shall not include any objection or Cause of Action against the Settling Lenders or Supporting Creditors.

189.     "*Unsecured Claims Distribution Trust Beneficial Interests*" means the beneficial interests in the Unsecured Claims Distribution Trust to be issued to Holders of Allowed Unsecured Claims pursuant to the Plan (if applicable).

190.     "*Unsecured Claims Distribution Trust Documents*" means that certain trust agreement, the form of which shall be included in the Plan Supplement, and relevant documents related thereto.

191.     "*Unsecured Claims Distribution Loan*" means $2.5 million in Cash loaned by the Debtors jointly to the Unsecured Claims Plan Administrator and the Unsecured Claims Distribution Trust on or prior to the Effective Date to be used solely to pay the fees and expenses thereof.

192.     "*Unsecured Claims Litigation Trustee*" means (if applicable) the Trustee who shall be appointed by the Unsecured Claims Distribution Trust Advisory Board to coordinate administration and other activities of the Unsecured Claims Distribution Trust and the Unsecured Claims Distribution Trust Assets in accordance with the Unsecured Distribution Trust Documents.

193.     "*Unsecured Claims Plan Administrator*" means the individual who shall be appointed by the Committee and whose identity shall be disclosed in the Plan Supplement, and who shall be authorized, subject to the consent of a majority of the Unsecured Claims Plan Administrator Advisory Board, to prosecute any Retained Challenge Actions and any Causes of Action pursuant to the Intercreditor Assignment.

194.     "*Unsecured Claims Plan Administrator Advisory Board*" means that certain advisory board, the initial members of whom shall be identified in the Plan Supplement, and whose appointment shall be governed as set forth in the Plan Supplement, with which the Unsecured Claims Plan Administrator shall consult on certain material decisions.

195.    "*Unsecured Claims Recovery*" means, with respect to each Holder of an Allowed Unsecured Claim, the Unsecured Claims Consideration attributable to each Debtor against which such Holder has an Allowed Claim, as set forth in **Exhibit G** of the Disclosure Statement.

196.    "*Unsecured Notes*" means, collectively, (a) the 2018 Unsecured Notes and (b) the 2022 Unsecured Notes.

197.    "*Unsecured Notes Claims*" means any Claim derived from or arising under the Unsecured Notes.

198.    "*Unsecured Notes Trustee*" means Wilmington Savings Fund Society, FSB, as indenture trustee under the 2018 Unsecured Notes Indenture and 2022 Unsecured Notes Indenture.

B.    *Rules of Interpretation.*

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neutral gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, or similar formation document or agreement, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any immaterial effectuating provisions may be interpreted by the Debtors or Reorganized Debtors, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (15) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors and the Reorganized Debtors, shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur

24

pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States, unless otherwise expressly provided.

F.      *Conflicts.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND DIP FACILITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and DIP Facility Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests.

A.      *Administrative Claims.*

1.      General Administrative Claims.

Except as specified in this Article II, unless the Holder of an Allowed General Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either: (a) on the Effective Date; (b) if the General Administrative Claim is not Allowed as of the Effective Date, sixty (60) days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed General Administrative Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Administrative Claim, without any further action by the Holders of such Allowed General Administrative Claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except for Claims of Professionals, requests for payment of General Administrative Claims that were not accrued in the ordinary course of business must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date.  Holders of General Administrative Claims that are required to File and serve a request for payment of such General Administrative Claims by the Administrative Claims Bar Date and do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Claims against the Debtors or Reorganized Debtors, as applicable, or their respective property, and such General Administrative Claims shall be deemed forever discharged and released as of the Effective Date.  Any requests for payment of General Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be Disallowed automatically without the need for further action by the Debtors or the Reorganized Debtors, as applicable, or further order of the Bankruptcy Court.  To the extent this Article II.A.1 conflicts with Article XII.C of the Plan with respect to fees and expenses payable under section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, Article XII.C of the Plan shall govern.  Notwithstanding the foregoing, no request for payment of a General Administrative Claim need be Filed with respect to a General Administrative Claim previously Allowed by Final Order.

The Debtors or the Reorganized Debtors, in their sole and absolute discretion, may settle General Administrative Claims without further Bankruptcy Court approval.  The Reorganized Debtors may also choose to object to any Administrative Claim no later than sixty (60) days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or Reorganized Debtors (or other party with standing), as applicable, object to a timely filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested.  In the event that the Debtors or Reorganized Debtors, as applicable, object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

2.      Professional Compensation.

(a)      Final Fee Applications.

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date, must be Filed and served on the Reorganized Debtors no later than sixty (60) days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice to other parties on the regular service list and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, including the Interim Compensation Order, and once approved by the Bankruptcy Court, promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.

(b)      Professional Fee Escrow Account.

On the Effective Date, the Debtors or Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors, as applicable.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order.  When all such Allowed amounts owing to

26

Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be paid by the Debtors or the Reorganized Debtors, as applicable.

               (c)       <u>Professional Fee Reserve Amount</u>.

       Professionals shall estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than five business days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total amount estimated pursuant to this section shall comprise the Professional Fee Reserve Amount.

               (d)       <u>Post-Confirmation Date Fees and Expenses</u>.

       Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**B.**      *Priority Tax Claims.*

       Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**C.**      *DIP Facility Claims.*

       Except to the extent that a Holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, each Holder of such Allowed DIP Facility Claim shall be paid in full in Cash from the proceeds of the Exit RBL Facility. Upon the payment or satisfaction of the Allowed DIP Facility Claims in accordance with this Article II.C, all Liens and security interests granted to secure the Allowed DIP Facility Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**D.**      *Statutory Fees.*

       All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall

pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the case of that particular Debtor being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.     Classification of Claims and Interests.*

Claims and Interests, except for Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Facility Claims, are classified as required by the Bankruptcy Code in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.  The Debtors reserve the right to assert that the treatment provided to Holders of Claims and Interests pursuant to Article III.B of the Plan renders such Holders Unimpaired.

1.     <u>Class Identification for the Debtors.</u>

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, each of which shall include the classifications set forth below.  Subject to Article I.D of the Plan, to the extent that a Class contains Claims or Interests only with respect to one or more particular Debtors, such Class applies solely to such Debtor.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | 1.5 Lien Notes Claims | Impaired | Entitled to Vote |
| Class 4 | 1.75 Lien Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 6 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 7 | GUC Claims | Impaired | Entitled to Vote |
| Class 8 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept/Reject) |
| Class 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

28

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 11 | Interests in EXCO | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

To the extent that a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the treatment of Allowed Claims and Allowed Interests in such Class is specified below.

1.      Class 1 – Other Secured Claims.

(a)     *Classification*:  Class 1 consists of Other Secured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

(i)     payment in full in Cash;

(ii)    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

(iii)   Reinstatement of such Claim; or

(iv)    other treatment rendering such Claim Unimpaired.

(c)     *Voting:*  Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims.

(a)     *Classification*:  Class 2 consists of Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

(i)     payment in full in Cash; or

(ii)    other treatment rendering such Claim Unimpaired or otherwise permitted by the Bankruptcy Code.

(c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

29

3.      Class 3 –1.5 Lien Notes Claims.

    (a)      *Classification*:  Class 3 consists of 1.5 Lien Notes Claims.

    (b)      *Allowance*: The 1.5 Lien Notes Claims held by any Settling Lender or any Supporting Creditor are Allowed.

    (c)      *Treatment*:  Except to the extent that a Holder of an Allowed 1.5 Lien Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 1.5 Lien Notes Claim (subject to, for the avoidance of doubt, the Secured Lender Settlement) each such Holder shall receive its Pro Rata share of the 1.5 Lien Claims Recovery; *provided* that to the extent that an Allowed 1.5 Lien Notes Claim is an Unsecured Claim following successful prosecution of a Secured Claim Challenge, the Holder of such Allowed Unsecured 1.5 Lien Notes Claim shall receive its Pro Rata share, together with all Holders of Allowed Unsecured Claims, of the Unsecured Claims Recovery; *provided*, *further*, that to the extent an Allowed 1.5 Lien Notes Claim is subordinated to Unsecured Claims as a result of successful prosecution of a Secured Claim Challenge, each Holder of an Allowed 1.5 Lien Notes Claim that is so subordinated shall receive no distribution on account of such subordinated Allowed 1.5 Lien Notes Claim until all Unsecured Claims senior to such subordinated Allowed 1.5 Lien Notes Claim have received 100 percent recovery.

    (d)      *Voting:*  Class 3 is Impaired under the Plan.  Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.      Class 4 – 1.75 Lien Term Loan Facility Claims.

    (a)      *Classification*:  Class 4 consists of 1.75 Lien Term Loan Facility Claims.

    (b)      *Allowance*: The 1.75 Lien Term Loan Facility Claims held by any Settling Lender or any Supporting Creditor are Allowed.

    (c)      *Treatment*:  Except to the extent that a Holder of an Allowed 1.75 Lien Term Loan Facility Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 1.75 Lien Term Loan Facility Claim, each such Holder shall receive its Pro Rata share of the 1.75 Lien Claims Recovery; *provided* that to the extent that an Allowed 1.75 Lien Term Loan Facility Claim is an Unsecured Claim following successful prosecution of a Secured Claim Challenge, the Holder of such Allowed Unsecured 1.75 Lien Term Loan Facility Claim shall instead receive its Pro Rata share, together with all Holders of Allowed Unsecured Claims, of the Unsecured Claims Recovery; *provided*, *further*, that to the extent an Allowed 1.75 Lien Term Loan Facility Claim is subordinated to Unsecured Claims as a result of successful prosecution of a Secured Claim Challenge, each Holder of an Allowed 1.75 Lien Term Loan Facility Claim that is so subordinated shall receive no distribution on account of such subordinated Allowed 1.75 Lien Term Loan Facility Claim until all Unsecured Claims senior to such subordinated Allowed 1.75 Lien Term Loan Facility Claim have received 100 percent recovery.

     (d)    *Voting:*  Class 4 is Impaired under the Plan.  Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan:

5.    Class 5 – Second Lien Term Loan Facility Claims.

     (a)    *Classification*:  Class 5 consists of Second Lien Term Loan Facility Claims.

     (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Second Lien Term Loan Facility Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Second Lien Term Loan Facility Claim, each such Holder shall receive, together with all Holders of Unsecured Claims, its Pro Rata share of the Unsecured Claims Recovery.

     (c)    *Voting:*  Class 5 is Impaired under the Plan.  Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

6.    Class 6 – Unsecured Notes Claims.

     (a)    *Classification*:  Class 6 consists of Unsecured Notes Claims.

     (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Notes Claim, each such Holder shall receive, together with all Holders of Allowed Unsecured Claims, its Pro Rata share of the Unsecured Claims Recovery.

     (c)    *Voting:*  Class 6 is Impaired under the Plan.  Holders of Claims in Class 6 are entitled to vote to accept or reject the Plan.

7.    Class 7 – GUC Claims.

     (a)    *Classification*:  Class 7 consists of GUC Claims.

     (b)    *Treatment*:  Except to the extent that a Holder of an Allowed GUC Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed GUC Claim, each such Holder shall receive, together with all Holders of Allowed Unsecured Claims, its Pro Rata share of the Unsecured Claims Recovery; *provided* that to the extent such GUC Claim is a Convenience Claim, such Holder shall receive its Pro Rata share of the Convenience Claims Distribution.

     (c)    *Voting:*  Class 7 is Impaired under the Plan.  Holders of Claims in Class 7 are entitled to vote to accept or reject the Plan.

31

8.      Class 8 – Intercompany Claims.

    (a)     *Classification*:  Class 8 consists of Intercompany Claims.

    (b)     *Treatment*:  Each Allowed Intercompany Claim shall be, at the option of the Debtors or the Reorganized Debtors, as applicable, either:  (i) Reinstated; or (ii) canceled and shall receive no distribution on account of such Claims and may be compromised, extinguished, or settled in each case, on or after the Effective Date.

    (c)     *Voting*:  Class 8 is either Unimpaired and/or treated as a General Administrative Claim, and such Holders of Class 8 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Class 8 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 8 are not entitled to vote to accept or reject the Plan.

9.      Class 9 – Section 510(b) Claims.

    (a)     *Classification*:  Class 9 consists of Section 510(b) Claims.

    (b)     *Treatment*:  Each Section 510(b) Claim shall be deemed canceled, discharged, released, and extinguished, and there shall be no distribution to Holders of Section 510(b) Claims on account of such Claims.

    (c)     *Voting*:  Class 9 is Impaired under the Plan.  Holders of Allowed Section 510(b) Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 9 are not entitled to vote to accept or reject the Plan.

10.     Class 10 – Intercompany Interests.

    (a)     *Classification*:  Class 10 consists of all Intercompany Interests.

    (b)     Treatment:  Intercompany Interests shall be Reinstated as of the Effective Date.[2]

    (c)     *Voting*:  Class 10 is Unimpaired, and such Holders of Class 10 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

11.     Class 11 – Interests in EXCO.

    (a)     *Classification*:  Class 11 consists of any Interests in EXCO.

    (b)     *Treatment*:  On the Effective Date, existing Interests in EXCO shall be deemed canceled, discharged, released, and extinguished, and there shall be no distribution to Holders of Interests in EXCO on account of such Interests.

---

2    Reinstatement of Intercompany Interests is for administrative purposes only as a means to preserve the corporate structure for holding company purposes and avoid the unnecessary cost of having to reconstitute that structure. There is no economic recovery under the Plan on account of Intercompany Interests.

(c)    *Voting:*  Class 11 is Impaired under the Plan.  Holders of Interests in EXCO are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Interests in Class 11 are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

E.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

F.    *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Holders of Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

G.    *Presumed Acceptance and Rejection of the Plan.*

To the extent that Claims of any Class receive no distribution under the Plan, each Holder of a Claim in such Class is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.  To the extent that Claims or Interests of any Class are Reinstated, each Holder of a Claim or Interest in such Class is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

H.    *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests, but rather for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Common Stock and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to

33

make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor as of the Effective Date shall continue to be owned by the applicable Reorganized Debtor.

I.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

J.      *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable or contractual subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Restructuring Transactions.*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, in consultation with the Required Parties, will effectuate the Restructuring Transactions, and will take any actions as may be necessary or advisable to effect a corporate restructuring of their respective business.  The actions to implement the Restructuring Transactions may include, as applicable, and without limitation:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, if applicable, the formation of any entity or entities that will constitute, in whole or in part, the Reorganized Debtors; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable state law; (4) the execution and delivery of the New Organizational Documents; (5) the execution and delivery of the Exit RBL Facility Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors, as applicable), subject to any post-closing execution and delivery periods provided for in the Exit RBL Facility Documents; (6) the issuance of the New Common Stock as set forth in the Plan; (7) the creation of the Unsecured Claims Distribution Trust in accordance with the Unsecured Claims Distribution Trust Documents; and (8) all other actions that the applicable Entities determine to be necessary or advisable, including making filings or recordings that may be required by law in connection with the Plan.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect

any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

B.      *Settlement of Settled Actions.*

The Plan shall be deemed a motion to approve the good-faith compromise and settlement pursuant to which the Debtors settle the Settled Actions pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all the Settled Actions.  The compromises and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.  The Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise, settlement, and release of the Settled Actions, as well as a finding by the Bankruptcy Court that the settlement of the Settled Actions and the releases and indemnities provided to effectuate such settlement are in the best interests of the Debtors, their Estates, and the Holders of Claims and Interests, and is fair, equitable, and reasonable.

C.      *Settlement of Claims After the Effective Date.*

In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors, the Unsecured Claims Litigation Trustee, or the Unsecured Claims Plan Administrator, as applicable, (in each case, in consultation with each other as provided herein) may compromise and settle Claims against, and Interests in, the Debtors and their Estates, and Causes of Action against other Entities.

D.      *Sources of Consideration for Plan Distributions.*

The Debtors shall fund distributions under the Plan with, as applicable:  (1) Cash on hand; (2) the Exit RBL Facility; (3) the New Common Stock; (4) the Unsecured Claims Distribution Trust Beneficial Interests; (5) the Challenge Action Recovery (if any); and (6) the Convenience Claims Distribution.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, of certain securities in connection with the Plan, including the New Common Stock and Claims Distribution Trust Beneficial Interests, will be exempt from SEC registration to the fullest extent permitted by law, as described more fully in Article VI.G below.

1.      *Exit RBL Facility.*

On the Effective Date, the Reorganized Debtors shall enter into the Exit RBL Facility.  The Exit RBL Facility shall be on terms set forth in the Exit RBL Facility Documents.

Confirmation shall be deemed approval of the Exit RBL Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees to be paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not previously approved by the Bankruptcy Court, and the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to obtain the Exit RBL Facility, including any and all documents required to enter into the Exit RBL Facility and all collateral documents related thereto, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation,

order, or rule or vote, consent, authorization, or approval of any person, subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate entry into the Exit RBL Facility.

E.      *Cancellation of Existing Securities and Agreements.*

Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, indentures, mortgages, security documents, and other documents evidencing Claims or Interests, including Other Secured Claims, 1.5 Lien Notes Claims, 1.75 Lien Term Loan Facility Claims, Second Lien Term Loan Facility Claims, Unsecured Notes Claims, and Interests in EXCO, shall be deemed canceled, surrendered, and discharged without any need for further action or approval of the Bankruptcy Court or any Holder or other person and the obligations of the Debtors or Reorganized Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged, and the Indenture Trustees and the Administrative Agents shall be released from all duties thereunder; *provided* that the Intercreditor Agreement shall not be deemed canceled, surrendered, or discharged; *provided, further,* that notwithstanding Confirmation or Consummation, any such indenture or agreement that governs the rights of the Holder of a Claim other than the Intercreditor Agreement shall continue in effect solely for purposes of:  (1) allowing Holders to receive distributions under the Plan; (2) naming any Indenture Trustee or Administrative Agent, solely in their capacity as such, in any Cause of Action not being released under the Plan; (3) allowing the Indenture Trustees and the Administrative Agents to enforce their rights, claims, and interests vis-à-vis any parties other than the Debtors; (4) allowing the Indenture Trustees and the Administrative Agents to make the distributions in accordance with the Plan (if any), as applicable; (5) preserving any rights of the Indenture Trustees and the Administrative Agents to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant indenture or the relevant credit agreement, including any rights to priority of payment and/or to exercise charging liens; (6) allowing the Indenture Trustees and the Administrative Agents to enforce any obligations owed to each of them under the Plan; (7) allowing the Indenture Trustees and the Administrative Agents to exercise rights and obligations relating to the interests of the Holders under the relevant indentures and credit agreements; (8) allowing the Indenture Trustees and the Administrative Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, but not limited, to enforce the respective obligations owed to such parties under the Plan; and (9) permitting the Indenture Trustees and the Administrative Agents to perform any functions that are necessary to effectuate the foregoing; *provided, still further,* that except as provided below, the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, as applicable, or result in any expense or liability to the Debtors or the Reorganized Debtors, as applicable; *and further,* that except as set forth in the Plan, after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall not be obligated to pay any fees or expenses under the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, or the Second Lien Credit Agreement, and all related Claims shall be released and discharged consistent with Article VIII of the Plan, including any claim for diminution in value of collateral as of the Effective Date; *provided that,* the Reorganized Debtors shall pay in Cash all reasonable and documented fees and expenses incurred after the Effective Date by the Indenture Trustees and the Administrative Agents (including the reasonable and documented fees and expenses of their advisors), or amounts attributable to losses or damages, with respect to the Debtors, the Reorganized Debtors, or the Plan pursuant to the Plan and in accordance with Article IV.S of the Plan.

F.      *Release of Liens.*

Except as otherwise expressly provided herein, on the Effective Date, all Liens on any property of any Debtors shall automatically terminate, all property subject to such Liens shall be automatically released, and all guarantees of any Debtors shall be automatically discharged and released.

G.      *Corporate Action.*

On the Effective Date, all actions contemplated under the Plan with respect to the Debtors and the Reorganized Debtors, as applicable, shall be deemed authorized and approved in all respects, including, as applicable:  (1) implementation of the Restructuring Transactions; (2) formation by the Debtors or such other party as contemplated in the Plan, Plan Supplement, or Confirmation Order, of Reorganized EXCO, and the any transactions related thereto; (3) selection of, and the election or appointment (as applicable) of, the directors and officers for the Reorganized Debtors; (4) adoption of and entry into any employment agreements; (5) execution and delivery of the Exit RBL Facility Documents and incurrence of the Exit RBL Facility; (6) approval and adoption of (and, as applicable, the execution, delivery, and filing of) the New Organizational Documents; (7) issuance and distribution of New Common Stock as set forth in the Plan; (8) formation of the Unsecured Claims Distribution Trust, issuance of the Unsecured Claims Distribution Trust Beneficial Interests, execution and delivery of the Unsecured Claims Distribution Trust Documents, and the vesting of the Unsecured Claims Distribution Trust Assets in the Unsecured Claims Distribution Trust; and (9) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).

All matters provided for herein involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action, authorization, or approval that would otherwise be required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan shall be deemed to have occurred or to have been obtained and shall be in effect as of the Effective Date, without any requirement of further action, authorization, or approval by the Bankruptcy Court, security holders, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other person.

On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments, and take such actions, contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors including, as applicable, the Exit RBL Facility Documents, the New Organizational Documents, the New Common Stock, the Unsecured Claims Distribution Trust Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing, and all such documents shall be deemed ratified.  The authorizations and approvals contemplated by this Article IV.F shall be effective notwithstanding any requirements under non-bankruptcy law.

H.      *Effectuating Documents; Further Transactions.*

On or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, and the officers, directors, and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, notice, or consents, except for those expressly required pursuant to the Plan.

I.      *Section 1146 Exemption.*

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including: (1) the Restructuring Transactions; (2) the Exit RBL Facility; (3) the issuance of the New Common Stock, including with regard to the Management Incentive Plan, (4) the transfer, if any, of the Debtors' assets to the Reorganized Debtors; (5) the assignment or surrender of any lease or sublease; (6) the Unsecured Claims Distribution Trust, the issuance of the Unsecured Claims Distribution Trust Beneficial Interests,

and the vesting of the Unsecured Claims Distribution Trust Assets in the Unsecured Claims Distribution Trust; and (7) the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer, mortgage recording tax, or other similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers or property without the payment of any such tax, recordation fee, or governmental assessment.

*J.*     *Corporate Existence.*

Except as otherwise provided in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan, the Plan Supplement, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan or Plan Supplement and require no further action or approval (other than any requisite filings required under applicable state or federal law).

*K.*     *Vesting of Assets.*

Except as otherwise provided in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each applicable Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, free and clear of all Liens, Claims, charges, Interests, or other encumbrances other than those specifically granted pursuant to the Plan or the Confirmation Order. Except as otherwise provided in the Plan, on and after the Effective Date, each of the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*L.*     *New Organizational Documents.*

On the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation, to the extent required for such New Organizational Documents to become effective. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. Such New Organizational Documents shall contain customary minority protections, reasonably acceptable to each of the Required Parties. The initial board of directors of the Reorganized Debtors shall consist of five (5) persons, three (3) of whom shall be chosen by Fairfax and Bluescape, one (1) of whom shall be chosen by the Committee, and one (1) of whom shall qualify as independent under the New York Stock Exchange definition of such term and shall be chosen jointly by the Committee, Fairfax, and Bluescape. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by

38

the laws of their respective state of incorporation and its respective New Organizational Documents and other constituent documents of the Reorganized Debtors.

M.      *Director, Officer, Manager, and Employee Liability Insurance.*

Notwithstanding anything contained in the Plan to the contrary, the D&O Tail Policies unexpired as of the Effective Date shall be continued.  To the extent that the D&O Tail Policies are deemed to be Executory Contracts, then, notwithstanding anything in the Plan to the contrary, the Debtors shall be deemed to have assumed all of the Debtors' unexpired D&O Tail Policies pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Tail Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity or other obligations of the Insurers under any of the D&O Tail Policies.

After the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring on or prior to the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full six-year term of such policy regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

N.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the initial Reorganized EXCO Board shall consist of five directors, the identities of whom will be disclosed in the Plan Supplement.  As of the Effective Date, the terms of the current members of the boards of directors or managers, as applicable, of each of the Debtors shall expire, and the initial Reorganized EXCO Board and the boards of directors or managers of each of the other Reorganized Debtors will include those directors and officers set forth in the lists of directors and officers of the Reorganized Debtors included in the Plan Supplement.

After the Effective Date, the officers of each of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of each person proposed to be an officer or to serve on the initial board of directors of any of the Reorganized Debtors.  To the extent any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer.  Each such director or officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents.

O.      *Management Incentive Plan.*

After the Effective Date, the Reorganized EXCO Board may adopt and implement a Management Incentive Plan pursuant to which management and key employees will receive a percentage of equity in Reorganized EXCO, comprised of New Common Stock.  The participants in the Management Incentive Plan, the timing and allocations of the awards to participants, and the other terms and conditions of such

awards (including, but limited to, vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights, and transferability) shall be determined by the Reorganized EXCO Board.

P.     *Employee Obligations.*

Except as otherwise provided in the Plan or the Plan Supplement, the Reorganized Debtors shall honor the Debtors' written contracts, agreements, policies, programs, plans, and Insurance Policies for, among other things, compensation, reimbursement, indemnity, health care benefits, disability benefits, vacation and sick leave benefits, workers' compensation claims, savings, severance benefits, including in the event of a change of control, retirement benefits, welfare benefits, relocation programs, certain grandfathered benefits, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the directors, officers and employees of any of the Debtors who served in such capacity at any time (including any compensation programs approved by the Bankruptcy Court); *provided* that the consummation of the transactions contemplated herein shall not constitute a "change in control" with respect to any of the foregoing arrangements.  To the extent that the above-listed written contracts, agreements, policies, programs, plans, and Insurance Policies are Executory Contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, each of them will be deemed assumed as of the Effective Date and assigned to the Reorganized Debtors.

Q.     *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, shall retain and may enforce (or the Unsecured Claims Plan Administrator may enforce, as applicable) all rights to commence and pursue any and all Causes of Action belonging to the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors', the Unsecured Claims Plan Administrator's, or Unsecured Claims Distribution Trust's, as applicable, rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations set forth in Article VIII of the Plan, which shall be deemed released and waived by the Debtors, the Reorganized Debtors, the Unsecured Claims Distribution Trust, or the Unsecured Claims Plan Administrator, as applicable, as of the Effective Date.  The Schedule of Retained Causes of Action shall specify which Causes of Action shall be deemed transferred to the Unsecured Claims Distribution Trust on the Effective Date.

The Reorganized Debtors, the Unsecured Claims Plan Administrator, or the Unsecured Claims Distribution Trust, as applicable, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, or in accordance with the Unsecured Claims Distribution Trust Documents, as applicable.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, the Unsecured Claims Plan Administrator, or the Unsecured Claims Distribution Trust, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors, the Reorganized Debtors, the Unsecured Claims Plan Administrator, and the Unsecured Claims Distribution Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.  Unless any Cause of Action of the Debtors against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Debtors, the Reorganized Debtors, the Unsecured Claims Plan Administrator, or the Unsecured Claims Distribution Trust, as applicable, expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including

the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor or the Unsecured Claims Distribution Trust, as applicable, except as otherwise provided in the Plan, including Article VIII of the Plan.  The Reorganized Debtors and the Unsecured Claims Distribution Trust, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce (or the Unsecured Claims Plan Administrator may enforce, as applicable) any and all such Causes of Action.  The Reorganized Debtors, the Unsecured Claims Plan Administrator, and the Unsecured Claims Distribution Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court, subject to, in the case of the Unsecured Claims Distribution Trust, the Plan and the Unsecured Claims Distribution Trust Documents, and in the case of the Unsecured Claims Plan Administrator, consultation with and obtaining the prior consent of the Unsecured Claims Plan Administrator Advisory Board as required pursuant to Section IV.U.4 hereof.

R.      *Preservation of Mineral Interests.*

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Mineral Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Mineral Interests, and no Mineral Interests shall be compromised or discharged by the Plan.  For the avoidance of doubt and notwithstanding anything to the contrary in the preceding sentence, any prepetition or pre-Effective Date right to payment asserted by a Holder of a Mineral Interest pursuant to such Mineral Interest shall be treated as a Claim under the Plan and shall be treated in accordance therewith (including, for the avoidance of doubt, by discharge or cure, if applicable).

S.      *Payment of Certain Fees.*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors, or the Reorganized Debtors, as applicable, shall pay on the Effective Date any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, accountants, and other professionals, advisors, and consultants (a) payable under the Exit RBL Facility Documents, (b) payable under the DIP Order (which fees and expenses shall be paid pursuant to the terms of the DIP Order); (c) of the Settling Lenders; (d) of the Supporting 1.5L Noteholders (in accordance with the respective Supporting Creditor Joinder of such Supporting 1.5L Noteholder) (d) of the Supporting 2L Lenders (in accordance with the respective Supporting Creditor Joinder of such Supporting 2L Lender); (e) of Cross Sound, the Unsecured Notes Trustee, and Reme, LLC, each of whom is a member of the Committee, and (f) of the Indenture Trustees and the Administrative Agents.

The Indenture Trustees and the Administrative Agents requesting payment of fees and expenses pursuant to the Plan shall provide reasonably detailed invoices to the Debtors or Reorganized Debtors, as applicable.  If any of the Debtors or the Reorganized Debtors, as applicable, dispute any of the requested Indenture Trustees' or Administrative Agents' fees and expenses, the Debtors or Reorganized Debtors, as applicable, shall (i) pay the undisputed portion of such Indenture Trustee's or Administrative Agent's fees

and expenses, and (ii) notify such Indenture Trustee of such dispute within five (5) days after presentment of the invoices by the Indenture Trustees or the Administrative Agents.  Upon such notification, such Indenture Trustee or Administrative Agent may submit such dispute for resolution by the Bankruptcy Court.

T.      *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

U.      *Unsecured Claims Distribution Trust; Unsecured Claims Plan Administrator.*

1.      Formation of the Unsecured Claims Distribution Trust.

On the Effective Date, if there are any Unsecured Claims Distribution Trust Assets, the Unsecured Claims Distribution Trust shall be created by the Debtors and shall be vested with the Unsecured Claims Distribution Trust Assets.  The Unsecured Claims Distribution Trust shall be governed and administered in accordance with the Unsecured Claims Distribution Trust Documents.  The Unsecured Claims Distribution Trust shall be governed by a three-person advisory board, whose members shall be chosen by the Committee and whose identity and compensation shall be included in the Plan Supplement.  The three-person advisory board shall select the Unsecured Claims Litigation Trustee, whose compensation shall be included in the Plan Supplement.  The Unsecured Litigation Trustee shall, among other things, prosecute, settle, or otherwise resolve the Contributed Challenge Actions and the Contributed Unsecured Notes Action (if applicable), and exercise the rights pursuant to the Intercreditor Assignment, in the Unsecured Litigation Trustee's sole discretion, in accordance with the Unsecured Distribution Trust Documents.

If there are no Unsecured Claims Distribution Trust Assets, the Unsecured Claims Distribution Trust shall not be created.

2.      Unsecured Claims Distribution Trust Assets.

On the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, the Unsecured Claims Distribution Trust Assets shall be transferred to the Unsecured Claims Distribution Trust by the Debtors for the benefit of holders of Allowed Unsecured Claims free and clear of all Claims, Lien, charges, encumbrances, rights, and interests, other than as provided by the Plan, without the need for any Entity to take any further action to obtain any approval.  From and after the Effective Date, the Unsecured Claims Distribution Trust shall have sole power and authority to investigate, prosecute, settle, release or otherwise liquidate, compromise, or resolve the Challenge Actions.

Substantially contemporaneously with the formation of the Unsecured Claims Distribution Trust, the Unsecured Notes Trustee shall be deemed to have contributed the Contributed Unsecured Notes Action to the Unsecured Claims Distribution Trust, unless the Unsecured Notes Trustee provides written notice to the Debtors prior to the Effective Date declining to contribute such Cause of Action, and such Cause of Action shall be prosecuted by the Unsecured Claims Litigation Trustee, who shall have the sole power and authority to investigate, prosecute, settle, release or otherwise liquidate, compromise, or resolve such Contributed Unsecured Notes Action.

Upon the creation of the Unsecured Claims Distribution Trust and pursuant to the Plan and the Unsecured Claims Distribution Trust Documents, Holders of Allowed Unsecured Claims shall become the beneficiaries of the Unsecured Claims Distribution Trust.

3.      Transfer.

The Unsecured Claims Distribution Trust Documents shall provide that the Unsecured Claims Distribution Trust Beneficial Interests shall be tradeable to the extent permitted by applicable law (without requiring the Unsecured Claims Distribution Trust to register as a reporting company under Section 12 of the Exchange Act of 1934) and otherwise in accordance with procedures and restrictions to be set forth in such Trust Agreement.

4.      Unsecured Claims Plan Administrator.

Upon the Effective Date, the Unsecured Claims Plan Administrator shall be vested with the sole right and obligation to pursue the Retained Challenge Actions and Intercreditor Assignment claims.  The Unsecured Claims Plan Administrator Advisory Board shall be a three-member board appointed by the Committee, the initial members of whom shall be disclosed in the Plan Supplement.  The Unsecured Claims Plan Administrator shall consult with and receive the consent of the majority of the Unsecured Claims Plan Administrator Advisory Board regarding (a) the prosecution, settlement, compromise, or other resolution of a Retained Challenge Action having an amount at issue in excess of $500,000, or any Cause of Action asserting the rights assigned to the Unsecured Claims Plan Administrator by virtue of the Intercreditor Assignment; (b) abandonment of any Retained Cause of Action having an amount in dispute in excess of $500,000; (c) the entry into any non-recourse litigation funding arrangement by the Unsecured Claims Plan Administrator in addition to the Unsecured Claims Distribution Loan; (d) the retention of counsel, financial advisor, or any other professional whose fees are expected to exceed $1,000,000 in any calendar year or which is retained other than on an hourly fee basis (e) the release or indemnity in favor of any third party except as set forth in the Plan; and (f) any other matter which could reasonably be expected to have a material effect on the amount of the Unsecured Claims Consideration.

Substantially contemporaneously with the Effective Date, each of the Settling Lenders and Supporting 1.5L Noteholders shall each be automatically be deemed to have effectuated the Intercreditor Assignment to the Unsecured Claims Plan Administrator, and such rights shall be exercised by the Unsecured Claims Plan Administrator in its sole power and authority; *provided* that, for the avoidance of doubt, the Unsecured Claims Plan Administrator shall not assert such rights, directly or indirectly, against any Settling Lender or Supporting Creditor.

5.      Unsecured Claims Distribution Loan.

On the Effective Date, the Debtors shall make the Unsecured Claims Distribution Loan jointly to the Unsecured Claims Plan Administrator and the Unsecured Claims Distribution Trust to be used solely to pay documented fees and expenses thereof, and both the Unsecured Claims Litigation Trustee and the Unsecured Claims Plan Administrator may draw on such loan with notice to the other.  The Unsecured Claims Distribution Loan shall not bear interest, and if not previously repaid as provided below, shall become due and payable upon the by the later of the termination of the Unsecured Claims Distribution Trust or the resolution of all Challenge Actions.  The Unsecured Claims Distribution Loan shall be repaid as a first priority claim promptly following the receipt of any Cash proceeds recovered by the Unsecured Claims Distribution Trust or the Unsecured Claims Plan Administrator on account of the Secured Claim Challenges, or from any other Cash otherwise remaining in the Unsecured Claims Distribution Trust, at its termination.  In addition, as security for the Unsecured Claims Distribution Loan, the Settlement Contribution Hold-Back shall be pledged to, and retained by, the Reorganized Debtors and remain unissued until the full principal balance of the loan has been repaid.  To the extent that the Unsecured Claims Distribution Trust and the Unsecured Claims Plan Administrator do not repay the Unsecured Claims Distribution Loan in full in Cash by the later of the termination of the Unsecured Claims Distribution Trust or the resolution of all Challenge Actions, the Unsecured Claims Distribution Loan shall be deemed repaid

by the Reorganized Debtors' retention of the portion of the Settlement Contribution Hold-Back equal to the principal balance due on the Unsecured Claims Distribution Loan as of that date, and the remainder of the Settlement Contribution Hold-Back (if any) shall be distributed Pro Rata to the Holders of Allowed Unsecured Claims.  The Unsecured Claims Distribution Trust and the Unsecured Claims Plan Administrator shall not incur any indebtedness or obligations that are Secured or that are otherwise senior in right of payment to the Unsecured Claims Distribution Loan unless the Unsecured Claims Distribution Loan has been repaid in full, in Cash.

6.      Attorney Client Privilege.

Any privilege or immunity attaching to any documents or communications (whether written or oral), including but not limited to attorney-client privilege, work product privilege, or joint interest privilege, related to the Unsecured Claims Distribution Trust Assets, Challenge Actions, or held by the Committee shall vest in the Unsecured Claims Litigation Trustee and its representatives or the Unsecured Claims Plan Administrator and its representatives, as appropriate.  The Debtors or Reorganized Debtors and the Unsecured Claims Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses.  Receipt of these privileges by the Unsecured Claims Distribution Trust shall not operate as a waiver of other privileges possessed or retained by the Debtors or Reorganized Debtors, as applicable, and no action taken by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan, shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors or Reorganized Debtors, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).

7.      Cooperation.

Upon the Effective Date, the Reorganized Debtors, Unsecured Claims Plan Administrator, and the Unsecured Claims Litigation Trustee agree to reasonably cooperate with respect to the investigation and/or prosecution of any Causes of Action related to the Plan.  Such cooperation shall include, but is not limited to (i) providing access to documents, (ii) providing access to employees and, as applicable, former employees to be interviewed, and prepared as a deposition or trial witness, (iii) causing witnesses to appear at a deposition or trial; and (iv) retaining all books, records and other documents relating to any applicable Cause of Action and not destroying such records until after termination of the Unsecured Claims Distribution Trust (if applicable); *provided that* in each case, the Unsecured Claims Litigation Trustee and Unsecured Claims Plan Administrator shall use best efforts to minimize disruption to the Reorganized Debtors and their employees; *provided further that* in each case, the Unsecured Claims Litigation Trustee and Unsecured Claims Plan Administrator shall direct all requests to, and shall not contact employees without the consent of, the general counsel of the Reorganized Debtor(s).

*V.      Indemnification of the Settling Lenders and Supporting 1.5 Lien Noteholders.*

The Debtors and the Reorganized Debtors, pursuant to the Secured Lender Settlement and the settlements embodied in the Plan, shall (a) indemnify and hold harmless the Settling Lenders and Supporting 1.5 Lien Noteholders from and against any expense, damage or liability arising from any Cause of Action brought by any person or Entity against the Settling Lenders relating to the Debtors, the Plan (including the implementation of the Plan), or the Restructuring Transactions, that, in each case, has arisen or may arise through and including the Effective Date (including any Cause of Action that arises in connection with events occurring prior to the Effective Date), and (b) promptly advance to the Settling Lenders and Supporting 1.5 Lien Noteholders their respective defense costs and expenses related to any such Cause of Action or any Claim, in each case (i) brought against them in any case, hearing, procedure or proceeding of any kind, (ii) threatened against them by any person or Entity, or (iii) brought against a third party and that requires the discovery of the Settling Lenders or Supporting 1.5 Lien Noteholders or

44

reasonably requires any other intervention or involvement by the Settling Lenders or Supporting 1.5 Lien Noteholders therein.  This indemnification shall be enforceable regardless of whether any person (including the person from whom indemnification is sought) alleges or proves: (a) the sole, concurrent, contributory, or comparative negligence (whether such negligence is simple or gross) or fault of the person seeking indemnification or (b) the sole or concurrent strict liability imposed upon the person seeking indemnification.

### ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, any Executory Contract or Unexpired Lease of the Debtors is deemed to be an Assumed Executory Contract or Unexpired Lease, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that:  (1) previously were assumed, assumed and assigned, or rejected by the Debtors; (2) are identified on the Rejected Executory Contract and Unexpired Lease List; (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a court order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Rejected Executory Contract and Unexpired Lease List, or the Assumed Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party before the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or rejection under applicable federal law.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List and the Assumed Executory Contract and Unexpired Lease List at any time through and including thirty (30) days after the Effective Date.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed within thirty (30) days after the later of:  (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; and (2) the effective date of such rejection.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, Reorganized Debtors, the Estates, or their property without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as GUC Claims and shall be treated in accordance with the Plan, unless a different security or

priority is otherwise asserted in such Proof of Claim and Allowed in accordance with Article VII of the Plan.

C.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

Any objection by a contract or lease counterparty to a proposed assumption of an Executory Contract or Unexpired Lease or the related cure cost (including as set forth on the Assumed Executory Contract or Unexpired Lease List) must be Filed, served, and actually received by the Debtors in accordance with the Disclosure Statement Order or other applicable Final Order of the Bankruptcy Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount.  For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease proposed to be assumed is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.

For the avoidance of doubt, the Debtors or the Reorganized Debtors, as applicable, may add any Executory Contract or Unexpired Lease proposed to be assumed to the Rejected Executory Contracts and Unexpired Lease List in accordance with the time limits provided by the Plan for any reason, including if the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable cure notice or the Plan, in which case such Executory Contract or Unexpired Lease is deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption.  Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed Disallowed, without further notice to or action, order, or approval of the Bankruptcy Court.

D.     *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed by the Executory Contract or Unexpired Lease counterparty or counterparties to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

E.      *Indemnification Obligations.*

The Debtors and the Reorganized Debtors shall assume the Indemnification Obligations for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals, advisors, and agents of the Debtors, to the extent consistent with applicable law, and such Indemnification Obligations shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.  Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify Indemnification Obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; *provided* that none of the Reorganized Debtors shall amend or restate any of the New Organizational Documents before the Effective Date to terminate or adversely affect any of the Reorganized Debtors' Indemnification Obligations.  For the avoidance of doubt, nothing in this paragraph shall affect the assumption of any Indemnification Obligations arising under the D&O Tail Policies.

F.      *Insurance Policies.*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, the *Order Granting Chubb Relief from the Automatic Stay* [Docket No. 907], any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases), (i) on the Effective Date each of the Debtors' Insurance Policies shall be deemed assumed by the applicable Reorganized Debtor pursuant to sections 105 and 365 of the Bankruptcy Code as though listed on the Assumed Executory Contract and Unexpired Lease List and the Reorganized Debtors shall become and remain jointly and severally liable in full for all of the Debtors' obligations under the Insurance Policies, regardless of whether such obligations arise before or after the Effective Date, without the requirement or need for any Insurer to File a Proof of Claim, an Administrative Claim, a Cure Claim or to object to any cure amount; (ii) nothing alters, modifies or otherwise amends the terms and conditions of (or the coverage provided by) any of the Insurance Policies; (iii) such Insurance Policies shall not be impaired in any way by the Plan or Confirmation Order, but will remain valid and enforceable in accordance with their terms and applicable non-bankruptcy law; and (iv) if and to the extent applicable, the automatic stay of Bankruptcy Code section 362(a) and the injunction set forth in Article VIII.F of the Plan, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit:  (a) claimants with valid workers' compensation claims or with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (b) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (1) workers' compensation claims, (2) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Article VIII.F of the Plan to proceed with its claim, and (3) all costs in relation to each of the foregoing; and (c) the Insurers to cancel any Insurance Policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Policies.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities,

options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Unless otherwise provided herein or in the applicable Executory Contract or Unexpired Lease (as may have been amended, modified, supplemented, or restated), modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Executory Contract and Unexpired Lease List or the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors or the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

I.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur with respect to a Debtor, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases with respect to such Debtor pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

J.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Assumed Executory Contracts or Unexpired Leases, will be performed by the applicable Debtor or the applicable Reorganized Debtor, liable thereunder in the ordinary course of their business.  Accordingly, any such contracts and leases (including any Assumed Executory Contracts or Unexpired Leases) that have not been rejected as of the date of the Confirmation Date shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Initial Distribution Date, on the Distribution Date following the date that such Claim or Interest becomes an Allowed Claim, including, for the avoidance of doubt, the date on which the Claims Resolution Stipulation is Filed and becomes a Final Order, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides

for such Allowed Claim in accordance with its priority and Allowed amount.  No Holder of a Claim shall recover more than 100 percent of the Allowed amount of such Claim.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.

To the extent any distributions made in accordance with the Plan are subject to disgorgement to the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, shall effectuate the distribution of such disgorged distribution to the Holders of Allowed Claims entitled to such distributions in accordance with the Plan as soon as reasonably practicable.  For the avoidance of doubt, to the extent disgorgement of a distribution made to a Holder of a Claim pursuant to the Plan is required, such Holder shall be required to disgorge any distribution but shall not be required to remit interest on such distribution.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

B.      *Challenge Resolution Stipulation.*

As soon as reasonably practicable following the resolution, whether by settlement or Final Order, of a Secured Claim Challenge with respect to any Disputed 1.5 Lien Claim or Disputed 1.75 Lien Claim, the Unsecured Claims Plan Administrator, in consultation with the Debtors or the Reorganized Debtors, as applicable, shall File a Challenge Resolution Stipulation, which shall set forth: (a) the Allowed amount, if any, of the 1.5 Lien Notes Claim or 1.75 Lien Term Loan Facility Claim; and (b) whether and in what amount such 1.5 Lien Notes Claim or 1.75 Lien Term Loan Facility Claim is Secured, Unsecured, or subordinated.

The Unsecured Claims Plan Administrator shall provide notice of such Challenge Resolution Stipulation in accordance with Bankruptcy Rule 2002(a) as soon as reasonably practicable following the resolution of the Secured Claim Challenge.  If no objection to the Challenge Resolution Stipulation is timely made, the Challenge Resolution Stipulation shall be deemed incorporated into and a part of the Plan as if set forth in full in the Plan and approved pursuant to the Confirmation Order.  If an objection is timely Filed, the Bankruptcy Court shall conduct a hearing prior to entering a Final Order approving the Challenge Resolution Stipulation.

C.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on such Distribution Record Date.

2.      Delivery of Distributions.

Except as otherwise provided herein, the Reorganized Debtors or the Unsecured Claims Litigation Trustee (with respect to the Unsecured Claims Distribution Trust Assets) in consultation with the Reorganized Debtors, shall be authorized to make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors'

records as of the date of any such distribution; *provided* that the Distribution Record Date shall not apply to publicly-traded Securities. The manner of such distributions shall be determined at the discretion of the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, and the address for each Holder of an Allowed Claim or Allowed Interest shall be deemed to be the address set forth in any Proof of Claim or Interest Filed by that Holder.

        3.       Delivery of Distributions on 1.75 Lien Term Loan Facility Claims and Second Lien Term Loan Facility Claims.

Except as otherwise provided in the Plan, all distributions on account of Allowed 1.75 Lien Term Loan Facility Claims and Allowed Second Lien Term Loan Facility Claims shall be governed by the respective credit agreement and shall be deemed completed when made to the respective Administrative Agent, which shall be deemed the Holder of their respective portion of the Allowed 1.75 Lien Term Loan Facility Claims and Allowed Second Lien Term Loan Facility Claims for purposes of distributions to be made hereunder. The applicable Administrative Agents shall hold or direct such distributions for the benefit of their respective Holders of Allowed 1.75 Lien Term Loan Facility Claims and Allowed Second Lien Term Loan Facility Claims. As soon as practicable following compliance with the requirements set forth in this Article VI, the Administrative Agents shall arrange to deliver or direct the delivery of such distributions to or on behalf of their respective Holders of 1.75 Lien Term Loan Facility Claims and Second Lien Term Loan Facility Claims.

        4.       Delivery of Distributions on 1.5 Lien Notes Claims, 2018 Unsecured Notes Claims, and 2022 Unsecured Notes Claims.

Except as otherwise provided in the Plan, or reasonably requested by the Indenture Trustees, all distributions to Holders of Allowed 1.5 Lien Notes Claims, Allowed 2018 Unsecured Notes Claims, and Allowed 2022 Unsecured Notes Claims shall be deemed completed when made to the respective Indenture Trustee; *provided* that non-Cash consideration shall not be distributed in the name of the Indenture Trustees. The applicable Indenture Trustees shall hold or direct such distributions for the benefit of the respective Holders of Allowed 1.5 Lien Notes Claims, Allowed 2018 Unsecured Notes Claims, and Allowed 2022 Unsecured Notes Claims. As soon as practicable in accordance with the requirements set forth in this Article VI, the Indenture Trustees shall arrange to deliver such distributions to or on behalf of such Holders in accordance with the 1.5 Lien Notes Indenture, the 2018 Unsecured Notes Indenture, and the 2022 Unsecured Notes Indenture, as applicable, and subject to the rights of the Indenture Trustees to assert their charging liens. If the Indenture Trustees are unable to make, or consent to the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, making such distributions, the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, with the cooperation of the applicable Indenture Trustee, shall make such distributions to the extent practicable. The Indenture Trustees shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors, the Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed 1.5 Lien Notes Claims, Allowed 2018 Unsecured Notes Claims, and Allowed 2022 Unsecured Notes Claims that is held in the name of, or by a nominee of, DTC, shall be made to the extent possible through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Reorganized Debtors shall reimburse the Indenture Trustees for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan or the cancellation and discharge of the 1.5 Lien Notes Indenture, the 2018 Unsecured Notes Indenture, and the 2022 Unsecured Notes Indenture. Any such fees or expenses invoiced after the Effective Date shall be paid promptly, but no later than five (5) Business Days after the Reorganized Debtors receive an invoice. The Indenture Trustees shall retain all rights under the 1.5 Lien Notes Indenture, the 2018 Unsecured Notes

Indenture, and the 2022 Unsecured Notes Indenture, as applicable, to exercise their charging lien against distributions to their respective Holders.

       5.       Delivery of Distributions to Holders of GUC Claims.

The Debtors, the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, will, in their reasonable discretion, in consultation with the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, determine the method for a timely distribution of all distributions to Holders of Allowed GUC Claims pursuant to the Plan.

       6.       No Fractional Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an applicable Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

       7.       Minimum Distribution.

No Cash payment of less than $500 or issuance of New Common Stock fewer than ten (10) shares shall be made to a Holder of an Allowed Claim on account of such Allowed Claim. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing minimum distribution threshold.

       8.       Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date such distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to the applicable Reorganized Debtor(s) automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and any claim of any Holder to such property shall be fully discharged, released, and forever barred.

For the avoidance of doubt, the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, and their respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder.

D.      *Special Rules for Distributions to Holders of Disputed Claims and Interests.*

Except as otherwise provided in the Plan, agreed to by the Debtors, Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, or set forth in an order of the Bankruptcy Court: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim (including, for the avoidance of doubt, any Disputed 1.5 Lien Claim or Disputed 1.75 Lien Claim) or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final

Order; *provided* that if a portion of a Claim is not Disputed, the Debtors or the Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, may make a partial distribution based on such portion of such Claim that is not Disputed; and (b) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or Disallowed. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class.

E.     *Manner of Payment.*

Unless otherwise set forth herein, all distributions of New Common Stock and Cash, as applicable, to the Holders of Allowed Claims under the Plan shall be made by the Debtors or Unsecured Claims Litigation Trustee, as applicable. At the option of the Reorganized Debtors or Unsecured Claims Litigation Trustee, as applicable, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.     *SEC Exemption.*

The New Common Stock and the Unsecured Claims Distribution Trust Beneficial Interests are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

All shares of the New Common Stock and the Unsecured Claims Distribution Trust Beneficial Interests issued pursuant to the Plan will be issued in reliance upon section 1145 of the Bankruptcy Code.

Pursuant to section 1145 of the Bankruptcy Code, the issuance of (1) the New Common Stock, (2) the Unsecured Claims Distribution Trust Beneficial Interest (if such interests are securities), and (3) any other securities issued in reliance on section 1145 of the Bankruptcy Code, are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities. Each of the foregoing securities (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable (except as provided in the Unsecured Claims Distribution Trust Documents) by any initial recipient thereof that (i) at the time of transfer, is not an "affiliate" of the Reorganized EXCO as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (ii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock under applicable securities laws.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the New Common Stock issuable pursuant to the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock issuable pursuant to the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, as applicable, the Debtors and the Reorganized Debtors, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit with respect to distributions pursuant to the Plan.  Notwithstanding any provision herein to the contrary, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, and establishing any other mechanisms they believe are reasonable and appropriate to comply with such requirements.  The Debtors and the Reorganized Debtors, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.  The Reorganized Debtors shall not have any duty to obtain an executed Internal Revenue Service Form W-9 (or other applicable tax form) from any Claim Holder.

H.      *Tax Matters Regarding the Unsecured Claims Distribution Trust.*

The Plan provides that, among other things, on the Effective Date the Unsecured Claims Distribution Trust shall be formed, to which all of the Debtors' right, title, and interest in certain litigation as well as certain statutory avoidance actions shall be assigned, with the proceeds therefrom distributed to certain Holders of Allowed Claims.

The Debtors, the Reorganized Debtors or the Unsecured Claims Litigation Trustee, as applicable, may establish one or more reserves on account of Claims that are Disputed or contingent.  The Unsecured Claims Litigation Trustee may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (a) make an election pursuant to Treasury Regulation Section 1.468B-9 to treat and so treat such reserve as a "disputed ownership fund" within the meaning of that section, and (b) distribute assets from such reserve as, when, and to the extent such Claims that are Disputed cease to be Disputed, whether by virtue of becoming Allowed or otherwise resolved.  The beneficiaries of the Unsecured Claims Distribution Trust shall be bound by such election, if made by the trustee, and, as such, shall, for U.S. federal income tax purposes (and, to the extent permitted by law) for state and local income tax purposes, report consistently therewith.

I.      *No Postpetition or Default Interest on Claims.*

Notwithstanding any documents that govern the Debtors' prepetition funded indebtedness or Proofs of Claim to the contrary, (1) postpetition and/or default interest shall not accrue or be paid on any Claims and (2) no Holder of a Claim shall be entitled to:  (a) interest accruing on or after the Petition Date on any such Claim; or (b) interest at the contract default rate.  For the avoidance of doubt, no interest shall accrue or be paid as a result of a delay, if any, between the Confirmation Date and the date a Holder of an Allowed Claim receives a distribution pursuant to the Plan.

For the avoidance of doubt, postpetition interest shall continue to be paid through and including the Effective Date pursuant to the terms of the DIP Order in respect of the 1.5 Lien Notes and all unpaid

postpetition interest accrued and unpaid as of the Effective Date in respect of the 1.5 Lien Notes shall be paid on the Effective Date to the holders of 1.5 Lien Notes entitled to receive such interest.

J.     *Setoffs and Recoupment.*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors, as applicable may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors, as applicable, of any such right it may have against the Holder of such Claim.

K.     *No Double Payment of Claims.*

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the Holder of an Allowed Claim against more than one Debtor may recover distributions from all co-obligor Debtors' Estates until the Holder has received payment in full on the Allowed Claims.  No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

L.     *Claims Paid or Payable by Third Parties.*

1.     Claims Paid by Third Parties.

The Debtors, the Reorganized Debtors, the Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, as applicable, shall reduce a Claim, and such Claim shall be deemed Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, Reorganized Debtor, or the Unsecured Claims Litigation Trustee, as applicable.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, Reorganized Debtor, or the Unsecured Claims Litigation Trustee, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, or the Unsecured Claims Litigation Trustee, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor, or the Unsecured Claims Litigation Trustee, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day period specified above until the amount is repaid.

2.     Claims Payable by Third Parties.

Except as otherwise provided for in the Plan, no distributions under the Plan shall be made on account of a Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such a Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

54

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, any distributions of insurance proceeds to Holders of Allowed Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy.  Except as otherwise provided in the Plan, the Plan shall not otherwise constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies, nor shall anything contained herein (a) constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers, or (b) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any Insurer.

*M.*     *Allocation of Distributions Between Principal and Interest.*

For distributions in respect of Allowed Claims, to the extent that any such Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

*A.*     *Allowance of Claims.*

Except as otherwise set forth in the Plan, after the Effective Date, the Reorganized Debtors or the Unsecured Claims Distribution Trust, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as specifically provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

*B.*     *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, and subject to the rights and duties of the applicable Reorganized Debtor(s) or the Unsecured Claims Distribution Trust or Unsecured Claims Plan Administrator (as applicable), as set forth herein, after the Effective Date, (a) (i) the Unsecured Claims Distribution Trust and Unsecured Claims Plan Administrator shall have the sole authority to File, withdraw, or litigate to judgment, objections to Claims in Classes 3, 4, 5, and 6; (ii) the Unsecured Claims Distribution Trust, the Unsecured Claims Plan Administrator, or the applicable Reorganized Debtor, as designated in the Claims Objection Schedule, shall have the sole authority to File, withdraw, or litigate to judgment, objections to Claims in Class 7; and (iii) the applicable Reorganized Debtor(s) shall have the sole authority to File, withdraw, or litigate to judgment, objections to all other Claims; (b) the applicable Reorganized Debtor(s) or the Unsecured Claims Distribution Trust or Unsecured Claims Plan Administrator, as applicable, shall have the authority to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c)  the applicable Reorganized Debtor(s) or the Unsecured Claims Distribution Trust or Unsecured Claims Plan Administrator, as applicable, shall have the authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, the Unsecured Claims Distribution Trust and Unsecured Claims Plan Administrator shall have the sole authority to prosecute, settle, or otherwise resolve the Secured Claim Challenges (other than, for the avoidance of doubt, against any Settling Lender).

C.      *Adjustment to Claims Without Objection.*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted on the Claims Register by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Time to File Objections to Claims or Interests.*

Any objections or challenges to Claims or Interests shall be Filed on or before the applicable Claims Objection Deadline.

E.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors, the Reorganized Debtors, or the Unsecured Claims Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. § 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been Disallowed or expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

F.      *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Debtors, the Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, shall establish one or more reserves for Claims that are contingent or have not yet been Allowed, in an amount or amounts as reasonably determined by the applicable Debtors, Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim.  To the extent that a Disputed Claim may be entitled to receive New Common Stock pursuant to the Plan, such New Common Stock will remain authorized but unissued pending resolution of such Disputed Claim.

Any assets held in any such reserve shall be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  As such, such assets will be subject to entity-level taxation, and the Debtors and Reorganized Debtors, or the Unsecured Claims Litigation Trustee, as applicable, shall be required to comply with the relevant rules.

G.      *Disallowance of Claims.*

Any Claims held by Entities from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 547, 548, 549, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and the full amount of such obligation to the Debtors has been paid or turned over in full.

All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and Disallowed as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.  All Proofs of Claim Filed on account of an employee benefit shall be deemed satisfied and Disallowed as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed to by the Reorganized Debtors in their sole discretion, any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

H.      *Amendments to Proofs of Claim.*

On or after the Effective Date, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Proof of Claim or Interest Filed that is not so authorized before it is Filed shall be deemed Disallowed in full without any further action.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

J.      *No Distributions Pending Allowance.*

Except as otherwise set forth herein, if an objection to a Claim or portion thereof is Filed as set forth in Article VII.C of the Plan, no payment or distribution provided under the Plan shall be made on account of such Disputed Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

K.      *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date a Disputed Claim becomes Allowed, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan, as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under such order or judgment of the Bankruptcy Court.

## ARTICLE VIII.
## RELEASE, INJUNCTION, EXCULPATION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors, if applicable), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. For the avoidance of doubt, from and after the Effective Date, any Claim for adequate protection (as required by the Bankruptcy Code) of any Secured Claim for post-Effective Date diminution in value shall be deemed satisfied, discharged, and released, effective as of the Effective Date, and neither the Reorganized Debtors nor the Unsecured Claims Distribution Trust, as applicable, shall have any obligation to provide such protection.

B.      **Release of Liens.**

**Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, except with regard to Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.2(b) of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns (including Reorganized EXCO, if applicable), in each case, without any further approval or order of the Bankruptcy Court**

and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable.

C.      *Releases by the Debtors.*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates, from any and all claims and Causes of Action whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof, if applicable), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the DIP Order (and any payments or transfers in connection therewith), the New Organizational Documents, any preference or avoidance claims pursuant to sections 544, 547, 548, or 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, with respect to the foregoing, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the releases described herein are: (1) in exchange for the good and valuable consideration provided by or on behalf of the Released Parties; (2) a good faith settlement and compromise of the Settled Actions released herein; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6)  a bar to any of the Debtors, the Reorganized Debtors, the Debtors' Estates, the Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, the Unsecured Claims Distribution Trust, or asserting any claim or Cause of Action released pursuant to the releases described herein or asserting (directly or indirectly) or trading any

claim or Cause of Action released pursuant to the releases described herein against any Released Party at any time.

D.      *Releases by Holders of Claims and Interests.*

        As of the Effective Date, except to enforce distributions under the Plan, each Releasing Party is deemed to have released and discharged each Released Party from any and all claims and Causes of Action, including claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the day-to-day management of the Debtors, any decisions made or not made by the Debtors' board members, and/or the ownership or operation of the Debtors), Reorganized EXCO (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts (including but not limited to the transactions consummated in 2015 and 2017), the Settled Actions, the D&O Liability Insurance Policies, the Secured Lender Settlement, the D&O Settlement, any intercompany transactions, transactions pursuant and/or related to the Intercreditor Agreement, the 1.5 Lien Notes Indenture, the 1.75 Lien Credit Agreement, the Second Lien Credit Agreement, the 2018 Unsecured Notes Indenture, the 2022 Unsecured Notes Indenture, the New Organizational Documents, the DIP Order (and any payments or transfers in connection therewith), the formulation, preparation, dissemination, negotiation, or consummation of the Exit RBL Facility, the Mediation, the settlements contemplated by the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, with respect to the foregoing, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

        Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described herein, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described herein is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Settled Actions; (5) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases described herein.

E.      *Exculpation.*

        Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Mediation, the formulation, preparation, dissemination, negotiation, Filing, or termination of any prepetition transactions, the Disclosure Statement, the Plan, the Secured Lender Settlement, the D&O Settlement, the D&O Liability Insurance Policies, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any

legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Exit RBL Facility, the Filing of the Chapter 11 Cases, the negotiation, terms, or execution of the settlement agreements effectuated pursuant to Federal Rule of Bankruptcy Procedure 9019, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan (if any), or the distribution of property under the Plan, or any other related agreement, with respect to the foregoing, except for claims related to any related act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to or in connection with the Plan and the Restructuring Transactions.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Injunction.*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have Held, Hold, or may Hold Claims or Interests that have been released pursuant to Article VIII.C or Article VIII.D of the Plan, shall be discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, the Unsecured Claims Distribution Trust, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

G.    *Release of D&O Carriers and D&O Liability Insurance Policies.*

Upon the Debtors' receipt of the D&O Proceeds in cleared funds, the parties to the D&O Settlement, on behalf of themselves, their predecessors, successors, affiliates and assigns, and all persons acting by, through or under them, and each of them, fully release and forever discharge the D&O Carriers, together with their predecessors, successors, affiliates, and assigns, and all persons acting by, through or under them, from all known and unknown claims, liabilities, obligations,

promises, agreements, (including the D&O Liability Insurance Policies issued by the D&O Carriers), controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees and expenses (including attorneys' fees and costs), of any nature whatsoever, whether or not apparent or yet to be discovered, related to the Debtors; *provided* that nothing in this section releases (a) any party to the D&O Settlement from its obligations under the D&O Settlement; (b) any party to the D&O Settlement from its liability for breach of any term, warranty, or representation in the D&O Settlement; or (c) the D&O Carriers from payment of Defense Costs (as defined in and in accordance with the terms of the D&O Liability Insurance Policies issued by the D&O Carriers) incurred in connection with the D&O Settlement.  The D&O Carriers' payment of the D&O Proceeds and any Defense Costs (as defined in the D&O Liability Insurance Policies issued by the D&O Carriers) is deemed to have exhausted the limits of the D&O Liability Insurance Policies issued by the D&O Carriers.  Moreover, upon the Debtors' receipt of the D&O Proceeds in cleared funds, the D&O Liability Insurance Policies issued by the D&O Carriers are immediately discharged and cancelled, and the D&O Carriers are immediately released from any and all obligations under the D&O Liability Insurance Policies issued by the D&O Carriers.  Notwithstanding any language in the D&O Settlement or Plan, as of the Effective Date, no party may pursue or file any action that implicates the D&O Liability Insurance Policies issued by the D&O Carriers.  For the avoidance of doubt, nothing in this paragraph shall affect the obligations of Beazley Insurance Company, Inc., Allied World National Assurance Company, and XL Specialty Insurance Company arising under Policy No. V15RVK170901, Policy No. 0310-0059, and Policy No. ELU148628-17 or the obligations of the Insurers not party to the D&O Settlement arising under the D&O Liability Insurance Policies issued by such Insurers.  Coverage for all the Insureds by Beazley Insurance Company, Inc., Allied World National Assurance Company, and XL Specialty Insurance Company arising under Policy No. V15RVK170901, Policy No. 0310-0059, and Policy No. ELU148628-17 is expressly preserved.

H.      *Bar Order and Channeling Injunction.*

        Except as otherwise specifically provided in the Plan, the Enjoined Parties shall be permanently barred, restrained, and enjoined, with regard to the Claims set forth in this Article VIII.H (1)-(6) (collectively, the "Enjoined Claims") from ever:

        1.      commencing, asserting, continuing, filing, conducting, or bringing, directly, indirectly, or derivatively, any Claim, demand, suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum), against (a) any of the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors and their predecessors, affiliates, successors, principals, directors, officers, and related entities, and (b) the D&O Carriers with regard to any and all claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' or any of the Released Parties' conduct, individually or collectively, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

        2.      asserting, continuing, filing, conducting, or bringing, directly, indirectly, or derivatively, any Claim, demand, suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum), against any of the

Released Parties, or their respective property, including the proceeds of such property that would result in the avoidance of allegedly fraudulent (actual or constructive) or preferential transfers from the Debtors to any of the Released Parties, regardless of whether such Released Party is the initial or subsequent transferee, and/or recovery of such allegedly fraudulent (actual or constructive) or preferential transfers from such Released Party;

3. enforcing, levying, employing legal process (including proceedings supplementary), whether prejudgment or post-judgment, attaching, garnishing, sequestering, collecting, or otherwise recovering by any means or in any manner, any Claims against (a) the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors, and their predecessors, affiliates, successors, principals, directors, officers, and related entities; and (b) the D&O Carriers with regard to any and all Claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' conduct, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

4. pursuing, aiding, or abetting any action brought by any person or entity seeking recovery, contribution and/or indemnity from (a) any of the Released Parties, or their respective property, including the proceeds of such property, with regard to all matters arising out of or related to any involvement of any of the Released Parties whatsoever in transactions, acts, or events in any manner related to the Debtors and their predecessors, affiliates, successors, principals, directors, officers, and related entities, and (b) the D&O Carriers with regard to any and all Claims under the D&O Liability Insurance Policies, including but not limited to, matters relating to (i) the Settled Insured Claims; (ii) the Debtors' failure to perform under any agreement with any of the Enjoined Parties or failure to perform any obligation owed to any of the Enjoined Parties; (iii) the Debtors' breach of contract, breach of warranty or breach of any other obligation owed to any of the Enjoined Parties as a result of the same, or upon breach of any duty owed to any Enjoined Parties whether based upon a theory of law or equity; or (iv) the Debtors' or the Released Parties' conduct, individually or collectively, or any transaction or agreement by and among any of the Debtors' directors and officers, and any of the Released Parties;

5. enforcing any terms set forth in any settlement agreement by and among any of the Released Parties and any of the Enjoined Parties that would resolve, compromise, or settle Claims that would otherwise be enjoined by the bar order or the channeling injunction set forth in this section; and

6. pursuing any of the Enjoined Claims recited herein as they relate to any Claims against retained professionals including accountants and legal counsel as well as their agents and assigns of any of the Released Parties.

The injunction described in this section and incorporated into the Confirmation Order shall be referred to as the "Bar Order and Channeling Injunction."

The automatic stay shall be lifted, to the extent it may be applicable, to permit the D&O Carriers to contribute the D&O Proceeds.

The Bankruptcy Court shall expressly retain jurisdiction in enforcing, implementing and interpreting the scope of the Bar Order and Channeling Injunction.

*I.      Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*J.      Recoupment.*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*K.      Binding Effect.*

On the Effective Date, except as otherwise provided herein to the contrary, and effective as of the Effective Date, the Plan will bind, and will be deemed binding upon, all Holders of Claims against and Interests in the Debtors, and such Holder's respective successors and assigns, to the maximum extent permissible by law, notwithstanding whether or not such Holder (1) will receive any property or interest in property under the Plan, or (2) has filed a Proof of Claim or Interest in the Chapter 11 Cases, or (3) failed to vote to accept or reject the Plan or affirmatively voted to reject the Plan.

*L.      SEC Rights Reserved*

Nothing in the Plan or the Confirmation Order (i) releases any non-Debtor Entity from any claim or Cause of Action of the SEC; or (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any claims, Causes of Action, proceedings or investigations against any non-Debtor Entity in any forum.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

*A.      Conditions Precedent to Confirmation*

It shall be a condition to Confirmation that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.      the Bankruptcy Court shall have entered the Disclosure Statement Order and the Confirmation Order in a manner consistent in all material respects with the Plan; and

2.      the Confirmation Order shall, among other things:

(a)     decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(b)     authorize the Debtors and the Reorganized Debtors, as applicable, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(c)     authorize the Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable/necessary to:  (i) implement the Restructuring Transactions; (ii) authorize, issue, incur, and/or distribute the Exit RBL Facility, the New Common Stock, the exemption from registration provided by section 1145 of the Bankruptcy Code and in the case of any other securities pursuant to the exemption from registration provided by section 1145 of the Bankruptcy Code or another exemption from the registration requirements of the Securities Act or pursuant to one or more registration statements; (iii) make all distributions and issuances as required and as applicable under the Plan, including Cash, the New Common Stock, the Exit RBL Facility, and the Unsecured Claims Distribution Trust Assets; and (iv) enter into any agreements, transactions, and sales of property, as set forth in the Plan Supplement with respect to the Debtors or the Reorganized Debtors, as applicable, including the Exit RBL Facility Documents;

(d)     provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order in furtherance of, or in connection with, any transfers of property pursuant to the Plan, including any deeds, mortgages, security interest filings, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan shall not be subject to transfer or recording taxes or fees to the extent permissible under section 1146 of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment;

(e)     authorize and approve the settlement of the Settled Actions pursuant to the Secured Lender Settlement and the D&O Settlement;

(f)     contain the release, injunction, and exculpation provisions contained in Article VIII herein; and

(g)     grant the Unsecured Claims Distribution Trust immediate standing to assert the Contributed Challenge Actions (if applicable); and

(h)     grant the Unsecured Claims Plan Administrator the authority to assert the Retained Challenge Actions and Intercreditor Assignment.

**B.**     *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.      the Confirmation Order shall have become a Final Order;

2.      the Plan and the applicable documents included in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed and be in form and substance reasonably satisfactory to each of the Required Parties;

3.      the New Organizational Documents with respect to the Reorganized Debtors, the Exit RBL Facility Documents shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived) and subject to any post-closing execution and delivery requirements provided for in the Exit RBL Facility Documents and be in form and substance reasonably satisfactory to each of the Required Parties;

4.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the Restructuring Transactions;

5.      all Allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court and all fees and expenses payable pursuant to Article IV.R shall have been paid in full;

6.      the Unsecured Claims Distribution Loan shall have been issued, and the Unsecured Claims Plan Administrator and Unsecured Claims Distribution Trust Advisory Board shall have been appointed; and if there are any Unsecured Claims Distribution Trust Assets, the Unsecured Claims Distribution Trust shall have been formed and the Unsecured Claims Distribution Trust Assets shall have been transferred to the Unsecured Claims Distribution Trust;

7.      the Debtors shall have received the D&O Proceeds;

8.      any Cause of Action asserted, or that may be asserted, as a result of the transactions contemplated by the Plan by LSP, including, without limitation, those Causes of Action alleged pursuant to Adversary Proceeding No. 18-30155 (Gen IV Investment Opportunities, LLC et al v. Fairfax Financial Holdings Limited et al.) against the Settling Lenders shall have been dismissed with prejudice or otherwise resolved to the satisfaction of the Required Parties; and

9.      the payments required to be made pursuant to the terms of Article IV.S of the Plan shall have been paid.

10.     the payments required by the Enterprise Settlement Agreement to have been made by the Effective Date shall have been made.

C.      *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this IX may be waived by the prior written consent of the Required Parties without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided that* the condition set forth in paragraph B.9 may not be waived without the prior written consent of the applicable Supporting Lender and the condition set forth in paragraph B.10 may not be waived without the prior written consent of the Enterprise Entities (as defined in the Enterprise Settlement Agreement).

D.      *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

E.      *Effect of Failure of Conditions.*

If the Effective Date does not occur with respect to any of Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Subject to the limitations contained in the Plan, and on prior notice to and with the consent of each of the Required Parties, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors, with the consent of each of the Required Parties, reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount

certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the extent provided under applicable law, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount, or Allowance of Claims or Interests, including a Challenge Resolution Stipulation;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the Rejected Executory Contracts and Unexpired Lease List, or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

5.      adjudicate, decide, or resolve any and all matters related to the Causes of Action enumerated in the Schedule of Retained Causes of Action;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary to execute, implement, or consummate the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including injunctions or other actions as may be necessary to restrain interference by an Entity with Consummation or enforcement of the Plan;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.        adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions or the Plan;

10.       resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

11.       resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

12.       resolve any cases, controversies, suits, disputes, or Causes of Action relating to the distribution or the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.L.1 of the Plan;

13.       issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by or assess damages against any Entity with Consummation or enforcement of the Plan or the Restructuring Transactions;

14.       enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.       enter an order or decree concluding or closing the Chapter 11 Cases;

16.       adjudicate any and all disputes arising from or relating to distributions under the Plan or any of the transactions contemplated therein;

17.       consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.       determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.       hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including any request made under section 505 of the Bankruptcy Code for the expedited determination of any unpaid liability of a Debtor for any tax incurred during the administration of the Chapter 11 Cases, including any tax liability arising from or relating to the Restructuring Transactions, for tax periods ending after the Petition Date and through the closing of the Chapter 11 Cases;

20.       hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee benefit program, regardless of whether such termination occurred before or after the Effective Date;

21.       hear and determine all pre-Effective Date disputes involving the obligations or terms of the Exit RBL Facility;

22.　　　except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

23.　　　enforce all orders previously entered by the Bankruptcy Court and resolve any issues not enumerated above related to any matters adjudicated in the Chapter 11 Cases; and

24.　　　hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the foregoing, the Bankruptcy Court shall retain non-exclusive jurisdiction to adjudicate, decide, or resolve any and all matters related to Secured Claim Challenges.

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

A.　　*Immediate Binding Effect.*

Subject to Article I.B of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon, as applicable, the Debtors, the Reorganized Debtors, Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, and the Unsecured Claims Distribution Trust, and as applicable, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.　　*Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Reorganized Debtors, and the Unsecured Claims Distribution Trust, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.　　*Dissolution of the Committee.*

On the Effective Date, the Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases; *provided* that such official committee shall be deemed to remain in existence solely with respect to, and shall not be heard on any issue except, applications filed by the Professionals pursuant to sections 330 and 331 of the Bankruptcy Code.  From and after the Effective Date, none of, as applicable, the Debtors, the Reorganized Debtors, the Unsecured Claims Distribution Trust, the Unsecured Claims Litigation Trustee, or the Unsecured Claims Plan Administrator shall be responsible for paying any fees or expenses incurred after the Effective Date by the members of or advisors to the Committee, and neither the Debtors or the Reorganized Debtors shall be responsible for paying any fees or expenses incurred by the Unsecured Claims Litigation Trustee, the Unsecured Claims Plan Administrator, or advisors to the Unsecured Claims

Distribution Trust (without limiting the Debtors' obligation to transfer the Unsecured Claims Distribution Trust Funds to the Unsecured Claims Distribution Trust) on the Effective Date.

D.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, will be paid by each of the applicable Reorganized Debtors for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtors is converted, dismissed, or closed, whichever occurs first.  All such fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the applicable Reorganized Debtor shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until the earliest of the date on which the applicable Chapter 11 Case of the Reorganized Debtors is converted, dismissed, or closed.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor, Settling Lender, or any other Entity with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.      if to the Debtors, to:

EXCO Resources, Inc.
112377 Merit Drive, Suite 1700
Dallas, Texas 75251
Houston, Texas 77002
Attention:  Heather Summerfield
Email address:  hsummerfield@excoresources.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue

New York, New York 10022
Facsimile:  (212) 446-4900
Attention:  Christopher T. Greco
E-mail addresses:  christopher.greco@kirkland.com

–and–

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Facsimile:  (312) 862-2200
Attention:  Patrick J. Nash, Esq. and Alexandra Schwarzman, Esq.
E-mail addresses: patrick.nash@kirkland.com; alexandra.schwarzman@kirkland.com

2.     if to the Required Parties, to:

Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Attention:  Andrew K. Glenn and Shai Schmidt
E-mail addresses:  AGlenn@kasowitz.com; SSchmidt@kasowitz.com

Bracewell LLP
CityPlace I, 34th Floor
185 Asylum Street
Hartford, Connecticut 06103
Facsimile:  (860) 760-6814
Attention:  Kurt A. Mayr and David Lawton
E-mail address:  kurt.mayr@bracewell.com; david.lawton@bracewell.com

Brown Rudnick LLP
Seven Times Square
New York, NY 10036
Facsimile: (212) 209-4801
Attention:  Robert Stark and Kenneth Aulet
E-mail addresses: rstark@brownrudnick.com; kaulet@brownrudnick.com

Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Facsimile: (617) 289-0418
Attention:  Steven B. Levine
E-mail address:  slevine@brownrudnick.com

Jackson Walker LLP
1401 McKinney Street,
Suite 1900
Houston, Texas 77010
Facsimile: (713) 752-4221
Attention: Elizabeth Freeman
E-mail addresses: efreeman@jw.com

Quinn Emanuel Urquhart & Sullivan, LLP
711 Louisiana Street, Suite 500,
Houston, TX 77002
Facsimile:
Attention:  Patricia Tomasco
E-mail address: pattytomasco@quinnemanuel.com

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York
Attention:  Philip Dublin and Alexis Freeman
Email addresses:  pdublin@akingump.com, afreeman@akingump.com

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to Entities that request to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.    *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.    *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https:/dm.epiq11.com/ERI or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy.

K.    *Nonseverability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no

way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as applicable, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Reorganized Debtors' consent; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors shall have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

N.      *Closing of Chapter 11 Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of EXCO, and all contested matters and adversary proceedings relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of EXCO; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Chapter 11 Case of EXCO has been closed.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of EXCO in accordance with the Bankruptcy Code and the Bankruptcy Rules.

O.      *Creditor Default.*

On and after the Effective Date, any act or omission by a Holder of a Claim or an Interest in contravention of the provisions of the Plan shall be deemed an event of default under the Plan.  Upon an event of default the Reorganized Debtors may (and may grant to the Unsecured Claims Distribution Trust and Unsecured Claims Plan Administrator the authority other than, for the avoidance of doubt, with respect to the Released Parties, and pursuant to the discharge of their duties under the Plan, which grant shall not be unreasonably withheld, to) seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs in remedying such default.  Upon the finding of such a default by a creditor, the Bankruptcy Court may: (a) designate a party to appear, sign and/or accept

the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce the Plan by order of specific performance; (c) award judgment against such defaulting creditor in favor of the Reorganized Debtors (or, if applicable, the Unsecured Claims Distribution Trust or Unsecured Claims Plan Administrator) in an amount, including interest, to compensate the Reorganized Debtors (or, if applicable, the Unsecured Claims Distribution Trust or Unsecured Claims Plan Administrator) for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of the Plan.

[*Remainder of page intentionally left blank.*]

Dated: June 12, 2019

Respectfully submitted,

By: *Tyler S. Farquharson*

Name: Tyler S. Farquharson

Title: Chief Financial Officer and Treasurer of
EXCO Resources, Inc.

Prepared by:

KIRKLAND & ELLIS LLP
Christopher T. Greco (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022

–and–

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654

–and–

FOLEY GARDERE
Marcus A. Helt (TX 24052187)
Michael K. Riordan (TX 24070502)
1000 Louisiana St., Suite 2000
Houston, Texas 77002

*Co-Counsel to the Debtors and Debtors in Possession*